Robert V. Prongay (SBN 270796)
  rprongay@glancylaw.com
Charles Linehan (SBN 307439)
  clinehan@glancylaw.com
Pavithra Rajesh (SBN 323055)
  prajesh@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff Brian Donley*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN DONLEY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC., MICHAEL RAPINO, and JOE BERCHTOLD,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Brian Donley ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Live Nation Entertainment, Inc. ("Live Nation" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Live Nation; and (c) review of other publicly available information concerning Live Nation.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Live Nation securities between February 23, 2022 and July 28, 2023, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Live Nation is live entertainment company and concert and ticketing platform operating in 48 countries. Live Nations owns, operates, and has exclusive booking rights for a number of global venues and claims to be one of the world's leading artist managements companies. Through Ticketmaster, Live Nation provides ticket sales and resale services for concerts, sporting events, performing arts experiences, festivals, museums, and theaters.

3. Live Nation and Ticketmaster merged in January 2010 but were under a consent decree with the U.S. Department of Justice ("DOJ") to preserve competition in the live events market. In 2019, Live Nation faced federal scrutiny for pressuring concert venues to use Ticketmaster over other systems in five incidents, which would have violated the consent decree. To resolve these claims, the Company extended the consent decree to expire in December 2025 and added new provisions. Pursuant to the amended consent decree, Live Nation agreed to abide by a set of

rules, including not threatening to condition the provision of Live Nation concerts on a venue choosing Ticketmaster or retaliate in response to a venue choosing a ticketing service provider other than Ticketmaster. The Company is subject to an automatic penalty of $1 million for each violation.

4.      On November 18, 2022, *The New York Times* reported that the DOJ had opened an antitrust investigation into Ticketmaster and Live Nation after the ticketing platform's systems crashed during a highly-anticipated presale for Taylor Swift tickets. The ensuing chaos of disappointed "Swifties" highlighted Live Nation's power over the live music industry, exacerbating complaints that the Company has "constrained competition and harmed consumers."

5.      On this news, Live Nation's stock price fell $5.64, or 7.8%, to close at $66.21 per share on November 18, 2022, on unusually heavy trading volume.

6.      Then, on February 23, 2023 at 3:30 p.m. Eastern time, *NPR* reported that, following Congressional hearings, the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights wrote to the DOJ, presenting evidence that "Live Nation is harming America's music industry." The letter cited issues with Live Nation's pricing models and fees, increasingly long contracts with competitors, and retaliatory behavior against artists and venues that don't want to work with it. The senators "encourage[d]" the DOJ to take action if it found Live Nation had "walled itself off from competitive pressure at the expense of the industry and fans."

7.      On this news, Live Nation's stock price fell $7.71, or 10.1%, to close at $68.78 per share on February 24, 2023, on unusually heavy trading volume.

8.      Then, on July 28, 2023 at 3:13 p.m. Eastern time, *Politico* reported that the DOJ "could file an antitrust lawsuit against [Live Nation and Ticketmaster] by the end of the year, according to three people with knowledge of the matter." Politico further reported that the DOJ complaint is expected to allege that "the entertainment giant is abusing its power over the live music industry."

9.      On this news, Live Nation's stock price fell $7.60, or 7.8%, to close at $89.33 per share on July 28, 2023, on unusually heavy trading volume.

10.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Live Nation engaged in anticompetitive conduct, including charging high fees and extended contracts with talent, and retaliated against venues; (2) that, as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this

Judicial District. In addition, the Company's principal executive offices are located in this District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Plaintiff Brian Donley, as set forth in the accompanying certification, incorporated by reference herein, purchased Live Nation securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Live Nation is incorporated under the laws of Delaware with its principal executive offices located in Beverly Hills, California. Live Nation's common stock trades on the New York Stock Exchange under the symbol "LYV."

18.     Defendant Michael Rapino ("Rapino") was the Company's Chief Executive Officer ("CEO") at all relevant times.

19.     Defendant Joe Berchtold ("Berchtold") was the Company's Chief Financial Officer ("CFO") at all relevant times.

20.     Defendants Rapino and Berchtold (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been

disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21. Live Nation is live entertainment company and concert and ticketing platform operating in 48 countries. Live Nations owns, operates, and has exclusive booking rights for a number of global venues and claims to be one of the world's leading artist managements companies. Through Ticketmaster, Live Nation provides ticket sale and resale services for concerts, sporting events, performing arts experiences, festivals, museums, and theaters.

22. Live Nation and Ticketmaster merged in January 2010 but were under a consent decree with the U.S. Department of Justice ("DOJ") to preserve competition in the live events market. In 2019, Live Nation faced federal scrutiny for pressuring concert venues to use Ticketmaster over other systems in five incidents, which would have violated the consent decree. To resolve these claims, the Company extended the consent decree to expire in December 2025 and added new provisions. Pursuant to the amended consent decree, Live Nation agreed to abide by a set of rules, including not threatening to condition the provision of Live Nation concerts on a venue choosing Ticketmaster or retaliate in response to a venue choosing a ticketing service provider other than Ticketmaster. The Company is subject to an automatic penalty of $1 million for each violation.

**Materially False and Misleading**

**Statements Issued During the Class Period**

23.     The Class Period begins on February 23, 2022.[1] On that day, Live Nation filed its annual report on Form 10-K for the period ended December 31, 2021. Therein, the Company stated:

> ***In December 2019, we agreed with the United States Department of Justice to extend and clarify the court-imposed final judgment to which we became subject in connection with the merger of Live Nation, Inc. and Ticketmaster Entertainment LLC, which places certain restrictions and obligations on us which could negatively impact our business.***
>
> In connection with the merger of Live Nation, Inc. and Ticketmaster Entertainment LLC in 2010, we became subject, through July 2020, to a court-imposed final judgment (the "Final Judgment") that places certain restrictions and obligations on us in order to address the issues the United States Department of Justice (the "DOJ") raised in its antitrust review of the merger. Pursuant to the Final Judgment, we agreed to abide by certain behavioral remedies and to provide periodic reports to the DOJ about our compliance with the Final Judgment. The Final Judgment was due to expire in July 2020; in December 2019, we reached an agreement with the DOJ to clarify certain aspects of the Final Judgment and extend its duration through the end of 2025 (the "Amended Final Judgment").
>
> ***Under the Amended Final Judgment we may not (i) threaten to condition (or actually condition) the provision of Live Nation concerts on a venue choosing Ticketmaster, or (ii) retaliate (i.e., withhold any Live Nation concerts) in response to a venue choosing a ticketing services provider other than Ticketmaster.*** In addition, pursuant to the Amended Final Judgment, (i) an independent monitor has been appointed to monitor and report to the DOJ on our compliance with the Amended Final Judgment, and investigate any potential violations thereof, (ii) we appointed an internal antitrust compliance officer and have conducted (and will continue to annually conduct) internal trainings to ensure our employees fully comply with the Amended Final Judgment; (iii) we provided, and will continue to provide, notice to current or potential venue customers of the Amended Final Judgment and its restrictions on our business conduct; and (iv) we are subject to an automatic penalty of $1,000,000 for each violation. We agreed to pay costs and fees for the independent monitor and the DOJ's past investigation and enforcement.
>
> During the duration of the Amended Final Judgment, we are restricted from engaging in certain business activities that, absent the Final Judgment, would be lawful for us to undertake. Our inability to

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

undertake these business strategies could disadvantage us when we compete against firms that are not restricted by any such order. In addition, our business will be under continued and enhanced scrutiny by the DOJ, including by the independent monitor. ***Our compliance with the Amended Final Judgment therefore creates certain unquantifiable business risks for us***.

(First emphasis in original.)

24. On May 5, 2022, Live Nation filed its Form 10-Q for the quarterly period ended March 31, 2022. Therein, the Company stated that it faced class action lawsuits in Canada alleging that "Live Nation and/or Ticketmaster engage in conduct that is intended to encourage the resale of tickets on secondary ticket exchanges at elevated prices." The Company stated:

Based on information presently known to management, we do not believe that a loss is probable of occurring at this time, and we believe that the potential liability, if any, will not have a material adverse effect on our financial position, cash flows or results of operations. ***Further, we do not currently believe that the claims asserted in these lawsuits have merit, and considerable uncertainty exists regarding any monetary damages that will be asserted against us. We continue to vigorously defend these actions.***

25. In conjunction with the 10-Q, the Company issued a press release, which stated:

***The industry continues to embrace market-based pricing, particularly on the best tickets, shifting $500 million to artists for shows this year, resulting from a double-digit increase in ticket pricing***, and reducing the price arbitrage in the secondary market. At the same time, in the U.S., the average entry level price to get in and enjoy the show remains under $35, approachable for almost all fans.

26. On August 4, 2022, Live Nation filed its Form 10-Q for the quarter ended June 30, 2022, stating:

Our Ticketing segment revenue for the quarter grew by $331 million, from $244 million in the second quarter of 2021 to $575 million in the second quarter of 2022. Ticketing AOI for the quarter increased by $131 million, from $99 million in 2021 to $231 million in 2022. The improvement resulted from an increase in ticket sales, ***upward pricing momentum due to higher fan demand***, and higher ancillary revenue streams. Our fee-bearing ticket sales for the quarter were 72 million, 46 million higher than in the second quarter of last year. This was a record quarter for reported ticket sales, exceeding our last record set in the fourth quarter of 2018 by 9 million tickets or 15%. The increase was largely driven by sales in the United States, the United Kingdom, our mainland European markets, and the addition of OCESA. ***Our resale***

*business continued to excel*, with nearly a billion dollars in GTV for the second quarter of 2022, more than doubling resale GTV in the second quarter of 2019. It was our second highest resale quarter ever, powered by both Concerts and all the major sporting leagues. For the first six months of 2022, our Ticketing revenue grew by $783 million, from $272 million in 2021 to $1.1 billion in 2022. Ticketing AOI for the first six month increased by $400 million, from $37 million in 2021 to $437 million in 2022. Through the end of June, our fee-bearing ticket sales are 124 million tickets, 91 million ahead of 2021 and, notably, 20 million ahead of 2019 when all markets were fully open. Resale GTV through the end of June 2022 was over $1.8 billion which is 90% of our full-year resale GTV in 2019. Overall pricing on our fee-bearing tickets for the first half of the year is up more than 15% compared to 2019. *Consumer demand for premium seats and VIP experiences has continued, with our Ticketmaster dynamic price sales and GTV growing by 2.5 times the volume in 2019. Lastly, we have signed 13 million net new tickets so far this year, which gives us confidence that the Ticketmaster features and functionality will continue to fuel growth going forward.*

\*      \*      \*

*Ticketing revenue increased $331.3 million during the three months ended June 30, 2022 as compared to the same period of the prior year primarily due to an increase in North America primary and secondary ticket fees driven by more events on sale and upward pricing momentum due to higher fan demand in 2022* as compared to the resumption of concerts and sporting events starting late in the second quarter of 2021. Ticketing had incremental revenue of $26.1 million during three months ended June 30, 2022 due to acquisitions.

27.     On October 26, 2022, the Company issues a press release in support of President Biden's call for ticketing fee transparency, stating:

We applaud President Biden's advocacy for fee transparency in every industry, including live event ticketing. Live Nation Entertainment advocated for the all-in pricing mandate passed in New York earlier this year, which requires face-value prices and fees to be shown upfront – and we support the FTC mandating this nationally. We operate ticketing marketplaces in 30+ countries around the world and have seen all-in pricing adopted successfully in many countries when mandated across the board. This only works if all ticketing marketplaces go all-in together, so that consumers truly have accurate comparisons as they shop for tickets.

28.     Then, on November 3, 2022, Live Nation issued a press release reporting its financial results for the quarter ended September 30, 2022, stating the following:

As we have grown attendance, we have also continued driving greater market pricing for our concerts, and now expect to transfer over $550

million of additional payments to artists this year, continuing our efforts to help artists get the full value from their shows.

* * *

Finally on Ticketmaster, a point on some recent press regarding ticketing fees. **We will continue to advocate for fee transparency in live event ticketing.** We advocated for the all-in pricing mandate passed in New York earlier this year, which requires face-value prices and fees to be shown upfront – and we support the FTC mandating this nationally. We operate ticketing marketplaces in more than 30 countries around the world and have seen all-in pricing adopted successfully in many countries when mandated across the board. This only works if all ticketing marketplaces adopt together, so that consumers truly can accurately compare as they shop for tickets.

29.     The above statements identified in ¶¶ 23-28 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Live Nation engaged in anticompetitive conduct, including charging high fees and extended contracts with talent, and retaliated against venues; (2) that, as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

30.     The truth began to emerge on November 18, 2022, *The New York Times* reported that the DOJ had opened an antitrust investigation into Ticketmaster and Live Nation after the ticketing platform's systems crashed during a highly-anticipated presale for Taylor Swift tickets. The ensuing chaos of disappointed "Swifties" highlighted Live Nation's power over the live music industry, exacerbating complaints that the Company has "constrained competition and harmed consumers." The article reported that the DOJ has "in recent months contacted music venues and players in the ticket market, asking about Live Nation's practices and the wider dynamics of the industry," and that the "inquiry appears to be broad, looking at whether the company maintains a monopoly over the industry,

one of the people said." Furthermore, the article went into detail on the Taylor Swift ticket debacle, stating:

> The problems began Tuesday when Ticketmaster's Verified Fan system, which aims to weed out bots and professional scalpers from the process, began doling out access codes to fans who were interested in buying tickets to Ms. Swift's Eras tour, scheduled to start in March.

> According to a blog post by Ticketmaster, which was published on Thursday but deleted within hours, 3.5 million fans registered for the program. The company "invited" 1.5 million of those customers to the presale by sending them codes, and the remaining two million were placed on a waiting list.

> That day, Ticketmaster received 3.5 billion system requests, causing its app to crash for many users; some who were in the process of buying tickets with their codes were unable to complete their transactions. According to Ticketmaster, two million tickets were sold on Tuesday alone. Another presale, for Capital One cardholders, was held on Wednesday.

> **But Thursday afternoon, Ticketmaster canceled its plans for a public ticket sale on Friday, when it would typically sell any tickets remaining after presales. It was unclear how many tickets had already been sold for Ms. Swift's tour, and how many — if any — remained.**

> On Friday, in her first comments about the ticketing debacle, Ms. Swift posted a statement to social media saying she was looking into the situation to see how it could be improved. But she also expressed disappointment in Ticketmaster.

> "I'm not going to make excuses for anyone," Ms. Swift wrote, "because we asked them, multiple times, if they could handle this kind of demand, and we were assured that they could."

31.    On this news, Live Nation's stock price fell $5.64, or 7.8%, to close at $66.21 per share on November 18, 2022, on unusually heavy trading volume.

32.    On November 19, 2022, Live Nation issued a statement on the matter, stating as follows:

### A Statement From Live Nation Entertainment

> **As we have stated many times in the past, Live Nation takes its responsibilities under the antitrust laws seriously and does not engage in behaviors that could justify antitrust litigation, let alone orders that would require it to alter fundamental business practices.**

> The concert promotion business is highly competitive, with artist management in control of selecting their promoting team. The demand for live entertainment continues to grow, and there are more promoters

than ever working with artists to help them connect with fans through live shows. The Department of Justice itself recognized the competitive nature of the concert promotion business at the time of the Live Nation-Ticketmaster merger.  That dynamic has not changed.

Ticketmaster has a significant share of the primary ticketing services market because of the large gap that exists between the quality of the Ticketmaster system and the next best primary ticketing system. The market is increasingly competitive nonetheless, with rivals making aggressive offers to venues.   That Ticketmaster continues to be the leader in such an environment is a testament to the platform and those who operate it, not to any anticompetitive business practices. 5 years ago tickets were paper, now you scan in with your phone, and can transfer tickets to your friend with one tap. We innovate and invest in our technology more than any other ticketing company, and we will continue to do so.

Secondary ticketing is extremely competitive, with Ticketmaster competing with StubHub, SeatGeek, Vivid and many others.  ***No serious argument can be made that Ticketmaster has the kind of market position in secondary ticketing that supports antitrust claims.***

For the past 12 years Live Nation has operated under a Consent Decree that among other things seeks to prevent anticompetitive leveraging of Live Nation promoted content to advantage Ticketmaster.  Pursuant to the Amended Decree voluntarily entered in 2020, Live Nation's compliance is monitored by a former federal judge. ***There never has been and is not now any evidence of systemic violations of the Consent Decree.  It remains against Live Nation policy to threaten venues that they won't get Live Nation shows if they do not use Ticketmaster, and Live Nation does not re-route content as retaliation for a lost ticketing deal.***

Ticketmaster is also the most transparent and fan-friendly ticketing system in the United States. ***Ticketmaster does not set or control ticket prices, strongly advocates for all-in pricing so that fans are not surprised by what tickets really cost, and is the undisputed market leader in ticket security and fighting bots.  Ticketmaster also does not embrace deceptive and questionable secondary ticketing practices prevalent on rival sites such as speculative ticketing.***

We are proud of the work we do across both concerts and ticketing, and will continue working to improve and support the live events industry.

33.   The above statements identified in ¶ 32 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Live Nation engaged in anticompetitive conduct, including charging high fees and extended contracts with talent, and retaliated against venues; (2) that, as a result, Live Nation was reasonably likely to incur regulatory scrutiny

and face fines, penalties, and reputational harm; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

34.    The truth continued to emerge on February 23, 2023, when NPR reported that the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights called on the DOJ to continue examining the "anticompetitive conduct" of Live Nation and Ticketmaster, citing issues with Live Nation's pricing models and fees, increasingly long contracts with competitors, and alleged retaliatory behavior against artists and venues that do not want to work with it. In a letter to Assistant Attorney General for Antitrust, Jonathan Kanter, Senator Amy Klobuchar wrote:

> As you know, we have long been concerned about the state of competition in America's ticketing industry, especially with the power and reach of Live Nation and its wholly-owned subsidiary, Ticketmaster. We strongly believe that music and live events connect communities and bring people together. For too long, Live Nation and Ticketmaster have wielded monopoly power anticompetitively, harming fans and artists alike.

> We recently held a bipartisan hearing in the Senate Judiciary Committee at which the President of Live Nation testified under oath, as did other industry participants, including an artist, a secondary market ticketing company, a promoter, and industry experts. We write to share some of the evidence developed at that hearing and to encourage the Division to follow up on some remaining questions in this industry.

> **As an initial matter, other than Live Nation's executive, every witness at our hearing testified that Live Nation is harming America's music industry.** For example:

> - The Founder and CEO of Seat Geek testified that Ticketmaster now uses even longer exclusive agreements with venues, in some instances as long as ten years.

> - Clyde Lawrence, lead singer in the band Lawrence, testified that on a $30 ticket, Live Nation adds $12 in fees, and of that $42 price the customer pays, only $12 goes to the band before accounting for its cost of the tour.

> - A competing promoter, Jam Productions, testified that Live Nation attempts to lock up talent so competitors cannot produce

concert tours. He also noted that 87 percent of Billboard's Top 40 Tours in 2022 were ticketed by Ticketmaster in the U.S. and that Ticketmaster has exclusive ticketing contracts for more than 85 percent of the nation's NFL, NHL, and NBA teams. (While Live Nation contested the accuracy of this data, it failed to provide any alternative data.)

- A public policy expert at the James Madison Institute testified that Ticketmaster's market dominance allows it to harm consumers through charging service fees and demanding exclusivities. In particular, he noted that the service fees can be greater than 30 percent and "are tacked on at the very end of the process, on the very last screen before purchasing," raising questions about deceptive pricing strategies.

- A former DOJ lawyer testified that the conduct remedies in the 2010 consent decree from the Live Nation-Ticketmaster merger investigation have failed and that such failures constitute hard evidence of the firm's monopoly power. She also testified that "the company still has the power to silence market participants who fear its retaliation."

35.     Seemingly in response to the senators' letter, Live Nation issued a statement on February 23, 2023, stating:

If there's any chance of improving ticketing for fans and artists, we all need to focus on the facts. In the last few weeks alone, we've submitted more than 35 pages of information to provide greater context and transparency to policymakers on the realities of the industry. These include the fact that this industry is more competitive than ever: Ticketmaster has actually lost market share since the 2010 merger, not gained it; that venues set and keep most of the fees associated with tickets and are increasingly taking an ever-larger share; and Ticketmaster has for years been advocating for a federal all-in pricing requirement. *We believe that policymakers would benefit from asking more questions about the chaos caused by scalpers and the resale-first side of the industry. We remain committed to working with lawmakers on developing reforms that will benefit fans and artists including those outlined in a FAIR Ticketing Act.*

36.     On February 23, 2023, after the market closed, Live Nation filed its annual report on Form 10-K for the period ended December 31, 2022. Therein, the Company touted claims of the competitive nature of the live entertainment industry, seemingly refuting allegations of its monopoly on the industry, stating:

**Competition**

Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences. . . .

*     *     *

Some of our competitors in the live music industry have a stronger presence in certain markets, have access to other sports and entertainment venues and may have greater financial resources in those markets, which may enable them to gain a greater competitive advantage in relation to us.

***In markets where we own or operate a venue, we compete with other venues to serve artists likely to perform in that general region.*** Consequently, touring artists have various alternatives to our venues when scheduling tours. Our main competitors in venue management include ASM Global, Madison Square Garden Entertainment Corp., The Nederlander Organization and Bowery Presents, in addition to numerous smaller regional companies in North America, Europe, Australia and New Zealand. Some of our competitors in venue management may have more attractive or a greater number of venues in certain markets, and may have greater financial resources in those markets.

The ticketing services industry includes the sale of tickets primarily through online and mobile channels, but also through telephone and ticket outlets. The transition to online and mobile ticket purchases has made it easier for technology-based companies to offer primary ticketing services and standalone, automated ticketing systems that enable venues to perform their own ticketing services or utilize self-ticketing systems. In the online environment, we compete with other websites, online event sites and ticketing companies to provide event information, sell tickets and provide other online services such as fan clubs and artist websites.

We experience competition from other national, regional and local primary ticketing service providers to secure new venues and to reach fans for events. Resale, or secondary, ticketing services have created more aggressive buying of primary tickets whereby certain brokers are using automated internet "bot" technology to attempt to buy the best tickets when they go on sale, notwithstanding federal and state prohibitions. We actively develop and apply methods to mitigate the impact of these bots, however, the bot technology constantly evolves and changes. The internet allows fans and other ticket resellers to reach a vastly larger audience through the aggregation of inventory on resale websites and marketplaces, and provides consumers with more convenient access to tickets for a larger number and greater variety of events.

We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that we understand have recently entered or could enter these markets.

Our main competitors at the local market level for sponsorships and advertising dollars include local sports teams, which often offer state-of-the-art venues, strong brand association and attractive local media packages, as well as festivals, theme parks and other local events. On the national level, our competitors include the major sports leagues that sell sponsorships combined with significant national media packages.

37.     Additionally, in the 2022 10-K, Live Nation addressed the Taylor Swift incident, shifting responsibility onto hackers and "bots", stating:

Although we have developed systems and processes that are designed to protect customer and employee information and to prevent security breaches or incidents (which could result in data loss or other harm or loss), such measures cannot provide absolute security or certainty. It is possible that advances in computer and hacker capabilities, new variants of malware, the development of new penetration methods and tools, inadvertent violations of company policies or procedures or other developments could result in a compromise of customer or employee information or a breach of the technology and security processes that are used to protect customer and employee information. The techniques used to obtain unauthorized access, automate or expedite transactions or other activities on our platform (e.g., "bots"), disable or degrade service or sabotage systems (or otherwise bring about one or more of these effects) may change frequently and as a result, may be difficult for our business to detect for long periods of time and may impact the efficacy of our defenses and/or the products and services we provide. In addition, despite our best efforts, we may be unaware of or unable to anticipate these techniques or implement adequate preventative measures. ***For instance, in November 2022, significant bot activity in connection with a large ticket onsale significantly contributed to a degraded website experience for customers and our eventually needing to pause the on-sale to address these issues.*** We have expended significant capital and other resources to protect against and remedy such potential security breaches, incidents and their consequences, including the establishment of a dedicated cybersecurity organization within our larger technology environment, and will continue to do so in the future.

38.     On this news, Live Nation's stock price fell $7.71, or 10.1%, to close at $68.78 per share on February 24, 2023, on unusually heavy trading volume. As observed by an article by *Barron's* published on February 24, 2023 entitled "Live Nation's Stock Is Paying for the Taylor Swift Ticket Mess":

Live Nation Entertainment gave investors an upbeat earnings report and outlook but the stock on Friday was on track for its worst day in nearly a year. ***Worries about regulatory scrutiny and margins may be weighing on shares of the Ticketmaster parent.***

39.     On July 27, 2023, Live Nation submitted its 10-Q for quarter ended June 30, 2023. Therein, the Company stated:

We are optimistic about the long-term potential of our Company and are focused on the key elements of our business model: expanding our concerts platform with more shows and fans in both existing and new markets as well as improving the on-site experience for our fans by enhancing food and beverage products and premium service offerings. We will drive conversion of ticket sales through development of innovative products that support selling tickets to fans. ***Our ticket marketplaces have reduced friction in the ticket purchase experience and created additional revenue opportunities.*** In addition, we continue to grow our sponsorship and advertising partnerships and our clients are able to reach their customers via the powerful connection that live shows creates with ardent fans.

***Serving artists remains at the center of our strategy and we work with them to continue improving the fan experience.*** We joined with more than 20 of the industry's top artist coalitions, management groups, music labels, and agencies to propose the FAIR Ticketing Act which focuses on reforms that will protect fans, artists, and venues. As part of this, we joined with President Biden to champion all-in pricing at the venues we operate and pushed for increased transparency to consumers, outlawing speculative tickets, greater enforcement of the BOTS Act and elimination of other deceptive practices. We believe these are positive first steps to a broader reform that is needed in the industry.

40.    The above statements identified in ¶¶ 35-37, 39 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Live Nation engaged in anticompetitive conduct, including charging high fees and extended contracts with talent, and retaliated against venues; (2) that, as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm; and (2) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **Disclosures at the End of the Class Period**

41.    On July 28, 2023 at 3:13 p.m. Eastern time, *Politico* reported that the DOJ "could file an antitrust lawsuit against [Live Nation and Ticketmaster] by the end of the year, according to three people with knowledge of the matter." Politico further reported that the DOJ complaint is expected to allege that "the entertainment giant is abusing its power over the live music industry."

42.     On this news, Live Nation's stock price fell $7.60, or 7.8%, to close at $89.33 per share on July 28, 2023, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Live Nation securities between February 23, 2022 and July 28, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Live Nation's shares actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Live Nation shares were traded publicly during the Class Period on the New York Stock Exchange. Record owners and other members of the Class may be identified from records maintained by Live Nation or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Live Nation; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

49.     The market for Live Nation's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Live Nation's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Live Nation's securities relying upon the integrity of the market price of the Company's securities and market information relating to Live Nation, and have been damaged thereby.

50.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Live Nation's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or

misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Live Nation's business, operations, and prospects as alleged herein.

51.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Live Nation's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

52.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

53.    During the Class Period, Plaintiff and the Class purchased Live Nation's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

54.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name

of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Live Nation, their control over, and/or receipt and/or modification of Live Nation's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Live Nation, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

55.    The market for Live Nation's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Live Nation's securities traded at artificially inflated prices during the Class Period.  On February 25, 2022, the Company's share price closed at a Class Period high of $126.04 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Live Nation's securities and market information relating to Live Nation, and have been damaged thereby.

56.    During the Class Period, the artificial inflation of Live Nation's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Live Nation's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Live Nation and its business, operations, and prospects, thus causing the price of the Company's

securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

57.   At all relevant times, the market for Live Nation's securities was an efficient market for the following reasons, among others:

(a)   Live Nation shares met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)   As a regulated issuer, Live Nation filed periodic public reports with the SEC and/or the New York Stock Exchange;

(c)   Live Nation regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Live Nation was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

58.   As a result of the foregoing, the market for Live Nation's securities promptly digested current information regarding Live Nation from all publicly available sources and reflected such information in Live Nation's share price. Under these circumstances, all purchasers of Live Nation's securities during the Class Period suffered similar injury through their purchase of Live Nation's securities at artificially inflated prices and a presumption of reliance applies.

59.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Live Nation who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

61.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Live Nation's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

63.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Live Nation's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Live Nation's financial well-being and prospects, as specified herein.

65.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts,

practices, and a course of conduct as alleged herein in an effort to assure investors of Live Nation's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Live Nation and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

66.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

67.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of

concealing Live Nation's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Live Nation's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Live Nation's securities during the Class Period at artificially high prices and were damaged thereby.

69.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Live Nation was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Live Nation securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

70.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

72.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

73.    Individual Defendants acted as controlling persons of Live Nation within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the

power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.   As set forth above, Live Nation and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

1  DATED:  August 4, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GLANCY PRONGAY & MURRAY LLP**

By:   */s/ Pavithra Rajesh*
_____
Robert V. Prongay
Charles Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Brian Donley*

**SWORN CERTIFICATION OF PLAINTIFF**

**LIVE NATION ENTERTAINMENT, INC. SECURITIES LITIGATION**

I, Brian Donley, certify that:

1.  I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase the Live Nation Entertainment, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Live Nation Entertainment, Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

8/2/2023

_____
Date

*Brian Donley*

_____
Brian Donley

**Brian Donley's Transactions in Live Nation Entertainment, Inc. (LYV)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 7/25/2023 | Bought | 5 | $97.2500 |