# Exhibit 2

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

_____

**Form 10-K**

☐   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021,**
**or**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**
**Commission File Number 001-32601**

_____

# LIVE NATION ENTERTAINMENT, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **20-3247759** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

**9348 Civic Center Drive**
**Beverly Hills, CA 90210**
(Address of principal executive offices, including zip code)
**(310) 867-7000**
(Registrant's telephone number, including area code)

_____

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on which Registered |
|---|---|---|
| Common Stock, $.01 Par Value per Share | LYV | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   ☒ Yes   ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   ☐ Yes   ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   ☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large Accelerated Filer | ☒ | Accelerated Filer | | ☐ |
| Non-accelerated Filer | ☐ | Smaller Reporting Company | | ☐ |
| | | Emerging Growth Company | | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   ☐ Yes   ☒ No

On June 30, 2021, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the Common Stock beneficially held by non-affiliates of the registrant was approximately $   12.7 billion. (For purposes hereof, directors, executive officers and 10% or greater stockholders have been deemed affiliates).

On February 16, 2022, there were  224,625,821 outstanding shares of the registrant's common stock, $0.01 par value per share, including 3,021,605 shares of unvested restricted and deferred stock awards and excluding 408,024 shares held in treasury.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of our Definitive Proxy Statement for the 2022 Annual Meeting of Stockholders, expected to be filed within 120 days of our fiscal year end, are incorporated by reference into Part III.

**LIVE NATION ENTERTAINMENT, INC.**

**INDEX TO FORM 10-K**

| | | Page |
|---|---|---|
| **PART I** | | |
| ITEM 1. | BUSINESS | 2 |
| ITEM 1A. | RISK FACTORS | 14 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 28 |
| ITEM 2. | PROPERTIES | 29 |
| ITEM 3. | LEGAL PROCEEDINGS | 29 |
| **PART II** | | |
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 30 |
| ITEM 6. | SELECTED FINANCIAL DATA | 30 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 31 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 52 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 53 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 105 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 105 |
| ITEM 9B. | OTHER INFORMATION | 107 |
| ITEM 9C. | DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS | 107 |
| **PART III** | | |
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 107 |
| ITEM 11. | EXECUTIVE COMPENSATION | 107 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 107 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 107 |
| ITEM 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 107 |
| **PART IV** | | |
| ITEM 15. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 108 |
| ITEM 16. | FORM 10-K SUMMARY | 116 |

Exhibit 2, page 011

**LIVE NATION ENTERTAINMENT, INC.**

**GLOSSARY OF KEY TERMS**

| | |
|---|---|
| AOCI | Accumulated other comprehensive income (loss) |
| AOI | Adjusted operating income (loss) |
| Company | Live Nation Entertainment, Inc. and subsidiaries |
| FASB | Financial Accounting Standards Board |
| GAAP | United States Generally Accepted Accounting Principles |
| Liberty Media | Liberty Media Corporation |
| Live Nation | Live Nation Entertainment, Inc. and subsidiaries |
| LNE | Live Nation Entertainment, Inc. |
| OCESA | OCESA Entretenimiento, S.A. de C.V. and certain other related subsidiaries of Corporación Interamericana de Entretenimiento, S.A.B. de C.V. |
| SEC | United States Securities and Exchange Commission |
| VIE | Variable interest entity |
| Ticketmaster | The ticketing business of the Company |

1

Exhibit 2, page 012

**PART I**

*"Live Nation"* (which may be referred to as the *"Company," "we," "us" or "our"*) means Live Nation Entertainment, Inc. and its subsidiaries, or one of our segments or subsidiaries, as the context requires.

**Special Note About Forward-Looking Statements**

Certain statements contained in this Form 10-K (or otherwise made by us or on our behalf from time to time in other reports, filings with the SEC, news releases, conferences, internet postings or otherwise) that are not statements of historical fact constitute "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Exchange Act of 1934, as amended, notwithstanding that such statements are not specifically identified. Forward-looking statements include, but are not limited to, statements about our financial position, business strategy, competitive position, potential growth opportunities, potential operating performance improvements, the effects of competition, the effects of future legislation or regulations and plans and objectives of our management for future operations. We have based our forward-looking statements on our beliefs and assumptions considering the information available to us at the time the statements are made. Use of the words "may," "should," "continue," "plan," "potential," "anticipate," "believe," "estimate," "expect," "intend," "outlook," "could," "target," "project," "seek," "predict," or variations of such words and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements.

Forward-looking statements are not guarantees of future performance and are subject to risks and uncertainties that could cause actual results to differ materially from those in such statements. Factors that could cause actual results to differ from those discussed in the forward-looking statements include, but are not limited to, those set forth under Item 1A.—Risk Factors as well as other factors described herein or in our quarterly and other reports we file with the SEC (collectively, "cautionary statements"). Based upon changing conditions, should any risk or uncertainty that has already materialized, such as, for example, the risks and uncertainties posed by the global COVID-19 pandemic, worsen in scope, impact or duration, or should one or more of the currently unrealized risks or uncertainties materialize, or should any underlying assumptions prove incorrect, actual results may vary materially from those described in any forward-looking statements. All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the applicable cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date on which they are made. We do not intend to update these forward-looking statements, except as required by applicable law.

**ITEM 1.   BUSINESS**

The unprecedented and rapid spread of COVID-19 and the related government restrictions and social distancing measures implemented throughout the world significantly impacted our business through the first half of this year. Late in the second quarter, however, we began to see the positive impacts of successful vaccination rollouts in many of our key markets, mainly the United States and United Kingdom, with social distancing restrictions easing and live events resuming. In the third quarter, we saw a meaningful restart of our operations with outdoor amphitheater events and festivals taking place in both the United States and United Kingdom. The discussion below is based on operational metrics for 2021. Refer to Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Operating Metrics for 2019 operational metrics which are more representative of the size of our business.

**Our Company**

We believe that we are the largest live entertainment company in the world, connecting over 310 million fans across all of our concerts and ticketing platforms in 45 countries in 2021 and over 580 million fans in 2019 prior to the global COVID-19 pandemic.

We believe we are the largest producer of live music concerts in the world, based on total fans that attend Live Nation events as compared to events of other promoters, connecting over 35 million fans to more than 17,200 events for over 4,400 artists in 2021. We connected nearly 98 million fans to more than 40,000 events for over 5,000 artists in 2019 prior to the global COVID-19 pandemic. Live Nation owns, operates, has exclusive booking rights for or has an equity interest in 320 venues, including *House of Blues*® music venues and prestigious locations such as *The Fillmore*® in San Francisco, *Brooklyn Bowl*®, the Hollywood Palladium, the Ziggo Dome in Amsterdam, 3Arena in Ireland, Royal Arena in Copenhagen and Spark Arena in New Zealand. We believe we are one of the world's leading artist management companies based on the number of artists represented. Our artist management companies manage music artists and acts across all music genres. As of December 31, 2021, we had 100 managers providing services to more than 450 artists.

Exhibit 2, page 013

We believe we are the world's leading live entertainment ticketing sales and marketing company, based on the number of tickets we sell. Ticketmaster provides ticket sales, ticket resale services and marketing and distribution globally through *www.ticketmaster.com* and *www.livenation.com* and our other websites, mobile apps, numerous retail outlets and call centers, selling over 282 million tickets through our systems in 2021. Ticketmaster serves nearly 7,100 clients worldwide across multiple event categories, providing ticketing services for leading arenas, stadiums, festival and concert promoters, professional sports franchises and leagues, college sports teams, performing arts venues, museums and theaters. Prior to the global COVID-19 pandemic, we sold over 485 million tickets through our systems and served nearly 11,500 clients worldwide in 2019.

We believe our global footprint is one of the world's largest music advertising network for corporate brands and includes one of the world's leading ecommerce websites, based on a comparison of gross sales of top internet retailers prior to the global COVID-19 pandemic.

Our principal executive offices are located at 9348 Civic Center Drive, Beverly Hills, California 90210 (telephone: 310-867-7000). Our principal website is *www.livenationentertainment.com*. Live Nation is listed on the New York Stock Exchange, trading under the symbol "LYV."

### Our Strategy

Our strategy is to grow our global leadership position in live entertainment, promote more shows, sell more tickets and partner with more sponsors, thereby increasing our revenue, earnings and cash flow. We serve artists, venues and sports teams and leagues to secure content and tickets; we invest in technology to build innovative products which advance our ticketing, digital presence, including mobile platforms, and advertising; and we are paid by advertisers that want to connect their brands with our passionate fan base.

Our core businesses surrounding the promotion of live events include ticketing and sponsorship and advertising. We believe our focus on growing these businesses will increase shareholder value as we continue to enhance our revenue streams and achieve economies of scale with our global platforms. We also continue to strengthen our core operations, further expanding into global markets and optimizing our cost structure. Our strategy is to grow and innovate through the initiatives listed below.

- *Expand our Concert Platform.* We will deliver more shows, grow our fan base and increase our ticket sales by continuing to build our portfolio of concerts globally, expanding our business into additional top global music markets, and further building our presence in existing markets. Through our strong partnership with artists, agents and managers, we believe we can continue to expand our concert base by delivering strong and consistent services. In December 2021 we acquired OCESA, one of the most prominent live event businesses globally with a robust business portfolio in ticketing, sponsorship, food and beverage, merchandise, and venue operations across Mexico and Latin America.

- *Grow our Revenue per Show.* We will grow our revenue per show across our venues through more effective ticket pricing, broader ticketing distribution and more targeted promotional marketing. We will also grow our onsite fan monetization by improving ease of purchase including contactless payment and rollout of digital technology, through improved onsite products, merchandising, and enhanced experiences for our fans.

- *Sell More Tickets and Invest in Product Improvements.* We are focused on selling tickets through a wide set of sales channels, including mobile and online, and leveraging our fan database. We will continue to enhance our application programming interface features to reach a broader audience and expand our digital ticketing rollout, strengthening control over distribution for our clients and creating new and unique marketing opportunities. We will grow the volume of secondary tickets sold through a trusted environment for fan ticket exchanges, allowing our fans to have a dependable, secure destination for secondary ticket acquisition for all events. We will continue to invest in our ticketing platforms and develop innovative products to build fan traffic to our sales channels, drive increased ticket sales, and continue to build our client base.

- *Grow Sponsorship and Advertising Partnerships.* We will continue to drive growth in our sponsorship relationships and capture a larger share of the global music sponsorship market by further monetizing our fan base and portfolio of brands. We will focus on expanding existing partnerships and developing new corporate sponsor partners to provide them with targeted strategic programs, accessing the fans attending our shows each year. We will continue to develop and to scale new products in order to drive onsite and digital revenue.

### Our Strengths

We believe we have unique resources that are unmatched in the live entertainment industry.

Exhibit 2, page 014

- *Fans*. We connected over 310 million fans to their favorite live event in 2021 and over 580 million fans in 2019 prior to the global COVID-19 pandemic. Our database of fans and their interests provides us with the means to efficiently market our shows to them.

- *Artists*. We have extensive relationships with artists ranging from those just beginning their careers to established superstars. We promoted shows or tours for over 4,400 artists globally in 2021 and over 5,000 artists in 2019 prior to the global COVID-19 pandemic. In addition, through our artist management companies, we managed more than 450 artists in 2021 and more than 500 artists in 2019.

- *Digital Platforms and Ticketing.* We own and operate various branded websites, both in the United States and abroad, which are customized to reflect services offered in each jurisdiction. Our primary commercial websites, *www.livenation.com* and *www.ticketmaster.com*, together with our other branded ticketing websites, are designed to promote ticket sales for live events. We also have both Live Nation and Ticketmaster mobile apps that our fans can use to access event information and buy tickets.

- *Distribution Network*. We believe that our global distribution network of promoters, venues and festivals provides us with a strong position in the live concert industry. We believe we have one of the largest global networks of live entertainment businesses in the world, with offices in 43 countries worldwide. In addition, we own, operate, have exclusive booking rights for, or have an equity interest in, 320 venues located across 45 countries as of the end of 2021, making us, we believe, the second largest operator of music venues in the world. We also believe that we are one of the largest music festival producers in the world with 56 festivals globally in 2021 and 111 festivals globally in 2019 prior to the global COVID-19 pandemic. In addition, we believe that our global ticketing distribution network—which includes one of the largest ecommerce sites and related apps along with nearly 7,100 clients worldwide in 2021 and nearly 11,500 clients in 2019 — makes us the largest ticketing network in the world.

- *Sponsors*. We monetize our physical and digital assets through long-term sponsorship agreements and advertising. We employ a sales force of approximately 500 people that works with approximately 560 sponsors and nearly 1,200 in 2019 prior to the global COVID-19 pandemic, through a combination of strategic partnerships, local venue-related deals, national agreements and digital campaigns, both in North America and internationally. Our sponsors include some of the most well-recognized national and global brands across diverse sectors including consumer, financials and leisure including Citibank, O$_2$, American Express, Cisco, Hilton, Red Bull and Anheuser Busch (each of these brands is a registered trademark of the sponsor).

**Our Industry**

We operate in the following main industries within the live entertainment business: live music events, music venue operations, the provision of management and other services to artists and athletes, ticketing services and sponsorship and advertising sales.

The live music industry includes concert promotion and/or production of music events or tours. Typically, to initiate live music events or tours, booking agents contract with artists to represent them for defined periods. Booking agents then work with promoters, who will contract with them or with artists directly, to arrange events. Promoters earn revenue primarily from the sale of tickets. Artists are paid by the promoter under one of several different formulas, which may include fixed guarantees and/or a percentage of ticket sales or event profits. In addition, promoters may also reimburse artists for certain costs of production, such as sound and lights. Under guaranteed payment formulas, promoters assume the risks of unprofitable events. Promoters may renegotiate lower guarantees or cancel events because of insufficient ticket sales in order to reduce their losses. Promoters can also reduce the risk of losses by entering into global or national touring agreements with artists and including the right to offset lower performing shows against higher performing shows on the tour in the determination of overall artist fees. Artist managers primarily provide services to music artists to manage their careers. The artist manager negotiates on behalf of the artist and is paid a fee, generally as a percentage of the artist's earnings.

For music tours, four to eight months typically elapse between initially booking artists and the first performances. Artists, in conjunction with promoters, managers and booking agents, set ticket prices and advertising plans. Promoters market events, sell tickets, rent or otherwise provide venues and arrange for local production services, such as stages and equipment.

Venue operators typically contract with promoters to have their venues rented for specific events on specific dates and receive fixed fees or percentages of ticket sales as rental income. In addition, venue operators provide services such as concessions, parking, security, ushering and ticket scanning at the gate, and receive some or all of the revenue from concessions, merchandise, parking and premium seating.

Exhibit 2, page 015

Ticketing services generally refers to the sale of tickets primarily through online and mobile channels, but also include sales through phone, outlet and box office channels. Ticketing companies will contract with venues and/or promoters to sell tickets to events over a period of time, generally three to five years. The ticketing company generally gets paid a fixed fee per ticket sold or a percentage of the total ticket service charges. The ticketing company receives the cash for the ticket sales and related service charges at the time the ticket is sold and periodically remits these receipts to the venue and/or promoter after deducting its fee. Venues will often also sell tickets through a local box office at the venue using the ticketing company's technology. The ticketing company will generally not earn a fee on these box office tickets.

Ticketing resale services generally refers to the sale of tickets by a holder who originally obtained the tickets from a venue or other entity, or a ticketing services provider selling on behalf of a venue or other entity. Resale tickets are also referred to as secondary tickets. Generally, the ticket resale company is paid a service charge when the ticket is resold and the negotiated ticket value is paid to the holder.

The sponsorship and advertising industry within the live entertainment business involves the sale of international, national, regional and local advertising and promotional programs to a variety of companies to advertise or promote their brand, product or service. These sponsorships typically include venue naming rights, onsite venue signage, online advertisements and exclusive partner rights in various categories such as credit card, beverage, travel and telecommunications, and may include event pre-sales and onsite product activation.

**Our Business**

Our reportable segments are Concerts, Ticketing and Sponsorship & Advertising.

*Concerts*. Our Concerts segment principally involves the global promotion of live music events in our owned or operated venues and in rented third-party venues, the operation and management of music venues, the production of music festivals across the world, the creation of associated content and the provision of management and other services to artists. Including intersegment revenue, our Concerts business generated $4.7 billion, or 75.3%, of our total revenue during 2021. We promoted more than 17,200 live music and other events in 2021. While our Concerts segment traditionally operates year-round, we experience higher revenue during the second and third quarters due to the seasonal nature of shows at our outdoor amphitheaters and festivals, which primarily occur from May through October.

As a promoter, we earn revenue primarily from the sale of tickets and pay artists under one of several formulas, including a fixed guaranteed amount and/or a percentage of ticket sales or event profits. For each event we promote, we either use a venue we own or operate, or rent a third-party venue. Revenue is generally impacted by the number of events, volume of ticket sales and ticket prices. Event costs such as artist fees and production expenses are included in direct operating expenses and are typically substantial in relation to the revenue. As a result, significant increases or decreases in promotion revenue do not typically result in comparable changes to operating income.

As a venue operator, we generate revenue primarily from the sale of concessions, parking, premium seating, rental income and ticket rebates or service charges earned on tickets sold through our internal ticketing operations or by third parties under ticketing agreements. In our amphitheaters, the sale of concessions is outsourced and we receive a share of the net revenue from the concessionaire, which is recorded in revenue with limited associated direct operating expenses. Revenue generated from venue operations typically has a higher margin than promotion revenue and therefore typically has a more direct relationship to changes in operating income.

As a festival promoter, we typically book artists, secure festival sites, provide for third-party production services, sell tickets and advertise events to attract fans. We also provide or arrange for third parties to provide operational services as needed such as concessions, merchandising and security. We earn revenue from the sale of tickets and typically pay artists a fixed guaranteed amount. We also earn revenue from the sale of concessions, camping fees and service charges earned on tickets sold. For each event, we either use a festival site we own or rent a third-party festival site. Revenue is generally impacted by the number of events, volume of ticket sales and ticket prices. Event costs such as artist fees and production expenses are included in direct operating expenses and are typically substantial in relation to the revenue. Since the artist fees are typically fixed guarantees for these events, significant increases or decreases in festival promotion revenue will generally result in comparable changes to operating income.

5

Exhibit 2, page 016

*Ticketing*. Our Ticketing segment is primarily an agency business that sells tickets for events on behalf of its clients and retains a portion of the service charge as its fee. We sell tickets for our events and also for third-party clients across multiple live event categories, providing ticketing services for leading arenas, stadiums, amphitheaters, music clubs, concert promoters, professional sports franchises and leagues, college sports teams, performing arts venues, museums and theaters. We sell tickets through websites, mobile apps and ticket outlets. During 2021, we sold 35%, 63% and 2% of primary tickets through these channels, respectively. Our Ticketing segment also manages our online activities including enhancements to our websites and product offerings. Including intersegment revenue, our Ticketing business generated $1.1 billion, or 18.1%, of our total revenue during 2021, which excludes the face value of tickets sold and is net of the fees paid to our ticketing clients. Through all of our ticketing services, we sold 132 million tickets in 2021 on which we were paid fees for our services. In addition, approximately 151 million tickets were sold using our Ticketmaster systems, including through season seat packages, our venue clients' box offices, and other channels through which we did not receive a fee. Our ticketing sales are impacted by fluctuations in the availability of events for sale to the public, which may vary depending upon event scheduling by our clients. As ticket sales increase, related ticketing operating income generally increases as well.

We sell tickets on behalf of our clients through our ticketing platforms across the world. We generally enter into written agreements with individual clients to provide primary ticketing services for specified multi-year periods, typically ranging from three to five years. Pursuant to these agreements, clients generally determine and then tell us what tickets will be available for sale, when such tickets will go on sale to the public and what the ticket price will be, sometimes with our guidance and recommendations. Agreements with venue clients in North America and Australia generally grant us exclusive rights to sell tickets for all events presented at the relevant venue for which tickets are made available to the general public. Agreements with promoter clients in other international markets generally grant us the right to an allocation of tickets for events presented by a given promoter at any venue, unless that venue is already covered by an existing exclusive agreement with our ticketing business or another ticketing service provider. Similarly, in such international markets we have venue agreements which provide Ticketmaster an allocation of tickets for all events at those venues. While we generally have the right to sell a substantial portion of our clients' tickets, venue and promoter clients often sell and distribute a portion of their tickets in-house through their box office and season ticket programs. In addition, under many written agreements between promoters and our clients, and generally subject to Ticketmaster approval, the client may allocate certain tickets for artist, promoter, agent and venue use and do not make those tickets available for sale by us. Due to these and other permitted third-party ticket distribution channels, we do not always sell all of our clients' tickets, even at venues where we are the exclusive primary ticketing service provider, and the amount of tickets that we sell varies from client to client and from event to event, and also varies as to any given client from year to year.

We currently offer ticket resale services, sometimes referred to as secondary ticketing, principally through our integrated inventory platform, league/team platforms and other platforms internationally. We enter into arrangements with the holders of tickets previously distributed by a venue or other source to post those tickets for sale at a purchase price equal to a new sales price, determined by the ticket holder, plus a service fee to the buyer. The seller in this circumstance receives the new sales price less a seller service fee.

*Sponsorship & Advertising*. Our Sponsorship & Advertising segment employs a sales force that creates and maintains relationships with sponsors through a combination of strategic, international, national and local opportunities that allow businesses to reach customers through our concert, festival, venue and ticketing assets, including advertising on our websites. We work with our corporate clients to help create marketing programs that support their business goals and connect their brands directly with fans and artists. We also develop, book and produce custom events or programs for our clients' specific brands, which are typically presented exclusively to the clients' consumers. These custom events can involve live music events with talent and media, using both online and traditional outlets. Including intersegment revenue, our Sponsorship & Advertising business generated $411.9 million, or 6.6%, of our total revenue during 2021. We typically experience higher revenue in the second and third quarters as a large portion of sponsorships are usually associated with our outdoor venues and festivals, which are primarily used in or occur from May through October.

We believe that we have a unique opportunity to connect the music fan to corporate sponsors and therefore seek to optimize this relationship through strategic sponsorship programs. We continue to also pursue the sale of national and local sponsorships, both domestically and internationally, and placement of advertising, including signage, online advertising and promotional programs. Many of our venues have naming rights sponsorship programs. We believe national and international sponsorships allow us to maximize our network of venues and festivals and to arrange multi-venue or multi-festival branding opportunities for advertisers. Our local and venue-focused sponsorships include venue signage, promotional programs, onsite activation, hospitality and tickets, and are derived from a variety of client companies across various industry categories.

6

Exhibit 2, page 017

**Live Nation Venue Details**

In the live entertainment industry, venue types generally consist of:

- *Stadiums*—Stadiums are multi-purpose facilities, often housing local sports teams. Stadiums typically have 30,000 or more seats. Although they are the largest venues available for live music, they are not specifically designed for live music.

- *Amphitheaters*—Amphitheaters are generally outdoor venues with between 5,000 and 30,000 seats that are used primarily in the summer season. We believe they are popular because they are designed specifically for concert events, with premium seat packages and better lines of sight and acoustics.

- *Arenas*—Arenas are indoor venues that are used as multi-purpose facilities, often housing local sports teams. Arenas typically have between 5,000 and 20,000 seats. Because they are indoors, they are able to offer amenities that other similar-sized outdoor venues cannot, such as luxury suites and premium club memberships. As a result, we believe they are popular for higher-priced concerts aimed at audiences willing to pay for these amenities.

- *Theaters*—Theaters are indoor venues that are built primarily for music events, but may include theatrical performances. These venues typically have a capacity of between 1,000 and 6,500. Theaters represent less risk to concert promoters because they have lower fixed costs associated with hosting a concert and may provide a more appropriately-sized venue for developing artists and more artists in general. Because these venues have a smaller capacity than an amphitheater or arena, they do not offer as much economic upside on a per show basis. Theaters can also be used year-round.

- *Clubs*—Clubs are indoor venues that are built primarily for music events, but may also include comedy clubs. These venues typically have a capacity of less than 1,000 and often without full fixed seating. Because of their small size, they do not offer as much economic upside, but they also represent less risk to a concert promoter because they have lower fixed costs associated with hosting a concert and also may provide a more appropriately-sized venue for developing artists. Clubs can also be used year-round.

- *Restaurants & Music Halls*—Restaurants & Music Halls are indoor venues that offer customers an integrated live music, entertainment and dining experience. This category includes our *House of Blues*® and *Brooklyn Bowl*® venues whose live music halls are specially designed to provide optimum acoustics and typically can accommodate between 1,000 to 2,000 guests. A full-service restaurant and bar is located adjacent to the live music hall. We believe that the strength of the brand and the quality of the food, service and unique atmosphere in our restaurants attract customers to these venues independently from a live music event and generate a significant amount of repeat business from local customers.

- *Festival Sites*—Festival sites are outdoor locations used primarily in the summer season to stage large single-day or multi-day concert events featuring several artists on multiple stages. Depending on the location, festival site capacities can range from 10,000 to over 100,000 fans per day. We believe they are popular because of the value provided to the fan by packaging several artists together for an event. While festival sites only host a few events each year, they can provide higher operating income because we are able to generate income from many different services provided at the event.

- *Other Venues*—Other venues includes restaurants, exhibition and convention halls that typically are not used for live music events.

7

The following table summarizes the number of venues by type that we owned, leased, operated, had exclusive booking rights for or had an equity interest in as of December 31, 2021:

| Venue Type | Capacity | Owned | Leased | Operated | Exclusive Booking Rights | Equity Interest | Total |
|---|---|---|---|---|---|---|---|
| Stadium | More than 30,000 | — | — | 1 | — | — | 1 |
| Amphitheater | 5,000 - 30,000 | 10 | 39 | 3 | 16 | — | 68 |
| Arena | 5,000 - 20,000 | 1 | 14 | 2 | 4 | — | 21 |
| Theater | 1,000 - 6,500 | 8 | 60 | 10 | 24 | 2 | 104 |
| Club | Less than 1,000 | 4 | 40 | 1 | 12 | — | 57 |
| Restaurants & Music Halls | 1,000 - 2,000 | 2 | 13 | — | — | — | 15 |
| Festival Sites [1] | Varies | 2 | — | 37 | — | — | 39 |
| Other Venues | Varies | — | 12 | — | — | 3 | 15 |
| Total venues in operation | | 27 | 178 | 54 | 56 | 5 | 320 |
| | | | | | | | |
| Venues currently under construction | | — | 3 | — | — | 3 | 6 |
| Venues not currently in operation | | 3 | 1 | — | 4 | 2 | 10 |
| | | | | | | | |
| Total venues in operation by location: | | | | | | | |
| North America | | 19 | 130 | 16 | 56 | 5 | 226 |
| International | | 8 | 48 | 38 | — | — | 94 |

[1] Operated festival sites includes multi-year agreements providing us the right to use public or private land for a defined period of time leading up to and continuing after the festival. We may enter into multiple agreements for a single festival site or use the same site for multiple festivals. We have aggregated the agreements for each festival site and reported them as one festival site.

### Competition

Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences. We believe that our primary strengths include:

- the quality of service delivered to our artists, fans, ticketing clients and corporate sponsors;
- our track record and reputation in promoting and producing live music events and tours both domestically and internationally;
- our artist relationships;
- our global footprint;
- the quality of our ticketing software and services;
- our ecommerce site and its extensive database;
- our diverse distribution platform of venues;
- the scope, effectiveness and expertise of our advertising and sponsorship programs; and
- our financial stability.

Although we believe that our products and services currently compete favorably with respect to such factors, we cannot provide any assurance that we can maintain our competitive position against current and potential competitors, especially those with significantly greater brand recognition, or greater financial, marketing, technical and other resources.

In the markets in which we promote music concerts, we face competition from other promoters and venue operators. We believe that barriers to entry into the promotion services business are low and that certain local promoters are increasingly expanding the geographic scope of their operations.

Exhibit 2, page 019

Some of our competitors in the live music promotion industry are Anschutz Entertainment Group, or AEG, Another Planet Entertainment, CTS Eventim, Jam Productions, Ltd., I.M.P., Outback Presents and TEG Dainty in addition to numerous smaller regional companies and various casinos and venues in North America, Europe, Asia and Australia. AEG operates under a number of different names including AEG Presents, Concerts West, Frontier Touring, Goldenvoice and Messina Touring Group. Some of our competitors in the live music industry have a stronger presence in certain markets, have access to other sports and entertainment venues and may have greater financial resources in those markets, which may enable them to gain a greater competitive advantage in relation to us.

In markets where we own or operate a venue, we compete with other venues to serve artists likely to perform in that general region. Consequently, touring artists have various alternatives to our venues when scheduling tours. Our main competitors in venue management include ASM Global, Madison Square Garden Entertainment Corp., The Nederlander Organization and Bowery Presents, in addition to numerous smaller regional companies in North America, Europe, Australia and New Zealand. Some of our competitors in venue management may have more attractive or a greater number of venues in certain markets, and may have greater financial resources in those markets.

The ticketing services industry includes the sale of tickets primarily through online and mobile channels, but also through telephone and ticket outlets. As online and mobile ticket purchases increase, it has made it easier for technology-based companies to offer primary ticketing services and standalone, automated ticketing systems that enable venues to perform their own ticketing services or utilize self-ticketing systems. In the online environment, we compete with other websites, online event sites and ticketing companies to provide event information, sell tickets and provide other online services such as fan clubs and artist websites.

We experience competition from other national, regional and local primary ticketing service providers to secure new venues and to reach fans for events. Resale, or secondary, ticketing services have created more aggressive buying of primary tickets whereby certain brokers are using automated internet "bot" technology to attempt to buy the best tickets when they go on sale, notwithstanding federal and state prohibitions. We actively develop and apply methods to mitigate the impact of these bots, however, the bot technology constantly evolves and changes. The internet allows fans and other ticket resellers to reach a vastly larger audience through the aggregation of inventory on resale websites and marketplaces, and provides consumers with more convenient access to tickets for a larger number and greater variety of events.

We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that we understand have recently entered or could enter these markets.

Our main competitors at the local market level for sponsorships and advertising dollars include local sports teams, which often offer state-of-the-art venues, strong brand association and attractive local media packages, as well as festivals, theme parks and other local events. On the national level, our competitors include the major sports leagues that sell sponsorships combined with significant national media packages.

**Government Regulations**

We are subject to federal, state and local laws, both domestically and internationally, governing matters such as:

- privacy and the protection of personal or sensitive information;

- compliance with the United States Foreign Corrupt Practices Act, the United Kingdom Bribery Act 2010 and similar regulations in other countries;

- primary ticketing and ticket resale services;

- construction, renovation and operation of our venues;

- licensing, permitting and zoning, including noise ordinances;

- human health, safety, security and sanitation requirements;

- the service of food and alcoholic beverages;

- working conditions, labor, minimum wage and hour, citizenship and employment laws;

- compliance with the Americans with Disabilities Act of 1990 ("ADA"), the United Kingdom's Disability Discrimination Act of 1995 ("DDA") and similar regulations in other countries;

- hazardous and non-hazardous waste and other environmental protection laws;

Exhibit 2, page 020

- sales and other taxes and withholding of taxes;
- marketing activities via the telephone and online; and
- historic landmark rules.

We believe that we are materially in compliance with these laws.

We are required to comply with federal, state and international laws regarding privacy and the storing, sharing, use, disclosure and protection of personally identifiable information and user data, an area that is increasingly subject to legislation and regulations in numerous jurisdictions around the world, including the European Union's GDPR (as defined and discussed below in Item 1A.—Risk Factors) and the California Consumer Protection Act.

We are required to comply with the laws of the countries in which we operate and also the United States Foreign Corrupt Practices Act and the United Kingdom Bribery Act 2010 regarding anti-bribery regulations. These regulations make it illegal for us to pay, promise to pay or receive money or anything of value to, or from, any government or foreign public official for the purpose of directly or indirectly obtaining or retaining business. This ban on illegal payments and bribes also applies to agents or intermediaries who use funds for purposes prohibited by the statute.

From time to time, federal, state, local and international authorities and/or consumers commence investigations, inquiries or litigation with respect to our compliance with applicable consumer protection, advertising, unfair business practice, antitrust (and similar or related laws) and other laws, particularly as related to primary ticketing and ticket resale services.

The regulations relating to our food service operations in our venues are many and complex. A variety of regulations at various governmental levels relating to the handling, preparation and serving of food, the cleanliness of food production facilities and the hygiene of food-handling personnel are enforced primarily at the local public health department level.

We also must comply with applicable licensing laws, as well as state and local service laws, commonly called dram shop statutes. Dram shop statutes generally prohibit serving alcoholic beverages to certain persons such as an individual who is intoxicated or a minor. If we violate dram shop laws, we may be liable to third parties for the acts of the customer. Although we generally hire outside vendors to provide these services at our larger operated venues and regularly sponsor training programs designed to minimize the likelihood of such a situation, we cannot guarantee that intoxicated or minor customers will not be served or that liability for their acts will not be imposed on us.

We are also required to comply with the ADA, the DDA and certain state statutes and local ordinances that, among other things, require that places of public accommodation, including our websites as well as existing and newly-constructed venues, be accessible to customers with disabilities. The ADA and the DDA require that venues be constructed to permit persons with disabilities full use of a live entertainment venue. The ADA and the DDA may also require that certain modifications be made to existing venues to make them accessible to customers and employees who are disabled. In order to comply with the ADA, the DDA and other similar ordinances, we may face substantial capital expenditures in the future.

From time to time, governmental bodies have proposed legislation that could affect our business. For example, some legislatures have proposed laws in the past that would impose potential liability on us and other promoters and producers of live music events for entertainment taxes and for incidents that occur at our events, particularly relating to drugs and alcohol. Some jurisdictions have also proposed legislation that would restrict ticketing methods or mandate ticket inventory disclosure.

In addition, we and our venues are subject to extensive environmental laws and regulations relating to the use, storage, disposal, emission and release of hazardous and non-hazardous substances, as well as zoning and noise level restrictions which may affect, among other things, the hours of operations of and the type of events we can produce at our venues.

**Our People and Culture**

Bringing more than 17,200 events to life and connecting over 310 million fans across all of our concerts and ticketing platforms, as we did in 2021, is a massive undertaking, made possible by our thousands of employees spread across 45 countries. Our teams come together every day to grow our business, and we recognize our people are the key to our success—whether they're putting on a show at one of our venues, selling tickets, working with our brand partners or supporting our businesses in a myriad of other ways.

*Taking Care of Our Own*

Our core value with our employees is "taking care of our own," which means our top priority is making sure that every employee can rely on us to go above just providing standard compensation and benefits by offering assistance for a range of planned and unplanned situations. We also ensure that our employees have direct access to senior executives to raise concerns and share ideas. Our programs are structured under seven core pillars, designed to support key life moments:

Exhibit 2, page 021

- Taking Care of Yourself: To enhance overall happiness and wellness, we offer flexible vacation time, free ticket perks and in-house meditation sessions, crisis support and crowdfunding networks, and more.

- Taking Care of Your Health: Beyond a full suite of medical, dental and vision benefits, we provide access to virtual doctor's appointments and mental health services.

- Taking Care of Your Family: We provide assistance with fertility needs such as egg-freezing, egg-donation and IVF, as well as adoption or surrogacy, primary caregiver leave for new parents, sick leave to care for loved ones, and leave for bereavement or end-of-life care.

- Taking Care of Your Career: We offer many different career advancement opportunities including leadership workshops for mid-career employees, recognition for successful patent applications, live and on-demand training and tuition reimbursement to further an ongoing education.

- Taking Care of Your Wealth: To support long-term financial goals, we have traditionally provided 401(k) or pension matching, a stock reimbursement program, and student loan repayment assistance.

- Taking Care of Our Own: During life's most difficult moments, we offer employees financial support to help them through a variety of crises, including unexpected deaths, natural disasters, and escaping domestic violence. To this end, in March 2020, in partnership with House of Blues Music Forward Foundation, we announced Crew Nation, a global relief fund offering financial support to live music crews to which we have donated over $10 million.

- Taking Care of Others: In order to empower our employees to get involved in causes that are meaningful to them, we provide paid time off for them to volunteer in their local communities.

While some of these programs have temporarily been impacted by the pandemic, our strong commitment of taking care of every employee makes Live Nation a better place, which in turn helps drive our operating successes.

### Diversity, Inclusion and Belonging

We are continually striving towards our goal of being as diverse as the fans and artists that we serve, with an aim to uplift people across race, ethnicity, gender, sexual orientation, disability, and other underrepresented groups. Programs key to this mission include:

- Live Nation Women Fund: An early-stage investment fund we have created focused on female-led live music businesses.

- Promotion and Pay: Ongoing reviews of positions and compensation with the goal of ensuring that all employees across Live Nation are paid appropriately and provided with promotion opportunities, regardless of individual demographics.

- Employee Resource Groups: Our seven employee-led groups with executive leaders as sponsors provide programs that focus on empowering underrepresented groups within our employee base through career development, networking, talent development, advocacy, non-profit support and community outreach.

- 2025 Diversity Goals: We remain committed to reaching the ambitious goals we set to strengthen the company's diversity from the top down. Our efforts thus far have resulted in both hiring and promoting diverse talent into a number of key leadership roles.

- Industry Engagement: In 2021, we further demonstrated our commitment to diversity and inclusion by joining the efforts of "Diversify The Stage" and signing their pledge to provide greater access to equitable opportunities for underrepresented groups in live music, events, and touring industries.

### Human Capital

Our compensation philosophy is focused on attracting and retaining talented individuals who contribute to our values and help lead our dynamic and innovative environment. To determine market-competitive pay for our employees, we use a combination of entertainment and technology industry benchmarks.

We are committed to encouraging and rewarding pay-for-performance that is aligned with business objectives in the best interest of our shareholders for long-term growth and profitability. We further strive to reward individual achievements and contributions that are both aligned with and supportive of our short- and long-term goals and core business values. We believe that our efforts in these areas are working and contributing to the overall success of the Company, as evidenced by accolades such as obtaining a Great Place to Work® certification (2017-19), placing fourth on Indeed's list of the World's 50 Best Workplaces (2019), placing third on Fast Company's Most Innovative Companies list for the music sector (2019), and our inclusion on Forbes' Best Employers For Diversity list (2019).

11

Exhibit 2, page 022

As of December 31, 2021, we had approximately 10,200 full-time employees. During regular operational times, our staffing needs vary significantly throughout the year. Therefore, we also employ seasonal and part-time employees, primarily for our live music venues and festivals. At the end of 2021, we employed approximately 12,000 seasonal and part-time employees and during peak seasonal periods, particularly in the summer months, we employed as many as 14,300 seasonal and part-time employees in 2021.

**Labor Relations**

The stagehands at some of our venues and other employees are subject to collective bargaining agreements. Our union agreements typically have a term of three years and thus regularly expire and require negotiation in the course of our business. We believe that we have good relationships with our employees and other unionized labor involved in our events, and there have been no related significant work stoppages in the past three years. Upon the expiration of any of our collective bargaining agreements, however, we may be unable to renegotiate on terms favorable to us, and our business operations at one or more of our facilities may be interrupted as a result of labor disputes or difficulties and delays in the process of renegotiating our collective bargaining agreements. In addition, our business operations at one or more of our facilities may also be interrupted as a result of labor disputes by outside unions attempting to unionize a venue even though we do not have unionized labor at that venue currently. A work stoppage at one or more of our owned or operated venues or at our promoted events could have a material adverse effect on our business, results of operations and financial condition. We cannot predict the effect that a potential work stoppage will have on our results of operations.

**Information About Our Executive Officers**

Set forth below are the names, ages and current positions of our executive officers and other significant employees as of February 16, 2022.

| Name | Age | Position |
| --- | --- | --- |
| Michael Rapino | 56 | President, Chief Executive Officer and Director |
| Jacqueline Beato | 38 | Chief Operating Officer–U.S. Concerts |
| Joe Berchtold | 57 | President and Chief Financial Officer |
| Brian Capo | 55 | Chief Accounting Officer |
| Liz Dyer | 36 | Senior Vice President–Human Resources |
| Johnel Evans | 47 | Global Vice President–Diversity and Inclusion |
| Arthur Fogel | 68 | Chairman–Global Music and President–Global Touring |
| John Hopmans | 63 | Executive Vice President–Mergers and Acquisitions and Strategic Finance |
| Bob Roux | 64 | President–U.S. Concerts |
| Michael Rowles | 56 | General Counsel and Secretary |
| Sherri Pucci Sosa | 51 | President–Venue Nation United States |
| Russell Wallach | 56 | President–Sponsorship and Advertising |
| Mark Yovich | 47 | President–Ticketmaster |

*Michael Rapino* is our President and Chief Executive Officer and has served in this capacity since August 2005. He has also served on our board of directors since December 2005. Mr. Rapino has worked for us or our predecessors since 1999.

*Jacqueline Beato* is our Chief Operating Officer of our U.S. Concerts division and has served in this capacity since February 2022. Prior to that, Ms. Beato served as Executive Vice President of Operations starting in August 2020 and Senior Vice President of Investor Relations since joining us in July 2019. Ms. Beato was Senior Vice President of Finance and Treasurer of Caesars Entertainment prior to joining Live Nation.

*Joe Berchtold* is our President and Chief Financial Officer. He has served as President since December 2017 and Chief Financial Officer since July 2021. Prior to that, Mr. Berchtold served as our Chief Operating Officer since joining us in April 2011.

*Brian Capo* is our Chief Accounting Officer and has served in this capacity since joining us in December 2007.

*Liz Dyer* is our Senior Vice President of Human Resources and has served in this capacity since September 2020. Prior to that, Ms. Dyer served in various human resources roles since joining us in April 2016.

12

*Johnel Evans* is our Global Vice President of Diversity and Inclusion and has served in this capacity since joining us in June 2021. Prior to that, Ms. Evans was the Vice President, Inclusion Diversity & Engagement at Becton Dickinson and Company from September 2018 to June 2021 and Vice President, Human Resources of Becton Dickinson and Company's Vascular Access Division from November 2015 to September 2018.

*Arthur Fogel* is the Chairman of our Global Music group and President of our Global Touring division and has served in these capacities since 2005. Mr. Fogel has worked for us or our predecessors since 1999.

*John Hopmans* is our Executive Vice President of Mergers and Acquisitions and Strategic Finance and has served in this capacity since joining us in April 2008.

*Bob Roux* is President of our U.S. Concerts division and has served in this capacity since October 2010. Mr. Roux has worked for us or our predecessors since 1990.

*Michael Rowles* is our General Counsel and has served in this capacity since joining us in March 2006 and as our Secretary since May 2007.

*Sherri Pucci Sosa* is our President of Venue Nation United States and has served in this capacity since joining us in April 2021. Prior to that Ms. Sosa was the Senior Vice President and General Manager of various casino and hotel properties of Caesars Entertainment from 2015 to March 2021.

*Russell Wallach* is President of our Sponsorship and Advertising division and has served in this capacity since July 2006. Mr. Wallach has worked for us or our predecessors since 1996.

*Mark Yovich* is President of Ticketmaster and has served in this capacity since December 2020. Prior to that, Mr. Yovich served as President of Ticketmaster's International division since November 2011. Mr. Yovich has worked for us or our predecessors since 2000.

**Available Information**

We are required to file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any materials we have filed with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Our filings with the SEC are also available to the public through the SEC's website at *www.sec.gov*.

You can find more information about us online at our investor relations website located at *www.investors.livenationentertainment.com*. Our Annual Report on Form 10-K, our Quarterly Reports on Form 10-Q, our Current Reports on Form 8-K and any amendments to those reports are available free of charge on our website as soon as reasonably practicable after we electronically file such material with the SEC. The information posted on or accessible through our website is not incorporated into this Annual Report on Form 10-K.

Exhibit 2, page 024

**ITEM 1A.   RISK FACTORS**

*You should carefully consider each of the following risks and all of the other information set forth in this Annual Report. The following risks relate principally to our business and operations, our leverage and our common stock. If any of the risks and uncertainties develop into actual events, this could have a material adverse effect on our business, financial condition or results of operations. In that case, the trading price of our common stock could decline.*

**Risks Relating to the COVID-19 Pandemic**

***The global COVID-19 pandemic has had, and may continue to have, a material negative impact on our business and operating results. The ultimate magnitude of this impact will depend on a variety of factors, including the duration of the pandemic, restrictions or new operational requirements in place or that result as our operations recommence on a jurisdiction by jurisdiction basis, the state of the global economy as a result of the pandemic, and the public's willingness to attend events with large numbers of people, all of which are unknowable at this time.***

In mid-March 2020, as the unprecedented impact of the global COVID-19 pandemic became clearer, we ceased all Live Nation tours and closed our venues to support global efforts at social distancing and mitigating the spread of the virus, and to comply with restrictions put in place by various governmental entities. Other concert promoters, venue operators and sports leagues around the globe similarly shut down. Each of our segments—Concerts, Ticketing and Sponsorship & Advertising—depends on live music and sporting events in order to generate most of its revenue. While most sports leagues have recommenced, some have done so at reduced capacity, and thus without the typical need for ticketing. Similarly, concerts have resumed on a jurisdiction by jurisdiction basis, often at reduced capacity and with the potential for cancellations and rescheduled events. Our revenue will continue to be negatively impacted until such time as concerts and sporting events resume full activity levels at full capacity on a global basis; the possibility exists that these circumstances might continue for a longer period of time than current expectations.

Due to the unprecedented nature of the global COVID-19 pandemic, particularly the non-linear recovery due in part to surges of the virus and its variants that in some instances has halted or reversed the lessening of restrictions on activities and the return to pre-pandemic life, our ability to forecast our cash inflows is hampered, and therefore our focus is on forecasting and managing operating costs and cash outflows against our overall liquidity position. At this time, it is impossible to know or predict whether the positive steps we saw toward returning to pre-pandemic event levels in various global jurisdictions in 2021 will continue or be hampered by additional waves of the virus, potentially causing national and local governments around the world to once again place or retain various restrictions on gatherings of people that prohibit or greatly impair the ability to hold concert and sporting events. This uncertainty exists on a jurisdiction by jurisdiction basis in the in the 45 countries in which we operate.

We face ancillary risks and uncertainties arising from the global COVID-19 pandemic in addition to any partial or complete shutdown of its revenue-generating operations. Many of these risks and uncertainties are more fully described below in this Item 1A. whether or not such risk factors identify the global COVID-19 pandemic as the underlying cause, and many extend beyond the initial impact of the pandemic on our business due to the uncertainty as to how the live music and sporting industries, and the world in general, will change in the short and long term as a result of the pandemic. The risks and uncertainties described herein should be read in conjunction with those set forth below. Such additional or attendant risks and uncertainties include, among other things:

- The impact of tightening labor markets across the globe with unemployment rates dropping, resignations reaching record highs, and upward pressure on salaries and wages due to inflation and demand for skilled workers in numerous fields; combined with, continuing supply chain issues could impact our ability to produce tours and festivals as well as open and maintain venues without timing and cost disruptions;
- the increased risk of litigation in the current and future environment, such as pending lawsuits challenging aspects of our ticket refund policies and procedures;
- a reduction in the profitability of our operations, whether due to increased operating costs of complying with governmental restrictions or safety precautions and protocols voluntarily undertaken, such as the need to supply personal protective equipment or conduct health screenings at points of ingress, or due to a reduction in revenue arising from such precautions, such as the potential that venues may not be able to be filled to capacity due to spacing and social distancing limitations in place at such time;
- potential decreased willingness of artists to tour, or impracticability of touring due to varying restrictions from jurisdiction to jurisdiction, including the possibility that national or sub-national borders are closed to travel;
- potential changes to consumer preferences for consumption of live music or sporting events due to fears of, or restrictions on, large gatherings;
- loss of ticketing clients due to the economic impacts of the pandemic whereby they are no longer in operation, reducing the number of events to which our ticketing business can sell tickets;

14

- the inability to pursue expansion opportunities or acquisitions due to capital constraints;
- the future availability or increased cost of insurance coverage;
- a potential shift away from live events by sponsors and advertisers; and
- the incurrence of additional expenses related to compliance, precautions and management of our company during and after this period.

The likelihood of the realization or intensification of these risks and uncertainties and the ultimate magnitude of their impact on us are not knowable or quantifiable at this time, as the global COVID-19 pandemic and its impacts may continue for an unknown period of time. Thus far, there have been several waves—periods where infection rates subside followed by spikes due to variants of the virus or other factors—of the pandemic, which may lead to stronger restrictions being put into place for a greater duration of time. Different jurisdictions have and will continue to lift social distancing guidelines and restrictions on gatherings of people at different times, will have varied rules in place thereafter and will respond to any future waves of the virus in different ways. The longer the duration of the global COVID-19 pandemic, and the greater the ancillary and lingering effects, the greater the material negative impact on the Company and its results of operations may be. While vaccination programs are now in place, the changing and evolving nature of the COVID-19 virus presents challenges to such programs, making the future course and duration of the pandemic uncertain, which impacts our business in a manner that is unknowable at this time.

In addition, due to the reduction in cash flows we have experienced and are likely to experience in the future from the global COVID-19 pandemic, we have proactively taken a number of steps to enhance our liquidity position, including our cost-savings and cash management programs described in Item 8.—Financial Statements—Note 2—Impact of the Global COVID-19 Pandemic and the additional debt issuances. Our decreased cash flows have heightened and intensified the risks described under the "Risks Relating to Our Leverage" section of the risk factors in this report. There can be no assurances that we will remain in compliance with the covenants in our debt and credit instruments, or that we would be able to obtain waivers or amendments in order to avoid default.

We will continue to evaluate and explore additional mechanisms to attempt to ensure that we have adequate capital to fund our business, including through the issuance and sale of additional debt or equity securities. The terms of future debt agreements could include more restrictive covenants, or require incremental collateral, which may further restrict our business operations or be unavailable due to our covenant restrictions then in effect. In 2020, Moody's and S&P downgraded the Company's credit ratings and applied negative outlooks to our business. In 2021, Moody's and S&P both revised their outlooks from negative to stable, and in January 2022, S&P further improved their outlook to positive. We may experience negative credit actions if the pandemic and its ancillary effects persist. There is no guarantee that debt financings will be available in the future to fund our obligations, or that they will be available on terms consistent with our expectations. Additionally, the impact of the global COVID-19 pandemic on the financial markets could adversely impact our ability to raise funds.

### Risks Relating to Our Business and the Live Events and Ticketing Industries

*Our business is highly sensitive to public tastes and is dependent on our ability to secure popular artists and other live music events, and we and our ticketing clients may be unable to anticipate or respond to changes in consumer preferences, which may result in decreased demand for our services.*

Our business is highly sensitive to rapidly changing public tastes and is dependent on the availability of popular artists and events. Our live entertainment business depends in part on our ability to anticipate the tastes of consumers and to offer events that appeal to them. Since we rely on unrelated parties to create and perform at live music events, any unwillingness to tour or lack of availability of popular artists could limit our ability to generate revenue. In particular, there are a limited number of artists that can headline a major North American or global tour or who can sell out larger venues, including many of our amphitheaters. If those artists do not choose to tour, or if we are unable to secure the rights to their future tours, then our concerts business would be adversely affected. Our artist management business could be adversely affected if the artists it represents do not tour or perform as frequently as anticipated, or if such tours or performances are not as widely attended by fans as anticipated due to changing tastes, general economic conditions or otherwise. Our ticketing business relies on third parties to create and perform live entertainment, sporting and leisure events and to price tickets to such events. Accordingly, our ticketing business' success depends, in part, upon the ability of these third parties to correctly anticipate public demand for particular events, as well as the availability of popular artists, entertainers and teams.

15

In addition, our live entertainment business typically books our live music tours four to eight months in advance of the beginning of the tour and often agrees to pay an artist a fixed guaranteed amount prior to our receiving any revenue. Therefore, if the public is not receptive to the tour, or we or an artist cancel the tour, we may incur a loss for the tour depending on the amount of the fixed guarantee or incurred costs relative to any revenue earned, as well as revenue we could have earned at booked venues. We have cancellation insurance policies in place to cover a portion of our losses if an artist cancels a tour but such policies may not be sufficient and are subject to deductibles. Furthermore, consumer preferences change from time to time, and our failure to anticipate, identify or react to these changes could result in reduced demand for our services, which would adversely affect our business, financial condition and results of operations.

***Our business depends on relationships between key promoters, executives, agents, managers, artists and clients and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations.***

The live music business is uniquely dependent upon personal relationships, as promoters and executives within live music companies such as ours leverage their existing network of relationships with artists, agents and managers in order to secure the rights to the live music tours and events which are critical to our success. Due to the importance of those industry contacts to our business, the loss of any of our promoters, officers or other key personnel could adversely affect our business. Similarly, the artist management business is dependent upon the highly personalized relationship between a manager and an artist, and the loss of a manager may also result in a loss of the artist represented by the manager, which could adversely affect our business. Although we have entered into long-term agreements with many of those individuals described above to protect our interests in those relationships, we can give no assurance that all or any of these key employees or managers will remain with us or will retain their associations with key business contacts, including music artists, as some agreements between a manager and an artist are not for a fixed period of time and are instead terminable at will.

The success of our ticketing business depends, in significant part, on our ability to maintain and renew relationships with existing clients and to establish new client relationships. We anticipate that, for the foreseeable future, the substantial majority of our Ticketing segment revenue will be derived from both online and mobile sales of tickets. We also expect that revenue from primary ticketing services, which consists primarily of our portion of per ticket convenience charges and per order service fees, will continue to comprise the substantial majority of our Ticketing segment revenue. We cannot provide assurances that we will be able to maintain existing client contracts, or enter into or maintain new client contracts, on acceptable terms, if at all, and the failure to do so could have a material adverse effect on our business, financial condition and results of operations.

Another important component of our success is our ability to maintain existing and to build new relationships with third-party distribution channels, advertisers, sponsors and service providers. Any adverse change in these relationships, including the inability of these parties to fulfill their obligations to our businesses for any reason, could adversely affect our business, financial condition and results of operations.

***We face intense competition in the live music and ticketing industries, and we may not be able to maintain or increase our current revenue, which could adversely affect our business, financial condition and results of operations.***

Our businesses are in highly competitive industries, and we may not be able to maintain or increase our current revenue due to such competition. The live music industry competes with other forms of entertainment for consumers' discretionary spending and within this industry we compete with other venues to book artists, and, in the markets in which we promote music concerts, we face competition from other promoters and venue operators. Our competitors compete with us for key employees who have relationships with popular music artists and who have a history of being able to book such artists for concerts and tours. These competitors may engage in more extensive development efforts, undertake more far-reaching marketing campaigns, adopt more aggressive pricing policies and make more attractive offers to existing and potential artists. Due to increasing artist influence and competition to attract and maintain artist clients, we may enter into agreements on terms that are less favorable to us, which could negatively impact our financial results. Our competitors may develop services, advertising options or music venues that are equal or superior to those we provide or that achieve greater market acceptance and brand recognition than we achieve. Within the live music industry, our artist management business also competes with numerous other artist management companies and individual managers in the United States alone, both to discover new and emerging artists and to represent established artists. Across the live music industry, it is possible that new competitors may emerge and rapidly acquire significant market share.

16

Exhibit 2, page 027

Our ticketing business faces significant competition from other national, regional and local primary ticketing service providers to secure new and retain existing clients on a continuous basis. Additionally, we face significant and increasing challenges from companies that sell self-ticketing systems and from clients who choose to self-ticket, through the integration of such systems into their existing operations or the acquisition of primary ticket services providers or by increasing sales through venue box offices and season and subscription sales. We also face competition in the resale of tickets from resale marketplaces and from other ticket resellers with online distribution capabilities. The advent of new technology, particularly as it relates to online ticketing, has amplified this competition. The intense competition that we face in the ticketing industry could cause the volume of our ticketing services business to decline. As we are also a content provider and venue operator we may face direct competition with our prospective or current primary ticketing clients, who primarily include live event content providers. This direct competition with our prospective or current primary ticketing clients could result in a decline in the number of ticketing clients we have and a decline in the volume of our ticketing business, which could adversely affect our business, financial condition and results of operations.

In the secondary ticket sales market, we have restrictions on our business that are not faced by our competitors, imposed as a result of agreements entered into with the Federal Trade Commission ("FTC"), the Attorneys General of several individual states, and various international governing bodies. These restrictions include: a requirement to clearly and conspicuously disclose on any primary ticketing website where a link or redirect to a resale website owned or controlled by us is posted, that the link is directing the user to a resale website and that ticket prices often exceed the ticket's original price; and a requirement to make certain clear and conspicuous disclosures and in certain instances disclose when a ticket being offered for resale is not "in-hand" as well as a requirement to monitor and enforce the compliance of third parties offering tickets on our websites with such disclosure requirements. There are certain state laws that now ban such ticket listings, and the New York Attorney General has in the past brought lawsuits against resale companies for these practices.

Other variables related to the competitive environment that could adversely affect our financial performance by, among other things, leading to decreases in overall revenue, the number of sponsors, event attendance, ticket prices and fees or profit margins include:

- an increased level of competition for advertising dollars, which may lead to lower sponsorships as we attempt to retain advertisers or which may cause us to lose advertisers to our competitors offering better programs that we are unable or unwilling to match;
- unfavorable fluctuations in operating costs, including increased guarantees to artists, which we may be unwilling or unable to pass through to our customers via higher ticket prices;
- inability or unwillingness to fund the significant up-front cash requirements associated with our touring and ticketing businesses due to insufficient cash on hand or capacity under our senior secured credit facility, which could result in the loss of key tours to competitors or the inability to secure and retain ticketing clients;
- competitors' offerings that may include more favorable terms than we do in order to obtain agreements for new venues or ticketing arrangements or to obtain events for the venues they operate;
- technological changes and innovations that we are unable to adopt or are late in adopting that offer more attractive entertainment alternatives than we or other live entertainment providers currently offer, which may lead to a reduction in attendance at live events, a loss of ticket sales or lower ticket fees; and
- other entertainment options available to our audiences that we do not offer.

***Our success depends, in significant part, on entertainment, sporting and leisure events and economic and other factors adversely affecting such events could have a material adverse effect on our business, financial condition and results of operations.***

A decline in attendance at or reduction in the number of live entertainment, sporting and leisure events may have an adverse effect on our revenue and operating income. In addition, during periods of economic slowdown and recession, many consumers have historically reduced their discretionary spending and advertisers have reduced their advertising expenditures. The impact of economic slowdowns on our business is difficult to predict, but they may result in reductions in ticket sales, sponsorship opportunities and our ability to generate revenue. The risks associated with our businesses may become more acute in periods of a slowing economy or recession, which may be accompanied by a decrease in attendance at live entertainment, sporting and leisure events. Many of the factors affecting the number and availability of live entertainment, sporting and leisure events are beyond our control. For instance, certain sports leagues have experienced labor disputes leading to threatened or actual player lockouts. Any such lockouts that result in shortened or canceled seasons would adversely impact our business to the extent that we provide ticketing services to the affected teams both due to the loss of games and ticketing opportunities as well as the possibility of decreased attendance following such a lockout due to adverse fan reaction.

17

Exhibit 2, page 028

Our business depends on discretionary consumer and corporate spending. Many factors related to corporate spending and discretionary consumer spending, including economic conditions affecting disposable consumer income such as unemployment levels, fuel prices, interest rates, changes in tax rates and tax laws that impact companies or individuals, and inflation can significantly impact our operating results. Business conditions, as well as various industry conditions, including corporate marketing and promotional spending and interest levels, can also significantly impact our operating results. These factors can affect attendance at our events, premium seat sales, sponsorship, advertising and hospitality spending, concession and merchandise sales, as well as the financial results of sponsors of our venues, events and the industry. Negative factors such as challenging economic conditions and public concerns over terrorism and security incidents, particularly when combined, can impact corporate and consumer spending, and one negative factor can impact our results more than another. There can be no assurance that consumer and corporate spending will not be adversely impacted by current economic conditions, or by any future deterioration in economic conditions, thereby possibly impacting our operating results and growth.

***We are dependent upon our ability to lease, acquire and develop live music venues, and if we are unable to do so on acceptable terms, or at all, our results of operations could be adversely affected.***

Our Concerts and Sponsorship & Advertising segments require access to venues to generate revenue from live music events. For these events, we use venues that we own, but we also operate a number of our live music venues under various agreements which include leases with third parties, ownership through an equity interest or booking agreements, which are agreements where we contract to book the events at a venue for a specific period of time. Our long-term success in the live music business will depend in part on the availability of venues, our ability to lease these venues and our ability to enter into booking agreements upon their expiration. As many of these agreements are with third parties over whom we have little or no control, we may be unable to renew these agreements or enter into new agreements on acceptable terms or at all, and may be unable to obtain favorable agreements with venues. Our ability to renew these agreements or obtain new agreements on favorable terms depends on a number of other factors, many of which are also beyond our control, such as national and local business conditions and competition from other promoters. If the cost of renewing these agreements is too high or the terms of any new agreement with a new venue are unacceptable or incompatible with our existing operations, we may decide to forego these opportunities. There can be no assurance that we will be able to renew these agreements on acceptable terms or at all, or that we will be able to obtain attractive agreements with substitute venues, which could have a material adverse effect on our results of operations.

We may continue to expand our operations through the development of live music venues and the expansion of existing live music venues, which poses a number of risks, including:

- construction of live music venues may result in cost overruns, delays or unanticipated expenses;
- desirable sites for live music venues may be unavailable or costly; and
- the attractiveness of our venue locations may deteriorate over time.

Growth or maintenance of our existing revenue depends in part on consistent investment in our venues. Therefore, we expect to continue to make substantial capital improvements to meet long-term increasing demand, improve value and grow revenue. We frequently have a number of significant capital projects underway. Numerous factors, many of which are beyond our control, may influence the ultimate costs and timing of various capital improvements.

The amount of capital expenditures can vary significantly from year to year. In addition, actual costs could vary materially from our estimates if our assumptions about the quality of materials, equipment or workmanship required or the cost of financing such expenditures were to change. Construction is also subject to governmental permitting processes which, if changed, could materially affect the ultimate cost.

Additionally, the market potential of live music venue sites cannot be precisely determined, and our live music venues may face competition in markets from unexpected sources. Newly constructed live music venues may not perform up to our expectations. We face significant competition for potential live music venue locations and for opportunities to acquire existing live music venues. Because of this competition, we may be unable to add to or maintain the number of our live music venues on terms we consider acceptable.

***There is the risk of personal injuries and accidents in connection with our live music events, which could subject us to personal injury or other claims and increase our expenses, as well as reduce attendance at our live music events, causing a decrease in our revenue.***

18

Exhibit 2, page 029

There are inherent risks involved with producing live music events. As a result, personal injuries and accidents have occurred, and may in the future occur, from time to time, which could subject us to claims and liabilities for personal injuries. Incidents in connection with our live music events at any of our venues or festival sites that we own or rent could also result in claims, reducing operating income or reducing attendance at our events, which could cause a decrease in our revenue. We have been subject to wrongful death claims and are currently subject to other litigation. In addition, while we have security protocols in place at our events, illegal drug use or alcohol consumption at our events could result in negative publicity, adverse consequences (including illness, injury or death) to the persons engaged in such activities or others, and litigation against us. While we maintain insurance policies that provide coverage within limits that are sufficient, in management's judgment, to protect us from material financial loss for personal injuries sustained by persons at our venues or events or accidents in the ordinary course of business, there can be no assurance that such insurance will be adequate at all times and in all circumstances.

On November 5, 2021, the Astroworld music festival was held in Houston, Texas. During the course of the festival, ten members of the audience sustained fatal injuries and others suffered non-fatal injuries. Following these events, hundreds of civil lawsuits have been filed against Live Nation Entertainment, Inc. and related entities, asserting insufficient crowd control and other theories, seeking compensatory and punitive damages. These events are the subject of an ongoing investigation by local authorities in Harris County, Texas, and are the subject of an inquiry we received from the House of Representatives Committee on Oversight and Reform. We may incur material liabilities from the 2021 Astroworld event, for which it is currently expected liability insurance can provide sufficient coverage, but at this time there are no assurances of such coverage. In addition, this could negatively impact our business, including our ability to obtain reasonably priced insurance coverage for future events, costs of operating security at events and other cost and commercial ramifications. These effects could have a material impact on our business, financial condition, results of operations and/or cash flows.

***Poor weather adversely affects attendance at our live music events, which could negatively impact our financial performance from period to period.***

We promote and/or ticket many live music events. Weather conditions surrounding these events affect sales of tickets, concessions and merchandise, among other things. Poor weather conditions can have a material effect on our results of operations particularly because we promote and/or ticket a finite number of events. Increased weather variability due to climate change exacerbates weather-related issues we face. Due to weather conditions, we may be required to cancel or reschedule an event to another available day or a different venue, which would increase our costs for the event and could negatively impact the attendance at the event, as well as concession and merchandise sales. Poor weather can affect current periods as well as successive events in future periods.

### Risks Relating to Information Technology, Cybersecurity and Intellectual Property

***The success of our ticketing business and other operations depends, in part, on the integrity of our systems and infrastructure, as well as affiliate and third-party computer systems, computer networks and other communication systems. System interruption and the lack of integration and redundancy in these systems and infrastructure may have an adverse impact on our business, financial condition and results of operations.***

System interruption and the lack of integration and redundancy in the information systems and infrastructure, both of our own ticketing systems and other computer systems and of affiliate and third-party software, computer networks and other communications systems service providers on which we rely, may adversely affect our ability to operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations. Such interruptions could occur by virtue of natural disaster, malicious actions such as hacking or acts of terrorism or war, or human error. In addition, the loss of some or all of certain key personnel could require us to expend additional resources to continue to maintain our software and systems and could subject us to systems interruptions. The large infrastructure plant that is required to operate our systems requires an ongoing investment of time, money and effort to maintain or refresh hardware and software and to ensure it remains at a level capable of servicing the demand and volume of business that Ticketmaster receives. Failure to do so may result in system instability, degradation in performance, or unfixable security vulnerabilities that could adversely impact both the business and the consumers utilizing our services.

While we have backup systems for certain aspects of our operations, disaster recovery planning by its nature cannot be sufficient for all eventualities. In addition, we may not have adequate insurance coverage to compensate for losses from a major interruption. If any of these adverse events were to occur, it could adversely affect our business, financial condition and results of operations.

***Data loss or other breaches of our network security could materially harm our business and results of operations, and the processing, storage, use and disclosure of personal or sensitive information could give rise to liabilities and additional costs as a result of governmental regulation, litigation and conflicting legal requirements relating to personal privacy rights.***

19

Exhibit 2, page 030

Due to the nature of our business, we process, store, use, transfer and disclose certain personal or sensitive information about our customers and employees. Penetration of our network or other misappropriation or misuse of personal or sensitive information and data, including credit card information and other personally identifiable information, could cause interruptions in our operations and subject us to increased costs, litigation, inquiries and actions from governmental authorities, and financial or other liabilities. In addition, security breaches, incidents or the inability to protect information could lead to increased incidents of ticketing fraud and counterfeit tickets. Security breaches and incidents could also significantly damage our reputation with consumers, ticketing clients and other third parties, and could result in significant costs related to remediation efforts, such as credit or identity theft monitoring.

Although we have developed systems and processes that are designed to protect customer and employee information and to prevent security breaches or incidents (which could result in data loss or other harm or loss), such measures cannot provide absolute security or certainty. It is possible that advances in computer and hacker capabilities, new variants of malware, the development of new penetration methods and tools, inadvertent violations of company policies or procedures or other developments could result in a compromise of customer or employee information or a breach of the technology and security processes that are used to protect customer and employee information. The techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems may change frequently and as a result, may be difficult for our business to detect for long periods of time. In addition, despite our best efforts, we may be unaware of or unable to anticipate these techniques or implement adequate preventative measures. We have expended significant capital and other resources to protect against and remedy such potential security breaches, incidents and their consequences, including the establishment of a dedicated cybersecurity organization within our larger technology environment, and will continue to do so in the future.

We also face risks associated with security breaches and incidents affecting third parties with which we are affiliated or with which we otherwise conduct business. In particular, hardware, software or applications we develop or procure from third parties may contain defects in design or manufacture and/or may pose a security risk that could unexpectedly compromise information security. For example, in the second quarter of 2018, we became aware that a third-party customer support product, used in certain jurisdictions outside the United States, was infected with a malicious code that may have allowed an unauthorized party to skim customers' personal or payment information from their browsers. While we acted promptly to disable the infected third-party product, we continue to review our systems and interface with regulatory authorities as a result of this incident. These include proceedings contesting a proposed fine issued by the United Kingdom's ("U.K.") Information Commissioner's Office in November 2020 against Ticketmaster U.K. Limited in connection with this incident. Consumers are generally concerned with the security and privacy of the internet, and any publicized security problems affecting our businesses and/or third parties may discourage consumers from doing business with us, which could have an adverse effect on our business, financial condition and results of operations.

In addition to the above concerns related to network and data security, the collection, transfer, use, disclosure, security and retention of personal or sensitive information and other user data are governed by existing and evolving federal, state and international laws. We have expended significant capital and other resources to keep abreast of the evolving privacy landscape, including the establishment of a dedicated global privacy organization within our legal team. However, our business could be adversely affected if legislation or regulations are expanded to require changes in business practices or policies (including, for example, practices or policies regarding the collection, transfer, use, disclosure, security, and retention of personal or sensitive information), or if governing jurisdictions interpret or implement legislation or regulations in a manner which negatively affects our business, financial condition and/or results of operations. Due to the changes in the data privacy regulatory environment, we may incur additional costs and challenges to our business that restrict or limit our ability to collect, transfer, use, disclose, secure, or retain personal or sensitive information. These changes in data privacy laws may require us to modify our current or future products, services, programs, practices or policies, which may in turn impact the products and services available to our customers.

Regulators and government enforcement actions worldwide are imposing significant fines against companies for data privacy violations. Our business operations, including our ticketing business, involve the collection, transfer, use, disclosure, security, and disposal of personal or sensitive information in various locations around the world, including the European Union ("E.U."), where the General Data Protection Regulation ("GDPR") governs data privacy and can result in the imposition of significant fines and penalties. In addition, following the withdrawal of the United Kingdom from the E.U. on December 31, 2020, we were required to separately comply with the U.K.'s data protection law, under which additional fines and penalties could be imposed independent of the GDPR. In the United States, several new comprehensive privacy laws, including in California, Virginia and Colorado, which go into effect in 2023, will require us to update our policies and procedures to continue to protect data as required under those laws. The relationship between U.K. data protection law and the GDPR remains unclear, including regarding how data transfers between the E.U. and U.K. will be treated. The changes in the E.U.,U.K. and the United States. could lead to additional compliance costs and could increase our overall risk.

20

Exhibit 2, page 031

As we expand our operations into new jurisdictions, the costs associated with compliance with applicable local data privacy laws and regulations increases. It is possible that government or industry regulation in these markets will require us to deviate from our standard processes and/or make changes to our products, services and operations, which will increase operational cost and risk.

Our failure or the failure of the various third-party vendors and service providers with which we are affiliated or otherwise conduct business to comply with applicable federal, state or international laws and regulations and/or to comply with our privacy policies and/or or any compromise of security that results in the unauthorized collection, transfer, use or disclosure of personal or sensitive information or other user data may result in negative publicity resulting in reputation or brand damage, may discourage potential users from purchasing tickets or trying our products and services, and may result in proceedings/fines by governmental agencies and/or private litigation brought by consumers; the realization of one or all of the foregoing could adversely affect our business, financial condition and results of operations.

***We may fail to adequately protect our intellectual property rights or may be accused of infringing upon intellectual property rights of third parties.***

We regard our intellectual property rights, including patents, trademarks and domain names, copyrights, trade secrets and similar intellectual property (as applicable) as critical to our success. We also rely heavily upon software codes, informational databases and other components that make up our products and services.

We have been granted trademark registrations and patents and/or have trademark and patent applications pending with the United States Patent and Trademark Office and/or various foreign authorities for various proprietary trademarks, technologies and other inventions. Any patent or trademark application filed may not result in a patent or trademark registration being issued, or existing or future patents or trademarks may not be adjudicated valid by a court or be afforded adequate protection against competitors. Likewise, the issuance of a patent or trademark registration to us does not mean that its processes, inventions or trademark will not be found to infringe upon rights previously issued to third parties. We rely on a combination of laws and contractual restrictions with employees, customers, suppliers, affiliates and others to establish and protect these proprietary rights. Despite these precautions, it may be possible for a third party to copy or otherwise obtain and use our intellectual property without authorization which, if discovered, might require legal action to correct. In addition, third parties may independently and lawfully develop substantially similar intellectual properties.

From time to time, we are subject to legal proceedings and claims in the ordinary course of business, including claims of alleged infringement of the intellectual property rights of third parties. Our failure to protect our intellectual property rights in a meaningful manner or challenges to related contractual rights could result in erosion of brand names or other intellectual property and could adversely affect our business, financial condition and results of operations. Therefore, litigation may be necessary in the future to enforce our intellectual property rights, protect trade secrets or determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations.

**Risks Relating to Governmental Regulation and Litigation**

***We operate in international markets which subject us to risks associated with the legislative, judicial, accounting, regulatory, political and economic risks and conditions specific to such markets, which could adversely affect our business, financial condition and results of operations.***

We provide services in various jurisdictions abroad through a number of brands and businesses that we own and operate, as well as through joint ventures, and we expect to continue to expand our international presence. We face, and expect to continue to face, additional risks in the case of our existing and future international operations, including:

- political instability, adverse changes in diplomatic relations and unfavorable economic and business conditions in the markets in which we currently have international operations or into which we may expand, particularly in the case of emerging markets;
- more restrictive or otherwise unfavorable government regulation of the live entertainment and ticketing industries, which could result in increased compliance costs and/or otherwise restrict the manner in which we provide services and the amount of related fees charged for such services;
- limitations on the enforcement of intellectual property rights;
- limitations on the ability of foreign subsidiaries to repatriate profits or otherwise remit earnings;
- adverse tax consequences due both to the complexity of operating across multiple tax regimes as well as changes in, or new interpretations of, international tax treaties and structures;
- expropriations of property and risks of renegotiation or modification of existing agreements with governmental authorities;
- diminished ability to legally enforce our contractual rights in foreign countries;

21

Exhibit 2, page 032

- limitations on technology infrastructure, which could limit our ability to migrate international operations to a common ticketing system;
- variability in venue security standards and accepted practices;
- lower levels of internet usage, credit card usage and consumer spending in comparison to those in the United States; and
- difficulties in managing operations and adapting to consumer desires due to distance, language and cultural differences, including issues associated with (i) business practices and customs that are common in certain foreign countries but might be prohibited by United States law and our internal policies and procedures, and (ii) management and operational systems and infrastructures, including internal financial control and reporting systems and functions, staffing and managing of foreign operations, which we might not be able to do effectively or cost-efficiently.

As we expand into new markets these risks will be intensified and will have the potential to impact a greater percentage of our business and operating results. Our ability to expand our international operations into new jurisdictions, or further into existing jurisdictions will depend, in significant part, on our ability to identify potential acquisition candidates, joint venture or other partners, and enter into arrangements with these parties on favorable terms, as well as our ability to make continued investments to maintain and grow existing international operations. If the revenue generated by international operations is insufficient to offset expenses incurred in connection with the maintenance and growth of these operations, our business, financial condition and results of operations could be materially and adversely affected. In addition, in an effort to make international operations in one or more given jurisdictions profitable over the long term, significant additional investments that are not profitable over the short term could be required over a prolonged period.

In foreign countries in which we operate, a risk exists that our employees, contractors or agents could, in contravention of our policies, engage in business practices prohibited by applicable United States laws and regulations, such as the United States Foreign Corrupt Practices Act, as well as the laws and regulations of other countries prohibiting corrupt payments to government officials such as the United Kingdom Bribery Act 2010. We maintain policies prohibiting such business practices and have in place global anti-corruption compliance and training programs designed to ensure compliance with these laws and regulations. Nevertheless, the risk remains that one or more of our employees, contractors or agents, including those based in or from countries where practices that violate such United States laws and regulations or the laws and regulations of other countries may be customary, as well as those associated with newly-acquired businesses, will engage in business practices that are prohibited by our policies, circumvent our compliance programs and, by doing so, violate such laws and regulations. Any such violations, even if prohibited by our internal policies, could result in fines, criminal sanctions against us and/or our employees, prohibitions on the conduct of our business and damage to our reputation, which could adversely affect our business, financial condition and results of operations.

In addition, given our substantial operations in the U.K. and the E.U., we face risks and uncertainties due to the U.K.'s exit from the European Union. The U.K. has agreed "third country" trading status in a new E.U.-U.K. Trade and Cooperation Agreement applicable from January 1, 2021. The trade agreement sets out arrangements in areas such as tariff-free trade in goods. However, it does not match the level of economic integration that existed while the U.K. was an E.U. Member State. There will be additional bureaucracy and cost with customs formalities, VAT, excise duties and ATA carnets for goods moved between the U.K. and the E.U.

These risks and uncertainties include some regulatory uncertainty for data protection. It has been confirmed that the U.K. ICO will not be able to act as the single authority for E.U. multinationals; this means that E.U. multinationals will often have two regulators; one for U.K. activities and one for the rest of the E.U. where cross-border processing takes place. Live Nation has been assigned a new lead authority based on its cross-border processing, so it continues to have a main point of contact for the E.U. In addition, the U.K. is now not part of the E.U. for purposes of data transfers. The GDPR principle that data cannot leave the E.U. (to the U.K. in this case) now applies, however the U.K. has been granted adequacy by the E.U., allowing data to continue to flow to the U.K. Live Nation has already documented data flows to identify where U.K. flows occur and have contractual templates prepared. We are in the process of reviewing the U.K.'s International Data Transfer Agreement laid out before the U.K. and will monitor whether the U.K. will implement an adequacy system, as proposed by the U.K. government's data reform package, so we are prepared to comply with any transfer limitation obligations under the U.K. regime.

Live Nation as a tour sponsor will continue to use temporary worker routes into the U.K. now including E.U. and European Economic Area musicians and crew on the sponsor's license. For tours in Europe, U.K. musicians' working arrangements will be subject to individual E.U. member states and bilateral agreements reached with the U.K. Government. In the majority of member states the working arrangements will be similar, such as in France and Germany. In others, there may be new requirements for the sponsor. As a significant sponsor with a long-established footprint across the E.U. and E.E.A. markets, Live Nation remains in a strong position when European markets reopen from coronavirus restrictions.

22

Exhibit 2, page 033

*We are subject to extensive governmental regulation, and our failure to comply with these regulations could adversely affect our business, financial condition and results of operations.*

Our operations are subject to federal, state and local statutes, rules, regulations, policies and procedures, both domestically and internationally, which are subject to change at any time, governing matters such as:

- privacy laws and protection of personal or sensitive information, as more particularly described above under the risk factor related to our processing, storage, use and disclosure of personal or sensitive information;
- compliance with the United States Foreign Corrupt Practices Act, the United Kingdom Bribery Act 2010 and similar regulations in other countries, as more particularly described above under the risk factor related to our international operations;
- primary ticketing and ticket resale services;
- construction, renovation and operation of our venues;
- licensing, permitting and zoning, including noise ordinances;
- human health, safety, security and sanitation requirements;
- the service of food and alcoholic beverages;
- working conditions, labor, minimum wage and hour, citizenship and employment laws;
- compliance with the ADA and the DDA;
- hazardous and non-hazardous waste and other environmental protection laws;
- sales and other taxes and withholding of taxes;
- marketing activities via the telephone and online; and
- historic landmark rules.

Our failure to comply with these laws and regulations could result in proceedings/fines against us by governmental agencies and private actions brought by consumers, which if material, could adversely affect our business, financial condition and results of operations. While we attempt to conduct our business and operations in a manner that we believe to be in compliance with such laws and regulations, there can be no assurance that a law or regulation will not be interpreted or enforced in a manner contrary to our current understanding of the law or regulation. In addition, the promulgation of new laws, rules and regulations could restrict or unfavorably impact our business, which could decrease demand for services, reduce revenue, increase costs and/or subject us to additional liabilities. For example, some legislatures have proposed laws in the past that would impose potential liability on us and other promoters and producers of live music events for entertainment taxes and for incidents that occur at our events, particularly relating to drugs and alcohol. New legislation could be passed that may negatively impact our business, such as provisions that have recently been proposed in various jurisdictions that would restrict ticketing methods. Additionally, governmental actions such as the current sanctions by the United States Department of the Treasury's Office of Foreign Assets Control and European regulators on certain Russian individuals and entities, as well as other sanctions elsewhere in the world, could restrict or limit our business activities in certain areas or subject us to sanction for noncompliance, even if inadvertent.

From time to time, federal, state and local authorities and/or consumers commence investigations, inquiries or litigation with respect to our compliance with applicable consumer protection, advertising, unfair business practice, antitrust (and similar or related laws) and other laws. Our businesses have historically cooperated with authorities in connection with these investigations and have satisfactorily resolved each such material investigation, inquiry or litigation. We are currently subject to agreements with the States of New Jersey, Maryland and Illinois and the FTC which govern, and in certain cases place limitations on, our ticketing resale practices. Our competitors in the secondary ticket sales market are not, to our knowledge, bound by such limitations (other than as a result of laws that apply equally to all secondary ticket sellers) and as a result, we may be at a competitive disadvantage. From time to time, other states, Canadian provinces and the federal government have commenced investigations or inquiries related to other aspects of our ticketing business, including a now-settled suit brought by the Canadian Competition Bureau relating to alleged deceptive marketing practices. In addition, in January 2020, we agreed with the United States Department of Justice to extend the duration of the consent decree we entered into in connection with our merger with Ticketmaster Entertainment LLC, which places certain restraints on our business (see the risk factor entitled "We recently agreed with the United States Department of Justice to extend and clarify the court-imposed final judgment to which we became subject in connection with the merger of Live Nation, Inc. and Ticketmaster Entertainment LLC, which places certain restrictions and obligations on us which could negatively impact our business" below). We have incurred legal expenses in connection with the defense of governmental investigations and litigation in the past and may be required to incur additional expenses in the future regarding such investigations and litigation. In the case of antitrust (and similar or related) matters, any adverse outcome could limit or prevent us from engaging in the ticketing business generally (or in a particular segment thereof) or subject us to potential damage assessments, all of which could have a material adverse effect on our business, financial condition and results of operations.

23

Exhibit 2, page 034

*Unfavorable outcomes in legal proceedings may adversely affect our business and operating results.*

Our results may be affected by the outcome of pending and future litigation. Unfavorable rulings in our legal proceedings may have a negative impact on us that may be greater or smaller depending on the nature of the rulings. In addition, we are currently, and from time to time in the future may be, subject to various other claims, investigations, legal and administrative cases and proceedings (whether civil or criminal) or lawsuits by governmental agencies or private parties, as further described in the immediately preceding risk factor. If the results of these investigations, proceedings or suits are unfavorable to us or if we are unable to successfully defend against third-party lawsuits, we may be required to pay monetary damages or may be subject to fines, penalties, injunctions or other censure that could have a material adverse effect on our business, financial condition and results of operations. Even if we adequately address the issues raised by an investigation or proceeding or successfully defend a third-party lawsuit or counterclaim, we may have to devote significant financial and management resources to address these issues, which could harm our business, financial condition and results of operations.

*In December 2019, we agreed with the United States Department of Justice to extend and clarify the court-imposed final judgment to which we became subject in connection with the merger of Live Nation, Inc. and Ticketmaster Entertainment LLC, which places certain restrictions and obligations on us which could negatively impact our business.*

In connection with the merger of Live Nation, Inc. and Ticketmaster Entertainment LLC in 2010, we became subject, through July 2020, to a court-imposed final judgment (the "Final Judgment") that places certain restrictions and obligations on us in order to address the issues the United States Department of Justice (the "DOJ") raised in its antitrust review of the merger. Pursuant to the Final Judgment, we agreed to abide by certain behavioral remedies and to provide periodic reports to the DOJ about our compliance with the Final Judgment. The Final Judgment was due to expire in July 2020; in December 2019, we reached an agreement with the DOJ to clarify certain aspects of the Final Judgment and extend its duration through the end of 2025 (the "Amended Final Judgment").

Under the Amended Final Judgment we may not (i) threaten to condition (or actually condition) the provision of Live Nation concerts on a venue choosing Ticketmaster, or (ii) retaliate (i.e., withhold any Live Nation concerts) in response to a venue choosing a ticketing services provider other than Ticketmaster. In addition, pursuant to the Amended Final Judgment, (i) an independent monitor has been appointed to monitor and report to the DOJ on our compliance with the Amended Final Judgment, and investigate any potential violations thereof, (ii) we appointed an internal antitrust compliance officer and have conducted (and will continue to annually conduct) internal trainings to ensure our employees fully comply with the Amended Final Judgment; (iii) we provided, and will continue to provide, notice to current or potential venue customers of the Amended Final Judgment and its restrictions on our business conduct; and (iv) we are subject to an automatic penalty of $1,000,000 for each violation. We agreed to pay costs and fees for the independent monitor and the DOJ's past investigation and enforcement.

During the duration of the Amended Final Judgment, we are restricted from engaging in certain business activities that, absent the Final Judgment, would be lawful for us to undertake. Our inability to undertake these business strategies could disadvantage us when we compete against firms that are not restricted by any such order. In addition, our business will be under continued and enhanced scrutiny by the DOJ, including by the independent monitor. Our compliance with the Amended Final Judgment therefore creates certain unquantifiable business risks for us.

In connection with the merger we also entered into a consent agreement with the Canadian Commissioner of Competition (the "Canadian Consent Agreement"), which had the effect of imposing essentially the same terms as the Final Judgment on our business in Canada. The various terms of the Canadian Consent Agreement expired on or before July 2020.

### Risks Relating to Our Leverage

*We have a large amount of debt and lease obligations that could restrict our operations and impair our financial condition. The agreements governing our senior secured credit facility and certain of our other indebtedness impose restrictions on us that limit the discretion of management in operating our business and that, in turn, could impair our ability to meet our obligations under our debt.*

The agreements governing our senior secured credit facility and certain of our other indebtedness include restrictive covenants that, among other things, restrict our ability to:

- incur additional debt;
- pay dividends and make distributions;
- make certain investments;
- repurchase our stock and prepay certain indebtedness;
- create liens;
- enter into transactions with affiliates;
- modify the nature of our business;
- enter into sale-leaseback transactions;
- transfer and sell material assets; and

24

- merge or consolidate.

In addition, our senior secured credit facility includes other restrictions, including requirements to maintain certain financial ratios. Our failure to comply with the terms and covenants of our indebtedness could lead to a default under the terms of the governing documents, which would entitle the lenders to accelerate the indebtedness and declare all amounts owed due and payable.

As of December 31, 2021, our total indebtedness, excluding unamortized debt discounts and debt issuance costs of $99.5 million, was $5.8 billion. Our available borrowing capacity under the revolving portion of our senior secured credit facility at that date was $569.9 million, with outstanding letters of credit of $60.1 million. We may also incur significant additional indebtedness in the future.

Our substantial indebtedness could have adverse consequences, including:

- making it more difficult for us to satisfy our obligations;
- increasing our vulnerability to adverse economic, regulatory and industry conditions;
- limiting our ability to obtain additional financing for future working capital, capital expenditures, acquisitions and other purposes;
- requiring us to dedicate a substantial portion of our cash flow from operations to fund payments on our debt, thereby reducing funds available for operations and other purposes;
- limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- making us more vulnerable to increases in interest rates; and
- placing us at a competitive disadvantage compared to our competitors that have less debt.

*To service our debt and lease obligations and to fund potential acquisitions, artist and ticketing advances and capital expenditures, we will require a significant amount of cash, which depends on many factors beyond our control.*

Our ability to service our debt and lease obligations and to fund potential acquisitions, artist and ticketing advances and capital expenditures will require a significant amount of cash, which depends on many factors beyond our control. Our ability to make payments on and to refinance our debt will also depend on our ability to generate cash in the future. This is, to an extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We cannot provide assurance that our business will generate sufficient cash flow or that future borrowings will be available to us in an amount sufficient to enable us to pay our debt or to fund our other liquidity needs. If our future cash flow from operations and other capital resources is insufficient to pay our obligations as they mature or to fund our liquidity needs, we may be forced to reduce or delay our business activities and capital expenditures, sell assets, obtain additional equity capital or restructure or refinance all or a portion of our debt on or before maturity. In addition, the terms of our existing debt, including our senior secured credit facility, and other future debt may limit our ability to pursue any of these alternatives.

These measures might also be unsuccessful or inadequate in permitting us to meet scheduled debt service or lease obligations. We may be unable to restructure or refinance our obligations and obtain additional debt or equity financing or sell assets on satisfactory terms or at all. Capital markets have been volatile in the recent past; a downturn could negatively impact our ability to access capital should the need arise. As a result, the inability to meet our debt or lease obligations could cause us to default on those obligations. Any such defaults could materially harm our financial condition and liquidity.

See Item 7.—Management's Discussion and Analysis of Financial Condition and Results of Operations—Contractual Obligations and Commitments—Firm Commitments for further discussion.

*We depend on the cash flows of our subsidiaries in order to satisfy our obligations.*

We rely on distributions and loans from our subsidiaries to meet our payment requirements under our obligations. If our subsidiaries are unable to pay dividends or otherwise make payments to us, we may not be able to make debt service payments on our obligations. We conduct substantially all of our operations through our subsidiaries. Our operating cash flows and consequently our ability to service our debt is therefore principally dependent upon our subsidiaries' earnings and their distributions of those earnings to us and may also be dependent upon loans or other payments of funds to us by those subsidiaries. Our subsidiaries are separate legal entities and may have no obligation, contingent or otherwise, to pay any amount due pursuant to our obligations or to make any funds available for that purpose. Our foreign subsidiaries generate a portion of our operating cash flows. Although we do not intend to repatriate these funds from our foreign subsidiaries in order to satisfy payment requirements in the United States, we would be required to accrue and pay United States state income taxes as well as any applicable foreign withholding or transaction taxes on future repatriations. These taxes could be substantial and could have a material adverse effect on our financial condition and results of operations. In addition, the ability of our subsidiaries to provide funds to us may be subject to restrictions under our senior secured credit facility and may be subject to the terms of such subsidiaries' future indebtedness, as well as the availability of sufficient surplus funds under applicable law.

Exhibit 2, page 036

*Conversion of our convertible notes may dilute the ownership interest of existing stockholders and may affect our per share results and the trading price of our common stock.*

The issuance of shares of our common stock upon conversion of our convertible notes may dilute the ownership interests of existing stockholders. Issuances of stock on conversion may also affect our per share results of operations. Any sales in the public market of our common stock issuable upon such conversion could adversely affect prevailing market prices of our common stock.

**General Risks Relating to our Business and Operations**

*We may be adversely affected by the occurrence of extraordinary events, such as terrorist attacks or disease epidemics.*

The occurrence and threat of extraordinary events, such as terrorist attacks, intentional or unintentional mass-casualty incidents, public health concerns such as contagious disease outbreaks, natural disasters or similar events, may deter artists from touring and/or substantially decrease the use of and demand for our services and the attendance at live music events, which may decrease our revenue or expose us to substantial liability. The terrorism and security incidents in the past, military actions in foreign locations, periodic elevated terrorism alerts and fears from publicized contagious disease outbreaks have raised numerous challenging operating factors, including public concerns regarding air travel, military actions and additional national or local catastrophic incidents, causing a nationwide disruption of commercial and leisure activities.

In the event of actual or threatened terrorism events, some artists may refuse to travel or book tours, which could adversely affect our business. Attendance at events may decline due to fears over terrorism and contagious disease outbreaks, which could adversely impact our operating results. There have been terrorist attacks at events that we have promoted or with which we have otherwise been involved, which have resulted in lawsuits questioning, among other things, the adequacy of the security precautions at these events. While we are constantly evaluating the security precautions for our events in an effort to ensure the safety of the public, no security measures can guarantee safety and there can be no assurances that we won't face liabilities, which could be substantial and materially impact our operating results, in connection with such terrorist attacks at our events. In addition, we hold a large number of events at third-party venues that we do not own or operate. While we do not have direct control over the security at such venues, there can be no guarantees that victims of a terrorism or casualty event at such venues will not seek to impose, or ultimately be successful in imposing, liability on us.

While we have health and safety programs designed to mitigate the risks that are inherent in the staging of concerts and other events, as well as those associated with extraordinary occurrences or actions that may take place at our events, there can be no assurances that these programs will be sufficient to fully cover every possibility. Despite our best efforts, some occurrences or actions are difficult to foresee and adequately plan for, which could lead to fan, vendor and/or employee harm resulting in fines, penalties, legal costs and reputational risk that could materially and adversely impact our business and results of operations.

*Exchange rates may cause fluctuations in our results of operations that are not related to our operations.*

Because we own assets overseas and derive revenue from our international operations, we may incur currency translation losses or gains due to changes in the values of foreign currencies relative to the United States Dollar. We cannot predict the effect of exchange rate fluctuations upon future operating results. For the year ended December 31, 2021, our international operations accounted for approximately 19% of our revenue. We cannot predict the future relationship between the United States Dollar and the currencies used by our international businesses, principally the British Pound, Euro, Australian Dollar and Canadian Dollar. We experienced foreign exchange rate operating income of $2.6 million for the year ended December 31, 2020 and foreign exchange operating losses of $9.2 million and $9.8 million for the years ended December 31, 2021 and 2019, respectively, which impacted our operating income (loss). See Item 7A.—Quantitative and Qualitative Disclosures about Market Risk.

*We may enter into future acquisitions and take certain actions in connection with such transactions, including actions taken to comply with antitrust, competition and other regulations, that could affect our business and results of operations; if we are unsuccessful in our future acquisition endeavors, our business could be adversely impacted.*

Our future growth rate depends in part on our selective acquisition of additional businesses. A portion of our growth has been attributable to acquisitions. We may be unable to identify other suitable targets for further acquisition or make further acquisitions at favorable prices. If we identify a suitable acquisition candidate, our ability to successfully complete the acquisition would depend on a variety of factors, and may include our ability to obtain financing on acceptable terms and requisite government approvals. In addition, the credit agreement for our senior secured credit facility restricts our ability to make certain acquisitions. In connection with future acquisitions, we could take certain actions that could adversely affect our business, including:

- using a significant portion of our available cash;
- issuing equity securities, which would dilute current stockholders' percentage ownership;

26

- incurring substantial debt;
- incurring or assuming contingent liabilities, known or unknown;
- incurring amortization expenses related to intangibles; and
- incurring large accounting write-offs or impairments.

In addition, acquisitions involve inherent risks which, if realized, could adversely affect our business and results of operations, including those associated with:

- integrating the operations, financial reporting, technologies and personnel of acquired companies, including establishing and maintaining a system of internal controls appropriate for a public company environment;
- managing geographically dispersed operations;
- the diversion of management's attention from other business concerns;
- the inherent risks in entering markets or lines of business in which we have either limited or no direct experience;
- the potential loss of key employees, customers and strategic partners of acquired companies; and
- the impact of laws and regulations relating to antitrust at the state, federal and international levels, which could significantly affect our ability to complete acquisitions and expand our business.

***Our operations are seasonal and our results of operations vary from quarter to quarter and year over year, so our financial performance in certain financial quarters or years may not be indicative of, or comparable to, our financial performance in subsequent financial quarters or years.***

We believe our financial results and cash needs will vary greatly from quarter to quarter and year to year depending on, among other things, the timing of tours, tour cancellations, event ticket on-sales, capital expenditures, seasonal and other fluctuations in our operating results, the timing of guaranteed payments and receipt of ticket sales and fees, financing activities, acquisitions and investments and receivables management. Because our results may vary significantly from quarter to quarter and year to year, our financial results for one quarter or year cannot necessarily be compared to another quarter or year and may not be indicative of our future financial performance in subsequent quarters or years. Typically, we experience our lowest financial performance in the first and fourth quarters of the calendar year as our outdoor venues are primarily used, and our festivals primarily occur, during May through October. In addition, the timing of tours of top grossing acts can impact comparability of quarterly results year over year and potentially annual results. The timing of event on-sales by our ticketing clients can also impact this comparability. In addition, the seasonality of our businesses could create cash flow management risks if we do not adequately anticipate and plan for periods of decreased activity, which could negatively impact our ability to execute on our strategy, which in turn could harm our results of operations. Due to the unprecedented stoppage of our concert events globally in mid-March 2020 due to the global COVID-19 pandemic, we did not experience our typical seasonality trends in 2020 and 2021 even with the resumption of events late in the second quarter of 2021.

The following table sets forth our operating income (loss) for the last eight fiscal quarters (in thousands):

|  | 2021 | 2020 |
|---|---|---|
| **March 31** | $ (303,172) | $ (172,670) |
| **June 30** | (127,285) | (588,067) |
| **September 30** | 137,145 | (504,441) |
| **December 31** | (124,546) | (388,014) |

27

Exhibit 2, page 038

***Costs associated with, and our ability to obtain, adequate insurance could adversely affect our profitability and financial condition.***

We currently secure insurance programs to address our various risks with terms, conditions and costs that are appropriate for our business. However, heightened concerns and challenges regarding property, casualty, business interruption, contingency and other insurance coverage have resulted from terrorist and other security incidents along with varying weather-related conditions, pandemics and other incidents. Any such events that are of a massive scale causing significant losses to insurance providers could negatively impact the insurance marketplace, and as a result, we may experience increased difficulty obtaining sufficiently high policy limits of coverage at a cost we believe to be reasonable, including coverage for acts of terrorism, cyber attacks, weather-related damage and disruptions and other perils associated with our operations, including communicable diseases and/or pandemics. We have experienced a significant increase in our cost to obtain appropriate insurance over the past several years, though it is difficult to gauge the portion of this increase that is due to conditions in the insurance marketplace generally versus that attributable to our claims history for the mass casualty, cybersecurity, the global COVID-19 pandemic and other incidents that we have faced. We have a material investment in property and equipment at each of our venues, which are generally located near major cities and which hold events typically attended by a large number of fans. We also have a significant investment in technology, including our ticketing systems. At December 31, 2021, we had property and equipment with a net book value of $1.1 billion. We cannot guarantee that future increases in insurance costs and difficulties obtaining high policy limits will not adversely impact our profitability, thereby possibly impacting our operating results and growth.

We cannot provide assurance that our insurance policy coverage limits, including insurance coverage for property, casualty, artists, business interruption losses, cyber attacks and acts of terrorism, would be adequate under the circumstances should one or multiple events occur at or near any of our business locations, or that our insurers would have adequate financial resources to sufficiently or fully pay our related claims or damages. We cannot guarantee that adequate coverage limits will be available, offered at a reasonable cost, or offered by insurers with sufficient financial soundness. The occurrence of such an incident or incidents affecting any one or more of our business facilities could have a material adverse effect on our financial position and future results of operations if asset damage and/or company liability were to exceed insurance coverage limits or if an insurer were unable to sufficiently or fully pay our related claims or damages.

***We depend upon unionized labor for the provision of some of our services and any work stoppages or labor disturbances could disrupt our business; potential union pension obligations could cause us to incur unplanned liabilities.***

The stagehands at some of our venues and other employees are subject to collective bargaining agreements. Our union agreements typically have a term of three years and thus regularly expire and require negotiation in the ordinary course of our business. Upon the expiration of any of our collective bargaining agreements, however, we may be unable to negotiate new collective bargaining agreements on terms favorable to us, and our business operations may be interrupted as a result of labor disputes or difficulties and delays in the process of renegotiating our collective bargaining agreements. In addition, our business operations at one or more of our facilities may also be interrupted as a result of labor disputes by outside unions attempting to unionize a venue even though we do not have unionized labor at that venue currently. A work stoppage at one or more of our owned or operated venues or at our promoted events could have a material adverse effect on our business, financial condition and results of operations. We cannot predict the effect that a potential work stoppage would have on our business.

We participate in, and make recurrent contributions to, various multiemployer pension plans that cover many of our current and former union employees. Our required recurrent contributions to these plans could unexpectedly increase during the term of a collective bargaining agreement due to ERISA laws that require additional contributions to be made when a pension fund enters into critical status, which may occur for reasons that are beyond our control. In addition, we may be required by law to fulfill our pension withdrawal liability with respect to any multiemployer pension plans from which we may withdraw or partially withdraw. Our potential withdrawal liability will increase if a multiemployer pension plan in which we participate has significant underfunded liabilities. Any unplanned or greater than expected multiemployer pension liabilities could have a material adverse effect on our business, financial condition and results of operations.

**ITEM 1B.   UNRESOLVED STAFF COMMENTS**

None.

Exhibit 2, page 039

**ITEM 2.    PROPERTIES**

As of December 31, 2021, we own, operate or lease 165 entertainment venues throughout North America and 94 entertainment venues internationally. We have a lease ending June 30, 2030 for our corporate headquarters in Beverly Hills, California, used primarily by our executive group and certain of our domestic operations management staff. We also lease office space and other facilities in 43 countries that support our Concerts, Ticketing and Sponsorship & Advertising segment operations. We believe our venues and facilities are generally well-maintained and in good operating condition and have adequate capacity to meet our current business needs.

Our leases are for varying terms ranging from monthly to multi-year. These leases can typically be for terms of three to 10 years for our office leases and five to 25 years for our venue leases, and many include renewal options. There is no significant concentration of venues under any one lease or subject to negotiation with any one landlord. We believe that an important part of our management activity is to negotiate suitable lease renewals and extensions.

**ITEM 3.    LEGAL PROCEEDINGS**

Information regarding our legal proceedings can be found in Part II—Financial Information—Item 8. Financial Statements and Supplementary Data—Note 9—Commitments and Contingent Liabilities and —Note 3—Business Acquisitions.

Exhibit 2, page 040

Table of Contents

**PART II—FINANCIAL INFORMATION**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our common stock was listed on the New York Stock Exchange under the symbol "LYV" beginning on December 21, 2005. There were 2,991 stockholders of record as of February 16, 2022. This figure does not include an estimate of the indeterminate number of beneficial holders whose shares may be held of record by brokerage firms and clearing agencies.

**Purchase of Equity Securities**

The following table provides information regarding repurchases of our common stock during the quarter ended December 31, 2021.

| Period | Total Number of Shares Purchased [1] | Average Price Paid per Share [1] | Total Number of Shares Purchased as Part of Publicly Announced Program [2] | Maximum Fair Value of Shares that May Yet Be Purchased Under the Program [2] |
|---|---|---|---|---|
| October 2021 | — | $— | | |
| November 2021 | — | $— | | |
| December 2021 | 28,682 | $104.63 | | |
| | 28,682 | | | |

---

[1] Represents shares of common stock that employees surrendered as part of the default option to satisfy withholding taxes in connection with the vesting of restricted stock awards, and in respect of the exercise price and withholding taxes for net stock option exercises where no resulting shares were sold, under our stock incentive plan. Pursuant to the terms of our stock plan, such shares revert to available shares under the plan.

[2] We do not have a publicly announced program to purchase shares of our common stock. Accordingly, there were no shares purchased as part of a publicly announced program.

**Dividend Policy**

Information regarding our dividend policy can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 12—Equity.

**Recent Sales of Unregistered Securities**

None.

**ITEM 6. SELECTED FINANCIAL DATA**

Information is within Part II—Financial Information—Item 8.—Financial Statements and Supplementary Data and should be read in conjunction with Item 7.—Management's Discussion and Analysis of Financial Condition and Results of Operations.

30

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion of our financial condition and results of operations together with the audited consolidated financial statements and notes to the consolidated financial statements included elsewhere in this Annual Report. This discussion contains forward-looking statements that involve risks and uncertainties. The forward-looking statements are not historical facts, but rather are based on current expectations, estimates, assumptions and projections about our industry, business and future financial results. Our actual results could differ materially from the results contemplated by these forward-looking statements due to a number of factors, including those discussed under Item 1A.—Risk Factors and other sections in this Annual Report.*

*The following discussion of our financial condition and results of operations generally discusses 2021 and 2020 items along with year-over-year comparisons between these two years. Discussion of 2019 items and year-over-year comparisons between 2020 and 2019 can be found in Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations in our 2020 Annual Report on Form 10-K.*

**Executive Overview**

In 2021, we saw a meaningful restart of our operations in the second half of the year which is reflected in our financials and key performance indicators. After nearly a year and a half of very limited events and ticket sales, shows restarted in some key markets at scale during the third quarter. In particular, we saw outdoor amphitheater events as well as festivals take place in the United States and United Kingdom with enthusiastic fan response. Despite the operational challenges associated with ramping up our concerts in a compressed timeframe, increased health protocols, and a tighter labor market, we were able to hold most planned concerts, increase overall per fan profitability, and improve our operating income by over $1 billion compared to 2020. Emerging from the pandemic, our organization has streamlined its operations, reduced costs and focused its cash management strategies for future flexibility. Even in the face of new Covid variants and regional surges, our reopening is well underway in the United States and United Kingdom, while other parts of the world catch up as vaccination efforts gain momentum and government responses evolve. A key leading indicator of the future health of our business is transacted ticket sales and we had a record Q4 with the largest number of tickets sold in a quarter and the highest gross ticket value, excluding refunded tickets. Our resale business also hit an historic high for us in Q4.

Our total revenue increased by $4.4 billion for the full year, from $1.9 billion in 2020 to $6.3 billion in 2021. All three of our segments reported revenue growth due to more events, higher ticket sales and increased sponsor fulfillment over the past twelve months. As a result, our operating income improved by $1.2 billion, from a loss of $1.7 billion in 2020 to a loss of $418 million in 2021. The improvement resulted from increased events, ticket sales and sponsor client activation partially offset by higher selling, general and administrative expenses as we brought employees back from furlough and began hiring new roles to execute 2021 events and prepare for 2022. The impact of changes in foreign exchange rates did not materially impact our year-over-year variances.

Our Concerts segment revenue for the full year increased by $3.3 billion, from $1.5 billion in 2020 to $4.7 billion in 2021. The revenue growth was a result of increased shows and fans during the year as well as higher ancillary spend per fan and pricing at our events. The number of events for the full year was more than 17,200 compared to approximately 8,200 events in 2020. The number of fans for the full year was 35.1 million compared to approximately 11.1 million last year. The growth was largely in the United States and United Kingdom. Concerts operating loss for the full year improved by $340 million, from a loss of $959 million in 2020 to $618 million in 2021. The improvement was primarily due to more shows this year, an increase in net ancillary spend per fan at our amphitheater and festival events, and growth in pricing across all venue types. Our amphitheater net ancillary spend per fan grew by double digits compared to 2019 as a result of higher consumption and our transition to cashless transactions. At our major festivals that had over 100 thousand fans, we also saw growth in onsite spend with our ancillary per fan increasing by double-digits over 2019. Compared to 2019, overall pricing on tickets also increased by double digits. And while we have seen some adverse impacts in our operating expenses per show due to labor shortages and supply chain issues, our spend per fan metrics have outpaced the higher costs.

Our Ticketing segment revenue for the full year increased by $946 million, from $188 million in 2020 to $1.1 billion in 2021. The improvement resulted from an increase in ticket sales, stronger pricing, and a reduction in ticket refunds this year. Excluding refunds, we sold 153 million fee-bearing tickets this year compared to 58 million tickets last year. The improvement was almost entirely driven by sales in the United States and the United Kingdom, largely for concert and sporting events. Pricing on our fee-bearing tickets increased by double-digits, reflecting strong consumer demand, particularly for premium seats and VIP experiences. Our resale business bounced back dramatically in the second half of the year and Q4 was our highest resale gross transaction value quarter ever, at over $1 billion. Ticketing operating income for the year improved by $782 million, from a $612 million loss in 2020 to income of $170 million in 2021. The improvement in operating results was largely driven by increased ticket sales, strong ticket pricing and higher ancillary revenue streams.

31

Exhibit 2, page 042

Our Sponsorship & Advertising segment revenue for the full year increased by $208 million, from $204 million in 2020 to $412 million in 2021. The improvement was due to higher activations with our marketing partners driven by more events going on sale, venues re-opening and supplying more advertising content to our clients. Even with a compressed sales window, we saw strong sales for many of our larger festivals. Operating income for the year increased by $157 million, from $45 million in 2020 to $202 million in 2021. The improvement was due to more sponsor and online advertising activations resulting from the restart of live events and rapidly increasing ticket sales, particularly in the United States.

As ticket sales and events scale up in key markets, we continue to focus on mitigating the financial impact of the pandemic. We are balancing our ramp-up with the cost-savings initiatives we implemented across the organization and are also protecting our liquidity by managing cash outflows associated with all our major expenditures: operating expenses, capital expenditures, acquisitions, and advances in both our ticketing and concert businesses. The progress and momentum over the last three quarters has made us even more optimistic about the long-term potential of our company and the unique power of live shows to unite people.

**Impact of the Global COVID-19 Pandemic**

The unprecedented and rapid spread of COVID-19 and the related government restrictions and social distancing measures implemented throughout the world significantly impacted our business from mid-March through the first half of this year. Late in the second quarter, however, we began to see the positive impacts of successful vaccination rollouts in many of our key markets, mainly the United States and United Kingdom, with social distancing restrictions easing and live events resuming. In the third quarter, we saw a meaningful restart of our operations with outdoor amphitheater events and festivals taking place in both the United States and United Kingdom. The restart of our operations has been executed with careful consideration for the safety and health of our fans, artists and employees through a mix of masking, testing and vaccination protocols at our events, venues and offices around the world.

*Operating Results*

The impact of the global COVID-19 pandemic to our operating results are discussed in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 2—Impact of the Global COVID-19 Pandemic.

*Cash and available liquidity*

We currently have approximately $569.9 million available for future borrowings under our senior secured credit facility, net of outstanding letters of credit. In January 2021, we issued $500 million principal amount of 3.75% senior secured notes due 2028 and in September 2021, we elected to draw down the $400 million term loan A under the amended senior secured credit facility and completed the public offering of 5,239,259 shares of common stock for $449.6 million of net proceeds. We will continue to evaluate future financing opportunities to further expand liquidity at reasonable costs. Additionally, our senior secured credit facility has reverted back to a net leverage covenant (as defined in the agreement) as of December 31, 2021. We believe these additional debt and equity issuances allow us the flexibility to manage our business through the disruption that we continue to experience into 2022.

As of December 31, 2021, our total cash and cash equivalents balance was $4.9 billion, which included $1.3 billion of ticketing client cash. We believe this cash, net of client cash, together with our available debt capacity of $569.9 million, gives us the liquidity to fund our operations during the pandemic. Our total cash includes event-related deferred revenue for which the amount can fluctuate over the course of the year, but given the shift of shows into 2022, we expect this number to remain above seasonally normal levels throughout the first half of 2022.

Event-related deferred revenue consists of cash held by our Concerts business for future shows, with roughly one-third of the funds associated with upcoming shows in the United States and two-thirds for international shows as of December 31, 2021. In the United States, the funds are largely associated with shows in our owned or operated venues, notably amphitheaters and theaters and clubs, as well as festivals. Internationally, the funds held are from a combination of both shows in our owned or operated venues, as well as shows in third-party venues associated with our promoter share of tickets in allocation markets.

*Cost and Cash Management Programs*

In response to the impacts the COVID-19 pandemic has had, and continues to have, on our business globally, we have implemented a number of initiatives to reduce fixed costs and conserve cash while our business was shut down. As part of these cost reduction efforts in 2020, we implemented salary reductions for most of our employees, with salaries for senior executives reduced by up to 60%. Additional cost reduction efforts that began in 2020 included hiring freezes, reduction in the use of contractors, rent re-negotiations, furloughs, termination of certain employees and reduction or elimination of other discretionary spending, including, among other things, travel and entertainment, repairs and maintenance, and marketing. As of the end of 2021, salaries have been fully restored and furloughed employees have returned to work and, as our business scales back up, we are beginning to reinvest in our growth while continuing to closely monitor our cash flow and liquidity.

Exhibit 2, page 043

We continue to make use of government support programs globally. In most European and Asia-Pacific markets, including the United Kingdom, Germany, Italy, France, Spain and Australia, there were payroll support programs to mitigate a substantial portion of employee costs. Additionally, in the United States, we filed for payroll support under the Employee Retention Credit program established as part of the CARES Act, which ended in the third quarter of 2021. Finally, the CARES Act also provides for deferred payment of the employer portion of social security taxes through the end of 2020, with 50% of the deferred amount due December 31, 2021 and the remaining 50% due December 31, 2022.

Based on these actions and assumptions regarding the impact of the global COVID-19 pandemic, we believe that we will remain in compliance with our debt covenants throughout 2022 and be able to generate sufficient liquidity and profitability to satisfy our obligations for the next twelve months, prior to giving effect to any additional financings that may occur. Our forecasted expense management and liquidity measures may be modified as we get more clarity on the timing of events. We cannot assure you that our assumptions used to estimate our leverage, liquidity and profitability requirements will be correct because the evolving nature of the pandemic makes its ultimate magnitude and duration unknown, and as a consequence, our ability to be predictive is uncertain.

*Health and Safety and Planning and Executing a Return to Business*

We are currently implementing steps for the health and safety of our employees as they return to work in our offices in the future, and for our artists and fans as they return to live events. We are returning to work in local markets in appropriate numbers with expanded cleaning and in compliance with any social distancing or other regulations. Similarly, we are resuming concerts when the time is right on a market by market basis. We recognize that as concerts have started back up, the experience at our venues has changed, and are working with medical experts and public health officials to implement safety precautions and protocols necessary for fans to return to enjoy our shows. The reopening of concerts is happening on a market by market basis, and given that we operate in 45 countries globally, the timelines will vary from now to not for several months or beyond and changing conditions may cause reopened markets to again close down in the future.

As the leading global live event and ticketing company, we believe that we are well-positioned to provide the best service to artists, teams, fans and venues as business resumes. More than twenty years of ongoing global growth demonstrates the resilience of fan demand for the live entertainment experience.

**Segment Overview**

*Concerts*

Revenue and related costs for events are generally deferred and recognized when the event occurs. All advertising costs incurred during the year for shows in future years are expensed at the end of the year. If a current year event is rescheduled into a future year, all advertising costs incurred to date are expensed in the period when the event is rescheduled.

Concerts direct operating expenses include artist fees, event production costs, show-related marketing and advertising expenses, along with other costs.

To judge the health of our Concerts segment, we primarily monitor the number of confirmed events and fan attendance in our network of owned or operated and third-party venues, talent fees, average paid attendance, market ticket pricing, advance ticket sales and the number of major artist clients under management. In addition, at our owned or operated venues and festivals, we monitor ancillary revenue per fan and premium ticket sales. For business that is conducted in foreign markets, we also compare the operating results from our foreign operations to prior periods without the impact of changes in foreign exchange rates.

Exhibit 2, page 044

***Ticketing***

Revenue related to ticketing service charges is recognized when the ticket is sold for our third-party clients. For our own events, where our concert promoters control ticketing, revenue is deferred and recognized when the event occurs. Gross transaction value ("GTV") represents the total amount of the transaction related to a ticket sale and includes the face value of the ticket as well as the service charge. We use GTV to evaluate changes in ticket fee revenue that are driven by the pricing of our service charges.

Ticketing direct operating expenses include call center costs and credit card fees, along with other costs.

To judge the health of our Ticketing segment, we primarily review the GTV and the number of tickets sold through our ticketing operations, the number of clients renewed or added and the average royalty rate paid to clients who use our ticketing services. In addition, we review the number of visits to our websites, cost of customer acquisition, the purchase conversion rate, the overall number of customers in our database, the number and percentage of tickets sold via mobile and the number of app installs. For business that is conducted in foreign markets, we also compare the operating results from our foreign operations to prior periods without the impact of changes in foreign exchange rates.

***Sponsorship & Advertising***

Revenue related to sponsorship and advertising programs is recognized over the term of the agreement or operating season as the benefits are provided to the sponsor unless the revenue is associated with a specific event, in which case it is recognized when the event occurs.

Sponsorship & Advertising direct operating expenses include fulfillment costs related to our sponsorship programs, along with other costs.

To judge the health of our Sponsorship & Advertising segment, we primarily review the revenue generated through sponsorship arrangements and online advertising, and the percentage of expected revenue under contract. For business that is conducted in foreign markets, we also compare the operating results from our foreign operations to prior periods without the impact of changes in foreign exchange rates.

Exhibit 2, page 045

Table of Contents

**Key Operating Metrics**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| | *(in thousands except estimated events)* | | |
| **Concerts** [1] | | | |
| Estimated events: | | | |
| North America | 12,004 | 5,270 | 28,407 |
| International | 5,230 | 2,847 | 11,830 |
| Total estimated events | 17,234 | 8,117 | 40,237 |
| Estimated fans: | | | |
| North America | 26,331 | 6,075 | 62,687 |
| International | 8,728 | 5,067 | 34,967 |
| Total estimated fans | 35,059 | 11,142 | 97,654 |
| **Ticketing** [2] | | | |
| Estimated number of fee-bearing tickets sold | 131,685 | 31,101 | 219,975 |
| Estimated number of non-fee-bearing tickets sold | 150,650 | 88,823 | 266,750 |
| Total estimated tickets sold | 282,335 | 119,924 | 486,725 |

———————

[1]  Events generally represent a single performance by an artist. Fans generally represent the number of people who attend an event. Festivals are counted as one event in the quarter in which the festival begins, but the number of fans is based on the days the fans were present at the festival and thus can be reported across multiple quarters. Events and fan attendance metrics are estimated each quarter.

[2]  The fee-bearing tickets estimated above include primary and secondary tickets that are sold using our Ticketmaster systems or that we issue through affiliates. This metric includes primary tickets sold during the year regardless of event timing, except for our own events where our concert promoters control ticketing which are reported when the events occur. The non-fee-bearing tickets estimated above include primary tickets sold using our Ticketmaster systems, through season seat packages and our venue clients' box offices, along with tickets sold on our "do it yourself" platform. These ticketing metrics are net of any refunds requested and any cancellations that occurred during the period and up to the time of reporting of these consolidated financial statements. Fee-bearing tickets sold above are net of refunds of 21.0 million and 27.3 million tickets for the years ended December 31, 2021 and 2020, respectively.

35

**Non-GAAP Measures**

The following table sets forth the reconciliation of AOI to operating income (loss):

| | Operating income (loss) | | Stock-based compensation expense | | Loss (gain) on disposal of operating assets | | Depreciation and amortization | | Amortization of non-recoupable ticketing contract advances | | Acquisition expenses | | AOI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | *(in thousands)* | | | | | | | |
| **2021** | | | | | | | | | | | | | |
| Concerts | $ | (618,486) | $ | 115,976 | $ | (1,162) | $ | 243,439 | $ | — | $ | 38,895 | $ | (221,338) |
| Ticketing | | 170,343 | | 33,753 | | (67) | | 133,227 | | 81,592 | | 1,697 | | 420,545 |
| Sponsorship & Advertising | | 202,177 | | 12,120 | | — | | 27,942 | | — | | — | | 242,239 |
| Other and Eliminations | | 180 | | — | | — | | 43 | | (7,186) | | — | | (6,963) |
| Corporate | | (172,072) | | 47,488 | | 18 | | 11,626 | | — | | 2,320 | | (110,620) |
| Total | $ | (417,858) | $ | 209,337 | $ | (1,211) | $ | 416,277 | $ | 74,406 | $ | 42,912 | $ | 323,863 |
| **2020** | | | | | | | | | | | | | |
| Concerts | $ | (958,975) | $ | 68,805 | $ | 505 | $ | 266,255 | $ | — | $ | (15,436) | $ | (638,846) |
| Ticketing | | (612,002) | | 13,395 | | (1) | | 169,921 | | 54,692 | | (568) | | (374,563) |
| Sponsorship & Advertising | | 44,873 | | 6,420 | | — | | 30,617 | | — | | — | | 81,910 |
| Other and Eliminations | | (13,440) | | — | | (1) | | 6,684 | | (6,721) | | — | | (13,478) |
| Corporate | | (113,648) | | 28,269 | | — | | 11,548 | | — | | 2,916 | | (70,915) |
| Total | $ | (1,653,192) | $ | 116,889 | $ | 503 | $ | 485,025 | $ | 47,971 | $ | (13,088) | $ | (1,015,892) |
| **2019** | | | | | | | | | | | | | |
| Concerts | $ | (53,463) | $ | 12,935 | $ | (2,490) | $ | 239,682 | $ | — | $ | 45,659 | $ | 242,323 |
| Ticketing | | 231,958 | | 6,268 | | 116 | | 156,894 | | 85,844 | | 1,276 | | 482,356 |
| Sponsorship & Advertising | | 330,270 | | 2,744 | | — | | 33,084 | | — | | — | | 366,098 |
| Other and Eliminations | | (1,114) | | — | | — | | 364 | | (5,542) | | — | | (6,292) |
| Corporate | | (182,807) | | 26,838 | | 1 | | 13,967 | | — | | 26 | | (141,975) |
| Total | $ | 324,844 | $ | 48,785 | $ | (2,373) | $ | 443,991 | $ | 80,302 | $ | 46,961 | $ | 942,510 |

***Adjusted Operating Income (Loss)***

AOI is a non-GAAP financial measure that we define as operating income (loss) before certain stock-based compensation expense, loss (gain) on disposal of operating assets, depreciation and amortization (including goodwill impairment), amortization of non-recoupable ticketing contract advances and acquisition expenses (including transaction costs, changes in the fair value of accrued acquisition-related contingent consideration obligations, and acquisition-related severance and compensation). We use AOI to evaluate the performance of our operating segments. We believe that information about AOI assists investors by allowing them to evaluate changes in the operating results of our portfolio of businesses separate from non-operational factors that affect net income (loss), thus providing insights into both operations and the other factors that affect reported results. AOI is not calculated or presented in accordance with GAAP. A limitation of the use of AOI as a performance measure is that it does not reflect the periodic costs of certain amortizing assets used in generating revenue in our business. Accordingly, AOI should be considered in addition to, and not as a substitute for, operating income (loss), net income (loss), and other measures of financial performance reported in accordance with GAAP. Furthermore, this measure may vary among other companies; thus, AOI as presented herein may not be comparable to similarly titled measures of other companies.

36

Exhibit 2, page 047

***AOI Margin***

AOI margin is a non-GAAP financial measure that we calculate by dividing AOI by revenue. We use AOI margin to evaluate the performance of our operating segments. We believe that information about AOI margin assists investors by allowing them to evaluate changes in the operating results of our portfolio of businesses separate from non-operational factors that affect net income (loss), thus providing insights into both operations and the other factors that affect reported results. AOI margin is not calculated or presented in accordance with GAAP. A limitation of the use of AOI margin as a performance measure is that it does not reflect the periodic costs of certain amortizing assets used in generating revenue in our business. Accordingly, AOI margin should be considered in addition to, and not as a substitute for, operating income (loss) margin, and other measures of financial performance reported in accordance with GAAP. Furthermore, this measure may vary among other companies; thus, AOI margin as presented herein may not be comparable to similarly titled measures of other companies.

***Constant Currency***

Constant currency is a non-GAAP financial measure. We calculate currency impacts as the difference between current period activity translated using the current period's currency exchange rates and the comparable prior period's currency exchange rates. We present constant currency information to provide a framework for assessing how our underlying businesses performed excluding the effect of foreign currency rate fluctuations.

Exhibit 2, page 048

**Segment Operating Results**

**Concerts**

Our Concerts segment operating results were, and discussions of significant variances are, as follows:

| | Year Ended December 31, | | | % Change 2021 vs 2020 | % Change 2020 vs 2019 |
|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | | |
| | *(in thousands)* | | | | |
| Revenue | $ 4,722,190 | $ 1,468,433 | $ 9,428,094 | * | (84)% |
| Direct operating expenses | 3,913,975 | 1,222,997 | 7,857,437 | * | (84)% |
| Selling, general and administrative expenses | 1,184,424 | 937,651 | 1,386,928 | 26% | (32)% |
| Depreciation and amortization | 243,439 | 266,255 | 239,682 | (9)% | 11% |
| Loss (gain) on disposal of operating assets | (1,162) | 505 | (2,490) | * | * |
| Operating loss | $ (618,486) | $ (958,975) | $ (53,463) | 36% | * |
| Operating margin | (13.1)% | (65.3)% | (0.6)% | | |
| AOI ** | $ (221,338) | $ (638,846) | $ 242,323 | 65% | * |
| AOI margin ** | (4.7)% | (43.5)% | 2.6% | | |

---

\* Percentages are not meaningful.

\*\* See "—Non-GAAP Measures" above for the definition of AOI and AOI margin as well as reconciliation of AOI.

*Revenue*

Concerts revenue increased $3.3 billion during the year ended December 31, 2021 as compared to the prior year primarily due to the resumption of shows and festivals in major markets including the United States and United Kingdom late in the second quarter of 2021 as compared to revenue generated in January through mid-March of 2020 when our business was fully open prior to the global COVID-19 pandemic. Concerts had incremental revenue of $42.9 million during 2021 from acquisitions, primarily from OCESA.

*Operating results*

Concerts operating loss decreased $340.5 million during the year ended December 31, 2021 as compared to the prior year primarily driven by the resumption of shows and festivals during 2021 discussed above. Included in depreciation and amortization in 2020 are $23.2 million in impairment charges of intangible assets due to the impacts from the global COVID-19 pandemic. Included in depreciation and amortization in 2019 are $21.2 million in impairment charges primarily associated with revenue-generating contract intangible assets. Concerts operating results for the year ended December 31, 2021 include net operating losses of $19.6 million related to acquisitions and new venues.

Exhibit 2, page 049

**Ticketing**

Our Ticketing segment operating results were, and discussions of significant variances are, as follows:

| | Year Ended December 31, | | | | | | % Change 2021 vs 2020 | % Change 2020 vs 2019 |
|---|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2019 | | | |
| | *(in thousands)* | | | | | | | |
| Revenue | $ | 1,134,268 | $ | 188,383 | $ | 1,545,189 | * | (88)% |
| Direct operating expenses | | 358,246 | | 129,433 | | 514,169 | * | (75)% |
| Selling, general and administrative expenses | | 472,519 | | 501,032 | | 642,052 | (6)% | (22)% |
| Depreciation and amortization | | 133,227 | | 169,921 | | 156,894 | (22)% | 8% |
| Loss (gain) on disposal of operating assets | | (67) | | (1) | | 116 | * | * |
| Operating income (loss) | $ | 170,343 | $ | (612,002) | $ | 231,958 | * | * |
| Operating margin | | 15.0% | | * | | 15.0% | | |
| AOI ** | $ | 420,545 | $ | (374,563) | $ | 482,356 | * | * |
| AOI margin ** | | 37.1% | | * | | 31.2% | | |

---

\*      Percentages are not meaningful.

\*\*    See "—Non-GAAP Measures" above for the definition of AOI and AOI margin as well as reconciliation of AOI.

*Revenue*

Ticketing revenue increased $945.9 million during the year ended December 31, 2021 as compared to the prior year primarily due to an increase in North America primary and secondary ticket fees driven by more events on sale due to the resumption of concerts and sporting events in the second quarter of 2021, strong ticket pricing and lower ticket refunds in 2021.

*Operating results*

Ticketing operating income for the year ended December 31, 2021 was $170.3 million as compared to an operating loss of $612.0 million for the prior year primarily driven by the increased ticketing activity discussed above along with cost reduction measures implemented in the second quarter of 2020 continuing into 2021, including salary reductions, hiring freezes, furloughs, and reduction or elimination of other discretionary spending along with participation in government support programs globally.

39

**Sponsorship & Advertising**

Our Sponsorship & Advertising segment operating results were, and discussions of significant variances are, as follows:

| | Year Ended December 31, | | | % Change 2021 vs 2020 | % Change 2020 vs 2019 |
|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | | |
| | (in thousands) | | | | |
| Revenue | $ 411,910 | $ 203,676 | $ 590,274 | * | (65)% |
| Direct operating expenses | 86,540 | 52,517 | 114,326 | 65% | (54)% |
| Selling, general and administrative expenses | 95,251 | 75,669 | 112,594 | 26% | (33)% |
| Depreciation and amortization | 27,942 | 30,617 | 33,084 | (9)% | (7)% |
| Operating income | $ 202,177 | $ 44,873 | $ 330,270 | * | (86)% |
| Operating margin | 49.1% | 22.0% | 56.0% | | |
| AOI ** | $ 242,239 | $ 81,910 | $ 366,098 | * | (78)% |
| AOI margin ** | 58.8% | 40.2% | 62.0% | | |

---

\* Percentages are not meaningful.

\** See "—Non-GAAP Measures" above for the definition of AOI and AOI margin as well as reconciliation of AOI.

*Revenue*

Sponsorship & Advertising revenue increased $208.2 million during the year ended December 31, 2021 as compared to the prior year primarily due to increased activity in national sponsorship programs, festival sponsorships and online advertising in North America due to the resumption of concert events and festivals in the second quarter of 2021.

*Operating results*

Sponsorship & Advertising operating income increased $157.3 million during the year ended December 31, 2021 as compared to the prior year primarily driven by the higher sponsorship activity discussed above.

40

**Consolidated Results of Operations**

| | | 2021 | | | 2020 | 2019 | % Change 2021 vs 2020 | | % Change 2020 vs 2019 |
|---|---|---|---|---|---|---|---|---|---|
| | | As Reported | Currency Impacts | Constant Currency** *(in thousands)* | As Reported | As Reported | As Reported | Constant Currency | As Reported |
| Revenue | $ | 6,268,447 | $ (43,985) | $ 6,224,462 | $ 1,861,178 | $ 11,547,969 | * | * | (84)% |
| Operating expenses: | | | | | | | | | |
| Direct operating expenses | | 4,355,989 | (26,407) | 4,329,582 | 1,402,400 | 8,467,182 | * | * | (83)% |
| Selling, general and administrative expenses | | 1,754,822 | (20,327) | 1,734,495 | 1,524,342 | 2,145,486 | 15% | 14% | (29)% |
| Depreciation and amortization | | 416,277 | (6,483) | 409,794 | 485,025 | 443,991 | (14)% | (16)% | 9% |
| Loss (gain) on disposal of operating assets | | (1,211) | 4 | (1,207) | 503 | (2,373) | * | * | * |
| Corporate expenses | | 160,428 | (21) | 160,407 | 102,100 | 168,839 | 57% | 57% | (40)% |
| Operating income (loss) | | (417,858) | $ 9,249 | $ (408,609) | (1,653,192) | 324,844 | 75% | 75% | * |
| Operating margin | | (6.7)% | | (6.6)% | (88.8)% | 2.8% | | | |
| Interest expense | | 282,440 | | | 226,832 | 157,521 | | | |
| Interest income | | (6,625) | | | (11,737) | (14,406) | | | |
| Equity in losses (earnings) of nonconsolidated affiliates | | (2,520) | | | 5,458 | (5,457) | | | |
| Loss (gain) from sale of investments in nonconsolidated affiliates | | (83,578) | | | 1,727 | (1,119) | | | |
| Other expense (income), net | | 3,692 | | | (18,807) | 3,201 | | | |
| Income (loss) before income taxes | | (611,267) | | | (1,856,665) | 185,104 | | | |
| Income tax expense (benefit) | | (2,481) | | | (28,875) | 66,892 | | | |
| Net income (loss) | | (608,786) | | | (1,827,790) | 118,212 | | | |
| Net income (loss) attributable to noncontrolling interests | | 42,118 | | | (103,255) | 48,323 | | | |
| Net income (loss) attributable to common stockholders of Live Nation | $ | (650,904) | | | $ (1,724,535) | $ 69,889 | | | |

*   Percentages are not meaningful.
**  See "—Non-GAAP Measures" above for definition of constant currency.

41

Exhibit 2, page 052

*Corporate*

Corporate expenses increased $58.3 million, or 57%, during the year ended December 31, 2021 as compared to the prior year primarily due to increased compensation expense driven by headcount growth and incentive compensation as a result of the increased operating results during 2021. During 2020, cost reduction efforts due to the COVID-19 pandemic included salary reductions, hiring freezes, reduction in the use of contractors, furloughs, and reduction or elimination of other discretionary spending, including, among other things, travel and entertainment and repairs and maintenance.

*Interest expense*

Interest expense increased $55.6 million, or 25%, during the year ended December 31, 2021 as compared to the prior year due to additional interest costs from the issuance of our 2.0% convertible senior notes in February 2020, the issuance of our 6.5% senior secured notes in May 2020, the issuance of our 3.75% senior secured notes in January 2021 and the draw down of our term loan A under the amended senior secured credit facility.

Our debt balances, excluding unamortized debt discounts and issuance costs, were $5.8 billion and $5.0 billion as of December 31, 2021 and 2020, respectively.

*Loss (Gain) from sale of investments in nonconsolidated affiliates*

Gain from sale of investments in nonconsolidated affiliates was $83.6 million during the year ended December 31, 2021 as compared to a loss of $1.7 million in the prior year primarily due to the sale of certain cost basis investments during 2021.

*Other expense (income), net*

Other expense (income), net was a net loss of $3.7 million during the year ended December 31, 2021 and includes net foreign exchange rate losses of $20.6 million offset by $15.4 million in mark to market adjustments for certain investments. Other expense (income), net was a net income of $18.8 million during the year ended December 31, 2020 and includes net foreign exchange rate gains of $9.0 million. The net foreign exchange rate gains and losses result primarily from revaluation of certain foreign currency denominated net assets held internationally.

*Income taxes*

For the year ended December 31, 2021, we had a net tax benefit of $2.5 million on losses before income taxes of $611.3 million compared to a net tax benefit of $28.9 million on losses before income taxes of $1.9 billion for 2020. In 2021, the net income tax benefit consisted of $7.5 million tax expense related to United States federal income taxes, offset by $8.8 million tax benefit related to foreign entities and $1.2 million tax benefit related to state and local income taxes. The net increase in tax expense of $26.4 million is due primarily to higher pre-tax income or lower pre-tax losses in taxable jurisdictions.

*Net income (loss) attributable to noncontrolling interests*

Net income (loss) attributable to noncontrolling interests was an income of $42.1 million during the year ended December 31, 2021 as compared to loss of $103.3 million in the prior year primarily due to higher operating results from certain concert and festival promotion businesses in North America during 2021 due to the resumption of events in 2021.

**Liquidity and Capital Resources**

In response to the impact that the global COVID-19 pandemic has had on our business, and the uncertainty of the duration of current conditions globally, we have taken certain actions to strengthen our liquidity position and preserve our capital resources.

In April 2020, we amended our senior secured credit facility to provide an incremental $130 million revolving credit facility. We further amended our senior secured credit facility in July 2020, which, among other things, substitutes our net leverage covenant with a $500 million liquidity covenant (as defined in the agreement) until the earlier of (a) December 31, 2021 and (b) at our election, any fiscal quarter prior to December 31, 2021. In February 2020, we issued $400 million principal amount of 2.0% convertible senior notes due 2025 and in May 2020 we issued $1.2 billion principal amount of 6.5% senior secured notes due 2027. In January 2021, we issued $500 million principal amount of 3.75% senior secured notes due 2028 and in September 2021, we elected to draw down the $400 million term loan A under the amended senior secured credit facility and completed the public offering of 5,239,259 shares of common stock for $449.6 million of net proceeds. As a result, we believe these amendments and additional debt and equity issuances will allow us the flexibility to manage our business through the disruption we continue to experience into 2022.

Our cash is centrally managed on a worldwide basis. Our primary short-term liquidity needs are to fund general working capital requirements, capital expenditures and debt service requirements while our long-term liquidity needs are primarily related to acquisitions and debt repayment. Our primary sources of funds for our short-term liquidity needs will be cash flows from operations and borrowings under our amended senior secured credit facility, while our long-term sources of funds will be

42

from cash flows from operations, long-term bank borrowings and other debt or equity financings. We may from time to time engage in open market purchases of our outstanding debt securities or redeem or otherwise repay such debt.

Our balance sheet reflects cash and cash equivalents of $4.9 billion at December 31, 2021 and $2.5 billion at December 31, 2020. Included in the December 31, 2021 and 2020 cash and cash equivalents balances are $1.3 billion and $673.5 million, respectively, of cash received that includes the face value of tickets sold on behalf of our ticketing clients and their share of service charges, which we refer to as client cash. We generally do not utilize client cash for our own financing or investing activities as the amounts are payable to clients on a regular basis. Our foreign subsidiaries held approximately $1.5 billion in cash and cash equivalents, excluding client cash, at December 31, 2021.

We generally do not repatriate these funds, but if we did, we would need to accrue and pay United States state income taxes as well as any applicable foreign withholding or transaction taxes on future repatriations. We may from time to time enter into borrowings under our revolving credit facility. If the original maturity of these borrowings is 90 days or less, we present the borrowings and subsequent repayments on a net basis in the statement of cash flows to better represent our financing activities. Our balance sheet reflects total net debt of $5.7 billion and $4.9 billion at December 31, 2021 and 2020, respectively. Our weighted-average cost of debt, excluding unamortized debt discounts and debt issuance costs on our term loans and notes, was 4.2% at December 31, 2021.

Our cash and cash equivalents are held in accounts managed by third-party financial institutions and consist of cash in our operating accounts and invested cash. Cash held in non-interest-bearing and interest-bearing operating accounts in many cases exceeds the Federal Deposit Insurance Corporation insurance limits. The invested cash is in interest-bearing funds consisting primarily of bank deposits and money market funds. While we monitor cash and cash equivalents balances in our operating accounts on a regular basis and adjust the balances as appropriate, these balances could be impacted if the underlying financial institutions fail. To date, we have experienced no loss or lack of access to our cash and cash equivalents; however, we can provide no assurances that access to our cash and cash equivalents will not be impacted by adverse conditions in the financial markets, including those resulting from the global COVID-19 pandemic.

For our Concerts segment, we often receive cash related to ticket revenue in advance of the event, which is recorded in deferred revenue until the event occurs. In the United States, this cash is largely associated with events in our owned or operated venues, notably amphitheaters, festivals, theaters and clubs. Internationally, this cash is from a combination of both events in our owned or operated venues, as well as events in third-party venues associated with our promoter's share of tickets in allocation markets. With the exception of some upfront costs and artist advances, which are recorded in prepaid expenses until the event occurs, we pay the majority of event-related expenses at or after the event. Artists are paid when the event occurs under one of several different formulas, which may include fixed guarantees and/or a percentage of ticket sales or event profits, net of any advance they have received. When an event is cancelled, any cash held in deferred revenue is reclassified to accrued expenses as those funds are typically refunded to the fan within 30 days of event cancellation. In certain markets, we are offering fans an incentive to receive a voucher for a future ticket purchase to one of our events in lieu of receiving a refund for a cancelled event. Where a fan has elected to receive the incentive voucher, the cash from the original ticket purchase remains in deferred revenue. When a show is rescheduled, fans have the ability to request a refund if they do not want to attend the event on the new date, although historically we have had low levels of refund requests for rescheduled events.

We view our available cash as cash and cash equivalents, less ticketing-related client cash, less event-related deferred revenue, less accrued expenses due to artists and cash collected on behalf of others, plus event-related prepaid expenses. This is essentially our cash available to, among other things, repay debt balances, make acquisitions, pay artist advances and finance capital expenditures.

Our intra-year cash fluctuations are impacted by the seasonality of our various businesses. Examples of seasonal effects include our Concerts segment, which reports the majority of its revenue in the second and third quarters. Cash inflows and outflows depend on the timing of event-related payments but the majority of the inflows generally occur prior to the event. See "—Seasonality" below. We believe that we have sufficient financial flexibility to fund these fluctuations and to access the global capital markets on satisfactory terms and in adequate amounts, although there can be no assurance that this will be the case, and capital could be less accessible and/or more costly given current economic conditions, including those resulting from the global COVID-19 pandemic. We expect cash flows from operations and borrowings under our amended senior secured credit facility, along with other financing alternatives, to satisfy working capital requirements, capital expenditures and debt service requirements for at least the succeeding year.

We may need to incur additional debt or issue equity to make other strategic acquisitions or investments. There can be no assurance that such financing will be available to us on acceptable terms or at all. We may make significant acquisitions in the near term, subject to limitations imposed by our financing agreements and market conditions.

43

Exhibit 2, page 054

The lenders under our revolving loans and counterparty to our interest rate hedge agreement consists of banks and other third-party financial institutions. While we currently have no indications or expectations that such lenders will be unable to fund their commitments as required, we can provide no assurances that future funding availability will not be impacted by adverse conditions in the financial markets, including those resulting from the global COVID-19 pandemic. Should an individual lender default on its obligations, the remaining lenders would not be required to fund the shortfall, resulting in a reduction in the total amount available to us for future borrowings, but would remain obligated to fund their own commitments. Should the counterparty to our interest rate hedge agreement default on its obligation, we could experience higher interest rate volatility during the period of any such default.

**Fourth Quarter Results of Operations (Unaudited)**

|  | December 31, | |
|---|---|---|
|  | 2021 | 2020 |
|  | *(in thousands)* | |
| Revenue | $ 2,703,170 | $ 237,383 |
| Operating loss | $ (124,546) | $ (388,014) |
| Net loss | $ (162,471) | $ (463,826) |
| Net loss attributable to common stockholders of Live Nation | $ (194,924) | $ (443,332) |
| Basic net loss available to common stockholders of Live Nation | $ (210,485) | $ (436,197) |
| Diluted net loss available to common stockholders of Live Nation | $ (210,485) | $ (436,197) |
| Basic and diluted net loss per common share available to common stockholders of Live Nation | (0.96) | (2.04) |

44

Exhibit 2, page 055

**Sources of Cash**

During 2020, we amended our senior secured credit facility, issued $1.2 billion principal amount of 6.5% senior secured notes due 2027 and issued $400 million principal amount of 2.0% convertible senior notes due 2025. A portion of the proceeds were used to pay transaction fees of approximately $35.5 million, leaving approximately $1.6 billion for general corporate purposes.

In January 2021, we issued $500 million principal amount of 3.75% senior secured notes due 2028. The proceeds were used to pay fees of $7.7 million and repay $75.0 million aggregate principal amount of our senior secured term loan B facility, leaving approximately $417.3 million for general corporate purposes, including acquisitions and organic investment opportunities.

In September 2021, we elected to draw down the $400 million term loan A under the amended senior secured credit facility prior to expiration of the drawdown period on October 17, 2021. We intend to use the proceeds from the drawdown for general corporate purposes. We also completed the public offering of 5,239,259 shares of common stock. A portion of the gross proceeds of $455.3 million were used to pay fees of $5.7 million, leaving $449.6 million of net proceeds. We used the net proceeds to fund the acquisition of 51% of the capital stock of OCESA and any remaining proceeds for general corporate purposes.

*Amended Senior Secured Credit Facility*

Information regarding our amended senior secured credit facility can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

*6.5% Senior Secured Notes Due 2027*

Information regarding our 6.5% senior secured notes due 2027 can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6 —Long-Term Debt.

*3.75% Senior Secured Notes Due 2028*

Information regarding our 3.75% senior secured notes due 2028 can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

*4.75% Senior Notes Due 2027*

Information regarding our 4.75% senior notes due 2027 can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

*4.875% Senior Notes Due 2024*

Information regarding our 4.875% senior notes due 2024 can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

*5.625% Senior Notes Due 2026*

Information regarding our 5.625% senior notes due 2026 can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

*3.75% Senior Secured Notes Due 2028*

Information regarding our 3.75% senior secured notes due 2028 can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

*2.5% Convertible Senior Notes Due 2023*

Information regarding our 2.5% convertible senior notes due 2023 can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

*2.0% Convertible Senior Notes Due 2025*

Information regarding our 2.0% convertible senior notes due 2025 can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

*Extinguishment of Debt*

Information regarding extinguishment of our debt in October 2019 can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

Exhibit 2, page 056

*Debt Covenants*

Information regarding our debt covenants can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt.

**Uses of Cash**

*Acquisitions*

When we make acquisitions, the acquired entity may have cash on its balance sheet at the time of acquisition. All amounts related to the use of cash for acquisitions discussed in this section are presented net of any cash acquired. During 2021, we used $384.3 million of cash primarily for the acquisition of OCESA. Information regarding our acquisitions can be found in Part II —Financial Information —Item 8.—Financial Statements and Supplementary Data—Note 3—Business Acquisitions.

During 2020, we used $41.1 million of cash primarily for the acquisitions of a festival promotion business and a venue management business, both located in the United States. As of the date of acquisition, the acquired businesses had a total of $77.4 million of cash on their balance sheets, primarily related to deferred revenue for future events.

*Purchases and Sales of Noncontrolling Interests, net*

In 2020, we used $106.2 million of cash primarily for the acquisitions of the remaining or additional interest in festival promotion businesses located in the United States and Brazil.

*Capital Expenditures*

Venue and ticketing operations are capital intensive businesses, requiring investment in our existing venues and ticketing systems in order to address fan and artist expectations, technological industry advances and various federal, state and/or local regulations.

We categorize capital outlays between maintenance capital expenditures and revenue generating capital expenditures. Maintenance capital expenditures are associated with the renewal and improvement of existing venues and technology systems, web development and administrative offices. Revenue generating capital expenditures generally relate to the construction of new venues, major renovations to existing buildings or buildings that are being added to our venue network, the development of new ticketing tools and technology enhancements. Revenue generating capital expenditures can also include smaller projects whose purpose is to increase revenue and/or improve operating income. Capital expenditures typically increase during periods when our venues are not in operation since that is the time that such improvements can be completed.

Our capital expenditures, including accruals for amounts incurred but not yet paid for but net of expenditures funded by outside parties such as landlords and noncontrolling interest partners or replacements funded by insurance proceeds, consisted of the following:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| | *(in thousands)* | | | | | |
| Maintenance capital expenditures | $ | 68,148 | $ | 65,111 | $ | 150,896 |
| Revenue generating capital expenditures | | 102,418 | | 126,445 | | 164,708 |
| Total capital expenditures | $ | 170,566 | $ | 191,556 | $ | 315,604 |

Maintenance capital expenditures for 2021 increased from the same period of the prior year primarily due to leasehold improvements of certain venue-related projects.

Revenue generating capital expenditures for 2021 decreased from the prior year primarily due to lower spending in our amphitheater venues and a reduction in technology-related projects as part of our cash savings initiatives implemented in connection with the global COVID-19 pandemic.

For the years ended December 31, 2021, 2020 and 2019, $5.9 million, $17.9 million and $22.0 million, respectively, of insurance proceeds and landlord or noncontrolling interest partner reimbursements have been excluded from capital expenditures in the table above.

We currently expect capital expenditures to be approximately $375 million for the year ending December 31, 2022.

Exhibit 2, page 057

**Contractual Obligations and Commitments**

*Firm Commitments*

We have future cash obligations for our debt obligations and operating lease liabilities. We lease office space, certain equipment and many of the venues used in our concert operations under long-term operating leases. Some of our lease agreements contain renewal options and annual rental escalation clauses (generally tied to the consumer price index), as well as provisions for our payment of utilities and maintenance. Information regarding our scheduled maturities of our outstanding debt obligations (excluding unamortized debt discounts and issuance costs) and operating lease liabilities can be found in Part II—Financial Information—Item 8.—Financial Statements and Supplementary Data—Note 6—Long-Term Debt and —Note 5—Leases, respectively.

We also have minimum payments associated with non-cancelable contracts related to our operations, such as artist guarantees and client ticketing agreements. As part of our ongoing capital projects, we will enter into construction-related commitments for future capital expenditure work. Information regarding our minimum payments for non-cancelable contracts and capital expenditures commitments can be found in Part II—Financial Information—Item 8.—Financial Statements and Supplementary Data—Note 9—Commitments and Contingent Liabilities as of December 31, 2021 and thus do not represent all expected expenditures for those periods.

The estimated interest payments, expected payments of contingent and deferred consideration liabilities as of December 31, 2021 are as follows:

| | Payments Due by Period | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | | 2022 | | 2023 | | 2024 | | 2025 | | 2026 | | Thereafter |
| | *(in thousands)* | | | | | | | | | | | | |
| Estimated interest payments [1] | $ | 1,142,345 | $ | 248,419 | $ | 233,015 | $ | 223,879 | $ | 185,460 | $ | 165,834 | $ | 85,738 |
| Contingent and deferred consideration | | 63,191 | | 49,765 | | 2,552 | | 814 | | 4,593 | | 303 | | 5,164 |
| Uncertain income tax positions [2] | | — | | — | | — | | — | | — | | — | | — |
| Total | $ | 1,205,536 | $ | 298,184 | $ | 235,567 | $ | 224,693 | $ | 190,053 | $ | 166,137 | $ | 90,902 |

_____

[1] Does not include interest on the revolving credit facility as the balance was zero as of December 31, 2021.

[2] Does not include $0.1 million of uncertain tax positions due to the unpredictable timing of the future payments.

*Guarantees of Third-Party Obligations*

As of December 31, 2021 and 2020, we guaranteed the debt of third parties of approximately $20.8 million and $12.1 million, respectively, primarily related to maximum credit limits on employee and tour-related credit cards, obligations of a nonconsolidated affiliate and obligations under a venue management agreement.

47

Exhibit 2, page 058

**Cash Flows**

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2021 | 2020 | | 2019 |
| | | *(in thousands)* | | | |
| Cash provided by (used in): | | | | | |
| Operating activities | $ | 1,780,568 | $ (1,083,388) | $ | 469,783 |
| Investing activities | $ | (566,962) | $ (224,062) | $ | (691,000) |
| Financing activities | $ | 1,171,332 | $ 1,350,082 | $ | 328,889 |

### Operating Activities

Cash provided by operating activities was $1.8 billion for the year ended December 31, 2021 as compared to cash used in operating activities of $1.1 billion for the prior year primarily due to increases in accounts payable, client accounts and accrued expenses resulting from the resumption of events in certain markets late in the second quarter of 2021 along with a reduction of net loss year over year partially offset by increases in accounts receivable.

### Investing Activities

Cash used in investing activities increased $342.9 million for the year ended December 31, 2021 as compared to the prior year primarily due to the OCESA acquisition. See "—Uses of Cash" above for further discussion.

### Financing Activities

Cash provided by financing activities decreased $178.8 million for the year ended December 31, 2021 as compared to the prior year primarily due to higher net proceeds in 2020 from debt issuances partially offset by proceeds from the sale of common stock and lower purchases of noncontrolling interests in 2021. See "—Sources of Cash" above for further discussion.

**Seasonality**

Information regarding the seasonality of our business can be found in Part II—Financial Information—Item 8.—Financial Statements and Supplementary Data—Note 1—The Company and Summary of Significant Accounting Policies.

**Market Risk**

We are exposed to market risks arising from changes in market rates and prices, including movements in foreign currency exchange rates and interest rates.

### Foreign Currency Risk

We have operations in countries throughout the world. The financial results of our foreign operations are measured in their local currencies. Our foreign subsidiaries also carry certain net assets or liabilities that are denominated in a currency other than that subsidiary's functional currency. As a result, our financial results could be affected by factors such as changes in foreign currency exchange rates or weak economic conditions in the foreign markets in which we have operations. Currently, we do not have significant operations in any hyper-inflationary countries. Our foreign operations reported an operating loss of   $176.9 million for the year ended December 31, 2021. We estimate that a 10% change in the value of the United States dollar relative to foreign currencies would change our operating income for the year ended December 31, 2021 by $17.7 million. As of December 31, 2021, our most significant foreign exchange exposure included the Euro, British Pound, Australian Dollar, Canadian Dollar and Mexican Peso. This analysis does not consider the implication such currency fluctuations could have on the overall economic conditions of the United States or other foreign countries in which we operate or on the results of operations of our foreign entities. In addition, the reported carrying value of our assets and liabilities, including the total cash and cash equivalents held by our foreign operations, will also be affected by changes in foreign currency exchange rates.

We primarily use forward currency contracts, in addition to options, to reduce our exposure to foreign currency risk associated with short-term artist fee commitments. We also may enter into forward currency contracts to minimize the risks and/or costs associated with changes in foreign currency rates on forecasted operating income. At December 31, 2021, we had forward currency contracts outstanding with a notional amount of $100.4 million.

*Interest Rate Risk*

Our market risk is also affected by changes in interest rates. We had $5.8 billion of total debt, excluding unamortized debt discounts and issuance costs, outstanding as of December 31, 2021. Of the total amount, we had $5.0 billion of fixed-rate debt and $0.8 billion of floating-rate debt.

Based on the amount of our floating-rate debt as of December 31, 2021, each 25-basis point increase or decrease in interest rates would increase or decrease our annual interest expense and cash outlay by approximately $1.9 million. This potential increase or decrease is based on the simplified assumption that the level of floating-rate debt remains constant with an immediate across-the-board increase or decrease as of December 31, 2021 with no subsequent change in rates for the remainder of the period.

In January 2020, we entered into an interest rate swap agreement that is designated as a cash flow hedge for accounting purposes to effectively convert a portion of our floating-rate debt to a fixed-rate basis. The swap agreement expires in October 2026, has a notional amount of $500.0 million and ensures that a portion of our floating-rate debt does not exceed 3.397%.

**Recent Accounting Pronouncements**

Information regarding recently issued and adopted accounting pronouncements can be found in Item 8.—Financial Statements and Supplementary Data—Note 1—The Company and Summary of Significant Accounting Policies.

**Critical Accounting Policies and Estimates**

The preparation of our consolidated financial statements in conformity with GAAP requires management to make estimates, judgments and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amount of revenue and expenses during the reporting period. On an ongoing basis, we evaluate our estimates that are based on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. The result of these evaluations forms the basis for making judgments about the carrying values of assets and liabilities and the reported amount of revenue and expenses that are not readily apparent from other sources. Because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such difference could be material. Management believes that the following accounting estimates are the most critical to aid in fully understanding and evaluating our reported financial results, and they require management's most difficult, subjective or complex judgments, resulting from the need to make estimates about the effect of matters that are inherently uncertain. The following narrative describes these critical accounting estimates, the judgments and assumptions and the effect if actual results differ from these assumptions where applicable.

*Consolidation*

Typically we consolidate entities in which we own more than 50% of the voting common stock and control operations and also VIEs for which we are the primary beneficiary. Investments in nonconsolidated affiliates in which we own more than 20% of the voting common stock or otherwise exercise significant influence over operating and financial policies, but not control of the nonconsolidated affiliate, are accounted for using the equity method of accounting. Investments in nonconsolidated affiliates in which we own less than 20% of the voting common stock and do not exercise significant influence over operating and financial policies are accounted for at fair value unless the investment does not have a readily determinable fair value in which case the investment is accounted for at cost less any impairment. Intercompany accounts among the consolidated businesses have been eliminated in consolidation. Net income (loss) attributable to noncontrolling interests is reflected in the statements of operations for consolidated affiliates.

*Business Combinations*

We account for our business combinations under the acquisition method of accounting. Identifiable assets acquired, liabilities assumed and any noncontrolling interest in the acquiree are recognized and measured as of the acquisition date at fair value. Additionally, contingent consideration is recorded at fair value on the acquisition date and classified as a liability. Goodwill is recognized to the extent by which the aggregate of the acquisition-date fair value of the consideration transferred and any noncontrolling interest in the acquiree exceeds the recognized basis of the identifiable assets acquired, net of assumed liabilities. Determining the fair value of assets acquired, liabilities assumed and noncontrolling interest requires management's judgment and often involves the use of significant estimates and assumptions, including assumptions with respect to future cash flows, discount rates and asset lives among other items.

*Intangibles*

We test for possible impairment of definite-lived intangible assets whenever events or circumstances change, such as a current period operating cash flow loss combined with a history of, or projections of, operating cash flow losses or a significant adverse change in the manner in which the asset is intended to be used, which could indicate that the carrying amount of the asset may not be recoverable.

We test for possible impairment of indefinite-lived intangible assets on at least an annual basis. Based on facts and circumstances, we perform either a qualitative or a quantitative assessment for impairment. If a qualitative assessment is performed, and the existence of events and circumstances indicate that it is more likely than not that an indefinite-lived intangible asset is impaired, we perform the quantitative impairment test by comparing the fair value with the carrying amount.

When performing quantitative assessments for impairment of our definite-lived and indefinite-lived intangible assets, we compare the estimated undiscounted future cash flows related to the asset or asset group to the carrying amount of those assets or asset group. If the carrying value is greater than the estimated undiscounted future cash flows, the cost basis of the asset or asset group is reduced to reflect the current fair value. We use various assumptions in determining the current fair value of these definite-lived and indefinite-lived intangible assets, including future expected cash flows, discount rates and royalty rates as well as other fair value measures. Our impairment loss calculations require us to apply judgment in estimating future cash flows, including forecasting useful lives of the assets and selecting the discount rate that reflects the risk inherent in future cash flows.

If actual results are not consistent with our assumptions and judgments used in estimating future cash flows and asset fair values, we may be exposed to future impairment losses that could be material to our results of operations.

*Goodwill*

We currently have six reporting units with goodwill balances: International Concerts, North America Concerts, Artist Management and Artist Services (non-management) within the Concerts segment; Sponsorship & Advertising; and Global Ticketing.

We test goodwill for impairment in any period when an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount or when we change our reporting units. We review goodwill for impairment annually, as of October 1, using a two-step process. The first step of the process is a qualitative evaluation as to whether it is more likely than not that the fair value of any of our reporting units is less than its carrying value using an assessment of relevant events and circumstances. Examples of such events and circumstances include historical financial performance, industry and market conditions, macroeconomic conditions, reporting unit-specific events, historical results of goodwill impairment testing, and the timing of the last performance of a quantitative assessment. We also considered changes in discount rates, market multiples, carrying value and forecast since the last quantitative test.

If any reporting units are concluded to be more likely than not impaired, or if that conclusion cannot be determined qualitatively, a second step is performed for that reporting unit. Regardless, it is our policy that all reporting units undergo a second step at least once every five years to support our annual qualitative first step. This second step, used to quantitatively screen for potential impairment and measure the impairment, if any, compares the fair value of the reporting unit with its carrying amount, including goodwill. Inherent in such fair value determinations are certain judgments and estimates relating to future cash flows, including our interpretation of current economic indicators and market valuations, and assumptions about our strategic plans with regard to our operations. Due to the uncertainties associated with such estimates, actual results could differ from such estimates. If the reporting unit's carrying value exceeds its fair value, the excess of the carrying value over the fair value is recorded as an impairment to goodwill. If a reporting unit's carrying value is negative, the reporting unit passes the impairment test. In this case, we will disclose the amount of goodwill allocated to that reporting unit and disclose which reportable segment the reporting unit is included in.

In both steps, discount rates, market multiples and sensitivity tests are derived and/or computed with the assistance of external valuation consultants. Generally, we test for sensitivity to changes in discount rates, revenue and terminal growth rates, and market multiples.

In developing fair values for our reporting units, we may employ a discounted cash flow or a market multiple methodology, or a combination thereof. The discounted cash flow methodology establishes fair value by estimating the present value of the projected future cash flows to be generated from the reporting unit. The discount rate applied to the projected future cash flows to arrive at the present value is intended to reflect all risks of ownership and the associated risks of realizing the stream of projected future cash flows. The discounted cash flow methodology uses our estimates of future financial performance. The most significant assumptions used in the discounted cash flow methodology are the discount rate and expected future revenue, which vary among reporting units.

The market multiple methodology compares us to similar companies on the basis of risk characteristics to determine our risk profile relative to those companies as a group. This analysis generally focuses on both quantitative considerations, which include financial performance and other quantifiable data, and qualitative considerations, which include any factors which are expected to impact future financial performance. The most significant assumptions affecting the market multiple methodology are the market multiples used on projected future cash flows and market participant acquisition premium. A market participant acquisition premium represents the additional value a buyer would pay to obtain control of the respective reporting unit because having control would lead to higher cash flows, lower cost of capital or both. In 2021, as part of the October 1 annual review, market multiples were not incorporated into our assessments for some reporting units where its current financial metrics do not support use of the market approach as a corroborating approach. When these businesses stabilize, we will reincorporate the market approach into their fair value methodology.

In 2021 as part of our annual impairment test, all of our reporting units with goodwill were assessed under the initial qualitative evaluation and did not advance to the second step. Considerations included (a) excess of fair values over carrying values in the most recent quantitative analysis performed, (b) discount rates, (c) financial results and (d) sensitivity analyses. We also considered changes in discount rates, market multiples if applicable, carrying value and forecasts since the last time a quantitative test was performed.

Given the results of the tests performed, although we cannot predict future performance or market conditions, we do not currently believe any of our reporting units are at risk of failing the second step in the near future.

### Revenue Recognition

Revenue from the promotion or production of an event is recognized when the show occurs. Revenue collected in advance of the event is recorded as deferred revenue until the event occurs. Revenue collected from sponsorship agreements, which is not related to a single event, is classified as deferred revenue and recognized over the term of the agreement or operating season as the benefits are provided to the sponsor.

Revenue from our ticketing operations primarily consists of our share of convenience and order processing fees charged at the time a ticket for an event is sold in either the primary or secondary markets. We act as an agent on behalf of our clients and therefore do not record the face value of the tickets as revenue. For tickets sold for our concert and festival events, where our concert promoters control ticketing, revenue is recognized when the show occurs. Revenue for these ticket service charges collected in advance of the event is recorded as deferred revenue until the event occurs and these service charges are shared between our Ticketing and Concerts segments. For tickets sold for events of our third-party clients and secondary market sales, this revenue is recognized at the time of the sale and is recorded by our Ticketing segment.

We account for taxes that are externally imposed on revenue producing transactions on a net basis, as a reduction of revenue.

### Litigation Accruals

We are currently involved in certain legal proceedings and, as required, have accrued our estimate of the probable costs for the resolution of these claims. Management's estimates used have been developed in consultation with counsel and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies. It is possible, however, that future results of operations for any particular period could be materially affected by changes in our assumptions or the effectiveness of our strategies related to these proceedings.

### Income Taxes

We account for income taxes using the liability method in accordance with the FASB guidance for income taxes. Under this method, deferred tax assets and liabilities are determined based on differences between financial reporting bases and tax bases of assets and liabilities and are measured using the enacted tax rates expected to apply to taxable income in the periods in which the deferred tax asset or liability is expected to be realized or settled. Deferred tax assets are reduced by valuation allowances if we believe it is more likely than not that some portion or the entire asset will not be realized. As almost all earnings from our continuing foreign operations are permanently reinvested and not distributed, our income tax provision does not include additional United States state taxes and foreign withholding or transaction taxes on those foreign earnings that would be incurred if they were distributed. It is not practicable to determine the amount of state and foreign income taxes, if any, that might become due in the event that any remaining available cash associated with these earnings were distributed.

The FASB guidance for income taxes prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. The amount recognized is measured as the largest amount of benefit that is more likely than not to be realized upon ultimate settlement.

Exhibit 2, page 062

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Required information is within Item 7.— Management's Discussion and Analysis of Financial Condition and Results of Operations—Market Risk.

Exhibit 2, page 063

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Live Nation Entertainment, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Live Nation Entertainment, Inc. (the Company) as of December 31, 2021 and 2020, the related consolidated statements of operations, comprehensive income (loss), changes in equity and cash flows for each of the three years in the period ended December 31, 2021, and the related notes and financial statement schedule listed in the index at Item 15(a)2 (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 23, 2022, expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

53

Exhibit 2, page 064

*Acquisition of OCESA*

| | |
|---|---|
| *Description of the Matter* | As disclosed in Note 3 to the consolidated financial statements, during the year ended December 31, 2021, the Company completed its acquisition of an aggregate 51% interest in OCESA for $431.9 million. This transaction was accounted for as a business combination. The Company allocated the purchase price, on a preliminary basis, to the assets acquired and liabilities assumed based on their respective fair values, including identified intangible assets of $340 million and resulting goodwill of $443 million. |
| | Auditing the Company's accounting for its acquisition of OCESA was complex due to the significant estimation utilized by management in developing the valuation models used in the preliminary purchase price allocation. The significant assumptions utilized included, among others, forecasted revenue growth and discount rate. These assumptions are forward-looking and could be affected by future economic and market conditions. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design, and tested the operating effectiveness of the Company's controls over its accounting for the OCESA acquisition. For example, we tested controls over the valuation of the identified intangible assets and resulting goodwill, including management's review of the valuation models, underlying data and assumptions used to develop the estimate of fair value of these assets. |
| | To test the estimated fair value of the identified intangible assets and resulting goodwill, we performed audit procedures that included, among others, evaluating the Company's selection of the valuation methodologies, evaluating the significant assumptions used in the valuation calculations, and testing the completeness and accuracy of the underlying data supporting the significant assumptions. We involved our valuation specialists to assist with evaluating the methodology used by management to determine the fair value estimates. Additionally, we performed sensitivity analyses of the identified significant assumptions and compared them, as applicable, to current industry and market trends, the assumptions used by the Company to value similar assets in other acquisitions, as well as historical results. |

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2005.

Los Angeles, California
February 23, 2022

54

Exhibit 2, page 065

**LIVE NATION ENTERTAINMENT, INC.**

**CONSOLIDATED BALANCE SHEETS**

| | | December 31, | | |
|---|---|---|---|---|
| | | 2021 | | 2020 |
| | | *(in thousands, except share data)* | | |
| **ASSETS** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 4,884,729 | $ | 2,537,787 |
| Accounts receivable, less allowance of $50,491 and $72,904, respectively | | 1,066,573 | | 486,734 |
| Prepaid expenses | | 654,894 | | 577,130 |
| Restricted cash | | 3,063 | | 8,652 |
| Other current assets | | 74,834 | | 39,465 |
| **Total current assets** | | 6,684,093 | | 3,649,768 |
| Property, plant and equipment, net | | 1,091,929 | | 1,101,414 |
| Operating lease assets | | 1,538,911 | | 1,424,223 |
| Intangible assets | | | | |
| Definite-lived intangible assets, net | | 1,026,338 | | 855,600 |
| Indefinite-lived intangible assets | | 369,028 | | 369,058 |
| Goodwill | | 2,590,869 | | 2,129,203 |
| Long-term advances | | 552,697 | | 668,756 |
| Other long-term assets | | 548,453 | | 391,281 |
| **Total assets** | $ | 14,402,318 | $ | 10,589,303 |
| **LIABILITIES AND EQUITY** | | | | |
| Current liabilities | | | | |
| Accounts payable, client accounts | $ | 1,532,345 | $ | 744,096 |
| Accounts payable | | 110,623 | | 86,356 |
| Accrued expenses | | 1,645,906 | | 894,149 |
| Deferred revenue | | 2,774,792 | | 1,839,323 |
| Current portion of long-term debt, net | | 585,254 | | 53,415 |
| Current portion of operating lease liabilities | | 123,715 | | 107,147 |
| Other current liabilities | | 83,087 | | 72,083 |
| **Total current liabilities** | | 6,855,722 | | 3,796,569 |
| Long-term debt, net | | 5,145,484 | | 4,855,096 |
| Long-term operating lease liabilities | | 1,606,064 | | 1,445,674 |
| Other long-term liabilities | | 431,581 | | 353,267 |
| Commitments and contingent liabilities | | | | |
| Redeemable noncontrolling interests | | 551,921 | | 272,449 |
| Stockholders' equity | | | | |
| Preferred stock—Series A Junior Participating, $0.01 par value; 20,000,000 shares authorized; no shares issued and outstanding | | — | | — |
| Preferred stock, $0.01 par value; 30,000,000 shares authorized; no shares issued and outstanding | | — | | — |
| Common stock, $0.01 par value; 450,000,000 shares authorized; 225,082,603 and 218,423,061 shares issued and 224,674,579 and 218,015,037 shares outstanding in 2021 and 2020, respectively | | 2,220 | | 2,145 |
| Additional paid-in capital | | 2,897,695 | | 2,386,790 |
| Accumulated deficit | | (3,327,737) | | (2,676,833) |
| Cost of shares held in treasury | | (6,865) | | (6,865) |
| Accumulated other comprehensive loss | | (147,964) | | (177,009) |
| **Total Live Nation stockholders' equity** | | (582,651) | | (471,772) |
| Noncontrolling interests | | 394,197 | | 338,020 |
| **Total equity** | | (188,454) | | (133,752) |
| **Total liabilities and equity** | $ | 14,402,318 | $ | 10,589,303 |

See Notes to Consolidated Financial Statements

55

Exhibit 2, page 066

**LIVE NATION ENTERTAINMENT, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | | Year Ended December 31, | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| | *(in thousands except share and per share data)* | | |
| Revenue | $ 6,268,447 | $ 1,861,178 | $ 11,547,969 |
| Operating expenses: | | | |
| Direct operating expenses | 4,355,989 | 1,402,400 | 8,467,182 |
| Selling, general and administrative expenses | 1,754,822 | 1,524,342 | 2,145,486 |
| Depreciation and amortization | 416,277 | 485,025 | 443,991 |
| Loss (gain) on disposal of operating assets | (1,211) | 503 | (2,373) |
| Corporate expenses | 160,428 | 102,100 | 168,839 |
| Operating income (loss) | (417,858) | (1,653,192) | 324,844 |
| Interest expense | 282,440 | 226,832 | 157,521 |
| Interest income | (6,625) | (11,737) | (14,406) |
| Equity in losses (earnings) of nonconsolidated affiliates | (2,520) | 5,458 | (5,457) |
| Loss (gain) from sale of investments in nonconsolidated affiliates | (83,578) | 1,727 | (1,119) |
| Other expense (income), net | 3,692 | (18,807) | 3,201 |
| Income (loss) before income taxes | (611,267) | (1,856,665) | 185,104 |
| Income tax expense (benefit) | (2,481) | (28,875) | 66,892 |
| Net income (loss) | (608,786) | (1,827,790) | 118,212 |
| Net income (loss) attributable to noncontrolling interests | 42,118 | (103,255) | 48,323 |
| Net income (loss) attributable to common stockholders of Live Nation | $ (650,904) | $ (1,724,535) | $ 69,889 |
| | | | |
| Basic and diluted net loss per common share available to common stockholders of Live Nation | $ (3.09) | $ (8.12) | $ (0.02) |
| Weighted average common shares outstanding: | | | |
| Basic and diluted | 217,190,862 | 212,270,944 | 210,082,696 |
| | | | |
| Reconciliation to net loss available to common stockholders of Live Nation: | | | |
| Net income (loss) attributable to common stockholders of Live Nation | $ (650,904) | $ (1,724,535) | $ 69,889 |
| Accretion of redeemable noncontrolling interests | (19,771) | 1,180 | (74,771) |
| Basic and diluted net loss available to common stockholders of Live Nation | $ (670,675) | $ (1,723,355) | $ (4,882) |

See Notes to Consolidated Financial Statements

56

Exhibit 2, page 067

**LIVE NATION ENTERTAINMENT, INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

| | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2021 | 2020 | 2019 |
| | | *(in thousands)* | | |
| Net income (loss) | $ | (608,786) $ | (1,827,790) $ | 118,212 |
| Other comprehensive income (loss), net of tax: | | | | |
| Unrealized gain (loss) on cash flow hedge | | 15,204 | (36,689) | — |
| Realized loss on cash flow hedge | | 7,825 | 5,102 | — |
| Foreign currency translation adjustments | | 6,016 | 291 | (482) |
| Comprehensive income (loss) | | (579,741) | (1,859,086) | 117,730 |
| Comprehensive income (loss) attributable to noncontrolling interests | | 42,118 | (103,255) | 48,323 |
| Comprehensive income (loss) attributable to common stockholders of Live Nation | $ | (621,859) $ | (1,755,831) $ | 69,407 |

See Notes to Consolidated Financial Statements

57

Exhibit 2, page 068

**LIVE NATION ENTERTAINMENT, INC.**

**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY**

| | Common Shares Issued | Common Stock | Additional Paid-In Capital | Accumulated Deficit | Cost of Shares Held in Treasury | Accumulated Other Comprehensive Income (Loss) | Noncontrolling Interests | Total Equity | Redeemable Noncontrolling Interests |
|---|---|---|---|---|---|---|---|---|---|
| | | | | *(in thousands, except share data)* | | | | | *(in thousands)* |
| **Balances at December 31, 2018** | 209,135,581 | $ 2,091 | $ 2,268,209 | $ (1,019,223) | $ (6,865) | $ (145,231) | $ 243,762 | $ 1,342,743 | $ 329,355 |
| Non-cash and stock-based compensation | — | — | 48,887 | — | — | — | — | 48,887 | — |
| Common stock issued under stock plans, net of shares withheld for employee taxes | 392,147 | 5 | (15,357) | — | — | — | — | (15,352) | — |
| Exercise of stock options | 910,006 | 9 | 14,095 | — | — | — | — | 14,104 | — |
| Conversion of convertible debt | 824,328 | 8 | 28,578 | — | — | — | — | 28,586 | — |
| Acquisitions | — | — | — | — | — | — | 137,981 | 137,981 | 52,373 |
| Purchases of noncontrolling interests | — | — | (23,878) | — | — | — | (24,867) | (48,745) | (1,459) |
| Redeemable noncontrolling interests fair value adjustments | — | — | (74,771) | — | — | — | — | (74,771) | 74,771 |
| Contributions received | — | — | — | — | — | — | 14,285 | 14,285 | — |
| Cash distributions | — | — | — | — | — | — | (84,115) | (84,115) | (23,362) |
| Other | — | — | (144) | — | — | — | (2,179) | (2,323) | 2,764 |
| Comprehensive income (loss): | | | | | | | | | |
| Net income | — | — | — | 69,889 | — | — | 33,267 | 103,156 | 15,056 |
| Foreign currency translation adjustments | — | — | — | — | — | (482) | — | (482) | — |
| **Balances at December 31, 2019** | 211,262,062 | 2,113 | 2,245,619 | (949,334) | (6,865) | (145,713) | 318,134 | 1,463,954 | 449,498 |
| Cumulative effect of change in accounting principle | — | — | — | (2,964) | — | — | — | (2,964) | — |
| Non-cash and stock-based compensation | — | — | 116,899 | — | — | — | — | 116,899 | — |
| Common stock issued under stock plans, net of shares withheld for employee taxes | 1,382,256 | 14 | (37,876) | — | — | — | — | (37,862) | — |
| Exercise of stock options, net of shares withheld for option cost and employee taxes | 1,822,670 | 18 | 20,952 | — | — | — | — | 20,970 | — |
| Fair value of convertible debt conversion feature, net of issuance costs | — | — | 33,347 | — | — | — | — | 33,347 | — |
| Acquisitions | — | — | — | — | — | — | 54,378 | 54,378 | 23,511 |
| Divestitures | — | — | — | — | — | — | 6 | 6 | — |
| Purchases of noncontrolling interests | — | — | 14,336 | — | — | — | (3,975) | 10,361 | (129,652) |
| Sales of noncontrolling interests | — | — | (7,667) | — | — | — | 39,406 | 31,739 | — |
| Redeemable noncontrolling interests fair value adjustments | — | — | 1,180 | — | — | — | — | 1,180 | (1,180) |
| Contributions received | — | — | — | — | — | — | 4,668 | 4,668 | 750 |
| Cash distributions | — | — | — | — | — | — | (25,092) | (25,092) | (16,532) |
| Other | — | — | — | — | — | — | (2,731) | (2,731) | 2,535 |
| Comprehensive income (loss): | | | | | | | | | |
| Net loss | — | — | — | (1,724,535) | — | — | (46,774) | (1,771,309) | (56,481) |
| Unrealized loss on cash flow hedge | — | — | — | — | — | (36,689) | — | (36,689) | — |
| Realized loss on cash flow hedge | — | — | — | — | — | 5,102 | — | 5,102 | — |
| Foreign currency translation adjustments | — | — | — | — | — | 291 | — | 291 | — |
| **Balances at December 31, 2020** | 214,466,988 | 2,145 | 2,386,790 | (2,676,833) | (6,865) | (177,009) | 338,020 | (133,752) | 272,449 |
| Non-cash and stock-based compensation | — | — | 96,747 | — | — | — | — | 96,747 | — |
| Common stock issued under stock plans, net of shares withheld for employee taxes | 921,186 | 9 | (27,707) | — | — | — | — | (27,698) | — |
| Exercise of stock options, net of shares withheld for option cost and employee taxes | 1,337,301 | 13 | 12,458 | — | — | — | — | 12,471 | — |
| Sale of common shares | 5,239,259 | 53 | 449,577 | — | — | — | — | 449,630 | — |
| Acquisitions | — | — | — | — | — | — | 21,120 | 21,120 | 280,828 |
| Divestitures | — | — | — | — | — | — | — | — | — |
| Purchases of noncontrolling interests | — | — | (110) | — | — | — | (2,577) | (2,687) | (1,698) |
| Sales of noncontrolling interests | — | — | (289) | — | — | — | 9,318 | 9,029 | — |
| Redeemable noncontrolling interests fair value adjustments | — | — | (19,771) | — | — | — | — | (19,771) | 19,771 |
| Contributions received | — | — | — | — | — | — | 21,911 | 21,911 | 95 |
| Cash distributions | — | — | — | — | — | — | (41,011) | (41,011) | (11,357) |
| Other | — | — | — | — | — | — | (3,090) | (3,090) | 221 |
| Comprehensive income (loss): | | | | | | | | | |
| Net income (loss) | — | — | — | (650,904) | — | — | 50,506 | (600,398) | (8,388) |
| Unrealized gain on cash flow hedge | — | — | — | — | — | 15,204 | — | 15,204 | — |
| Realized loss on cash flow hedge | — | — | — | — | — | 7,825 | — | 7,825 | — |
| Foreign currency translation adjustments | — | — | — | — | — | 6,016 | — | 6,016 | — |
| **Balances at December 31, 2021** | 221,964,734 | $ 2,220 | $ 2,897,695 | $ (3,327,737) | $ (6,865) | $ (147,964) | $ 394,197 | $ (188,454) | $ 551,921 |

See Notes to Consolidated Financial Statements

58

**LIVE NATION ENTERTAINMENT, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2021 | 2020 | 2019 |
| | | *(in thousands)* | | |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net income (loss) | $ | (608,786) $ | (1,827,790) $ | 118,212 |
| Reconciling items: | | | | |
| Depreciation | | 222,840 | 245,713 | 220,459 |
| Amortization | | 193,437 | 239,312 | 223,532 |
| Amortization of non-recoupable ticketing contract advances | | 74,406 | 47,971 | 80,302 |
| Deferred income tax benefit | | (9,639) | (37,877) | (465) |
| Amortization of debt issuance costs and discounts | | 37,260 | 32,774 | 24,116 |
| Provision for uncollectible accounts receivable | | (17,826) | 43,076 | 27,926 |
| Non-cash compensation expense | | 209,337 | 116,889 | 48,785 |
| Unrealized changes in fair value of contingent consideration | | (6,732) | (24,448) | 6,698 |
| Equity in losses (earnings) of nonconsolidated affiliates, net of distributions | | 11,189 | 18,280 | 14,152 |
| Loss (gain) on sale of investments in nonconsolidated affiliates | | (83,578) | 1,727 | (1,119) |
| Other, net | | (15,333) | (18,472) | (4,908) |
| Changes in operating assets and liabilities, net of effects of acquisitions and dispositions: | | | | |
| Decrease (increase) in accounts receivable | | (485,211) | 490,588 | (159,792) |
| Decrease (increase) in prepaid expenses and other assets | | 95,533 | 141,631 | (170,486) |
| Increase (decrease) in accounts payable, accrued expenses and other liabilities | | 1,315,722 | (1,379,461) | (45,920) |
| Increase in deferred revenue | | 847,949 | 826,699 | 88,291 |
| Net cash provided by (used in) operating activities | | 1,780,568 | (1,083,388) | 469,783 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Advances of notes receivable | | (28,899) | (56,957) | (50,035) |
| Collections of notes receivable | | 23,835 | 80,963 | 13,216 |
| Investments made in nonconsolidated affiliates | | (110,589) | (11,242) | (57,280) |
| Purchases of property, plant and equipment | | (152,734) | (213,746) | (323,566) |
| Cash paid for acquisitions, net of cash acquired | | (384,251) | (41,083) | (235,071) |
| Purchases of intangible assets | | (7,100) | (8,863) | (42,261) |
| Proceeds from sale of investments in nonconsolidated affiliates | | 90,432 | 19,003 | 1,455 |
| Other, net | | 2,344 | 7,863 | 2,542 |
| Net cash used in investing activities | | (566,962) | (224,062) | (691,000) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Proceeds from long-term debt, net of debt issuance costs | | 903,827 | 1,607,365 | 937,400 |
| Payments on long-term debt including extinguishment costs | | (109,705) | (30,987) | (437,267) |
| Contributions from noncontrolling interests | | 22,026 | 5,418 | 14,285 |
| Distributions to noncontrolling interests | | (52,368) | (41,624) | (107,476) |
| Purchases and sales of noncontrolling interests, net | | (9,638) | (106,242) | (50,267) |
| Proceeds from sale of common stock, net of issuance costs | | 449,630 | — | — |
| Proceeds from exercise of stock options | | 30,618 | 30,647 | 14,104 |
| Taxes paid for net share settlement of equity awards | | (45,845) | (47,539) | (15,353) |
| Payments for deferred and contingent consideration | | (17,319) | (66,992) | (26,537) |
| Other, net | | 106 | 36 | — |
| Net cash provided by financing activities | | 1,171,332 | 1,350,082 | 328,889 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | | (43,585) | 29,565 | (11,633) |
| Net increase in cash, cash equivalents and restricted cash | | 2,341,353 | 72,197 | 96,039 |
| Cash, cash equivalents and restricted cash at beginning of period | | 2,546,439 | 2,474,242 | 2,378,203 |
| Cash, cash equivalents and restricted cash at end of period | $ | 4,887,792 $ | 2,546,439 $ | 2,474,242 |
| | | | | |
| **SUPPLEMENTAL DISCLOSURE** | | | | |
| Cash paid during the year for: | | | | |
| Interest, net of interest income | $ | 224,402 $ | 166,403 $ | 103,915 |
| Income taxes, net of refunds | $ | 15,911 $ | 26,151 $ | 66,937 |

See Notes to Consolidated Financial Statements

59

Exhibit 2, page 070

**LIVE NATION ENTERTAINMENT, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1—THE COMPANY AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### History

Live Nation was incorporated in Delaware on August 2, 2005 in preparation for the contribution and transfer by Clear Channel Communications, Inc. of substantially all of its entertainment assets and liabilities to us. We completed this separation on December 21, 2005 and became a publicly traded company on the New York Stock Exchange trading under the symbol "LYV."

On January 25, 2010, we merged with Ticketmaster Entertainment LLC and it became a wholly-owned subsidiary of Live Nation. Effective with the merger, Live Nation, Inc. changed its name to Live Nation Entertainment, Inc.

### Seasonality

Our Concerts and Sponsorship & Advertising segments typically experience higher revenue and operating income in the second and third quarters as our outdoor venues and festivals are primarily used in or occur from May through October. In addition, the timing of when tickets are sold and the tours of top-grossing acts can impact comparability of quarterly results year over year, although annual results may not be impacted. Our Ticketing segment revenue is impacted by fluctuations in the availability of events for sale to the public, which vary depending upon scheduling by our clients.

Cash flows from our Concerts segment typically have a slightly different seasonality as payments are often made for artist performance fees and production costs for tours in advance of the date the related event tickets go on sale. These artist fees and production costs are expensed when the event occurs. Once tickets for an event go on sale, we generally begin to receive payments from ticket sales at our owned or operated venues and festivals in advance of when the event occurs. We record these ticket sales as revenue when the event occurs. Our seasonality also results in higher balances in cash and cash equivalents, accounts receivable, prepaid expenses, accrued expenses and deferred revenue at different times in the year.

Due to the unprecedented stoppage of our concert and other events globally beginning in mid-March resulting from the global COVID-19 pandemic, we did not experience our typical seasonality trends in 2020 and 2021 even with the resumption of events late in the second quarter of 2021.

### Basis of Presentation and Principles of Consolidation

Our consolidated financial statements include all of our accounts, including our majority owned and controlled subsidiaries and VIEs for which we are the primary beneficiary. Intercompany accounts among the consolidated businesses have been eliminated in consolidation. Net income (loss) attributable to noncontrolling interests is reflected in the statements of operations.

Typically, we consolidate entities in which we own more than 50% of the voting common stock and control operations and also VIEs for which we are the primary beneficiary. Investments in nonconsolidated affiliates in which we own more than 20% of the voting common stock or otherwise exercise significant influence over operating and financial policies but not control of the nonconsolidated affiliate are accounted for using the equity method of accounting. Investments in nonconsolidated affiliates in which we own less than 20% of the voting common stock and do not exercise significant influence over operating and financial policies are accounted for at fair value unless the investment does not have a readily determinable fair value in which case the investment is accounted for at cost less any impairment.

All of our cash flow activity reflected on the consolidated statements of cash flows is presented net of any non-cash transactions so the amounts reflected may be different than amounts shown in other places in our consolidated financial statements that are based on accrual accounting and therefore include non-cash amounts. For example, purchases of property, plant and equipment reflected on the consolidated statements of cash flows reflect the amount of cash paid during the year for these purchases and does not include the impact of the changes in accrued expenses related to capital expenditures during the year.

Exhibit 2, page 071

*Variable Interest Entities*

In the normal course of business, we enter into joint ventures or make investments in companies that will allow us to expand our core business and enter new markets. In certain instances, such ventures or investments may be considered a VIE because the equity at risk is insufficient to permit it to carry on its activities without additional financial support from its equity owners. In determining whether we are the primary beneficiary of a VIE, we assess whether we have the power to direct activities that most significantly impact the economic performance of the entity and have the obligation to absorb losses or the right to receive benefits from the entity that could potentially be significant to the VIE. The activities we believe most significantly impact the economic performance of our VIEs include the unilateral ability to approve the annual budget, to terminate key management and to approve entering into agreements with artists, among others. We have certain rights and obligations related to our involvement in the VIEs, including the requirement to provide operational cash flow funding. As of December 31, 2021 and 2020, excluding intercompany balances and allocated goodwill and intangible assets, there were approximately $363 million and $302 million of assets and $276 million and $270 million of liabilities, respectively, related to VIEs included in our balance sheets. None of our VIEs are significant on an individual basis.

*Nonconsolidated Affiliates*

In general, nonconsolidated investments in which we own more than 20% of the common stock or otherwise exercise significant influence over an affiliate are accounted for under the equity method. We review the value of equity method investments and record impairment charges in the statements of operations for any decline in value that is determined to be other-than-temporary. If we obtain control of a nonconsolidated affiliate through the purchase of additional ownership interest or changes in the governing agreements, we remeasure our investment to fair value first and then apply the accounting guidance for business combinations. Any gain or loss resulting from the remeasurement to fair value is recorded as a component of other expense (income), net in the statements of operations.

*Cash, Cash Equivalents and Restricted Cash*

Cash and cash equivalents include all highly liquid investments with an original maturity of three months or less. Our cash and cash equivalents include domestic and foreign bank accounts as well as interest-bearing accounts consisting primarily of bank deposits and money market accounts managed by third-party financial institutions. These balances are stated at cost, which approximates fair value.

Restricted cash primarily consists of cash held in escrow accounts to fund capital improvements of certain leased or operated venues. The cash is held in these accounts pursuant to the related lease or operating agreement.

Included in the December 31, 2021 and 2020 cash and cash equivalents balance is $1.3 billion and $673.5 million, respectively, of cash received that includes the face value of tickets sold on behalf of our ticketing clients and their share of service charges ("client cash"), which amounts are to be remitted to these clients. We generally do not utilize client cash for our own financing or investing activities as the amounts are payable to our clients on a regular basis. These amounts due to our clients are included in accounts payable, client accounts.

Cash held in interest-bearing operating accounts in many cases exceeds the Federal Deposit Insurance Corporation insurance limits. To reduce our credit risk, we monitor the credit standing of the financial institutions that hold our cash and cash equivalents; however, these balances could be impacted in the future if the underlying financial institutions fail. To date, we have experienced no loss or lack of access to our cash or cash equivalents; however, we can provide no assurances that access to our cash and cash equivalents will not be impacted in the future by adverse conditions in the financial markets, including those resulting from the global COVID-19 pandemic.

*Allowance for Doubtful Accounts*

We evaluate the collectability of our accounts receivable based on a combination of factors. Generally, we record reserves based on the amount of cash we expect to receive when an account receivable balance is established. Our reserve estimate is primarily based on our historical accounts receivable write-offs. We adjust the historical reserve estimate applied to current accounts receivable when events or circumstances change, such as changes in current economic conditions or there is a significant deterioration in our accounts receivable aging, indicating that the reserve estimate may be insufficient to cover the expected loss. We generally apply a portfolio approach to all of our accounts receivable based on reporting unit unless there are facts and circumstances that indicate a specific group of customers is at greater risk of nonpayment.

We believe that the credit risk with respect to trade receivables is limited due to the large number and the geographic diversification of our customers.

61

***Prepaid Expenses***

The majority of our prepaid expenses relate to event expenses including show advances and deposits and other costs directly related to future concert events. For advances that are expected to be recouped over a period of more than twelve months, the long-term portion of the advance is classified as long-term advances. These prepaid costs are charged to operations upon completion of the related events.

Ticketing contract advances, which can be either recoupable or non-recoupable, represent amounts paid in advance to our clients pursuant to ticketing agreements and are reflected in prepaid expenses or in long-term advances if the amount is expected to be recouped or recognized over a period of more than twelve months. Recoupable ticketing contract advances are generally recoupable against future royalties earned by our clients, based on the contract terms, over the life of the contract. Non-recoupable ticketing contract advances, excluding those amounts paid to support clients' advertising costs, are fixed additional incentives occasionally paid by us to secure the contract with certain clients and are typically amortized over the life of the contract on a straight-line basis.

Artist advances and ticketing contract advances are reviewed for recoverability whenever circumstances change, such as extended delays in an artist's touring cycle, a decline in an artist's tour earnings, lack of events on sale for a ticketing client or a decline in a client's ticket sales, indicating that the advance may not be recoupable over the term of the agreement. We review various factors, including past recoupment amounts, timing of an artist's last tour, expectations of future tours, ticketing clients' historical ticket sales and expectations of clients' future ticket sales, to determine if we believe the advance will recoup as expected. If an advance is not expected to be fully recoupable, a reserve is established to reduce the advance to the amount we expect to recoup. The reserves are recorded as a component of direct operating expenses in our consolidated statements of operations.

***Business Combinations***

During 2021, 2020 and 2019, we completed several acquisitions that were accounted for as business combinations under the acquisition method of accounting. When we make these acquisitions, we often acquire a controlling interest without buying 100% of the business. These acquisitions and the related results of operations were not significant on either an individual basis or in the aggregate for the years ended December 31, 2020 and 2019. Further information regarding our acquisitions for the year ended December 31, 2021 can be found in Note 3—Business Acquisitions.

During 2020, we acquired the remaining redeemable noncontrolling interests of certain subsidiaries and settled certain contingent consideration obligations in exchange for debt obligations totaling $11.8 million which are reflected in current portion of long-term debt, net on our consolidated balance sheets. These non-cash transactions have not been reflected as cash flows from financing activities within our consolidated statements of cash flows.

We account for our business combinations under the acquisition method of accounting. Identifiable assets acquired, liabilities assumed and any noncontrolling interest in the acquiree are recognized and measured as of the acquisition date at fair value. Additionally, any contingent consideration is recorded at fair value on the acquisition date and classified as a liability. Goodwill is recognized to the extent by which the aggregate of the acquisition-date fair value of the consideration transferred and any noncontrolling interest in the acquiree exceeds the recognized basis of the identifiable assets acquired, net of assumed liabilities. Determining the fair value of assets acquired, liabilities assumed and noncontrolling interests requires management's judgment and often involves the use of significant estimates and assumptions, including assumptions with respect to future cash flows, discount rates and asset lives among other items.

***Property, Plant and Equipment***

Property, plant and equipment are stated at cost or fair value at the date of acquisition. Depreciation is computed using the straight-line method over their estimated useful lives, which are typically as follows:

Buildings and improvements - 10 to 50 years

Computer equipment and capitalized software - 3 to 10 years

Furniture and other equipment - 3 to 10 years

Leasehold improvements are depreciated over the shorter of the economic life or associated lease term. Expenditures for maintenance and repairs are charged to operations as incurred, whereas expenditures for asset renewal and improvements are capitalized.

Exhibit 2, page 073

We test for possible impairment of property, plant and equipment whenever events or circumstances change, such as a current period operating cash flow loss combined with a history of, or projections of, operating cash flow losses or a significant adverse change in the manner in which the asset is intended to be used, which could indicate that the carrying amount of the asset may not be recoverable. If indicators exist, we compare the estimated undiscounted future cash flows related to the asset to the carrying value of the asset. If the carrying value is greater than the estimated undiscounted future cash flow amount, an impairment charge is recorded based on the difference between the fair value and the carrying value. Any such impairment charge is recorded in depreciation and amortization in the statements of operations. The impairment loss calculations require management to apply judgment in estimating future cash flows and the discount rates that reflect the risk inherent in future cash flows.

***Intangible Assets***

We classify intangible assets as definite-lived or indefinite-lived. Definite-lived intangibles include revenue-generating contracts, client/vendor relationships, trademarks and naming rights, technology, non-compete agreements, and venue management and leasehold agreements, all of which are amortized either on a straight-line basis over the respective lives of the agreements, typically 3 to 10 years, or on a basis more representative of the time pattern over which the benefit is derived. We periodically review the appropriateness of the amortization periods related to our definite-lived intangible assets. These assets are stated at cost or fair value at the date of acquisition. Indefinite-lived intangibles consist of trade names which are not subject to amortization.

We test for possible impairment of definite-lived intangible assets whenever events or circumstances change, such as a current period operating cash flow loss combined with a history of, or projections of, operating cash flow losses or a significant adverse change in the manner in which the asset is intended to be used, which could indicate that the carrying amount of the asset may not be recoverable. If indicators exist, we compare the estimated undiscounted future cash flows related to the asset to the carrying value of the asset. If the carrying value is greater than the estimated undiscounted future cash flow amount, an impairment charge is recorded based on the difference between the fair value and the carrying value. Any such impairment charge is recorded in depreciation and amortization in the statements of operations.

We test for possible impairment of indefinite-lived intangible assets at least annually. Depending on facts and circumstances, qualitative factors may first be assessed to determine whether the existence of events and circumstances indicate that it is more likely than not that an indefinite-lived intangible asset is impaired. If it is concluded that it is more likely than not impaired, we perform a quantitative impairment test by comparing the fair value with the carrying amount. When specific assets are determined to be impaired, the cost basis of the asset is reduced to reflect the current fair value. Any such impairment charge is recorded in depreciation and amortization in the statements of operations. The impairment loss calculations require management to apply judgment in estimating future cash flows, expected future revenue, discount rates and royalty rates that reflect the risk inherent in future cash flows.

***Goodwill***

We review goodwill for impairment annually, as of October 1, using a two-step process. We also test goodwill for impairment in other periods if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount or when we change our reporting units.

The first step is a qualitative evaluation as to whether it is more likely than not that the fair value of any of our reporting units is less than its carrying value using an assessment of relevant events and circumstances. Examples of such events and circumstances include historical financial performance, industry and market conditions, macroeconomic conditions, reporting unit-specific events, historical results of goodwill impairment testing and the timing of the last performance of a quantitative assessment. We also considered changes in discount rates, market multiples, carrying value and forecast since the last quantitative test.

If any reporting units are concluded to be more likely than not impaired, or if that conclusion cannot be determined qualitatively, a second step is performed for that reporting unit. Regardless, all reporting units undergo a second step at least once every five years to support our annual qualitative first step. This second step, used to quantitatively screen for potential impairment and measure the impairment, if any, compares the fair value of the reporting unit with its carrying amount, including goodwill. Inherent in such fair value determinations are certain judgments and estimates relating to future cash flows, including our interpretation of current economic indicators and market valuations, and assumptions about our strategic plans with regard to our operations. Due to the uncertainties associated with such estimates, actual results could differ from such estimates. If the reporting unit's carrying value exceeds its fair value, the excess of the carrying value over the fair value is recorded as an impairment to goodwill. If a reporting unit's carrying value is negative, the reporting unit passes the impairment test. In both steps, discount rates, market multiples, and sensitivity tests are derived and/or computed with the assistance of external valuation consultants.

Exhibit 2, page 074

In developing fair values for our reporting units, we employ a discounted cash flow or a market multiple methodology, or a combination thereof. The discounted cash flow methodology establishes fair value by estimating the present value of the projected future cash flows to be generated from the reporting unit. The discount rate applied to the projected future cash flows to arrive at the present value is intended to reflect all risks of ownership and the associated risks of realizing the stream of projected future cash flows. The discounted cash flow methodology uses our estimates of future financial performance. The most significant assumptions used in the discounted cash flow methodology are the discount rate and expected future revenue, which vary among reporting units.

The market multiple methodology compares us to similar companies on the basis of risk characteristics to determine our risk profile relative to those companies as a group. This analysis generally focuses on both quantitative considerations, which include financial performance and other quantifiable data, and qualitative considerations, which include any factors which are expected to impact future financial performance. The most significant assumptions affecting the market multiple methodology are the market multiples used on projected future cash flows and market participant acquisition premium. A market participant acquisition premium represents the additional value a buyer would pay to obtain control of the respective reporting unit because having control would lead to higher cash flows, lower cost of capital or both.

*Leases*

We lease office space, many of our concert venues, festival sites and certain equipment. We record a lease asset and liability on our consolidated balance sheets at the inception of the lease or when we take possession of the leased space or equipment, if later, based on the required payments over the term of the lease. We do not recognize a lease asset or liability for leases with an initial term of twelve months or less, including multi-year festival site leases where the sum of the non-consecutive periods of rental time is less than twelve months. Rent expense for these short-term leases is generally recognized on a straight-line basis over the lease term.

Some of our lease agreements contain annual rental escalation clauses, as well as provisions for us to pay the related utilities and maintenance. We have elected to account for the lease components (i.e., fixed payments including rent and parking) and non-lease components (i.e., common-area maintenance costs) as a single lease component.

Many of our lease agreements contain renewal options that can extend the lease for additional terms typically ranging from one to ten years. Renewal options at the discretion of the lessor are included in the lease term while renewal options at our discretion are generally not included in the lease term unless they are reasonably certain to be exercised.

In addition to fixed rental payments, many of our leases contain contingent rental payments based on a percentage of revenue, tickets sold or other variables, while others include periodic adjustments to rental payments based on the prevailing inflationary index or market rental rates. Contingent rent obligations are not included in the initial measurement of the lease or liability and are recognized as rent expense in the period that the contingency is resolved. Our leases do not contain any material residual value guarantees or restrictive covenants.

We measure our lease assets and liabilities using an incremental borrowing rate which varies from lease to lease depending on geographical location and length of the lease.

*Accounts Payable, Client Accounts*

Accounts payable, client accounts consists of contractual amounts due to our ticketing clients which includes the face value of tickets sold and the clients' share of service charges.

*Income Taxes*

We account for income taxes using the liability method which results in deferred tax assets and liabilities based on differences between financial reporting bases and tax bases of assets and liabilities and are measured using the enacted tax rates expected to apply to taxable income in the periods in which the deferred tax asset or liability is expected to be realized or settled. Deferred tax assets are reduced by valuation allowances if we believe it is more likely than not that some portion of or the entire asset will not be realized. As almost all earnings from our continuing foreign operations are permanently reinvested and not distributed, our income tax provision does not include additional United States state and foreign withholding or transaction taxes on those foreign earnings that would be incurred if they were distributed. It is not practicable to determine the amount of state and foreign income taxes, if any, that might become due in the event that any remaining available cash associated with these earnings were distributed.

The FASB guidance for income taxes prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. The amount recognized is measured as the largest amount of benefit that is more likely than not to be realized upon ultimate settlement.

Exhibit 2, page 075

We have established a policy of including interest related to tax loss contingencies in income tax expense (benefit) in the statements of operations.

The Tax Cuts and Jobs Act ("TCJA") enacted in December 2017 subjects a United States corporation to tax on its Global Intangible Low-Taxed Income ("GILTI"). We have established a policy of treating the taxes due on future GILTI inclusions in United States taxable income as a current-period expense when incurred.

### Revenue Recognition

Revenue from the promotion or production of an event in our Concerts segment is recognized when the show occurs. Revenue collected in advance of the event is recorded as deferred revenue until the event occurs. Revenue collected from sponsorship agreements, which is not related to a single event, is classified as deferred revenue and recognized over the term of the agreement or operating season as the benefits are provided to the sponsor.

Revenue from our ticketing operations primarily consists of service fees charged at the time a ticket for an event is sold in either the primary or secondary markets. For primary tickets sold to our concert and festival events, where our concert promoters control ticketing, the revenue for the associated ticket service charges collected in advance of the event is recorded as deferred revenue until the event occurs and these service charges are shared between our Ticketing and Concerts segments. For primary tickets sold for events of third-party clients and secondary market sales, the revenue is recognized at the time of the sale and is recorded by our Ticketing segment.

We account for taxes that are externally imposed on revenue producing transactions on a net basis.

### Gross versus Net Revenue Recognition

We report revenue on a gross or net basis based on management's assessment of whether we act as a principal or agent in the transaction. To the extent we act as the principal, revenue is reported on a gross basis. The determination of whether we act as a principal or an agent in a transaction is based on an evaluation of whether we have control of the good or service before it is transferred to the customer. Our Ticketing segment's revenue, which primarily consists of service fees from its ticketing operations, is recorded net of the face value of the ticket as we generally act as an agent in these transactions.

### Business Interruption Insurance Recovery

We record revenue or offset expense for covered business interruptions in the period we determine it is probable we will be compensated for the costs incurred or the applicable contingencies with the insurance company are resolved for lost revenue. This may result in business interruption insurance recoveries being recorded in a period subsequent to the period we experience lost revenue and/or incurred the expenses from a covered event that are being reimbursed. For the years ended December 31, 2021 and 2020, we recorded business interruption insurance recoveries of $97.2 million and $125.7 million, respectively. The recoveries in 2020 were primarily due to the global COVID-19 pandemic while the recoveries in 2021 were for a variety of claims. For the year ended December 31, 2021, business interruption insurance recoveries was primarily recorded as revenue. For the year ended December 31, 2020, approximately half was recorded as revenue and half as a reduction to our direct operating and selling, general and administrative expenses.

### Foreign Currency

Results of operations for foreign subsidiaries and foreign equity investees are translated into United States dollars using the average exchange rates during the year. The assets and liabilities of those subsidiaries and investees are translated into United States dollars using the exchange rates at the balance sheet date. The related translation adjustments are recorded in a separate component of stockholders' equity in AOCI. Foreign currency transaction gains and losses are included in the statements of operations and include the impact of revaluation of certain foreign currency denominated net assets or liabilities held internationally. For the year ended December 31, 2021, we recorded net foreign currency transaction losses of $20.6 million. For the years ended December 31, 2020 and 2019, we recorded net foreign currency transaction gains of $9.0 million and $3.2 million, respectively. We do not currently have significant operations in highly inflationary countries.

### Advertising Expense

We record advertising expense in the year that it is incurred. Throughout the year, general advertising expenses are recognized as they are incurred, but event-related advertising for concerts is recognized once the show occurs. If an event is rescheduled into the following year, the advertising costs are expensed in the period the event is rescheduled. However, all advertising costs incurred during the year and not previously recognized are expensed at the end of the year. Advertising expenses of $260.8 million, $103.3 million and $452.7 million for the years ended December 31, 2021, 2020 and 2019, respectively, were recorded as a component of direct operating expenses. Advertising expenses of $18.1 million, $14.8 million and $27.8 million for the years ended December 31, 2021, 2020 and 2019, respectively, were recorded as a component of selling, general and administrative expenses.

Exhibit 2, page 076

***Direct Operating Expenses***

Direct operating expenses include artist fees, show-related marketing and advertising expenses, rent expense for events in third-party venues, credit card fees, telecommunication and data communication costs associated with our call centers, commissions paid on tickets distributed through independent sales outlets away from the box office, and salaries and wages related to seasonal employees at our venues along with other costs, including ticket stock and shipping. These costs are primarily variable in nature.

***Selling, General and Administrative Expenses***

Selling, general and administrative expenses include salaries and other compensation costs related to full-time employees, fixed rent, travel and entertainment, legal expenses and consulting along with other costs.

***Depreciation and Amortization***

Our depreciation and amortization is presented as a separate line item in the statements of operations. There is no depreciation or amortization included in direct operating expenses, selling, general and administrative expenses or corporate expenses. Amortization of nonrecoupable ticketing contract advances is recorded as a reduction to revenue.

***Non-cash and Stock-based Compensation***

We follow the fair value recognition provisions in the FASB guidance for stock compensation. Stock-based compensation expense includes compensation expense for all share-based payments using the estimated grant date fair value. Stock-based compensation expense is adjusted for forfeitures as they occur.

The fair value for options in Live Nation stock is estimated on the date of grant using the Black-Scholes option-pricing model. The fair value of the options is amortized to expense on a straight-line basis over the options' vesting period. We use an expected volatility based on an even weighting of our own traded options and historical volatility. We use a weighted-average expected life based on historical experience calculated with the assistance of outside consultants. The risk-free rate for periods within the expected life of the option is based on the United States Treasury note rate.

The fair value of restricted stock awards and deferred stock awards, which is generally the stock price on the date of grant, is amortized to expense on a straight-line basis over the vesting period except for restricted stock awards and deferred stock awards with minimum performance or market targets as their vesting condition. The performance-based awards are amortized to expense on a graded basis over the vesting period to the extent that it is probable that the performance criteria will be met. Market-based award fair values are estimated using a Monte Carlo simulation model and are then amortized to expense on a graded basis over the derived service period, which is estimated as the median weighted average vesting period from the Monte Carlo simulation models. However, unlike awards with a service or performance condition, the expense for market-based awards will not be reversed solely because the market condition is not satisfied.

***Use of Estimates***

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates, judgments, and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes including, but not limited to, legal, tax and insurance accruals, acquisition accounting and impairments. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. Actual results could differ from those estimates.

Exhibit 2, page 077

*Accounting Pronouncements - Not Yet Adopted*

In August 2020, the FASB issued guidance that simplifies the accounting for convertible instruments and its application of the derivatives scope exception for contracts in an entity's own equity. The new guidance reduces the number of accounting models that require separating embedded conversion features from convertible instruments. As a result, only conversion features accounted for under the substantial premium model and those that require bifurcation will be accounted for separately. For contracts in an entity's own equity, the new guidance eliminates some of the current requirements for equity classification. The guidance also addresses how convertible instruments are accounted for in the diluted earnings per share calculation and requires enhanced disclosures about the terms of convertible instruments and contracts in an entity's own equity. The guidance is effective for annual periods beginning after December 15, 2021 and interim periods within that year. The guidance should be applied using either a modified retrospective method or a full retrospective method. We will adopt this guidance on January 1, 2022 using the modified retrospective method and expect to record a cumulative-effect adjustment of $60.5 million as a reduction to accumulated deficit in the consolidated balance sheets. We expect the impact of adoption to also result in a reduction of additional paid-in capital of $96.0 million and increases in current portion of long-term debt, net and long-term debt, net of $14.7 million and $20.8 million, respectively, as a result of reversal of the separation of the convertible debt between debt and equity. The adoption is not expected to have a material effect on our consolidated statements of operations and consolidated statements of cash flows.

## NOTE 2—IMPACT OF THE GLOBAL COVID-19 PANDEMIC

The unprecedented and rapid spread of COVID-19 and the related government restrictions and social distancing measures implemented throughout the world significantly impacted our business from mid-March 2020 through the first half of this year. Late in the second quarter, however, we began to see the positive impacts of successful vaccination rollouts in many of our key markets, mainly the United States and United Kingdom, with social distancing restrictions easing and live events resuming. In the third quarter, we saw a meaningful restart of our operations with outdoor amphitheater events and festivals taking place in the United States and United Kingdom. The restart of our operations has been executed with careful consideration of the safety and health of our fans, artists and employees through a mix of masking, testing and vaccination protocols at our events, venues and offices around the world.

*Operating Results*

While the first half of the year saw a material impact from the global COVID-19 pandemic, in the second half of the year, ticket sales grew, new sponsor partners were signed and shows began to resume, primarily in the United States and United Kingdom. Our overall revenue for the year ended December 31, 2021 increased by $4.4 billion to $6.3 billion as compared to prior year. The revenue increase during the year was across all of our segments as a result of more events going on sale and occurring globally, along with lower refunds, as compared to prior year. The increase in revenue during 2021 was primarily in our Concerts and Ticketing segments largely due to the resumption of shows and festivals late in the second quarter of 2021 and continuing throughout the rest of 2021 primarily in the United States and United Kingdom.

The event-related deferred revenue for our Concerts segment, which is reported as part of deferred revenue on our consolidated balance sheets, includes the face value and Concerts' share of service charges for all tickets sold by December 31, 2021 for shows expected to occur in the next 12 months. Any refunds committed to for shows cancelled or rescheduled during the year ended December 31, 2021 have either been returned to fans or are reflected in accrued expenses on the consolidated balance sheets. We are no longer estimating future refunds as operations have resumed in our major markets and event cancellations and postponements have declined such that our estimation of future events that could be impacted by the global COVID-19 pandemic would result in an insignificant reclassification from deferred revenue to accrued expenses. We expect that the majority of our shows postponed due to the pandemic will be rescheduled. Event-related deferred revenue for tickets sold for shows expected to occur after December 31, 2022 totaled $73.2 million and is reflected in other long-term liabilities on our consolidated balance sheets.

The revenue recognized in our Ticketing segment during 2021 includes our share of ticket service charges for tickets sold during the period for third-party clients and for shows that occurred in the period for our Concerts segment where our promoters control the ticketing. Revenue has been reduced for any shows that were cancelled and for refunds requested on rescheduled shows up to the time of the filing of these consolidated financial statements, and funds have either been returned to the customer or are reflected in accrued expenses on the consolidated balance sheets. Our ticketing clients determine if shows will be rescheduled or cancelled and what the refund policy will be for those shows. We have not recorded an estimate for refunds that may occur in the future since our clients, not Ticketmaster, determine when shows are cancelled or rescheduled and we have a limited amount of historical data of refunds resulting from a global shutdown of live events on which to reliably determine an estimate.

67

Exhibit 2, page 078

For events that are cancelled, our standard policy is to refund the fans within 30 days, subject to regulations in various markets and in some cases at the discretion of our venue or event organizer clients. Our ticket refund policies for rescheduled shows vary by ticketing client and country. In multiple international markets, including Germany, Italy and Belgium, governmental regulations have been put in place in response to the global COVID-19 pandemic which allow for the issuance of vouchers in place of cash refunds for rescheduled shows, and in some cases for cancelled shows.

The restart of our operations is now well underway in the United States and United Kingdom and we expect the same to happen in other parts of the world as vaccination efforts gain momentum in mainland Europe, Asia-Pacific and Latin America. The reduction in live events due to the pandemic has had a negative impact on our operating results during the year ended December 31, 2021 and we expect certain markets to continue to be impacted in the first quarter of 2022 as there is still uncertainty on the exact timing and pace of the recovery in certain markets where vaccination efforts are still underway.

**NOTE 3—BUSINESS ACQUISITIONS**

During 2021, we completed the acquisition of an aggregate 51% interest in OCESA. This acquisition was accounted for as a business combination under the acquisition method of accounting. With the exception of OCESA, all other acquisitions were not material on an individual basis or in the aggregate.

**OCESA Acquisition**

*Description of Transaction*

On December 6, 2021, we completed our acquisition of an aggregate 51% of the capital stock of OCESA (the "Acquisition") for $431.9 million, subject to certain adjustments. Upon closing of the Acquisition, we and Corporación Interamericana de Entretenimiento, S.A.B. de C.V. terminated the then pending International Chamber of Commerce arbitration in connection with the earlier termination of the purchase agreements, and any related litigation was also dismissed.

One of the most prominent live event businesses globally, OCESA has a robust business portfolio in ticketing, sponsorship, food and beverage, merchandise, and venue operation across Mexico and Latin America. As part of the Acquisition, we also acquired an equity interest in OcesaSeitrack, OCESA's booking and artist management joint venture; ICREA, one of Mexico's special and corporate event specialists; and Centro Citibanamex, an exhibition and convention center in Mexico City. We expect the Acquisition to add value and growth to our Concerts, Ticketing and Sponsorship & Advertising segments.

Exhibit 2, page 079

*Recording of Assets Acquired and Liabilities Assumed*

The following table summarizes the preliminary acquisition-date fair value of the identifiable assets acquired, liabilities assumed and noncontrolling interests including goodwill:

| | Initial Allocation |
|---|---|
| | *(in thousands)* |
| Fair value of consideration transferred | $ 431,943 |
| Fair value of redeemable noncontrolling interests | 280,000 |
| Fair value of noncontrolling interests | 7,000 |
| Fair value of pre-existing investment in nonconsolidated affiliates | 50,000 |
| | |
| Less: Preliminary recognized amounts of identifiable assets acquired and liabilities assumed | |
| Cash and cash equivalents | 113,014 |
| Accounts receivable | 89,844 |
| Prepaid expenses | 33,070 |
| Other current assets | 658 |
| Property, plant and equipment | 25,318 |
| Operating lease assets | 67,142 |
| Intangible assets | 340,000 |
| Investments in nonconsolidated affiliates | 30,000 |
| Other long-term assets | 36,525 |
| Accounts payable, client accounts | (13,344) |
| Accounts payable | (12,584) |
| Accrued expenses | (69,583) |
| Deferred revenue | (144,557) |
| Current portion of operating lease liabilities | (9,209) |
| Long-term operating lease liabilities | (57,984) |
| Long-term deferred income taxes | (102,279) |
| Goodwill | $ 442,912 |

Goodwill represents the future economic benefits arising from other assets acquired that could not be individually identified and separately recognized. The goodwill arising from the Acquisition consists largely of cost savings and new opportunities expected from combining the operations of Live Nation and OCESA. The anticipated synergies primarily relate to cost efficiencies on promotion, venue and festivals as well as ticketing and sponsorship opportunities. Of the total amount of preliminary goodwill recognized in connection with the Acquisition, none will be deductible for tax purposes. Preliminary goodwill of $39.0 million, $155.6 million and $248.3 million has been allocated to the Concerts, Ticketing and Sponsorship & Advertising segments, respectively, as a result of the Acquisition.

Below is a summary of the methodologies and significant assumptions used in estimating the fair value of intangible assets and noncontrolling interests.

69

Exhibit 2, page 080

*Intangible assets* — the preliminary fair value of the acquired intangible assets is currently being evaluated using commonly used valuation techniques. In estimating the fair value of the acquired intangible assets, we utilized the valuation methodology determined to be most appropriate for the individual intangible asset being valued. The acquired definite-lived intangible assets include the following:

| | Preliminary Estimated Fair Value | Preliminary Estimated Useful Lives [1] |
|---|---|---|
| | *(in thousands)* | *(years)* |
| Client/vendor relationships | $ 102,000 | 5 to 10 |
| Revenue-generating contracts | 90,000 | 4 to 10 |
| Venue management and leaseholds | 107,000 | 10 |
| Trademarks and naming rights | 41,000 | 5 to 10 |
| Total acquired intangible assets | $ 340,000 | |

[1] Determination of the preliminary estimated useful lives of the individual categories of intangible assets was based on the nature of the applicable intangible asset and the expected future cash flows to be derived from the intangible asset. Amortization of intangible assets with definite lives is recognized over the shorter of the respective lives of the agreement or the period of time the assets are expected to contribute to future cash flows.

Some of the more significant estimates and assumptions inherent in determining the fair value of the identifiable intangible assets are associated with forecasting cash flows and profitability. The primary assumptions used were generally based upon the present value of anticipated cash flows discounted at rates ranging from 12% to 13%. Estimated years of projected earnings generally follow the range of estimated remaining useful lives for each intangible asset class.

*Noncontrolling interests* — The preliminary fair value of the redeemable noncontrolling interests and noncontrolling interests of $280.0 million and $7.0 million, respectively, were estimated by applying the market approach. The fair value estimates are based on fair value of consideration transferred, adjustment of 20% to account for acquisition premium and adjustments of 10% to 20% to account for lack of marketability that market participants would consider when estimating the fair value of the individual noncontrolling interests.

**Actual and Pro Forma Impact of Acquisition**

The revenue, loss from continuing operations and net loss of OCESA that are included in our consolidated statements of operations are not material for the year ended December 31, 2021 since the Acquisition closed on December 6, 2021. Pro forma results of operations, assuming that OCESA had been acquired on January 1, 2020, for the years ended December 31, 2021 and 2020 were not material to our consolidated statements of operations.

We incurred a cumulative total of $12.3 million of acquisition transaction expenses relating to the Acquisition, of which $9.0 million, $1.1 million and $1.2 million are included in selling, general and administrative expenses within our consolidated statements of operations for the years ended December 31, 2021, 2020 and 2019, respectively.

We are in the process of completing our purchase accounting in accordance with GAAP, whereby the purchase price is allocated to the assets acquired and liabilities assumed based upon their estimated fair values on the acquisition date. As we completed the Acquisition in the last month of the year ended December 31, 2021 and given the size of the Acquisition, the purchase accounting should be considered preliminary and is subject to revision based on final determinations of fair value and allocations of purchase price to the identifiable assets and liabilities acquired.

**NOTE 4—LONG-LIVED ASSETS**

We reviewed our long-lived assets for potential impairment indicators due to the suspension of our live events resulting from the global COVID-19 pandemic. Our venues are either owned or we have long-term operating rights under lease or management agreements with terms ranging from 5 to 25 years. Many of our definite-lived intangible assets are based on revenue-generating contracts, and client or vendor relationships associated with live events and have useful lives, established at the time of acquisition, typically ranging from 3 to 10 years. Our more significant investments in nonconsolidated affiliates are in the concert event promotion, venue operation or ticketing businesses, and these businesses have been experiencing similar impacts to their operations, in line with what we are experiencing as a result of the pandemic. Based on our assessments, we recorded impairment charges on certain of our definite-lived intangible assets, which are discussed below.

70

Exhibit 2, page 081

Table of Contents

Late in the second quarter of 2021 we began to see the positive impacts of successful vaccination rollouts in many of our key markets, mainly the United States and United Kingdom, with social distancing restrictions easing and live events resuming. In the third quarter of 2021, we saw a meaningful restart of our operations with outdoor amphitheater events and festivals taking place in both the United States and United Kingdom. We expect the same to happen in other parts of the world as vaccination efforts gain momentum in mainland Europe, Asia-Pacific and Latin America. The reduction in live events due to the pandemic has had a negative impact on our operating results for 2021 and we expect certain markets to continue to be impacted in the first quarter of 2022 as there is still uncertainty on the exact timing and pace of the recovery in certain markets where vaccination efforts are still underway. As our larger venues have reopened and tours have resumed in the United States and United Kingdom and we expect other markets to reopen throughout 2022, we believe the underlying business supporting all of our long-lived assets will begin generating operating income once again.

***Property, Plant and Equipment, Net***

Property, plant and equipment includes expenditures for the construction of new venues, major renovations to existing buildings or buildings that are being added to our venue network, the development of new ticketing tools and technology enhancements along with the renewal and improvement of existing venues and technology systems, web development and administrative offices.

Property, plant and equipment consisted of the following:

| | December 31, | |
| | **2021** | **2020** |
| | *(in thousands)* | |
| Land, buildings and improvements | $ 1,324,278 | $ 1,239,696 |
| Computer equipment and capitalized software | 910,581 | 887,637 |
| Furniture and other equipment | 411,403 | 424,363 |
| Construction in progress | 173,865 | 151,830 |
| | 2,820,127 | 2,703,526 |
| Less: accumulated depreciation | 1,728,198 | 1,602,112 |
| | $ 1,091,929 | $ 1,101,414 |

71

Exhibit 2, page 082

*Definite-lived Intangible Assets*

The following table presents the changes in the gross carrying amount and accumulated amortization of definite-lived intangible assets for the years ended December 31, 2021 and 2020:

| | Client / vendor relationships | Revenue-generating contracts | Venue management & leaseholds | Trademarks and naming rights | Technology | Other [1] | Total |
|---|---|---|---|---|---|---|---|
| | | | | *(in thousands)* | | | |
| **Balance as of December 31, 2019:** | | | | | | | |
| Gross carrying amount | $ 527,490 | $ 700,557 | $ 149,586 | $ 152,935 | $ 87,338 | $ 25,219 | $ 1,643,125 |
| Accumulated amortization | (203,361) | (402,022) | (42,699) | (56,416) | (54,220) | (14,266) | (772,984) |
| Net | 324,129 | 298,535 | 106,887 | 96,519 | 33,118 | 10,953 | 870,141 |
| Gross carrying amount: | | | | | | | |
| Acquisitions—current year | 129,015 | 69,766 | 8,695 | 12 | 19,712 | 94 | 227,294 |
| Acquisitions—prior year | (33,118) | 22,821 | 2,093 | — | 1,000 | — | (7,204) |
| Foreign exchange | 8,391 | 7,720 | 2,923 | (2,462) | 411 | 12 | 16,995 |
| Other [2] | (135,704) | (222,200) | (15,341) | (141) | (36,178) | (7,912) | (417,476) |
| Net change | (31,416) | (121,893) | (1,630) | (2,591) | (15,055) | (7,806) | (180,391) |
| Accumulated amortization: | | | | | | | |
| Amortization | (77,389) | (88,640) | (23,532) | (16,737) | (27,646) | (5,368) | (239,312) |
| Foreign exchange | (1,351) | (9,239) | (1,034) | (613) | (433) | (49) | (12,719) |
| Other [2] | 135,704 | 222,191 | 15,341 | 162 | 36,500 | 7,983 | 417,881 |
| Net change | 56,964 | 124,312 | (9,225) | (17,188) | 8,421 | 2,566 | 165,850 |
| **Balance as of December 31, 2020:** | | | | | | | |
| Gross carrying amount | 496,074 | 578,664 | 147,956 | 150,344 | 72,283 | 17,413 | 1,462,734 |
| Accumulated amortization | (146,397) | (277,710) | (51,924) | (73,604) | (45,799) | (11,700) | (607,134) |
| Net | 349,677 | 300,954 | 96,032 | 76,740 | 26,484 | 5,713 | 855,600 |
| Gross carrying amount: | | | | | | | |
| Acquisitions—current year | 117,817 | 93,102 | 107,000 | 41,033 | 10,419 | 2,650 | 372,021 |
| Acquisitions—prior year | 5,558 | — | — | — | — | — | 5,558 |
| Dispositions | — | (1,932) | — | — | — | — | (1,932) |
| Foreign exchange | (5,922) | (13,430) | (2,146) | (1,689) | 160 | 4 | (23,023) |
| Other [2] | (36,597) | (63,146) | (19,954) | (8,823) | (45,527) | (9,653) | (183,700) |
| Net change | 80,856 | 14,594 | 84,900 | 30,521 | (34,948) | (6,999) | 168,924 |
| Accumulated amortization: | | | | | | | |
| Amortization | (72,066) | (67,918) | (15,599) | (14,944) | (18,758) | (4,152) | (193,437) |
| Dispositions | — | 751 | — | — | — | — | 751 |
| Foreign exchange | 3,141 | 5,779 | 622 | 554 | (190) | (1) | 9,905 |
| Other [2] | 36,597 | 63,189 | 19,972 | 8,645 | 46,372 | 9,820 | 184,595 |
| Net change | (32,328) | 1,801 | 4,995 | (5,745) | 27,424 | 5,667 | 1,814 |
| **Balance as of December 31, 2021:** | | | | | | | |
| Gross carrying amount | 576,930 | 593,258 | 232,856 | 180,865 | 37,335 | 10,414 | 1,631,658 |
| Accumulated amortization | (178,725) | (275,909) | (46,929) | (79,349) | (18,375) | (6,033) | (605,320) |
| Net | $ 398,205 | $ 317,349 | $ 185,927 | $ 101,516 | $ 18,960 | $ 4,381 | $ 1,026,338 |

---

[1] Other primarily includes intangible assets for non-compete agreements.

[2] Other primarily includes netdowns of fully amortized or impaired assets.

72

Exhibit 2, page 083

Included in the current year acquisition amounts above for 2021 are definite-lived intangible assets primarily associated with the acquisition of OCESA. Information regarding the preliminary estimated fair value of the acquired OCESA intangible assets can be found in Note 3—Business Acquisitions.

Included in the current year acquisitions amounts above for 2020 are definite-lived intangible assets primarily associated with the acquisitions of a festival and concert promotion business located in Ireland, a merchandise business, a festival promotion business and ticketing relationships, all located in the United States.

The 2021 and 2020 additions to definite-lived intangible assets from acquisitions have weighted-average lives as follows:

| | Weighted-Average Life [1] | |
|---|---|---|
| | 2021 | 2020 |
| | (in years) | |
| Revenue-generating contracts | 9 | 9 |
| Client/vendor relationships | 9 | 8 |
| Trademarks and naming rights | 10 | 1 |
| Technology [1] | 0 | 5 |
| Venue management and leaseholds | 10 | 7 |
| Other | 2 | 1 |
| All categories | 10 | 8 |

_____

[1] The weighted average life of technology intangibles does not include purchased software licenses that are typically amortized over 1 to 3 years.

We test for possible impairment of definite-lived intangible assets whenever events or circumstances change, such as a significant reduction in operating cash flow or a change in the manner in which the asset is intended to be used, which may indicate that the carrying amount of the asset may not be recoverable. For the years ended December 31, 2021 and 2020, we reviewed definite-lived intangible assets that management determined had an indicator that remaining future operating cash flows over the acquisition-date estimated useful life may not support their carrying value, as a result of the expected impacts from the global COVID-19 pandemic, and it was determined that certain of those assets were impaired since the estimated undiscounted operating cash flows associated with those assets were less than their carrying value.

For the year ended December 31, 2021, there were no significant impairment charges. For the year ended December 31, 2020, we recorded impairment charges of $3.6 million as a component of depreciation and amortization primarily related to intangible assets for revenue-generating contracts, venue management and leaseholds and client/vendor relationships in the Concerts segment primarily as a result of the expected impacts from the global COVID-19 pandemic where the useful life of the definite-lived intangible asset was expiring within the near term. For the year ended December 31, 2019, we recorded impairment charges of $26.8 million as a component of depreciation and amortization primarily related to intangible assets for revenue-generating contracts in the Concerts and Sponsorship & Advertising segments. See Note 8—Fair Value Measurements for further discussion of the inputs used to determine the fair values.

Amortization of definite-lived intangible assets for the years ended December 31, 2021, 2020 and 2019 was $193.4 million, $239.3 million and $223.5 million, respectively.

The following table presents our estimate of amortization expense for each of the five succeeding fiscal years for definite-lived intangible assets that exist at December 31, 2021:

| | (in thousands) |
|---|---|
| 2022 | $ 194,045 |
| 2023 | $ 168,195 |
| 2024 | $ 148,994 |
| 2025 | $ 120,926 |
| 2026 | $ 102,083 |

73

Exhibit 2, page 084

As acquisitions and dispositions occur in the future and the valuations of intangible assets for recent acquisitions are completed, amortization expense may vary.

*Indefinite-lived Intangibles*

We have indefinite-lived intangible assets which consist of trade names. These indefinite-lived intangible assets had a carrying value of $69.0 million and $369.1 million as of December 31, 2021 and 2020, respectively.

*Goodwill*

We currently have six reporting units with goodwill balances: International Concerts, North America Concerts, Artist Management and Artist Services (non-management) within the Concerts segment; Sponsorship & Advertising; and Global Ticketing. We review goodwill for impairment annually, as of October 1, using a two-step process: a qualitative review and a quantitative analysis.

In 2021, as part of the October 1 annual review, market multiples were not incorporated into our assessments for some reporting units where its current financial metrics do not support use of the market approach as a corroborating approach. When those businesses stabilizes, we will reincorporate the market approach into their fair value methodology.

In 2021, as part of our annual test for impairment, all of our reporting units with goodwill were assessed under the initial qualitative evaluation and did not advance to the quantitative analysis. Considerations included excess of fair values over carrying values in the most recent quantitative analysis performed, discount rates, financial results and sensitivity analyses. We also considered changes in discount rates, market multiples if applicable, carrying value and forecasts since the last time a quantitative test was performed. One of our reporting units, International Concerts, which accounts for $265.9 million of goodwill had a negative carrying value.

No impairment charges were recorded for the years ended December 31, 2021, 2020 and 2019 as a result of our annual test or interim tests when performed. See Note 8—Fair Value Measurements for discussion of the impairment calculation.

74

The following table presents the changes in the carrying amount of goodwill in each of our reportable segments for the years ended December 31, 2021 and 2020:

| | Concerts | Ticketing | Sponsorship & Advertising | Total |
|---|---|---|---|---|
| | *(in thousands)* | | | |
| **Balance as of December 31, 2019:** | | | | |
| Goodwill | $ 1,226,057 | $ 766,263 | $ 441,541 | $ 2,433,861 |
| Accumulated impairment losses | (435,363) | — | — | (435,363) |
| Net | 790,694 | 766,263 | 441,541 | 1,998,498 |
| | | | | |
| Acquisitions—current year | 66,810 | 8,778 | 13,847 | 89,435 |
| Acquisitions—prior year | 9,033 | — | 7,165 | 16,198 |
| Foreign exchange | 16,373 | 7,518 | 1,181 | 25,072 |
| | | | | |
| **Balance as of December 31, 2020:** | | | | |
| Goodwill | 1,318,273 | 782,559 | 463,734 | 2,564,566 |
| Accumulated impairment losses | (435,363) | — | — | (435,363) |
| Net | 882,910 | 782,559 | 463,734 | 2,129,203 |
| | | | | |
| Acquisitions—current year | 84,592 | 157,519 | 248,295 | 490,406 |
| Acquisitions—prior year | (1,275) | (3,888) | 418 | (4,745) |
| Dispositions | (150) | — | — | (150) |
| Foreign exchange | (10,989) | (6,126) | (6,730) | (23,845) |
| | | | | |
| **Balance as of December 31, 2021:** | | | | |
| Goodwill | 1,390,451 | 930,064 | 705,717 | 3,026,232 |
| Accumulated impairment losses | (435,363) | — | — | (435,363) |
| Net | $ 955,088 | $ 930,064 | $ 705,717 | $ 2,590,869 |

Included in the current year acquisitions amounts above for 2021 is goodwill primarily associated with the acquisition of OCESA. See Note 3—Business Acquisitions for further discussion.

Included in the current year acquisitions amounts above for 2020 are goodwill primarily associated with the acquisitions of a festival and concert promotion business located in Ireland as well as a merchandise business, a festival promotion business and a concerts streaming business located in the United States.

We are in various stages of finalizing our acquisition accounting for recent acquisitions, which include the use of external valuation consultants, and the completion of this accounting could result in a change to the associated purchase price allocations, including goodwill and the allocation between segments.

*Investments in Nonconsolidated Affiliates*

During the year ended December 31, 2021, we sold certain investments in nonconsolidated affiliates for $110.2 million in cash and noncash consideration resulting in a gain on sale of investments in nonconsolidated affiliates of $83.6 million.

During the year ended December 31, 2021, we entered into certain agreements whereby we received equity in the counterparty to those agreements primarily in exchange for providing sponsorship and marketing programs and support and recognized $25.0 million in noncash additions to investments in nonconsolidated affiliates which are included in other long term assets on our consolidated balance sheets associated with these agreements.

Exhibit 2, page 086

**NOTE 5—LEASES**

The significant components of operating lease expense are as follows:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2021 | | 2020 |
| | | *(in thousands)* | | |
| Operating lease cost | $ | 241,012 | $ | 241,819 |
| Variable and short-term lease cost | | 92,863 | | 35,202 |
| Sublease income | | (6,014) | | (13,270) |
| Net lease cost | $ | 327,861 | $ | 263,751 |

Many of our leases contain contingent rent obligations based on revenue, tickets sold or other variables, while others include periodic adjustments to rent obligations based on the prevailing inflationary index or market rental rates. Contingent rent obligations are not included in the initial measurement of the lease asset or liability and are recorded as rent expense in the period that the contingency is resolved. Our variable and short-term lease cost has increased during the year ended December 31, 2021 as compared to the previous year due to the resumption of concert events and festivals in the second half of 2021.

Supplemental cash flow information for our operating leases is as follows:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2021 | | 2020 |
| | | *(in thousands)* | | |
| Cash paid for amounts included in the measurement of lease liabilities | $ | 189,205 | $ | 203,419 |
| Lease assets obtained in exchange for lease obligations, net of terminations | $ | 251,401 | $ | 129,174 |

Future maturities of our operating lease liabilities at December 31, 2021 are as follows:

| | | *(in thousands)* |
|---|---|---|
| 2022 | $ | 219,965 |
| 2023 | | 237,184 |
| 2024 | | 219,726 |
| 2025 | | 204,392 |
| 2026 | | 193,157 |
| Thereafter | | 1,498,876 |
| Total lease payments | | 2,573,300 |
| Less: Interest | | 843,521 |
| Present value of lease liabilities | $ | 1,729,779 |

The weighted average remaining lease term and weighted average discount rate for our operating leases are as follows:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| Weighted average remaining lease term (in years) | 13.2 | | 13.9 | |
| Weighted average discount rate | 6.10 | % | 6.31 | % |

As of December 31, 2021, we have additional operating leases that have not yet commenced with total lease payments of $181.9 million. These operating leases, which are not included on our consolidated balance sheets, have commencement dates ranging from January 2022 to June 2030 with lease terms ranging from 2 to 20 years.

In response to the impacts we experienced from the global COVID-19 pandemic, we amended certain of our lease agreements for deferral or abatement of fixed rent payments in 2020. These lease concessions did not substantially increase our obligations under the respective lease agreements. Therefore, we elected to account for these lease concessions as though enforceable rights and obligations for those concessions existed in our lease agreements as clarified by the FASB rather than applying the lease modification guidance.

Exhibit 2, page 087

**NOTE 6—LONG-TERM DEBT**

Long-term debt, which includes finance leases, consisted of the following:

|  | December 31, | |
|---|---|---|
|  | **2021** | **2020** |
|  | *(in thousands)* | |
| Senior Secured Credit Facility: | | |
| Term loan A | $ 395,000 | $ — |
| Term loan B | 854,385 | 938,125 |
| 6.5% Senior Secured Notes due 2027 | 1,200,000 | 1,200,000 |
| 3.75% Senior Secured Notes due 2028 | 500,000 | — |
| 4.75% Senior Notes due 2027 | 950,000 | 950,000 |
| 4.875% Senior Notes due 2024 | 575,000 | 575,000 |
| 5.625% Senior Notes due 2026 | 300,000 | 300,000 |
| 2.5% Convertible Senior Notes due 2023 | 550,000 | 550,000 |
| 2.0% Convertible Senior Notes due 2025 | 400,000 | 400,000 |
| Other long-term debt | 105,890 | 125,226 |
| Total principal amount | 5,830,275 | 5,038,351 |
| Less unamortized discounts and debt issuance costs | (99,537) | (129,840) |
| Total long-term debt, net of unamortized discounts and debt issuance costs | 5,730,738 | 4,908,511 |
| Less: current portion | 585,254 | 53,415 |
| Total long-term debt, net | $ 5,145,484 | $ 4,855,096 |

Future maturities of long-term debt at December 31, 2021 are as follows:

|  | *(in thousands)* |
|---|---|
| 2022 | $ 602,325 |
| 2023 | 65,272 |
| 2024 | 1,351,867 |
| 2025 | 36,388 |
| 2026 | 1,120,579 |
| Thereafter | 2,653,844 |
| Total | $ 5,830,275 |

All long-term debt without a stated maturity date is considered current and is reflected as maturing in the earliest period shown in the table above. As discussed below, our 2.5% convertible senior notes due 2023 are redeemable by holders outside of our control beginning in 2022 and thus, are classified in current portion of long-term debt. See Note 8—Fair Value Measurements for discussion of the fair value measurement of our long-term debt.

77

Exhibit 2, page 088

*Amended Senior Secured Credit Facility*

In April and July 2020, we amended our senior secured credit facility and now have (i) a $400 million term loan A facility, (ii) a $950 million term loan B facility, (iii) a $500 million revolving credit facility and (iv) a $130 million incremental revolving credit facility. In addition, subject to certain conditions, we have the right to increase such facilities by an amount equal to the sum of (x) $425 million during the Restricted Period and $855 million after the Restricted Period, (y) the aggregate principal amount of voluntary prepayments of the term loan A and term loan B and permanent reductions of the revolving credit facility commitments, in each case, other than from proceeds of long-term indebtedness, and (z) except during the Restricted Period, additional amounts so long as the senior secured leverage ratio calculated on a pro-forma basis (as defined in the agreement) is no greater than 3.75x. The combined revolving credit facilities provide for borrowings up to $630 million with sublimits of up to (i) $150 million for the issuance of letters of credit, (ii) $50 million for swingline loans, (iii) $300 million for borrowings in Dollars, Euros or British Pounds and (iv) $100 million for borrowings in those or one or more other approved currencies. The amended senior secured credit facility is secured by a first priority lien on substantially all of the tangible and intangible personal property of LNE and LNE's domestic subsidiaries that are guarantors, and by a pledge of substantially all of the shares of stock, partnership interests and limited liability company interests of our direct and indirect domestic subsidiaries and 65% of each class of capital stock of any first-tier foreign subsidiaries, subject to certain exceptions.

The interest rates per annum applicable to revolving credit facility loans and the term loan A under the amended senior secured credit facility are, at our option, equal to either Eurodollar plus 2.25% or a base rate plus 1.25%. The interest rates per annum applicable to the term loan B are, at our option, equal to either Eurodollar plus 1.75% or a base rate plus 0.75%. The interest rates per annum applicable to the incremental revolving credit facility are, at our option, equal to either Eurodollar plus 2.5% or a base rate plus 1.5%. We are required to pay a commitment fee of 0.5% per year on the undrawn portion available under the revolving credit facility and delayed draw term loan A, 1.75% per year on the undrawn portion available under the incremental revolving credit facility and variable fees on outstanding letters of credit.

For the term loan A, we are required to make quarterly payments increasing over time from $2.5 million to $5.0 million with the balance due at maturity in October 2024. For the term loan B, we are required to make quarterly payments of $2.4 million with the balance due at maturity in October 2026. Both the existing and incremental revolving credit facilities mature in October 2024. We are also required to make mandatory prepayments of the loans under the amended credit agreement, subject to specified exceptions, from excess cash flow and with the proceeds of asset sales, debt issuances and specified other events.

There were no borrowings under the revolving credit facilities as of December 31, 2021. Based on our outstanding letters of credit of $60.1 million, $569.9 million was available for future borrowings from our revolving credit facilities.

*6.5% Senior Secured Notes Due 2027*

In May 2020, we issued $1.2 billion principal amount of 6.5% senior secured notes due 2027. Interest on the notes is payable semi-annually in cash in arrears on May 15 and November 15 of each year and the notes will mature on May 15, 2027. We may redeem some or all of the notes, at any time prior to May 15, 2023, at a price equal to 100% of the aggregate principal amount, plus any accrued and unpaid interest to the date of redemption, plus a "make-whole" premium. We may redeem up to 35% of the aggregate principal amount of the notes from the proceeds of certain equity offerings prior to May 15, 2023, at a price equal to 106.5% of the aggregate principal amount, plus accrued and unpaid interest thereon, if any, to the date of redemption. In addition, on or after May 15, 2023 we may redeem some or all of the notes at any time at redemption prices starting at 104.875% of their principal amount, plus any accrued and unpaid interest to the date of redemption. We must make an offer to redeem the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date, if we experience certain defined changes of control. The notes are secured by a first priority lien on substantially all of the tangible and intangible personal property of LNE and LNE's domestic subsidiaries that are guarantors, and by a pledge of substantially all of the shares of stock, partnership interests and limited liability company interests of our direct and indirect domestic subsidiaries and 65% of each class of capital stock of any first-tier foreign subsidiaries, subject to certain exceptions.

Exhibit 2, page 089

*3.75% Senior Secured Notes due 2028*

In January 2021, we issued $500 million principal amount of 3.75% senior secured notes due 2028. Interest on the notes is payable semi-annually in cash in arrears on January 15 and July 15 of each year and began on July 15, 2021, and the notes will mature on January 15, 2028. We may redeem some or all of the notes, at any time prior to January 15, 2024, at a price equal to 100% of the aggregate principal amount, plus any accrued and unpaid interest to the date of redemption, plus a 'make-whole' premium. We may redeem up to 35% of the aggregate principal amount of the notes from the proceeds of certain equity offerings prior to January 15, 2024, at a price equal to 103.75% of the aggregate principal amount, plus accrued and unpaid interest thereon to the date of redemption. In addition, on or after January 15, 2024 we may redeem some or all of the notes at any time at redemption prices specified in the notes indenture, plus any accrued and unpaid interest to the date of redemption.

We must make an offer to redeem the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date, if we experience certain defined changes of control. The notes are secured by a first priority lien on substantially all of the tangible and intangible personal property of LNE and LNE's domestic subsidiaries that are guarantors, and by a pledge of substantially all of the shares of stock, partnership interests and limited liability company interests of our direct and indirect domestic subsidiaries.

*4.75% Senior Notes Due 2027*

At December 31, 2021, we had $950 million principal amount of 4.75% senior notes due 2027. Interest on the notes is payable semi-annually in cash in arrears on April 15 and October 15 of each year, and will mature on October 15, 2027. We may redeem some or all of the notes, at any time prior to October 15, 2022, at a price equal to 100% of the aggregate principal amount, plus any accrued and unpaid interest to the date of redemption, plus a 'make-whole' premium. We may redeem up to 35% of the aggregate principal amount of the notes from the proceeds of certain equity offerings prior to October 15, 2022, at a price equal to 104.750% of the aggregate principal amount, plus accrued and unpaid interest thereon, if any, to the date of redemption. In addition, on or after October 15, 2022, we may redeem some or all of the notes at any time at redemption prices starting at 103.563% of their principal amount, plus any accrued and unpaid interest to the date of redemption. We must make an offer to redeem the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date, if we experience certain defined changes of control.

*4.875% Senior Notes Due 2024*

At December 31, 2021, we had $575 million principal amount of 4.875% senior notes due 2024. Interest on the notes is payable semiannually in cash in arrears on May 1 and November 1 of each year, and the notes will mature on November 1, 2024. In addition, on or after November 1, 2019, we may redeem some or all of the notes at any time at redemption prices starting at 103.656% of their principal amount, plus any accrued and unpaid interest to the date of redemption. We must make an offer to redeem the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date, if we experience certain defined changes of control.

*5.625% Senior Notes Due 2026*

At December 31, 2021, we had $300 million principal amount of 5.625% senior notes due 2026. Interest on the notes is payable semiannually in cash in arrears on March 15 and September 15 of each year, and the notes will mature on March 15, 2026. We may redeem some or all of the notes at any time prior to March 15, 2021 at a price equal to 100% of the principal amount, plus any accrued and unpaid interest to the date of redemption, plus a 'make-whole' premium. We may redeem up to 35% of the aggregate principal amount of the notes from proceeds of certain equity offerings prior to March 15, 2021, at a price equal to 105.625% of the aggregate principal amount being redeemed, plus any accrued and unpaid interest thereon to the date of redemption. In addition, on or after March 15, 2021, we may redeem some or all of the notes at any time at redemption prices that start at 104.219% of their principal amount, plus any accrued and unpaid interest to the date of redemption. We must make an offer to redeem the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date, if we experience certain defined changes of control.

*2.5% Convertible Senior Notes Due 2023*

At December 31, 2021, we had $550 million principal amount of 2.5% convertible senior notes due 2023. The notes pay interest semiannually in arrears on March 15 and September 15 of each year, at a rate of 2.5% per annum. The notes will mature on March 15, 2023, and may not be redeemed by us prior to the maturity date. The notes will be convertible, under certain circumstances, until December 15, 2022, and on or after such date without condition, at an initial conversion rate of 14.7005 shares of our common stock per $1,000 principal amount of notes, subject to adjustment, which represents a 54.4% conversion premium based on the last reported sale price for our common stock of $44.05 on March 19, 2018 prior to issuing the debt. Upon conversion, the notes may be settled in shares of common stock or, at our election, cash or a combination of cash and shares of common stock. Assuming we fully settled the notes in shares, the maximum number of shares that could be issued to satisfy the conversion is currently 8.1 million.

79

If we experience a fundamental change, as defined in the indenture governing the notes, the holders of the notes may require us to purchase for cash all or a portion of their notes, subject to specified exceptions, at a price equal to 100% of the principal amount of the notes plus any accrued and unpaid interest.

The carrying amount of the equity component of the notes is $64.0 million, which is treated as a debt discount and the principal amount of the liability component (face value of the notes) is $550 million. As of December 31, 2021, the remaining period for the unamortized debt discount balance of $14.9 million was approximately one year and the value of the notes, if converted and fully settled in shares, exceeds the principal amount of the notes by $417.7 million. As of December 31, 2021, the effective interest rate on the liability component of the notes was 5.7%.

### 2.0% Convertible Senior Notes Due 2025

In February 2020, we issued $400 million principal amount of 2.0% convertible senior notes due 2025. Interest on the notes is payable semiannually in arrears on February 15 and August 15, at a rate of 2.0% per annum. The notes will mature on February 15, 2025. The notes will be convertible, under certain circumstances, until November 15, 2024, and on or after such date without condition, at an initial conversion rate of 9.4469 shares of our common stock per $1,000 principal amount of notes, subject to adjustment, which represents a 50.0% conversion premium based on the last reported sale price for our common stock of $70.57 on January 29, 2020 prior to issuing the notes. Upon conversion, the notes may be settled in shares of common stock or, at our election, cash or a combination of cash and shares of common stock. Assuming we fully settled the notes in shares, the maximum number of shares that could be issued to satisfy the conversion is currently 3.8 million.

We may redeem for cash all or a portion of the notes, at our option, on or after February 21, 2023 and before the 41st scheduled trading day before the maturity date, if the sales price of our common stock reaches specified targets as defined in the indenture. The redemption price will equal 100% of the principal amount of the notes plus accrued interest, if any.

If we experience a fundamental change, as defined in the indenture governing the notes, the holders of the notes may require us to purchase for cash all or a portion of their notes, subject to specified exceptions, at a price equal to 100% of the principal amount of the notes plus any accrued and unpaid interest.

The carrying amount of the equity component of the notes is $33.9 million, which is treated as a debt discount, and the principal amount of the liability component (face value of the notes) is $400 million. As of December 31, 2021, the remaining period for the unamortized debt discount balance of $21.1 million was approximately three years and the value of the notes, if converted and fully settled in shares, exceeds the principal amount of the notes by $52.3 million. As of December 31, 2021, the effective interest rate on the liability component of the notes was 4.2%.

The following table summarizes the amount of pre-tax interest cost recognized on the convertible senior notes:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| | *(in thousands)* | | | | | |
| Interest cost recognized relating to: | | | | | | |
| Contractual interest coupon | $ | 21,750 | $ | 21,011 | $ | 14,015 |
| Amortization of debt discount | | 20,883 | | 19,260 | | 12,599 |
| Amortization of debt issuance costs | | 3,330 | | 3,230 | | 2,134 |
| Total interest cost recognized on the notes | $ | 45,963 | $ | 43,501 | $ | 28,748 |

### Other Long-term Debt

As of December 31, 2021, other long-term debt includes capital leases of $4.7 million, debt to noncontrolling interest partners of $59.9 million and $19.8 million of a subsidiary's term loan and revolving credit facility. Our other long-term debt has a weighted average cost of debt of 5.6% and maturities at various dates through September 2050.

### Extinguishment of Debt

In October 2019, we issued $950 million principal amount of 4.75% senior notes due 2027 and further amended our senior secured credit facility, including the draw down of $950 million principal amount under the new term loan B facility. The proceeds were used to repay the $1.1 billion principal balance outstanding on the term loans A and B under our then existing senior secured credit facility, to repay the entire $250 million principal amount of the 5.375% senior notes due 2022, to repay the related redemption premium of $3.4 million on the senior notes and accrued interest and fees of $30.8 million, leaving $527.5 million for general corporate purposes, including acquisitions. We recorded a $4.5 million loss on extinguishment of debt related to this refinancing.

Exhibit 2, page 091

*Debt Covenants*

Our amended senior secured credit facility contains a number of restrictions that, among other things, require us to satisfy a financial covenant and restrict our and our subsidiaries' ability to incur additional debt, make certain investments and acquisitions, repurchase our stock and prepay certain indebtedness, create liens, enter into agreements with affiliates, modify the nature of our business, enter into sale-leaseback transactions, transfer and sell material assets, merge or consolidate, and pay dividends and make distributions (with the exception of subsidiary dividends or distributions to the parent company or other subsidiaries on at least a pro-rata basis with any noncontrolling interest partners). Non-compliance with one or more of the covenants and restrictions could result in the full or partial principal balance of the credit facility becoming immediately due and payable. The amended senior secured credit facility agreement has one covenant, measured quarterly, that relates to net leverage. We are required to maintain a ratio of consolidated total net debt to consolidated EBITDA (both as defined in the amended credit agreement) for the trailing four consecutive quarters of 6.75x through September 30, 2022 with step downs to 6.25x on December 31, 2022, 5.75x on December 31, 2023, 5.50x on December 31, 2024 and 5.25x on June 30, 2025 through maturity, except that calculations of consolidated EBITDA (as defined in the agreement) will be substituted with an annualized consolidated EBITDA (as defined in the agreement) through June 30, 2022.

The indentures governing our 6.5% senior secured notes, 3.75% senior secured notes, 4.75% senior notes, 4.875% senior notes and 5.625% senior notes contain covenants that limit, among other things, our ability and the ability of our restricted subsidiaries to incur certain additional indebtedness and issue preferred stock, make certain distributions, investments and other restricted payments, sell certain assets, agree to any restrictions on the ability of restricted subsidiaries to make payments to us, merge, consolidate or sell all of our assets, create certain liens, and engage in transactions with affiliates on terms that are not on an arms-length basis. Certain covenants, including those pertaining to incurrence of indebtedness, restricted payments, asset sales, mergers, and transactions with affiliates will be suspended during any period in which the notes are rated investment grade by both rating agencies and no default or event of default under the indenture has occurred and is continuing. All of these notes contain two incurrence-based financial covenants, as defined, requiring a minimum fixed charge coverage ratio of 2.0x and a maximum secured indebtedness leverage ratio of 3.5x.

Some of our other subsidiary indebtedness includes restrictions on entering into various transactions, such as acquisitions and disposals, and prohibits payment of ordinary dividends. They also have financial covenants including minimum consolidated EBITDA to consolidated net interest payable, minimum consolidated cash flow to consolidated debt service, maximum consolidated debt to consolidated EBITDA and minimum liquidity, all as defined in the applicable debt agreements.

As of December 31, 2021, we believe we were in compliance with all of our debt covenants related to our senior secured credit facility and our corporate senior secured notes, senior notes and convertible senior notes. We expect to remain in compliance with all of these covenants throughout 2022.

81

**NOTE 7—DERIVATIVE INSTRUMENTS**

We primarily use forward currency contracts and options to reduce our exposure to foreign currency risk associated with short-term artist fee commitments. We may also enter into forward currency contracts to minimize the risks and/or costs associated with changes in foreign currency rates on forecasted operating income. At December 31, 2021 and 2020, we had forward currency contracts and options outstanding with notional amounts of $100.4 million and $42.0 million, respectively. These instruments have not been designated as hedging instruments and any change in fair value is reported in earnings during the period of the change. Our foreign currency derivative activity, including the related fair values, are not material to any period presented.

In January 2020, we entered into an interest rate swap agreement that is designated as a cash flow hedge for accounting purposes to effectively convert a portion of our floating-rate debt to a fixed-rate basis. The swap agreement expires in October 2026, has a notional amount of $500 million and ensures that a portion of our floating-rate debt does not exceed 3.397%. The principal objective of this contract is to reduce the variability of the cash flow in our variable rate interest payments associated with our senior secured credit facility term loan B, thus reducing the impact of interest rate changes on future interest expense. Cash flows associated with the interest rate swap agreement are reflected as cash flows from operating activities within our consolidated statements of cash flows. As of December 31, 2021, there is no ineffective portion or amount excluded from effectiveness testing.

As a cash flow hedge, the effective portion of the loss on the derivative instrument was reported as a component of other comprehensive loss. Amounts are deferred in other comprehensive loss and reclassified into earnings in the same line item associated with the forecasted transaction in the period or periods during which the hedged transaction affects earnings.

During the year ended December 31, 2021, we recorded unrealized gains of $15.2 million, as a component of other comprehensive loss related to this hedge. Based on the current interest rate expectations, we estimate that approximately $6.1 million in other comprehensive loss will be reclassified into earnings in the next 12 months as an adjustment to interest expense. See Note 8—Fair Value Measurements for further discussion and disclosure of the fair values for this interest rate swap derivative.

We do not enter into derivative instruments for speculative or trading purposes and do not anticipate any significant recognition of derivative activity through the income statement in the future related to the instruments currently held. See Note 8—Fair Value Measurements for further discussion and disclosure of the fair values for our derivative instruments.

**NOTE 8—FAIR VALUE MEASUREMENTS**

*Recurring*

We currently have various financial instruments carried at fair value, such as marketable securities, derivatives and contingent consideration, but do not currently have nonfinancial assets and liabilities that are required to be measured at fair value on a recurring basis. Our financial assets and liabilities are measured using inputs from all levels of the fair value hierarchy as defined in the FASB guidance for fair value. For this categorization, only inputs that are significant to the fair value are considered. The three levels are defined as follows:

Level 1—Inputs are unadjusted quoted prices in active markets for identical assets or liabilities that can be accessed at the measurement date.

Level 2—Inputs include quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active, inputs other than quoted prices that are observable for the asset or liability (i.e., interest rates, yield curves, etc.) and inputs that are derived principally from or corroborated by observable market data by correlation or other means (i.e., market corroborated inputs).

Level 3—Unobservable inputs that reflect assumptions about what market participants would use in pricing the asset or liability. These inputs would be based on the best information available, including our own data.

82

Exhibit 2, page 093

In accordance with the fair value hierarchy described above, the following table shows the fair value of our financial assets and liabilities that are required to be measured at fair value on a recurring basis, which are classified on the balance sheets as cash and cash equivalents, other current assets, other long-term assets, other current liabilities and other long-term liabilities:

| | Fair Value Measurements at December 31, 2021 | | | | Fair Value Measurements at December 31, 2020 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| | *(in thousands)* | | | | *(in thousands)* | | | |
| **Assets:** | | | | | | | | |
| Cash equivalents | $ 620,980 | $ — | $ — | $ 620,980 | $ 282,696 | $ — | $ — | $ 282,696 |
| Forward currency contracts | — | 428 | — | 428 | — | 118 | — | 118 |
| Investments in nonconsolidated affiliates | 6,835 | — | — | 6,835 | 12,688 | — | — | 12,688 |
| Total | $ 627,815 | $ 428 | $ — | $ 628,243 | $ 295,384 | $ 118 | $ — | $ 295,502 |
| **Liabilities:** | | | | | | | | |
| Interest rate swap | $ — | $ 8,558 | $ — | $ 8,558 | $ — | $ 31,587 | $ — | $ 31,587 |
| Forward currency contracts | — | 120 | — | 120 | — | 1,423 | — | 1,423 |
| Put option | — | — | 5,679 | 5,679 | — | — | 8,183 | 8,183 |
| Contingent consideration | — | — | 20,936 | 20,936 | — | — | 46,574 | 46,574 |
| Total | $ — | $ 8,678 | $ 26,615 | $ 35,293 | $ — | $ 33,010 | $ 54,757 | $ 87,767 |

Cash equivalents consist of money market funds. Fair values for cash equivalents are based on quoted prices in an active market. Fair values for forward currency contracts are based on observable market transactions of spot and forward rates. The fair value of our investments in nonconsolidated affiliates are based quoted prices in an active market. The fair value for our interest rate swap is based upon inputs corroborated by observable market data with similar tenors.

Certain third parties have a put option to sell to us their noncontrolling interest in one of our subsidiaries and such put option is carried at fair value using Level 3 inputs. The put option is triggered by the occurrence of specific events, one of which is certain to occur, that requires us to buy the noncontrolling interest. The redemption price for the put option is a variable amount based on a formula linked to historical earnings. We have recorded a current liability for the put option which is valued based on the historic results of that subsidiary. Changes in the fair value are recorded in selling, general and administrative expenses.

We have certain contingent consideration obligations related to acquisitions which are measured at fair value using Level 3 inputs. The amounts due to the sellers are based on the achievement of agreed-upon financial performance metrics by the acquired companies where the contingent obligation is either earned or not earned. We record the liability at the time of the acquisition based on the present value of management's best estimates of the future results of the acquired companies compared to the agreed-upon metrics. Subsequent to the date of acquisition, we update the original valuation to reflect current projections of future results of the acquired companies and the passage of time. Accretion of, and changes in the valuations of, contingent consideration are reported in selling, general and administrative expenses. See Note 9—Commitments and Contingent Liabilities for additional information related to the contingent payments.

Due to their short maturity, the carrying amounts of accounts receivable, accounts payable and accrued expenses approximated their fair values at December 31, 2021 and 2020.

Our outstanding debt held by third-party financial institutions is carried at cost, adjusted for discounts or debt issuance costs. Our debt is not publicly traded and the carrying amounts typically approximate fair value for debt that accrues interest at a variable rate, which are considered to be Level 2 inputs as defined in the FASB guidance.

Exhibit 2, page 094

The following table presents the estimated fair values of our senior secured notes, senior notes and convertible senior notes at December 31, 2021 and 2020:

| | Estimated Fair Value at: | |
| | December 31, 2021 | December 31, 2020 |
| | Level 2 | |
| | *(in thousands)* | |
|---|---|---|
| 6.5% Senior Secured Notes Due 2027 | $ 1,315,284 | $ 1,340,688 |
| 3.75% Senior Secured Notes Due 2028 | $ 498,380 | $ — |
| 4.75% Senior Notes Due 2027 | $ 978,358 | $ 970,872 |
| 4.875% Senior Notes due 2024 | $ 582,952 | $ 581,480 |
| 5.625% Senior Notes due 2026 | $ 310,284 | $ 307,785 |
| 2.5% Convertible Senior Notes due 2023 | $ 996,369 | $ 720,764 |
| 2.0% Convertible Senior Notes due 2025 | $ 531,040 | $ 425,172 |

The estimated fair value of our third-party fixed-rate debt is based on quoted market prices in active markets for the same or similar debt, which are considered to be Level 2 inputs.

### *Non-recurring*

The following table shows the fair value of our assets that have been adjusted to fair value on a non-recurring basis which had a significant impact on our results of operations for the years ended December 31, 2021 and 2020:

| Description | Fair Value Measurement | Fair Value Measurements Using | | | Loss (Gain) |
| | | Level 1 | Level 2 | Level 3 | |
| | | *(in thousands)* | | | |
|---|---|---|---|---|---|
| **2021** | | | | | |
| Investments in nonconsolidated affiliates | 50,000 | — | — | 50,000 | (23,711) |
| **2020** | | | | | |
| Definite-lived intangible assets, net | $ 7,963 | $ — | $ — | $ 7,963 | $ 23,630 |

During 2021, we recorded a gain related to investments in nonconsolidated affiliates of $23.7 million, as a component of other expense, net. The gain was related to the acquisition of a controlling interest in the ticketing business of OCESA on December 6 2021, which was previously accounted for under the equity method. To calculate the gain, we remeasured this investment to fair value using a market multiple methodology. The key inputs in the fair value measurement include a future cash flow projection, including revenue, profit margins, market multiples and adjustment related to discount for lack of marketability. The key inputs used for this non-recurring fair value measurement are considered Level 3 inputs.

During 2021, there were no significant impairment charges. During 2020, we recorded impairment charges related to definite-lived intangible assets of $23.6 million as a component of depreciation and amortization. The impairment charges are primarily related to intangible assets for revenue-generating contracts, venue management and leaseholds and client/vendor relationships in the Concerts segment. It was determined that these assets were impaired since the most recent estimated undiscounted future cash flows associated with these assets were less than their carrying value, primarily as a result of the expected impacts from the global COVID-19 pandemic for the 2020 period. These impairments were calculated using operating cash flows, which were discounted to approximate fair value. The key inputs in these calculations include future cash flow projections, including revenue profit margins, and, for the fair value computation, a discount rate. The key inputs used for these non-recurring fair value measurements are considered Level 3 inputs.

During 2019, we recorded impairment charges related to definite-lived intangible assets of $26.8 million as a component of depreciation and amortization. The impairment charges are primarily related to intangible assets for revenue-generating contracts in the Concerts and Sponsorship & Advertising segments. It was determined that these assets were impaired since the most recent estimated undiscounted future cash flows associated with these assets were less than their carrying value. These impairments were calculated using operating cash flows, which were discounted to approximate fair value. The key inputs in these calculations include future cash flow projections, including revenue profit margins, and, for the fair value computation, a discount rate. The key inputs used for these non-recurring fair value measurements are considered Level 3 inputs.

Exhibit 2, page 095

**NOTE 9—COMMITMENTS AND CONTINGENT LIABILITIES**

We have non-cancelable contracts related to minimum performance payments with various artists, other event-related costs and nonrecoupable ticketing contract advances. We also have commitments relating to additions to property, plant, and equipment under certain construction commitments for facilities and venues.

As of December 31, 2021, our future minimum payments under non-cancelable contracts and capital expenditure commitments consist of the following:

| | Non-cancelable Contracts | | Capital Expenditures |
|---|---|---|---|
| | | *(in thousands)* | |
| 2022 | $ 1,672,720 | $ | 2,200 |
| 2023 | 410,929 | | 935 |
| 2024 | 195,082 | | 934 |
| 2025 | 117,467 | | 962 |
| 2026 | 101,749 | | 6,652 |
| Thereafter | 209,815 | | 19,752 |
| Total | $ 2,707,762 | $ | 31,435 |

Certain agreements relating to acquisitions provide for deferred purchase consideration payments at future dates. A liability is established at the time of the acquisition for these fixed payments. For obligations payable at a date greater than twelve months from the acquisition date, we apply a discount rate to calculate the present value of the obligations. As of December 31, 2021, we have accrued $34.2 million in other current liabilities and $7.9 million in other long-term liabilities and, as of December 31, 2020, we had accrued $11.7 million in other current liabilities and $7.3 million in other long-term liabilities, related to these deferred purchase consideration payments.

We have contingent obligations related to acquisitions which are accounted for as business combinations. Contingent consideration associated with business combinations is recorded at fair value at the time of the acquisition and reflected at current fair value for each subsequent reporting period thereafter until settled. We record these fair value changes in our statements of operations as selling, general and administrative expenses. The contingent consideration is generally subject to payout following the achievement of future performance targets and a portion is expected to be payable in the next twelve months. As of December 31, 2021, we have accrued $15.6 million in other current liabilities and $5.3 million in other long-term liabilities and, as of December 31, 2020, we had accrued $27.5 million in other current liabilities and $19.1 million in other long-term liabilities, representing the fair value of these estimated payments. The last contingency period for which we have an outstanding contingent payment is for the period ending July 2026. See Note 8—Fair Value Measurements for further discussion related to the valuation of these contingent payments.

As of December 31, 2021 and 2020, we guaranteed the debt of third parties of approximately $20.8 million and $12.1 million, respectively, primarily related to maximum credit limits on employee and tour-related credit cards, obligations of a nonconsolidated affiliate and obligations under a venue management agreement.

**Litigation**

*Consumer Class Actions*

The following putative class action lawsuits were filed against Live Nation and/or Ticketmaster in Canada: Thompson-Marcial and Smith v. Ticketmaster Canada Holdings ULC (Ontario Superior Court of Justice, filed September 2018); McPhee v. Live Nation Entertainment, Inc., et al. (Superior Court of Quebec, District of Montreal, filed September 2018); Crystal Watch v. Live Nation Entertainment, Inc., et al. (Court of Queen's Bench for Saskatchewan, by amendments filed September 2018); and Gomel v. Live Nation Entertainment, Inc., et al. (Supreme Court of British Columbia, Vancouver Registry, filed October 2018). Similar putative class actions were filed in the United States during the same time period, but as of November 2020, each of the lawsuits filed in the United States has been dismissed with prejudice.

The Canadian lawsuits make similar factual allegations that Live Nation and/or Ticketmaster engage in conduct that is intended to encourage the resale of tickets on secondary ticket exchanges at elevated prices. Based on these allegations, each plaintiff asserts violations of different provincial and federal laws. Each plaintiff also seeks to represent a class of individuals who purchased tickets on a secondary ticket exchange, as defined in each plaintiff's complaint. The Watch complaint also makes claims related to Ticketmaster's fee display practices on the primary market. The complaints seek a variety of remedies, including unspecified compensatory damages, punitive damages, restitution, injunctive relief and attorneys' fees and costs.

The McPhee matter is stayed pending the outcome of the Watch matter, and the Thompson-Marcial, Watch, and Gomel cases are in the class certification phase. In April 2021, the court in the Gomel lawsuit refused to certify all claims other than those pled under British Columbia's Business Practices and Consumer Protection Act and claims for punitive damages, but the court did certify a class of British Columbia residents who purchased tickets to an event in Canada on any secondary market exchange from June 30, 2015 through April 15, 2021 that were initially purchased on Ticketmaster.ca. We filed a notice of appeal of the class certification ruling in May 2021, and the plaintiff filed a cross-appeal shortly thereafter. The appeals have been fully briefed, and we are awaiting the scheduling of a hearing date.

Based on information presently known to management, we do not believe that a loss is probable of occurring at this time, and we believe that the potential liability, if any, will not have a material adverse effect on our financial position, cash flows or results of operations. Further, we do not currently believe that the claims asserted in these lawsuits have merit, and considerable uncertainty exists regarding any monetary damages that will be asserted against us. We continue to vigorously defend these actions.

### Astroworld Litigation

On November 5, 2021, the Astroworld music festival was held in Houston, Texas. During the course of the festival, ten members of the audience sustained fatal injuries and others suffered non-fatal injuries. Following these events, at least 448 civil lawsuits have been filed against Live Nation Entertainment, Inc. and related entities, asserting insufficient crowd control and other theories, seeking compensatory and punitive damages. Pursuant to a February 14, 2022 order of the state Multidistrict Litigation Panel, matter 21-1033, the civil cases have been assigned to Judge Kristen Hawkins of the 11th District Court of Harris County, Texas, for oversight of pretrial matters under Texas's rules governing multidistrict litigation.

We are currently unable to reliably predict the developments in, outcome of, and economic costs and other consequences of pending or future litigation related to these matters. We will continue to investigate the factual and legal defenses, and evaluate these matters based on subsequent events, new information and future circumstances. We currently expect that liability insurance can provide sufficient coverage, but at this time there are no assurances of such coverage. Given that these cases are in the early stages and in light of the uncertainties surrounding them, we do not currently possess sufficient information to determine a range of reasonably possible liability. Notwithstanding the foregoing, and without admitting liability or wrongdoing, we may incur material liabilities from the 2021 Astroworld event, which could have a material impact on our business, financial condition, results of operations and/or cash flows.

### Other Litigation

From time to time, we are involved in other legal proceedings arising in the ordinary course of our business, including proceedings and claims based upon purported violations of antitrust laws, intellectual property rights and tortious interference, which could cause us to incur significant expenses. We have also been the subject of personal injury and wrongful death claims relating to accidents at our venues in connection with our operations. As required, we have accrued our estimate of the probable settlement or other losses for the resolution of any outstanding claims. These estimates have been developed in consultation with counsel and are based upon an analysis of potential results, including, in some cases, estimated redemption rates for the settlement offered, assuming a combination of litigation and settlement strategies. It is possible, however, that future results of operations for any particular period could be materially affected by changes in our assumptions or the effectiveness of our strategies related to these proceedings.

## NOTE 10—CERTAIN RELATIONSHIPS AND RELATED-PARTY TRANSACTIONS

**Transactions Involving Related Parties**

The following table provides details of the total revenue earned and expenses incurred from all related-party transactions:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2019 | |
| | *(in thousands)* | | | | | |
| Related-party revenue | $ | 10,736 | $ | 482 | $ | 131,909 |
| Related-party expenses | $ | 1,580 | $ | 1,009 | $ | 1,711 |
| Related-party acquisition related | $ | 3,000 | $ | — | $ | 3,000 |

The significant related-party transactions included in the table above are detailed below.

Exhibit 2, page 097

*Liberty Media*

Two current members of our board of directors were originally nominated by Liberty Media pursuant to a stockholder agreement. These directors receive directors' fees and stock-based awards on the same basis as other non-employee members of our board of directors.

We lease a venue from, and provide ticketing services to, a sports franchise owned by Liberty Media and pay royalty fees and non-recoupable ticketing contract advances to the sports franchise. We also receive transaction fees from the sports franchise for tickets the sports franchise sells using our ticketing software.

*Legends*

Our Chief Executive Officer became a member of the board of Legends Hospitality Holding Company, LLC ("Legends") in February 2015. In 2017, our President and Chief Financial Officer assumed this role from the Chief Executive Officer. Legends provides concession services to certain of our owned or operated amphitheaters. We receive fees based on concession sales at each of the amphitheaters. In January 2021, our President and Chief Financial Officer resigned as a board member of Legends.

*Sirius XM*

Our Chief Executive Officer is a member of the board of directors of Sirius XM Holdings Inc. ("Sirius XM"), a satellite radio company that is a subsidiary of Liberty Media. From time to time, we purchase advertising from Sirius XM.

**Transactions Involving Equity Method Investees**

We conduct business with certain of our equity method investees in the ordinary course of business. Transactions primarily relate to venue rentals and ticketing services. Revenue of $5.0 million, $2.2 million and $2.9 million were earned in 2021, 2020 and 2019, respectively, and expenses of $2.9 million, $1.3 million and $1.0 million were incurred in 2021, 2020 and 2019, respectively, from these equity investees for services rendered or provided in relation to these business ventures.

As of December 31, 2021 and 2020, we had accounts receivable and notes receivable balances of $3.9 million and $19.2 million, respectively, due from certain of our equity investees.

**NOTE 11—INCOME TAXES**

Significant components of the provision for income tax expense (benefit) are as follows:

| | Year Ended December 31, | | |
| | 2021 | 2020 | 2019 |
| | (in thousands) | | |
|---|---|---|---|
| **Current:** | | | |
| Federal | $ — | $ — | $ — |
| Foreign | 8,713 | 7,978 | 61,834 |
| State | (1,555) | 1,024 | 5,523 |
| Total current | 7,158 | 9,002 | 67,357 |
| **Deferred:** | | | |
| Federal | 7,451 | (16,366) | 5,314 |
| Foreign | (17,434) | (20,772) | (6,345) |
| State | 344 | (739) | 566 |
| Total deferred | (9,639) | (37,877) | (465) |
| Income tax expense (benefit) | $ (2,481) | $ (28,875) | $ 66,892 |

The domestic income (loss) before income taxes was $(401.4) million, $(1.5) billion and $36.1 million for 2021, 2020 and 2019, respectively. Foreign income (loss) before income taxes was $(209.9) million, $(374.5) million and $149.0 million for 2021, 2020 and 2019, respectively.

87

Significant components of our deferred tax liabilities and assets are as follows:

| | | December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2021 | | 2020 |
| | | *(in thousands)* | | |
| Deferred tax liabilities: | | | | |
| Leases | $ | 209,758 | $ | 206,701 |
| Intangible assets | | 265,092 | | 170,517 |
| Prepaid expenses | | 3,424 | | 17,786 |
| Other | | 5,829 | | 31,835 |
| Total deferred tax liabilities | | 484,103 | | 426,839 |
| Deferred tax assets: | | | | |
| Intangible assets | | 48,738 | | 38,846 |
| Accrued expenses | | 105,118 | | 40,843 |
| Net operating loss carryforwards | | 957,509 | | 955,160 |
| Foreign tax and other credit carryforwards | | 45,009 | | 51,119 |
| Equity compensation | | 14,602 | | 25,209 |
| Leases | | 237,963 | | 224,776 |
| Other | | 84,786 | | 34,171 |
| Total gross deferred tax assets | | 1,493,725 | | 1,370,124 |
| Valuation allowance | | 1,219,496 | | 1,100,407 |
| Total net deferred tax assets | | 274,229 | | 269,717 |
| Net deferred tax liabilities | $ | (209,874) | $ | (157,122) |

Each reporting period, we evaluate the realizability of all of our deferred tax assets in each tax jurisdiction. As of December 31, 2021, we continued to maintain a full valuation allowance against our net deferred tax assets in certain jurisdictions due to cumulative pre-tax losses. As a result of the valuation allowances, no tax benefits have been recognized for losses incurred in those tax jurisdictions in 2021, 2020 and 2019.

During 2021 and 2020, we recorded net deferred tax liabilities of $103.5 million and $35.3 million, respectively, due principally to differences in financial reporting and tax bases in assets acquired in business combinations. The increase in intangible assets deferred tax liability is primarily due to the OCESA acquisition.

As of December 31, 2021, we have United States federal, state and foreign deferred tax assets related to net operating loss carryforwards of $403.1 million, $150.9 million and $403.5 million, respectively. Based on current statutory carryforward periods, the operating loss carryforwards will expire on various dates beginning in 2025. Our federal net operating loss may be subject to statutory limitations on the amount that can be used in any given year.

88

Exhibit 2, page 099

Table of Contents

The reconciliation of income tax computed at the United States federal statutory rates to income tax expense (benefit) is:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 |
| | | *(in thousands)* | | | | |
| Income tax expense (benefit) at United States statutory rate of21% | $ | (128,366) | $ | (389,900) | $ | 38,872 |
| State income taxes, net of federal tax benefits | | (1,267) | | 713 | | 3,137 |
| Differences between foreign and United States statutory rates | | (11,237) | | (12,794) | | 6,384 |
| Non-United States income inclusions and exclusions | | (1,677) | | 1,809 | | (3,222) |
| United States income inclusions and exclusions | | (22,121) | | (16,495) | | (2,582) |
| Nondeductible items | | 18,413 | | 39,861 | | 10,118 |
| Tax contingencies | | 895 | | (1,302) | | (1,340) |
| Tax expense from acquired goodwill | | 7,795 | | 6,950 | | 6,107 |
| Change in valuation allowance | | 135,908 | | 344,161 | | 8,536 |
| Other, net | | (824) | | (1,878) | | 882 |
| | $ | (2,481) | $ | (28,875) | $ | 66,892 |

Income tax expense (benefit) is principally attributable to our earnings in foreign tax jurisdictions along with state income taxes.

Amounts included in differences between foreign and United States statutory rates are impacted by changes in the mix of international earnings subject to various tax rates which can differ greatly in their proximity to the United States statutory rate. The differences between statutory rates is also impacted by our Luxembourg affiliates and tax rulings which include the application of a reduced Luxembourg effective rate to the net income before tax resulting from our financing activities in Luxembourg.

Amounts included in United States income inclusions and exclusions include the favorable impact of tax deductions for vesting of restricted stock awards and exercises of stock options partially offset in 2019 by unfavorable inclusions for GILTI under the provisions associated with the TCJA.

Nondeductible items for all years presented include the impact of increased nondeductible expenses pursuant to the provisions of the TCJA including nondeductible executive compensation. The 2020 nondeductible expenses also include adjustments for nondeductible noncontrolling interest.

The change in valuation allowance for each period presented resulted primarily from changes in the income (loss) within jurisdictions with full valuation allowances, including the United States.

89

The following table summarizes the activity related to our unrecognized tax benefits:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| | *(in thousands)* | | | | | |
| Balance at January 1 | $ | 21,732 | $ | 21,723 | $ | 34,071 |
| Additions: | | | | | | |
| Increase for current year positions | | 524 | | 1,689 | | 2,215 |
| Increase for prior year positions | | 335 | | — | | 1,898 |
| Interest and penalties for prior years | | 36 | | 352 | | 458 |
| Reductions: | | | | | | |
| Decrease for prior year positions | | — | | (2,109) | | (3,272) |
| Expiration of applicable statute of limitations | | — | | — | | — |
| Settlements for prior year positions | | (1,435) | | (17) | | (13,852) |
| Foreign exchange | | 138 | | 94 | | 205 |
| Balance at December 31 | $ | 21,330 | $ | 21,732 | $ | 21,723 |

In February 2019, we reached a settlement agreement with the Canadian taxing authority regarding existing uncertain tax positions. The gross liability for unrecognized tax benefits primarily decreased in 2019 due to this settlement.

If we were to prevail on all uncertain tax positions, the net effect would be a decrease to our income tax provision of approximately $0.1 million. The remaining $21.2 million is offset by deferred tax assets that represent tax benefits that would be received in the event that we did not prevail on all uncertain tax positions. As of December 31, 2021, it is not expected that the total amounts of unrecognized tax benefits will increase or decrease materially within the next year.

We regularly assess the likelihood of additional assessments in each taxing jurisdiction resulting from current and subsequent years' examinations. Liabilities for income taxes are established for future income tax assessments when it is probable there will be future assessments and the amount can be reasonably estimated. Once established, liabilities for uncertain tax positions are adjusted only when there is more information available or when an event occurs necessitating a change to the liabilities. As of December 31, 2021, we believe that the resolution of income tax matters for open years will not have a material effect on our consolidated financial statements although the resolution of income tax matters could impact our effective tax rate for a particular future period.

The tax years 2009 through 2021 remain open to examination by the primary tax jurisdictions to which we are subject.

## NOTE 12—EQUITY

### Dividends

From inception and through December 31, 2021, we have not declared or paid any dividends. We currently intend to retain future earnings, if any, to finance the expansion of our business. Therefore, we do not expect to pay any cash dividends in the foreseeable future. Moreover, the terms of our senior secured credit facility limit the amount of funds that we will have available to declare and distribute as dividends on our common stock. Payment of future cash dividends, if any, will be at the discretion of our board of directors in accordance with applicable laws after taking into account various factors, including the financial condition, operating results, current and anticipated cash needs, plans for expansion and contractual restrictions with respect to the payment of dividends.

Exhibit 2, page 101

*Common Stock*

The following table reconciles common stock reported in the consolidated statements of changes in equity to the consolidated balance sheets.

| | December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Common shares issued as reported in the consolidated statement of changes in equity | 221,964,734 | 214,466,988 |
| Unissued retirement eligible restricted stock awards | 65,625 | — |
| Unvested restricted stock awards | 860,244 | 1,589,073 |
| Unvested deferred stock awards issued | 2,192,000 | 2,367,000 |
| Common shares issued as reported in the consolidated balance sheets | 225,082,603 | 218,423,061 |

Unvested restricted stock awards and unvested deferred stock awards issued will be reflected in the statements of changes in equity at the time of vesting.

In September 2021, we completed the public offering of 5,239,259 shares of common stock. A portion of the proceeds of $455.3 million were used to pay fees of $5.7 million, leaving approximately $449.6 million of net proceeds. We used the net proceeds to fund the acquisition of 51% of the capital stock of OCESA and any remaining proceeds for general corporate purposes.

During 2021, 2020 and 2019, we issued 2.3 million, 3.2 million and 1.3 million shares, respectively, of common stock in connection with stock option exercises and vesting of restricted stock awards.

During 2019, we issued 0.8 million shares of common stock to holders of our 2.5% convertible senior notes due 2019 upon conversion of $28.6 million of the principal amount of the notes.

*Common Stock Reserved for Future Issuance*

Common stock of approximately 16.6 million shares as of December 31, 2021 is reserved for future issuances under the stock incentive plan (including 7.7 million options, 0.9 million restricted stock awards and 2.2 million deferred stock awards currently granted).

*Noncontrolling Interests*

Common securities held by the noncontrolling interests that do not include put arrangements exercisable outside of our control are recorded in equity, separate from our stockholders' equity.

The purchase or sale of additional ownership in an already controlled subsidiary is recorded as an equity transaction with no gain or loss recognized in net income (loss) or comprehensive income (loss) as long as the subsidiary remains a controlled subsidiary. In 2021, 2020 and 2019, we acquired all or additional equity interests in several companies that did not have a significant impact to equity either on an individual basis or in the aggregate. The following schedule reflects the change in ownership interests for these transactions:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2021 | | 2020 | | 2019 | |
| | *(in thousands)* | | | | | |
| Net income (loss) attributable to common stockholders of Live Nation | $ | (650,904) | $ | (1,724,535) | $ | 69,889 |
| Transfers of noncontrolling interests: | | | | | | |
| Changes in Live Nation's additional paid-in capital for purchases of noncontrolling interests, net of transaction costs | | (110) | | 14,336 | | (23,878) |
| Changes in Live Nation's additional paid-in capital for sales of noncontrolling interests, net of transaction costs | | (289) | | (7,667) | | — |
| Net transfers of noncontrolling interests | | (399) | | 6,669 | | (23,878) |
| Change from net income (loss) attributable to common stockholders of Live Nation and net transfers of noncontrolling interests | $ | (651,303) | $ | (1,717,866) | $ | 46,011 |

Exhibit 2, page 102

*Redeemable Noncontrolling Interests*

We are subject to put arrangements where the holders of the noncontrolling interests can require us to repurchase their shares at specified dates in the future or within specified periods in the future. Certain of these puts can be exercised earlier upon the occurrence of triggering events as specified in the agreements. The redemption amounts for these puts are either at a fixed amount, at fair value at the time of exercise or a variable amount based on a formula linked to earnings. In accordance with the FASB guidance for business combinations, the redeemable noncontrolling interests are recorded at their fair value at acquisition date. For put arrangements that are not currently redeemable, we accrete to the estimated redemption value over the period from the date of issuance to the earliest redemption date of the individual puts, with the offset recorded to additional paid-in capital. Decreases in accretion are only recognized to the extent that increases had been previously recognized. The estimated redemption values that are based on a formula linked to future earnings are computed each reporting period using projected cash flows, and the estimated redemption values that are based on fair value at the time of exercise are computed each reporting period by applying a multiple to projected earnings, both of which take into account the current expectations regarding profitability and the timing of revenue-generating events. The balances are reflected in our balance sheets as redeemable noncontrolling interests outside of permanent equity.

Our estimate of redemption amounts for puts that are redeemable at fixed or determinable prices on fixed or determinable dates for the years ended December 31, 2022, 2023, 2024, 2025 and 2026 are $78.0 million, $76.6 million, $84.6 million, $64.1 million and $334.4 million, respectively.

*Transactions with Noncontrolling Interest Partners*

We have loaned or advanced money to noncontrolling interest partners under the terms of the partnership operating agreements, promissory notes or other arrangements. As of December 31, 2021, we had outstanding notes receivable and prepayments of $21.0 million in other current assets and $72.1 million in other long-term assets, and as of December 31, 2020, we had outstanding notes receivable and prepayments of $3.0 million in other current assets and $84.1 million in other long-term assets.

*Accumulated Other Comprehensive Income (Loss)*

The following table presents changes in the components of AOCI, net of taxes, for the years ended December 31, 2021, 2020 and 2019:

| | Loss on Cash Flow Hedges | Foreign Currency Items | Total |
|---|---|---|---|
| | *(in thousands)* | | |
| **Balance at December 31, 2018** | $ — | $ (145,231) | $ (145,231) |
| Other comprehensive loss before reclassifications | — | (482) | (482) |
| Amount reclassified from AOCI | — | — | — |
| Net other comprehensive loss | — | (482) | (482) |
| **Balance at December 31, 2019** | — | (145,713) | (145,713) |
| Other comprehensive income (loss) before reclassifications | (36,689) | 291 | (36,398) |
| Amount reclassified from AOCI | 5,102 | — | 5,102 |
| Net other comprehensive income (loss) | (31,587) | 291 | (31,296) |
| **Balance at December 31, 2020** | (31,587) | (145,422) | (177,009) |
| Other comprehensive income before reclassifications | 15,204 | 6,016 | 21,220 |
| Amount reclassified from AOCI | 7,825 | — | 7,825 |
| Net other comprehensive income | 23,029 | 6,016 | 29,045 |
| **Balance at December 31, 2021** | $ (8,558) | $ (139,406) | $ (147,964) |

See Note 8—Fair Value Measurements for further discussion and disclosure of the fair value of our interest rate swap that has been designated as a cash flow hedge.

92

*Earnings per Share*

Basic net income (loss) per common share is computed by dividing the net income (loss) available to common stockholders by the weighted average number of common shares outstanding during the period. Diluted net income per common share adjusts basic net income per common share for the effects of stock options, restricted and deferred stock awards and other potentially dilutive financial instruments only in the periods in which such effect is dilutive. Our convertible senior notes are considered in the calculation of diluted net income per common share, if dilutive.

The calculation of diluted net income per common share includes the effects of the assumed exercise of any outstanding stock options, the assumed vesting of shares of restricted and deferred stock awards and the assumed conversion of the convertible senior notes where dilutive. For the years ended December 31, 2021, 2020 and 2019 there were no reconciling items to the weighted average common shares outstanding in the calculation of diluted net income per common share. The following table shows securities excluded from the calculation of diluted net income per common share because such securities were anti-dilutive:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2021** | **2020** | **2019** |
| Options to purchase shares of common stock | 7,719,714 | 9,323,323 | 11,347,305 |
| Restricted and deferred stock awards—unvested | 3,052,244 | 3,956,073 | 3,655,582 |
| Conversion shares related to convertible senior notes | 11,864,035 | 11,014,846 | 8,374,536 |
| Number of anti-dilutive potentially issuable shares excluded from diluted common shares outstanding | 22,635,993 | 24,294,242 | 23,377,423 |

**NOTE 13—REVENUE RECOGNITION**

The global COVID-19 pandemic has significantly impacted the recognition of revenue for our Concerts, Ticketing and Sponsorship & Advertising segments. Late in the second quarter of 2021 we began to see the positive impacts of successful vaccination rollouts in many of our key markets, mainly the United States and United Kingdom, with social distancing restrictions easing and live events resuming. In the third quarter of 2021, we saw a meaningful restart of our operations with outdoor amphitheater events and festivals taking place in both the United States and United Kingdom.

For our Concerts segment, the impact is partially a delay in the timing of revenue recognition as many events are being rescheduled to dates in 2022. For events that have been cancelled as of December 31, 2021, the deferred revenue has been reclassified to accrued expenses on our consolidated balance sheets where not already refunded to the fan. In certain markets, we are offering fans an incentive to receive a voucher for a future ticket purchase to one of our events in lieu of receiving a refund for the cancelled event. Where a fan has elected to receive the incentive voucher, the cash from the original ticket purchase remains in deferred revenue. For certain of our rescheduled events, we are offering a limited refund window for fans to request a refund. Where a fan has elected to receive a refund for a rescheduled event, the deferred revenue has been reclassified to accrued expenses if not already refunded. We are no longer estimating future refunds as operations have resumed in our major markets and event cancellations and postponements have declined such that our estimation of future events that could be impacted by the global COVID-19 pandemic would result in an insignificant reclassification from deferred revenue to accrued expenses.

For our Ticketing segment, the impact is similar to the Concerts segment if the tickets sold for an event are controlled by our concert promoters. For the Ticketing segment's third-party clients, previously recognized service charges are reversed from revenue when the event is cancelled or a refund is issued for a rescheduled event, including refunds issued after the balance sheet date but prior to the filing of our consolidated financial statements. The revenue reversal is reflected as accrued expenses on our consolidated balance sheets where not already refunded to the fan. The timing of our third-party clients' event cancellations and rescheduling of postponed events versus new events available for sale can result in refunds of service charges exceeding current quarter sales resulting in negative revenue for that period.

For our Sponsorship & Advertising segment, the impact is partially a delay in the timing of revenue recognition due to our concert events being rescheduled, our venues being closed and the limited number of events currently available for sale on our websites. In response to the impacts we are experiencing from the global COVID-19 pandemic, we have amended or are continuing negotiations with certain of our sponsors to either provide additional benefits when our venues reopen and our concert events resume or extend the term of the agreement with no additional benefits to the sponsor.

Exhibit 2, page 104

*Concerts*

Concerts revenue, including intersegment revenue, for the years ended December 31, 2021, 2020 and 2019 are as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| | *(in thousands)* | | | | | |
| Total Concert Revenue | $ | 4,722,190 | $ | 1,468,433 | $ | 9,428,094 |
| Percentage of consolidated revenue | 75.3 | % | 78.9 | % | 81.6 | % |

Our Concerts segment generates revenue from the promotion or production of live music events and festivals in our owned or operated venues and in rented third-party venues, artist management commissions and the sale of merchandise for music artists at events. As a promoter and venue operator, we earn revenue primarily from the sale of tickets, concessions, merchandise, parking, ticket rebates or service charges on tickets sold by Ticketmaster or third-party ticketing agreements, and rental of our owned or operated venues. As an artist manager, we earn commissions on the earnings of the artists and other clients we represent, primarily derived from clients' earnings for concert tours. Over 95% of Concerts' revenue, whether related to promotion, venue operations, artist management or artist event merchandising, is recognized on the day of the related event. The majority of consideration for our Concerts segment is collected in advance of or on the day of the event. Consideration received in advance of the event is recorded as deferred revenue or in long-term liabilities if the event is more than twelve months from the balance sheet date. Any consideration not collected by the day of the event is typically received within three months after the event date.

*Ticketing*

Ticketing revenue, including intersegment revenue, for the years ended December 31, 2021, 2020 and 2019 are as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| | *(in thousands)* | | | | | |
| Total Ticketing Revenue | $ | 1,134,268 | $ | 188,383 | $ | 1,545,189 |
| Percentage of consolidated revenue | 18.1 | % | 10.1 | % | 13.4 | % |

Ticket fee revenue is generated from convenience and order processing fees, or service charges, charged at the time a ticket for an event is sold in either the primary or secondary markets. Our Ticketing segment is primarily an agency business that sells tickets for events on behalf of its clients, which include venues, concert promoters, professional sports franchises and leagues, college sports teams, theater producers and museums. Our Ticketing segment records revenue arising from convenience and order processing fees, regardless of whether these fees are related to tickets sold in the primary or secondary market, and regardless of whether these fees are associated with our concert events or third-party clients' concert events. Our Ticketing segment does not record the face value of the tickets as revenue. Ticket fee revenue is recognized when the ticket is sold for third-party clients and secondary market sales, as we have no further obligation to our client's customers following the sale of the ticket. For our concert events where our concert promoters control ticketing, ticket fee revenue is recognized when the event occurs because we also have the obligation to deliver the event to the fan. The delivery of the ticket to the fan is not considered a distinct performance obligation for our concert events because the fan cannot receive the benefits of the ticket unless we also fulfill our obligation to deliver the event. The majority of ticket fee revenue is collected within the month of the ticket sale. Revenue received from the sale of tickets in advance of our concert events is recorded as deferred revenue or in other long-term liabilities if the date of the event is more than twelve months from the balance sheet date. Reported revenue is net of any refunds made or committed to and also the impact of any cancellations of events that occurred during the period and up to the time of filing these consolidated financial statements.

Exhibit 2, page 105

Ticketing contract advances, which can be either recoupable or non-recoupable, represent amounts paid in advance to our clients pursuant to ticketing agreements and are reflected in prepaid expenses or in long-term advances if the amount is expected to be recouped or recognized over a period of more than twelve months. Recoupable ticketing contract advances are generally recoupable against future royalties earned by the client, based on the contract terms, over the life of the contract. Royalties are typically earned by the client when tickets are sold. Royalties paid to clients are recorded as a reduction to revenue when the tickets are sold and the corresponding service charge revenue is recognized. Non-recoupable ticketing contract advances, excluding those amounts paid to support clients' advertising costs, are fixed additional incentives occasionally paid by us to certain clients to secure the contract and are typically amortized over the life of the contract on a straight-line basis as a reduction to revenue. At December 31, 2021 and 2020, we had ticketing contract advances of $90.5 million and $63.5 million, respectively, in prepaid expenses and $86.5 million and $87.0 million, respectively, in long-term advances. We amortized $74.4 million, $48.0 million and $80.3 million for the years ended December 31, 2021, 2020 and 2019 respectively, related to non-recoupable ticketing contract advances.

### Sponsorship & Advertising

Sponsorship & Advertising revenue, including intersegment revenue, for the years ended December 31, 2021, 2020 and 2019 are as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| | *(in thousands)* | | | | | |
| Total Sponsorship & Advertising Revenue | $ | 411,910 | $ | 203,676 | $ | 590,274 |
| Percentage of consolidated revenue | 6.6 | % | 10.9 | % | 5.1 | % |

Our Sponsorship & Advertising segment generates revenue from sponsorship and marketing programs that provide its sponsors with strategic, international, national and local opportunities to reach customers through our venue, concert and ticketing assets, including advertising on our websites. These programs can also include custom events or programs for the sponsors' specific brands, which are typically experienced exclusively by the sponsors' customers. Sponsorship agreements may contain multiple elements, which provide several distinct benefits to the sponsor over the term of the agreement, and can be for a single or multi-year term. We also earn revenue from exclusive access rights provided to sponsors in various categories such as ticket pre-sales, beverage pouring rights, venue naming rights, media campaigns, signage within our venues, and advertising on our websites. Revenue from sponsorship agreements is allocated to the multiple elements based on the relative stand-alone selling price of each separate element, which are determined using vendor-specific evidence, third-party evidence or our best estimate of the fair value. Revenue is recognized over the term of the agreement or operating season as the benefits are provided to the sponsor unless the revenue is associated with a specific event, in which case it is recognized when the event occurs. Revenue is collected in installment payments during the year, typically in advance of providing the benefit or the event. Revenue received in advance of the event or the sponsor receiving the benefit is recorded as deferred revenue or in other long-term liabilities if the date of the event is more than twelve months from the balance sheet date.

At December 31, 2021, we had contracted sponsorship agreements with terms greater than one year that had approximately $1.0 billion of revenue related to future benefits to be provided by us. We expect to recognize, based on current projections, approximately 41%, 22%, 15% and 22% of this revenue in 2022, 2023, 2024 and thereafter, respectively.

### Deferred Revenue

The majority of our deferred revenue is typically classified as current and is shown as a separate line item on the consolidated balance sheets. Deferred revenue that is not expected to be recognized within the next twelve months is classified as long-term and reflected in other long-term liabilities on the consolidated balance sheets. At December 31, 2021, 2020 and 2019, we had current deferred revenue of $2.8 billion, $1.8 billion and $1.4 billion, respectively.

Exhibit 2, page 106

The table below summarizes the amount of prior year current deferred revenue recognized during the years ended December 31, 2021 and 2020:

| | December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| | *(in thousands)* | |
| Concerts | $ 516,035 | $ 273,734 |
| Ticketing | 43,508 | 26,471 |
| Sponsorship & Advertising | 74,266 | 18,010 |
| Other & Corporate | — | 3,402 |
| | $ 633,809 | $ 321,617 |

As of December 31, 2021, approximately 49.1% of the current deferred revenue balance from December 31, 2020 is expected to be recognized in 2022 and thus such amounts remain in current deferred revenue. In addition, as of December 31, 2021, approximately 13.7% of the current deferred revenue balance from December 31, 2020 has been refunded to fans as the corresponding events have cancelled or refunds were requested for rescheduled events, and thus such amounts have been reclassified to accrued expenses if not already refunded. Our long-term deferred revenue balance has increased as events have been rescheduled into 2023 in markets still experiencing severe impacts from the global COVID-19 pandemic. We had long-term deferred revenue of $116.7 million, $88.6 million and $34.4 million at December 31, 2021, 2020 and 2019, respectively, which is reflected in other long-term liabilities on the consolidated balance sheets.

96

Exhibit 2, page 107

**NOTE 14—STOCK-BASED COMPENSATION**

In December 2005, we adopted our 2005 Stock Incentive Plan, which has been amended and/or restated on several occasions. In connection with our merger with Ticketmaster Entertainment LLC, we adopted the Amended and Restated Ticketmaster 2008 Stock & Annual Incentive Plan. The plans authorize us to grant stock option awards, director shares, stock appreciation rights, restricted stock and deferred stock awards, other equity-based awards and performance awards. We have granted restricted stock awards, options to purchase our common stock and deferred stock awards to employees, directors, consultants, and our affiliates under the stock incentive plans at no less than the fair market value of the underlying stock on the date of grant. The stock incentive plans contain anti-dilutive provisions that require the adjustment of the number of shares of our common stock represented by, and the exercise price of, each option for any stock splits or stock dividends. The ten-year term of the Ticketmaster plan expired in August 2018; accordingly, no new awards may be granted under that plan but outstanding awards shall continue in full force and effect in accordance with their terms.

The following is a summary of stock-based compensation expense we recorded during the respective periods:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| | *(in thousands)* | | | | | |
| Selling, general and administrative expenses | $ | 161,849 | $ | 88,620 | $ | 21,947 |
| Corporate expenses | | 47,488 | | 28,269 | | 26,838 |
| Total | $ | 209,337 | $ | 116,889 | $ | 48,785 |

As of December 31, 2021, there was $53.2 million of total unrecognized compensation cost related to stock-based compensation arrangements for stock options, restricted stock and deferred stock awards. This cost is expected to be recognized over a weighted-average period of 1.9 years.

***Stock Options***

Stock options are granted for a term not exceeding ten years and the non-vested options are generally forfeited in the event the employee, director or consultant terminates his or her employment or relationship with us or one of our affiliates. Any options that have vested at the time of termination are forfeited to the extent they are not exercised within the applicable post-employment exercise period provided in their option agreements. These options typically vest over one to four years.

The following assumptions were used to calculate the fair value of our options on the date of grant:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Risk-free interest rate | 1.01% | 0.09% - 1.19% | 1.89% - 2.53% |
| Dividend yield | 0.0 % | 0.0 % | 0.0 % |
| Volatility factors | 42.61% | 32.37% - 51.83% | 27.63% - 28.12% |
| Weighted average expected life (in years) | 6.40 | 2.51 | 6.08 |

97

Exhibit 2, page 108

Table of Contents

The following table presents a summary of our stock options outstanding at the dates given, and stock option activity for the period between such dates ("Price" reflects the weighted average exercise price per share):

| | Year Ended December 31, | | | | | | | | | | |
| | 2021 | | | 2020 | | | 2019 | | | | |
| | Options | | Price | Options | | Price | Options | | Price | | |
| | *(in thousands, except per share data)* | | | | | | | | | | |
| Outstanding January 1 | 9,323 | $ | 18.93 | 11,347 | $ | 18.36 | 11,784 | $ | 16.55 | | |
| Granted | 9 | | 89.81 | 51 | | 66.27 | 487 | | 57.00 | | |
| Exercised | (1,603) | | 22.32 | (2,071) | | 16.96 | (910) | | 15.50 | | |
| Forfeited or expired | (9) | | 75.57 | (4) | | 41.71 | (14) | | 10.82 | | |
| Outstanding December 31 | 7,720 | $ | 18.24 | 9,323 | $ | 18.93 | 11,347 | $ | 18.36 | | |
| Exercisable December 31 | 7,702 | $ | 18.13 | 8,827 | $ | 16.98 | 10,493 | $ | 15.77 | | |
| Weighted average fair value per option granted | | $ | 38.55 | | $ | 13.62 | | $ | 18.50 | | |

The total intrinsic value of stock options exercised during the years ended December 31, 2021, 2020 and 2019 was $106.4 million, $87.9 million and $39.6 million, respectively. Cash received from stock option exercises for the years ended December 31, 2021, 2020 and 2019 was $30.6 million, $30.6 million and $14.1 million, respectively.

There were 5.8 million shares available for future grants under the stock incentive plan at December 31, 2021. Upon share option exercise or vesting of restricted or deferred stock, we issue new shares or treasury shares to fulfill these grants. Vesting dates on the stock options range from February 2022 to March 2025, and expiration dates range from January 2022 to March 2031 at exercise prices and average contractual lives as follows:

| Range of Exercise Prices | Outstanding as of 12/31/21 | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | | Exercisable as of 12/31/21 | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | *(in thousands)* | *(in years)* | | | *(in thousands)* | *(in years)* | | |
| $5.00 - $9.99 | 4,102 | 0.9 | $ | 8.76 | 4,102 | 0.9 | $ | 8.76 |
| $10.00 - $14.99 | 174 | 1.2 | $ | 11.69 | 174 | 1.2 | $ | 11.69 |
| $15.00 - $19.99 | 669 | 4.0 | $ | 19.32 | 669 | 4.0 | $ | 19.32 |
| $20.00 - $24.99 | 898 | 2.1 | $ | 21.09 | 898 | 2.1 | $ | 21.09 |
| $25.00 - $29.99 | 1,082 | 4.2 | $ | 27.38 | 1,082 | 4.2 | $ | 27.38 |
| $30.00 - $44.99 | 327 | 6.1 | $ | 43.95 | 327 | 6.1 | $ | 43.95 |
| $45.00 - $60.99 | 445 | 7.2 | $ | 56.82 | 431 | 7.2 | $ | 56.78 |
| $61.00 - $89.99 | 23 | 9.0 | $ | 73.43 | 19 | 8.9 | $ | 70.26 |

The total intrinsic value of options outstanding and options exercisable as of December 31, 2021 was $783.2 million and $782.2 million, respectively.

*Restricted Stock*

We have granted restricted stock awards to our employees, directors and consultants under our stock incentive plan. These common shares carry a legend which typically restricts their transferability for a term of one to five years and are forfeited in the event the recipient's employment or relationship with us is terminated prior to the lapse of the restriction. In addition, certain restricted stock awards require us or the recipient to achieve minimum performance targets in order for these awards to vest.

In 2021, we granted 0.8 million shares of restricted stock under our stock incentive plan. These awards will all vest on the grant date or over a period of six months to four years.

In 2020, we granted 2.1 million shares of restricted stock and 0.3 million shares of performance-based awards, respectively, under our stock incentive plan. These awards will all vest over a period of three months to four years with the exception of the performance-based awards which will vest within two years if the performance criteria are met. As of December 31, 2021, the performance-based criteria for these awards were not met and such awards were forfeited.

98

In 2019, we granted 0.2 million shares of restricted stock and 0.2 million shares of performance-based awards, respectively, under our stock incentive plans. These awards will all vest over a period of one or four years with the exception of the performance-based awards which will vest within two years if the performance criteria are met. As of December 31, 2021, the performance-based criteria for these awards have been met unless otherwise forfeited.

The following table presents a summary of our unvested restricted stock awards outstanding at December 31, 2021, 2020 and 2019 ("Price" reflects the weighted average share price at the date of grant):

| | Restricted Stock | | |
| --- | --- | --- | --- |
| | Awards | | Price |
| | *(in thousands, except per share data)* | | |
| Unvested at December 31, 2018 | 1,399 | $ | 38.13 |
| Granted | 415 | | 57.58 |
| Forfeited | (26) | | 38.45 |
| Vested | (618) | | 36.54 |
| Unvested at December 31, 2019 | 1,170 | $ | 45.80 |
| Granted | 2,454 | | 55.52 |
| Forfeited | (106) | | 53.26 |
| Vested | (1,929) | | 47.48 |
| Unvested at December 31, 2020 | 1,589 | $ | 58.19 |
| Granted | 758 | | 86.57 |
| Forfeited | (361) | | 61.18 |
| Vested | (1,126) | | 61.25 |
| Unvested at December 31, 2021 | 860 | $ | 78.48 |

The total grant date fair market value of the shares issued upon the vesting of restricted stock awards during the years ended December 31, 2021, 2020 and 2019 was $69.2 million, $91.6 million and $22.6 million, respectively.

***Deferred Stock***

We granted deferred stock awards to our employees where the employees are entitled to receive shares of common stock in the future. Deferred stock can only be settled in stock as determined at the time of the grant. All of the deferred stock awards require us to achieve minimum market conditions in order for these awards to issue and vest.

In 2020 and 2019, we achieved minimum market conditions resulting in the issuance of 0.8 million shares and 1.5 million shares of restricted stock, respectively, subject to vesting over one to four years. As of December 31, 2021, there were no deferred stock awards outstanding for which the minimum market conditions have not been met.

99

The following table presents a summary of our unvested deferred stock awards outstanding at December 31, 2021, 2020 and 2019 ("Price" reflects the weighted average grant date fair value):

| | Deferred Stock | | |
| --- | --- | --- | --- |
| | Awards | | Price |
| | *(in thousands, except per share data)* | | |
| Unvested at December 31, 2018 | 2,500 | $ | 26.69 |
| Awarded | — | | 0.00 |
| Forfeited | — | | 0.00 |
| Vested | (14) | | 36.08 |
| Unvested at December 31, 2019 | 2,486 | $ | 26.63 |
| Awarded | — | | 0.00 |
| Forfeited | — | | 0.00 |
| Vested | (119) | | 28.80 |
| Unvested at December 31, 2020 | 2,367 | $ | 26.53 |
| Awarded | — | | 0.00 |
| Forfeited | — | | 0.00 |
| Vested | (175) | | 26.12 |
| Unvested at December 31, 2021 | 2,192 | $ | 26.56 |

100

Exhibit 2, page 111

**NOTE 15—OTHER INFORMATION**

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2021** | | **2020** | |
|  | *(in thousands)* | | | |
| The following details the components of "Other current assets": | | | | |
| Inventory | $ | 33,826 | $ | 22,000 |
| Notes receivable | | 19,206 | | 14,556 |
| Other | | 21,802 | | 2,909 |
| Total other current assets | $ | 74,834 | $ | 39,465 |
| | | | | |
| The following details the components of "Other long-term assets": | | | | |
| Investments in nonconsolidated affiliates | $ | 293,645 | $ | 170,494 |
| Notes receivable | | 69,371 | | 88,889 |
| Other | | 185,437 | | 131,898 |
| Total other long-term assets | $ | 548,453 | $ | 391,281 |
| | | | | |
| The following details the components of "Accrued expenses": | | | | |
| Accrued compensation and benefits | $ | 287,079 | $ | 90,070 |
| Accrued event expenses | | 467,189 | | 127,004 |
| Accrued insurance | | 122,783 | | 128,348 |
| Accrued legal | | 18,102 | | 23,596 |
| Collections on behalf of others | | 83,403 | | 51,127 |
| Accrued ticket refunds | | 36,661 | | 143,827 |
| Other | | 630,689 | | 330,177 |
| Total accrued expenses | $ | 1,645,906 | $ | 894,149 |
| | | | | |
| The following details the components of "Other current liabilities": | | | | |
| Contingent and deferred purchase consideration | $ | 49,827 | $ | 39,207 |
| Other | | 33,260 | | 32,876 |
| Total other current liabilities | $ | 83,087 | $ | 72,083 |
| The following details the components of "Other long-term liabilities": | | | | |
| Deferred income taxes | $ | 236,549 | $ | 170,759 |
| Deferred revenue | | 116,682 | | 88,641 |
| Contingent and deferred purchase consideration | | 13,256 | | 26,401 |
| Other | | 65,094 | | 67,466 |
| Total other long-term liabilities | $ | 431,581 | $ | 353,267 |

Exhibit 2, page 112

**NOTE 16—SEGMENT DATA**

Our reportable segments are Concerts, Ticketing and Sponsorship & Advertising. Our Concerts segment involves the promotion of live music events globally in our owned or operated venues and in rented third-party venues, the production of music festivals, the operation and management of music venues, the creation of associated content and the provision of management and other services to artists. Our Ticketing segment involves the management of our global ticketing operations, including providing ticketing software and services to clients, and consumers with a marketplace, both online and mobile, for tickets and event information, and is responsible for our primary ticketing website, *www.ticketmaster.com*. Our Sponsorship & Advertising segment manages the development of strategic sponsorship programs in addition to the sale of international, national and local sponsorships and placement of advertising such as signage, promotional programs, rich media offerings, including advertising associated with live streaming and music-related content, and ads across our distribution network of venues, events and websites.

Revenue and expenses earned and charged between segments are eliminated in consolidation. Our capital expenditures below include accruals for amounts incurred but not yet paid for, but are not reduced by reimbursements received from outside parties such as landlords and noncontrolling interest partners or replacements funded by insurance proceeds.

We manage our working capital on a consolidated basis. Accordingly, segment assets are not reported to, or used by, our management to allocate resources to or assess performance of our segments, and therefore, total segment assets have not been presented.

There were no customers that individually accounted for more than 10% of our consolidated revenue in any year.

Exhibit 2, page 113

The following table presents the results of operations for our reportable segments for the years ending December 31, 2021, 2020 and 2019:

| | Concerts | Ticketing | Sponsorship & Advertising | Other | Corporate | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| | | | _(in thousands)_ | | | | |
| **2021** | | | | | | | |
| Revenue | $ 4,722,190 | $ 1,134,268 | $ 411,910 | $ 2,988 | $ — | $ (2,909) | $ 6,268,447 |
| Direct operating expenses | 3,913,975 | 358,246 | 86,540 | — | — | (2,772) | 4,355,989 |
| Selling, general and administrative expenses | 1,184,424 | 472,519 | 95,251 | 2,765 | — | (137) | 1,754,822 |
| Depreciation and amortization | 243,439 | 133,227 | 27,942 | 43 | 11,626 | — | 416,277 |
| Loss (gain) on disposal of operating assets | (1,162) | (67) | — | — | 18 | — | (1,211) |
| Corporate expenses | — | — | — | — | 160,428 | — | 160,428 |
| Operating income (loss) | $ (618,486) | $ 170,343 | $ 202,177 | $ 180 | $ (172,072) | $ — | $ (417,858) |
| Intersegment revenue | $ 2,505 | $ 404 | $ — | $ — | $ — | $ (2,909) | $ — |
| Capital expenditures | $ 92,132 | $ 49,004 | $ 12,299 | $ — | $ 23,036 | $ — | $ 176,471 |
| **2020** | | | | | | | |
| Revenue | $ 1,468,433 | $ 188,383 | $ 203,676 | $ 3,233 | $ — | $ (2,547) | $ 1,861,178 |
| Direct operating expenses | 1,222,997 | 129,433 | 52,517 | — | — | (2,547) | 1,402,400 |
| Selling, general and administrative expenses | 937,651 | 501,032 | 75,669 | 9,990 | — | — | 1,524,342 |
| Depreciation and amortization | 266,255 | 169,921 | 30,617 | 6,684 | 11,548 | — | 485,025 |
| Loss (gain) on disposal of operating assets | 505 | (1) | — | (1) | — | — | 503 |
| Corporate expenses | — | — | — | — | 102,100 | — | 102,100 |
| Operating income (loss) | $ (958,975) | $ (612,002) | $ 44,873 | $ (13,440) | $ (113,648) | $ — | $ (1,653,192) |
| Intersegment revenue | $ 712 | $ 1,835 | $ — | $ — | $ — | $ (2,547) | $ — |
| Capital expenditures | $ 119,730 | $ 77,018 | $ 5,781 | $ — | $ 6,886 | $ — | $ 209,415 |
| **2019** | | | | | | | |
| Revenue | $ 9,428,094 | $ 1,545,189 | $ 590,274 | $ 3,162 | $ — | $ (18,750) | $ 11,547,969 |
| Direct operating expenses | 7,857,437 | 514,169 | 114,326 | — | — | (18,750) | 8,467,182 |
| Selling, general and administrative expenses | 1,386,928 | 642,052 | 112,594 | 3,912 | — | — | 2,145,486 |
| Depreciation and amortization | 239,682 | 156,894 | 33,084 | 364 | 13,967 | — | 443,991 |
| Loss (gain) on disposal of operating assets | (2,490) | 116 | — | — | 1 | — | (2,373) |
| Corporate expenses | — | — | — | — | 168,839 | — | 168,839 |
| Operating income (loss) | $ (53,463) | $ 231,958 | $ 330,270 | $ (1,114) | $ (182,807) | $ — | $ 324,844 |
| Intersegment revenue | $ 6,672 | $ 12,078 | $ — | $ — | $ — | $ (18,750) | $ — |
| Capital expenditures | $ 186,819 | $ 105,246 | $ 10,261 | $ — | $ 35,252 | $ — | $ 337,578 |

Exhibit 2, page 114

The following table provides revenue and long-lived assets for our foreign operations included in the consolidated financial statements:

| | United Kingdom Operations | | Other Foreign Operations | | Total Foreign Operations | | Total Domestic Operations | | Consolidated Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *(in thousands)* | | | | | |
| **2021** | | | | | | | | | | |
| Revenue | $ | 594,809 | $ | 618,005 | $ | 1,212,814 | $ | 5,055,633 | $ | 6,268,447 |
| Long-lived assets | $ | 90,603 | $ | 185,550 | $ | 276,153 | $ | 815,776 | $ | 1,091,929 |
| **2020** | | | | | | | | | | |
| Revenue | $ | 194,177 | $ | 472,364 | $ | 666,541 | $ | 1,194,637 | $ | 1,861,178 |
| Long-lived assets | $ | 91,192 | $ | 184,679 | $ | 275,871 | $ | 825,543 | $ | 1,101,414 |
| **2019** | | | | | | | | | | |
| Revenue | $ | 838,940 | $ | 3,076,486 | $ | 3,915,426 | $ | 7,632,543 | $ | 11,547,969 |
| Long-lived assets | $ | 77,084 | $ | 186,265 | $ | 263,349 | $ | 854,583 | $ | 1,117,932 |

104

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We have established disclosure controls and procedures to ensure that material information relating to our company, including our consolidated subsidiaries, is made known to the officers who certify our financial reports and to other members of senior management and our board of directors.

Based on their evaluation as of December 31, 2021, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) are effective to ensure that (1) the information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (2) the information we are required to disclose in such reports is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or internal controls will prevent all possible errors and fraud. Our disclosure controls and procedures are, however, designed to provide reasonable assurance of achieving their objectives, and our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective at that reasonable assurance level.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended. Our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the 2013 framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Based on its evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2021.

In December 2021, we acquired OCESA (see Item 8. Financial Statements and Supplementary Data—Note 3—Business Acquisitions). Management excluded OCESA from our evaluation of internal control over financial reporting. This exclusion is in accordance with the guidance issued by the United States SEC that allows companies to exclude acquisitions from management's report on internal control over financial reporting for the first year after the acquisition. The preliminary total assets, excluding goodwill and identifiable intangible assets, for OCESA represent approximately 2.9% to our consolidated assets as of December 31, 2021. The preliminary total revenue of OCESA represent less than 1.0% of our consolidated revenues for the year ended December 31, 2021.

Ernst & Young LLP, an independent registered public accounting firm, has issued an attestation report on our internal control over financial reporting. The attestation report is included herein.

**Changes in Internal Control Over Financial Reporting**

We are in the process of integrating OCESA, which was acquired in December 2021, into our overall internal control over financial reporting process. Other than this integration, there have been no changes in our internal control over financial reporting during the fourth quarter of the fiscal year ended December 31, 2021 that have materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. We have not experienced any material impact to our internal controls over financial reporting resulting from the fact that employees are working remotely due to the global COVID-19 pandemic. We are continually monitoring and assessing the impact of the global COVID-19 pandemic on our internal controls to minimize the affect on their design and operating effectiveness.

Exhibit 2, page 116

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Live Nation Entertainment, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Live Nation Entertainment, Inc.'s internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Live Nation Entertainment, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on the COSO criteria.

As indicated in the accompanying Management's Report on Internal Control Over Financial Reporting, management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of OCESA, which is included in the 2021 consolidated financial statements of the Company and constituted approximately 2.9% of total consolidated assets, excluding goodwill and identifiable intangible assets, as of December 31, 2021, and less than 1% of total consolidated revenues, for the year then ended. Our audit of internal control over financial reporting of the Company also did not include an evaluation of the internal control over financial reporting of OCESA.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the 2021 consolidated financial statements of the Company and our report dated February 23, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Los Angeles, California
February 23, 2022

**ITEM 9B. OTHER INFORMATION**

None.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

## PART III

**ITEM 10.          DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

Other than the information set forth under Item 1. Business—Information About Our Executive Officers, the information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**ITEM 11.          EXECUTIVE COMPENSATION**

The information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**ITEM 12.          SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**ITEM 13.          CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**ITEM 14.          PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a)1. Financial Statements.

The following consolidated financial statements are included in Item 8:

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 42) | 53 |
| Consolidated Balance Sheets as of December 31, 2021 and 2020 | 55 |
| Consolidated Statements of Operations for the Years Ended December 31, 2021, 2020 and 2019 | 56 |
| Consolidated Statements of Comprehensive Income (Loss) for the Years Ended December 31, 2021, 2020 and 2019 | 57 |
| Consolidated Statements of Changes in Equity for the Years Ended December 31, 2021, 2020 and 2019 | 58 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2021, 2020 and 2019 | 59 |
| Notes to Consolidated Financial Statements | 60 |

(a)2. Financial Statement Schedule.

The following financial statement schedule for the years ended December 31, 2021, 2020 and 2019 is filed as part of this report and should be read in conjunction with the consolidated financial statements.

**Schedule II Valuation and Qualifying Accounts**

All other schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted.

Exhibit 2, page 119

**LIVE NATION ENTERTAINMENT, INC.**

**SCHEDULE II**

**VALUATION AND QUALIFYING ACCOUNTS**

**Allowance for Doubtful Accounts**

| Description | Balance at Beginning of Period | Charges of Costs, Expenses and Other | Write-off of Accounts Receivable | Other [1] | Balance at End of Period |
|---|---|---|---|---|---|
| | | | *(in thousands)* | | |
| Year ended December 31, 2019 | $ 34,225 | $ 24,419 | $ (7,968) | $ (160) | $ 50,516 |
| Year ended December 31, 2020 | $ 50,516 | $ 26,103 | $ (11,901) | $ 8,186 | $ 72,904 |
| Year ended December 31, 2021 | $ 72,904 | $ (17,658) | $ (3,846) | $ (909) | $ 50,491 |

_____

[1] Foreign currency adjustments, acquisitions and miscellaneous adjustments. The year ended December 31, 2020 includes a $3.0 million cumulative-effect adjustment related to our adoption of the accounting guidance for current expected credit losses for financial assets measured at amortized cost.

Exhibit 2, page 120

**LIVE NATION ENTERTAINMENT, INC.**

**SCHEDULE II**

**VALUATION AND QUALIFYING ACCOUNTS**

**Deferred Tax Asset Valuation Allowance**

| Description | Balance at Beginning of Period | Charges of Costs, Expenses and Other | Deletions | Other [1] | Balance at End of Period |
|---|---|---|---|---|---|
| | | *(in thousands)* | | | |
| Year ended December 31, 2019 | $ 530,642 | $ 8,536 | $ — | $ 128,064 | $ 667,242 |
| Year ended December 31, 2020 | $ 667,242 | $ 344,161 | $ — | $ 89,004 | $ 1,100,407 |
| Year ended December 31, 2021 | $ 1,100,407 | $ 135,908 | $ — | $ (16,819) | $ 1,219,496 |

[1] During 2021, 2020 and 2019, the valuation allowance was adjusted for acquisitions, divestitures and foreign currency adjustments. The 2019 and 2020 valuation allowance increased due to increases in fully valued deferred tax assets, primarily net operating loss carryforwards. The 2021 valuation allowance increased primarily due to increases in certain fully valued United States federal deferred tax assets.

110

Exhibit 2, page 121

(a)3. Those exhibits required by Item 601 of Regulation S-K

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| | | Form | File No. | Exhibit No. | Filing Date | |
|---|---|---|---|---|---|---|
| 2.1 | Share Subscription Agreement and Other Covenants entered into as of May 1, 2018, by and among Live Nation Entertainment, Inc., Live Nation International Holdings B.V., Rock City, S.A., and Roberto Medina and certain other shareholders of Rock City, S.A. | 8-K | 001-32601 | 2.1 | 5/10/2018 | |
| 2.2 | Stock Purchase Agreement dated July 24, 2019, by and among Corporación Interamericana de Entretenimiento, S.A.B. de C.V. as Seller, Ticketmaster New Ventures, S. de R.L. de C.V. as Purchaser, Live Nation Entertainment, Inc. as joint obligor of Purchaser, and OCESA Entretenimiento, S.A. de C.V. | 10-Q | 001-32601 | 2.1 | 10/31/2019 | |
| 2.3 | First Amendment to the Stock Purchase Agreement dated September 13, 2021, by and among Corporación Interamericana de Entretenimiento, S.A.B. de C.V. as Seller, Ticketmaster New Ventures, S. de R.L. de C.V. as Purchaser, Live Nation Entertainment, Inc. as joint obligor of Purchaser, and OCESA Entretenimiento, S.A. de C.V. | 10-Q | 001-32601 | 2.2 | 11/4/2021 | |
| 2.4 | Stock Purchase Agreement dated July 24, 2019, by and among Grupo Televisa, S.A.B. and Promo-Industrias Metropolitanas, S.A.de R.L. de C.V., the Sellers, Ticketmaster New Ventures, S. de R.L. de C.V. and Ticketmaster New Ventures Holdings, Inc., the Purchasers, Live Nation Entertainment, Inc. as joint obligor of Purchasers, and OCESA Entretenimiento, S.A. de C.V. | 10-Q | 001-32601 | 2.2 | 10/31/2019 | |
| 2.5 | First Amendment to the Stock Purchase Agreement dated September 13, 2021, by and among Grupo Televisa, S.A.B. and Promo-Industrias Metropolitanas, S.A. de C.V. the Sellers, Ticketmaster New Ventures, S. de R.L. de C.V. and Ticketmaster New Ventures Holdings, Inc. the Purchasers, Live Nation Entertainment, Inc. as joint obligor of Purchasers, and OCESA Entretenimiento, S.A. de C.V. | 10-Q | 001-32601 | 2.4 | 11/4/2021 | |
| 3.1 | Amended and Restated Certificate of Incorporation of Live Nation Entertainment, Inc., as amended. | 10-K | 001-32601 | 3.1 | 2/25/2010 | |
| 3.2 | Certificate of Amendment to the Amended and Restated Certificate of Incorporation of Live Nation Entertainment, Inc. | 8-K | 001-32601 | 3.1 | 6/7/2013 | |
| 3.3 | Fifth Amended and Restated Bylaws of Live Nation Entertainment, Inc. | 8-K | 001-32601 | 3.2 | 6/7/2013 | |
| 4.1 | Form of Certificate of Designations of Series A Junior Participating Preferred Stock. | 8-K | 001-32601 | 4.2 | 12/23/2005 | |
| 4.2 | Description of Securities. | 10-K | 001-32601 | 4.2 | 3/01/2021 | |
| 10.1 | Stockholder Agreement, dated February 10, 2009, among Live Nation, Inc., Liberty Media Corporation, Liberty USA Holdings, LLC and Ticketmaster Entertainment, Inc. | 8-K | 001-32601 | 10.2 | 2/13/2009 | |
| 10.2 | Registration Rights Agreement, dated January 25, 2010, among Live Nation, Inc., Liberty Media Corporation and Liberty Media Holdings USA, LLC. | 8-K | 001-32601 | 10.1 | 1/29/2010 | |
| 10.3 | Form of Indemnification Agreement. | 10-K | 001-32601 | 10.23 | 2/25/2010 | |
| 10.4 § | Live Nation Entertainment, Inc. 2005 Stock Incentive Plan, as amended and restated as of March 19, 2015. | 8-K | 001-32601 | 10.2 | 6/11/2015 | |
| 10.5 § | Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan. | S-8 | 333-164507 | 10.1 | 1/26/2010 | |

111

Exhibit 2, page 122

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit No. | Filing Date | |
| 10.6 § | Amendment No. 1 to the Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan. | 10-Q | 001-32601 | 10.1 | 11/4/2010 | |
| 10.7 § | Form Stock Option Agreement for the Live Nation Entertainment, Inc. 2005 Stock Incentive Plan, as amended and restated as of March 19, 2015. | 10-Q | 001-32601 | 10.2 | 5/6/2021 | |
| 10.8 § | Form Restricted Stock Award Agreement for the Live Nation Entertainment, Inc. 2005 Stock Incentive Plan, as amended and restated as of March 19, 2015. | 10-Q | 001-32601 | 10.3 | 5/6/2021 | |
| 10.9 § | Form Stock Option Agreement for the Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan. | 10-Q | 001-32601 | 10.4 | 5/6/2021 | |
| 10.10 § | Form Restricted Stock Award Agreement for the Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan. | 10-Q | 001-32601 | 10.5 | 5/6/2021 | |
| 10.11 § | Amended and Restated Live Nation, Inc. Stock Bonus Plan. | 8-K | 001-32601 | 10.1 | 1/25/2010 | |
| 10.12 § | Employment Agreement, entered into December 15, 2017, by and between Live Nation Entertainment, Inc. and Michael Rapino. | 8-K | 001-32601 | 10.1 | 12/18/2017 | |
| 10.13 § | Employment Agreement, effective as of January 1, 2018, by and between Live Nation Entertainment, Inc. and Joe Berchtold. | 8-K | 001-32601 | 10.1 | 12/20/2017 | |
| 10.14 § | Employment Agreement, effective as of January 1, 2018, by and between Live Nation Entertainment, Inc. and Michael Rowles. | 8-K | 001-32601 | 10.3 | 12/20/2017 | |
| 10.15 § | Employment Agreement, effective December 17, 2007, between Live Nation Worldwide, Inc. and Brian Capo. | 10-Q | 001-32601 | 10.4 | 8/7/2008 | |
| 10.16 § | First Amendment to Employment Agreement, effective December 31, 2008, between Live Nation Worldwide, Inc. and Brian Capo. | 10-K | 001-32601 | 10.30 | 3/5/2009 | |
| 10.17 § | Second Amendment to Employment Agreement, effective October 22, 2009, between Live Nation Worldwide, Inc. and Brian Capo. | 10-K | 001-32601 | 10.55 | 2/25/2010 | |
| 10.18 § | Third Amendment to Confirmation of Employment and Compensation Arrangement, effective January 1, 2017, by and between Live Nation Worldwide, Inc. and Brian J. Capo. | 10-Q | 001-32601 | 10.1 | 8/9/2017 | |
| 10.19 § | Employment Agreement, effective as of January 1, 2015, between Live Nation Entertainment, Inc. and John Hopmans. | 10-Q | 001-32601 | 10.1 | 8/3/2021 | |
| 10.20 § | First Amendment to Employment Agreement, effective as of January 1, 2019, between Live Nation Worldwide, Inc. and John Hopmans. | 10-Q | 001-32601 | 10.2 | 8/3/2021 | |
| 10.21 § | Second Amendment to Employment Agreement, effective as of January 1, 2019, between Live Nation Worldwide, Inc. and John Hopmans. | 10-Q | 001-32601 | 10.3 | 8/3/2021 | |
| 10.22 | Credit Agreement entered into as of May 6, 2010, among Live Nation Entertainment, Inc., the Foreign Borrowers party thereto, the Guarantors identified therein, the Lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian Agent and J.P. Morgan Europe Limited, as London Agent. | 10-Q | 001-32601 | 10.4 | 8/5/2010 | |

112

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit No. | Filing Date | |
| 10.23 | Amendment No. 1, to the Credit Agreement, dated as of June 29, 2012, entered into by and among Live Nation Entertainment, Inc., the relevant Credit Parties identified therein, the Lenders party thereto, and JPMorgan Chase Bank, N.A., as administrative agent for the Lenders. | 10-Q | 001-32601 | 10.2 | 8/7/2012 | |
| 10.24 | Amendment No. 2 to the Credit Agreement, dated as of August 16, 2013, entered into by and among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent for the Lenders, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent and J.P. Morgan Europe Limited, as London agent. | 10-Q | 001-32601 | 10.2 | 5/6/2014 | |
| 10.25 | Amendment No. 3 to the Credit Agreement, dated as of October 31, 2016, entered into by and among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent, J.P. Morgan Europe Limited, as London agent and the lenders from time to time party thereto. | 10-K | 001-32601 | 10.26 | 2/23/2017 | |
| 10.26 | Amendment No. 4 to the Credit Agreement, dated June 27, 2017, entered into by Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent, J. P. Morgan Europe Limited, as London agent and the lenders from time to time party thereto. | 10-Q | 001-32601 | 10.2 | 8/9/2017 | |
| 10.27 | Amendment No. 5 to the Credit Agreement, dated as of March 28, 2018, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent, J.P. Morgan Europe Limited, as London agent and the lenders from time to time party thereto. | 10-Q | 001-32601 | 10.3 | 5/3/2018 | |
| 10.28 | Amendment No. 6 to the Credit Agreement, dated as of October 17, 2019, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent, J.P. Morgan Europe Limited, as London agent and the lenders from time to time party thereto. | 10-K | 001-32601 | 10.28 | 2/27/2020 | |
| 10.29 | Amendment No. 7 to the Credit Agreement, dated as of April 9, 2020, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch as Canadian Agent, J.P. Morgan Europe Limited, as London Agent and the lenders from time to time party thereto. | 10-Q | 001-32601 | 10.1 | 8/5/2020 | |
| 10.30 | Amendment No. 8 to the Credit Agreement, dated as of July 29, 2020, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch as Canadian Agent, J.P. Morgan Europe Limited, as London Agent and the lenders from time to time party thereto. | 10-Q | 001-32601 | 10.1 | 11/5/2020 | |

113

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| | | Form | File No. | Exhibit No. | Filing Date | |
| --- | --- | --- | --- | --- | --- | --- |
| 10.31 | Amendment No. 9 to the Credit Agreement, dated as of January 26, 2022, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch as Canadian Agent, J.P. Morgan Europe Limited, as London Agent and the lenders from time to time party thereto. | | | | | X |
| 10.32 | Incremental Term Loan Joinder Agreement No. 1, dated August 20, 2012, by and among Live Nation Entertainment, Inc., JPMorgan Chase Bank, N.A., as administrative agent, each Incremental Term Loan Lender defined therein and the relevant Credit Parties identified therein. | 10-Q | 001-32601 | 10.2 | 11/5/2012 | |
| 10.33 | Indenture, dated as of May 23, 2014, among Live Nation Entertainment, Inc., the Guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.1 | 7/31/2014 | |
| 10.34 | First Supplemental Indenture, dated as of August 27, 2014, among Live Nation Entertainment, Inc., Ticketstoday, LLC, the Existing Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.1 | 10/30/2014 | |
| 10.35 | Second Supplemental Indenture, dated as of October 31, 2014, among Live Nation Entertainment, Inc., EXMO, Inc., Artist Nation Management, Inc., Guyo Entertainment, Inc., the Existing Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-K | 001-32601 | 10.33 | 2/26/2015 | |
| 10.36 | Third Supplemental Indenture, dated as of March 27, 2015 among Live Nation Entertainment, Inc., Country Nation, LLC, the Existing Guarantors Party thereto and The Bank of New York Mellon Trust Company N.A., as trustee. | 10-Q | 001-32601 | 10.1 | 4/30/2015 | |
| 10.37 | Fourth Supplemental Indenture, dated as of August 13, 2015, among Live Nation Entertainment, Inc., the guarantors listed in Appendix I thereto, FG Acquisition Co, LLC, Front Gate Holdings, LLC and Front Gate Ticketing Solutions, LLC and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.2 | 10/29/2015 | |
| 10.38 | Fifth Supplemental Indenture, dated as of October 31, 2016, among Live Nation Entertainment, Inc., the Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-K | 001-32601 | 10.42 | 2/23/2017 | |
| 10.39 | Sixth Supplemental Indenture, dated as of April 7, 2017, among Live Nation Entertainment, Inc., the Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.2 | 5/4/2017 | |
| 10.40 | Seventh Supplemental Indenture, entered into as of March 20, 2018, among Live Nation Entertainment, Inc., the Guarantor party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.5 | 5/3/2018 | |
| 10.41 | Eighth Supplemental Indenture, entered into as of October 17, 2019, among Live Nation Entertainment, Inc., the Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-K | 001-32601 | 10.38 | 2/27/2020 | |
| 10.42 | Indenture, dated as of May 23, 2014, between Live Nation Entertainment, Inc., and HSBC Bank USA, National Association, as trustee. | 10-Q | 001-32601 | 10.2 | 7/31/2014 | |

114

Exhibit 2, page 125

| Exhibit No. | Exhibit Description | Form | File No. | Exhibit No. | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| | | | | **Incorporated by Reference** | | |
| 10.43 | Indenture, dated as of October 31, 2016, by and among Live Nation Entertainment, Inc. the Guarantors defined therein and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-K | 001-32601 | 10.44 | 2/23/2017 | |
| 10.44 | First Supplemental Indenture, dated as of April 7, 2017, among Live Nation Entertainment, Inc., the Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.1 | 5/4/2017 | |
| 10.45 | Second Supplemental Indenture, entered into as of March 20, 2018, among Live Nation Entertainment, Inc., the Guarantors identified therein, and the Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.4 | 5/3/2018 | |
| 10.46 | Third Supplemental Indenture, entered into as of October 17, 2019, among Live Nation Entertainment, Inc., the Guarantors identified therein, and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-K | 001-32601 | 10.43 | 2/27/2020 | |
| 10.47 | Fourth Supplemental Indenture, entered into as of May 20, 2020, among Live Nation Entertainment, Inc., the Guarantors identified therein, and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.3 | 8/5/2020 | |
| 10.48 | Indenture, dated as of March 20, 2018, by and among Live Nation Entertainment, Inc., the Guarantors defined therein, and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.1 | 5/3/2018 | |
| 10.49 | First Supplemental Indenture, entered into as of October 17, 2019, among Live Nation Entertainment, Inc., the Guarantors identified therein, and The Bank of New York Mellon Trust Company, N.A., as trustee | 10-K | 001-32601 | 10.45 | 2/27/2020 | |
| 10.50 | Second Supplemental Indenture, entered into as of May 20, 2020, among Live Nation Entertainment, Inc., the Guarantors identified therein, and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.4 | 8/5/2020 | |
| 10.51 | Indenture, dated as of March 20, 2018, between Live Nation Entertainment, Inc., and HSBC Bank USA, National Association, as trustee. | 10-Q | 001-32601 | 10.2 | 5/3/2018 | |
| 10.52 | Indenture dated as of October 17, 2019 by and among Live Nation Entertainment, Inc., the Guarantors and U.S. Bank National Association, as trustee. | 10-K | 001-32601 | 10.47 | 2/27/2020 | |
| 10.53 | First Supplemental Indenture, entered into as of May 20, 2020, among Live Nation Entertainment, Inc., the Guarantors identified therein, and U.S. Bank National Association, as trustee. | 10-Q | 001-32601 | 10.5 | 8/5/2020 | |
| 10.54 | Indenture dated as of February 3, 2020 between Live Nation Entertainment, Inc. and HSBC Bank USA, National Association, as trustee. | 10-Q | 001-32601 | 10.1 | 5/7/2020 | |
| 10.55 | Indenture, dated as of May 20, 2020 by and among Live Nation Entertainment, Inc., the Guarantors identified therein and U.S. Bank National Association, as trustee and notes collateral agent. | 10-Q | 001-32601 | 10.2 | 8/5/2020 | |
| 10.56 | Indenture, dated as of January 4, 2021 by and among Live Nation Entertainment, Inc., the Guarantors identified therein and U.S. Bank National Association, as trustee and notes collateral agent. | 10-Q | 001-32601 | 10.1 | 5/6/2021 | |
| 14.1 | Code of Business Conduct and Ethics. | 10-K | 001-32601 | 14.1 | 3/01/2021 | |
| 21.1 | Subsidiaries of the Company. | | | | | X |
| 23.1 | Consent of Ernst & Young LLP. | | | | | X |

115

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit No. | Filing Date | |
| 24.1 | Power of Attorney (see signature page). | | | | | X |
| 31.1 | Certification of Chief Executive Officer. | | | | | X |
| 31.2 | Certification of Chief Financial Officer. | | | | | X |
| 32.1 | Section 1350 Certification of Chief Executive Officer. | | | | | X |
| 32.2 | Section 1350 Certification of Chief Financial Officer. | | | | | X |
| 101.INS | XBRL Instance Document - The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the inline XBRL document. | | | | | X |
| 101.SCH | XBRL Taxonomy Schema Document. | | | | | X |
| 101.CAL | XBRL Taxonomy Calculation Linkbase Document. | | | | | X |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document. | | | | | X |
| 101.LAB | XBRL Taxonomy Label Linkbase Document. | | | | | X |
| 101.PRE | XBRL Taxonomy Presentation Linkbase Document. | | | | | X |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | | | | | X |

§    Management contract or compensatory plan or arrangement.

We have not filed long-term debt instruments of our subsidiaries where the total amount under such instruments is less than ten percent of the total assets of the Company and its subsidiaries on a consolidated basis. However, we will furnish a copy of such instruments to the Commission upon request.

**ITEM 16. FORM 10-K SUMMARY**

Not applicable.

116

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 23, 2022.

LIVE NATION ENTERTAINMENT, INC.

By:  /s/ Michael Rapino

**Michael Rapino**
**President and Chief Executive Officer**

117

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints, jointly and severally, Michael Rapino and Joe Berchtold, and each of them, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Michael Rapino<br>**Michael Rapino** | President, Chief Executive Officer<br>and Director | February 23, 2022 |
| /s/ Joe Berchtold<br>**Joe Berchtold** | Chief Financial Officer | February 23, 2022 |
| /s/ Brian Capo<br>**Brian Capo** | Chief Accounting Officer | February 23, 2022 |
| /s/ Maverick Carter<br>**Maverick Carter** | Director | February 23, 2022 |
| /s/ Ping Fu<br>**Ping Fu** | Director | February 23, 2022 |
| /s/ Jeffrey T. Hinson<br>**Jeffrey T. Hinson** | Director | February 23, 2022 |
| /s/ Chad Hollingsworth<br>**Chad Hollingsworth** | Director | February 23, 2022 |
| /s/ Jimmy Iovine<br>**Jimmy Iovine** | Director | February 23, 2022 |
| /s/ James S. Kahan<br>**James S. Kahan** | Director | February 23, 2022 |
| /s/ Gregory B. Maffei<br>**Gregory B. Maffei** | Director | February 23, 2022 |
| /s/ Randall T. Mays<br>**Randall T. Mays** | Director | February 23, 2022 |
| /s/ Dana Walden<br>**Dana Walden** | Director | February 23, 2022 |
| /s/ Latriece Watkins<br>**Latriece Watkins** | Director | February 23, 2022 |

118

**EXHIBIT 10.31**

**Execution Version**

AMENDMENT No. 9, dated as of January 26, 2022 (this "Amendment"), to that certain credit agreement among LIVE NATION ENTERTAINMENT, INC., a Delaware corporation (the "Parent Borrower"), the "Guarantors" identified in such Credit Agreement, JPMORGAN CHASE BANK, N.A., as Administrative Agent and Collateral Agent, JPMORGAN CHASE BANK, N.A., TORONTO BRANCH, as Canadian Agent, J.P. MORGAN EUROPE LIMITED, as London Agent and the lenders from time to time party thereto (as such credit agreement has been amended, restated, modified and supplemented from time to time to date, the "Credit Agreement"); capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

WHEREAS, Section 11.01 of the Credit Agreement provides that the Credit Parties and the Required Lenders may amend the Credit Agreement and the other Credit Documents for certain purposes; and

WHEREAS, each Lender with Delayed Draw Term A Loans and/or Revolving Commitments that has executed a consent to this Amendment in the form attached hereto (a "Consent") in its capacity as a Delayed Draw Term A Lender and/or Revolving Lender, respectively, has agreed to consent to this Amendment and such Delayed Draw Term A Lenders and Revolving Lenders constitute Required Lenders.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1. **Amendment**. The Credit Agreement is, effective as of the Amendment No. 9 Effective Date (as defined below), hereby amended to delete the stricken text (indicated textually in the same manner as the following example: stricken text) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the pages of the Credit Agreement attached as Exhibit A hereto (which, for clarity, reflects the amendments made pursuant to Amendments Nos. 1 through 8 to the Credit Agreement, and such Credit Agreement, the "Amended Credit Agreement"). Each Person party to this Amendment (other than JPMorgan Chase Bank, N.A. in its capacity as a Lender and any Credit Party) by its execution of a Consent, agrees that JPMorgan Chase Bank, N.A.'s execution of this Amendment in its capacity as Administrative Agent constitutes such Person's irrevocable approval of this Amendment. The Lenders delivering Consents to this Amendment constitute the Required Lenders necessary for approval of the amendments contemplated by the changes from the Credit Agreement set forth in the Amended Credit Agreement and hereby ratify all such amendments.

Section 2. **Effectiveness**. Section 1 of this Amendment shall become effective on the date that the conditions below are satisfied (the "Amendment No. 9 Effective Date") at which time the Credit Agreement in effect prior to date hereof shall be replaced in its entirety by the Amended Credit Agreement:

(a)     The Administrative Agent shall have received (i) executed signature pages to (or consents authorizing the relevant party's consent to) this Amendment from (A) Lenders constituting the Required Lenders under the Credit Agreement (prior to giving effect to Amendment No. 9) and (B) each of the Credit Parties.

(b)     The statement in Section 3 shall be true and correct as of the Amendment No. 9 Effective Date.

Exhibit 2, page 130

(c)      All accrued reasonable and documented out-of-pocket fees and expenses of the Administrative Agent (including the reasonable fees and expenses of counsel of one counsel to the Administrative Agent) shall have been paid; <u>provided</u> that the Parent Borrower shall have received a reasonably detailed invoice therefor at least two (2) Business Days prior to the Amendment No. 9 Effective Date.

Section 3. **<u>Representations and Warranties; No Default</u>**. (A) The representations and warranties of the Parent Borrower and each other Credit Party contained in <u>Article VI</u> of the Credit Agreement shall be true and correct in all material respects on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (<u>provided</u> that representations and warranties that are qualified by materiality shall be true and correct in all respects) and (B) no Default or Event of Default shall exist, or would result from the occurrence of the Amendment No. 9 Effective Date or any transactions occurring on such date.

Section 4. **<u>Counterparts; Integration; Effectiveness</u>**. This Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Amendment constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Amendment shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Amendment by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Amendment. The words "execution," "execute," "signature" and words of like import in this Amendment shall be deemed to include electronic signatures, which shall be of the same legal effect, validity or enforceability as a manually executed signature, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 5. **<u>Applicable Law</u>**. THIS AMENDMENT AND THE CONSENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Section 6. **<u>Headings</u>**. Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Amendment.

Section 7. **<u>Effect of Amendment</u>**. Except as expressly set forth herein, (i) this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders, the Administrative Agent or any other Agent, in each case under the Credit Agreement or any other Credit Document; and (ii) shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other provision of either such agreement or any other Credit Document. Each and every term, condition, obligation, covenant and agreement contained in the Credit Agreement, after giving effect to this Amendment or any other Credit Document is hereby ratified and re-affirmed in all respects and shall continue in full force and effect. Each Credit Party reaffirms its obligations under the Credit Documents to which it is party and the validity of the Liens granted by it pursuant to the Collateral Documents. This Amendment shall constitute a Credit Document for purposes of the Credit Agreement and from and after the Amendment No. 9 Effective Date, all references to the Credit Agreement in any Credit Document and all references in the Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import

Exhibit 2, page 131

referring to the Credit Agreement, shall, unless expressly provided otherwise, refer to the Amended Credit Agreement. Each of the Credit Parties hereby (i) consents to this Amendment, (ii) confirms that all obligations of such Credit Party under the Credit Documents to which such Credit Party is a party shall continue to apply to the Credit Agreement as amended hereby and (iii) agrees that all security interests granted by it pursuant to any Credit Document (whether before, on or after the Amendment No. 9 Effective Date) shall secure (and continue to secure) the Obligations under the Credit Documents as amended by this Amendment. The parties hereto acknowledge and agree that the amendment of the Credit Agreement pursuant to this Amendment and all other Credit Documents amended and/or executed and delivered in connection herewith shall not constitute a novation of the Credit Agreement and the other Credit Documents as in effect prior to the Amendment No. 9 Effective Date.

Section 8. **SUBMISSION TO JURISDICTION; WAIVER OF VENUE; SERVICE OF PROCESS**. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF SUCH STATE AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AMENDMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY HERETO MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AMENDMENT OR ANY OTHER CREDIT DOCUMENT AGAINST ANY OTHER PARTY HERETO OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN THE PRIOR PARAGRAPH OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02 OF THE CREDIT AGREEMENT. NOTHING IN THIS AMENDMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 9. **WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO

(A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AMENDMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

[*The remainder of this page is intentionally left blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**LIVE NATION ENTERTAINMENT, INC.**

By:     <u>/s/ Michael Rowles</u>
          Name: Michael Rowles
          Title: Executive Vice President,
               General Counsel and Secretary

[Signature Page to Amendment No. 9]

**CONNECTICUT PERFORMING ARTS PARTNERS**

By: NOC, INC.,
a partner

        By:       /s/ Michael Rowles
               Name: Michael Rowles
               Title: Executive Vice President,
                     General Counsel and
       Secretary

By: CONNECTICUT AMPHITHEATER
DEVELOPMENT CORPORATION,
a partner

        By:       /s/ Michael Rowles
               Name: Michael Rowles
               Title: Executive Vice President,
                     General Counsel and
       Secretary

[Signature Page to Amendment No. 9]

**BLUES AT THE DEPOT, LLC**
**HOB ACE OF SPADES CORP.**
**HOB BOARDWALK, INC.**
**HOB CAFE CORP.**
**HOB CHICAGO, INC.**
**HOB DEPOT CORP.**
**HOB ENTERTAINMENT, LLC**
**HOB GRAND RAPIDS, LLC**
**HOB HIFI DALLAS CORP.**
**HOB MARQUIS CORP.**
**HOB PUNCH LINE PENN CORP.**
**HOB PUNCH LINE S.F. CORP.**
**HOB QUEEN THEATER CORP.**
**HOB ROSE CITY MH CORP.**
**HOB SUMMIT MH CORP.**
**HOB VARSITY CORP.**
**HOUSE OF BLUES ANAHEIM RESTAURANT CORP.**
**HOUSE OF BLUES CLEVELAND, LLC**
**HOUSE OF BLUES CONCERTS, INC.**
**HOUSE OF BLUES DALLAS RESTAURANT CORP.**
**HOUSE OF BLUES HOUSTON RESTAURANT CORP.**
**HOUSE OF BLUES LAS VEGAS RESTAURANT CORP.**
**HOUSE OF BLUES MYRTLE BEACH RESTAURANT CORP.**
**HOUSE OF BLUES NEW ORLEANS RESTAURANT CORP.**
**HOUSE OF BLUES ORLANDO RESTAURANT CORP.**
**HOUSE OF BLUES RESTAURANT HOLDING CORP.**
**HOUSE OF BLUES SAN DIEGO RESTAURANT CORP.**
**LIVE NATION BOGART, LLC LIVE NATION CHICAGO, INC. FILLMORE NEW ORLEANS CORP. NO LIMIT ENTERTAINMENT LLC SPACELAND PRODUCTIONS LLC**
**THE ECHO LLC**


By:        /s/ Michael Rowles
           Name: Michael Rowles
           Title: President



[Signature Page to Amendment No. 9]

ARTIST NATION MANAGEMENT GROUP, LLC
ASSEMBLY ROOM STUDIOS, LLC
BARON GLOBAL, INC.
C3 BOOKING, LLC
C3 PRESENTS, L.L.C.
C3P EMO'S LLC
CELLAR DOOR VENUES, INC.
CONNECTICUT AMPHITHEATER DEVELOP-
MENT    CORPORATION
EIGHT BALL PRICING SOLUTIONS, LLC
F AND F CONCESSIONS, INC.
FACULTY MANAGEMENT, LLC
FACULTY PRODUCTIONS, LLC F
ESTIVAL HOLDINGS, L.L.C.
FILLMORE MINNEAPOLIS CORP.
FRONT GATE TICKETING SOLUTIONS, LLC
HARD EVENTS LLC
HOB MARINA CITY, INC.
HOFESH, LLC
IO MEDIA, INC.
IOMEDIA TECHNOLOGIES, LLC
LIVE NATION LGTOURS (USA),
LLC LIVE NATION MARKETING, INC.
LIVE NATION MTOURS (USA), INC.
LIVE NATION PRODUCTIONS, LLC
LIVE NATION TICKETING, LLC
LIVE NATION TOURING (USA), INC.
LIVE NATION USHTOURS (USA), LLC
LIVE NATION UTOURS (USA), INC.
LIVE NATION WORLDWIDE, INC.
LMG MANAGEMENT LLC
MBA ARTIST MANAGEMENT COMPANY, LLC MICROFLEX 2001 LLC
NEW ERA FARMS, LLC
NEW YORK THEATER, LLC NOC, INC.
REIGNDEER ENTERTAINMENT CORP.
RIVAL LABS, INC.
SPALDING ENTERTAINMENT, LLC TICKETMASTER L.L.C.
TICKETMASTER NEW VENTURES HOLDINGS, INC.
TICKETWEB, LLC
TM VISTA INC.
TNA TOUR II (USA) INC. VECTOR MANAGEMENT LLC
WOLFSON ENTERTAINMENT, INC.

By:        /s/ Michael Rowles
           Name: Michael Rowles
           Title: Executive Vice President,
                  General Counsel and
       Secretary

[Signature Page to Amendment No. 9]

**LIVE NATION STUDIOS HOLDINGS, LLC**
**MICHIGAN LICENSES, LLC**
**TICKETSTODAY, LLC**
**WILTERN RENAISSANCE LLC**

By:          LIVE NATION WORLDWIDE, INC.,
               its sole member

By:          /s/ Michael Rowles
               Name: Michael Rowles
               Title: Executive Vice President,
                    General Counsel and
            Secretary

**HOUSE OF BLUES SAN DIEGO, LLC**

By:          /s/ Michael Rowles
               Name: Michael Rowles
               Title: General Counsel and
            Secretary

**BIGCHAMPAGNE, LLC**

By: TICKETMASTER L.L.C.,
its sole member

By:          /s/ Michael Rowles
               Name: Michael Rowles
               Title: Executive Vice President,
                    General Counsel and
            Secretary

**AXIS NATION, LLC**

By: FESTIVAL HOLDINGS, L.L.C.,
its sole member and manager

By:          /s/ Michael Rowles
               Name: Michael Rowles
               Title: Executive Vice President,
                    General Counsel and
            Secretary

[Signature Page to Amendment No. 9]

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent, Delayed Draw Term A Lender, Collateral Agent, Revolving Lender, L/C Issuer and Swing Line Lender

By:    /s/ Inderjeet Aneja
       Name: Inderjeet Aneja
       Title: Executive Director

[Signature Page to Amendment No. 9]

<u>Exhibit A</u>

**<u>AMENDED CREDIT AGREEMENT</u>**

[See attached.]

**CREDIT AGREEMENT**

dated as of May 6, 2010

as amended by Amendment No. 1 on June 29, 2012,

as amended by Amendment No. 2 on August 16, 2013,

as amended by Amendment No. 3 on October 31, 2016,

as amended by Amendment No. 4 on June 27, 2017,

as amended by Amendment No. 5 on March 28, 2018,

as amended by Amendment No. 6 on October 17, 2019,

and as amended by Amendment No. 7 on April 9, 2020,

as amended by Amendment No. 8 on July 29, ~~2020~~2020,

as amended by Amendment No. 9 on January 26, 2022

among

**LIVE NATION ENTERTAINMENT, INC.**,
as Parent Borrower,

**CERTAIN FOREIGN SUBSIDIARIES OF THE PARENT BORROWER**,
as Foreign Borrowers,

**CERTAIN SUBSIDIARIES OF THE BORROWER**,
as Guarantors,

**THE LENDERS PARTY HERETO**,

**JPMORGAN CHASE BANK, N.A.**,
as Administrative Agent and Collateral Agent,

**JPMORGAN CHASE BANK, N.A., TORONTO BRANCH**,
as Canadian Agent,

**J.P. MORGAN EUROPE LIMITED**, as London Agent,

**U.S. BANK NATIONAL ASSOCIATION,**
as Syndication Agent,

**JP MORGAN CHASE BANK, N.A.**, **GOLDMAN SACHS BANK USA**, **BOFA
SECURITIES, INC.**, **CITIBANK, N.A.**,
**HSBC SECURITIES (USA) INC.**, **MIZUHO BANK, LTD.**,
**MORGAN STANLEY SENIOR FUNDING, INC.**, **MUFG UNION BANK, N.A.**,
~~**SUNTRUST ROBINSON HUMPHREY, INC.**~~**TRUIST SECURITIES, INC.**, **THE BANK OF NOVA SCOTIA**
and
**WELLS FARGO SECURITIES, LLC**,

as Joint Lead Arrangers and Joint Bookrunners

1

Exhibit 2, page 142

**TABLE OF CONTENTS**

| Section | | Page |
|---|---|---|
| | ARTICLE I DEFINITIONS AND ACCOUNTING TERMS | 1 |
| 1.01 | Defined Terms | 1 |
| 1.02 | Interpretative Provisions | 51 |
| 1.03 | Accounting Terms and Provisions | 52 |
| 1.04 | Rounding | 53 |
| 1.05 | Times of Day | 53 |
| 1.06 | Exchange Rates; Currency Equivalents | 53 |
| 1.07 | Additional Alternative Currencies | 53 |
| 1.08 | Additional Borrowers | 54 |
| 1.09 | Change of Currency | 54 |
| 1.10 | Letter of Credit Amounts | 55 |
| 1.11 | Limited Condition Acquisitions | 55 |
| 1.12 | Divisions | 56 |
| | ARTICLE II COMMITMENTS AND CREDIT EXTENSIONS | 56 |
| 2.01 | Commitments | 56 |
| 2.02 | Borrowings, B/A Drawings, Conversions and Continuations | 62 |
| 2.03 | Additional Provisions with Respect to Letters of Credit | 65 |
| 2.04 | Additional Provisions with Respect to Swingline Loans | 71 |
| 2.05 | Repayment of Loans and B/As | 72 |
| 2.06 | Prepayments | 73 |
| 2.07 | Termination or Reduction of Commitments | 78 |
| 2.08 | Interest | 78 |
| 2.09 | Fees | 79 |
| 2.10 | Computation of Interest and Fees | 80 |
| 2.11 | Payments Generally; Applicable Agent's Clawback | 80 |
| 2.12 | Sharing of Payments by Lenders | 82 |
| 2.13 | Evidence of Debt | 83 |
| 2.14 | [Reserved] | 83 |
| 2.15 | Canadian Bankers' Acceptances | 83 |
| 2.16 | Defaulting Lenders | 85 |
| 2.17 | Extended Term Loans and Extended Revolving Commitments | 88 |
| 2.18 | Refinancing Terms Loans | 90 |
| 2.19 | Replacement Revolving Commitments | 91 |
| | ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY | 93 |
| 3.01 | Taxes | 93 |
| 3.02 | Illegality | 96 |
| 3.03 | Inability to Determine Rates | 96 |
| 3.04 | Increased Cost; Capital Adequacy | 97 |
| 3.05 | Compensation for Losses | 98 |
| 3.06 | Mitigation Obligations; Replacement of Lenders | 99 |
| 3.07 | Survival Losses | 99 |
| 3.08 | Additional Reserve Costs | 99 |
| | ARTICLE IV GUARANTY | 100 |
| 4.01 | The Guaranty | 100 |

i

| Section | | Page |
|---|---|---|
| 4.02 | Obligations Unconditional | 100 |
| 4.03 | Reinstatement | 101 |
| 4.04 | Certain Waivers | 101 |
| 4.05 | Remedies | 102 |
| 4.06 | Rights of Contribution | 102 |
| 4.07 | Guaranty of Payment; Continuing Guaranty | 102 |
| 4.08 | Keepwell | 102 |
| **ARTICLE V CONDITIONS PRECEDENT TO CREDIT EXTENSIONS** | | **103** |
| 5.01 | Conditions to Amendment No.7 Effective Date | 103 |
| 5.02 | Conditions to All Credit Extensions | 104 |
| 5.03 | First Credit Extension to each Foreign Borrower | 105 |
| 5.04 | Additional Conditions to Delayed Draw Term A Loans | 106 |
| **ARTICLE VI REPRESENTATIONS AND WARRANTIES** | | **106** |
| 6.01 | Existence, Qualification and Power | 106 |
| 6.02 | Authorization; No Contravention | 106 |
| 6.03 | Governmental Authorization; Other consents | 107 |
| 6.04 | Binding Effect | 107 |
| 6.05 | Financial Statements | 107 |
| 6.06 | No Material Adverse Effect | 107 |
| 6.07 | Litigation | 107 |
| 6.08 | No default | 107 |
| 6.09 | Ownership of Property; Liens | 108 |
| 6.10 | Environmental Matters | 108 |
| 6.11 | Taxes | 108 |
| 6.12 | ERISA Compliance | 108 |
| 6.13 | Labor Matters | 109 |
| 6.14 | Subsidiaries | 109 |
| 6.15 | Margin Regulations; Investment Company Act | 109 |
| 6.16 | Disclosure | 109 |
| 6.17 | Compliance with Laws | 109 |
| 6.18 | Insurance. | 110 |
| 6.19 | Solvency | 110 |
| 6.20 | Intellectual Property; Licenses, Etc | 110 |
| 6.21 | Collateral Matters. | 110 |
| 6.22 | Status of Obligations | 111 |
| 6.23 | Immunities, Etc | 111 |
| 6.24 | Anti-Money Laundering, Economic Sanction Laws and Anti-Corruption Laws | 111 |
| 6.25 | EEA Financial Institution | 111 |
| **ARTICLE VII AFFIRMATIVE COVENANTS** | | **112** |
| 7.01 | Financial Statements | 112 |
| 7.02 | Certificates; Other Information. | 113 |
| 7.03 | Notification | 114 |
| 7.04 | Preservation of Existence | 115 |
| 7.05 | Payment of Taxes and Other Obligations. | 115 |
| 7.06 | Compliance with Law | 115 |
| 7.07 | Maintenance of Property | 116 |
| 7.08 | Insurance | 116 |
| 7.09 | Books and Records | 116 |
| 7.10 | Inspection Rights | 116 |

| Section | | Page |
|---|---|---|
| 7.11 | Use of Proceeds | 116 |
| 7.12 | Joinder of Subsidiaries as Guarantors.. | 117 |
| 7.13 | Pledge of Capital Stock | ~~117~~ 118 |
| 7.14 | Pledge of Other Property | 118 |
| 7.15 | Further Assurances Regarding Collateral | 118 |
| 7.16 | Rating | ~~118~~ 119 |
| 7.17 | Ownership of Foreign Borrowers | ~~118~~ 119 |
| 7.18 | Redemption of 2022 Senior Notes | 119 |
| 7.19 | Post-Closing Matters | 119 |
| | ARTICLE VIII NEGATIVE COVENANTS | 119 |
| 8.01 | Liens | 119 |
| 8.02 | Investments | 122 |
| 8.03 | Indebtedness | ~~124~~ 125 |
| 8.04 | Mergers and Dissolutions | 128 |
| 8.05 | Dispositions | ~~128~~ 129 |
| 8.06 | Restricted Payments | ~~129~~ 130 |
| 8.07 | Change in Nature of Business | ~~130~~ 131 |
| 8.08 | Change in Accounting Practices or Fiscal Year | 131 |
| 8.09 | Transactions with Affiliates | ~~131~~ 132 |
| 8.10 | Financial Covenant | ~~131~~ 132 |
| 8.11 | [Reserved.] | ~~131~~ 132 |
| 8.12 | Limitation on Subsidiary Distributions | ~~131~~ 132 |
| 8.13 | Amendment of Material Documents | ~~132~~ 133 |
| 8.14 | Sale and Leaseback Transactions | ~~132~~ 133 |
| 8.15 | Swap Contracts | ~~133~~ 134 |
| | ARTICLE IX EVENTS OF DEFAULT AND REMEDIES | ~~133~~ 134 |
| 9.01 | Events of Default | ~~133~~ 134 |
| 9.02 | Remedies upon Event of Default | ~~135~~ 136 |
| 9.03 | Application of Funds | ~~136~~ 137 |
| | ARTICLE X AGENTS | ~~137~~ 138 |
| 10.01 | Appointment and Authorization of the Agents | ~~137~~ 138 |
| 10.02 | Rights as a Lender | ~~138~~ 139 |
| 10.03 | Exculpatory Provisions | ~~138~~ 139 |
| 10.04 | Reliance by Agents | ~~139~~ 140 |
| 10.05 | Delegation of Duties | ~~139~~ 140 |
| 10.06 | Resignation of an Agent | ~~139~~ 140 |
| 10.07 | Non-Reliance on Agents and Other Lenders | ~~140~~ 141 |
| 10.08 | No Other Duties | ~~140~~ 141 |
| 10.09 | Agents May File Proofs of Claim | ~~140~~ 141 |
| 10.10 | Collateral and Guaranty Matters | ~~140~~ 141 |
| 10.11 | Witholding Tax | 142 |
| 10.12 | Treasury Management Agreements and Swap Contracts | ~~142~~ 143 |
| 10.13 | Credit Bidding | ~~142~~ 143 |
| | ARTICLE XI MISCELLANEOUS | ~~143~~ 144 |
| 11.01 | Amendments, Etc | ~~143~~ 144 |
| 11.02 | Notices; Effectiveness; Electronic Communication | ~~147~~ 148 |
| 11.03 | No Waiver; Cumulative Remedies; Enforcement | ~~149~~ 150 |

| Section | | Page |
|---|---|---|
| 11.04 | Expenses; Indemnity; Damage Waiver | ~~149~~ 150 |
| 11.05 | Payments Set Aside | ~~151~~ 152 |
| 11.06 | Successors and Assigns | ~~151~~ 152 |
| 11.07 | Treatment of Certain Information; Confidentiality | ~~156~~ 157 |
| 11.08 | Right of Setoff | ~~157~~ 158 |
| 11.09 | Interest Rate Limitation | ~~157~~ 158 |
| 11.10 | Counterparts; Integration; Effectiveness | ~~157~~ 158 |
| 11.11 | Survival of Representations and Warranties | ~~158~~ 159 |
| 11.12 | Severability | ~~158~~ 159 |
| 11.13 | Replacement of Lenders | ~~158~~ 159 |
| 11.14 | Governing Law; Jurisdiction; Etc | ~~160~~ 161 |
| 11.15 | Waiver of Jury Trial | ~~160~~ 161 |
| 11.16 | USA PATRIOT Act Notice | ~~160~~ 161 |
| 11.17 | Designation of Senior Debt | ~~161~~ 162 |
| 11.18 | Limitation on Foreign Credit Party Obligations | ~~161~~ 162 |
| 11.19 | No Advisory or Fiduciary Responsibility | ~~161~~ 162 |
| 11.20 | Acknowledgement and Consent to Bail in of EEA Financial Institutions | ~~161~~ 162 |
| 11.21 | Judgment Currency; Submission to Jurisdiction | ~~162~~ 163 |
| 11.22 | Acknowledgment Regarding Any Supported QFC's | ~~162~~ 163 |
| 11.23 | Restricted Lenders | ~~163~~ 164 |

**SCHEDULES**

| | |
|---|---|
| Schedule 1.01A | Designated Sale and Leaseback Assets |
| Schedule 1.01C | Amendment No. 6 Effective Date Guarantors |
| Schedule 1.01D | HOBE Excluded Assets |
| Schedule 1.01E | Certain Capital Stock |
| Schedule 1.01F | Letter of Credit Cap |
| Schedule 6.14 | Subsidiaries |
| Schedule 6.21 | Filings and Recordings |
| Schedule 7.08 | Insurance |
| Schedule 7.19 | Post-Closing Matters |
| Schedule 8.01 | Existing Liens |
| Schedule 8.02(b) | Existing Investments |
| Schedule 8.02(x) | Designated Investments |
| Schedule 8.03 | Existing Indebtedness |
| Schedule 8.05 | Designated Assets |
| Schedule 8.06(b) | Certain Restricted Payments |
| Schedule 11.02 | Notice Addresses |

**EXHIBITS**

| | |
|---|---|
| Exhibit 1.01A | Form of Foreign Borrower Agreement |
| Exhibit 1.01B | Form of Foreign Borrower Termination |
| Exhibit 1.01C | Form of U.S. Pledge Agreement |
| Exhibit 1.01D | Form of U.S. Security Agreement |
| Exhibit 2.02 | Form of Loan Notice |
| Exhibit 2.13-1 | Form of Dollar Revolving Note |
| Exhibit 2.13-2 | Form of Limited Currency Revolving Note |
| Exhibit 2.13-3 | Form of Multicurrency Revolving Note |
| Exhibit 2.13-4 | Form of Swingline Note |
| Exhibit 2.13-5 | Form of Delayed Draw Term A Loan Note |
| Exhibit 2.13-6 | Form of Term B-4 Note |
| Exhibit 2.13-7 | Form of 2020-1 Incremental Revolving Note |
| Exhibit 3.01(e)-1 | Form of United States Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit 3.01(e)-2 | Form of United States Tax Compliance Certificate (Fore Foreign Lenders That Are Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit 3.01(e)-3 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants That Are Not Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit 3.01(e)-4 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants That Are Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit 7.02(b) | Form of Compliance Certificate |
| Exhibit 7.12 | Form of Joinder Agreement |
| Exhibit 11.06(b) | Form of Assignment and Assumption |
| Exhibit 11.06(j) | Loan Offer Provisions |

**CREDIT AGREEMENT**

This CREDIT AGREEMENT (this "Credit Agreement") is entered into as of May 6, 2010 (and amended by Amendment No. 1 on June 29, 2012, as further amended by Amendment No. 2 on August 16, 2013, as further amended by Amendment No. 3 on October 31, 2016, as further amended by Amendment No. 4 on June 27, 2017, as further amended by Amendment No. 5 on March 28, 2018, as further amended by Amendment No. 6 on October 17, 2019, as further amended by Amendment No. 7 on April 9, ~~2020 and~~2020, as further amended by Amendment No. 8 on July 29, 2020and as further amended by Amendment No. 9 on January 26, 2022, among LIVE NATION ENTERTAINMENT, INC., a Delaware corporation (the "Parent Borrower"), the Foreign Borrowers party hereto from time to time (together with the Parent Borrower, the "Borrowers"), the Guarantors identified herein, the Lenders party hereto, JPMORGAN CHASE BANK, N.A., as Administrative Agent and Collateral Agent, JPMORGAN CHASE BANK, N.A., TORONTO BRANCH, as Canadian Agent and J.P. MORGAN EUROPE LIMITED, as London Agent.

**W I T N E S S E T H**

WHEREAS, the Borrowers and the Guarantors have requested that the Lenders provide revolving credit and term loan facilities for the purposes set forth herein; and

WHEREAS, the Lenders have agreed to make the requested facilities available on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

**ARTICLE I**

**DEFINITIONS AND ACCOUNTING TERMS**

**1.01    Defined Terms.**

As used in this Credit Agreement, the following terms have the meanings provided below: "2020-1 Incremental Revolving Commitment Fee Rate"

means 1.75% per annum.

"2020-1 Incremental Revolving Commitment Percentage" means, for each 2020-1 Incremental Revolving Lender as of any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such 2020-1 Incremental Revolving Lender's 2020-1 Incremental Revolving Committed Amount as of such time and the denominator of which is the Aggregate 2020-1 Incremental Revolving Committed Amount as of such time. The 2020-1 Incremental Revolving Commitment Percentages as of the Amendment No. 7 Effective Date are set forth in Schedule I to Amendment No. 7 under the column entitled "2020-1 Incremental Revolving Commitment Percentage".

"2020-1 Incremental Revolving Commitments" has the meaning assigned to such term in Amendment No.7.

"2020-1 Incremental Revolving Committed Amount" means, for each 2020-1 Incremental Revolving Lender, the amount set forth in Schedule I to Amendment No. 7 under the row applicable to such Lender in the column entitled "2020-1 Incremental Revolving Commitments", in the Assignment and Assumption by which such 2020-1 Incremental Revolving Lender became a 2020-1 Incremental Revolving Lender or in any documentation relating to Incremental Revolving Commitments or Additional Credit Extension Amendments, as such 2020-1 Incremental Revolving Committed Amount may be reduced or increased pursuant to the other provisions hereof.

"2020-1 Incremental Revolving Facility" means the Aggregate 2020-1 Incremental Revolving Commitments and the provisions herein related to the 2020-1 Incremental Revolving Loans.

"2020-1 Incremental Revolving Lenders" means the Persons listed on Schedule I to Amendment No. 7 under the heading "2020-1 Incremental Revolving Lenders" together with their successors and permitted assigns, and any Person that shall be designated a "2020-1 Incremental Revolving Lender" pursuant to Incremental Revolving Commitments or an Additional Credit Extension Amendment in accordance with the provisions hereof.

"2020-1 Incremental Revolving Loan" has the meaning provided in Section 2.01(a)(iv).

"2020-1 Incremental Revolving Notes" means the promissory notes, if any, given to evidence the 2020-1 Incremental Revolving Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of 2020-1 Incremental Revolving Note is attached as Exhibit 2.13-7.

"2023 Convertible Notes" means the $550.0 million aggregate principal amount of 2.5% of convertible senior notes due 2023 of the Parent Borrower.

"2023 Convertible Notes Indenture" means the indenture, dated March 20, 2018, governing the 2023 Convertible Notes.

"2022 Senior Notes" means the $250.0 million aggregate outstanding principal amount of 5.375% of Senior Notes due 2022 of the Parent Borrower.

"2024 Senior Notes" means the $575.0 million aggregate outstanding principal amount of 4.875% of Senior Notes due 2024 of the Parent Borrower.

"2026 Senior Notes" means the $300.0 million aggregate outstanding principal amount of 5.625% of Senior Notes due 2026 of the Parent Borrower.

"2027 Senior Notes" means the $950.0 million aggregate outstanding principal amount of 4.75% of Senior Notes due 2027 of the Parent Borrower.

"Academy Music Group" means AMG and its Subsidiaries.

"Acquisition" means the purchase or acquisition (whether in one or a series of related transactions) by any Person of (a) more than fifty percent (50%) of the Capital Stock with ordinary voting power of another Person or (b) all or substantially all of the property (other than Capital Stock) of another Person or division or line of business or business unit of another Person, whether or not involving a merger or consolidation with such Person.

"Additional Credit Extension Amendment" means an amendment to this Credit Agreement (which may, at the option of the Administrative Agent and the Parent Borrower, be in the form of an amendment and restatement of this Credit Agreement) providing for any Incremental Revolving Commitments, Incremental Revolving Facilities or Incremental Term Loans pursuant to Section 2.01(f), Extended Term Loans and/or Extended Revolving Commitments pursuant to Section 2.17, Refinancing Term Loans pursuant to Section 2.18, and/or Replacement Revolving Commitments pursuant to Section 2.19, which shall be consistent with the applicable provisions of this Credit Agreement and otherwise reasonably satisfactory to the parties thereto. Each Additional Credit Extension Amendment shall be executed by the L/C Issuer and/or the Swingline Lender (to the extent Section 11.01 would require the consent of the L/C Issuer and/or the Swingline Lender, respectively, for the amendments effected in such Additional Credit Extension Amendment), the Administrative Agent, the Credit Parties and the other parties specified in Section 2.01(f), 2.17, 2.18 or 2.19, as applicable, of this Credit Agreement (but not any other Lender not specified in Section 2.01(f), 2.17, 2.18 or 2.19, as applicable, of this Credit Agreement), but shall not effect any amendments that would require the consent of each affected Lender or all Lenders pursuant to Section 11.01. Any Additional Credit Extension Amendment shall include conditions for closing documentation, all to the extent reasonably requested by the Administrative Agent.

"Additional Term B-4 Commitment" means the commitment of the Additional Term B-4 Lender to make a term loan on the Amendment No. 6 Effective Date in an aggregate amount equal to $950.0 million minus the aggregate principal amount of the Converted Term B-3 Loans of all Lenders (which aggregate amount of Additional Term B-4 Commitment is equal to $103,419,112.78).

"Additional Term B-4 Lender" means the Person identified as such in Amendment No. 6.

"Adjusted Eurodollar Rate" means, with respect to any Eurodollar Rate Loan for any Interest Period, an interest rate *per annum* (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the Eurodollar Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means JPMCB in its capacity as administrative agent for the Lenders under any of the Credit Documents, or any successor administrative agent.

"Administrative Agent Fee Letter" means that certain administrative agent fee letter dated as of the Closing Date between the Parent Borrower and JPMCB.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.02, or such other address or account as the Administrative Agent may from time to time notify the Parent Borrower and the Lenders.

"Administrative Questionnaire" means an administrative questionnaire for the Lenders in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means any of the Administrative Agent, the Canadian Agent, the London Agent or the Collateral Agent.

"Agent Parties" has the meaning assigned to such term in Section 11.02(c).

"Aggregate Commitments" means the aggregate principal amount of the Revolving Commitments, Delayed Draw Term A Commitments and the Additional Term B-4 Commitment.

"Aggregate Delayed Draw Term A Commitments" means, at any time, the excess of (A) Delayed Draw Term A Commitments of all Lenders as of the Amendment No. 6 Effective Date, as such amount may be reduced by the operation of Section 2.07 or Section 2.01(d) over (B) the aggregate principal amount of all Delayed Draw Term A Loans made at or prior to such time.

"Aggregate 2020-1 Incremental Revolving Commitments" means the 2020-1 Incremental Revolving Commitments of all the Lenders.

"Aggregate 2020-1 Incremental Revolving Committed Amount" has the meaning provided in Section 2.01(a)(iv).

"Aggregate Dollar Revolving Commitments" means the Dollar Revolving Commitments of all the Lenders.

"Aggregate Dollar Revolving Committed Amount" has the meaning provided in Section 2.01(a)(i).

-3-

"Aggregate Limited Currency Revolving Commitments" means the Limited Currency Revolving Commitments of all the Lenders.

"Aggregate Limited Currency Revolving Committed Amount" has the meaning provided in Section 2.01(a)(ii).

"Aggregate Multicurrency Revolving Commitments" means the Multicurrency Revolving Commitments of all Lenders.

"Aggregate Multicurrency Revolving Committed Amount" has the meaning provided in Section 2.01(a)(iii).

"Aggregate Revolving Commitment Percentage" means, as to each Revolving Lender at any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Revolving Lender's Revolving Committed Amount at such time and the denominator of which is the Aggregate Revolving Committed Amount at such time.

"Aggregate Revolving Commitments" means the sum of the Revolving Commitments of all Revolving Lenders.

"Aggregate Revolving Committed Amount" means the collective reference to the Aggregate 2020-1 Incremental Revolving Committed Amount, the Aggregate Dollar Revolving Committed Amount, the Aggregate Limited Currency Revolving Committed Amount and the Aggregate Multicurrency Revolving Committed Amount.

"AIL Group" means Amphitheatre Ireland Limited and its Subsidiaries.

"AIL Indebtedness" means Indebtedness of any Person comprising part of the AIL Group in an aggregate amount for all such Indebtedness not exceeding the Dollar Equivalent of €40,000,000 at any time outstanding.

"Allocated Amount" has the meaning assigned to such term in Amendment No. 6.

"Alternative Currency" means each of Euros, Canadian Dollars, Sterling, Danish Krone, Swedish Krona, Australian Dollars, Japanese Yen, Mexican Pesos, Brazilian Real and Swiss Francs and any other currency added as an
"Alternative Currency" pursuant to Section 1.07 hereof (any such other currency so added, an "Other Alternative Currency").

"Alternative Currency Fronting Lender" means, with respect to any Fronted Currency Loan, each Multicurrency Revolving Lender that (a) has indicated in writing to the Administrative Agent and the Parent Borrower that it can fund Fronted Currency Loans in such Fronted Currency, (b) has agreed, in its sole discretion, in writing to act as an Alternative Currency Fronting Lender hereunder with respect to such Fronted Currency and (c) has been approved in writing by the Administrative Agent (unless such Alternative Currency Fronting Lender is the same Person as the Administrative Agent) and the Parent Borrower as an Alternative Currency Fronting Lender with respect to such Fronted Currency. The Administrative Agent shall notify the Multicurrency Revolving Lenders of the identity of each Alternative Currency Fronting Lender. With respect to each Borrowing of Fronted Currency Loans, there shall be only one Alternative Currency Fronting Lender (but for the avoidance of doubt, there may be more than one Alternative Currency Fronting Lender at any time, including for the same Fronted Currency, and in such case, the Parent Borrower shall determine which Alternative Currency Fronting Lender shall make such Fronted Currency Loan).

"Alternative Currency L/C Obligations" means any L/C Obligations arising from an Alternative Currency Letter of Credit.

"Alternative Currency L/C Sublimit" means $60.0 million.

"Alternative Currency Letter of Credit" means any Letter of Credit denominated in an Alternative Currency.

"Alternative Currency Sublimit" means $100.0 million.

-4-

"Amendment No. 2 Effective Date" means August 16, 2013.

"Amendment No. 3" means Amendment No. 3 to this Credit Agreement, dated as of the Amendment No. 3 Effective Date, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 3 Effective Date" means October 31, 2016.

"Amendment No. 4" means Amendment No. 4 to this Credit Agreement, dated as of the Amendment No. 4 Effective Date, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 4 Effective Date" means June 27, 2017.

"Amendment No. 5 Effective Date" means March 28, 2018.

"Amendment No. 6" means Amendment No. 6 to this Credit Agreement, dated as of October 17, 2019, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 6 Effective Date" has the meaning specified in Amendment No. 6 (for the avoidance of doubt, the Amendment No. 6 Effective Date is October 17, 2019).

"Amendment No. 6/No. 7 Interim Period" means the period from and including the Amendment No. 6 Effective Date through and including the Amendment No. 7 Effective Date.

"Amendment No. 6 New Guarantor" has the meaning specified in Amendment No. 6.

"Amendment No. 7" means Amendment No. 7 to this Credit Agreement, dated as of April 9, 2020, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 7 Effective Date" has the meaning specified in Amendment No. 7 (for the avoidance of doubt, the Amendment No. 7 Effective Date is April 9, 2020).

"Amendment No. 8" means Amendment No. 8 to this Credit Agreement, dated as of July 29, 2020, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 8 Effective Date" has the meaning specified in Amendment No. 8 (for the avoidance of doubt, the Amendment No. 8 Effective Date is July 29, 2020).

"AMG" means Academy Music Holdings Ltd., a company incorporated in England and Wales.

"AMG Indebtedness" means Indebtedness of any Person comprising part of the Academy Music Group in an aggregate amount for all such Indebtedness not exceeding the Dollar Equivalent of £60,000,000 at any time outstanding.

"Anti-Corruption Laws" has the meaning provided in Section 6.24(a).

"Applicable Agent" means (a) with respect to a Loan denominated in Dollars or a Letter of Credit denominated in any Approved Currency, or with respect to any payment that does not relate to any Loan, Borrowing or Letter of Credit, the Administrative Agent, (b) with respect to a Loan denominated in Canadian Dollars or a B/A, the Canadian Agent and (c) with respect to a Loan denominated in any other Alternative Currency, the London Agent.

"Applicable Agent's Office" means such Applicable Agent's address and, as appropriate, account as set forth on Schedule 11.02, or such other address or account as such Applicable Agent may from time to time notify the Parent Borrower and the Lenders.

-5-

"Applicable Disposition Amount" means $950.0 million increased by $50.0 million on each January 1 beginning on January 1, 2020minus the aggregate amount (measured at the fair market value thereof) of all Property Disposed of
pursuant to Section 8.05 (other than Dispositions of Designated Assets) from and after the Amendment No. 6 Effective Date.

"Applicable Pari Passu Debt" has the meaning provided in Section 2.06(b)(ii).

"Applicable Percentage" means (i) with respect to Revolving Loans (other than 2020-1 Incremental Revolving Loans), Swingline Loans (it being understood that all Swingline Loans shall be Base Rate Loans), B/A Drawings, Letter of Credit Fees and Delayed Draw Term A Loans, 2.25% per annum in the case of any Eurodollar Rate Loans and 1.25% per annum in the case of any Base Rate Loans, (ii) with respect to Term B-4 Loans, 1.75% per annum in the case of any Eurodollar Rate Loans and 0.75% per annum in the case of any Base Rate Loans, (iii) with respect to 2020-1 Incremental Revolving Loans, 2.50% per annum in the case of any Eurodollar Rate Loans and 1.50% per annum in the case of any Base Rate Loans, and (iv) with respect to any other Class of Term Loans, as specified in the Additional Credit Extension Amendment related thereto (it being understood that Amendment No. 6 constitutes the Additional Credit Extension Amendment in respect of the Term B-4 Loans). For the avoidance of doubt, with respect to interest that shall have accrued during the Amendment No. 6/No. 7 Interim Period, the Applicable Percentage that was in effect during the Amendment No. 6/No. 7 Interim Period shall apply for all determinations of interest during the Amendment No. 6/No. 7 Interim Period.

"Applicable Time" means, with respect to any borrowings and payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Applicable Agent or the applicable L/C Issuer, as applicable, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"Approved Currency" means each of Dollars and each Alternative Currency.

"Approved Fund" means any Fund that is administered, managed or underwritten by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06) and accepted by the Administrative Agent and, if required by Section 11.06, the Parent Borrower, in substantially the form of Exhibit 11.06(b) or any other form approved by the Administrative Agent.

"Attributable Principal Amount" means (a) in the case of capital leases, the amount of capital lease obligations determined in accordance with GAAP, (b) in the case of Synthetic Leases, an amount determined by capitalization of the remaining lease payments thereunder as if it were a capital lease determined in accordance with GAAP, and (c) in the case of Sale and Leaseback Transactions, the present value (discounted in accordance with GAAP at the debt rate implied in the applicable lease) of the obligations of the lessee for rental payments during the term of such lease.

"Australian Bill Rate" means, for any Interest Period: (a) the rate published at or about 10:30 a.m., Sydney local time, on the first day of such Interest Period on the Reuters Screen under the heading "BBSY" for bills of exchange having a tenor approximating as closely as possible the length of such Interest Period, or (b) if the rate described under clause (a) above is not published at the relevant time, or the basis on which that rate is displayed is changed and in the opinion of the Administrative Agent it ceases to reflect the applicable Lenders' cost of funding, then the applicable rate will be determined by the Administrative Agent to be the average of the buying rates quoted to the Administrative Agent by three (3) Australian banks at or about 10:30 a.m., Sydney local time, on the date of determination for bills of exchange with a tenor approximating the length of such Interest Period; provided that if the Australian Bill Rate as otherwise determined pursuant to this definition shall be less than 0.0% per annum, the Australian Bill Rate shall be 0.0% per annum.

"Australian Dollars" or "AU$" means the lawful currency of Australia.

-6-

"Auto-Extension Letter of Credit" has the meaning provided in Section 2.03(b)(iii).

"B/A" means a bill of exchange, including a depository bill issued in accordance with the Depository Bills and Notes Act (Canada), denominated in Canadian Dollars, drawn by a Canadian Borrower and accepted by a Multicurrency Revolving Lender in accordance with the terms of this Credit Agreement.

"B/A Drawing" means B/As accepted and purchased on the same date and as to which a single Contract Period is in effect, including any B/A Equivalent Loans accepted and purchased on the same date and as to which a single Contract Period is in effect. For greater certainty, all provisions of this Credit Agreement which are applicable to B/As are also applicable, *mutatis mutandis*, to B/A Equivalent Loans.

"B/A Equivalent Loan" has the meaning set forth in Section 2.15(k).

"B/A Fee" has the meaning provided in Section 2.09(c).

"B/A Obligations" means all reimbursement obligations of the Canadian Borrowers in respect of B/As accepted hereunder.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code": Title 11 of the United States Code.

"Base Rate" means (i) in the case of Loans denominated in Dollars, for any day, a rate *per annum* equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Adjusted Eurodollar Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, provided that, the Adjusted Eurodollar Rate for any day shall be based on the Eurodollar Rate at approximately 11:00 a.m. London time on such day (any change in the Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted Eurodollar Rate, respectively) and (ii) in the case of Loans denominated in Canadian Dollars, the greater of (a) the rate of interest publicly announced from time to time by the Canadian Agent as its "prime" reference rate in effect on such day at its principal office in Toronto for determining interest rates applicable to commercial loans denominated in Canadian Dollars in Canada (each change in such reference rate being effective from and including the date such change is publicly announced as being effective) and (b) the interest rate per annum equal to the sum of (x) the CDOR Rate on such day (or, if such rate is not so reported on the Reuters Screen CDOR Page, the average of the rate quotes for bankers' acceptances denominated in Canadian Dollars with a term of 30 days received by the Canadian Agent at approximately 10:00 a.m., Toronto time, on such day (or, if such day is not a Business Day, on the next preceding Business Day) from one or more banks of recognized standing selected by it) and (y) 0.50% per annum. The "Prime Rate" is a rate set by JPMCB or the Canadian Agent, as applicable based upon various factors including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by JPMCB or the Canadian Agent shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

Exhibit 2, page 154

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an "affiliate' (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Borrower Obligations" means, without duplication, (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Borrower arising under any Credit Document or otherwise with respect to any Loan, B/A or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Borrower of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, (b) unless otherwise designated in writing by Parent Borrower and such Hedge Bank (as defined below), all obligations under any Swap Contract between Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary) and the Administrative Agent, any Lead Arranger, any Lender or Affiliate of the Administrative Agent, a Lead Arranger or a Lender or any Person that was the Administrative Agent, a Lead Arranger, a Lender or Affiliate of the Administrative Agent, a Lead Arranger or a Lender at the time it entered into such Swap Contract, (each, in such capacity, a "Hedge Bank"), other than any Swap Contract entered into in connection with any Permitted Bond Hedge Transaction or any Permitted Warrant Transaction and (c) unless otherwise designated in writing by Parent Borrower and such Treasury Management Bank (as defined below), all obligations under any Treasury Management Agreement between Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary) and the Administrative Agent, any Lender or Affiliate of the Administrative Agent or a Lender or any Person that was the Administrative Agent, a Lender or Affiliate of the Administrative Agent or a Lender at the time it entered into such Treasury Management Agreement (each, in such capacity, a "Treasury Management Bank"); provided that Excluded Swap Obligations shall not be a Borrower Obligation of any Guarantor that is not a Qualified ECP Guarantor.

"Borrowers" has the meaning provided in the preamble hereto.

"Borrowing" means (a) a borrowing consisting of simultaneous Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period, or (b) a borrowing of Swingline Loans, as appropriate.

"Brazilian Real" or "R$" means the lawful money of Brazil.

"Business Day" means any day (other than a day which is a Saturday, Sunday, or other day on which banks in New York are authorized or required by law to close); provided, however, that (a) when used in connection with a rate determination, borrowing, or payment in respect of a Eurodollar Rate Loan, the term "Business Day" shall also exclude any day on which banks in London, England are not open for dealings in deposits of Dollars or foreign currencies, as applicable, in the London Interbank Market, (b) when used in connection with a Loan denominated in Euros, the term "Business Day" shall also exclude any day on which the TARGET payment system is not open for the settlement of payments in Euros, (c) when used in connection with a Loan denominated in Canadian Dollars or a B/A, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in Canadian Dollars in Toronto and (d) when used in connection with a Loan denominated in any Alternative Currency other than Euros and Canadian Dollars, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in the applicable currency in the principal financial center of the country of such currency.

"Canadian Agent" means JPMorgan Chase Bank, N.A., Toronto Branch, in its capacity as Canadian agent for the Lenders hereunder, or any successor Canadian agent.

"Canadian Borrower" means the Parent Borrower or any Subsidiary that is incorporated or otherwise organized under the laws of Canada or any political subdivision thereof that has been designated as a Foreign Borrower pursuant to Section 1.08 and, in each case that has not ceased to be a Foreign Borrower as provided in Section 1.08.

"Canadian Dollars" and "C$" means the lawful currency of Canada.

-8-

"Canadian Lending Office" means, as to any Limited Currency Revolving Lender, the applicable branch, office or Affiliate of such Limited Currency Revolving Lender designated by such Limited Currency Revolving Lender to make Loans in Canadian Dollars and to accept and purchase or arrange for the purchase of B/As and as to any Multicurrency Revolving Lender, the applicable branch, office or Affiliate of such Multicurrency Revolving Lender designated by such Multicurrency Revolving Lender to make Loans in Canadian Dollars and to accept and purchase or arrange for the purchase of B/As.

"Capital Expenditures" means, as to any Person, expenditures with respect to property, plant and equipment during such period which should be capitalized in accordance with GAAP (including the Attributable Principal Amount of capital leases). The following items will be excluded from the definition of Capital Expenditures: (a) expenditures to the extent funded by insurance proceeds, condemnation awards or payments pursuant to a deed in lieu thereof, (b) expenditures to the extent made through barter transactions and (c) non-cash capital expenditures required to be booked as capital expenditures in accordance with GAAP.

"Capital Stock" means (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person (but excluding, in each case, any debt security that is convertible into, or exchangeable for, Capital Stock). For the avoidance of doubt, a debt security that is convertible into, or exchangeable for, cash and/or Capital Stock, in an amount determined by reference to the price of such Capital Stock, will be deemed to satisfy the requirements of the exclusion set forth in the final parenthetical of the preceding sentence.

"Cash Collateralize" has the meaning provided in Section 2.03(g).

"Cash Equivalents" means (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve (12) months from the date of acquisition, (b) Dollar-denominated time deposits, money market deposits and certificates of deposit of (i) any Lender that accepts such deposits in the ordinary course of such Lender's business, (ii) any domestic commercial bank of recognized standing having capital and surplus in excess of $500.0 million or (iii) any bank whose short-term commercial paper rating from S&P is at least A-1 or from Moody's is at least P-1, in each case with maturities of not more than two hundred seventy (270) days from the date of acquisition, (c) commercial paper issued by any issuer bearing at least an "A-2" rating for any short-term rating provided by S&P and/or Moody's and maturing within two hundred seventy (270) days of the date of acquisition, (d) repurchase agreements entered into by the Parent Borrower with a bank or trust company (including any of the Lenders) or recognized securities dealer having capital and surplus in excess of $500.0 million for direct obligations issued by or fully guaranteed by the United States and having, on the date of purchase thereof, a fair market value of at least one hundred percent (100%) of the amount of the repurchase obligations, (e) Investments (classified in accordance with GAAP as current assets) in money market investment programs registered under the Investment Company Act of 1940, as amended, that are administered by reputable financial institutions having capital and surplus of at least $500.0 million and the portfolios of which are limited to Investments of the character described in the foregoing subclauses hereof, (f) shares of mutual funds if no less than 95% of such funds' investments satisfy the provisions of clauses (a) through (e) above, and (g) in the case of any Foreign Subsidiary, short-term investments of comparable credit quality (or the best available in such Foreign Subsidiary's jurisdiction) and tenor to those referred to in clauses (a) through (f) above which are customarily used for cash management purposes in any country in which such Foreign Subsidiary operates.

"CDOR Rate" means, on any date, an interest rate per annum equal to the greater of (x) the average discount rate applicable to bankers' acceptances denominated in Canadian Dollars with a term of 30 days (for purposes of the definition of the term "Base Rate") or with a term equal to the Contract Period of the relevant B/As (for purposes of the definition of the term "Discount Rate") appearing on the Reuters Screen CDOR Page (or on any successor or substitute page of such screen, or any successor to or substitute for such screen, providing rate quotations comparable to those currently provided on such page of such screen, as determined by the Canadian Agent from time to time) at approximately 10:00 a.m., Toronto time, on such date (or, if such date is not a Business Day, on the next preceding Business Day) and (y) 0.00%.

-9-

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code.

"CFC Holdco" means any Domestic Subsidiary with no material assets other than the Capital Stock of one or more Foreign Subsidiaries that are CFCs.

"Change in Law" means the occurrence, after the Amendment No. 6 Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority provided, that (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case, be deemed to have been introduced or adopted after the Amendment No. 6 Effective Date, regardless of the date enacted or adopted.

"Change of Control" means an event or series of events by which:

(a)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan unless such plan is part of a group) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934), directly or indirectly, of forty percent (40%) or more of the equity securities of the Parent Borrower entitled to vote for members of the board of directors or equivalent governing body of the Parent Borrower on a fully diluted basis;

(b)     there shall be consummated any share exchange, consolidation or merger of the Parent Borrower pursuant to which the Parent Borrower's Capital Stock entitled to vote in the election of the board of directors of the Parent Borrower generally would be converted into cash, securities or other property, or the Parent Borrower sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets, in each case other than pursuant to a share exchange, consolidation or merger of the Parent Borrower in which the holders of the Parent Borrower's Capital Stock entitled to vote in the election of the board of directors of the Parent Borrower generally immediately prior to the share exchange, consolidation or merger have, directly or indirectly, at least a majority of the total voting power in the aggregate of all classes of Capital Stock of the continuing or surviving entity entitled to vote in the election of the board of directors of such person generally immediately after the share exchange, consolidation or merger; or

(c)     a "change of control" or any comparable term under, and as defined in, any of the documentation relating to the 2023 Convertible Notes or the Existing Senior Unsecured Debt shall have occurred.

"Class" means (i) with respect to any Commitment, its character as a Revolving Commitment, a Delayed Draw Term A Commitment, an Additional Term B-4 Commitment or any other group of Commitments (whether established by way of new Commitments or by way of conversion or extension of existing Commitments or Loans) designated as a "Class" in an Additional Credit Extension Amendment and (ii) with respect to any Loans, its character as a Revolving Loan, a Swingline Loan, a Delayed Draw Term A Loan, a Term B-4 Loan or any other group of Loans (whether made pursuant to new Commitments or by way of conversion or extension of existing Loans) designated as a "Class" in an Additional Credit Extension Amendment; provided that (x) in no event shall there be more than three Classes of Revolving Commitments or more than three Classes of Revolving Loans outstanding at any time and (y) notwithstanding anything to the contrary, the borrowing and repayment of Revolving loans shall be made on a pro rata basis across all Classes of Revolving Loans (except to the extent that any applicable Additional Credit Extension Amendment provides that the Class of Revolving Loans established thereunder shall be entitled to less than pro rata treatment in repayments), and any termination of Revolving Commitments shall be made on a pro rata basis across all Classes of Revolving Commitments (except to the extent

-10-

that any applicable Additional Credit Extension Amendment provides that the Class of Revolving Commitments established thereunder shall be entitled to less than pro rata treatment in reduction of Revolving Commitments).Commitments or Loans that have different maturity dates, pricing (other than upfront fees) or other terms shall be designated separate Classes.

"Closing Date" means May 6, 2010.

"Collateral" means the collateral identified in, and at any time covered, or purported to be covered by, the Collateral Documents.

"Collateral Agent" means JPMCB in its capacity as collateral agent or security trustee, as applicable, for the Lenders under any of the Collateral Documents, or any successor collateral agent.

"Collateral Documents" means the U.S. Security Agreement, the U.S. Pledge Agreement, the Foreign Collateral Documents and any other documents executed and delivered in connection with the attachment or perfection (or the equivalent under applicable foreign law) of security interests granted to secure the Obligations.

"Commitment Fee Rate" means 0.50% per annum. For the avoidance of doubt, with respect to Commitment Fees that shall have accrued during the Amendment No. 6/No. 7 Interim Period, the Commitment Fee Rate that was in effect during the Amendment No. 6/No. 7 Interim Period shall apply for all determinations of the Commitment Fee during the Amendment No. 6/No. 7 Interim Period.

"Commitment Fees" has the meaning provided in Section 2.09(a).

"Commitment Period" means the period from and including the Amendment No. 6 Effective Date to the earlier of (a) (i) in the case of Revolving Loans and Swingline Loans, the Revolving Termination Date or (ii) in the case of the Letters of Credit, the L/C Expiration Date, or (b) in the case of the Revolving Loans, Swingline Loans and the Letters of Credit, the date on which the applicable Revolving Commitments shall have been terminated as provided herein.

"Commitments" means the Revolving Commitments, the L/C Commitments, the Swingline Commitment, the Delayed Draw Term A Commitments, the Additional Term B-4 Commitment and any other commitment to extend credit established pursuant to an Additional Credit Extension Amendment, as the context may require.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit 7.02(b).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Capital Expenditures" means, for any period for the Consolidated Group, without duplication, all Capital Expenditures.

"Consolidated EBITDA" means, for any period for the Consolidated Group, Consolidated Net Income in such period plus, without duplication, (A) in each case solely to the extent decreasing Consolidated Net Income in such period: (a) consolidated interest expense (net of interest income), (b) provision for taxes, to the extent based on income or profits, (c) amortization and depreciation, (d) the amount of all expenses incurred in connection with (x) the closing and initial funding of this Credit Agreement or the Transactions, (y) the Ticketmaster Merger in an amount under this clause (y) not to exceed $85.0 million in the aggregate and (z) the acquisition of an aggregate of 51% of the Capital Stock of OCESA Entretenimiento S.A. de C.V. in an amount under this clause (z) not to exceed $20.0 million in the aggregate, (e) the amount of all non-cash deferred compensation expense, (f) the amount of all expenses associated with the early extinguishment of Indebtedness, (g) any losses from sales of Property, other than from sales in the ordinary course of business, (h) any non-cash impairment loss of goodwill or other intangibles required to be taken pursuant to GAAP, (i)

-11-

any non-cash expense recorded with respect to stock options or other equity-based compensation, (j) any extraordinary loss in accordance with GAAP, (k) any restructuring, non-recurring or other unusual item of loss or expense (including write-offs and write-downs of assets), other than any write-off or write-down of inventory or accounts receivable; provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (k) and clause (o) below in any four quarter period shall not exceed 20% of Consolidated EBITDA in such period (such percentage to be calculated prior to giving effect to any amounts added to Consolidated EBITDA for such period pursuant to this clause (k) or clause (o) below), (l) any non-cash loss related to discontinued operations, (m) any other non-cash charges (other than write-offs or write-downs of inventory or accounts receivable), (n) fees and expenses incurred in connection with the making of acquisitions and other non-ordinary course Investments pursuant to Section 8.02, in an aggregate amount not to exceed $40.0 million in any four quarter period and (o) the amount of pro forma "run rate" cost savings, operating expense reductions and synergies (in each case net of actual amounts realized) related to any cost-savings initiative or acquisition or disposition outside of the ordinary course of business that are reasonably identifiable, factually supportable and projected by such person in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of such person) within 24 months after the date such acquisition or disposition is consummated or such cost savings initiative is implemented, as the case may be; provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (o) and clause (k) above in any four quarter period shall not exceed 20% of Consolidated EBITDA in such period (such percentage to be calculated prior to giving effect to any amounts added to Consolidated EBITDA for such period pursuant to this clause (o) or clause (k) above); provided that (I) in the case of any non-cash charge referred to in this definition of Consolidated EBITDA that relates to accruals or reserves for a future cash disbursement, such future cash disbursement shall be deducted from Consolidated EBITDA in the period when such cash is so disbursed and (II) if there shall exist one or more Specified Subsidiaries during such period, the amounts otherwise added to Consolidated EBITDA pursuant to any of clauses (A)(a) through (o) of this definition shall be reduced such that the contribution of any such Specified Subsidiary to such amounts is limited to the Specified Percentage applicable to such Specified Subsidiary minus (B) in each case solely to the extent increasing Consolidated Net Income in such period: (a) any extraordinary gain in accordance with GAAP, (b) any nonrecurring item of gain or income (including write-ups of assets), other than any write-up of inventory or accounts receivable, (c) any gains from sales of Property, other than from sales in the ordinary course of business, (d) any non-cash gain related to discontinued operations, and (e) the aggregate amount of all other non-cash items increasing Consolidated Net Income during such period; provided that (I) in the case of any non-cash item referred to in clause (B) of this definition of Consolidated EBITDA that relates to a future cash payment to the Parent Borrower or a Subsidiary, such future cash payment shall be added to Consolidated EBITDA in the period when such payment is so received by the Parent Borrower or such Subsidiary and (II) if there shall exist one or more Specified Subsidiaries during such period, the amounts otherwise subtracted from Consolidated EBITDA pursuant to any of clauses (B)(a) through (e) of this definition shall be increased such that the contribution of any such Specified Subsidiary to such amounts is limited to the Specified Percentage applicable to such Specified Subsidiary.

"Consolidated Excess Cash Flow" means, for any period for the Consolidated Group, (a) net cash provided by operating activities for such period as reported on the audited GAAP cash flow statement delivered under Section 7.01(a) minus (b) the sum of, in each case to the extent not otherwise reducing net cash provided by operating activities in such period, without duplication, (i) scheduled (including at maturity) principal payments (including payments of principal with respect to the 2023 Convertible Notes required from time to time under the terms of the 2023 Convertible Notes Indenture) and payments of interest in each case made in cash on Consolidated Total Funded Debt during such period (including for purposes hereof, sinking fund payments, payments in respect of the principal components under capital leases and the like relating thereto), in each case other than in connection with a refinancing thereof (for the avoidance of doubt, no payments made on (x) the Amendment No. 3 Effective Date with respect to the Term A-1 Loans or Term B-1 Loans, (y) the Amendment No. 4 Effective Date with respect to the Term B-2 Loans and (z) the Amendment No. 6 Effective Date with respect to the Term A-2 Loans or Term B-3 Loans, Original Revolving Commitments, Original Revolving Loans and Original Swingline Loans shall be included under this clause (i)), (ii) Consolidated Capital Expenditures made in cash during such period that are not financed with the proceeds of Indebtedness, an issuance of Capital Stock or from a reinvestment of Net Cash Proceeds referred to in Section 2.06(b)(ii), (iii) prepayments of Funded Debt during such period (other than prepayments of Loans owing under this Credit Agreement (except prepayments of Revolving Loans to the extent there is a simultaneous reduction in the Aggregate Revolving Commitments in the amount of such prepayment pursuant to Section 2.07) and other than such prepayments made with the proceeds of other Indebtedness);provided that, for the avoidance of doubt, no payments made on the Amendment No. 6 Effective Date with respect to the Original Revolving Commitments, Original Revolving Loans or Original Swingline Loans shall be included under this clause (iii), (iv) to the extent not financed with the incurrence or assumption of Indebtedness or

-12-

proceeds from an issuance of Capital Stock, Subject Dispositions, Specified Dispositions or Involuntary Dispositions, cash sums expended for Investments pursuant to Sections 8.02(b), (c) (to the extent such advances are not repaid to Parent Borrower or a Subsidiary), (e), (f), (g) (but with respect to expenditures for Investments pursuant to Section 8.02(e), (f) or (g), such expenditures shall only reduce Consolidated Excess Cash Flow pursuant to this clause (iv) to the extent such expenditures are not made in Parent Borrower or a Person that was not one of Parent Borrower's Subsidiaries prior to such expenditure), (i), (j), (k) (other than with respect to any amount expended on such Investments through the use of the Cumulative Credit), (z), (aa) or (cc) during such period or contractually committed to be made during the three months following the end of such period (but with respect to expenditures for Investments pursuant to Section 8.02(z), (aa) and (cc), such expenditures shall only reduce Consolidated Excess Cash Flow to the extent such expenditures are made in a Person that was not one of Parent's Subsidiaries prior to such expenditure, and to the extent any contractually committed amounts reduced Consolidated Excess Cash Flow pursuant to this clause (iv) during such period but the expenditures contemplated by such committed amounts are not so made during such three months, such committed amounts shall be added to Consolidated Excess Cash Flow for the period following such period (unless such expenditures otherwise reduce Consolidated Excess Cash Flow during such following period)), without duplication of amounts deducted from Consolidated Excess Cash Flow in prior periods, the aggregate consideration required to be paid in cash by the Parent Borrower or any Subsidiary pursuant to binding contracts (the "Contract Consideration") entered into prior to or during such period relating to Consolidated Capital Expenditures to be consummated or made during the three months following the end of such period; provided that to the extent the aggregate amount of internally generated cash actually utilized to finance such Consolidated Capital Expenditures during such three months is less than the Contract Consideration, the amount of such shortfall shall be added to Consolidated Excess Cash Flow for the period following such period, (vi) to the extent such amounts increased net cash provided by operating activities in such period, (A) ticketing-related client funds collected by the Parent Borrower or any of its Subsidiaries, on behalf of Persons other than Parent Borrower or any of its Affiliates and (B) event-related deferred revenue of the Parent Borrower or any of its Subsidiaries, (vii) accrued expenses due from the Parent Borrower or any of its Subsidiaries to artists, as of the last date of such period and (viii) accrued expenses for cash collected by the Parent Borrower or any of its Subsidiaries on behalf of others for ticket sales, as of the last date of such period, plus (c) to the extent such amounts decreased net cash provided by operating activities in such period, (A) ticketing related client funds remitted by the Parent Borrower or any of its Subsidiaries and (B) event-related deferred revenue of the Parent Borrower or any of its Subsidiaries.

"Consolidated Group" means the Parent Borrower and its consolidated Subsidiaries, as determined in accordance with GAAP.

"Consolidated Net Debt" means, at any time, (a) Consolidated Total Funded Debt, minus (b) if positive, the lesser of (x) $300.0 million and (y) the aggregate amount of Free Cash held on such date by the Consolidated Group (provided that with respect to any Specified Subsidiary, only the Specified Percentage of such Specified Subsidiary's Free Cash shall be included in this clause (y)).

"Consolidated Net Income" means, for any period for the Consolidated Group, the net income (or loss), determined on a consolidated basis (after any deduction for minority interests except in the case of any Credit Party) of the Consolidated Group in accordance with GAAP; provided that (i) in determining Consolidated Net Income, the net income of any Unrestricted Subsidiary or any other Person which is not a Subsidiary of the Parent Borrower or is accounted for by the Parent Borrower by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to a member of the Consolidated Group during such period, (ii) for purposes of calculating Consolidated EBITDA when determining the Consolidated Total Leverage Ratio for any clause of Section 8.06 only, the net income of any Subsidiary of the Parent Borrower (other than a Domestic Guarantor) shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its Organization Documents or any agreement, instrument or law applicable to such Subsidiary (other than to the extent such net income is actually received in cash by Parent Borrower or a Domestic Guarantor during such period from such Subsidiary and is not otherwise included in Consolidated Net Income) and (iii) the cumulative effect of any change in accounting principles shall be excluded. Consolidated Net Income shall be calculated on a Pro Forma Basis.

"Consolidated Net Leverage Ratio" means, as of the last day of any fiscal quarter the ratio of (i) Consolidated Net Debt on such day to (ii)(A) for purposes of determining compliance with Section 8.10(a) as of the end of any Specified Quarter, Consolidated EBITDA, which shall be equal to the quotient obtained by dividing (a) Consolidated EBITDA for

-13-

Exhibit 2, page 160

the Consolidated Group for the period comprising the Specified Quarters that have ended on or prior to such day by (b) the sum of the Financial Covenant Percentage Factor applicable to such Specified Quarters (for example, if the Specified Quarters are comprised of the fiscal quarters ended December 31, 2021, March 31, 2022 and June 30, 2022 and the Consolidated Net Leverage Ratio is being tested for the fiscal quarter ended June 30, 2022, Consolidated EBITDA for such fiscal quarter shall be equal to the quotient obtained by dividing (I) Consolidated EBITDA for the nine-month period commencing on October 1, 2021 and ending on June 30, 2022 by (II) 0.5468, which amount equals the sum of 8.57% plus 12.24% plus 33.87%), and (B) for all purposes other than immediately preceding clause (A), Consolidated EBITDA of the Consolidated Group for the period of four (4) consecutive fiscal quarters ending on such day.

"Consolidated Tangible Assets" means, as of any date, Consolidated Total Assets as of such date, less, to the extent otherwise constituting Consolidated Total Assets, all of the Parent Borrower's and its Subsidiaries' goodwill, patents, tradenames, trademarks, copyrights, franchises, experimental expenses, organization expenses and any other assets classified as intangible assets in accordance with GAAP as shown on the most recent balance sheet of the Parent Borrower required to have been delivered pursuant to Section 7.01(a) or (b).

"Consolidated Total Assets" means the total assets of the Parent Borrower and its Subsidiaries on a consolidated basis determined in accordance with GAAP, as shown on the most recent balance sheet of the Parent Borrower required to have been delivered pursuant to Section 7.01(a) or (b) or, for the period prior to the time any such statements are required to be so delivered pursuant to Section 7.01(a) or (b), as shown on the financial statements referred to in the second sentence of Section 6.05.

"Consolidated Total Funded Debt" means, at any time, the principal amount of all Funded Debt of the Consolidated Group determined on a consolidated basis (it being understood and agreed that outstanding letters of credit, bankers' acceptances and similar facilities shall not constitute Funded Debt unless such letters of credit, bankers' acceptances or similar facilities have been drawn on and the resulting obligations have not been paid by the Parent Borrower).

"Consolidated Total Leverage Ratio" means, as of the last day of any fiscal quarter, the ratio of (i) Consolidated Total Funded Debt on such day to (ii) Consolidated EBITDA of the Consolidated Group for the period of four (4) consecutive fiscal quarters ending on such day.

"Contract Consideration" has the meaning assigned to such term in the definition of Consolidated Excess Cash Flow.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Contract Period" means, with respect to any B/A, the period commencing on the date such B/A is issued and accepted and ending on the date 30, 60, 90 or 180 days thereafter, as the applicable Canadian Borrower may elect (in each case subject to availability); provided that if such Contract Period would end on a day other than a Business Day, such Contract Period shall be extended to the next succeeding Business Day.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Convertible Indebtedness" means Indebtedness of the Parent Borrower permitted to be incurred under the terms of this Credit Agreement that is either (a) convertible or exchangeable into common stock of the Parent Borrower (and cash in lieu of fractional shares) and/or cash (in an amount determined by reference to the price of such common stock) or (b) sold as units with call options, warrants or rights to purchase (or substantially equivalent derivative transactions) that are in each case exercisable for common stock of the Parent Borrower and/or cash (in an amount determined by reference to the price of such common stock).

"Converted Term B-3 Loan" means the Allocated Amount of each Term B-3 Loan held by a Term B-3 Amendment No. 6 Converting Lender on the Amendment No. 6 Effective Date immediately prior to the effectiveness of Amendment No. 6.

-14-

"Covered Entity" means any of the following:

(i)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)   a    "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to it in Section 11.22.

"Credit Agreement" has the meaning provided in the preamble hereto, as the same may be amended and modified from time to time.

"Credit Documents" means this Credit Agreement, Amendment No. 7, Amendment No. 6, the Notes, the Collateral Documents, the Engagement Letter, the Administrative Agent Fee Letter, the Issuer Documents, the Joinder Agreements, any Foreign Borrower Agreements, any Foreign Borrower Terminations, any Revolving Lender Joinder Agreement, any guarantee of the Obligations by a Credit Party delivered to the Administrative Agent pursuant to the requirements of this Credit Agreement, any Additional Credit Extension Amendment and any Incremental Term Loan Joinder Agreement.

"Credit Extension" means each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Parties" means the Parent Borrower, any Foreign Subsidiary that becomes a Foreign Borrower under Section 1.08 and any Guarantor.

"Credit Party Materials" has the meaning provided in Section 7.02.

"Cumulative Credit" means, with respect to any proposed use of the Cumulative Credit at any time, an amount equal to (a) the excess of (I) the amount of the Consolidated Excess Cash Flow for each full fiscal quarter of the Parent Borrower completed after December 31, 2013, to the extent the financial statements required to be delivered for the period ending on the last day of such fiscal quarter pursuant to Section 7.01(a) or (b) have been delivered and, to the extent the end of such fiscal quarter coincides with the end of a fiscal year of the Parent Borrower, all prepayments that may be (or, prior to the Amendment No. 2 Effective Date were) required pursuant to Section 2.06(b)(iv) with respect to the Consolidated Excess Cash Flow generated in such fiscal year have been made (provided that (A) to the extent the end of any fiscal quarter of the Parent Borrower does not coincide with the end of a fiscal year of the Parent Borrower, 25% of the Consolidated Excess Cash Flow generated in such fiscal quarter shall not be counted toward calculating the amount referred to in this clause (a) until the financial statements for the fiscal year in which fiscal quarter falls have been delivered pursuant to Section 7.01(a) and all prepayments that may be required pursuant to Section 2.06(b)(iv) with respect to the Consolidated Excess Cash Flow generated in such fiscal year have been made and (B) with respect to the fiscal year ending December 31, 2016, the amount that would have been required to be prepaid pursuant to Section 2.06(b)(iv) assuming that Section 2.06(b)(iv) had been used to make such prepayments) over (II) all such prepayments so made or required to be made (or with respect to the year ending December 31, 2016, assumed to be made) pursuant to Section 2.06(b)(iv); provided that the amount calculated under this clause (a) shall never be less than zero, plus (b) without duplication of any amounts referred to in clause (c), the aggregate amount of Net Cash Proceeds of any issuance of Qualified Capital Stock of the Parent Borrower (but not including any issuance or purchase referred to in Sections 8.02(c), 8.02(r) or 8.06(h)) after January 1, 2016 and at or prior to such time less the aggregate amount of Restricted Payments made since January 1, 2016 and through the Amendment No. 3 Effective Date pursuant to Sections 8.06(f) or (g) of this Credit Agreement (as in effect prior to the Amendment No. 3 Effective Date), excluding any Restricted Payments made to redeem, repurchase or otherwise acquire the 2020 Senior Notes (as defined in the Credit Agreement immediately prior to giving effect to the Amendment No. 5 Effective Date) plus (c) if positive, to the extent not otherwise reflected in Consolidated Excess Cash Flow, the amount of cash returns on any Investment made pursuant to Section 8.02(k) (other than any Investment subsequently deemed to be made pursuant to Section 8.02(e)) in a Person other than the Parent Borrower or a Subsidiary (to the extent such Investment was made through the use of the

-15-

Cumulative Credit) resulting from interest payments, dividends, repayments of loans or advances or profits from Dispositions of Property, in each case to the extent actually received by a Domestic Credit Party at or prior to such time (provided that any such cash returns in respect of amounts described in clause (c) above shall only increase the Cumulative Credit for purposes of determining the amount of the Cumulative Credit available for making Investments pursuant to Section 8.02(k)) plus (d) $125.0 million minus (e) the aggregate amount of Investments and Restricted Payments made since the Amendment No. 3 Effective Date pursuant to Sections 8.02(k) (excluding Investments subsequently deemed to have been made pursuant to Section 8.02(e)) and 8.06(f), respectively, through utilization of the Cumulative Credit (excluding such proposed use of the Cumulative Credit, but including any other simultaneous proposed use of the Cumulative Credit) (provided that Investments of amounts described in clause (c) above shall only decrease the Cumulative Credit for purposes of determining the amount of the Cumulative Credit available for making Investments pursuant to Section 8.02(k)) minus (f) without duplication of amounts subtracted under clause (a)(II) above, the ECF Application Amount for each fiscal year of the Parent Borrower, to the extent the financial statements for such fiscal year have been delivered pursuant to Section 7.01(a) less any voluntary prepayments of the Term Loans made during such fiscal year (other than (i) such voluntary prepayments made with the proceeds of Indebtedness, (ii) any prepayment of Term A-1 Loans or Term B-1 Loans made on the Amendment No. 3 Effective Date with the proceeds of (or conversion into) the Term A-2 Loans and Term B-2 Loans, (iii) any prepayment of Term B-2 Loans made on the Amendment No. 4 Effective Date with the proceeds of (or conversion into) Term B-3 Loans and (iv) any prepayment of Term A-2 Loans or Term B-3 Loans made on the Amendment No. 6 Effective Date with the proceeds of (or conversion into) the Term B-4 Loans and the proceeds of the 2027 Senior Notes).

"Danish Krone" or "Dkr" means the lawful currency of Denmark.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event, act or condition that constitutes an Event of Default or that, with notice, the passage of time, or both, would constitute an Event of Default.

"Default Rate" means an interest rate equal to (a) with respect to Obligations other than (i) Eurodollar Rate Loans and (ii) Letter of Credit Fees, the Base Rate plus the Applicable Percentage, if any, applicable to such Loans plus two percent (2%) per annum; (b) with respect to Eurodollar Rate Loans, the Adjusted Eurodollar Rate plus the Applicable Percentage, if any, applicable to such Loans plus two percent (2%) per annum; and (c) with respect to Letter of Credit Fees, a rate equal to the Applicable Percentage plus two percent (2%) per annum.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion of its Loans or participations in Letters of Credit or Swingline Loans required to be funded by it hereunder within three (3) Business Days of the date required to be funded by it hereunder unless such Lender notifies the Administrative Agent and the Parent Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Parent Borrower or the Applicable Agent that it does not intend to comply with any of its funding obligations under this Credit Agreement (unless such notification relates to such Lenders' obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Applicable Agent or any applicable L/C Issuer, to confirm that it will comply with the terms of this Credit Agreement relating to its participation obligations in respect of all then outstanding Letters of Credit and Swingline Loans (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Parent Borrower), (d) has otherwise failed to pay over to the Applicable Agent, any applicable L/C Issuer or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, unless the subject of a good faith dispute, (e) in the case of a

-16-

Lender with a Commitment, Swingline Exposure or L/C Obligations, is insolvent or has become the subject of a bankruptcy or insolvency proceeding or Bail-In Action or (f) has any Affiliate that has Control of such Lender that is insolvent or that has become the subject of a bankruptcy or insolvency proceeding; provided that a Lender shall not qualify as a "Defaulting Lender" solely as the result of the acquisition or maintenance of an ownership interest in such Lender or any Person Controlling such Lender, or the exercise of Control over such Lender or any Person Controlling such Lender, by a governmental authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality thereof) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Delayed Draw Commitment Fee" has the meaning provided in Section 2.09(a).

"Delayed Draw Term A Commitment" means as to any Delayed Draw Term A Lender at any time, the amount set forth under the heading "Delayed Draw Term A Commitment" opposite such Person's name on Schedule I to Amendment No. 6 or in the Assignment and Assumption by which such Delayed Draw Term A Lender became a Delayed Draw Term A Lender, as such amount may be reduced by the operation of Section 2.07 or Section 2.01(d). The original aggregate principal amount of the Delayed Draw Term A Commitments on the Amendment No. 6 Effective Date is $400.0 million.

"Delayed Draw Term A Commitment Percentage" means, for each Delayed Draw Term A Lender as of any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Delayed Draw Term A Lender's Delayed Draw Term A Commitment as of such time and the denominator of which is the Aggregate Delayed Draw Term A Commitments as of such time. The Delayed Draw Term A Commitment Percentages as of the Amendment No. 6 Effective Date are set forth in Schedule I to Amendment No. 6 under the column entitled "Delayed Draw Term A Commitment Percentage".

"Delayed Draw Term A Commitment Period" means the period from the date one day after the Amendment No. 6 Effective Date through and including the Delayed Draw Term A Outside Date.

"Delayed Draw Term A Commitment Termination Date" means the earliest of (a) the date on which the entire amount of the Aggregate Delayed Draw Term A Commitments of all Delayed Draw Term A Lenders have been drawn as Delayed Draw Term A Loans, (b) the date on which the aggregate Delayed Draw Term A Commitments of all Delayed Draw Term A Lenders have been terminated or reduced to zero pursuant to Section 2.07 and (c) the Delayed Draw Term A Outside Date.

"Delayed Draw Term A Lender" means the Persons listed on Schedule I to Amendment No. 6 under the heading "Delayed Draw Term A Loan Lenders" together with their successors and permitted assigns.

"Delayed Draw Term A Loan Termination Date" means the fifth anniversary of the Amendment No. 6 Effective Date.

"Delayed Draw Term A Loan Note" means the promissory notes substantially in the form of Exhibit 2.13-5, if any, given to evidence the Delayed Draw Term A Loans, as amended, restated, modified, supplemented, extended, renewed or replaced.

"Delayed Draw Term A Loans" means the term loans made by the Lenders to the Parent Borrower pursuant to Section 2.01(d).

"Delayed Draw Term A Outside Date" means the date that is the second anniversary of the Amendment No.6 Effective Date.

"Designated Assets" means the assets listed on Schedule 8.05.

"Designated Investments" means the Investments listed on Schedule 8.02(x).

Exhibit 2, page 164

"Designated Non-Cash Consideration" means the fair market value of non-cash consideration received by the Parent Borrower or any Subsidiary in connection with a Subject Disposition that is designated as "Designated Non-Cash Consideration" on the date received pursuant to a certificate of a Responsible Officer of the Parent Borrower setting forth the basis of such fair market value (with the amount of Designated Non-Cash Consideration in respect of any Subject Disposition being reduced for purposes of Section 8.05 to the extent the Parent Borrower or any Subsidiary converts the same to cash or Cash Equivalents within 180 days following the closing of the applicable Subject Disposition).

"Designated Sale and Leaseback Assets" means the assets listed in Schedule 1.01A.

"Discount Proceeds" means, with respect to any B/A, an amount (rounded upward, if necessary, to the nearest C$.01) calculated by multiplying (a) the face amount of such B/A by (b) the quotient obtained by dividing (i) one by (ii) the sum of (A) one and (B) the product of (x) the Discount Rate (expressed as a decimal) applicable to such B/A and (y) a fraction of which the numerator is the Contract Period applicable to such B/A and the denominator is 365, with such quotient being rounded upward or downward to the fifth decimal place and .000005 being rounded upward.

"Discount Rate" means, with respect to a B/A being accepted and purchased on any day, (a) for a Lender which is a Schedule I Lender, (i) the CDOR Rate applicable to such B/A, or (ii) if the discount rate for a particular Contract Period is not quoted on the Reuters Screen CDOR Page, the arithmetic average (as determined by the Canadian Agent) of the percentage discount rates (expressed as a decimal and rounded upward, if necessary, to the nearest 1/100 of 1%) quoted to the Canadian Agent by the Schedule I Reference Lenders as the percentage discount rate at which each such bank would, in accordance with its normal practices, at approximately 10:00 a.m., Toronto time, on such day, be prepared to purchase bankers' acceptances accepted by such bank having a face amount and term comparable to the face amount and Contract Period of such B/A, and (b) for a Lender which is a Schedule II Lender or a Schedule III Lender, the lesser of (i) the CDOR Rate applicable to such B/A plus 0.10% per annum and (ii) the arithmetic average (as determined by the Canadian Agent) of the percentage discount rates (expressed as a decimal and rounded upward, if necessary, to the nearest 1/100 of 1%) quoted to the Canadian Agent by the Schedule II Reference Lenders as the percentage discount rate at which each such bank would, in accordance with its normal practices, at approximately 10:00 a.m., Toronto time, on such day, be prepared to purchase bankers' acceptances accepted by such bank having a face amount and term comparable to the face amount and Contract Period of such B/A.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction) of any Property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith (but excluding the making of any Investment pursuant to Section 8.02).

"Disqualified Capital Stock" means Capital Stock that (a) requires the payment of any dividends or distributions (other than dividends or distributions payable solely in shares of Capital Stock other than Disqualified Capital Stock) prior to the date that is the first anniversary of the Final Maturity Date or (b) matures or is mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof, in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation, on a fixed date or otherwise, in each case prior to the date that is the first anniversary of the Final Maturity Date (other than upon payment in full of the Obligations (other than contingent indemnification obligations for which no claim has been made) and termination of the Commitments).

"Dollar" or "$" means the lawful currency of the United States.

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Alternative Currency, the equivalent amount thereof in Dollars as determined by the Applicable Agent or the applicable L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

"Dollar Facility L/C Obligations" means, at any date of determination, the Dollar Facility Percentage multiplied by the sum of (x) the aggregate Dollar Equivalent amount available to be drawn under all outstanding Letters of Credit at such

-18-

Exhibit 2, page 165

date plus (y) the aggregate Dollar Equivalent amount of all L/C Borrowings at such date. For all purposes of this Credit Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Dollar Facility Percentage" means, at any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is the Aggregate Dollar Revolving Committed Amount at such time and the denominator of which is the L/C Committed Amount at such time.

"Dollar L/C Issuer" means JPMCB, Bank of America, N.A., Goldman Sachs Bank USA, Mizuho Bank, Ltd., Morgan Stanley Bank, N.A., MUFG Union Bank, N.A., ~~SunTrust~~Truist Bank, The Bank of Nova Scotia and Wells Fargo Bank, National Association, in their capacities as issuers of Letters of Credit hereunder, together with their respective successors in such capacity and any Dollar Revolving Lender approved by the Administrative Agent and the Parent Borrower; provided that no Lender shall be obligated to become an L/C Issuer hereunder. References herein and in the other Credit Documents to the Dollar L/C Issuer shall be deemed to refer to the Dollar L/C Issuer in respect of the applicable Letter of Credit or to all Dollar L/C Issuers, as the context requires.

"Dollar Revolving Commitment" means, for each Dollar Revolving Lender, the commitment of such Lender to make Dollar Revolving Loans (and to share in Dollar Revolving Obligations) hereunder, under documentation relating to Incremental Revolving Commitments or pursuant to an Additional Credit Extension Amendment, in each case, in the amount of such Lender's Dollar Revolving Committed Amount, as such commitment may be increased or decreased pursuant to the other provisions hereof.

"Dollar Revolving Commitment Percentage" means, for each Dollar Revolving Lender, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Dollar Revolving Lender's Dollar Revolving Committed Amount and the denominator of which is the Aggregate Dollar Revolving Committed Amount. The Dollar Revolving Commitment Percentages as of the Amendment No. 6 Effective Date are set forth in Schedule I to Amendment No. 6 under the column entitled "Dollar Revolving Commitment Percentage".

"Dollar Revolving Committed Amount" means, for each Dollar Revolving Lender, the amount set forth in Schedule I to Amendment No. 6 under the row applicable to such Lender in the column entitled "Dollar Revolving Committed Amount", in the Assignment and Assumption by which such Dollar Revolving Lender became a Dollar Revolving Lender or in any documentation relating to Incremental Revolving Commitments or Additional Credit Extension Amendments, as such Dollar Revolving Committed Amount may be reduced or increased pursuant to the other provisions hereof.

"Dollar Revolving Facility" means the Aggregate Dollar Revolving Commitments and the provisions herein related to the Dollar Revolving Loans, the Swingline Loans and the Letters of Credit.

"Dollar Revolving Lenders" means the Persons listed on Schedule I to Amendment No. 6 under the heading "Dollar Revolving Lender" together with their successors and permitted assigns, and any Person that shall be designated a "Dollar Revolving Lender" pursuant to Incremental Revolving Commitments or an Additional Credit Extension Amendment in accordance with the provisions hereof.

"Dollar Revolving Loan" has the meaning provided in Section 2.01(a)(i).

"Dollar Revolving Notes" means the promissory notes, if any, given to evidence the Dollar Revolving Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of Dollar Revolving Note is attached as Exhibit 2.13-1.

"Dollar Revolving Obligations" means the Dollar Revolving Loans, the Dollar Facility L/C Obligations and the Swingline Loans.

-19-

"Domestic Credit Party" means any Credit Party that is organized under the laws of the United States of America, any state thereof or the District of Columbia.

"Domestic Guaranteed Obligations" has the meaning provided in Section 4.01(a).

"Domestic Guarantor" means any Guarantor that is a Domestic Subsidiary.

"Domestic Obligations" means the Obligations of the Domestic Credit Parties, including any Obligations of Parent Borrower or any Domestic Credit Party in the capacity as a guarantor of Obligations of a Foreign Borrower.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary; provided that a CFC Holdco shall not be a Domestic Guarantor with respect to the Domestic Obligations.

"ECF Application Amount" means, with respect to any fiscal year of the Parent Borrower, the product of the ECF Percentage applicable to such fiscal year times the Consolidated Excess Cash Flow for such fiscal year.

"ECF Percentage" means, with respect to any fiscal year of the Parent Borrower ending after December 31, 2018, if the Senior Secured Leverage Ratio as of the last day of such fiscal year is (i) greater than or equal to 3.50:1.00, fifty percent (50%), (ii) greater than or equal to 3.25:1.00, but less than 3.50:1.00, twenty-five percent (25%) and (iii) less than 3.25:1.00, zero percent (0%).

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Yield" means, as to any Indebtedness, the effective yield on such Indebtedness, taking into account the interest rate, applicable interest rate margins, any interest rate floors or similar devices, interest rate indexes and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (x) the life of such Indebtedness and (y) the four years following the date of incurrence thereof) payable generally to lenders providing such Indebtedness, but excluding any commitment, underwriting or arrangement fees payable to any arranger (or affiliate thereof) in connection with the commitment or syndication of such Indebtedness, and not shared generally with the providers of such Indebtedness.

"Elected Quarter" has the meaning assigned to such term in the definition of Financial Covenant Election.

"Eligible Quarter" means any fiscal quarter of the Parent Borrower ending during the Financial Covenant Notice Period.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; and (d) any other Person (other than a natural person or a holding company, investment vehicle or trust for, or owned and operated by or for the

primary benefit of a natural person) approved by the party or parties whose approval is required under Section 11.06(b); provided that notwithstanding the foregoing, except pursuant to a transaction pursuant to Section 11.06(j), "Eligible Assignee" shall not include the Parent Borrower or any of the Parent Borrower's Affiliates or Subsidiaries.

"EMU Legislation" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"Engagement Letter" means the Engagement Letter dated as of October 2, 2019 among the Parent Borrower, JPMCB, the Lead Arrangers and U.S. Bank National Association.

"Environmental Laws" means any and all applicable federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Parent Borrower, any other Credit Party or any of their respective Subsidiaries resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Parent Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code or, solely for purposes of Section 412 of the Internal Revenue Code, is treated as a single employer under Section 414 of the Internal Revenue Code.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) with respect to any Pension Plan, the failure to satisfy the minimum funding standard under Section 412 of the Internal Revenue Code and Section 302 of ERISA, whether or not waived, the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) a withdrawal by the Parent Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (d) a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) by the Parent Borrower or any ERISA Affiliate from a Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA or notification that a Multiemployer Plan is insolvent pursuant to Section 4245 of ERISA or in "endangered" or "critical" status (within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition that constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment

-21-

of a trustee to administer, any Pension Plan or Multiemployer Plan; or (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Parent Borrower or any ERISA Affiliate.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Euro" and "€" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"Eurodollar Rate" means, with respect to any Loan for any applicable currency and for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for the relevant currency) for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; in each case the "Eurodollar Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that if the Eurodollar Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to the applicable currency then the Eurodollar Rate shall be the Interpolated Rate; provided, further, that with respect to the Delayed Draw Term A Loans, the Term B-4 Loans and Revolving Loans, if the Eurodollar Rate for the applicable Interest Period determined in accordance with the foregoing would be less than 0.00% per annum, then the Eurodollar Rate for such day shall be 0.00% per annum; provided further that with respect to Fronted Currency Loans, the determinations made by the Administrative Agent pursuant to this definition shall be made by the applicable Alternative Currency Fronting Lender with the approval (not to be unreasonably withheld) of the Administrative Agent. Notwithstanding the foregoing, the Eurodollar Rate for any Interest Period for any Revolving Loan denominated in Australian Dollars shall be the Australian Bill Rate for such Interest Period.

"Eurodollar Rate Loan" means a Loan that bears interest at a rate based on the Adjusted Eurodollar Rate.

"Eurodollar Screen Rate" has the meaning assigned to it in the definition of "Eurodollar Rate".

"Event of Default" means any of the events specified in Section 9.01; provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excluded Acquisition" means any purchase or other acquisition, in one transaction or a series of related transactions, of assets, properties and/or Capital Stock with an aggregate fair market value not exceeding $20.0 million (or the Dollar Equivalent thereof).

"Excluded Account" means any deposit or securities account (a) used exclusively for payroll, and/or payroll, local, state, federal and other Taxes and/or other employee wage and benefit payments to or for the benefit of any Credit Party's employees, (b) used exclusively to pay all Taxes required to be collected, remitted or withheld, (c) which any Credit Party holds exclusively as an escrow, fiduciary or trust for the benefit of another Person (other than a Credit Party) or (d) actually pledged pursuant to Section 8.01(ee).

"Excluded Property" means (a) vehicles or other assets covered by a certificate of title or ownership, (b) fee interests in real property, (c) leasehold real property, (d) those assets as to which the Parent Borrower and the Administrative Agent shall reasonably determine in writing that the costs of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby, (e) assets if the granting or perfecting of a security interest in such assets in favor of the Collateral Agent would violate any applicable Law (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any applicable jurisdiction) or principles of equity, (f) any right, title or interest in any instrument, permit, lease, general

-22-

Exhibit 2, page 169

intangible (other than Equity Interests), license, contract or agreement to the extent, but only to the extent that a grant of a security interest therein to secure the Obligations would, under the terms of such instrument, permit, lease, general intangible (other than Equity Interests), license, contract or agreement, result in a breach of the terms of, or constitute a default under, or result in the abandonment, termination, invalidation or unenforceability of, or require the consent of any Person other than a member of the Consolidated Group, which has not been obtained under such instrument, permit, lease, general intangible, license, contract or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any applicable jurisdiction or any other applicable law (including, without limitation, Title 11 of the United States Code) or principles of equity), (g)(A) any Capital Stock listed on Schedule 1.01E and (B) any Capital Stock acquired after the Closing Date (other than Capital Stock in a Subsidiary issued or acquired after such Person became a Subsidiary) in accordance with this Credit Agreement if, and to the extent that, and for so long as, in the case of this clause (B), (i) such Capital Stock constitutes less than 100% of all applicable Capital Stock of such Person, and the Person or Persons holding the remainder of such Capital Stock are not Affiliates of the Parent Borrower, (ii) the granting or perfecting of a security interest in such assets in favor of the Collateral Agent would violate applicable law or a contractual obligation binding on such Capital Stock and (iii) with respect to such contractual obligations (other than contractual obligations in connection with limited liability company agreements, stockholders' agreements and other joint venture agreements), such obligation existed at the time of the acquisition of such Capital Stock and was not created or made binding on such Capital Stock in contemplation of or in connection with the acquisition of such Person, (h) any Property purchased with the proceeds of purchase money Indebtedness or that is subject to a capital lease, in each case, existing or incurred pursuant to Sections 8.03(b) or (c) if the contract or other agreement in which the Indebtedness and/or Liens related thereto is granted (or the documentation providing for such capital lease obligation) prohibits or requires the consent of any Person other than a member of the Consolidated Group as a condition to the creation of any other security interest on such Property, (i) the HOBE Excluded Assets, (j) Permitted Deposits, (k) inventory consisting of beer, wine or liquor, (l) any Capital Stock of Unrestricted Subsidiaries, (m) solely with respect to the Domestic Obligations, (A) any voting Capital Stock in any First-Tier Foreign Subsidiary or any CFC Holdco that is directly owned by a Domestic Credit Party in excess of 65% of the total outstanding voting Capital Stock and (B) any assets of any Foreign Subsidiary or any CFC Holdco, (n) deposit and securities accounts of Foreign Subsidiaries subject to Liens granted pursuant to Section 8.01(z), (o) Excluded Accounts, (p) any intent-to use Trademark (as defined in the U.S. Security Agreement) applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar filing with regard thereto, to the extent and solely during the period, in which the grant of a security interest therein may impair the validity or enforceability of any Trademark that may issue from such intent to use Trademark application under applicable Law, (q) ticket inventory and Proceeds (as defined in the U.S. Security Agreement) thereof (including any deposit accounts holding such Proceeds) that are subject to a Lien, to the extent actually granted under Section 8.01(ee), and (r) "margin stock" (within the meaning of Regulation U issued by the FRB);provided, however, that Excluded Property shall not include any Proceeds, substitutions or replacements of any Excluded Property referred to in clauses (a) through (r) (unless such Proceeds, substitutions or replacements would constitute Excluded Property referred to in clauses (a) through (r)).

"Excluded Sale and Leaseback Transaction" means any Sale and Leaseback Transaction with respect to Property owned by the Parent Borrower or any Subsidiary to the extent such Property is acquired after the Amendment No. 5 Effective Date, so long as such Sale and Leaseback Transaction is consummated within 180 days of the acquisition of such Property.

"Excluded Subsidiary" means (a) any Immaterial Subsidiary, (b) any Unrestricted Subsidiary, (c) each Subsidiary of the Parent Borrower designated as such onSchedule 6.14 hereto, (d) each Subsidiary of the Parent Borrower that is not a Wholly Owned Subsidiary, (e) each Subsidiary designated as an "Excluded Subsidiary" by a written notice to the Administrative Agent; provided that such designation under this clause (e) shall constitute an Investment pursuant toSection 8.02, (f) any captive insurance subsidiaries or not-for-profit subsidiaries, (g) solely with respect to the Domestic Obligations, any Foreign Subsidiary or CFC Holdco and (h) unless otherwise agreed by Parent Borrower and the Administrative Agent, any Subsidiary of any of the foregoing Subsidiaries; provided further that a Foreign Borrower shall in no event be an Excluded Subsidiary.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity

-23-

Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, any of the following Taxes imposed on or with respect to any Agent, any Lender, any L/C Issuer or any other recipient (a "Recipient") or required to be withheld or deducted from a payment to any Recipient, (a) Taxes imposed on or measured by such recipient's net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to Laws in effect at the time (i) such Lender becomes a party hereto (other than pursuant to an assignment request by the Parent Borrower under Section 11.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts with respect to such withholding Tax pursuant to Section 3.01, (c) any Tax that is attributable to a Recipient's failure to comply with Section 3.01(e), and (d) any Tax imposed pursuant to FATCA.

"Existing Class" means a Class of Existing Term Loans or a Class of Existing Revolving Commitments.

"Existing Revolving Commitments" has the meaning specified in Section 2.17(b).

"Existing Senior Unsecured Debt" means the 2024 Senior Notes, the 2026 Senior Notes and the 2027 Senior Notes.

"Existing Term Loans" has the meaning specified in Section 2.17(a).

"Extended Class" means a Class of Extended Term Loans or a Class of Extended Revolving Commitments.

"Extended Revolving Commitments" has the meaning specified in Section 2.17(b).

"Extended Term Loans" has the meaning specified in Section 2.17(a).

"Extending Lender" has the meaning specified in Section 2.17(c).

"Extension Effective Date" has the meaning specified in Section 2.17(c).

"Extension Election" has the meaning specified in Section 2.17(c).

"Extension Request" means a Revolving Credit Extension Request or a Term Loan Extension Request.

"Fair Value" has the meaning provided in the definition of the term Solvent.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code as of the Amendment No. 6 Effective Date (and any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof and any agreements entered into pursuant to current Section 1471(b) (or any amended or successor version described above) and any

-24-

intergovernmental agreement implementing the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to such intergovernmental agreement.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate.

"Final Maturity Date" means, at any time, the latest of the Revolving Termination Date, the Delayed Draw Term A Loan Termination Date, the Term B-4 Loan Termination Date, any final maturity date applicable to any outstanding Incremental Term Loans at such time and any final maturity date specified in an Additional Credit Extension Amendment.

"Financial Covenant Election" means an irrevocable election made by the Parent Borrower during the Financial Covenant Notice Period by written notice from the Parent Borrower to the Administrative Agent on any Business Day during either (i) the last month of any Eligible Quarter or (ii) not more than thirty (30) days following the conclusion of any Eligible Quarter (such Business Day, the "Financial Covenant Election Date") to become subject to the covenant contained in Section 8.10(a) hereof; if such election is so made, the "Elected Quarter" shall be (x) in the case of clause (i) of this definition, the Eligible Quarter that shall end on the last day of such month and (y) in the case of clause (ii) of this definition, the Eligible Quarter that has most recently ended prior to such election.

"Financial Covenant Election Date" has the meaning assigned thereto in the definition of Financial Covenant Election.

"Financial Covenant Notice Period" means the period following the Amendment No. 8 Effective Date and ending on October 29, 2021.

"Financial Covenant Percentage Factor" means, (a) for the first quarter of Parent Borrower's fiscal year, 12.24%, (b) for the second quarter of Parent Borrower's fiscal year, 33.87%, (c) for the third quarter of Parent Borrower's fiscal year, 45.32% and (d) for the fourth quarter of Parent Borrower's fiscal year, 8.57%.

"Financial Covenant Start Date" means the last day of the first Specified Quarter.

"First-Tier Foreign Subsidiary" means any Foreign Subsidiary that is owned directly by a Domestic Credit Party.

"Foreign Borrower Agreement" means a Foreign Borrower Agreement substantially in the form of Exhibit 1.01A hereto.

"Foreign Borrower Termination" means a Foreign Borrower Termination substantially in the form of Exhibit 1.01B hereto.

"Foreign Borrowers" means each Subsidiary of the Parent Borrower that becomes a Foreign Borrower pursuant to Section 1.08, in each case together with its successors and, in each case, that has not ceased to be a Foreign Borrower as provided in Section 1.08.

"Foreign Collateral Document" means each pledge, security or guarantee agreement or trust deed among the Collateral Agent and one or more Foreign Credit Parties that is reasonably acceptable to the Collateral Agent, together with each other agreement, instrument or document required or reasonably requested by the Administrative Agent to pledge, grant and/perfect the Lien on any property of any Foreign Credit Party.

"Foreign Credit Party" means any Credit Party other than a Domestic Credit Party.

"Foreign Disposition" has the meaning assigned to such term in Section 2.06(b)(vi).

-25-

"Foreign Guaranteed Obligations" has the meaning specified in Section 5.03(c).

"Foreign Guarantor" means any Guarantor that is a Foreign Subsidiary.

"Foreign Lender" means any Lender that is not a "United States person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"Foreign Obligations" means any Obligations of a Foreign Borrower or Foreign Guarantor (in each case in its capacity as such).

"Foreign Subsidiary" means any Subsidiary that is not organized under the laws of the United States of America, any state thereof, or the District of Columbia.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Free Cash" means cash and Cash Equivalents less (i) ticketing-related client funds, (ii) event-related deferred revenue and (iii) accrued expenses due to artists and for cash collected on behalf of others for ticket sales, plus event-related prepaids.

"Fronted Currencies" means Brazilian Real and any Other Alternative Currency agreed to by the Parent Borrower and the Administrative Agent.

"Fronted Currency Loan" means a Revolving Loan under the Multicurrency Revolving Facility made in a Fronted Currency.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Funded Debt" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations for borrowed money, whether current or long-term (including the Loan Obligations hereunder), and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     all purchase money indebtedness (including indebtedness and obligations in respect of conditional sales and title retention arrangements, except for customary conditional sales and title retention arrangements with suppliers that are entered into in the ordinary course of business) and all indebtedness and obligations in respect of the deferred purchase price of property or services (other than trade accounts payable incurred in the ordinary course of business);

(c)     all direct obligations under letters of credit (including standby and commercial), bankers' acceptances and similar instruments;

(d)     the Attributable Principal Amount of capital leases;

(e)     the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Capital Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Capital Stock);

-26-

(f)        Support Obligations in respect of Funded Debt of another Person; and

(g)        Funded Debt of any partnership or joint venture or other similar entity in which such Person is a general partner or joint venturer, and has personal liability for such obligations, but only to the extent there is recourse to such Person for payment thereof; provided, however, that the indebtedness of a Subsidiary of the Parent Borrower that is non-recourse to any of the Credit Parties and whose net income is excluded in the calculation of Consolidated Net Income due to the operation of clause (ii) of the definition thereof shall be excluded.

For purposes hereof, the amount of Funded Debt shall be determined (i) based on the outstanding principal amount in the case of borrowed money indebtedness under clause (a) and purchase money indebtedness and the deferred purchase obligations under clause (b), (ii) based on the maximum face amount in the case of letter of credit obligations and the other obligations under clause (c), (iii) based on the amount of Funded Debt that is the subject of the Support Obligations in the case of Support Obligations under clause (f), and (iv) with respect to the indebtedness of a non-Wholly Owned Subsidiary of the Parent Borrower that was the subject of an Investment made following the Amendment No. 6 Effective Date, to the extent such indebtedness is non-recourse to any of the Credit Parties or any of their respective Subsidiaries (other than such non-Wholly Owned Subsidiary or any Subsidiary of such non-Wholly Owned Subsidiary that is not a Credit Party), the Parent Borrower may elect, upon written notice from the Parent Borrower to the Administrative Agent designating such non-Wholly Owned Subsidiary a "Specified Subsidiary", that the amount of such indebtedness of such non-Wholly Owned Subsidiary or any Subsidiary of such non-Wholly Owned Subsidiary that shall be included in this definition of Funded Debt be a percentage of such indebtedness (the "Specified Percentage") that is equal to the percentage of the aggregate outstanding Capital Stock of such Specified Subsidiary owned by the Parent Borrower and its Subsidiaries (other than such Specified Subsidiary); provided that (A) the Specified Percentage shall not be less than the percentage of such Specified Subsidiary's net income that is included in Consolidated Net Income (after giving effect to the operation of the second parenthetical phrase in the definition of Consolidated Net Income) and (B) together with any financial statements delivered pursuant to Section 7.1(a) or (b), the Parent Borrower shall provide when delivering such financial statements a brief reconciliation of the Specified Percentage of the indebtedness referred to in this clause (iv) to the actual principal amount of such indebtedness. Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to mean the maximum face amount of such Letter of Credit after giving effect to all increases thereof contemplated by such Letter of Credit or the L/C Application therefor, whether or not such maximum face amount is in effect at such time.

"GAAP" has the meaning provided in Section 1.03(a).

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state, local, county, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Granting Lender" has the meaning provided in Section 11.06(h).

"Guaranteed Obligations" shall mean the Domestic Guaranteed Obligations and the Foreign Guaranteed Obligations.

"Guarantors" means (a) as of the Amendment No. 6 Effective Date, each Subsidiary of the Parent Borrower listed on Schedule 1.01C and (b) each other Person that becomes a Guarantor pursuant to the terms hereof, in each case together with its successors.

"Hazardous Materials" means all materials, substances or wastes characterized, classified or regulated as hazardous, toxic, pollutant, contaminant or radioactive under Environmental Laws, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes.

"Hedge Bank" has the meaning provided in the definition of "Borrower Obligations."

-27-

"HOBE Excluded Assets" means the assets listed on Schedule 1.01D hereto.

"Honor Date" has the meaning provided in Section 2.03(c)(i).

"Immaterial Subsidiary" means, at any date of determination, any Subsidiary of the Parent Borrower designated as such~~in writing~~ by the Parent Borrower that had assets representing 3.0% or less of the Parent Borrower's Consolidated Total Assets on, and generated less than 3.0% of the Parent Borrower's and its Subsidiaries' total revenues for the four quarters ending on, the last day of the most recent period at the end of which financial statements were required to be delivered pursuant to Section 7.01(a) or (b) or, if such date of determination is prior to the first delivery date under either such Section, on (or, in the case of revenues, for the four quarters ending on) the last day of the period of the most recent financial statements referred to in the second sentence of Section 6.05; provided that if all Domestic Subsidiaries that are individually "Immaterial Subsidiaries" have aggregate Total Assets that would represent 10.0% or more of the Parent Borrower's Consolidated Total Assets on such last day or generated 10.0% or more of the Parent Borrower's and its Subsidiaries' total revenues for such four fiscal quarters, then such number of Domestic Subsidiaries of the Parent Borrower as are necessary shall become Material Subsidiaries so that Domestic Subsidiaries that are "Immaterial Subsidiaries" have in the aggregate Total Assets that represent less than 10.0% of the Parent Borrower's Consolidated Total Assets and less than 10.0% of the Parent Borrower's and its Subsidiaries' total revenues as of such last day or for such four quarters, as the case may be (it being understood that any such determination with respect to revenues and assets shall be made on a Pro Forma Basis).

"Impacted Interest Period" has the meaning set forth in the definition of "Eurodollar Rate."

"Increase Period" has the meaning specified in Section 8.10.

"Incremental Base Amount" has the meaning provided in Section 2.01(f)(i)(x).

"Incremental Equivalent Debt" shall mean secured or unsecured Indebtedness of the Parent Borrower in the form of *pari passu* secured notes, junior lien term loans or notes or unsecured term loans or notes or bridge in lieu of the foregoing; provided that: (a) no Incremental Equivalent Debt shall be secured by any asset that does not constitute Collateral, (b) no Subsidiary of the Parent Borrower (other than a Domestic Credit Party) shall be an obligor with respect thereto, (c) no Incremental Equivalent Debt shall mature on or prior to the Term B-4 Loan Termination Date or have a shorter Weighted Average Life to Maturity than the Term B-4 Loans or have mandatory offers to purchase or mandatory prepayments that are more onerous than those applicable to the Term B-4 Loans (other than, with respect to maturity, customary extension rollover provisions (including by conversion or exchange) for bridge facilities, in which case, such maturity may be earlier than that of the Term B-4 Loans if such maturity is automatically extended upon the initial maturity date to a date not earlier than the maturity date of the Term B-4 Loans), (d) to the extent secured on a *pari passu* basis with the Term Loans, shall be subject to a customary *pari passu* intercreditor agreement or, to the extent secured on a junior lien basis with the Term Loans, shall be subject to a customary junior priority intercreditor agreement, in each case, on terms that are reasonably satisfactory to the Administrative Agent, (e) subject to the Limited Condition Acquisition provisions in Section 1.11, no Default or Event of Default shall have occurred and be continuing or shall result after giving effect to any such Incremental Equivalent Debt (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 9.01(a) or 9.01(f) as of the Transaction Agreement Date) shall exist and (f) the covenants, events of default, guarantees, collateral and other terms of which (other than interest rate and redemption premiums), taken as a whole, shall not be more restrictive in any material respect to the Parent Borrower and its Subsidiaries than those applicable to the Term B-4 Loans under this Credit Agreement, as determined by the Parent Borrower in good faith, except to the extent such terms apply solely to any period after the Term B-4 Loan Termination Date; provided that any such Incremental Equivalent Debt may contain any financial maintenance covenant that is more restrictive to the Parent Borrower and its Subsidiaries than those in this Credit Agreement and that applies prior to the Term B-4 Loan Termination Date, so long as all Lenders also receive the benefit of such restrictive terms, and which amendment to this Credit Agreement to cause all Lenders to so receive the benefit of such restrictive terms shall not require the consent of any Lender.

"Incremental Loan Facilities" has the meaning provided in Section 2.01(f).

-28-

Exhibit 2, page 175

"Incremental Revolving Commitments" has the meaning provided in Section 2.01(f).

"Incremental Revolving Facility" has the meaning provided in Section 2.01(f).

"Incremental Term Loan" has the meaning provided in Section 2.01(f).

"Incremental Term Loan Joinder Agreement" means a lender joinder agreement, in a form reasonably satisfactory to the Administrative Agent, the Parent Borrower and each Lender extending Incremental Term Loans, executed and delivered in accordance with the provisions of Section 2.01(h).

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

    (a)     all Funded Debt;

    (b)     net obligations under Swap Contracts;

    (c)     Support Obligations in respect of Indebtedness of another Person; and

    (d)     Indebtedness of any partnership or joint venture or other similar entity in which such Person is a general partner or joint venturer, and has personal liability for such obligations, but only to the extent there is recourse to such Person for payment thereof. For purposes hereof, the amount of Indebtedness shall be determined (i) based on Swap Termination Value in the case of net obligations under Swap Contracts under clause (b) and (ii) based on the outstanding principal amount of the Indebtedness that is the subject of the Support Obligations in the case of Support Obligations under clause (c).

"Indemnified Taxes" means all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document.

"Indemnitee" has the meaning provided in Section 11.04(b).

"Information" has the meaning provided in Section 11.07.

"Interest Payment Date" means, (a) as to any Base Rate Loan (including Swingline Loans), the last Business Day of each March, June, September and December, the Revolving Termination Date and the date of the final principal amortization payment on the Delayed Draw Term A Loans or Term B-4 Loans, as applicable, and, in the case of any Swingline Loan, any other dates as may be mutually agreed upon by the Parent Borrower and the Swingline Lender, and (b) as to any Eurodollar Rate Loan, the last Business Day of each Interest Period for such Loan, the date of repayment of principal of such Loan, the Revolving Termination Date and the date of the final principal amortization payment on the Delayed Draw Term A Loans or the Term B-4 Loans, as applicable, and in addition, where the applicable Interest Period exceeds three (3) months, the date every three (3) months after the beginning of such Interest Period. If an Interest Payment Date falls on a date that is not a Business Day, such Interest Payment Date shall be deemed to be the immediately succeeding Business Day.

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one week or one (1), two (2), three (3) or six (6) and, with prior written consent of all applicable Lenders, twelve (12) months thereafter, as selected by the Parent Borrower in its Loan Notice or such other period that is twelve months or less requested by the Parent Borrower and consented to by all the directly affected Lenders; provided that:

    (a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the immediately succeeding Business Day unless such Business Day falls in another calendar month (or, in the case of one week Interest Periods, another calendar week), in which case such Interest Period shall end on the immediately preceding Business Day;

-29-

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)     no Interest Period with respect to any Revolving Loan shall extend beyond the Revolving Termination Date; and

(d)     no Interest Period with respect to the Delayed Draw Term A Loans or Term B-4 Loans shall extend beyond any principal amortization payment date for such Loans, except to the extent that the portion of such Loan comprised of Eurodollar Rate Loans that is expiring prior to the applicable principal amortization payment date plus the portion comprised of Base Rate Loans equals or exceeds the principal amortization payment then due. "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Interpolated Rate" means, at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the Eurodollar Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Eurodollar Screen Rate for the longest period for which the Eurodollar Screen Rate is available for the applicable currency that is shorter than the Impacted Interest Period; and (b) the Eurodollar Screen Rate for the shortest period (for which that Eurodollar Screen Rate is available for the applicable currency) that exceeds the Impacted Interest Period, in each case, at such time.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person of or in the Capital Stock, Indebtedness or other equity or debt interest of another Person, whether by means of (a) the purchase or other acquisition of Capital Stock of another Person, (b) a loan, advance or capital contribution to, guaranty or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor undertakes any Support Obligation with respect to Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Involuntary Disposition" means the receipt by any member of the Consolidated Group of any cash insurance proceeds or condemnation awards payable by reason of theft, loss, physical destruction or damage, loss of use, taking or similar event with respect to any of its Property.

"IP Rights" has the meaning provided in Section 6.20.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance of such Letter of Credit).

"Issuer Documents" means, with respect to any Letter of Credit, the L/C Application and any other document, agreement or instrument entered into by a Borrower and an L/C Issuer (or in favor of an L/C Issuer) relating to such Letter of Credit.

"Japanese Yen" or "¥" means the lawful currency of Japan.

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit 7.12, executed and delivered in accordance with the provisions of Section 7.12.

"JPMCB" means JPMorgan Chase Bank, N.A.

"JPME" means J.P. Morgan Europe Limited.

"JPMorgan" means J.P. Morgan Securities LLC.

-30-

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes, executive orders and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority, including, without limitation, Environmental Laws.

"L/C Advance" means, with respect to each Lender, such Lender's funding of its participation in any L/C Borrowing.

"L/C Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"L/C Borrowing" means any extension of credit resulting from a drawing under any Letter of Credit that has not been reimbursed.

"L/C Commitment" means, with respect to the Dollar L/C Issuer or the Multicurrency L/C Issuer, the commitment of the Dollar L/C Issuer or the Multicurrency L/C Issuer to issue and to honor payment obligations under Letters of Credit and, with respect to each Revolving Lender, the commitment of such Revolving Lender to purchase participation interests in L/C Obligations up to the Dollar Equivalent of such Lender's Limited Currency Revolving Commitment Percentage thereof, in each case to the extent provided in Section 2.03(c).

"L/C Commitment Percentage" means, as to each L/C Revolving Lender at any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is the sum of such L/C Revolving Lender's Limited Currency Revolving Committed Amount and such L/C Revolving Lender's Dollar Revolving Committed Amount at such time and the denominator of which is the L/C Committed Amount at such time.

"L/C Committed Amount" means, at any time, the sum of the Aggregate Limited Currency Revolving Committed Amount plus the Aggregate Dollar Revolving Committed Amount at such time and as to any L/C Revolving Lender, its L/C Commitment Percentage of the L/C Committed Amount; provided that for the avoidance of doubt, the L/C Sublimit shall govern the maximum amount of L/C Obligations that may be outstanding pursuant to Section 2.01(b).

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Expiration Date" means the day that is seven (7) days prior to the Revolving Termination Date then in effect (or, if such day is not a Business Day, the immediately preceding Business Day).

"L/C Issuer" means a Dollar L/C Issuer or a Multicurrency L/C Issuer, and "L/C Issuers" means, collectively, each Dollar L/C Issuer and Multicurrency L/C Issuer.

"L/C Obligation" means a Dollar Facility L/C Obligation or a Limited Currency Facility L/C Obligation, as the context may require, and "L/C Obligations" means Dollar Facility L/C Obligations and Limited Currency Facility L/C Obligations, collectively.

-31-

"L/C Revolving Lender" means a Dollar Revolving Lender or a Limited Currency Revolving Lender, and the "L/C Revolving Lenders" refers to the Dollar Revolving Lenders and the Limited Currency Revolving Lenders, collectively.

"L/C Sublimit" has the meaning provided in Section 2.01(b).

"LCA Election" has the meaning provided in Section 1.11.

"Lead Arrangers" means JPMorgan, Goldman Sachs Bank USA, BofA Securities, Inc., Citibank, N.A., HSBC Securities (USA) Inc., Mizuho Bank, Ltd., Morgan Stanley Senior Funding, Inc., MUFG Union Bank, N.A., ~~SunTrust Robinson Humphrey~~Truist Securities, Inc., The Bank of Nova Scotia and Wells Fargo Securities, LLC.

"Lender" means each of the Persons identified as a "Lender" on the signature pages hereto (and, as appropriate, includes the Swingline Lender) and each Person who joins as a Lender pursuant to the terms hereof, together with its successors and permitted assigns.

"Lending Office" means, as to any Lender, the office or offices of such Lender set forth in such Lender's Administrative Questionnaire or such other office or offices as a Lender may from time to time provide notice of to the Parent Borrower and the Administrative Agent.

"Letter of Credit" means any letter of credit issued pursuant to this Credit Agreement.

"Letter of Credit Cap" means the amount set forth opposite each L/C Issuer on Schedule 1.01F; provided that such Schedule may be revised from time to time by the Parent Borrower, the Administrative Agent and such L/C Issuer to change such L/C Issuer's Letter of Credit Cap or by the Parent Borrower, the Administrative Agent and any new L/C Issuer to establish a Letter of Credit Cap for such new L/C Issuer.

"Letter of Credit Fees" has the meaning provided in Section 2.09(b)(i).

"Liabilities" has the meaning provided in the definition of the term Solvent.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property and any financing lease having substantially the same economic effect as any of the foregoing).

"Limited Condition Acquisition" means any Permitted Acquisition or other similar Investment by the Parent Borrower or one or more of its Restricted Subsidiaries permitted by this Credit Agreement whose consummation is not conditioned on the availability of, or on obtaining, third party acquisition financing and which is designated as a Limited Condition Acquisition to the Administrative Agent by the prior written election of the Parent Borrower.

"Limited Currency Facility L/C Obligations" means, at any date of determination, the Limited Currency Facility Percentage multiplied by the sum of (x) the aggregate Dollar Equivalent amount available to be drawn under all outstanding Letters of Credit at such date plus (y) the aggregate Dollar Equivalent of all L/C Borrowings at such date. For all purposes of this Credit Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Limited Currency Facility Percentage" means, at any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is the Aggregate Limited Currency Revolving Committed Amount at such time and the denominator of which is the L/C Committed Amount at such time.

"Limited Currency Revolving Commitment" means, for each Limited Currency Revolving Lender, the commitment of such Lender to make Limited Currency Revolving Loans (and to share in Limited Currency

-32-

Revolving Obligations) hereunder, under documentation relating to Incremental Revolving Commitments or pursuant to an Additional Credit Extension Amendment, in each case in the amount of such Lender's Limited Currency Revolving Committed Amount, as such commitment may be increased or decreased pursuant to the other provisions hereof.

"Limited Currency Revolving Commitment Percentage" means, for each Limited Currency Revolving Lender, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Limited Currency Revolving Lender's Limited Currency Revolving Committed Amount and the denominator of which is the Aggregate Limited Currency Revolving Committed Amount. The Limited Currency Revolving Commitment Percentages as of the Amendment No. 6 Effective Date are set forth in Schedule I to Amendment No. 6 under the column entitled "Limited Currency Revolving Commitment Percentage".

"Limited Currency Revolving Committed Amount" means, for each Limited Currency Revolving Lender, the amount set forth in Schedule I to Amendment No. 6 under the row applicable to such Lender in the column entitled "Limited Currency Revolving Committed Amount", in the Assignment and Assumption by which such Limited Currency Revolving Lender became a Limited Currency Revolving Lender or in any documentation relating to Incremental Revolving Commitments or Additional Credit Extension Amendments, as such Limited Currency Revolving Committed Amount may be reduced or increased pursuant to the other provisions hereof.

"Limited Currency Revolving Facility" means the Aggregate Limited Currency Revolving Commitments and the provisions herein related to the Limited Currency Revolving Loans and the Letters of Credit.

"Limited Currency Revolving Lenders" means the Persons listed on Schedule I to Amendment No. 6 under the heading "Limited Currency Revolving Lender" together with their successors and permitted assigns, and any Person that shall be designated a "Limited Currency Revolving Lender" pursuant to Incremental Revolving Commitments or an Additional Credit Extension Amendment in accordance with the provisions hereof.

"Limited Currency Revolving Loan" has the meaning provided in Section 2.01(a)(ii).

"Limited Currency Revolving Notes" means the promissory notes, if any, given to evidence the Limited Currency Revolving Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of Limited Currency Revolving Note is attached as Exhibit 2.13-2.

"Limited Currency Revolving Obligations" means the Limited Currency Revolving Loans and the Limited Currency Facility L/C Obligations.

"Liquidity" means as of any date (a) Liquidity Covenant Free Cash as of such date plus (b) the sum of (i) the Aggregate Delayed Draw Term A Commitments, (ii) the amount by which the Aggregate Dollar Revolving Committed Amount exceeds the Outstanding Amount of Dollar Revolving Obligations, (iii) the amount by which the Aggregate Limited Currency Revolving Committed Amount exceeds the Outstanding Amount of Limited Currency Revolving Obligations, (iv) the amount by which the Aggregate Multicurrency Revolving Committed Amount exceeds the Outstanding Amount of Multicurrency Revolving Obligations and (v) the amount by which the Aggregate 2020-1 Incremental Revolving Committed Amount exceeds the Outstanding Amount of 2020-1 Incremental Revolving Loans as of such date. Liquidity shall not be determined on a Pro Forma Basis.

"Liquidity Covenant Free Cash" as of any date means (x) Free Cash as of such date plus (y) event-related deferred revenue as of such date not exceeding $250.0 million in the aggregate.

"Loan" means any Revolving Loan, Swingline Loan, Delayed Draw Term A Loan, Term B-4 Loan or Incremental Term Loan, and the Base Rate Loans and Eurodollar Rate Loans comprising such Loans.

"Loan Notice" means a notice of (a) a Borrowing of Loans (including Swingline Loans), (b) a conversion of Loans from one (1) Type to the other, or (c) a continuation of Eurodollar Rate Loans, which shall be substantially in the form of Exhibit 2.02.

-33-

"Loan Obligations" means the Revolving Obligations, Delayed Draw Term A Loans, Term B-4 Loans and Incremental Term Loans; provided that Excluded Swap Obligations shall not be a Loan Obligation of any Guarantor that is not a Qualified ECP Guarantor.

"Local Time" means (a) with respect to a Loan or Borrowing denominated in Dollars, New York City time, (b) with respect to a Loan or Borrowing denominated in Canadian Dollars or a B/A, Toronto time and (c) with respect to a Loan or Borrowing denominated in any other Approved Currency, London time.

"London Agent" means JPME, in its capacity as London agent for the Lenders hereunder, or any successor London agent.

"Major Disposition" means any Subject Disposition (or any series of related Subject Dispositions) or any Involuntary Disposition (or any series of related Involuntary Dispositions), in each case resulting in the receipt by one or more members of the Consolidated Group of Net Cash Proceeds in excess of $100.0 million.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or financial condition of the Parent Borrower and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of any Agent or any Lender under any material Credit Document; or (c) a material adverse effect upon the legality, validity, binding effect or the enforceability against any Credit Party of any material Credit Document to which it is a party.

"Material Permitted Acquisition" means a Permitted Acquisition involving consideration of $300.0 million or greater.

"Material Subsidiary" means each Subsidiary of the Parent Borrower other than an Excluded Subsidiary. "Maximum Rate" has the meaning assigned to such term in Section 11.09.

"Mexican Peso" or "MXN" means the lawful money of Mexico.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multicurrency L/C Issuer" means JPMCB, Bank of America, N.A., Goldman Sachs Bank USA, Mizuho Bank, Ltd., Morgan Stanley Bank, N.A., MUFG Union Bank, N.A., SunTrustTruist Bank, The Bank of Nova Scotia and Wells Fargo Bank, National Association, in their capacities as issuers of Letters of Credit hereunder, together with their respective successors in such capacity and any Limited Currency Revolving Lender approved by the Administrative Agent and the Parent Borrower; provided that no other Lender shall be obligated to become an L/C Issuer hereunder. References herein and in the other Credit Documents to the Multicurrency L/C Issuer shall be deemed to refer to the Multicurrency L/C Issuer in respect of the applicable Letter of Credit or to all Multicurrency L/C Issuers, as the context requires.

"Multicurrency Revolving Commitment" means, for each Multicurrency Revolving Lender, the commitment of such Lender to make Multicurrency Revolving Loans (and to share in Multicurrency Revolving Obligations) hereunder, under documentation relating to Incremental Revolving Commitments or pursuant to an Additional Credit Extension Amendment, in each case in the amount of such Lender's Multicurrency Revolving Committed Amount, as such commitment may be increased or decreased pursuant to the other provisions hereof.

"Multicurrency Revolving Commitment Percentage" means, for each Multicurrency Revolving Lender, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Multicurrency Revolving Lender's Multicurrency Revolving Committed Amount and the denominator of which is the Aggregate Multicurrency Revolving Committed Amount. The Multicurrency Revolving Commitment Percentages as of the Amendment No. 6 Effective Date are set forth in Schedule I to Amendment No. 6 under the column entitled "Multicurrency Revolving Commitment Percentage".

-34-

"<u>Multicurrency Revolving Committed Amount</u>" means, for each Multicurrency Revolving Lender the amount set forth in Schedule I to Amendment No. 6 under the row applicable to such Lender in the column entitled "Multicurrency Revolving Committed Amount", in the Assignment and Assumption by which such Multicurrency Revolving Lender became a Multicurrency Revolving Lender or in any documentation relating to Incremental Revolving Commitments or Additional Credit Extension Amendments, as such Multicurrency Revolving Committed Amount may be reduced or increased pursuant to the other provisions hereof.

"<u>Multicurrency Revolving Facility</u>" means the Aggregate Multicurrency Revolving Commitments and the provisions herein related to the Multicurrency Revolving Loans and B/A's.

"<u>Multicurrency Revolving Lenders</u>" means the Persons listed on Schedule I to Amendment No. 6 under the heading "Multicurrency Revolving Lenders" together with their successors and permitted assigns, and any Person that shall be designated a "Multicurrency Revolving Lender" pursuant to Incremental Revolving Commitments or an Additional Credit Extension Amendment in accordance with the provisions hereof.

"<u>Multicurrency Revolving Loan</u>" has the meaning provided in <u>Section 2.01(a)(iii)</u>.

"<u>Multicurrency Revolving Notes</u>" means the promissory notes, if any, given to evidence the Multicurrency Revolving Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of Multicurrency Revolving Note is attached as <u>Exhibit 2.13-3</u>.

"<u>Multicurrency Revolving Obligations</u>" means the Multicurrency Revolving Loans and the B/A Obligations.

"<u>Multiemployer Plan</u>" means any employee pension benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Parent Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five (5) plan years, has made or been obligated to make contributions.

"<u>Net Cash Proceeds</u>" means the aggregate proceeds paid in cash or Cash Equivalents received by any member of the Consolidated Group in connection with any Subject Disposition, Involuntary Disposition or incurrence of Indebtedness or issuance of Capital Stock, net of (a) attorneys' fees, accountants' fees, investment banking fees, sales commissions, underwriting discounts, survey costs, title insurance premiums, and related search and recording charges, transfer Taxes, deed or mortgage recording Taxes, required debt payments and required payments of other obligations relating to the applicable asset to the extent such debt or obligations are secured by a Lien permitted hereunder (other than a Lien granted pursuant to a Credit Document) on such asset, other customary expenses and brokerage, consultant and other customary fees and expenses, in each case, actually incurred in connection therewith and directly attributable thereto, (b) Taxes paid or payable as a result thereof (estimated reasonably and in good faith by the Parent Borrower and after taking into account any available Tax credits or deductions and any tax sharing arrangements) and (c) solely with respect to a Subject Disposition, the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any Taxes deducted pursuant to clause (b) above) (i) related to any of the Property Disposed of in such Subject Disposition and (ii) retained by the Parent Borrower or any of the Subsidiaries including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (provided, however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds from and after the date of such reduction). For purposes hereof, "Net Cash Proceeds" includes any cash or Cash Equivalents received upon the Disposition of any non-cash consideration received by any member of the Consolidated Group in any Subject Disposition or Involuntary Disposition.

"<u>New York Courts</u>" means any New York State court or federal court of the United States of America sitting in New York City in the borough of Manhattan, and any appellate court from any thereof.

"<u>New York UCC</u>" means the Uniform Commercial Code as from time to time in effect in the State of New York.

-35-

"Non-Extension Notice Date" has the meaning provided in Section 2.03(b)(iii).

"Notes" means the Revolving Notes, the Swingline Note, the Delayed Draw Term A Loan Notes and the Term B-4 Notes.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a Federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligations" means the Borrower Obligations and the Guaranteed Obligations, other than Excluded Swap Obligations.

"OFAC" has the meaning assigned to such term in Section 6.24(a).

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Original Revolving Commitments" means the "Revolving Commitments" in effect under this Agreement immediately prior to the Amendment No. 6 Effective Date.

"Original Revolving Loans" means the "Revolving Loans" made pursuant to the Original Revolving Commitments.

"Original Swingline Loans" means the "Swingline Loans" made pursuant to the "Revolving Facility" in effect immediately prior to the Amendment No. 6 Effective Date.

"Other Alternative Currency" has the meaning assigned to such term in the definition of Alternative Currency.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made hereunder or under any other Credit Document or from the execution, delivery, registration or enforcement of, or otherwise with respect to, this Credit Agreement or any other Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment pursuant to Section 11.13).

"Outstanding Amount" means (a) with respect to Revolving Loans on any date, the Dollar Equivalent amount of the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments

Exhibit 2, page 183

or repayments of Revolving Loans occurring on such date; (b) with respect to Swingline Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments or repayments of Swingline Loans occurring on such date; (c) with respect to any B/A Obligations on any date, the Dollar Equivalent amount of the aggregate face amount of the B/As accepted hereunder and outstanding at such time after giving effect to any B/A Drawings occurring as such date and any other changes in such amount on such date, including as a result of any reimbursements by a Canadian Borrower of any B/As; (d) with respect to any L/C Obligations on any date, the Dollar Equivalent amount of the aggregate outstanding amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by any Borrower of Unreimbursed Amounts; and (e) with respect to the Delayed Draw Term A Loans or Term B-4 Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any prepayments or repayments of the Delayed Draw Term A Loans or Term B-4 Loans on such date.

"Overnight Bank Funding Rate" means, for any day, (a) with respect to any amount denominated in Dollars, the rate comprised of both overnight federal funds and overnight eurodollar by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate) and (b) with respect to any amount denominated in an Alternative Currency, the rate of interest per annum at which overnight deposits in the applicable Alternative Currency, in an amount approximately equal to the amount with respect to which such rate is being determined, would be offered for such day by a branch or Affiliate of JPMCB in the applicable offshore interbank market for such currency to major banks in such interbank market.

"Parent Borrower" has the meaning provided in the preamble hereto, together with its successors and permitted assigns pursuant to Section 8.04.

"Participant" has the meaning provided in Section 11.06(d).
"Participant Register" has the meaning provided in Section 11.06(d).

"Participating Fronted Currency Lenders" means, with respect to any Fronted Currency, each Multicurrency Revolving Lender (other than any Alternative Currency Fronting Lender with respect to such Fronted Currency), unless such Multicurrency Revolving Lender has notified the Administrative Agent in writing (or via email) that it can make Revolving Loans in such Fronted Currency. For the avoidance of doubt, unless it has notified the Parent Borrower otherwise in writing, the Administrative Agent shall be a Participating Fronted Currency Lender.

"Participating Member State" means each state so described in any EMU Legislation.

"Patriot Act" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)). "PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Parent Borrower or any ERISA Affiliate or to which the Parent Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years.

"Perfection Certificate" means that certain perfection certificate dated the Amendment No. 6 Effective Date, executed and delivered by the Parent Borrower in favor of the Collateral Agent for the benefit of the holders of the Obligations, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Permitted Acquisition" means any Acquisition; provided that (i) no Default or Event of Default shall have occurred and be continuing or exist immediately after giving effect to such Acquisition (or, in the case of any

-37-

Limited Condition Acquisition, no Event of Default under Section 9.01(a) or 9.01(f) shall have occurred and be continuing on the Transaction Agreement Date), (ii) subject to the Limited Condition Acquisition provisions, after giving effect on a Pro Forma Basis to the Investment to be made, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and if such Acquisition involves consideration greater than $250.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (ii)) and (iii) if such Acquisition involves consideration in excess of $250.0 million (or if the total of all consideration for all Acquisitions since the Amendment No. 6 Effective Date exceeds $500.0 million), all assets acquired in such Acquisition shall be held by a Domestic Credit Party and all Persons acquired in such Acquisition shall become Domestic Guarantors; provided further that the Parent Borrower may elect to allocate consideration expended in such Acquisition for Property to be held by members of the Consolidated Group that are not Domestic Credit Parties or Acquisitions of Subsidiaries that are not Domestic Guarantors to Investments made pursuant to Sections 8.02(f), (k), (z), (aa), (cc) or, to the extent the consideration comes from a Foreign Subsidiary, Section 8.02(g), so long as capacity to make such Investments pursuant to the applicable Section is available at the time of such allocation (and any consideration so allocated shall reduce capacity for Investments pursuant to such Sections to the extent that capacity for such Investments are limited by such Sections), and to the extent such consideration is in fact so allocated to one of such Sections in accordance with the foregoing requirements, such consideration shall not count toward the $250.0 million and $500.0 million limitations set forth in this clause (iii). Notwithstanding any provision herein to the contrary, clauses (ii) and (iii) shall not apply to Excluded Acquisitions.

"Permitted Bond Hedge Transaction" means any call or capped call option (or substantively equivalent derivative transaction) on the Parent Borrower's common stock purchased by the Parent Borrower in connection with the issuance of any Convertible Indebtedness; provided that the purchase price for such Permitted Bond Hedge Transaction, less the proceeds received by the Parent Borrower from the sale of any related Permitted Warrant Transaction, does not exceed the net proceeds received by the Parent Borrower from the sale of such Convertible Indebtedness issued in connection with the Permitted Bond Hedge Transaction.

"Permitted Business" means the businesses of the Parent Borrower and its Subsidiaries conducted on the Amendment No. 7 Effective Date and any business reasonably related, ancillary or complementary thereto and any reasonable extension thereof.

"Permitted Deposits" means, with respect to the Parent Borrower or any of its Subsidiaries, cash or cash equivalents (and all accounts and other depositary arrangements with respect thereto) securing customary obligations of such Person that are incurred in the ordinary course of business in connection with ticketing, promoting or producing live entertainment events.

"Permitted Liens" means Liens permitted pursuant to Section 8.01.

"Permitted Warrant Transaction" means any call option, warrant or right to purchase (or substantively equivalent derivative transaction) on the Parent Borrower's common stock sold by the Parent Borrower substantially concurrently with any purchase by the Parent Borrower of a related Permitted Bond Hedge Transaction.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by the Parent Borrower or, with respect to any such plan that is subject to Section 412 of the Internal Revenue Code or Title IV of ERISA, any ERISA Affiliate.

"Platform" has the meaning provided in Section 7.02.

"Prepayment Account" has the meaning provided in Section 2.06(c)(iii).

-38-

"Present Fair Saleable Value" has the meaning provided in the term Solvent.

"Prime Rate" has the meaning provided in the definition of the term Base Rate.

"Pro Forma Basis" and "Pro Forma Effect" mean, with respect to any Subject Disposition, Specified Disposition, Acquisition, Incremental Loan Facilities, Incremental Equivalent Debt or the Transactions, for purposes of determining the applicable pricing level under the definition of "Applicable Percentage" and determining compliance with the financial covenant and conditions and the requirements of the definition of "Immaterial Subsidiary" hereunder, that such Subject Disposition, Specified Disposition, Acquisition, Incremental Loan Facilities, Incremental Equivalent Debt or the Transactions shall be deemed to have occurred as of the first day of the applicable period of four (4) consecutive fiscal quarters (or, in the case where the proviso to Consolidated Net Leverage Ratio applies, for the applicable period of four fiscal quarters set forth in such period of four fiscal quarters set forth therein). Further, for purposes of making calculations on a "Pro Forma Basis" hereunder, (a) in the case of any Subject Disposition or Specified Disposition, (i) income statement items (whether positive or negative) attributable to the property, entities or business units that are the subject of such Subject Disposition or Specified Disposition shall be excluded to the extent relating to any period prior to the date thereof and (ii) Indebtedness paid or retired in connection with such Subject Disposition or Specified Disposition shall be deemed to have been paid and retired as of the first day of the applicable period; and (b) in the case of any Acquisition, (i) income statement items (whether positive or negative) attributable to the property, entities or business units that are the subject thereof shall be included to the extent relating to any period prior to the date thereof and (ii) Indebtedness incurred in connection with such Acquisition shall be deemed to have been incurred as of the first day of the applicable period (and interest expense shall be imputed for the applicable period assuming prevailing interest rates hereunder).

"Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of outstanding Delayed Draw Term A Commitments, Term B-4 Loans, Dollar Revolving Commitments, Limited Currency Revolving Commitments, Multicurrency Revolving Commitments or 2020-1 Incremental Revolving Commitments, as applicable, of such Lender at such time and the denominator of which is the aggregate amount of Delayed Draw Term A Commitments of all Lenders, Term B-4 Loans of all Lenders, Dollar Revolving Commitments of all Lenders, Limited Currency Revolving Commitments of all Lenders, Multicurrency Revolving Commitments of all Lenders or 2020-1 Incremental Revolving Commitments of all Lenders, as applicable, at such time; provided that if any such Revolving Commitments have been terminated, then the Pro Rata Share of each applicable Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"Property" means an interest of any kind in any property or asset, whether real, personal or mixed, and whether tangible or intangible.

"Public Lender" has the meaning provided in Section 7.02.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 11.22.

"Qualified Capital Stock" means any Capital Stock of the Parent Borrower other than Disqualified Capital Stock.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Credit Party that has total assets exceeding $10.0 million at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

-39-

"Ratable Net Proceeds Share" means, at any time with respect to any Net Cash Proceeds of a Subject Disposition or Involuntary Disposition, the product of (x) such Net Cash Proceeds and (y) a fraction, the numerator of which is the aggregate principal amount of Applicable Pari Passu Debt outstanding at such time and the denominator of which is sum of the (A) aggregate principal amount of the Revolving Loans and Swingline Loans outstanding at such time plus (B) aggregate principal amount of Term Loans outstanding at such time plus (C) aggregate principal amount of Applicable Pari Passu Debt outstanding at such time.

"Recipient" has the meaning provided in the definition of the term Excluded Taxes.

"Refinancing Debt" has the definition set forth in Section 2.18(a).

"Refinancing Effective Date" has the meaning specified in Section 2.18(b).

"Refinancing Notes/Loans" has the meaning provided in Section 2.18(a).

"Refinancing Term Loans" has the meaning specified in Section 2.18(a).

"Register" has the meaning provided in Section 11.06(c).

"Registered Public Accounting Firm" has the meaning provided in the Securities Laws and shall be independent of the Parent Borrower as prescribed by the Securities Laws.

"Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System of the United States as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System of the United States as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Replaced Revolving Commitments" has the meaning specified in Section 2.19(a).
"Replacement Revolving Commitments" has the meaning specified in Section 2.19(a).

"Replacement Revolving Lender" has the meaning specified in Section 2.19(b).

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty-day notice period to the PBGC has been waived by regulation.

"Repricing Transaction" means (x) the refinancing or repricing of all or any portion of the Term B-4 Loans with term loans the primary purpose of which is to reduce the Effective Yield from that of the Term B-4 Loans as of the Amendment No. 6 Effective Date (immediately after giving effect to Amendment No. 6) or (y) an effective lowering of the Effective Yield of any Term B-4 Loans pursuant to any amendment to the Credit Documents or any conversion or exchange of such Term B-4 Loans; provided that a Repricing Transaction shall not be deemed to occur in connection with such a refinancing, repricing, amendment, conversion or exchange done in connection with an Acquisition not otherwise permitted by the Credit Documents or a Change of Control.

"Request for Credit Extension" means (a) with respect to a Borrowing of Loans (including Swingline Loans) or B/A Drawing, a Loan Notice and (b) with respect to an L/C Credit Extension, a L/C Application.

"Required 2020-1 Incremental Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate 2020-1 Incremental Revolving Commitments or, if the 2020-1 Incremental Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of 2020-1 Incremental Revolving Loans.

-40-

"Required Delayed Draw Term A Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the aggregate principal amount of the sum of (i) Delayed Draw Term A Commitments and (ii) Delayed Draw Term A Loans.

"Required Dollar Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate Dollar Revolving Commitments or, if the Dollar Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Dollar Revolving Obligations (including, in each case, the aggregate principal amount of each Lender's risk participation and funded participation in L/C Obligations and Swingline Loans).

"Required Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the sum of (i) the Additional Term B-4 Loan Commitments and Converted Term B-3 Loans (or, from and after the borrowings on the Amendment No. 6 Effective Date, the Term B-4 Loans), (ii) the Delayed Draw Term A Commitments, (iii) the Delayed Draw Term A Loans and (iv) the Aggregate Revolving Commitments (or, if the Revolving Commitments shall have expired or been terminated, the Revolving Obligations (including, in each case, the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations and Swingline Loans))

"Required L/C Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the sum of the Aggregate Dollar Revolving Commitments and the Aggregate Limited Currency Revolving Commitments at such date or, if the Dollar Revolving Commitments and the Limited Currency Revolving Commitments if the Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of sum of the Dollar Revolving Obligations and Limited Currency Revolving Obligations (including, in each case, the aggregate principal amount of each Lender's risk participation and funded participation in L/C Obligations and Swingline Loans).

"Required Limited Currency Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate Limited Currency Revolving Commitments or, if the Limited Currency Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Limited Currency Revolving Loans and B/A Drawings made pursuant to the Limited Currency Revolving Commitments (including, in each case, the aggregate principal amount of each Lender's risk participation and funded participation in L/C Obligations).

"Required Multicurrency Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate Multicurrency Revolving Commitments or, if the Multicurrency Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Multicurrency Revolving Loans and B/A Drawings made pursuant to the Multicurrency Revolving Commitments.

"Required Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate Revolving Commitments or, if the Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Revolving Obligations (including, in each case, the aggregate principal amount of each Lender's risk participation and funded participation in L/C Obligations and Swingline Loans).

"Required Specified Currency Limited Currency/Multicurrency Revolving Lenders" means, as of any date of determination with respect to any currency other than Dollars, Lenders having more than fifty percent (50%) of the Aggregate Limited Currency Revolving Commitments and Aggregate Multicurrency Revolving Commitments that are required, under Section 2.01(a)(ii) or (iii) to make Revolving Loans in such currency or, if the Limited Currency Revolving Commitments or Multicurrency Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Limited Currency Revolving Loans and Multicurrency Revolving Loans and (if applicable) B/A Drawings made in such currency.

-41-

"Required Term B-4 Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Additional Term B-4 Commitment and Converted Term B-3 Loans (or, from and after the Amendment No. 6 Effective Date, the Term B-4 Loans).

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means, as to any Credit Party, the chief executive officer, chief operating officer, the president, any executive vice president, the chief financial officer, the chief accounting officer, the treasurer, any assistant treasurer, any vice president, any senior vice president, the secretary or the general counsel of such Credit Party, any manager of such Credit Party (if such Credit Party is a limited liability company) or the general partner of such Credit Party (if such Credit Party is a limited partnership). Any document delivered hereunder that is signed by a Responsible Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Credit Party, and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"Restricted Lender" has the meaning provided in Section 11.23.

"Restricted Payment" means (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any member of the Consolidated Group, (ii) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Capital Stock or of any option, warrant or other right to acquire any such Capital Stock or (iii) any payment or prepayment of principal on or redemption, repurchase or acquisition for value of, any Subordinated Debt of any member of the Consolidated Group or any Indebtedness of any member of the Consolidated Group incurred pursuant to (a) the 2023 Convertible Notes, the 2024 Senior Notes, the 2026 Senior Notes or the 2027 Senior Notes, (b) Section 8.03(f), (c) to the extent representing a refinancing of any Indebtedness described in the foregoing clause (a) or (b) Section 8.03(l) except, in each case, any scheduled payment of principal (including at maturity), or (d) any Indebtedness incurred pursuant to Section 8.03(bb) (other than, in the case of this clause (d), a refinancing of Indebtedness originally incurred under Section 8.03(bb) with other indebtedness incurred pursuant to Section 8.03(bb)).

"Restricted Period" means the period that (A) begins on the Amendment No. 8 Effective Date and (B) ends on the first date on which the Parent Borrower shall have delivered to the Administrative Agent both (x) the financial statements pursuant to Section 7.01(a) or 7.01(b) relating to the fiscal year or fiscal quarter of Parent Borrower that ends on the last day of the first Specified Quarter and (y) a duly completed Compliance Certificate pursuant to Section 7.02(b) relating to such Specified Quarter demonstrating compliance with Section 8.10(a) as of the last day of such Specified Quarter.

"Restricted Subsidiary" means any Subsidiary that is not an Unrestricted Subsidiary.

"Revaluation Date" means, with respect to (x) any Letter of Credit, each of the following: (i) each date of issuance of a Letter of Credit denominated in an Alternative Currency, (ii) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof (solely with respect to the increased amount), (iii) each date of any payment by an L/C Issuer under any Letter of Credit denominated in an Alternative Currency and (iv) such additional dates as the Applicable Agent or the L/C Issuer shall determine or the Required Lenders shall require (y) any B/A Drawing, each of the following: (i) each date of a B/A Drawing, (ii) each date of an amendment of any such B/A having the effect of increasing the amount thereof (solely with respect to the increased amount), (iii) each date of any payment by a Canadian Borrower under any B/A, and (iv) such additional dates as the Applicable Agent or the Required Multicurrency Revolving Lenders shall require and (z) any Revolving Loan, each of the following: (i) each date of Borrowing of a Revolving Loan denominated in an Alternative Currency, (ii) each date of any payment by any Revolving Lender under any Revolving Loan denominated in an Alternative Currency and (iii) such additional dates as the Applicable Agent or the Required Revolving Lenders shall require.

"Revolving Commitment" means, as to each Lender, the sum of such Lender's Dollar Revolving Commitment, Limited Currency Revolving Commitment, Multicurrency Revolving Commitment and 2020-1 Incremental Revolving

-42-

Commitment and "Revolving Commitments" means, collectively, the Dollar Revolving Commitments, Limited Currency Revolving Commitments, Multicurrency Revolving Commitments and 2020-1 Incremental Revolving Commitments of all Revolving Lenders.

"Revolving Commitment Fees" has the meaning provided in Section 2.09(a).

"Revolving Committed Amount" means, as to each Lender, the sum of such Lender's Dollar Revolving Committed Amount, Limited Currency Revolving Committed Amount, Multicurrency Revolving Committed Amount and 2020-1 Incremental Revolving Committed Amount.

"Revolving Credit Extension Request" has the meaning specified in Section 2.17(b).

"Revolving Facility" means the Dollar Revolving Facility, the Limited Currency Revolving Facility, the Multicurrency Revolving Facility or the 2020-1 Incremental Revolving Facility and "Revolving Facilities" means, collectively, the Dollar Revolving Facility, the Limited Currency Revolving Facility, the Multicurrency Revolving Facility and the 2020-1 Incremental Revolving Facility.

"Revolving Lender" means a Dollar Revolving Lender, a Limited Currency Revolving Lender, a Multicurrency Revolving Lender or a 2020-1 Incremental Revolving Lender and "Revolving Lenders" means the collective reference to the Dollar Revolving Lenders, the Limited Currency Revolving Lenders, the Multicurrency Revolving Lenders and the 2020-1 Incremental Revolving Lenders.

"Revolving Lender Joinder Agreement" means a joinder agreement, in a form to be agreed among the Administrative Agent, the Parent Borrower and each Lender with an Incremental Revolving Commitment or commitment under an Incremental Revolving Facility, executed and delivered in accordance with the provisions of Section 2.01(f).

"Revolving Loan" means a Dollar Revolving Loan, a Limited Currency Revolving Loan, a Multicurrency Revolving Loan or a 2020-1 Incremental Revolving Loan and "Revolving Loans" means, collectively, Dollar Revolving Loans, Limited Currency Revolving Loans, Multicurrency Revolving Loans and 2020-1 Incremental Revolving Loans.

"Revolving Notes" means the collective reference to the Dollar Revolving Notes, the Limited Currency Revolving Notes, the Multicurrency Revolving Notes and the 2020-1 Incremental Revolving Notes.

"Revolving Obligations" means the collective reference to the Dollar Revolving Obligations, the Limited Currency Revolving Obligations, the Multicurrency Revolving Obligations and the 2020-1 Incremental Revolving Obligations.

"Revolving Termination Date" means the fifth anniversary of the Amendment No. 6 Effective Date.

"S&P" means Standard & Poor's Ratings Services, a division of McGraw Hill Financial Inc. and any successor thereto.

"Sale and Leaseback Transaction" means, with respect to the Parent Borrower or any Subsidiary, any arrangement, directly or indirectly, with any Person (other than a Domestic Credit Party) whereby the Parent Borrower or such Subsidiary shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Same Day Funds" means (a) with respect to disbursements and payments in Dollars, immediately available funds, and (b) with respect to disbursements and payments in an Alternative Currency, same day or other funds as may be determined by the Applicable Agent or the applicable L/C Issuer, as applicable, to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

-43-

"Sanctions" has the meaning provided in Section 6.24(a). "Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Section 2.02(b) Ratable Share" has the meaning provided in Section 2.02(b).

"Secured Party" has the meaning assigned to such term in the U.S. Security Agreement.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the Public Company Accounting Oversight Board, as each of the foregoing may be amended and in effect on any applicable date hereunder.

"Senior Indebtedness" means Indebtedness of the Parent Borrower or any of its Subsidiaries that is not expressly subordinated in right of payment to any other Indebtedness of Parent Borrower or any of its Subsidiaries.

"Senior Secured Debt" means, at any time, Consolidated Total Funded Debt that constitutes Senior Indebtedness secured by a Lien on any Collateral.

"Senior Secured Leverage Ratio" means, as of the last day of any fiscal quarter, the ratio of (i) Senior Secured Debt on such day to (ii) Consolidated EBITDA of the Consolidated Group for the period of four (4) consecutive fiscal quarters ending on such day.

"Significant Subsidiary" means (1) any Subsidiary that satisfies the criteria for a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X under the Securities Laws, as such Regulation is in effect on the Amendment No. 6 Effective Date (with reference to 10% in such Rule being deemed to be 7.5% for the purposes of this definition), and (2) any Subsidiary that, when aggregated with all other Subsidiaries that are not otherwise Significant Subsidiaries and as to which any event described in Section 9.01(f) or (h) has occurred and is continuing, would constitute a Significant Subsidiary under clause (1) of this definition.

"Solvent" means, with respect to any Person, as of any date of determination, (a) the Fair Value and Present Fair Saleable Value of the aggregate assets of such Person exceeds the value of its Liabilities; (b) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business; (c) such Person will be able to pay its Liabilities as they mature or become absolute; and (d) the Fair Value and Present Fair Saleable Value of the aggregate assets of such Person exceeds the value of its Liabilities by an amount that is not less than the capital of such Person (as determined pursuant to Section 154 of the Delaware General Corporate Law). The term "Solvency" shall have an equivalent meaning. For the purposes of this definition, "Fair Value" means the aggregate amount at which the assets of the applicable entity (including goodwill) would change hands between a willing buyer and a willing seller, within a commercially reasonable amount of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act and with equity to both; "Present Fair Saleable Value" means the aggregate amount of net consideration (giving effect to reasonable and customary costs of sale or Taxes) that could be expected to be realized if the aggregate assets of the applicable entity are sold with reasonable promptness in an arm's length transaction under present conditions for the sale of assets of comparable business enterprises; and "Liabilities" means all debts and other liabilities of the applicable entity, whether secured, unsecured, fixed, contingent, accrued or not yet accrued.

"SPC" has the meaning provided in Section 11.06(h).

"Specified Disposition" means any Disposition referred to in clause (a) of the definition of Subject Disposition, to the extent a material amount of Property is disposed of in such Disposition.

-44-

"Specified Intercompany Transfers" means a Disposition of Property by a Domestic Credit Party to a member of the Consolidated Group that is not a Domestic Credit Party.

"Specified Percentage" has the meaning assigned to such term in the definition of Funded Debt.

"Specified Quarters" means (a) if a Financial Covenant Election has not been made prior to the last day of the Financial Covenant Notice Period, the fiscal quarters of Parent Borrower ending December 31, 2021, March 31, 2022 and June 30, 2022 or (b) if the Financial Covenant Election Date is made prior to the last day of the Financial Covenant Notice Period, the Elected Quarter and the following two fiscal quarters of Parent Borrower.

"Specified Restrictions Termination Date" means the first date following the end of the Restricted Period where a Compliance Certificate is delivered that requires the Consolidated Net Leverage Ratio for purposes of determining compliance with Section 8.10(a) be calculated using Consolidated EBITDA from four fiscal quarters pursuant to clause (B) of the definition of Consolidated Net Leverage Ratio.

"Specified Subsidiary" has the meaning assigned to such term in the definition of Funded Debt.

"Spot Rate" for a currency means the rate determined by the Applicable Agent or an L/C Issuer, as applicable, to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. (x) New York time, in the case of Canadian Dollars, or (y) London time, in the case of any other currency, in each case on the date two (2) Business Days prior to the date as of which the foreign exchange computation is made; provided that the Applicable Agent or such L/C Issuer may obtain such spot rate from another financial institution designated by the Applicable Agent or such L/C Issuer if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency; provided, further, that such L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made in the case of any Letter of Credit denominated in an Alternative Currency.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Administrative Agent is subject with respect to the Adjusted Eurodollar Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the FRB). Such reserve percentage shall include those imposed pursuant to such Regulation D. Eurodollar Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Statutory Reserves" means (a) for any Interest Period for any Eurodollar Rate Loan in dollars, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained during such Interest Period under Regulation D by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion dollars against "Eurocurrency liabilities" (as such term is used in Regulation D), (b) for any Interest Period for any portion of a Borrowing in Swiss Francs, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Swiss Francs maintained by commercial banks which lend in Swiss Francs, (c) for any Interest Period for any portion of a Borrowing in Sterling, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Sterling maintained by commercial banks which lend in Sterling, (d) for any Interest Period for any portion of a Borrowing in Euros, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Euros maintained by commercial banks which lend in Euros, (e) for any Interest Period for any portion of a Borrowing in Swedish Krona, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Swedish Krona maintained by commercial banks which lend in Swedish Krona, (f) for any Interest Period for any portion of a Borrowing in Australian Dollars, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for

-45-

funding in Australian Dollars maintained by commercial banks which lend in Australian Dollars, (g) for any Interest Period for any portion of a Borrowing in Danish Krone, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Danish Krone maintained by commercial banks which lend in Danish Krone, (h) for any Interest Period for any portion of a Borrowing in Brazilian Real, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Brazilian Real maintained by commercial banks which lend in Brazilian Real, (i) for any Interest Period for any portion of a Borrowing in Mexican Pesos, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Mexican Pesos maintained by commercial banks which lend in Mexican Pesos and (j) for any Interest Period for any portion of a Borrowing in Japanese Yen, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Japanese Yen maintained by commercial banks which lend in Japanese Yen. Eurodollar Rate Loans shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under Regulation D.

"Step-Up" has the meaning specified in Section 8.10.

"Sterling" and "£" mean the lawful currency of the United Kingdom.

"Subject Disposition" means any Disposition other than (a) Dispositions of damaged, worn-out or obsolete Property that, in the Parent Borrower's reasonable judgment, is no longer used or useful in the business of the Parent Borrower or its Subsidiaries; (b) Dispositions of inventory, services or other property in the ordinary course of business; (c) Dispositions of Property to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement equipment or property; (d) licenses, sublicenses, leases and subleases not interfering in any material respect with the business of any member of the Consolidated Group; (e) sales or discounts of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business; (f) any Disposition at any time by (i) a Domestic Credit Party to any other Domestic Credit Party, (ii) a Subsidiary that is not a Credit Party to a Domestic Credit Party, (iii) a Subsidiary that is not a Credit Party to another Subsidiary that is not a Credit Party, (iv) a Foreign Credit Party to any other Foreign Credit Party or (v) a Foreign Credit Party to any Foreign Subsidiary that is not a Foreign Credit Party (provided that the fair market value of Property Disposed of pursuant to this clause (v) shall not exceed $250.0 million in the aggregate in any fiscal year of the Parent Borrower); (g) Specified Intercompany Transfers; (h) the sale of Cash Equivalents; (i) an Excluded Sale and Leaseback Transaction; (j) Restricted Payments permitted by Section 8.06; (k) mergers and consolidations permitted by Section 8.04; (l) the granting of Liens permitted pursuant to Section 8.01; (m) a Disposition of Property, to the extent constituting the making of an Investment permitted pursuant to Section 8.02 (other than Section 8.02(a)); (n) Dispositions, in one transaction or a series of related transactions, of assets or other properties of the Parent Borrower or its Subsidiaries with a fair market value not exceeding $25.0 million; provided that the aggregate amount of Dispositions that are not Subject Dispositions by the operation of this clause (n) shall not exceed $100.0 million in the aggregate; (o) Dispositions related to the unwinding of any Swap Contract in accordance with its terms; and (p) the settlement or early termination of any Permitted Bond Hedge Transaction or any related Permitted Warrant Transaction.

"Subordinated Debt" means (x) as to the Parent Borrower, any Funded Debt of the Parent Borrower that is expressly subordinated in right of payment to the prior payment of any of the Loan Obligations of the Parent Borrower and (y) as to any Guarantor, any Funded Debt of such Guarantor that is expressly subordinated in right of payment to the prior payment of any of the Loan Obligations of such Guarantor.

"Subsidiary" of a Person means (A) a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise Controlled, directly, or indirectly through one or more intermediaries, or both, by such Person or (B) any other Person that is a consolidated subsidiary of such Person under GAAP and designated as a Subsidiary of such Person in a certificate to the Administrative Agent by a financial or accounting officer of such Person. Unless otherwise provided, "Subsidiary" shall refer to a Subsidiary of the Parent Borrower; provided that an Unrestricted Subsidiary shall be deemed not to be a

-46-

"Subsidiary" for purposes of this Credit Agreement and each other Credit Document; provided further that any Subsidiary other than an Unrestricted Subsidiary shall be deemed to be a Restricted Subsidiary.

"Subsidiary Redesignation" has the meaning provided in the definition of "Unrestricted Subsidiary."

"Support Obligations" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Support Obligations shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Support Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Supported QFC" has the meaning assigned to it in Section 11.22.

"Swap Contract" means any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination values determined in accordance therewith, such termination values, and (b) for any date prior to the date referenced in clause (a), the amounts determined as the mark-to-market values for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Swedish Krona" or "kr" means the lawful currency of Sweden.

"Swingline Borrowing" means a borrowing of a Swingline Loan pursuant to Section 2.01(c).

"Swingline Commitment" means, with respect to the Swingline Lender, the commitment of the Swingline Lender to make Swingline Loans, and with respect to each Lender, the commitment of such Lender to purchase participation interests in Swingline Loans.

-47-

"Swingline Exposure" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time. The Swingline Exposure of any Dollar Revolving Lender at any time shall be its Dollar Revolving Commitment Percentage of the total Swingline Exposure at such time.

"Swingline Lender" means JPMCB in its capacity as such, together with any successor in such capacity.

"Swingline Loan" has the meaning provided in Section 2.01(c).

"Swingline Note" means the promissory note given to evidence the Swingline Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of Swingline Note is attached as Exhibit 2.13-4.

"Swingline Sublimit" has the meaning provided in Section 2.01(c).

"Swiss Franc" or "CHF" means the lawful currency of Switzerland.

"Synthetic Lease" means any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing arrangement that is considered borrowed money indebtedness for tax purposes but is classified as an operating lease under GAAP.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tax Returns" means any return, report or similar statement filed or required to be filed with respect to any Tax (including any attached schedules) including any informational return, claim for refund, amended return or declaration of estimated Tax.

"Term A Amortization Payment Date" shall have the meaning assigned to such term in Section 2.05(c).

"Term A-1 Loans" means the "Term A-1 Loans" under the Credit Agreement as in effect prior to giving effect to Amendment No. 3.

"Term A-2 Loans" means the "Term A-2 Loans" under the Credit Agreement as in effect prior to giving effect to Amendment No. 6.

"Term B-1 Loans" means the "Term B-1 Loans" under the Credit Agreement as in effect prior to giving effect to Amendment No. 3.

"Term B-2 Loans" means the "Term B-2 Loans" under the Credit Agreement as in effect prior to giving effect to Amendment No. 4.

"Term B-3 Amendment No. 6 Converting Lender" means each Term B-3 Lender that, in accordance with Amendment No. 6, provided the Administrative Agent with a counterpart to Amendment No. 6 executed by such Lender with the box "Term B-3 Lender Conversion Option" checked.

"Term B-3 Lenders" the Persons holding Term B-3 Loans immediately prior to the occurrence of the Amendment No. 6 Effective Date.

"Term B-3 Loans" means the "Term B-3 Loans" under the Credit Agreement as in effect prior to giving effect to Amendment No. 6.

"Term B-4 Lenders" means, prior to the funding of the initial Term B-4 Loans on the Amendment No. 6 Effective Date, the Additional Term B-4 Lender and any holder of a Converted Term B-3 Loan, and from and after funding of the Term B-4 Loans, those Lenders holding any Term B-4 Loans (including any Incremental Term Loans that are Term B-4 Loans), together with their successors and permitted assigns.

-48-

"Term B-4 Loan Termination Date" means the date that is the seventh anniversary of the Amendment No. 6 Effective Date.

"Term B-4 Loans" has the meaning provided in Section 2.01(e).

"Term B-4 Note" means the promissory notes substantially in the form of Exhibit 2.13-6, if any, given to evidence the Term B-4 Loans, as amended, restated, modified, supplemented, extended, renewed or replaced.

"Term Loan Commitments" means the Delayed Draw Term A Commitments and the Additional Term B-4 Commitment.

"Term Loan Extension Request" has the meaning specified in Section 2.17(a).

"Term Loan Lenders" means the Delayed Draw Term A Lenders and the Term B-4 Lenders.

"Term Loans" means the Delayed Draw Term A Loans, Term B-4 Loans and any other Class established pursuant to an Additional Credit Extension Amendment.

"Ticketmaster Merger" means the merger of Ticketmaster Entertainment, Inc. and Live Nation Merger Sub, an indirect wholly-owned Subsidiary of the Parent Borrower, pursuant to the Agreement and Plan of Merger, dated as of February 10, 2009, among Ticketmaster Entertainment, LLC, the Parent Borrower and Live Nation Merger Sub.

"Total Assets" of any Person means the total assets of such Person as set forth on such Person's most recent balance sheet.

"Transaction Agreement Date" has the meaning provided in Section 1.11.

"Transactions" means (i) the borrowing of the Term B-4 Loans on the Amendment No. 6 Effective Date, (ii) the conversion of Term B-3 Loans of the Term B-3 Amendment No. 6 Converting Lenders into Term B-4 Loans, (iii) the establishment of the Delayed Draw Term A Commitments, (iv) the repayment of the Term A-2 Loans, the Term B-3 Loans that are not Converted Term B-3 Loans, the Original Revolving Loans and the Original Swingline Loans, (v) the termination of the Original Revolving Commitments, (vi) the redemption or satisfaction of the 2022 Senior Notes, (vii) the incurrence of the 2027 Senior Notes, (viii) the establishment of the 2020-1 Incremental Revolving Commitments on the Amendment No. 7 Effective Date, (ix) the actions taken pursuant to Amendment No. 8, and (x) the payment of fees and expenses in connection with the foregoing.

"Treasury Management Agreement" means any agreement governing the provision of treasury or cash management services, including deposit accounts, funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, purchase cards, account reconciliation and reporting and trade finance services.

"Treasury Management Bank" has the meaning provided in the definition of "Borrower Obligations."

"Type" means, with respect to any Revolving Loan or Term Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"UCC" means the Uniform Commercial Code in effect in any applicable jurisdiction from time to time.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and

-49-

certain affiliates of such credit institutions or investment firms. "UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" or "U.S." means the United States of America.

"United States Tax Compliance Certificate" has the meaning provided in Section 3.01(e).

"Unreimbursed Amount" has the meaning provided in Section 2.03(c)(i).

"Unrestricted Subsidiary" means any Subsidiary acquired, purchased or invested in after the Amendment No. 6 Effective Date that is designated as an Unrestricted Subsidiary hereunder by written notice from the Parent Borrower to the Administrative Agent; provided that the Parent Borrower shall only be permitted to so designate a new Unrestricted Subsidiary so long as (a) no Default or Event of Default has occurred and is continuing or would result therefrom; (b) after giving effect on a pro forma basis to such designation, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10; (c) such Unrestricted Subsidiary shall be solely capitalized (to the extent capitalized by any Credit Party) through one or more investments permitted by Section 8.02(k), (r) or (aa); (d) without duplication of clause (c), when any pre-existing Subsidiary is designated as an Unrestricted Subsidiary, the portion of the aggregate fair value of the assets of such newly designated Unrestricted Subsidiary (proportionate to the applicable Borrower's or Subsidiary's equity interest in such Unrestricted Subsidiary) at the time of the designation thereof as an Unrestricted Subsidiary shall be treated as Investments pursuant to Section 8.02(k) or (aa) (it being understood that such aggregate fair value shall be set forth in a certificate of a Responsible Officer of the Parent Borrower, which certificate (x) shall be dated as of the date such subsidiary is designated as an Unrestricted Subsidiary, (y) shall have been delivered by the Parent Borrower to the Administrative Agent (for delivery to the Lenders) on or prior to the date of such designation and (z) shall set forth a reasonably detailed calculation of such aggregate fair value); (e) with respect to the Existing Senior Unsecured Debt and any other material Indebtedness for borrowed money (to the extent the concept of an Unrestricted Subsidiary exists in such other material Indebtedness) and, in each case, any refinancing Indebtedness thereof, such Subsidiary shall have been designated an Unrestricted Subsidiary (or otherwise not be subject to the covenants and defaults except on a basis substantially similar to this Credit Agreement) under the documents governing such material Indebtedness permitted to be incurred or maintained herein; and (f) no Investment in an Unrestricted Subsidiary, or designation of a pre-existing Subsidiary as an Unrestricted Subsidiary, may be made through an Investment pursuant to Section 8.02(k) at any time during the Restricted Period. Any Unrestricted Subsidiary may be designated by the Parent Borrower to be a Restricted Subsidiary for purposes of this Credit Agreement (each, a "Subsidiary Redesignation"); provided that (i) no Default or Event of Default has occurred and is continuing or would result therefrom; (ii) after giving effect on a Pro Forma Basis to such designation, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10; (iii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Subsidiary Redesignation (both before and after giving effect thereto), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (provided that representations and warranties that are qualified by materiality shall be true and correct in all respects); and (iv) the Parent Borrower shall have delivered to the Administrative Agent a certificate executed by a Responsible Officer, certifying to the best of such officer's knowledge, compliance with the requirements of preceding clauses (i) through (iii), inclusive, and containing the calculations and information required to evidence the same. The term "Unrestricted Subsidiary" shall also include any subsidiary of an Unrestricted Subsidiary. An Unrestricted Subsidiary, for as long as such Subsidiary remains an Unrestricted Subsidiary, shall be deemed to not be a Subsidiary or Borrower for all purposes under the Credit Documents. Notwithstanding the foregoing, a Foreign Borrower shall in no event be an Unrestricted Subsidiary.

-50-

"U.S. Lender" means any Lender that is a "United States person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"U.S. Pledge Agreement" means the pledge agreement substantially in the form of Exhibit 1.01C (it being understood that the pledgors party thereto and schedules thereto shall be reasonably satisfactory to the Administrative Agent), given by the Domestic Credit Parties, as pledgors, to the Collateral Agent to secure the Obligations, and any other pledge agreements that may be given by any Person pursuant to the terms hereof, in each case as the same may be amended and modified from time to time.

"U.S. Security Agreement" means the security agreement substantially in the form of Exhibit 1.01D (it being understood that the grantors party thereto and schedules thereto shall be reasonably satisfactory to the Administrative Agent), given by Domestic Credit Parties, as grantors, to the Collateral Agent to secure the Obligations, and any other security agreements that may be given by any Person pursuant to the terms hereof, in each case as the same may be amended and modified from time to time.

"U.S. Special Resolution Regime" has the meaning assigned to it in Section 11.22.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Subsidiary" means, with respect to any direct or indirect Subsidiary of any Person, that one hundred percent (100%) of the Capital Stock with ordinary voting power issued by such Subsidiary (other than directors' qualifying shares and investments by foreign nationals mandated by applicable Law) is beneficially owned, directly or indirectly, by such Person.

"Withholding Agent" means any Credit Party and the Applicable Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.02    Interpretative Provisions.**

With reference to this Credit Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Credit Document), (ii) any reference herein to any Person shall be construed to include such

-51-

Person's successors and permitted assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Credit Document, shall be construed to refer to such Credit Document in its entirety and not to any particular provision thereof, (iv) all references in a Credit Document to "Articles," "Sections," "Exhibits" and "Schedules" shall be construed to refer to articles and sections of, and exhibits and schedules to, the Credit Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

(c)     Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Credit Agreement or any other Credit Document.

(d)     If a new Class of Revolving Commitments is established after the Amendment No. 6 Effective Date pursuant to an Additional Credit Extension Amendment, references to "Revolving Commitments" herein shall mean all Classes of Revolving Commitments, unless the Additional Credit Extension Amendment provides otherwise with respect to any one or more particular references to "Revolving Commitments"; and references to "Revolving Facility," "Revolving Lender" and "Revolving Loan" shall also be subject to such rule of interpretation.

**1.03     Accounting Terms and Provisions.**

(a)     As used herein, "GAAP" means generally accepted accounting principles in effect in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board from time to time applied on a consistent basis, subject to the provisions of this Section 1.03. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Credit Agreement shall be prepared in conformity with, GAAP applied on a consistent basis in a manner consistent with that used in preparing the audited financial statements referenced in Section 6.05, except as otherwise specifically prescribed herein.

(b)     Notwithstanding any provision herein to the contrary, determinations of (i) the Consolidated Net Leverage Ratio, the Consolidated Total Leverage Ratio and the Senior Secured Leverage Ratio, for the purposes of determining compliance with covenants, conditions and the Incremental Loan Facilities and (ii) revenues for determining Material Subsidiaries and Immaterial Subsidiaries shall be made on a Pro Forma Basis.

(c)     If at any time any change in GAAP or in the consistent application thereof would affect the computation of any financial ratio or requirement set forth in any Credit Document, the Parent Borrower may, after giving written notice thereof to the Administrative Agent, determine all such computations on such a basis; provided that if any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and either the Parent Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Parent Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided further that, until so amended (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Parent Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Credit Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be

-52-

construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification Topic 825 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Parent Borrower or any of its Subsidiaries at "fair value", as defined therein.

(d)      Notwithstanding any change in GAAP after the Amendment No. 2 Effective Date that would require lease obligations that would be treated as operating leases as of the Amendment No. 2 Effective Date to be classified and accounted for as capital leases or otherwise reflected on the consolidated balance sheet of the Consolidated Group, such obligations shall continue to be treated as operating leases and be excluded from the definition of Indebtedness and other relevant definitions for all purposes under this Credit Agreement.

(e)      All references herein to consolidated financial statements of the Parent Borrower and its Subsidiaries or to the determination of any amount for the Parent Borrower and its Subsidiaries on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Parent Borrower is required to consolidate pursuant to Financial Accounting Standards Board Accounting Standards Codification Topic 810 as if such variable interest entity were a Subsidiary as defined herein.

**1.04      Rounding.**

Any financial ratios required to be maintained by the Parent Borrower pursuant to this Credit Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05      Times of Day.**

Unless otherwise provided, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06      Exchange Rates; Currency Equivalents.**

The Applicable Agent or the applicable L/C Issuer, as applicable, shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of L/C Credit Extensions and Outstanding Amounts denominated in Alternative Currencies. Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur. Except for purposes of financial statements delivered hereunder or calculating covenants hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Credit Documents shall be such Dollar Equivalent amount as so determined by the Applicable Agent or the applicable L/C Issuer. For purposes of complying with covenants whose limitations or thresholds are denominated in United States dollars, the Dollar Equivalent of all amounts necessary to compute such compliance shall be used.

**1.07      Additional Alternative Currencies.**

Any Borrower may from time to time request that an additional currency be added as "Alternative Currency" provided that such requested currency is a lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars. Such request shall be subject to the approval of the Administrative Agent and each Multicurrency Revolving Lender, and, to the extent such Alternative Currency is proposed to be available under the Limited Currency Revolving Facility, each Limited Currency Revolving Lender; provided that if such "Alternative Currency" is to be used for Letters of Credit only, such request shall be subject only to the approval of the Administrative Agent and the Multicurrency L/C Issuer.

-53-

Exhibit 2, page 200

**1.08** **Additional Borrowers.**

Notwithstanding anything in Section 11.01 to the contrary, following the Closing Date, the Parent Borrower may add one or more of its Foreign Subsidiaries that is a Wholly Owned Subsidiary as an additional Foreign Borrower under the Limited Currency Revolving Facility or Multicurrency Revolving Facility by delivering to the Administrative Agent a Foreign Borrower Agreement executed by such Subsidiary and the Parent Borrower. After (i) five Business Days have elapsed after such delivery and (ii) receipt by each Lender and the Administrative Agent of such documentation and other information reasonably requested by such Lender or the Administrative Agent, as the case may be (which documentation and information shall be reasonably satisfactory to such Lender), for purposes of complying with all necessary "know your customer" or other similar checks under all applicable laws and regulations, such Foreign Subsidiary shall for all purposes of this Credit Agreement be a Foreign Borrower hereunder; provided that each Foreign Borrower shall also be a Foreign Guarantor. Any obligations in respect of borrowings by any Foreign Subsidiary under the Credit Agreement will constitute "Obligations," "Foreign Obligations" and "Secured Obligations" for all purposes of the Credit Documents. If the applicable additional Foreign Borrower is organized or incorporated under the laws of, or for applicable Tax purposes is resident of or treated as engaged in a trade or business in, or having a paying agent in, any jurisdiction other than a jurisdiction under the laws of which at least one of the then-existing Borrowers is organized or incorporated on the date such Foreign Borrower Agreement is delivered to the Applicable Agent, as a condition to adding such Foreign Borrower, there shall be an amendment to the Credit Documents (including, without limitation, to Section 3.01 of this Credit Agreement and the definition of "Excluded Taxes"), if such amendment is reasonably necessary or appropriate as mutually determined by the Administrative Agent and Parent Borrower which amendment must be as mutually agreed by the Administrative Agent, the Parent Borrower, the applicable additional Foreign Borrower and each Limited Currency Revolving Lender and/or Multicurrency Revolving Lender (as applicable) (provided that no such amendment shall materially adversely affect the rights of any Lender that has not consented to such amendment). Upon the execution by the Parent Borrower and a Foreign Borrower and delivery to the Administrative Agent of a Foreign Borrower Termination with respect to such Foreign Borrower, such Foreign Borrower shall cease to be a Foreign Borrower and a party to this Credit Agreement; provided that no Foreign Borrower Termination will become effective as to any Foreign Borrower (other than to terminate such Foreign Borrower's right to make further Borrowings under this Credit Agreement) at a time when any Loan to, B/A on behalf of, or Letter of Credit issued to such Foreign Borrower shall be outstanding hereunder. Promptly following receipt of any Foreign Borrower Agreement or Foreign Borrower Termination, the Administrative Agent shall send a copy thereof to each Lender. Notwithstanding the foregoing, no such Foreign Subsidiary may become a Foreign Borrower if any Limited Currency Revolving Lender or Multicurrency Revolving Lender would be prohibited by applicable Law from making loans to such Foreign Subsidiary.

**1.09**    **Change of Currency.**

(a)    Each obligation of the Borrowers to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the Amendment No. 6 Effective Date shall be redenominated into Euro at the time of such adoption (in accordance with the EMU Legislation). If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Credit Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency; provided that if any Borrowing in the currency of such member state is outstanding immediately prior to such date, such replacement shall take effect, with respect to such Borrowing, at the end of the then current Interest Period.

(b)    Each provision of this Credit Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.

-54-

(c)      Each provision of this Credit Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

**1.10    Letter of Credit Amounts.**

Unless otherwise provided, all references herein to the amount of a Letter of Credit at any time shall be deemed to mean the Dollar Equivalent of the maximum face amount available to be drawn of such Letter of Credit after giving effect to all increases thereof contemplated by such Letter of Credit or the Issuer Documents related thereto, whether or not such maximum face amount is in effect at such time.

**1.11    Limited Condition Acquisitions.**

In connection with any action being taken in connection with a Limited Condition Acquisition for purposes of determining

(a)      whether any Indebtedness that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in compliance with Section 8.03 or Section 2.01(f);

(b)      whether any Lien being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in accordance with Section 8.01 or Section 2.01(f);

(c)      whether any other transaction undertaken or proposed to be undertaken in connection with such Limited Condition Acquisition complies with the covenants or agreements contained in this Credit Agreement; and

(d)      any calculation of the ratios or baskets, including the Consolidated Net Leverage Ratio, Senior Secured Leverage Ratio, Consolidated Total Leverage Ratio, Consolidated Net Income, Consolidated EBITDA and baskets determined by reference to Consolidated EBITDA, Consolidated Total Assets and Consolidated Tangible Assets and whether a Default or Event of Default exists in connection with the foregoing (other than in the case of each of clause (a), (b), (c) and (d) above, with respect to any Credit Extension under the Revolving Facility):

At the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "LCA Election"), the date that the definitive agreement for such Limited Condition Acquisition is entered into (the "Transaction Agreement Date") may be used as the applicable date of determination, as the case may be, in each case with such pro forma adjustments as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Pro Forma Basis," Consolidated EBITDA or "Consolidated Net Income". For the avoidance of doubt, if the Parent Borrower makes an LCA Election, (a) any fluctuation or change in the Consolidated Net Leverage Ratio, Senior Secured Leverage Ratio, Consolidated Total Leverage Ratio, Consolidated Net Income, Consolidated EBITDA, Consolidated Total Assets and/or Consolidated Tangible Assets of the Parent Borrower from the Transaction Agreement Date to the date of consummation of such Limited Condition Acquisition will not be taken into account for purposes of determining whether any Indebtedness or Lien that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred, or whether any other transaction undertaken in connection with such Limited Condition Acquisition by the Parent Borrower or any of the Restricted Subsidiaries complies with the Credit Documents and (b) after the Transaction Agreement Date and until such Limited Condition Acquisition is consummated or the definitive agreements in respect thereof are terminated or expire, such Limited Condition Acquisition and all transactions proposed to be undertaken in connection therewith (including without limitation the incurrence of Indebtedness and Liens) will be given Pro Forma Effect as if they occurred at the beginning of the most recently completed four consecutive fiscal quarter period for which financial statements have been delivered pursuant to Section 7.01(a) or (b) and ended on or prior to the Transaction Agreement Date when determining compliance of other transactions (including without limitation the incurrence of Indebtedness and Liens unrelated to such Limited Condition Acquisition) that are consummated after the Transaction Agreement Date and on or prior to the date of consummation of such Limited Condition Acquisition and any such transactions (including without limitation any incurrence of Indebtedness and

-55-

the use of proceeds thereof) will be deemed to have occurred on the Transaction Agreement Date and be outstanding thereafter for purposes of calculating any baskets or ratios under the Credit Documents after the Transaction Agreement Date and before the date of consummation of such Limited Condition Acquisition (or the date the definitive agreements in respect thereof are terminated or expire).

**1.12** **Divisions.**

For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II COMMITMENTS AND CREDIT EXTENSIONS

**2.01** **Commitments.**

Subject to the terms and conditions set forth herein:

(a)      Revolving Loans.

(i)      Dollar Revolving Loans. On and following the Amendment No. 6 Effective Date, each Dollar Revolving Lender severally agrees to make revolving credit loans (the "Dollar Revolving Loans") in Dollars to the Parent Borrower from time to time on any Business Day prior to the Revolving Termination Date; provided that after giving effect to any such Dollar Revolving Loan, (x) with respect to the Dollar Revolving Lenders collectively, the Outstanding Amount of Dollar Revolving Obligations shall not exceed ONE HUNDRED MILLION DOLLARS ($100 MILLION) (as such amount may be increased pursuant to Section 2.01(g) or decreased pursuant to Section 2.07 or 9.02(a), the "Aggregate Dollar Revolving Committed Amount") and (y) with respect to each Dollar Revolving Lender individually, such Lender's Dollar Revolving Commitment Percentage of Dollar Revolving Obligations shall not exceed its respective Dollar Revolving Committed Amount. Dollar Revolving Loans may consist of Base Rate Loans, Eurodollar Rate Loans or a combination thereof, as the Parent Borrower may request. Dollar Revolving Loans may be repaid and reborrowed in accordance with the provisions hereof.

(ii)      Limited Currency Revolving Loans. On and following the Amendment No. 6 Effective Date, each Limited Currency Revolving Lender severally agrees to make revolving credit loans (the "Limited Currency Revolving Loans") in Dollars, Euros or Sterling to the Parent Borrower and each Foreign Borrower from time to time on any Business Day prior to the Revolving Termination Date; provided that after giving effect to any such Limited Currency Revolving Loan, (x) with respect to the Limited Currency Revolving Lenders collectively, the Outstanding Amount of Limited Currency Revolving Obligations shall not exceed THREE HUNDRED MILLION DOLLARS ($300 MILLION) (as such amount may be increased pursuant to Section 2.01(g) or decreased in accordance with the Section 2.07 or 9.02(a), the "Aggregate Limited Currency Revolving Committed Amount"), (y) with respect to each Limited Currency Revolving Lender individually, such Lender's Limited Currency Revolving Commitment Percentage of Limited Currency Revolving Obligations shall not exceed its respective Limited Currency Revolving Committed Amount and (z) the Outstanding Amount of all Limited Currency Revolving Obligations and Multicurrency Revolving Obligations denominated in an Alternative Currency shall not exceed the Alternative Currency Sublimit. Limited Currency Revolving Loans denominated in Dollars may consist of Base Rate Loans, Eurodollar Rate Loans or a combination thereof, as the

-56-

Borrowers may request. Limited Currency Revolving Loans denominated in Euros or Sterling must consist of Eurodollar Rate Loans.

(iii)    Multicurrency Revolving Loans. On and following the Amendment No. 6 Effective Date, each Multicurrency Revolving Lender severally agrees (A) to make revolving credit loans (the "Multicurrency Revolving Loans") in one or more Approved Currencies to the Parent Borrower and each Foreign Borrower from time to time on any Business Day prior to the Revolving Termination Date and (B) to cause its Canadian Lending Office to accept and purchase or arrange for the acceptance and purchase of drafts drawn by the Canadian Borrowers in Canadian Dollars as B/As; provided that after giving effect to any such Multicurrency Revolving Loan or B/A, (x) with respect to the Multicurrency Revolving Lenders collectively, the Outstanding Amount of Multicurrency Revolving Obligations shall not exceed ONE HUNDRED MILLION DOLLARS ($100 MILLION) (as such amount may be increased pursuant to Section 2.01(g) or decreased in accordance with the Section 2.07 or 9.02(a), the "Aggregate Multicurrency Revolving Committed Amount"), (y) with respect to each Multicurrency Revolving Lender individually, such Lender's Multicurrency Revolving Commitment Percentage of Multicurrency Revolving Obligations shall not exceed its respective Multicurrency Revolving Committed Amount and (z) the Outstanding Amount of all Limited Currency Revolving Obligations and Multicurrency Revolving Obligations denominated in an Alternative Currency shall not exceed the Alternative Currency Sublimit. Multicurrency Revolving Loans denominated in Dollars or Canadian Dollars and B/As may consist of Base Rate Loans, Eurodollar Rate Loans or a combination thereof, as the Borrowers may request. Multicurrency Revolving Loans denominated in an Alternative Currency (other than Canadian Dollars) must consist of Eurodollar Rate Loans.

(iv)    2020-1 Incremental Revolving Loans. On and following the Amendment No. 7 Effective Date, each 2020-1 Incremental Revolving Lender severally agrees to make revolving credit loans (the "2020-1 Incremental Revolving Loans") in Dollars to the Parent Borrower from time to time on any Business Day prior to the Revolving Termination Date; provided that after giving effect to any such 2020-1 Incremental Revolving Loan, (x) with respect to the 2020-1 Incremental Revolving Lenders collectively, the Outstanding Amount of 2020-1 Incremental Revolving Obligations shall not exceed ONE HUNDRED TWENTY MILLION DOLLARS ($120 MILLION) (as such amount may be increased pursuant to additional 2020-1 Incremental Revolving Commitments pursuant to the terms of Amendment No. 7 and Section 2.01(g) or decreased pursuant to Section 2.07 or 9.02(a), the "Aggregate 2020-1 Incremental Revolving Committed Amount") and (y) with respect to each 2020-1 Incremental Revolving Lender individually, such Lender's 2020-1 Incremental Revolving Commitment Percentage of 2020-1 Incremental Revolving Obligations shall not exceed its respective 2020-1 Incremental Revolving Committed Amount. 2020-1 Incremental Revolving Loans may consist of Base Rate Loans, Eurodollar Rate Loans or a combination thereof, as the Parent Borrower may request. 2020-1 Incremental Revolving Loans may be repaid and reborrowed in accordance with the provisions hereof.

(b)    Letters of Credit. On and after the Amendment No. 6 Effective Date, (x) each L/C Issuer, in reliance upon the commitments of the Revolving Lenders set forth herein, agrees (A) to issue Letters of Credit for the account of the Parent Borrower (or for the account of any member of the Consolidated Group, but in such case the Parent Borrower will remain obligated to reimburse such L/C Issuer for any and all drawings under such Letter of Credit, and the Parent Borrower acknowledges that the issuance of Letters of Credit for the account of members of the Consolidated Group inures to the benefit of the Parent Borrower, and the Parent Borrower acknowledges that the Parent Borrower's business derives substantial benefits from the business of such members of the Consolidated Group) on any Business Day, (B) to amend or extend Letters of Credit previously issued hereunder, and (C) to honor drawings under Letters of Credit; and (y) each L/C Revolving Lender severally agrees to purchase from the such L/C Issuer a participation interest in each Letter of Credit issued hereunder in an amount equal to the Dollar Equivalent of such L/C Revolving Lender's L/C Commitment Percentage thereof (and, in each case, with respect to the purchase of a participation in any Alternative Currency Letter of Credit, the purchase of such participation will also occur on each Revaluation Date); provided that (A) the Outstanding Amount of L/C Obligations shall not exceed ONE HUNDRED FIFTY MILLION DOLLARS ($150 MILLION) (as such amount may be decreased in accordance with the provisions hereof, the "L/C Sublimit"), (B) the Outstanding Amount of all Alternative Currency L/C Obligations shall not exceed the Alternative Currency L/C

-57-

Sublimit, (C) with regard to the Revolving Lenders collectively, the Outstanding Amount of Revolving Obligations shall not exceed the Aggregate Revolving Committed Amount, (D) with regard to each Revolving Lender individually, such Revolving Lender's Aggregate Revolving Commitment Percentage of Revolving Obligations shall not exceed its respective Aggregate Revolving Committed Amount, (E) the Outstanding Amount of all Dollar Revolving Obligations shall not exceed the Dollar Equivalent of the Aggregate Dollar Revolving Committed Amount, (F) the Outstanding Amount of all Limited Currency Revolving Obligations shall not exceed the Dollar Equivalent of the Aggregate Limited Currency Revolving Committed Amount, (G) [Reserved], (H) the L/C Obligations do not exceed the L/C Committed Amount, and (I) no L/C Issuer shall be required to (but, in its sole discretion, may) issue, amend, extend or increase any Letter of Credit, if after giving effect thereto, there would be L/C Obligations arising from Letters of Credit issued by such L/C Issuer in excess of its Letter of Credit Cap (provided that this clause (I) shall not be construed to invalidate any L/C Obligations of any L/C Issuer in place as of the Amendment No. 6 Effective Date). Subject to the terms and conditions hereof, the Parent Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Parent Borrower may obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(c) Swingline Loans. During the Commitment Period, the Swingline Lender agrees, in reliance upon the commitments of the other Dollar Revolving Lenders set forth herein, to make revolving credit loans (the "Swingline Loans") to the Parent Borrower in Dollars on any Business Day; provided that (i) the Outstanding Amount of Swingline Loans shall not exceed FIFTY MILLION DOLLARS ($50.0 MILLION) (as such amount may be decreased in accordance with the provisions hereof, the "Swingline Sublimit"), (ii) with respect to the Dollar Revolving Lenders collectively, the Outstanding Amount of Dollar Revolving Obligations shall not exceed the Aggregate Dollar Revolving Committed Amount and (iii) with regard to each Revolving Lender individually, such Revolving Lender's Aggregate Revolving Commitment Percentage of Revolving Obligations shall not exceed its respective Aggregate Revolving Committed Amount. Swingline Loans shall be comprised solely of Base Rate Loans, and may be repaid and reborrowed in accordance with the provisions hereof. Immediately upon the making of a Swingline Loan, each Dollar Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swingline Lender a participation interest in such Swingline Loan in an amount equal to such Lender's Dollar Revolving Commitment Percentage thereof.

(d) Delayed Draw Term A Loans. During the Delayed Draw Term A Commitment Period, each of the Delayed Draw Term A Lenders severally agrees to make term loans (in an aggregate principal amount not to exceed its Delayed Draw Term A Commitment) to the Parent Borrower in Dollars from time to time on any Business Day (the "Delayed Draw Term A Loans"). The Delayed Draw Term A Commitment of each Delayed Draw Term A Lender shall be automatically reduced by an amount equal to the principal amount of each Delayed Draw Term A Loan made by such Lender pursuant to the immediately preceding sentence upon the making of such Delayed Draw Term A Loan. The Delayed Draw Term A Loans may consist of Base Rate Loans, Eurodollar Rate Loans or a combination thereto, as the Parent Borrower may request. Amounts repaid on the Delayed Draw Term A Loans may not be reborrowed.

(e) Term B-4 Loans. (A) The Additional Term B-4 Lender agrees to make a term loan (in the amount equal to the Additional Term B-4 Commitment) to the Parent Borrower on the Amendment No. 6 Effective Date in a single advance in Dollars (together with each Term B-3 Loan converted into a Converted Term B-4 Loan as referred to in clause (B) below, the "Term B-4 Loans") and (B) each Converted Term B-3 Loan of each Term B-3 Amendment No. 6 Converting Lender shall be converted into a Term B-4 Loan of such Lender effective as of the Amendment No. 6 Effective Date in a principal amount equal to the principal amount of such Term B-3 Lenders' Converted Term B-3 Loan immediately prior to such conversion; provided that the Term B-4 Loans shall initially consist of Eurodollar Rate Loans. The Term B-4 Loans may consist of Base Rate Loans, Eurodollar Rate Loans or a combination thereof, as the Parent Borrower may request. Amounts repaid on the Term B-4 Loans may not be reborrowed.

(f) Incremental Loan Facilities. Any time after the Amendment No. 8 Effective Date, any Borrower may, upon written notice to the Administrative Agent, establish additional credit facilities (collectively, the "Incremental Loan Facilities") by increasing the Aggregate Revolving Commitments hereunder as provided in Section 2.01(g) (the "Incremental Revolving

-58-

Exhibit 2, page 205

Commitments"), establishing one or more additional revolving credit facility tranches hereunder as provided in Section 2.01(g) (the "Incremental Revolving Facilities") or establishing new term loans or increasing the aggregate principal amount of any existing Term B-4 Loans hereunder as provided in Section 2.01(h) (such new term loans or increased existing Term B-4 Loans, the "Incremental Term Loans"); provided that:

(i)     the aggregate principal amount of loans and commitments for all the Incremental Loan Facilities established after the Amendment No. 8 Effective Date will not exceed an amount equal to the sum of (x)(I) during the Restricted Period, $425.0 million and (II) following the end of the Restricted Period, $855.0 million (the applicable amount in this Section 2.01(f)(i)(x)(I) or Section 2.01(f)(i)(x)(II), the "Incremental Base Amount") minus the aggregate principal amount of Incremental Equivalent Debt incurred pursuant to Section 8.03(z)(i) and Incremental Loan Facilities previously established pursuant to this clause (x), plus (y) the aggregate principal amount of voluntary prepayments of the Term B-4 Loans and Delayed Draw Term A Loans pursuant to Section 2.06(a) and permanent reductions in the Revolving Commitments pursuant to Section 2.07 made prior to the date of such incurrence, in each case, other than from proceeds of long-term Indebtedness plus (z) except during the Restricted Period, additional amounts of Indebtedness that may be incurred at such time that would not cause the Senior Secured Leverage Ratio on a Pro Forma Basis (for the avoidance of doubt, after giving effect to such Incremental Loan Facilities (and the immediately following provisos)) as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) and (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05) to exceed 3.75 to 1.00; provided further that, in each case, with respect to any Incremental Revolving Commitment or Incremental Revolving Facility, the maximum amount of Revolving Loans available to be drawn thereunder is assumed to have been borrowed, but without giving effect to any incurrence under the Incremental Base Amount, that is incurred substantially simultaneously with amounts under this clause (z); provided further that the Borrowers shall be deemed to have utilized the amounts under clause (y) and (z) prior to utilization of the amounts under clause (x);

(ii)    subject to the Limited Condition Acquisition provisions, no Default or Event of Default shall have occurred and be continuing or shall result after giving effect to any such Incremental Loan Facility (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 9.01(a) or 9.01(f) as of the Transaction Agreement Date) shall exist);

(iii)   the conditions to the making of a Credit Extension under Section 5.02 shall be satisfied;

(iv)    after giving effect on a Pro Forma Basis to the borrowings to be made pursuant to such Incremental Loan Facility, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements of this clause (iv) and clauses (ii) and (iii) above);

(v)     all Incremental Term Loans shall be borrowed by the Parent Borrower and guaranteed by the Domestic Guarantors; and

(vi)    the Incremental Revolving Commitments and Incremental Revolving Facilities may be of the Parent Borrower and any other Borrower and shall be guaranteed only by Loan Parties; provided that for the avoidance of doubt (A) the use of such Incremental Revolving Commitments and Incremental Revolving Facilities shall be subject to the L/C Sublimit, the Swingline Sublimit, the Alternative Currency L/C Sublimit and the Alternative Currency Sublimit and (B) the 2020-1 Incremental Revolving Commitments and the 2020-1 Incremental Revolving Loans shall be borrowed and guaranteed by the Parent Borrower and all of the Domestic Guarantors (or any other Borrowers or Guarantors that from time to time borrow or guarantee, as the case may be, the Original Revolving Loans).

-59-

In connection with the establishment of any Incremental Loan Facility, (A) neither of the Lead Arrangers or the Administrative Agent hereunder shall have any obligation to arrange for or assist in arranging for any Incremental Loan Facility, (B) any Incremental Loan Facility shall be subject to such conditions, including fee arrangements, as may be provided in connection therewith and (C) none of the Lenders shall have any obligation to provide commitments or loans for any Incremental Loan Facility.

(g)    Establishment of Incremental Revolving Commitments and Incremental Revolving Facilities. Subject to Section 2.01(f), any Borrower may (x) establish Incremental Revolving Commitments or Incremental Revolving Facilities by increasing the Aggregate Dollar Revolving Committed Amount, Aggregate Limited Currency Revolving Committed Amount, Aggregate Multicurrency Revolving Committed Amount or the Aggregate 2020-1 Incremental Revolving Committed Amount hereunder and (y) establish Incremental Revolving Facilities; provided that:

(i)    any Person that is not a Revolving Lender that is proposed to be a Lender under any such increased Aggregate Revolving Committed Amount or Incremental Revolving Facility shall be reasonably acceptable to the Administrative Agent, any Person that is proposed to provide any such increased Aggregate Dollar Revolving Committed Amount (whether or not an existing Dollar Revolving Lender) or Aggregate Limited Currency Revolving Committed Amount (whether or not an existing Limited Currency Revolving Lender) shall be reasonably acceptable to each L/C Issuer and any Person that is proposed to provide any such increased Aggregate Dollar Revolving Committed Amount (whether or not an existing Dollar Revolving Lender) shall be reasonably acceptable to the Swingline Lender;

(ii)    any Incremental Revolving Facility shall not contain Swingline Loans or Letters of Credit under the Revolving Commitments;

(iii)    Persons providing commitments for the Incremental Revolving Commitments or Incremental Revolving Facilities pursuant to this Section 2.01(g) will provide a Revolving Lender Joinder Agreement;

(iv)    increases in the Aggregate Revolving Committed Amount will be in a minimum principal amount of $10.0 million and integral multiples of $5.0 million in excess thereof and Incremental Revolving Facilities shall be in a minimum principal amount of $5.0 million and integral multiples of $10.0 million;

(v)    in the case any Incremental Revolving Commitments are established, if any Revolving Loans are outstanding at the time of any such increase under the applicable Revolving Facility, either (x) each applicable Borrower will prepay such Revolving Loans on the date of effectiveness of the Incremental Revolving Commitments (including payment of any break-funding amounts owing under Section 3.05) or (y) each Lender with an Incremental Revolving Commitment shall purchase at par interests in each Borrowing of Revolving Loans then outstanding under the applicable Revolving Facility such that immediately after giving effect to such purchases, each Borrowing thereunder shall be held by each Lender in accordance with its Pro Rata Share of such Revolving Facility (and, in connection therewith, each applicable Borrower shall pay all amounts that would have been payable pursuant to Section 3.05 had the Revolving Loans so purchased been prepaid on such date);

(vi)    the final maturity date of any Incremental Revolving Facility shall be no earlier than the Revolving Termination Date and no Incremental Revolving Facility will require any scheduled amortization or mandatory commitment reduction prior to the Revolving Termination Date;

(vii)    the final maturity date of any Incremental Revolving Commitment shall be the same as the final maturity date of the Revolving Facility being increased and no Incremental Revolving Commitment will require any scheduled amortization or mandatory commitment reduction prior to the final maturity date of the Revolving Facility being increased; and

(viii)    the Effective Yield with respect to any Incremental Revolving Facility shall be determined by the Parent Borrower and the Lenders of the Incremental Revolving Facility; provided that with respect to any Incremental Revolving Facility incurred prior to the date that is

-60-

twelve (12) months after the Amendment No. 6 Effective Date, in the event that the Effective Yield for any such Incremental Revolving Facility is greater than the Effective Yield for the applicable Revolving Facility by more than 50 basis points, then the Applicable Percentage for the applicable Revolving Facility shall be increased to the extent necessary so that the Effective Yield for the Incremental Revolving Facility is not more than 50 basis points higher than the Effective Yield for the applicable Revolving Facility; provided, further, with respect to any adjustment to the Applicable Percentage required by the immediately preceding proviso, to the extent any Eurodollar Rate "floor" or Base Rate "floor" applicable to any Incremental Revolving Facility exceeds the Eurodollar Rate "floor" or Base Rate "floor" applicable to the applicable Revolving Facility, the Eurodollar Rate "floor" or Base Rate "floor" applicable to the applicable Revolving Facility shall be increased so that the Eurodollar Rate "floor" and Base Rate "floor" is the same for both the Incremental Revolving Facility and the applicable Revolving Facility but only to the extent an increase in such "floor" applicable to the applicable Revolving Facility would cause an increase in the interest rate then in effect for the applicable Revolving Facility, and in such case the applicable "floor" (but not the Applicable Percentage, except as set forth in the next parenthetical phrase) applicable to the applicable Revolving Facility shall be increased to the extent of such differential between the applicable "floors" (it being understood that the adjustment required pursuant to this proviso will only affect the component of any Applicable Percentage increase required by the immediately preceding proviso that is caused by the Eurodollar Rate or Base Rate "floors" for the Incremental Revolving Facility being higher than such "floors" for the applicable Revolving Facility and not any other component of any such required increase in the Applicable Percentage).

Any Incremental Revolving Commitment established hereunder shall have terms identical to the Dollar Revolving Commitments, Limited Currency Revolving Commitments, Multicurrency Revolving Commitments or 2020-1 Incremental Revolving Commitments, as the case may be, existing on the Amendment No. 7 Effective Date; provided that, if required to consummate an Incremental Revolving Commitment, the pricing, interest rate margins, rate floors and undrawn fees on the Revolving Facility being increased may be increased for all Lenders of such Revolving Facility without the consent of any Lender, but additional upfront or similar fees may be payable to the Lenders participating in the Incremental Revolving Commitment without any requirement to pay such amounts to any existing Lenders, it being understood that the Credit Parties and the Administrative Agent may make (without the consent of or notice to any other party) any amendment to reflect such increase in the Revolving Commitments.

Any Incremental Revolving Facility established hereunder shall be on terms to be determined by the Parent Borrower and the Lenders thereunder (and the Parent Borrower and the Administrative Agent may, without the consent of any other Lender, enter into an amendment to this Credit Agreement to appropriately include the Incremental Revolving Facilities hereunder); provided that, to the extent that such terms and documentation are not consistent with the applicable Revolving Facilities (except to the extent permitted by clause (vi) or (viii) above), they shall be reasonably satisfactory to the Administrative Agent; provided, further, that (x) without the consent of the Administrative Agent, such documentation may contain additional or more restrictive covenants than any then-existing Term Loans or Revolving Facility if such covenants are applicable only after the Final Maturity Date hereunder and (y) to the extent that any financial maintenance covenant is added for the benefit of any Incremental Revolving Facility that applies prior to the Final Maturity Date hereunder, no consent shall be required from the Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of all of the Term Loans and Revolving Facilities.

(h)    Establishment of Incremental Term Loans. Subject to Section 2.01(f), the Parent Borrower may, at any time, establish additional term loan commitments (including additional commitments for Term B-4 Loans) for Incremental Term Loans; provided that:

(i)    any Person that is not a Lender or Eligible Assignee that is proposed to be a Lender shall be reasonably acceptable to the Administrative Agent;

-61-

(ii)      Persons providing commitments for the Incremental Term Loan pursuant to this Section 2.01(h) will provide an Incremental Term Loan Joinder Agreement;

(iii)     additional commitments established for the Incremental Term Loan will be in a minimum aggregate principal amount of $15.0 million and integral multiples of $5.0 million in excess thereof; provided that such commitments shall not be established on more than four (4) separate occasions;

(iv)     the final maturity date of any Incremental Term Loan shall be no earlier than the Term B-4 Loan Termination Date;

(v)      the Effective Yield with respect to any Incremental Term Loans shall be determined by the Parent Borrower and the Lenders of the Incremental Term Loans; provided that with respect to any Incremental Term Loans incurred prior to the date that is twelve (12) months after the Amendment No. 6 Effective Date, in the event that the Effective Yield for any such Incremental Term Loans is greater than the Effective Yield for the Term B-4 Loans by more than 50 basis points, then the Applicable Percentage for the Term B-4 Loans shall be increased to the extent necessary so that the Effective Yield for the Incremental Term Loans is not more than 50 basis points higher than the Effective Yield for the Term B-4 Loans; provided, further, with respect to any adjustment to the Applicable Percentage required by the immediately preceding proviso, to the extent any Eurodollar Rate "floor" or Base Rate "floor" applicable to any Incremental Term Loans exceeds the Eurodollar Rate "floor" or Base Rate "floor" applicable to Term B-4 Loans, the Eurodollar Rate "floor" or Base Rate "floor" applicable to the Term B-4 Loans shall be increased so that the Eurodollar Rate "floor" and Base Rate "floor" is the same for both the Incremental Term Loans and the Term B-4 Loans but only to the extent an increase in such "floor" applicable to the Term B-4 Loans would cause an increase in the interest rate then in effect for the Term B-4 Loans, and in such case the applicable "floor" (but not the Applicable Percentage, except as set forth in the next parenthetical phrase) applicable to the Term B-4 Loans shall be increased to the extent of such differential between the applicable "floors" (it being understood that the adjustment required pursuant to this proviso will only affect the component of any Applicable Percentage increase required by the immediately preceding proviso that is caused by the Eurodollar Rate or Base Rate "floors" for the Incremental Term Loans being higher than such "floors" for the Term B-4 Loans and not any other component of any such required increase in the Applicable Percentage); and

(vi)     the Weighted Average Life to Maturity of any Incremental Term Loan shall not be shorter than the Term B-4 Loans (without giving effect to such Incremental Term Loans).

Any Incremental Term Loan established hereunder shall be on terms to be determined by the Parent Borrower and the Lenders thereunder (and the Parent Borrower and the Administrative Agent may, without the consent of any other Lender, enter into an amendment to this Credit Agreement to appropriately include the Incremental Term Loans hereunder including, without limitation, to provide that such Incremental Term Loans shall share in mandatory prepayments on the same basis as the Delayed Draw Term A Loans and Term B-4 Loans); provided that, to the extent that such terms and documentation are not consistent with the Term B-4 Loans (except to the extent permitted by clause (iv), (v) or (vi) above and except to the extent of any market call provisions), they shall be reasonably satisfactory to the Administrative Agent; provided, further, that (x) without the consent of the Administrative Agent, such documentation may contain additional or more restrictive covenants than those contained herein if such covenants are applicable only after the Final Maturity Date hereunder and (y) to the extent that any financial maintenance covenant is added for the benefit of any Incremental Term Loans that applies prior to the Final Maturity Date hereunder, no consent shall be required from the Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of all Lenders.

**2.02    Borrowings, B/A Drawings, Conversions and Continuations.**

(a)      Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of a B/A Drawing or a Eurodollar Rate Loans shall be made upon the applicable Borrower's irrevocable

-62-

notice to the Applicable Agent by delivery to the Applicable Agent of a written Loan Notice appropriately completed and signed by a Responsible Officer of the applicable Borrower. Each such notice must be received by the Applicable Agent not later than (i) with respect to Eurodollar Rate Loans, 12:00 noon (Local Time) three (3) Business Days (or, in the case of Limited Currency Revolving Loans or Multicurrency Revolving Loans denominated in Alternative Currency, four (4) Business Days) prior to the requested date of, (ii) with respect to Base Rate Loans denominated in Dollars, 12:00 noon (Local Time) on the requested date of, (iii) in the case of Base Rate Loans denominated in Canadian Dollars, 12:00 noon (Local Time) one Business Day prior to the requested date of, or (iv) in the case of B/A Drawings, 10:00 a.m. (Local Time) one Business Day prior to the requested date of any such Borrowing, conversion or continuation. Except in the case of (x) the Term B-4 Loans that are borrowed on the Amendment No. 6 Effective Date and (y) any Revolving Loan that is borrowed to refinance a Swingline Loan or L/C Borrowing (which may be in an amount sufficient to refinance such Swingline Loan or L/C Borrowing), each Borrowing, conversion or continuation shall be in a principal amount of (i) with respect to Eurodollar Rate Loans (A) denominated in Dollars, $1.0 million or a whole multiple of $1.0 million in excess thereof, (B) denominated in Euros, €1.0 million or a whole multiple of €1.0 million in excess thereof, (C) denominated in £, £1.0 million or a whole multiple of £1.0 million in excess thereof, (D) denominated in Canadian Dollars, C$1.0 million or a whole multiple of C$1.0 million in excess thereof, (E) denominated in Australian Dollars, AU$1.0 million or a whole multiple of AU$1.0 million in excess thereof, (F) denominated in Swiss Francs, CHF1.0 million or a whole multiple of CHF$1.0 million in excess thereof, (G) denominated in Swedish Krona, kr7.0 million or a whole multiple of kr7.0 million in excess thereof, (H) denominated in Danish Krone, Dkr2.0 million or a whole multiple of Dkr1.0 million in excess thereof, (I) denominated in Mexican Pesos, MXN5.0 million or a whole multiple of MXN1.0 million in excess thereof, (J) denominated in Japanese Yen, ¥100.0 million or a whole multiple of ¥100.0 million n in excess thereof or (K) denominated in Brazilian Real, R$1.0 million or a whole multiple of R$1.0 million in excess thereof or (ii) with respect to Base Rate Loans (A) denominated in Dollars, $1.0 million or a whole multiple of $100,000 in excess thereof or (B) denominated in Canadian Dollars or B/A Drawings, C$1.0 million or an integral multiple of C$100,000 in excess thereof. Each Loan Notice (whether telephonic or written) shall specify (i) whether such Borrower's request is with respect to Dollar Revolving Loans, Limited Currency Revolving Loans, Multicurrency Revolving Loans, 2020-1 Incremental Revolving Loans, B/A Drawings, Delayed Draw Term A Loans or Term B-4 Loans, (ii) whether such request is for a Borrowing, conversion, or continuation, (iii) the requested date of such Borrowing, conversion or continuation (which shall be a Business Day), (iv) the principal amount of Loans or B/A Drawings to be borrowed, converted or continued, (v) the Type of Loans to be borrowed, converted or continued,(vi) if such Loans are Limited Currency Revolving Loans or Multicurrency Revolving Loans, the currency of such Loans (which shall be an Approved Currency) and (vii) if applicable, the duration of the Contract Period or Interest Period with respect thereto. If the applicable Borrower fails to specify a Type of Loan in a Loan Notice or if the applicable Borrower fails to give a timely notice requesting a conversion or continuation (other than with respect to Limited Currency Revolving Loans or Multicurrency Revolving Loans denominated in an Alternative Currency other than Canadian Dollars), then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans. If the applicable Borrower requests a Borrowing of, conversion to, or continuation of Eurodollar Rate Loans in any Loan Notice, but fails to specify an Interest Period, the Interest Period will be deemed to be one (1) month. Each B/A Drawing shall have a Contract Period as specified in the request therefor and no B/A Drawing may be continued other than at the end of the Contract Period applicable thereto. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Parent Borrower or any other Borrower to repay such Loan in accordance with the terms hereof.

(b)     Following receipt of a Loan Notice, the Applicable Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the applicable Loans or B/A Drawings (the "Section 2.02(b) Ratable Share"), and if no timely notice of a conversion or continuation is provided by the applicable Borrower, the Applicable Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in the preceding subsection. In the case of a Borrowing denominated in Dollars, each Lender shall make the amount of its Loan available to the Applicable Agent in Dollars in immediately available funds at the Applicable Agent's Office not later than 2:00 p.m. (New York time) on the Business Day specified in the applicable Loan Notice. In the case of a Borrowing denominated in an Alternative Currency or a B/A Drawing, each Lender shall make the amount of its Loan or Discount Proceeds (net of applicable acceptance fees) available to the Applicable Agent in the applicable Alternative Currency in immediately available funds at the Applicable Agent's Office not later than 2:00 p.m. (Local Time) on the Business Day specified in the applicable Loan Notice.

Upon satisfaction of the applicable conditions set forth in Section 5.02 (and, if such Borrowing is the initial Credit Extension, Section 5.01), the Applicable Agent shall make all funds so received available to the applicable Borrower in like funds as received by the Applicable Agent either by (i) crediting the account of such Borrower on the books of the Applicable Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to the Applicable Agent by such Borrower. Notwithstanding anything contained in any Credit Document to the contrary, with respect to any requested Fronted Currency Loan (i) the Section 2.02(b) Ratable Share of the Alternative Currency Fronting Lender(s) for the applicable Fronted Currency shall be determined as if the Alternative Currency Fronting Lender(s) ratably owned the Multicurrency Revolving Commitments of the Participating Fronted Currency Lenders (for the avoidance of doubt, it is understood and agreed that (A) for the purposes of determining Pro Rata Shares of the Multicurrency Revolving Lenders and the use of the Multicurrency Revolving Commitments, the Multicurrency Revolving Commitments of the Participating Fronted Currency Lenders shall be deemed to be used when the Alternative Currency Fronting Lender(s) make such Fronted Currency Loan and (B) the Pro Rata Shares of the Multicurrency Revolving Lenders shall not otherwise be affected by the transactions contemplated by this sentence), and such Section 2.02(b) Ratable Share for purposes of this clause (i) shall be notified in writing by the Administrative Agent upon request by the applicable Alternative Currency Fronting Lender(s), (ii) if such Fronted Currency Loan is not paid for any reason when due (at maturity, acceleration or otherwise), each Participating Fronted Currency Lender shall pay to the Alternative Currency Fronting Lender an amount in Dollars equal to the Dollar Equivalent of such Participating Fronted Currency Lender's Pro Rata Share (without giving effect to the immediately preceding clause (i)) under the Multicurrency Revolving Facility of such Fronted Currency Loan (which such payment to be made (x) if any applicable Alternative Currency Fronting Lender makes the request therefor prior to noon on any Business Day, on such Business Day and (y) if otherwise, on the Business Day following the request therefor by the applicable Alternative Currency Fronting Lender), and such payment shall be made by such Participating Fronted Currency Lender regardless of any circumstance whatsoever, including the occurrence of a Default, Event of Default or the termination or expiration of the Multicurrency Revolving Commitments (and if such payment is not made by such Participating Fronted Currency Lender when required pursuant to this clause (ii), then interest (in Dollars) shall accrue on such payment at a rate equal to the greater of the applicable Overnight Bank Funding Rate from time to time in effect and a rate reasonably determined by the applicable Alternative Currency Fronting Lender in its sole discretion in accordance with banking industry rules on interbank compensation, and such payment and the interest thereon shall be due upon demand), (iii) the Participating Fronted Currency Lenders shall have no obligation to make any Loan in any Fronted Currency, and no Lender (other than the Alternative Currency Fronting Lenders) shall be liable or otherwise responsible for the failure of the applicable Alternative Currency Fronting Lender(s) to make any Fronted Currency Loan, (iv) the interest on the Fronted Currency Loans made by each Alternative Currency Fronting Lender pursuant to the operation of this sentence shall be for the account of such Alternative Currency Fronting Lender, (v) if there is no Alternative Currency Fronting Lender for a particular Fronted Currency at any time, then no Fronted Currency Loans in such Fronted Currency shall be made at such time and (vi) the Alternative Currency Fronting Lender for any particular Fronted Currency may set limits on the aggregate amount of Revolving Loans that may be made by it in such Fronted Currency by notice to the Administrative Agent and the Parent Borrower.

(c)     Except as otherwise provided herein, without the consent of the Required Lenders, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan. During the existence of a Default or Event of Default, at the request of the Required Lenders or the Applicable Agent, (i) no Loan denominated in Dollars or Canadian Dollars may be requested as, converted to or continued as a Eurodollar Rate Loan and (ii) any outstanding Eurodollar Rate Loan denominated in Dollars or Canadian Dollars shall be converted to a Base Rate Loan on the last day of the Interest Period with respect thereto.

(d)     The Applicable Agent shall promptly notify the applicable Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest

-64-

rate. The determination of the Adjusted Eurodollar Rate by the Applicable Agent shall be conclusive in the absence of manifest error. At any time that Base Rate Loans are outstanding, the Applicable Agent shall notify the Borrowers and the Lenders of any change in the Applicable Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)        After giving effect to all Borrowings, all B/A Drawings, all conversions of Loans and B/A Drawings from one Type to the other, and all continuations of Loans and B/A Drawings as the same Type, there shall not be more than ten (10) Interest Periods in effect with respect to the Revolving Loans and Term B-4 Loans and five (5) Interest Periods with respect to the Delayed Draw Term A Loans.

(f)        Upon the conversion of any Borrowing denominated in Canadian Dollars (or portion thereof), or the continuation of any B/A Drawing (or portion thereof), to or as a B/A Drawing, the net amount that would otherwise be payable to a Borrower by each Multicurrency Revolving Lender pursuant to Section 2.15(f) in respect of such new B/A Drawing shall be applied against the principal of the Multicurrency Revolving Loan made by such Multicurrency Revolving Lender as part of such Borrowing (in the case of a conversion), or the reimbursement obligation owed to such Multicurrency Revolving Lender under Section 2.15(i) in respect of the B/As accepted by such Multicurrency Revolving Lender as part of such maturing B/A Drawing (in the case of a continuation), and such Borrower shall pay to such Multicurrency Revolving Lender an amount equal to the difference between the principal amount of such Multicurrency Revolving Loan or the aggregate face amount of such maturing B/As, as the case may be, and such net amount.

**2.03       Additional Provisions with Respect to Letters of Credit.**

(a)        <u>Obligation to Issue or Amend</u>.

(i)        No L/C Issuer shall issue any Letter of Credit if:

(A)        subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve (12) months after the date of issuance or last extension, unless the Administrative Agent and such L/C Issuer have approved such expiry date;

(B)        the expiry date of any requested Letter of Credit would occur after the L/C Expiration Date, unless all the L/C Revolving Lenders have approved such expiry date;

(C)        with respect to a Letter of Credit to be issued by a Dollar L/C Issuer, such Letter of Credit is to be denominated in a currency other than Dollars; or

(D)        with respect to a Letter of Credit to be issued by a Multicurrency L/C Issuer, such Letter of Credit is to be denominated in a currency other than Dollars, Euros or Sterling (provided that the foregoing shall in no way limit the right of a Multicurrency L/C Issuer, in its sole discretion, to issue a Letter of Credit in any other Approved Currency).

(ii)       No L/C Issuer shall be under any obligation to issue any Letter of Credit if:

(A)        any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, or any Law applicable to such L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or request that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such L/C Issuer is not otherwise compensated hereunder) not in effect on the Amendment No. 6 Effective Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense that was not applicable on the Amendment No. 6 Effective Date and that such L/C Issuer in good faith deems material to it;

(1) the issuance of such Letter of Credit would violate any Law applicable to such L/C Issuer;

(2) except as otherwise agreed by such L/C Issuer and the Administrative Agent, such Letter of Credit is in an initial stated amount less than the Dollar Equivalent of $20,000;

-65-

(3) without derogation of clauses (a)(i)(C) and (D) above, such Letter of Credit is to be denominated in a currency other than Dollars or an Alternative Currency (it being understood and agreed, for the avoidance of doubt, that no L/C Issuer will be required to issue any Letters of Credit in Brazilian Real);

(4) except as otherwise agreed by such L/C Issuer, such Letter of Credit contains provisions for automatic reinstatement of the stated amount after any drawing thereunder;

(5) any Dollar Revolving Lender or Limited Currency Revolving Lender is at that time Defaulting Lender, unless such L/C Issuer has entered into arrangements, including the delivery of cash collateral, reasonably satisfactory to such L/C Issuer with the Parent Borrower or such Lender to eliminate the L/C Issuer's actual or potential L/C Obligations (after giving effect to Section 2.16) with respect to such Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which such L/C Issuer has exposure; and

(6) such Letter of Credit is a commercial Letter of Credit, unless such L/C Issuer otherwise consents, or if the issuance of such Letter of Credit would violate one or more policies of such L/C Issuer with respect to letters of credit.

(iii) No L/C Issuer shall be under any obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof; or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(iv) The applicable L/C Issuer shall act on behalf of the L/C Revolving Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and such L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article X with respect to any acts taken or omissions suffered by such L/C Issuer in connection with such Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article X included such L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to such L/C Issuer.

      (b)      <u>Procedures for Issuance and Amendment; Auto-Extension Letters of Credit</u>

     (i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of any Borrower delivered to the applicable L/C Issuer (with a copy to the Administrative Agent) in the form of a L/C Application, appropriately completed and signed by a Responsible Officer of such Borrower. Each such L/C Application must be received by the applicable L/C Issuer and the Administrative Agent (A) not later than 12:00 noon (New York time) at least three (3) Business Days prior to the proposed issuance date or date of amendment, as the case may be, of any Letter of Credit denominated in Dollars and (B) not later than 12:00 noon (Local Time) at least five (5) Business Days prior to the proposed issuance date or date of amendment, as the case may be, of any Letter of Credit denominated in an Alternative Currency (or, in each case, such later date and time as the applicable L/C Issuer and the Administrative Agent may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such L/C Application shall specify in form and detail reasonably satisfactory to the applicable L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount and currency thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as such L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such L/C Application shall specify in form and detail satisfactory to the applicable L/C Issuer: (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; (D) the purpose and nature of the requested Letter of Credit; and (E) such other matters as such L/C Issuer may reasonably require. Additionally, the Parent Borrower shall furnish to such L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as such L/C Issuer or the Administrative Agent may require.

    (ii)     Promptly after receipt of any L/C Application, the applicable L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such L/C Application from the applicable Borrower and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof. Unless such L/C Issuer has received written notice from the Administrative Agent, any L/C Revolving Lender or any Credit Party, at least one (1) Business Day prior to the requested date of issuance or amendment of the

-66-

applicable Letter of Credit, that one or more applicable conditions contained in Section 5.01 (if issued on the Amendment No. 6 Effective Date) or 5.02 shall not then be satisfied, then, subject to the terms and conditions hereof, the applicable L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Borrower (or Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with such L/C Issuer's usual and customary business practices.

(iii)    If any Borrower so requests in any L/C Application, the applicable L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit such L/C Issuer to prevent any such renewal at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued (but in any event not later than 30 days prior to the scheduled expiry date thereof). Unless otherwise directed by the L/C Issuer, the applicable Borrower shall not be required to make a specific request to the applicable L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the L/C Revolving Lenders shall be deemed to have authorized (but may not require) the applicable L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the L/C Expiration Date; provided, however, that no L/C Issuer shall permit any such extension if (A) such L/C Issuer has determined that it would not be permitted or would have no obligation at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of Section 2.03(a) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five (5) Business Days before the Non-Extension Notice Date from the Administrative Agent or the applicable Borrower that one or more of the applicable conditions specified in Section 5.02 is not then satisfied, and in each case directing such L/C Issuer not to permit such extension.

(i)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the applicable L/C Issuer will also deliver to the applicable Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)    Drawings and Reimbursements; Funding of Participations.

(i)    Upon any drawing under any Letter of Credit, the applicable L/C Issuer shall notify the applicable Borrower and the Administrative Agent thereof. In the case of a Letter of Credit denominated in Dollars, the Parent Borrower shall reimburse such L/C Issuer in Dollars. In the case of a Letter of Credit denominated in Sterling or euros, the applicable Borrower shall reimburse such L/C Issuer in Sterling or Euros, as applicable. In the case of a Letter of Credit denominated in an Alternative Currency other than Sterling or Euros, the applicable Borrower shall reimburse such L/C Issuer in such Alternative Currency unless (x) such L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars, or (y) in the absence of any such requirement for reimbursement in Dollars, the applicable Borrower shall have notified such L/C Issuer promptly following receipt of the notice of drawing that the applicable Borrower will reimburse such L/C Issuer in Dollars. In the case of any such reimbursement in Dollars of a drawing as of the applicable Revaluation Date under a Letter of Credit denominated in an Alternative Currency other than Sterling or Euros, such L/C Issuer shall notify the applicable Borrower of the Dollar Equivalent of the amount of the drawing promptly following the determination thereof. Not later than (x) 12:00 noon (New York time) on or prior to the date that is three (3) Business Days following the date that the applicable Borrower receives notice from any L/C Issuer of any payment by such L/C Issuer under a Letter of Credit to be reimbursed in Dollars, and (y) the Applicable Time on or prior to the date that is three (3) Business Days following the date the applicable Borrower receives notice from any L/C Issuer of any payment by such L/C Issuer under a Letter of Credit to be reimbursed in an Alternative Currency (each such date of payment by such L/C Issuer under a Letter of Credit, an "Honor Date"), the applicable Borrower shall reimburse such L/C Issuer through the Administrative Agent in Dollars or in the applicable Alternative Currency, as the case may be, in an amount equal to the amount of such drawing; provided, that such Borrower, and the applicable L/C Issuer may, each in their discretion, with the consent of the Administrative Agent and so long as such arrangements do not adversely affect the rights of any Lender in any material respect, enter into Letter of Credit cash collateral prefunding arrangements acceptable to them for the purpose of reimbursing Letter of Credit draws. If the applicable Borrower does not to reimburse the applicable L/C Issuer on the Honor Date, the Administrative Agent, at the request of such L/C Issuer, shall promptly notify each L/C Revolving Lender as of the Honor Date the Dollar Equivalent of such unreimbursed drawing (an "Unreimbursed Amount") and the amount of such L/C Revolving Lender's L/C Commitment Percentage thereof.

-67-

Exhibit 2, page 214

(ii)    Each L/C Revolving Lender shall upon any notice pursuant to Section 2.03(c)(i) make funds available to the Administrative Agent for the account of such L/C Issuer, in Dollars at the Administrative Agent's Office for payments in Dollars in an amount equal to its L/C Commitment Percentage of such Unreimbursed Amount not later than 1:00 p.m. (Local Time) on the Business Day specified in such notice by the Administrative Agent. With respect to any Unreimbursed Amount, the applicable Borrower shall be deemed to have incurred from the applicable L/C Issuer an L/C Borrowing in the amount of such Unreimbursed Amount, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at (i) through and including the third Business Day following the Honor Date, the rate of interest applicable to Revolving Loans that are Base Rate Loans and (ii) thereafter, the Default Rate. In such event, each L/C Revolving Lender's payment to the Administrative Agent for the account of such L/C Issuer pursuant to this Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Revolving Lender in satisfaction of its participation obligation under this Section 2.03.

(iii)    Until an L/C Revolving Lender funds its L/C Advance pursuant to this Section 2.03(c) to reimburse the applicable L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such L/C Revolving Lender's L/C Commitment Percentage of such amount shall be solely for the account of such L/C Issuer.

(iv)    Each L/C Revolving Lender's obligation to make L/C Advances to reimburse the applicable L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right that such L/C Revolving Lender may have against such L/C Issuer, the Parent Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default or Event of Default, (C) non-compliance with the conditions set forth in Section 5.02, or (D) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided that such L/C Issuer shall have complied with the provisions of Section 2.03(b)(ii). No such making of an L/C Advance shall relieve or otherwise impair the obligation of each Borrower to reimburse any L/C Issuer for the amount of any payment made by such L/C Issuer under any Letter of Credit, together with interest as provided herein.

(v)    If any L/C Revolving Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such L/C Revolving Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), such L/C Issuer shall be entitled to recover from such L/C Revolving Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at a rate per annum equal to the greater of the Federal Funds Effective Rate and a rate determined by such L/C Issuer in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by such L/C Issuer in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's L/C Advance in respect of the relevant L/C Borrowing. A certificate of the applicable L/C Issuer submitted to any applicable L/C Revolving Lender (through the Administrative Agent) with respect to any amounts owing under this clause (v) shall be conclusive absent manifest error.

(d)    <u>Repayment of Participations</u>.

(i)    At any time after any L/C Issuer has made a payment under any Letter of Credit and has received from any L/C Revolving Lender such L/C Revolving Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), if the Administrative Agent receives for the account of such L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the applicable Borrower or otherwise, including proceeds of cash collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such L/C Revolving Lender its L/C Commitment Percentage (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such L/C Revolving Lender's L/C Advance was outstanding), in the same currency in which such L/C Revolving Lender's L/C Advance was made and in the same type of funds as those received by the Administrative Agent.

-68-

(ii) If any payment received by the Administrative Agent for the account of any L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 11.05 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each L/C Revolving Lender shall pay to the Administrative Agent for the account of such L/C Issuer its L/C Commitment Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such L/C Revolving Lender, at a rate per annum equal to the applicable Overnight Bank Funding Rate from time to time in effect. The obligations of the L/C Revolving Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

(e) Obligations Absolute. The obligation of each Borrower to reimburse the applicable L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Credit Agreement under all circumstances, including the following:

(i) any lack of validity or enforceability of such Letter of Credit, this Credit Agreement or any other Credit Document;

(ii) the existence of any claim, counterclaim, setoff, defense or other right that any Borrower, any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), any L/C Issuer or any other Person, whether in connection with this Credit Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii) any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv) any payment by any L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by any L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v) any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to any Borrower or any Subsidiary or in the relevant currency markets generally; or

(vi) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Borrower or any Subsidiary.

The applicable Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to such Borrower and, in the event of any claim of noncompliance with such Borrower's instructions or other irregularity, such Borrower will immediately notify the applicable L/C Issuer. The Borrowers shall be conclusively deemed to have waived any such claim against the applicable L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f) Role of the L/C Issuers in such Capacity. Each L/C Revolving Lender and each Borrower agree that, in paying any drawing under a Letter of Credit, no L/C Issuer shall have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of any L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of any L/C Issuer shall be liable to any L/C Revolving Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Required L/C

-69-

Lenders; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final, non-appealable judgment); or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. Each Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to such Borrower's use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude such Borrower's pursuing such rights and remedies as such Borrower may have against the beneficiary or transferee at law or under any other agreement. None of any L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of any L/C Issuer, shall be liable or responsible for any of the matters described in clauses (i) through (vi) of Section 2.03(e); provided, however, that anything in such clauses to the contrary notwithstanding, each Borrower shall have a claim against each L/C Issuer, and each L/C Issuer shall be liable to each Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by such Borrower that are determined by a court of competent jurisdiction in a final non-appealable judgment to have been caused by such L/C Issuer's willful misconduct or gross negligence (as determined by a court of competent jurisdiction in a final, non-appealable judgment) or such L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, each L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and each L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, that may prove to be invalid or ineffective for any reason.

(g)     Cash Collateral. Upon the request of the Administrative Agent or the applicable L/C Issuer, (i) if any L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in a L/C Borrowing, or (ii) if, as of the L/C Expiration Date, any Letter of Credit may for any reason remain outstanding and partially or wholly undrawn the applicable Borrower shall immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations (in an amount equal to 103% of such Outstanding Amount determined as of the date of such L/C Borrowing or the L/C Expiration Date, as the case may be). The Administrative Agent may, at any time and from time to time after the initial deposit of cash collateral, request that additional cash collateral be provided in order to protect against the results of exchange rate fluctuations. For purposes hereof, "Cash Collateralize" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the applicable L/C Issuer and the L/C Revolving Lenders, as collateral for such L/C Obligations, cash or deposit account balances pursuant to customary documentation in form and substance reasonably satisfactory to the Administrative Agent and such L/C Issuer (which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. Cash collateral shall be maintained in blocked, interest bearing deposit accounts or money market fund accounts at the Administrative Agent.

(h)     Applicability of ISP. Unless otherwise expressly agreed by any L/C Issuer and the applicable Borrower when a Letter of Credit is issued, the rules of the ISP shall apply to each Letter of Credit.

(i)     Letters of Credit Issued for Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of any Subsidiary of the Parent Borrower, the Borrowers shall be obligated to reimburse the applicable L/C Issuer for any and all drawings under such Letter of Credit. The Borrowers hereby acknowledge that the issuance of Letters of Credit for the account of the Parent Borrower's Subsidiaries inures to the benefit of the Borrowers, and that each Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

(k)     Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(l)     Addition of L/C Issuer. Parent Borrower may, at any time and from time to time, designate one or more additional Revolving Lenders to act as a Dollar L/C Issuer or a Multicurrency L/C Issuer under the terms of

-70-

this Agreement, with the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed) and such Revolving Lender. Any Revolving Lender designated as a Dollar L/C Issuer or Multicurrency L/C Issuer, as the case may be, pursuant to this Section 2.03(l) shall have all the rights and obligations of the Dollar L/C Issuer and Multicurrency L/C Issuer, respectively, under the Credit Documents with respect to Letters of Credit issued or to be issued by it, and all references in the Credit Documents to the term "L/C Issuer," "Dollar L/C Issuer" or "Multicurrency L/C Issuer" shall, with respect to such Letters of Credit, be deemed to refer to such Lender in its capacity as the L/C Issuer, as the context shall require. The Administrative Agent shall notify the Revolving Lenders of any such additional L/C Issuer. If at any time there is more than one L/C Issuer hereunder, Parent Borrower may, in its discretion, select which L/C Issuer is to issue any particular Letter of Credit.

(a)     2020-1 Incremental Revolving Lenders. For the avoidance of doubt no 2020-1 Incremental Revolving Lender shall have any obligations in respect of the issuance or participation or the funding of any drawing or disbursement of any Letter of Credit.

**2.04     Additional Provisions with Respect to Swingline Loans.**

(a)   Borrowing Procedures. Each Swingline Borrowing shall be made upon the Parent Borrower's irrevocable notice to the Swingline Lender and the Administrative Agent by delivery to the Swingline Lender and the Administrative Agent of a written Loan Notice, appropriately completed and signed by a Responsible Officer of the Parent Borrower. Each such notice must be received by the Swingline Lender and the Administrative Agent not later than 2:00 p.m. (New York time) on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $100,000, and (ii) the requested borrowing date, which shall be a Business Day. Promptly after receipt by the Swingline Lender of any Loan Notice, the Swingline Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Loan Notice and, if not, the Swingline Lender will notify the Administrative Agent (by telephone or in writing) of the contents thereof. Unless the Swingline Lender has received notice (by telephone or in writing) from the Administrative Agent prior to 3:00 p.m. (New York time) on the date of the proposed Swingline Borrowing (A) directing the Swingline Lender not to make such Swingline Loan as a result of the limitations set forth in this Article II, or (B) that one or more of the applicable conditions specified in Section 5.01 (if on the Amendment No. 7 Effective Date) and Section 5.02 is not then satisfied, then, subject to the terms and conditions hereof, the Swingline Lender will, not later than 4:00 p.m. (New York time) on the borrowing date specified in such Loan Notice, make the amount of its Swingline Loan available to the Parent Borrower at its office by crediting the account of the Parent Borrower on the books of the Swingline Lender in immediately available funds. The Swingline Lender shall not be required to make any Swingline Loan at any time when a Dollar Revolving Lender is a Defaulting Lender (except if all of the Swingline Exposure of such Defaulting Lender is reallocated pursuant to Section 2.16).

(b)     Refinancing.

(i)     The Swingline Lender at any time in its sole and absolute discretion may (and, in any event, within ten Business Days of the applicable Swingline Borrowing, shall) request that each Dollar Revolving Lender fund its risk participations in Swingline Loans in an amount equal to such Dollar Revolving Lender's Dollar Revolving Commitment Percentage of Swingline Loans then outstanding. Each Dollar Revolving Lender shall make an amount equal to its Dollar Revolving Commitment Percentage of the amount specified in such notice available to the Administrative Agent in immediately available funds for the account of the Swingline Lender at the Administrative Agent's Office not later than 1:00 p.m. (New York time) on the day specified in such notice. The Administrative Agent shall remit the funds so received to the Swingline Lender.

(ii)     Each Dollar Revolving Lender's funding of its risk participation in the relevant Swingline Loan and each Dollar Revolving Lender's payment to the Administrative Agent for the account of the Swingline Lender pursuant to Section 2.04(b)(i) shall be deemed payment in respect of such participation.

(iii)     If any Dollar Revolving Lender fails to make available to the Administrative Agent for the account of the Swingline Lender any amount required to be paid by such Dollar Revolving Lender pursuant to the foregoing provisions of this Section 2.04(b) by the time specified in Section 2.04(b)(i), the Swingline Lender shall be entitled to recover from such Dollar Revolving Lender (acting through the Administrative Agent), on demand, such amount

-71-

with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swingline Lender at a rate per annum equal to the greater of the Federal Funds Effective Rate and a rate determined by the Swingline Lender in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Swingline Lender in connection with the foregoing. If such Dollar Revolving Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Dollar Revolving Lender's funded participation in the relevant Swingline Loan. A certificate of the Swingline Lender submitted to any Dollar Revolving Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

    (iv)    Each Dollar Revolving Lender's obligation to purchase and fund risk participations in Swingline Loans pursuant to this Section 2.04(b) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right that such Dollar Revolving Lender may have against the Swingline Lender, the Parent Borrower or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default or Event of Default, (C) non-compliance with the conditions set forth in Section 5.02, or (D) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided that Swingline Lender has complied with the provisions of Section 2.04(a). No such purchase or funding of risk participations shall relieve or otherwise impair the obligation of the Parent Borrower to repay Swingline Loans, together with interest as provided herein.

    (c)    Repayment of Participations.

    (i)    At any time after any Dollar Revolving Lender has purchased and funded a risk participation in a Swingline Loan, if the Swingline Lender receives any payment on account of such Swingline Loan, the Swingline Lender will distribute to such Dollar Revolving Lender its Dollar Revolving Commitment Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Dollar Revolving Lender's risk participation was funded) in the same funds as those received by the Swingline Lender.

    (ii)    If any payment received by the Swingline Lender in respect of principal or interest on any Swingline Loan is required to be returned by the Swingline Lender under any of the circumstances described in Section 11.05 (including pursuant to any settlement entered into by the Swingline Lender in its discretion), each Dollar Revolving Lender shall pay to the Swingline Lender its Dollar Revolving Commitment Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Effective Rate. The Administrative Agent will make such demand upon the request of the Swingline Lender. The obligations of the Dollar Revolving Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

    (d)    Interest for Account of Swingline Lender. The Swingline Lender shall be responsible for invoicing the Parent Borrower for interest on the Swingline Loans. Until each Dollar Revolving Lender funds its risk participation pursuant to this Section 2.04 of any Swingline Loan, interest in respect thereof shall be solely for the account of the Swingline Lender.

    (e)    Payments Directly to Swingline Lender. The Parent Borrower shall make all payments of principal and interest in respect of the Swingline Loans directly to the Swingline Lender.

    (f)    2020-1 Incremental Revolving Lenders. For the avoidance of doubt no 2020-1 Incremental Revolving Lender shall have any obligations in respect of the funding, participation or disbursement of any Swingline Loan.

**2.05    Repayment of Loans and B/As.**

    (a)    Revolving Loans and B/As. The Parent Borrower shall repay to the Dollar Revolving Lenders the Outstanding Amount of Dollar Revolving Loans on the Revolving Termination Date. Each Borrower shall repay to the Limited Currency Revolving Lenders the Outstanding Amount of the Limited Currency Revolving Loans made to

-72-

it on the Revolving Termination Date. Each Borrower shall repay to the Multicurrency Revolving Lenders the Outstanding Amount of Multicurrency Revolving Loans made to it and B/As accepted hereunder on the Revolving Termination Date. The Parent Borrower shall repay to the 2020-1 Incremental Revolving Lenders the Outstanding Amount of 2020-1 Incremental Revolving Loans made to it on the Revolving Termination Date.

(b)      Swingline Loans. The Parent Borrower shall repay to the Swingline Lender the Outstanding Amount of the Swingline Loans on the Revolving Termination Date.

(c)      Delayed Draw Term A Loans. Starting with the last Business Day of December 2019, on the last Business Day of each March, June, September and December (each such last Business Day, a "Term A Amortization Payment Date"), Parent Borrower shall repay an amount equal to the product of (a) the original aggregate principal amount of all Delayed Draw Term A Loans that shall have been made prior to such Term A Amortization Payment Date and (b)(i) with respect to any Term A Amortization Date occurring prior to the third anniversary of the Amendment No. 6 Effective Date, 0.625% and (ii) with respect to any Term A Amortization Date occurring on or following the third anniversary of the Amendment No. 6 Effective Date, 1.25%. On the Delayed Draw Term A Loan Termination Date, all Delayed Draw Term A Loans that are outstanding shall be repaid in full.

(d)      Term B-4 Loans. Starting with the last Business Day of December 2019, on the last Business Day of each March, June, September and December, the Parent Borrower shall repay an aggregate principal amount of Term B-4 Loans equal to 0.25% of the aggregate principal amount of all Term B-4 Loans funded or converted from Term B-3 Loans on the Amendment No. 6 Effective Date, and on the Term B-4 Loan Termination Date all Term B-4 Loans that are outstanding on the Term B-4 Loan Termination Date shall be repaid in full.

In the event any Incremental Term Loans, Refinancing Term Loans or Extended Term Loans are made, such Incremental Term Loans, Refinancing Term Loans or Extended Term Loans, as applicable, shall be repaid by the Parent Borrower in the amounts and on the dates set forth in the Additional Credit Extension Amendment with respect thereto and on the applicable maturity date thereof.

(e)      Term A-2 Loans and Term B-3 Loans. On the Amendment No. 6 Effective Date, all Term B-3 Loans that are not Converted Term B-3 Loans and all Term A-2 Loans, in each case, that are outstanding on the Amendment No. 6 Effective Date shall be repaid in full.

**2.06      Prepayments.**

(a)      Voluntary Prepayments. The Loans may be repaid and amounts owed in respect of outstanding B/As may be cash collateralized in whole or in part without premium or penalty (except as set forth in the last paragraph of this Section 2.06(a) and, in the case of Loans other than Base Rate Loans, amounts payable pursuant to Section 3.05); provided that:

(i)      in the case of B/A Drawings and Loans other than Swingline Loans, (A) notice thereof must be received by 12:00 noon (Local Time) by the Applicable Agent at least three (3) Business Days prior to the date of prepayment, in the case of Eurodollar Rate Loans, and one (1) Business Day prior to the date of prepayment, in the case of Base Rate Loans and B/A Drawings, (B) any such prepayment shall be a minimum principal amount of (n) $1.0 million and integral multiples of $1.0 million in excess thereof, in the case of Eurodollar Rate Loans denominated in Dollars, (o) €1.0 million and integral multiples of €1.0 million in excess thereof, in the case of Eurodollar Rate Loans denominated in Euros, (p) £1.0 million and integral multiples of £1.0 million in excess thereof, in the case of Eurodollar Rate Loans denominated in Sterling, (q) C$1.0 million and integral multiples of C$1.0 million in excess thereof, in the case of Eurodollar Rate Loans denominated in Canadian Dollars, (r) kr7.0 million and integral multiples of kr7.0 million in excess thereof, in the case of Eurodollar Rate Loans denominated in Swedish Krona, (s) AU$1.0 million and integral multiples of AU$1.0 million in excess thereof, in the case of Eurodollar Rate Loans denominated in Australian Dollars, (t) ¥100.0 million and integral multiples of ¥100.0 million thereof, in the case of Eurodollar Rate Loans denominated in Japanese Yen, (u) CHF1.0 million and integral multiples of CHF1.0 million thereof, in the case of Eurodollar Rate Loans denominated in Swiss Francs, (v) C$1.0 and integral multiples of C$100,000 in excess thereof, in the case of Base Rate Loans denominated in Canadian Dollars and B/As Drawings, (w) Dkr2.0 million and integral multiples of Dkr1.0 million in excess thereof, in the case of Eurodollar Rate Loans denominated in Danish Krone, (x) MXN5.0 million and integral multiples of MXN1.0 million in excess thereof, in the case of

-73-

Eurodollar Rate Loans denominated in Mexican Pesos, (y) R$1.0 million and integral multiples of R$1.0 million in excess thereof, in the case of Eurodollar Rate Loans denominated in Brazilian Real and (z) $1.0 million and integral multiples of $100,000 in excess thereof, in the case of Base Rate Loans denominated in Dollars, or, in each case the entire remaining principal amount thereof, if less; and

(ii)     in the case of Swingline Loans, (A) notice thereof must be received by the Swingline Lender by 1:00 p.m. (New York time) on the date of prepayment (with a copy to the Administrative Agent), and (B) any such prepayment shall be in the same minimum principal amounts as for advances thereof (or any lesser amount that may be acceptable to the Swingline Lender).

Each such notice of voluntary prepayment hereunder shall be irrevocable and shall specify the date and amount of such prepayment, or amount owed in respect of an outstanding B/A Drawing or portion thereof to be cash collateralized, the Loans and Types of Loans that are being prepaid or B/A Drawings to be cash collateralized and, if Eurodollar Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Applicable Agent will give prompt notice to the applicable Lenders of any prepayment on the Loans or cash collateralization of amounts owed in respect of outstanding B/As and the Lender's interest therein. Prepayments of Eurodollar Rate Loans hereunder shall be accompanied by accrued interest on the amount prepaid and breakage or other amounts due, if any, under Section 3.05. Notwithstanding the foregoing, a notice of voluntary prepayment delivered by the Parent Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Parent Borrower (by notice to the Applicable Agent on or prior to the specified effective date) if such condition is not satisfied. For the avoidance of doubt, all Original Revolving Commitments shall terminate on the Amendment No. 6 Effective Date and Parent Borrower shall repay all outstanding Original Revolving Loans and Original Swingline Loans, together with accrued and unpaid interest thereon.

In the event that, at any time following the effectiveness of Amendment No. 6 and on or prior to the date that is six months following the Amendment No. 6 Effective Date, a Repricing Transaction shall occur, a fee of 1.00% of the aggregate principal amount of the Term B-4 Loans so prepaid, refinanced, repriced, amended, converted or exchanged in such Repricing Transaction shall be payable to each Lender holding Term B-4 Loans upon such prepayment, refinancing, repricing, amendment, conversion or exchange. If, at any time following the effectiveness of Amendment No. 6 and on or prior to the date that is six months following the Amendment No. 6 Effective Date, any Term B-4 Lender that is a Non-Consenting Lender and is replaced pursuant to Section 11.13 in connection with its refusal to consent to any Repricing Transaction, such Term B-4 Lender shall receive the fee referred to in the immediately preceding sentence as if the Repricing Transaction had occurred.

(b)     Mandatory Prepayments. Subject in each case to Section 2.06(c):

(i)     Revolving Commitments.

(A)     If at any time (1) the Outstanding Amount of Dollar Revolving Obligations shall exceed the Aggregate Dollar Revolving Committed Amount, (2) the Outstanding Amount of Limited Currency Revolving Obligations shall exceed the Aggregate Limited Currency Revolving Committed Amount, (3) the Outstanding Amount of Multicurrency Revolving Obligations shall exceed the Aggregate Multicurrency Revolving Committed Amount, (4) the Outstanding Amount of all Limited Currency Revolving Obligations and Multicurrency Revolving Obligations denominated in an Alternative Currency shall exceed the Alternative Currency Sublimit, (5) the Outstanding Amount of all 2020-1 Incremental Revolving Obligations shall exceed the Aggregate 2020-1 Incremental Revolving Committed Amount, (6) the Outstanding Amount of Swingline Loans shall exceed the Swingline Sublimit and (7) the L/C Obligations shall exceed the L/C Sublimit or the L/C Committed Amount (in each case, other than solely as a result of changes in Spot Rates) immediate prepayment or cash collateralization of amounts owing in respect of outstanding B/As will be made on or in respect of the applicable Revolving Obligations in an amount equal to the difference; provided, however, that, except under the circumstances described in Section 2.03(a)(ii)(A)(5), 2.03(c), 2.03(d)(i), 2.03(g), 2.06(b)(i)(B), 2.16(d) or 9.02(c), LC Obligations will not be Cash Collateralized hereunder until the Revolving Loans and Swingline Loans have been paid in full. If on any Revaluation Date and solely as a result of changes in Spot Rates, (i) the Outstanding Amount of Limited Currency Revolving Obligations shall exceed 105% of the Aggregate Limited Currency Revolving Committed Amount, (ii) the Outstanding Amount of Multicurrency Revolving Obligations shall exceed 105% of the Aggregate Multicurrency Revolving Committed Amount or (iii) the Outstanding Amount of all Limited Currency Revolving Obligations and Multicurrency Revolving

-74-

Obligations denominated in an Alternative Currency shall exceed 105% of the Alternative Currency Sublimit, immediate prepayment or cash collateralization of amounts owing in respect of outstanding B/As will be made on or in respect of the applicable Revolving Obligations in an amount equal to the difference.

(B)    If the Administrative Agent or an L/C Issuer notifies the Parent Borrower at any time that the Outstanding Amount of all L/C Obligations (whether or not as a result of a change in Spot Rates) at such time exceeds an amount equal to 105% of the L/C Sublimit then in effect, then, within two (2) Business Days after receipt of such notice, the Parent Borrower shall Cash Collateralize the L/C Obligations in an aggregate amount sufficient to reduce such Outstanding Amount as of such date of payment to an amount not to exceed 100% of the L/C Sublimit. If the Administrative Agent or an L/C Issuer notifies the Parent Borrower at any time that the Outstanding Amount of all L/C Obligations denominated in an Alternative Currency at such time exceeds an amount equal to 105% of the Alternative Currency L/C Sublimit then in effect, then, within two (2) Business Days after receipt of such notice, the Parent Borrower shall Cash Collateralize the L/C Obligations in an aggregate amount sufficient to reduce such Outstanding Amount as of such date of payment to an amount not to exceed 100% of the Alternative Currency L/C Sublimit. The Administrative Agent may, at any time and from time to time after the initial deposit of such cash collateral, request that additional cash collateral be provided in order to protect against the results of further exchange rate fluctuations.

(ii)    <u>Subject Dispositions and Involuntary Dispositions</u>. On or before the applicable date set forth in the next sentence, prepayment will be made on the Loan Obligations in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received from any Subject Disposition or Involuntary Disposition by any member of the Consolidated Group occurring after the Amendment No. 6 Effective Date, but solely to the extent (x) the Net Cash Proceeds received in such Subject Disposition (or series of related Subject Dispositions) or Involuntary Disposition (or series of related Involuntary Dispositions) exceed $35.0 million, (y) the Net Cash Proceeds received in all Subject Dispositions or Involuntary Dispositions effected during the fiscal year in which the applicable Subject Disposition or Involuntary Disposition takes place exceeds $75.0 million and (z) such Net Cash Proceeds are not used to, subject to compliance with <u>Section 8.02</u>, acquire, maintain, develop, construct, improve, upgrade or repair Property or make Investments (other than inventory, accounts receivable, cash or Cash Equivalents) useful in the business of the Consolidated Group in any member of the Consolidated Group or to make investments in Permitted Acquisitions that are otherwise permitted hereunder within twelve (12) months of the date of such Subject Disposition or Involuntary Disposition (or to the extent contractually committed to be reinvested prior to the expiration of such twelve (12) month period, eighteen (18) months of the date of such Subject Disposition or Involuntary Disposition); <u>provided</u> that such a reinvestment shall not be permitted if an Event of Default shall have occurred and be continuing at the time the Parent Borrower commits to make such reinvestment or, if no such commitment is made, the time the reinvestment is actually made, and in either such circumstance such Net Cash Proceeds shall be used to make prepayments on the Loans; <u>provided further</u> that, to the extent any Incremental Equivalent Debt is then outstanding and is secured by a Lien on the Collateral that is pari passu in priority with the Lien on the Collateral securing the Obligations and is required by the terms thereof to make a prepayment or make a repurchase offer from the net cash proceeds of such Subject Disposition or Involuntary Disposition ("<u>Applicable Pari Passu Debt</u>"), a portion of such Net Cash Proceeds not exceeding the Ratable Net Proceeds Share may be applied to prepay such Applicable Pari Passu Debt. Any such prepayment from any Net Cash Proceeds required by the previous sentence shall be made (x) in the case of a Major Disposition in respect of which the notice referred to in <u>Section 7.02(g)</u> has not been delivered on or before the fifteenth (15th) Business Day following the receipt of the Net Cash Proceeds from such Major Disposition or to the extent such notice does not indicate reinvestment is intended with the Net Cash Proceeds of such Major Disposition, on or before the twenty-fifth (25th) Business Day following receipt of such Net Cash Proceeds and (y) in any other case, promptly after the Parent Borrower determines that it will not reinvest such Net Cash Proceeds in accordance with the terms and limitations of the previous sentence, but in no event later than 366 days (or 546 days if a contractual commitment to reinvest such Net Cash Proceeds has been made within the initial 366-day period) following the receipt of such Net Cash Proceeds.

-75-

Exhibit 2, page 222

(iii)    Indebtedness. Prepayment will be made on the Loan Obligations in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received from any incurrence or issuance of Indebtedness after the Amendment No. 6 Effective Date (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 8.03, (other than (a) Refinancing Debt and (b) initial borrowings under Replacement Revolving Commitments)); provided that prepayments required by initial borrowings under Replacement Revolving Commitments shall be applied only to borrowings under the Replaced Revolving Commitments (with reduction or termination of Revolving Commitments being replaced as required by clause (i) of the proviso to Section 2.19(a)); provided, further, that prepayments required by initial borrowings or Refinancing Term Loans or incurrence of Refinancing Notes/Loans shall be applied only to borrowings under the Refinancing Term Loans (with reduction or termination of Revolving Commitments being replaced as required by clause (i) of the proviso to Section 2.18(a)). Any prepayment in respect of such Indebtedness hereunder will be payable on the Business Day following receipt by the Parent Borrower or other members of the Consolidated Group of the Net Cash Proceeds therefrom.

(iv)    Consolidated Excess Cash Flow. If for any fiscal year of the Parent Borrower ending after December 31, 2018 there shall be Consolidated Excess Cash Flow, then, on a date that is no later than five Business Days following the date that financial statements for such fiscal year are required to be delivered pursuant to Section 7.01(a), the Loan Obligations shall be prepaid by an amount equal to the ECF Application Amount for such fiscal year less any voluntary prepayments of Term Loans made during such fiscal year (other than such voluntary prepayments that are funded by the proceeds of Indebtedness and for the avoidance of doubt other than any prepayments made on the Amendment No. 6 Effective Date).

(v)    Eurodollar Prepayment Account. If the Parent Borrower is required to make a mandatory prepayment of Eurodollar Rate Loans under this Section 2.06(b), so long as no Event of Default exists, the Parent Borrower shall have the right, in lieu of making such prepayment in full, to deposit an amount equal to such mandatory prepayment with the Applicable Agent in a cash collateral account maintained (pursuant to documentation reasonably satisfactory to the Applicable Agent) by and in the sole dominion and control of the Applicable Agent. Any amounts so deposited shall be held by the Applicable Agent as collateral for the prepayment of such Eurodollar Rate Loans and shall be applied to the prepayment of the applicable Eurodollar Rate Loans at the earliest of (x) the end of the current Interest Periods applicable thereto, (y) three months following the date of such deposit and (z) at the election of the Applicable Agent, upon the occurrence of an Event of Default. At the request of the Parent Borrower, amounts so deposited shall be invested by the Applicable Agent in Cash Equivalents maturing on or prior to the date or dates on which it is anticipated that such amounts will be applied to prepay such Eurodollar Rate Loans; any interest earned on such Cash Equivalents will be for the account of the Parent Borrower and the Parent Borrower will deposit with the Applicable Agent the amount of any loss on any such Cash Equivalents to the extent necessary in order that the amount of the prepayment to be made with the deposited amounts may not be reduced.

(vi)    Foreign Dispositions and Consolidated Excess Cash Flow. Notwithstanding any other provisions of this Section 2.06, (i) to the extent that any of or all the Net Cash Proceeds of any Subject Disposition or Involuntary Disposition by a Foreign Subsidiary (collectively, a "Foreign Disposition") or Consolidated Excess Cash Flow attributable to Foreign Subsidiaries are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds or Consolidated Excess Cash Flow so affected will not be required to be applied to prepay Loan Obligations at the times provided in this Section 2.06 but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Parent Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions available under applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds or Consolidated Excess Cash Flow that, in each case, would otherwise be required to be used to make a prepayment pursuant to Section 2.06(b)(ii) or 2.06(b)(iv), is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds or Consolidated Excess Cash Flow will be promptly (and in any event not later than ten Business Days after such repatriation) applied (net of additional Taxes payable or reserved against as a result thereof) to the prepayment of the Loan Obligations pursuant to this Section 2.06 and (ii) to the extent that the Parent Borrower has determined in good faith that repatriation of any of or all the Net Cash

-76-

Proceeds of any Foreign Disposition or Foreign Subsidiary Consolidated Excess Cash Flow would have material adverse Tax cost consequences with respect to such Net Cash Proceeds or Consolidated Excess Cash Flow, such Net Cash Proceeds or Consolidated Excess Cash Flow so affected may be retained by the applicable Foreign Subsidiary; provided that, in the case of this clause (ii), on or before the date on which any such Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to Section 2.06(b) or any such Consolidated Excess Cash Flow would have been required to be applied to prepayments pursuant to Section 2.06(b), the Parent Borrower applies an amount equal to such Net Cash Proceeds or Consolidated Excess Cash Flow to such reinvestments or prepayments, as applicable, as if such Net Cash Proceeds or Consolidated Excess Cash Flow had been received by the Parent Borrower rather than such Foreign Subsidiary, less the amount of additional Taxes that would have been payable or reserved against if such Net Cash Proceeds or Consolidated Excess Cash Flow had been repatriated (or, if less, the Net Cash Proceeds or Consolidated Excess Cash Flow that would be calculated if received by such Foreign Subsidiary).

(c)    Application. Within each Loan, prepayments will be applied first to Base Rate Loans, then to Eurodollar Rate Loans in direct order of Interest Period maturities. In addition:

(i)    Voluntary Prepayments of Loans. Prepayments of the Delayed Draw Term A Loans or Term B-4 Loans pursuant to Section 2.06(a) shall be applied to either tranche of Term Loans as directed by the Parent Borrower (and, within such tranche, shall be applied to the payments required under Section 2.05(c) (in the case of the Delayed Draw Term A Loans) and Section 2.05(d) (in the case of Term B-4 Loans) as directed by the Parent Borrower). Voluntary prepayments on the Loan Obligations will be paid by the Administrative Agent to the Lenders ratably in accordance with their respective interests therein.

(ii)    Mandatory Prepayments of Loans. Mandatory prepayments on the Loan Obligations will be paid by the Applicable Agent to the Lenders ratably in accordance with their respective interests therein; provided that:

(A)    Mandatory prepayments in respect of the Revolving Commitments under subsection (b)(i)(A) above shall be applied to the respective Revolving Obligations as appropriate.

(B)    Mandatory prepayments in respect of Subject Dispositions and Involuntary Dispositions under subsection (b)(ii) above, Indebtedness under subsection (b)(iii) and Consolidated Excess Cash Flow under subsection (b)(iv) above shall be applied (i) first to the Delayed Draw Term A Loans (for the avoidance of doubt, to the extent any Delayed Draw Term A Loans shall have been made and remain outstanding) and Term B-4 Loans on a pro rata basis (in direct order of maturity and, within such tranche, shall be applied on a pro rata basis to the payments required under Section 2.05(c) (in the case of the Delayed Draw Term A Loans (for the avoidance of doubt, to the extent any Delayed Draw Term A Loans shall have been made and remain outstanding)) and Section 2.05(d) (in the case of Term B-4 Loans)), then (ii) to the Revolving Obligations (without permanent reduction of the Revolving Commitments); provided that prepayments in respect of Indebtedness under subsection (b)(iii) with the proceeds of Refinancing Debt or Replacement Revolving Commitments shall be applied only to the Loan or Commitment being refinanced.

(iii)    Cash Collateralization of B/A Drawings. Amounts to be applied pursuant to this Section or Article IX to cash collateralize amounts to become due with respect to outstanding B/As shall be deposited in the Prepayment Account (as defined below). The Canadian Agent shall apply any cash deposited in the Prepayment Account allocable to amounts to become due in respect of B/As on the last day of their respective Contract Periods until all amounts due in respect of outstanding B/As have been prepaid or until all the allocable cash on deposit has been exhausted. For purposes of this Credit Agreement, the term "Prepayment Account" means an account established by a Canadian Borrower with the Canadian Agent and over which the Canadian Agent shall have exclusive dominion and control, including the exclusive right of withdrawal for application in accordance with this paragraph (iii). The Canadian Agent will, at the request of such Canadian Borrower, invest amounts on deposit in the Prepayment Account in short-term, cash equivalent investments selected by the Canadian Agent in consultation with such Canadian Borrower that mature prior to the last day of the applicable Contract Periods of the B/As to be prepaid; provided that the

-77-

Canadian Agent shall have no obligation to invest amounts on deposit in the Prepayment Account if an Event of Default shall have occurred and be continuing. The Borrowers shall indemnify the Canadian Agent for any losses relating to the investments so that the amount available to prepay amounts due in respect of B/As on the last day of the applicable Contract Period is not less than the amount that would have been available had no investments been made pursuant thereto. Other than any interest earned on such investments (which shall be for the account of such Canadian Borrower, to the extent not necessary for the prepayment of B/As in accordance with this Section 2.06 and Article IX), the Prepayment Account shall not bear interest. Interest or profits, if any, on such investments shall be deposited in the Prepayment Account and reinvested and disbursed as specified above. If the maturity of the Loans and all amounts due hereunder has been accelerated pursuant to Article IX, the Canadian Agent may, in its sole discretion, apply all amounts on deposit in the Prepayment Account to satisfy any of the Obligations in respect of the Loans, Unreimbursed Amounts and B/As (and each Borrower hereby grants to the Canadian Agent a security interest in its Prepayment Account to secure such Obligations).

**2.07**    **Termination or Reduction of Commitments.**

The Dollar Revolving Commitments, the Limited Currency Revolving Commitments, the Multicurrency Revolving Commitments, the 2020-1 Incremental Revolving Commitments or the Delayed Draw Term A Commitments (ratably among Dollar Revolving Commitments, the Limited Currency Revolving Commitments, the Multicurrency Revolving Commitments, the 2020-1 Incremental Revolving Commitments and the Delayed Draw Term A Commitments, as applicable) hereunder may be permanently reduced in whole or in part by notice from the Parent Borrower to the Administrative Agent; provided that (i) any such notice thereof must be received by 12:00 noon (New York time) at least five (5) Business Days prior to the date of reduction or termination and any such reduction or terminations shall be in a minimum amount of $1.0 million and integral multiples of $1.0 million in excess thereof; and (ii) the Commitments may not be reduced to an amount less than the Outstanding Amount of Loan Obligations then outstanding thereunder. The Administrative Agent will give prompt notice to the Lenders of any such reduction in Commitments. Any reduction of any Commitments shall be applied to the Commitment of each applicable Lender according to its Pro Rata Share. All commitment or other fees accrued with respect to any Commitment through the effective date of any termination thereof shall be paid on the effective date of such termination. A notice of termination of the Commitments delivered by the Parent Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Parent Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

**2.08**    **Interest.**

(a)    Subject to the provisions of subsection (b) below, (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted Eurodollar Rate for such Interest Period plus the Applicable Percentage; (ii) each Loan that is a Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Percentage; and (iii) each Swingline Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Percentage.

(b)    If any amount payable by the Borrowers under any Credit Document is not paid when due, then such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.

(c)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(d)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

2.09    **Fees.**

(a)    <u>Commitment Fees</u>. The Parent Borrower shall pay to the Administrative Agent for the account of (v) each Delayed Draw Term A Lender in accordance with its Delayed Draw Term A Commitment Percentage, a commitment fee equal to the Commitment Fee Rate times the actual daily aggregate amount of Delayed Draw Term A Commitments (the "<u>Delayed Draw Commitment Fee</u>"), (w) each Dollar Revolving Lender in accordance with its Dollar Revolving Commitment Percentage, a commitment fee equal to the Commitment Fee Rate times the actual daily amount by which the Aggregate Dollar Revolving Committed Amount exceeds the sum of (i) the Outstanding Amount of Dollar Revolving Loans (but not, for the avoidance of doubt, any Swingline Loans) and (ii) the Outstanding Amount of Dollar Facility L/C Obligations, (x) each Limited Currency Revolving Lender in accordance with its Limited Currency Revolving Commitment Percentage, a commitment fee equal to the Commitment Fee Rate times the actual daily amount by which the Aggregate Limited Currency Revolving Committed Amount exceeds the sum of (i) the Outstanding Amount of Limited Currency Revolving Loans and (ii) the Outstanding Amount of Limited Currency Facility L/C Obligations, (y) each Multicurrency Revolving Lender in accordance with its Multicurrency Revolving Commitment Percentage, a commitment fee equal to the Commitment Fee Rate times the actual daily amount by which the Aggregate Multicurrency Revolving Committed Amount exceeds the Outstanding Amount of Multicurrency Revolving Loans other than Fronted Currency Loans (the fees in clauses (w), (x) and (y) collectively, the "<u>Original Revolving Commitment Fees</u>") and (z) each 2020-1 Incremental Revolving Lender in accordance with its 2020-1 Incremental Revolving Commitment Percentage, a commitment fee equal to the 2020-1 Incremental Revolving Commitment Fee Rate times the actual daily amount by which the Aggregate 2020-1 Incremental Revolving Committed Amount exceeds the Outstanding Amount of 2020-1 Incremental Revolving Loans (the fees in clause (z), the "<u>2020-1 Incremental Revolving Commitment Fees</u>"; the Original Revolving Commitment Fees and 2020-1 Incremental Revolving Commitment Fees are referred to collectively as the "<u>Revolving Commitment Fees</u>" and, together with the Delayed Draw Commitment Fee, the "<u>Commitment Fees</u>"). The Delayed Draw Commitment Fee shall accrue from and including the 61st day following the Amendment No. 6 Effective Date, and shall be due and payable quarterly in arrears (A) on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the 61st day following the Amendment No. 6 Effective Date and (B) on the Delayed Draw Term A Commitment Termination Date. The Original Revolving Commitment Fees shall accrue from and including the Amendment No. 6 Effective Date and the 2020-1 Revolving Commitment Fees shall accrue from and including the Amendment No. 7 Effective Date, and the Revolving Commitment Fees shall be due and payable quarterly in arrears on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Amendment No. 6 Effective Date (in the case of the Original Revolving Commitment Fees) and the first such date to occur after the Amendment No. 7 Effective Date (in the case of the 2020-1 Incremental Revolving Commitment Fees); <u>provided</u> that all outstanding Revolving Commitment Fees shall be due and payable on the Revolving Termination Date.

(b)    <u>Letter of Credit Fees</u>.

(i)    <u>Letter of Credit Fees</u>. The Parent Borrower shall pay to the Administrative Agent, for the account of each L/C Revolving Lender in accordance with its L/C Commitment Percentage, a Letter of Credit fee, in Dollars, for each Letter of Credit, an amount equal to the Applicable Percentage for Revolving Loans that are Eurodollar Rate Loans multiplied by the daily maximum undrawn Outstanding Amount under such Letter of Credit (the "<u>Letter of Credit Fees</u>"). For purposes of computing the daily undrawn Outstanding Amount under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with <u>Section 1.10</u>. The Letter of Credit Fees shall be computed on a quarterly basis in arrears, and shall be due and payable on the tenth (10th) day of each January, April, July and October (for the Letter of Credit Fees accrued during the previous calendar quarter), commencing with the first such date to occur after the issuance of such Letter of Credit, on the L/C Expiration Date and thereafter on demand. If there is any change in the Applicable Percentage during any quarter, the daily amount available to be drawn under each Letter of Credit shall be computed and multiplied by the Applicable Percentage separately for each period during such quarter that such Applicable Percentage was in effect. Notwithstanding anything to the contrary contained herein, while any Event of Default has occurred and is continuing under <u>Section 9.01(a)</u>, <u>(f)</u> or <u>(h)</u>, all Letter of Credit Fees shall accrue at the Default Rate.

-79-

(ii) <u>Fronting Fee and Documentary and Processing Charges Payable to L/C Issuers</u>. The Parent Borrower shall pay directly to each L/C Issuer for its own account a fronting fee with respect to each Letter of Credit issued by it, 0.125% of the daily undrawn Outstanding Amount under such Letter of Credit on a quarterly basis in arrears. Such fronting fee shall be due and payable on the tenth (10th) day of each January, April, July and October (for fronting fees accrued during the previous calendar quarter or portion thereof, in the case of the first payment), commencing with the first such date to occur after the issuance of such Letter of Credit, on the L/C Expiration Date and thereafter on demand. For purposes of computing the daily undrawn Outstanding Amount under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with <u>Section 1.10</u>. In addition, the applicable Borrower shall pay directly to each L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the applicable L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(c) <u>B/A Fees</u>. Each Canadian Borrower agrees to pay to the Canadian Agent, in Dollars, for the account of each Multicurrency Revolving Lender, on each date on which a B/A drawn by such Canadian Borrower is accepted hereunder an acceptance fee (the "<u>B/A Fee</u>") computed by multiplying the Dollar Equivalent of the face amount of each such B/A by the product of (i) the Applicable Percentage for B/A Drawings on such date multiplied by (ii) a fraction, the numerator of which is the number of days in the Contract Period applicable to such B/A and the denominator of which is 365.

(d) <u>Alternative Currency Fronting Currency Lender Fees</u>. The Parent Borrower shall pay each Alternative Currency Fronting Lender such fronting fees (if any) with respect to Fronted Currency Loans as may be agreed among the Administrative Agent, such Alternative Currency Fronting Lender and the Parent Borrower at such times as may be agreed among the Administrative Agent, such Alternative Currency Fronting Lender and the Parent Borrower.

(e) <u>Other Fees</u>. The Parent Borrower shall pay to the Lead Arrangers, for their own respective accounts, fees in the amounts and at the times specified in the Engagement Letter. The Parent Borrower shall also pay to the Administrative Agent, for its own account, fees in the amounts and at the times specified in the Administrative Agent Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever. The Administrative Agent Fee Letter is hereby ratified and confirmed in all respects by JPMCB and Parent Borrower, and both such parties agree that it shall remain effective on and following the Amendment No. 6 Effective Date.

The applicable Borrower shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10    Computation of Interest and Fees.**

All computations of interest for Base Rate loans denominated in Canadian Dollars and Base Rate Loans denominated in Dollars when the Base Rate is determined by JPMCB's prime rate shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year), or, in the case of interest in respect of Eurodollar Rate Loans denominated in Alternative Currencies as to which market practice differs from the foregoing, in accordance with such market practice. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; <u>provided</u> that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.11(a)</u>, bear interest for one (1) day. Each determination by the Applicable Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Payments Generally; Applicable Agent's Clawback.**

(a) <u>General</u>. All payments to be made by any Credit Party hereunder shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. All payments of principal and interest on any Loan shall be payable in the same currency as such Loan is denominated. All payments of fees pursuant to <u>Section 2.09</u> shall be payable in Dollars. All payments in respect of Unreimbursed Amounts shall be payable in the currency provided in <u>Section 2.03</u>. All other payments herein shall be payable in the currency specified with respect to such payment or, if the currency is not specified, in Dollars. Except as otherwise expressly provided herein, all payments by the Borrowers shall be made to the Applicable Agent, for the account of the Lenders to which such payment is owed, at the Applicable Agent's Office in Same Day Funds not later than 3:00 p.m.

-80-

Local Time on the date specified herein. The Applicable Agent will promptly distribute to each Lender its Pro Rata Share of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Applicable Agent after 3:00 p.m. Local Time shall be deemed received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue. Subject to the definition of "Interest Period," if any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)     (i) <u>Funding by Lenders; Presumption by Applicable Agent</u>. Unless the Applicable Agent shall have received notice from a Lender prior to the proposed time of any Borrowing or acceptance and purchase of B/As that such Lender will not make available to the Applicable Agent such Lender's share of such Borrowing or the applicable Discount Proceeds (net of applicable acceptance fees), the Applicable Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> and may, in reliance upon such assumption, make available to the applicable Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing or the applicable Discount Proceeds (net of applicable acceptance fees) available to the Applicable Agent, then the applicable Lender and the applicable Borrower severally agree to pay to the Applicable Agent forthwith on demand such corresponding amount in Same Day Funds with interest thereon, for each day from and including the date such amount is made available to such Borrower to but excluding the date of payment to the Applicable Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing and (B) in the case of a payment to be made by such Borrower, the interest rate applicable to Base Rate Loans. If such Borrower and such Lender shall pay such interest to the Applicable Agent for the same or an overlapping period, the Applicable Agent shall promptly remit to such Borrower the amount of such interest paid by such Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Applicable Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing or such Lender's acceptance and purchase of B/As. Any payment by any Borrower shall be without prejudice to any claim such Borrower may have against a Lender that shall have failed to make such payment to the Applicable Agent.

(ii)    Payments <u>by the Borrowers; Presumptions by Applicable Agent</u>. Unless the Applicable Agent shall have received notice from the applicable Borrower prior to the date on which any payment is due to the Applicable Agent for the account of the Lenders or the applicable L/C Issuer hereunder that the applicable Borrower will not make such payment, the Applicable Agent may assume that the applicable Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lenders or the applicable L/C Issuer, as the case may be, the amount due. In such event, if the applicable Borrower has not in fact made such payment, then each of the Lenders or the L/C Issuers, as the case may be, receiving any such payment severally agrees to repay to the Applicable Agent forthwith on demand the amount so distributed to such Lender or L/C Issuer, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Applicable Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Applicable Agent in accordance with banking industry rules on interbank compensation.

A notice of the Applicable Agent to any Lender or any Borrower with respect to any amount owing under this <u>subsection (b)</u> shall be conclusive, absent manifest error.

(c)     <u>Failure to Satisfy Conditions Precedent</u>. If any Lender makes available to the Applicable Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the applicable Borrower by the Applicable Agent because the conditions to the applicable Credit Extension set forth in <u>Article V</u> are not satisfied or waived in accordance with the terms hereof, the Applicable Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     <u>Obligation of the Lenders Several</u>. The obligations of the Lenders hereunder to make Loans, to accept and purchase B/As, to fund participations in Letters of Credit and Swingline Loans and to make payments pursuant to <u>Section 11.04(c)</u> are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under <u>Section 11.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under <u>Section 11.04(c)</u>.

-81-

(e)    Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    Insufficient Funds. If at any time insufficient funds are received by and available to the Applicable Agent to pay fully all amounts of principal, L/C Borrowings, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and L/C Borrowings then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and L/C Borrowings then due to such parties.

**2.12    Sharing of Payments by Lenders.**

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, amounts owing to it in respect of any B/A Drawing or the participations in L/C Obligations or in Swingline Loans held by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans, amounts owing in respect of any B/A Drawing or participations and accrued interest thereon greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Applicable Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans, amounts owing in respect of any B/A Drawing and subparticipations in L/C Obligations and Swingline Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(a)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)    the provisions of this Section shall not be construed to apply to (x) any payment made by any Borrower pursuant to and in accordance with the express terms of this Credit Agreement, (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, amounts owing to it in respect of any B/A Drawing or subparticipations in L/C Obligations or Swingline Loans to any assignee or participant, other than to any Borrower or any Affiliate thereof (as to which the provisions of this Section shall apply) or (z) any payments made pursuant to Sections 2.17, 2.18 or 2.19.

Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Credit Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such participation.

Notwithstanding anything to the contrary contained herein, the provisions of this Section 2.12 shall be subject to the express provisions of this Credit Agreement which require, or permit, differing payments to be made to non-Defaulting Lenders as opposed to Defaulting Lenders.

**2.13    Evidence of Debt.**

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c) as a non-fiduciary agent for the Borrowers, in each case in the ordinary course of business. Each other Agent shall promptly provide the Administrative Agent with all information needed to maintain such accounts in respect of the Loans or B/A Drawings administered by such Agent. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of any Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the applicable Borrower shall execute and deliver to the Administrative Agent a Note for such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

-82-

Exhibit 2, page 229

(b)     In addition to the accounts and records referred to in subsection (a) above, each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records and, in the case of the Administrative Agent, entries in the Register, evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swingline Loans. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(c)     Each Lender having sold a participation in any of its Obligations, acting solely for this purpose as a non-fiduciary agent for the Borrowers, shall maintain a register for the recordation of the names and addresses of such Participants (and each change thereto, whether by assignment or otherwise) and the rights, interest or obligation of such Participants in any Obligation, in any Commitment and in any right to receive any payments hereunder.

**2.14**     **[Reserved].**

**2.15**     <u>**Canadian Bankers' Acceptances**</u>**.**

(a)     Each acceptance and purchase of B/As of a single Contract Period pursuant to Section 2.01 or 2.02 shall be made ratably by the Multicurrency Revolving Lenders in accordance with their Multicurrency Revolving Commitment Percentage. The failure of any Multicurrency Revolving Lender to accept any B/A required to be accepted by it shall not relieve any other Multicurrency Revolving Lender of its obligations hereunder; <u>provided</u> that the Multicurrency Revolving Commitments are several and no Multicurrency Revolving Lender shall be responsible for any other Multicurrency Revolving Lender's failure to accept B/As as required.

(b)     The B/As of a single Contract Period accepted and purchased on any date shall be in an aggregate amount that is an integral multiple of C$1.0 million and not less than C$5.0 million. The face amount of each B/A shall be C$100,000 or any whole multiple thereof. If any Multicurrency Revolving Lender's ratable share of the B/As of any Contract Period to be accepted on any date would not be an integral multiple of C$100,000, the face amount of the B/As accepted by such Multicurrency Revolving Lender may be increased or reduced to the nearest integral multiple of C$100,000 by the Canadian Agent in its sole discretion. B/As of more than one Contract Period may be outstanding at the same time; <u>provided</u> that there shall not at any time be more than a total of five (5) B/A Drawings outstanding.

(c)     To request an acceptance and purchase of B/As, a Canadian Borrower shall notify the Canadian Agent of such request by telephone or by telecopy not later than 10:00 a.m., Local Time, one Business Day before the date of such acceptance and purchase. Each such Loan Notice shall be irrevocable and, if telephonic, shall be confirmed promptly by hand delivery or telecopy to the Canadian Agent of a written request in a form approved by the Canadian Agent and signed by such Canadian Borrower. Each such Loan Notice shall specify the following information:

    (i)     the aggregate face amount of the B/As to be accepted and purchased;

    (ii)     the date of such acceptance and purchase, which shall be a Business Day;

    (iii)     the Contract Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Contract Period" (and which shall in no event end after the Revolving Termination Date); and

    (iv)     the location and number of the applicable Canadian Borrower's account to which any funds are to be disbursed, which shall comply with the requirements of <u>Section 2.02</u>. If no Contract Period is specified with respect to any requested acceptance and purchase of B/As, then the Canadian Borrower shall be deemed to have selected a Contract Period of 30 days' duration.

Promptly following receipt of a Loan Notice in accordance with this paragraph, the Canadian Agent shall advise each Multicurrency Revolving Lender of the details thereof and of the amount of B/As to be accepted and purchased by such Multicurrency Revolving Lender.

(d)     Each Canadian Borrower hereby appoints each Multicurrency Revolving Lender as its attorney to sign and endorse on its behalf, manually or by facsimile or mechanical signature, as and when deemed necessary by such Multicurrency Revolving Lender, blank forms of B/As. It shall be the responsibility of each Multicurrency Revolving Lender to maintain an adequate supply of blank

-83-

forms of B/As for acceptance under this Credit Agreement. Each Canadian Borrower recognizes and agrees that all B/As signed and/or endorsed on its behalf by any Multicurrency Revolving Lender shall bind such Canadian Borrower as fully and effectually as if manually signed and duly issued by authorized officers of such Canadian Borrower. Each Multicurrency Revolving Lender is hereby authorized to issue such B/As endorsed in blank in such face amounts as may be determined by such Multicurrency Revolving Lender; provided that the aggregate face amount thereof is equal to the aggregate face amount of B/As required to be accepted by such Multicurrency Revolving Lender. No Multicurrency Revolving Lender shall be liable for any damage, loss or claim arising by reason of any loss or improper use of any such instrument unless such loss or improper use results from the gross negligence or willful misconduct of such Multicurrency Revolving Lender. Each Multicurrency Revolving Lender shall maintain a record with respect to B/As (i) received by it from the Canadian Agent in blank hereunder, (ii) voided by it for any reason, (iii) accepted and purchased by it hereunder and (iv) canceled at their respective maturities. Each Multicurrency Revolving Lender further agrees to retain such records in the manner and for the periods provided in applicable provincial or Federal statutes and regulations of Canada and to provide such records to each Canadian Borrower upon its request and at its expense. Upon request by any Canadian Borrower, a Multicurrency Revolving Lender shall cancel all forms of B/A that have been pre-signed or pre-endorsed on behalf of such Canadian Borrower and that are held by such Multicurrency Revolving Lender and are not required to be issued pursuant to this Credit Agreement.

(e)     Drafts of each Canadian Borrower to be accepted as B/As hereunder shall be signed as set forth in paragraph (d) above. Notwithstanding that any Person whose signature appears on any B/A may no longer be an authorized signatory for any of the Multicurrency Revolving Lenders or such Canadian Borrower at the date of issuance of such B/A, such signature shall nevertheless be valid and sufficient for all purposes as if such authority had remained in force at the time of such issuance and any such B/A so signed shall be binding on such Canadian Borrower.

(f)     Upon acceptance of a B/A by a Multicurrency Revolving Lender, such Multicurrency Revolving Lender shall purchase, or arrange the purchase of, such B/A from the applicable Canadian Borrower at the Discount Rate for such Multicurrency Revolving Lender applicable to such B/A accepted by it and provide to the Canadian Agent the Discount Proceeds for the account of such Canadian Borrower as provided in Section 2.02. The acceptance fee payable by the applicable Canadian Borrower to a Multicurrency Revolving Lender under Section2.09 in respect of each B/A accepted by such Multicurrency Revolving Lender shall be set off against the Discount Proceeds payable by such Multicurrency Revolving Lender under this paragraph. Notwithstanding the foregoing, in the case of any B/A Drawing resulting from the conversion or continuation of a B/A Drawing or Multicurrency Revolving Loan pursuant to Section 2.02, the net amount that would otherwise be payable to such Canadian Borrower by each Lender pursuant to this paragraph will be applied as provided in Section 2.02(f).

(g)     Each Multicurrency Revolving Lender may at any time and from time to time hold, sell, rediscount or otherwise dispose of any or all B/A's accepted and purchased by it.

(h)     Each B/A accepted and purchased hereunder shall mature at the end of the Contract Period applicable thereto.

(i)     Each Canadian Borrower waives presentment for payment and any other defense to payment of any amounts due to a Multicurrency Revolving Lender in respect of a B/A accepted and purchased by it pursuant to this Credit Agreement which might exist solely by reason of such B/A being held, at the maturity thereof, by such Multicurrency Revolving Lender in its own right and each Canadian Borrower agrees not to claim any days of grace if such Multicurrency Revolving Lender as holder sues each Canadian Borrower on the B/A for payment of the amounts payable by such Canadian Borrower thereunder. On the specified maturity date of a B/A, or such earlier date as may be required pursuant to the provisions of this Credit Agreement, each Canadian Borrower shall pay the Multicurrency Revolving Lender that has accepted and purchased such B/A the full face amount of such B/A, and after such payment such Canadian Borrower shall have no further liability in respect of such B/A and such Multicurrency Revolving Lender shall be entitled to all benefits of, and be responsible for all payments due to third parties under, such B/A.

(j)     At the option of each Canadian Borrower and any Multicurrency Revolving Lender, B/As under this Credit Agreement to be accepted by such Multicurrency Revolving Lender may be issued in the form of depository bills for deposit with The Canadian Depository for Securities Limited pursuant to the Depository Bills and Notes Act (Canada). All depository bills so issued shall be governed by the provisions of this Section 2.15.

-84-

(k)  If a Multicurrency Revolving Lender is not a chartered bank under the Bank Act (Canada) or if a Multicurrency Revolving Lender notifies the Canadian Agent in writing that it is otherwise unable to accept B/As, such Multicurrency Revolving Lender will, instead of accepting and purchasing B/As, make a Loan (a "B/A Equivalent Loan") to the applicable Canadian Borrower in the amount and for the same term as the draft which such Multicurrency Revolving Lender would otherwise have been required to accept and purchase hereunder. Each such Multicurrency Revolving Lender will provide to the Canadian Agent the Discount Proceeds of such B/A Equivalent Loan for the account of the applicable Canadian Borrower in the same manner as such Multicurrency Revolving Lender would have provided the Discount Proceeds in respect of the draft which such Multicurrency Revolving Lender would otherwise have been required to accept and purchase hereunder. Each such B/A Equivalent Loan will bear interest at the same rate which would result if such Multicurrency Revolving Lender had accepted (and been paid an acceptance fee) and purchased (on a discounted basis) a B/A for the relevant Contract Period (it being the intention of the parties that each such B/A Equivalent Loan shall have the same economic consequences for the Multicurrency Revolving Lenders and the applicable Canadian Borrower as the B/A which such B/A Equivalent Loan replaces). All such interest shall be paid in advance on the date such B/A Equivalent Loan is made, and will be deducted from the principal amount of such B/A Equivalent Loan in the same manner in which the Discount Proceeds of a B/A would be deducted from the face amount of the B/A. Subject to the repayment requirements of this Credit Agreement, on the last day of the relevant Contract Period for such B/A Equivalent Loan, the applicable Canadian Borrower shall be entitled to convert each such B/A Equivalent Loan into another type of Multicurrency Revolving Loan, or to roll over each such B/A Equivalent Loan into another B/A Equivalent Loan, all in accordance with the applicable provisions of this Credit Agreement.

**2.16  Defaulting Lenders.**

Notwithstanding any provision of this Credit Agreement to the contrary, if any Lender becomes a Defaulting Lender hereunder (as determined by the Administrative Agent or, in the case of clause (d) below, any applicable L/C Issuer), then the following provisions shall apply for so long as such Defaulting Lender is a Defaulting Lender:

(a)  the Administrative Agent (or the applicable L/C Issuer, as the case may be) shall promptly notify the Parent Borrower and each Lender that such Lender is a Defaulting Lender for purposes of this Credit Agreement;

(b)  fees under Section 2.09(a) shall cease to accrue on the Commitment of such Defaulting Lender (except to the extent reallocated pursuant to Section 2.16(e));

(c)  the Commitments and Loans of such Defaulting Lender shall be disregarded for all purposes of any determination of whether the Required Lenders, Required Revolving Lenders, Required Dollar Revolving Lenders, Required L/C Lenders, Required Limited Currency Revolving Lenders, Required Multicurrency Revolving Lenders, Required 2020-1 Incremental Revolving Lenders, Required Delayed Draw Term A Lenders or Required Term B-4 Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 11.01);

(d)  if any Swingline Loan or Letter of Credit is outstanding at the time the notice described in clause (a) above is provided, the Parent Borrower shall within one Business Day following notice by the Administrative Agent (i) prepay such Swingline Loan and (ii) cash collateralize such Defaulting Lender's L/C Obligations in accordance with Section 2.03(a)(ii)(A)(5) and on terms similar to the procedures set forth in Section 2.03(g) for so long as such L/C Obligations are outstanding; provided that (A) to the extent the sum of the total Dollar Revolving Obligations (other than any Dollar Revolving Obligations constituting outstanding Dollar Revolving Loans made by any Defaulting Lender but including each Defaulting Lender's Dollar Facility L/C Obligations and Swingline Exposure) does not exceed the sum of the total Dollar Revolving Commitments (excluding the Dollar Revolving Commitment of any Defaulting Lender except to the extent of any outstanding Dollar Revolving Loans of such Defaulting Lender), the Administrative Agent may, by notice to the Dollar Revolving Lenders, elect to reallocate the Swingline Exposure among all non-Defaulting Lenders under the Dollar Revolving Facility by disregarding the Dollar Revolving Commitments of all Defaulting Lenders (except to the extent of any outstanding Dollar Revolving Loans of such Defaulting Lenders) for purposes of calculating each non-Defaulting Lender's Dollar Revolving Commitment Percentage, and to the extent the Administrative Agent elects to require such reallocation in accordance with the foregoing, no such Swingline Loan shall be required to be repaid pursuant to this Section 2.16(d) to the extent of such reallocation and (B) to the extent the sum of the total Dollar Revolving Obligations (other than any Dollar

-85-

Revolving Obligations constituting outstanding Dollar Revolving Loans made by any Defaulting Lender but including each Defaulting Lender's Dollar Facility L/C Obligations and Swingline Exposure) plus the total Limited Currency Revolving Obligations (other than any Limited Currency Revolving Obligations constituting outstanding Limited Currency Revolving Loans made by any Defaulting Lender but including each Defaulting Lender's Limited Currency Facility L/C Obligations) does not exceed the sum of the total Dollar Revolving Commitments (excluding the Dollar Revolving Commitment of any Defaulting Lender except to the extent of any outstanding Dollar Revolving Loans of such Defaulting Lender) plus the total Limited Currency Revolving Commitments (excluding the Limited Currency Revolving Commitment of any Defaulting Lender except to the extent of any outstanding Limited Currency Revolving Loans of such Defaulting Lender), the Administrative Agent may, by notice to the Dollar Revolving Lenders and the Limited Currency Revolving Lenders, elect to reallocate the L/C Obligations among all non-Defaulting Lenders under the Dollar Revolving Facility and Limited Currency Revolving Facility by disregarding the Dollar Revolving Commitments and Limited Currency Revolving Commitments of all Defaulting Lenders (except to the extent of any outstanding Loans of such Defaulting Lenders) for purposes of calculating each non-Defaulting Lender's L/C Commitment Percentage, and to the extent the Administrative Agent elects to require such reallocation in accordance with the foregoing, no such L/C Obligations shall be required to be cash collateralized pursuant to this Section 2.16(d) to the extent of such reallocation; provided that the reallocation pursuant to the foregoing shall not be permitted to the extent it would cause (x) any Dollar Revolving Lender's Dollar Revolving Obligations to exceed its Dollar Revolving Committed Amount or (y) any Limited Currency Revolving Lender's Limited Currency Revolving Obligations to exceed its Limited Currency Revolving Committed Amount;

(e)    to the extent:

(i)    the Parent Borrower cash collateralizes any Defaulting Lender's L/C Obligations pursuant to Section 2.16(d), the Parent Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 2.09(b)(i) with respect to such Defaulting Lender's L/C Obligations during the period such Defaulting Lender's L/C Obligations are cash collateralized (but shall be reallocated pursuant to clause (ii) below);

(ii)    the L/C Obligations of the non-Defaulting Lenders are reallocated pursuant to each applicable proviso to Section 2.16(d) above, then the fees payable to the Lenders pursuant to Section 2.09(b)(i) shall be adjusted proportionately to reflect such reallocation; or

(iii)    the Parent Borrower fails to cash collateralize any Defaulting Lender's L/C Obligations pursuant to Section 2.16(d) above and the L/C Obligations are not reallocated pursuant to either proviso, as applicable, to Section 2.16(d) above, then, without prejudice to any rights or remedies of any L/C Issuer or any Lender hereunder, then all fees that otherwise would have been payable to such Defaulting Lender pursuant to Section 2.09(b)(i) with respect to such Defaulting Lender's L/C Obligations shall be payable to each applicable L/C Issuer until such L/C Obligations are cash collateralized or reallocated pursuant to Section 2.16(d);

(f)    for purposes of determining:

(i)    the amount of the total Commitments for purposes of Sections 2.01, 2.03(b) and 2.04(a), the Commitment of each Defaulting Lender shall be excluded therefrom (other than any portion of such Commitment pursuant to which there is then outstanding a Loan from such Defaulting Lender); and

(ii)    the applicable L/C Obligations of any Lender with respect to any Letter of Credit that is issued, increased (to the extent of the increase only) or renewed (but, for the avoidance of doubt, not with respect to any other applicable L/C Obligations relating to any other Letter of Credit) during the period in which there is a Defaulting Lender or the Swingline Exposure of any Lender with respect to any Swingline Loan made during the period in which there is a Defaulting Lender, the Commitment of such Defaulting Lender shall be deemed to be zero; and

(g)    in the Administrative Agent's sole discretion:

-86-

(i)     any prepayment of the principal amount of any Loans shall be applied solely to prepay the Loans of all non-Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans of any Defaulting Lender; and

(ii)    subject to Section 2.16(e)(iii), any amount payable to such Defaulting Lender pursuant to this Credit Agreement (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Section 2.12 or Section 3.06(b)) may, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated non-interest bearing account and, subject to any applicable requirements of law, be applied at such time or times as may be determined by the Administrative Agent (i) first, pro rata, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent, applicable L/C Issuer or Swingline Lender hereunder, (ii) second, pro rata, to the payment of any amounts owing to the Borrowers or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Credit Agreement and (iii) third, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.

In the event that the Administrative Agent, the Parent Borrower, each applicable L/C Issuer and the Swingline Lender each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, the Administrative Agent shall promptly notify each Lender that such Lender has ceased to be a Defaulting Lender and, from and after the date of such notification, the Swingline Exposure and L/C Obligations of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment and on such date such Lender shall purchase at par such of the Loans of the other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Dollar Facility Percentage and Limited Currency Facility Percentage.

**2.17     Extended Term Loans and Extended Revolving Commitments.**

(a)     Parent Borrower may at any time and from time to time request that all or a portion of the Term Loans of any Class (the Loans of such applicable Class, the "Existing Term Loans") be converted into a new Class of Term Loans (the Loans of such applicable Class, the "Extended Term Loans") with terms consistent with this Section 2.17. In order to establish any Extended Term Loans, the Parent Borrower shall provide a notice to the Administrative Agent (a "Term Loan Extension Request") setting forth the proposed terms of the Extended Term Loans to be established, which shall be substantially identical to those applicable to the Existing Term Loans from which such Extended Term Loans are to be converted, as determined by the Parent Borrower in good faith and such determination shall be conclusive evidence that such terms are substantially identical to such Existing Term Loans (unless a Lender shall have objected thereto in writing within 5 Business Days and has set forth such Lender's objections with specificity), except that:

(i)     the maturity date of the Extended Term Loans shall be later than the maturity date of the Existing Term Loans;

(ii)    all or any of the scheduled amortization payments of principal of the Extended Term Loans shall be delayed to later dates than the scheduled amortization payments of principal of the Existing Term Loans such that the amortization payments of principal with respect to such Extended Term Loans for the period prior to the maturity date of the Existing Term Loans is no greater than the amounts due immediately prior to such extension;

(iii)   (A) the interest rates (including through fixed interest rates), interest margins, rate floors, upfront fees, funding discounts, original issue discounts and premiums with respect to the Extended Term Loans may be different than those for the Existing Term Loans and (B) additional fees and/or premiums may be payable to the Extending Lenders providing such Extended Term Loans in addition to any of the items contemplated by the preceding clause (A);

(iv)    the Extended Term Loans may have optional prepayment terms (including call protection and prepayment premiums) and mandatory prepayment terms as may be agreed between the Parent Borrower and the Extending Lenders so long as such Extended Term Loans do not participate on a greater than pro rata basis in any such mandatory prepayments as compared to then-existing Term Loan Lenders;

Exhibit 2, page 234

(v)     the Credit Parties may be subject to covenants and other terms for the benefit of the Extending Lenders that apply only after the Final Maturity Date of the Existing Term Loans (before giving effect to the Extended Term Loans); and

(vi)    no existing Lender shall be required to provide, consent to or convert into any Extended Term Loans and no Loans of such Lenders will be converted without such party's affirmative consent thereto.

(b)     The Borrowers may at any time and from time to time request that all or a portion of the Revolving Commitments of any Class (the Commitments of such applicable Class, the "Existing Revolving Commitments") be converted into a new Class of Revolving Commitments (the Commitments of such applicable Class, the "Extended Revolving Commitments") with terms consistent with this Section 2.17. In order to establish any Extended Revolving Commitments, the Borrowers shall provide a notice to the Administrative Agent (a "Revolving Credit Extension Request") setting forth the proposed terms of the Extended Revolving Commitments to be established, which terms shall be substantially identical to those applicable to the Existing Revolving Commitments, as determined by the Parent Borrower in good faith and such determination shall be conclusive evidence that such terms are substantially identical to such Existing Revolving Commitment (unless a Lender shall have objected thereto in writing within 5 Business Days and has set forth such Lender's objections with specificity), except that:

(i)     the maturity date of the Extended Revolving Commitments shall be later than the maturity date of the Existing Revolving Commitments;

(ii)    (A) the interest rates, interest margins, rate floors, upfront fees, funding discounts, original issue discounts and premiums with respect to the Extended Revolving Commitments may be different than those for the Existing Revolving Commitments and/or (B) additional fees and/or premiums may be payable to the Extending Lenders in addition to or in lieu of any of the items contemplated by the preceding clause (A) and/or (C) the undrawn revolving credit commitment fee rate with respect to the Extended Revolving Commitments may be different than those for the Existing Revolving Commitments;

(iii)   the Credit Parties may be subject to covenants and other terms for the benefit of the Extending Lenders that apply only after the Final Maturity Date of the Existing Revolving Commitments (before giving effect to the Extended Revolving Commitments); and

(iv)    no existing Lender shall be required to provide any Extended Revolving Commitments and no Existing Revolving Commitments will become Extended Revolving Commitments without such party's affirmative consent thereto.

(c)     Each Extension Request shall specify the date (the "Extension Effective Date") on which the applicable Borrower proposes that the conversion of an Existing Class into an Extended Class shall be effective, which shall be a date reasonably satisfactory to the Administrative Agent. Each Lender of an Existing Class that is requested to be extended shall be offered the opportunity to convert its Existing Class into the Extended Class on the same basis as each other Lender of such Existing Class. Any Lender (to the extent applicable, an "Extending Lender") wishing to have all or a portion of its Existing Class subject to such Extension Request converted into an Extended Class shall notify the Administrative Agent (an "Extension Election") on or prior to the date specified in such Extension Request of the amount of its Existing Class subject to such Extension Request that it has elected to convert into an Extended Class. In the event that the aggregate portion of the Existing Class subject to Extension Elections exceeds the amount of the Extended Class requested pursuant to the Extension Request, the portion of the Existing Class converted shall be allocated on a pro rata basis based on the amount of the Existing Class included in each such Extension Election. Notwithstanding the conversion of any Existing Revolving Commitment into an Extended Revolving Commitment, such Extended Revolving Commitment shall be treated identically with all Existing Revolving Commitments for purposes of the obligations of a Revolving Lender in respect of Swingline Loans under Section 2.01(c) and Letters of Credit under Section 2.03, except that the applicable Additional Credit Extension Amendment may provide that the maturity date for Swingline Loans and/or the Letters of Credit may be extended and the related obligations to make Swingline Loans and issue Letters of Credit may be continued so long as the Swingline Lender and/or the applicable L/C Issuer, as applicable, have consented to such extensions in their sole discretion (it being understood that no consent of any other Lender (other than the Extending Lenders) shall be required in connection with any such extension). In no event may the Swingline Sublimit or the L/C Sublimit be increased without the consent of the Swingline Lender or each L/C Issuer, as the case may be.

(d) An Extended Class shall be established pursuant to an Additional Credit Extension Amendment executed by the Extending Lenders (and the other Persons specified in the definition of Additional Credit Extension Amendment but no other existing Lender). No Additional Credit Extension Amendment shall provide for any Class of (x) Extended Term Loans in an aggregate principal amount that is less than $10.0 million or (y) Extended Revolving Commitments in an aggregate principal amount that is less than $5.0 million. In addition to any terms and changes required or permitted by Section 2.17(a), the Additional Credit Extension Amendment shall amend the scheduled amortization payments pursuant to Section 2.05 with respect to the Existing Term Loans from which the Extended Term Loans were converted to reduce each scheduled principal repayment amounts for the Existing Term Loans in the same proportion as the amount of Existing Term Loans to be converted pursuant to such Additional Credit Extension Amendment.

(e) Notwithstanding anything to the contrary contained in this Credit Agreement, on the Extension Effective Date, (i) the principal amount of each Existing Term Loan shall be deemed reduced by an amount equal to the principal amount converted into an Extended Term Loan, (ii) the amount of each Existing Revolving Commitment shall be deemed reduced by an amount equal to the amount converted into an Extended Revolving Commitment and (iii) if, on any Extension Effective Date, any Loans of any Extending Lender are outstanding under the applicable Existing Revolving Commitments, such Loans (and any related participations) shall be deemed to be converted into Loans (and related participations) made pursuant to the Extended Revolving Commitments in the same proportion as such Extending Lender's Existing Revolving Commitments are converted to Extended Revolving Commitments.

(f) This Section 2.17 shall supersede any provisions in Section 2.12 or Section 11.01 to the contrary. Each Extended Class shall be documented by an Additional Credit Extension Amendment executed by the Extending Lenders providing such Extended Class (and the other persons specified in the definition of Additional Credit Extension Amendment but no other existing Lender), and the Additional Credit Extension Amendment may provide for such amendments to this Credit Agreement and the other Credit Documents as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.17.

**2.18    Refinancing Term Loans.**

(a) The Parent Borrower may at any time and from time to time, with the consent of the Administrative Agent (not to be unreasonably withheld or delayed), request the establishment of one or more additional Classes of term loans under this Credit Agreement or an increase to an existing Class of term loans under this Credit Agreement (in each case, "Refinancing Term Loans") or one or more series of debt securities or term loans ("Refinancing Notes/Loans"; and together with Refinancing Term Loans, the "Refinancing Debt"); provided that:

(i) the proceeds of such Refinancing Debt shall be used, concurrently or substantially concurrently with the incurrence thereof, solely to refinance all or any portion of any outstanding Term Loans;

(ii) each Class of Refinancing Term Loans shall be in an aggregate amount of $5.0 million or any whole multiple of $1.0 million in excess thereof (or such other amount necessary to repay any Class of outstanding Term Loans in full);

(iii) such Refinancing Debt shall be in an aggregate principal amount not greater than the aggregate principal amount of Term Loans to be refinanced plus any accrued interest, fees, costs, premiums and expenses related thereto (including any original issue discount or upfront fees);

(iv) the final maturity date of such Refinancing Debt shall be later than the maturity date of the Term Loans being refinanced, and the Weighted Average Life to Maturity of such Refinancing Debt shall be longer than the then remaining Weighted Average Life to Maturity of each Class of Term Loans being refinanced;

(v) (A) the pricing, interest rate margins, rate floors, discounts, fees and optional and mandatory prepayment or redemption provisions (including premiums, if any) applicable to such Refinancing Debt shall be as agreed between the Parent Borrower and the providers of such Refinancing Debt so long as, in the case of any mandatory prepayment or redemption provisions, the providers of such Refinancing Debt do not participate on a greater than pro rata basis in any such prepayments as compared to Term Loan Lenders being refinanced and (B) the covenants and other terms applicable to such Refinancing

-89-

Term Loans (excluding those terms described in the immediately preceding clause (A)), which shall be as agreed between the Parent Borrower and the lenders providing such Refinancing Debt, shall not be materially more restrictive (when taken as a whole) to the Parent Borrower and its Restricted Subsidiaries than those applicable to any Class of Term Loans then outstanding under this Credit Agreement, as determined by the Parent Borrower in good faith, except to the extent such covenants and other terms apply solely to any period after the Final Maturity Date applicable under this Credit Agreement (after giving effect to such Refinancing Debt) or such covenants or other terms apply equally for the benefit of the other Lenders; provided that it is understood and agreed that Refinancing Debt may be guaranteed by Subsidiaries that are Domestic Credit Parties (but not other Subsidiaries); provided, further, that to the extent that any financial maintenance covenant is added for the benefit of such Refinancing Debt that applies prior to the Final Maturity Date hereunder, no consent shall be required from the Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of all Lenders (after giving effect to such Refinancing Debt);

(vi)     no existing Lender shall be required to provide any Refinancing Debt; and

(vii)     (A) the Refinancing Term Loans shall rank pari passu in right of payment and security with the existing Term B-4 Loans and (B) the Refinancing Notes/Loans may be (x) secured by Collateral on a pari passu basis with the existing Term B-4 Loans, (y) secured by Collateral on a junior lien basis to the existing Term B-4 Loans or (z) unsecured; provided, further, that in the case of clause (x) or clause (y), the holders of such Refinancing Notes/Loans or their representative is or becomes party to a customary intercreditor agreement reasonably satisfactory to the Administrative Agent and the Parent Borrower and all such Liens are subject to such intercreditor agreement.

(b)     Each such notice shall specify (x) the date (each, a "Refinancing Effective Date") on which the Parent Borrower proposes that the Refinancing Debt be made, which shall be a date reasonably acceptable to the Administrative Agent and (y) in the case of Refinancing Term Loans, the identity of the Persons (each of which shall be a Person that would be an Eligible Assignee (for this purpose treating a Lender of Refinancing Term Loans as if it were an assignee)) whom the Parent Borrower proposes would provide the Refinancing Term Loans and the portion of the Refinancing Term Loans to be provided by each such Person. On each Refinancing Effective Date, each Person with a commitment for a Refinancing Term Loan or Refinancing Notes/Loans shall make a Refinancing Term Loan to the Parent Borrower, and/or purchase Refinancing Notes/Loans from the Parent Borrower, in a principal amount equal to such Person's commitment therefor.

(c)     This Section 2.18 shall supersede any provisions in Section 2.12 or Section 11.01 to the contrary but shall be in addition to and not in lieu of the second paragraph of Section 11.01). The Refinancing Term Loans shall be documented by an Additional Credit Extension Amendment executed by the Persons providing the Refinancing Term Loans (and the other Persons specified in the definition of Additional Credit Extension Amendment but no other existing Lender), and the Additional Credit Extension Amendment may provide for such amendments to this Credit Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Parent Borrower, to effect the provisions of this Section 2.18. The Refinancing Notes/Loans shall be established pursuant to documentation which shall be consistent with the provisions set forth in Section 2.18(a).

-90-

**2.19    Replacement Revolving Commitments.**

(a)    The Borrowers may at any time and from time to time, with the consent of the Administrative Agent (not to be unreasonably withheld or delayed), request the establishment of one or more additional Classes of Revolving Commitments ("Replacement Revolving Commitments") to replace all or a portion of any existing Classes of Revolving Commitments under this Credit Agreement ("Replaced Revolving Commitments"); provided that:

(i)    substantially concurrently with the effectiveness of the Replacement Revolving Commitments, all or an equivalent portion of the Revolving Commitments in effect immediately prior to such effectiveness shall be terminated, and all or an equivalent portion of the Revolving Loans and Swingline Loans then outstanding, together with all interest thereon, and all other amounts accrued for the benefit of the Revolving Lenders, shall be repaid or paid (it being understood, however, than any Letters of Credit issued and outstanding under the Replaced Revolving Commitments shall be deemed to have been issued under the Replacement Revolving Commitments if the amount of such Letters of Credit would exceed the remaining amount of commitments under the Replaced Revolving Commitments after giving effect to the reduction contemplated hereby);

(ii)    such Replacement Revolving Commitments shall be in an aggregate amount not greater than the aggregate amount of Replaced Revolving Commitments to be replaced plus any accrued interest, fees, costs and expenses related thereto (including any upfront fees);

(iii)    the final maturity date of such Replacement Revolving Commitments shall be later than the maturity date of the Replaced Revolving Commitments;

(iv)    the L/C Sublimit and the Swingline Sublimit under such Replacement Revolving Commitments shall be as agreed between the Borrowers, the Lenders providing such Replacement Revolving Commitments, the Administrative Agent, the L/C Issuer (or any replacement L/C Issuer) and the Swingline Lender (or any replacement Swingline Lender); provided that in no event may the Swingline Sublimit or the L/C Sublimit be increased without the consent of the Swingline Lender (other than a replacement Swingline Lender with respect to such Replacement Revolving Commitment) or each L/C Issuer (other than a replacement L/C Issuer with respect to such Replacement Revolving Commitment), as the case may be;

(v)    (A) the pricing, rate floors, discounts, fees and optional prepayment or redemption provisions applicable to such Replacement Revolving Commitments shall be as agreed between the Borrowers and the Replacement Revolving Lenders so long as, in the case of any optional prepayment or redemption provisions, such Replacement Revolving Lenders do not participate on a greater than pro rata basis in any such prepayments as compared to Replaced Revolving Commitments and (B) the covenants and other terms applicable to such Replacement Revolving Commitments (excluding those terms described in the immediately preceding clause (A)), which shall be as agreed between the Borrowers and the lenders providing such Replacement Revolving Commitments, shall not be more favorable (when taken as a whole) to the lenders providing the Replacement Revolving Commitments than those applicable to the Replaced Revolving Commitments (as determined by the Parent Borrower in good faith), except to the extent such covenants and other terms apply solely to any period after the Final Maturity Date applicable under this Credit Agreement (before giving effect to the Replacement Revolving Commitments) or such covenants or other terms apply equally for the benefit of the other Lenders; provided that it is understood and agreed that the Replacement Revolving Commitments may be guaranteed by Subsidiaries that are Domestic Credit Parties (but not other Subsidiaries, except in the case of Replacement Revolving Commitments of Foreign Borrowers, which may be guaranteed by any Guarantors);

(vi)    no existing Lender shall be required to provide any Replacement Revolving commitments.

-91-

(vii)    the Replacement Revolving Commitments shall rank pari passu in right of payment and security with the existing Revolving Commitments;

(viii)    any Loans under a Replacement Revolving Commitment will be drawn and participate in Letters of Credit and Swingline Loans on a pro rata basis with any existing Revolving Commitments.

(b)    Each such notice shall specify (x) the date on which the Borrowers propose that the Replacement Revolving Commitments become effective, which shall be a date reasonably acceptable to the Administrative Agent and (y) the identity of the Persons (each of which shall be a Person that would be an Eligible Assignee (for this purpose treating a Lender of Replacement Revolving Commitments as if it were an assignee)) whom the Borrowers propose would provide the Replacement Revolving Commitments (each such person, a "Replacement Revolving Lender") and the portion of the Replacement Revolving Commitments to be provided by each such Person.

(c)    This Section 2.19 shall supersede any provisions in Section 2.12 or Section 11.01 to the contrary. The Replacement Revolving Commitments shall be documented by an Additional Credit Extension Amendment executed by the Persons providing the Replacement Revolving Commitments (and the other Persons specified in the definition of Additional Credit Extension Amendment but no other existing Lender), and the Additional Credit Extension Amendment may provide for such amendments to this Credit Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrowers, to effect the provisions of this Section 2.19.

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

**3.01    Taxes.**

(a)    Payments Free of Taxes. Except as otherwise required by Law (as determined in the good faith discretion of the applicable Withholding Agent), any and all payments by or on account of any obligation of the Credit Parties hereunder or under any other Credit Document shall be made free and clear of and without reduction or withholding for any Taxes; provided that if the applicable Withholding Agent shall be required by applicable Law (as determined in the good faith discretion of the applicable Withholding Agent) to deduct or withhold any Taxes from such payments, then (i) if the Tax in question is an Indemnified Tax or an Other Tax, the sum payable by the applicable Credit Party shall be increased as necessary so that after all required deductions or withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 3.01) the Applicable Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable Withholding Agent shall make such deductions or withholdings and (iii) the applicable Withholding Agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b)    Payment of Other Taxes. Without limiting the provisions of subsection (a) above, the applicable Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)    Indemnification by the Applicable Borrower. Without duplication of any amounts payable under Section 3.01(a), the applicable Borrower shall indemnify the Applicable Agent and each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable by the Applicable Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability, together with any reasonable supporting documentation, delivered to the applicable Borrower by a Lender (with a copy to the Administrative Agent), or by the Applicable Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. Upon the reasonable request of any Credit Party, the Lenders, and the Applicable Agent agree to use their reasonable efforts to cooperate with such Credit Party (at such Credit Party's direction and expense) in contesting the imposition of, or claiming a refund of, any Indemnified Taxes or Other Taxes paid by such Credit Party, whether directly to a Governmental Authority or pursuant to this Section 3.01, that such Credit Party reasonably believes were not correctly or legally asserted by the relevant Governmental

-92-

Authority unless such Lender or the Applicable Agent, as the case may be, determines in good faith that pursuing such a contest or refund would be materially disadvantageous to it.

(d)   <u>Evidence of Payments</u>. As soon as reasonably practicable after any payment of Taxes pursuant this Section 3.01 or Other Taxes by a Credit Party to a Governmental Authority, such Credit Party shall deliver to the Applicable Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Applicable Agent.

(e)   <u>Status of Lenders</u>. Each Lender shall, at such times as are reasonably requested by the applicable Borrower or the Applicable Agent, provide such Borrower and the Applicable Agent with any documentation prescribed by Law, or reasonably requested by such Borrower or the Applicable Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under the Credit Documents. Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation expired, obsolete or inaccurate in any material respect, deliver promptly to such Borrower and the Applicable Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable Withholding Agent) or promptly notify such Borrower and the Applicable Agent of its legal ineligibility to do so. For the avoidance of doubt, unless the applicable Withholding Agent has received forms or other documentation satisfactory to it indicating that payments under any Credit Document to or for a Lender are not subject to withholding Tax or are subject to such Tax at a reduced rate pursuant to an applicable tax treaty, the applicable Withholding Agent shall withhold amounts required to be withheld by applicable Law from such payment at the maximum applicable withholding rate.

Without limiting the generality of the foregoing, in the event that any Borrower is not a Foreign Borrower:

(i)   Each U.S. Lender shall deliver to the Parent Borrower and the Administrative Agent on or before the date on which it becomes a party to this Credit Agreement (and from time to time thereafter when required by Law or upon the reasonable request of the Parent Borrower or the Administrative Agent) two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding,

(ii)   Each Foreign Lender shall deliver to the Parent Borrower and the Administrative Agent on or before the date on which it becomes a party to this Credit Agreement (and from time to time thereafter when required by Law or upon the reasonable request of the Parent Borrower or the Administrative Agent) whichever of the following is applicable:

(A)   two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party.

(B)   two duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)   in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Internal Revenue Code, (x) a certificate, in substantially the form of <u>Exhibit 3.01(e)-1, -2, -3, or -4</u> (any such certificate a "<u>United States Tax Compliance Certificate</u>"), or any other form approved by the Administrative Agent, to the effect that such Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Parent Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code, and that no payments in connection with the Credit Documents are effectively connected with such Lender's conduct of a U.S. trade or business and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms),

(D)   to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a Lender that has granted a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate shall be provided by such Lender on behalf of such direct or indirect partner(s)),

(E)   any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Laws to permit the applicable Withholding Agent to determine the withholding or deduction required to be made on any payments to such Lender under the Credit Documents, or

(F)   the Administrative Agent (and any assignee or successor) will deliver, to the Parent Borrower, on or prior to the execution and delivery of this Agreement (or, assignment or succession, if applicable), either (i) (A) two (2) executed copies of IRS Form W-8ECI with respect to any amounts payable to the Administrative Agent for its own account and (B) two (2) duly completed copies of IRS Form W-8IMY (certifying that it is either a "qualified intermediary" or a "U.S. branch") for the amounts the Administrative Agent receives for the account of others, or (ii) two (2) executed copies of IRS Form W-9, whichever is applicable, and in each case of (i) and (ii), with the effect that the Parent Borrower can make payments to the Administrative Agent on behalf of the Lenders without any deduction or withholding of any U.S. federal withholding Taxes.

(iii)   If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Parent Borrower and the Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by the Parent Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Parent Borrower or the Administrative Agent as may be necessary for the Parent Borrower and the Administrative Agent to comply with their FATCA obligations, to determine whether such Lender has or has not complied with such Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause 3.01(e)(iii), FATCA shall include any amendments made to FATCA after the date of this agreement.

Notwithstanding any other provision of this clause (e), a Lender shall not be required to deliver any documentation that such Lender is not legally eligible to deliver. Each Lender hereby authorizes the Applicable Agent to deliver to the Borrowers and any successor Applicable Agent any documentation delivered by the Lender to the Applicable Agent pursuant to this Section 3.01(e).

(f)   Treatment of Certain Refunds. If the Applicable Agent or any Lender determines, in its reasonable discretion, exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Credit Party or with respect to which a Credit Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the applicable Credit Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Credit Party under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including any Taxes imposed with respect to the refund) of such Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such

-94-

refund); <u>provided</u> that the applicable Credit Party, upon the request of the Applicable Agent or such Lender, agrees to repay the amount paid over to such Credit Party <u>plus</u> any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Applicable Agent or such Lender in the event the Applicable Agent or such Lender is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Applicable Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Credit Party or any other Person. Notwithstanding anything to the contrary, in no event will any Lender be required to pay any amount to any Credit Party the payment of which would place such Lender in a less favorable net after-tax position that such Lender or would have been in if the Indemnified Tax or other Tax giving rise to such refund had never been imposed.

(g)    <u>Payments made by the Applicable Agent</u>. For the avoidance of doubt, any payments made by the Applicable Agent to any Lender shall be treated as payments made by the applicable Credit Party.

(h)    [Reserved].

(i)    <u>Issuing Banks and Swingline Lenders</u>. For the avoidance of doubt, for purposes of this <u>Section 3.01</u>, the term "Lender" shall include any L/C Issuer and the Swingline Lender, and "Law" includes FATCA.

(j)    <u>Treatment of Advances</u>. From and after the Amendment No. 3 Effective Date, solely for purposes of FATCA, the Borrowers and the Administrative Agent shall treat, and the Lenders hereby authorize the Borrowers and the Administrative Agent to treat, this Credit Agreement and all advances hereunder (including advances already outstanding) as no longer qualifying as "grandfathered obligations" within the meaning of Treasury Regulation section 1.1471-2(b)(2)(i).

**3.02    Illegality.**

If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Adjusted Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Parent Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Loans that are Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Parent Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Parent Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans. Upon any such prepayment or conversion, the Parent Borrower shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Inability to Determine Rates.**

(a)    If prior to the commencement of any Interest Period for a Eurodollar Rate Loan:

(i)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted Eurodollar Rate or the Eurodollar Rate, as applicable (including because the Eurodollar Screen Rate is not available or published on a current basis), for the applicable currency and such Interest Period; or

(ii)    the Administrative Agent is advised by the Required Lenders (or, to the extent relating to Eurodollar Rate Loans in currencies other than Dollars, the Required Specified Currency Limited Currency/Multicurrency Revolving Lenders) that the Adjusted Eurodollar Rate or the Eurodollar Rate, as applicable, for the applicable currency and such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for the applicable currency and such Interest Period; then the Administrative Agent shall give notice thereof to the Parent Borrower and the Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Parent Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (A) any request that requests the conversion of any Loan in Dollars to, or continuation of a Loan in Dollars as, a Eurodollar Rate Loan shall be ineffective and such Loan shall be

-95-

continued as a Base Rate Loan, (B) if any Loan Notice requests a Loan that is a Eurodollar Rate Loan in Dollars, such Loan shall be made as a Base Rate Loan, (C) any Loan Notice that requests the making of a Loan in such applicable currency (if such applicable currency is other than Dollars) shall be ineffective and (D) any then-outstanding Loan in such applicable currency (if such currency is other than Dollars) shall be maintained at a rate for the tenor of borrowings in such currency that is comparable to the tenor of the Loans as determined by the Administrative Agent in good faith plus the Applicable Percentage; provided, in the case of Borrowings in Dollars, that if the circumstances giving rise to such notice affect only one Type of Borrowings, then the other Type of Borrowings shall be permitted.

(b)        If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(i) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(i) have not arisen but either (w) the supervisor for the administrator of the Eurodollar Screen Rate has made a public statement that the administrator of the Eurodollar Screen Rate is insolvent (and there is no successor administrator that will continue publication of the Eurodollar Screen Rate), (x) the administrator of the Eurodollar Screen Rate has made a public statement identifying a specific date after which the Eurodollar Screen Rate will permanently or indefinitely cease to be published by it (and there is no successor administrator that will continue publication of the Eurodollar Screen Rate), (y) the supervisor for the administrator of the Eurodollar Screen Rate has made a public statement identifying a specific date after which the Eurodollar Screen Rate will permanently or indefinitely cease to be published or (z) the supervisor for the administrator of the Eurodollar Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Eurodollar Screen Rate may no longer be used for determining interest rates for loans, then the Administrative Agent and the Parent Borrower shall endeavor to establish an alternate rate of interest to the Eurodollar Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time (including any mathematical or other adjustments to such alternate rate of interest), and shall enter into, no earlier than five Business Days after such amendment is posted or otherwise distributed to the Lenders, an amendment to this Credit Agreement to reflect such alternate rate of interest and such other related changes to this Credit Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Percentage); provided that, if such alternate rate of interest as so determined would be less than zero, such rate in the case of Revolver Loans and Delayed Draw Term A Loans shall be deemed to be zero for the purposes of this Credit Agreement. Notwithstanding anything to the contrary in Section 11.01, such amendment shall become effective without any further action or consent of any other party to this Credit Agreement so long as the Administrative Agent shall not have received, within five Business Days of the date such amendment is so posted or otherwise distributed to the Lenders as referred to in the previous sentence, a written notice from the Required Lenders (or, to the extent relating to Eurodollar Rate Loans relating to Eurodollar Rate Loans in currencies other than Dollars, the Required Specified Currency Limited Currency/Multicurrency Revolving Lenders) stating that such Required Lenders (or Required Specified Currency Limited Currency/Multicurrency Revolving Lenders, as the case may be) object to such amendment. Until an alternate rate of interest shall be determined in accordance with this clause (b) (but, in the case of the circumstances described in clause (ii)(w), clause (ii)(x) or clause (ii)(y) of the first sentence of this Section 3.03(b), only to the extent the Eurodollar Screen Rate for the applicable currency and such Interest Period is not available or published at such time on a current basis), (x) any Loan Notice that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Borrowing of Eurodollar Rate Loans shall be ineffective and (y) if any Loan Notice requests a Borrowing of Eurodollar Rate Loans, such Borrowing shall be made as a Borrowing of Base Rate Loans.

3.04        **Increased Cost; Capital Adequacy.**

(a)        Increased Costs Generally. If any Change in Law shall:

-96-

Exhibit 2, page 243

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Adjusted Eurodollar Rate) or L/C Issuer;

(ii)    subject any Lender or L/C Issuer to any Tax of any kind whatsoever with respect to any Credit Document, any Letter of Credit, any participation in a Letter of Credit or any Loan made by it, or change the basis of taxation of payments to such Lender or L/C Issuer in respect thereof (except, in each case, for Indemnified Taxes or Other Taxes, any Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and in the definition of Connection Income Taxes); or

(iii)   impose on any Lender or L/C Issuer or the London or Canadian interbank market any other condition, cost or expense (other than Taxes) affecting this Credit Agreement or Eurodollar Rate Loans or B/A Drawings made by such Lender or any Letter of Credit or participation therein; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or, in the case of clause (ii) above, any Loan) or obtaining funds for the purchase of B/As, or of maintaining its obligation to make any such Loan or accept and purchase B/As, or to increase the cost to such Lender or L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or L/C Issuer, the Parent Borrower will pay to such Lender or L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements. If any Lender or L/C Issuer determines that any Change in Law affecting such Lender or L/C Issuer or any Lending Office of such Lender or such Lender's or L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or L/C Issuer's capital or on the capital of such Lender's or L/C Issuer's holding company, if any, as a consequence of this Credit Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such L/C Issuer, to a level below that which such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company could have achieved but for such Change in Law, then from time to time the Parent Borrower will pay to such Lender or L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement. A certificate of a Lender or L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Parent Borrower shall be conclusive absent manifest error. The Parent Borrower shall pay such Lender or L/C Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Delay in Requests. Failure or delay on the part of any Lender or L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's or L/C Issuer's right to demand such compensation; provided that the Parent Borrower shall not be required to compensate a Lender or L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or L/C Issuer, as the case may be, notifies the Parent Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

-97-

**3.05**     **Compensation for Losses.**

Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Parent Borrower shall promptly compensate such Lender for and hold such Lender harmless from any reasonable loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, pursuant to Section 2.01(g)(v), by reason of acceleration, or otherwise); or

(b)     the payment of any principal in respect of a B/A other than on the last day of a Contract Period for such B/A (whether voluntary, mandatory, automatic, pursuant to Section 2.01(g)(v), by reason of acceleration, or otherwise); or

(c)     any failure by the Parent Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Parent Borrower; or

(d)     any assignment of a Eurodollar Rate Loan or the right to receive payment in respect of a B/A on a day other than the last day of the Interest Period or Contract Period, as the case may be, therefor as a result of a request by the Parent Borrower pursuant to Section 11.13; including any reasonable loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. A certificate as to the amount of such payment or liability delivered to the Parent Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on behalf of a Lender, shall be conclusive absent manifest error. For the avoidance of doubt, notwithstanding the foregoing, no Lender shall demand, and the Borrower shall not be obligated to make, any funding loss payments pursuant to this Section 3.05 with respect to the payment of accrued interest on the Amendment No. 6 Effective Date with respect to the Converted Term B-3 Loans.

For purposes of calculating amounts payable by the Parent Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Adjusted Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

**3.06**     **Mitigation Obligations; Replacement of Lenders.**

(a)     Designation of a Different Lending Office. If any Lender requests compensation under Section 3.04, or the Parent Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Parent Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders. If any Lender requests compensation under Section 3.04, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Parent Borrower may replace such Lender in accordance with Section 11.13.

(c)     Limitation on Additional Amounts, Etc. Notwithstanding anything to the contrary contained in this Article III of this Credit Agreement, unless a Lender gives notice to the Parent Borrower that it is obligated to pay an

-98-

amount under this Article within nine (9) months after the latest of (i) the date the Lender incurs the respective increased costs, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital, (ii) the date such Lender has actual knowledge of its incurrence of the respective increased costs, loss, expense or liability, reductions in amounts received or receivable or reduction in return on capital or (iii) where the increased costs, loss, expense, liability, etc. relates to a third party claim (e.g., a Tax claim), the date on which the Lender has actual knowledge of such claim, then such Lender shall not be entitled to be compensated for such amounts by the Parent Borrower pursuant to this Article III to the extent any portion of such amounts are directly attributable (e.g., late penalties payable on a third party claim) to such Lender's failure to provide notice within the required period.

**3.07    Survival Losses.**

All of the Parent Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder, resignation of the Applicable Agent and any assignment of rights by, or replacement of, any Lender or L/C Issuer.

**3.08    Additional Reserve Costs.**

(a)    [Reserved].

(b)    For so long as any Lender is required to comply with reserve assets, liquidity, cash margin or other requirements of any monetary or other authority (including any such requirement imposed by the European Central Bank, the European System of Central Banks or the Bank of Canada, but excluding requirements reflected in the Statutory Reserves) in respect of any of such Lender's Eurodollar Rate Loans, such Lender shall be entitled to require the Parent Borrower to pay, contemporaneously with each payment of interest on each of such Lender's Loans subject to such requirements, additional interest on such Loan at a rate per annum specified by such Lender to be the cost to such Lender of complying with such requirements in relation to such Loan.

(c)    Any additional interest owed pursuant to paragraph (a) or (b) above shall be determined in reasonable detail by the applicable Lender, which determination shall be conclusive absent manifest error, and notified to the Parent Borrower (with a copy to the Administrative Agent) at least five Business Days before each date on which interest is payable for the applicable Loan, and such additional interest so notified to the Parent Borrower by such Lender shall be payable to the Administrative Agent for the account of such Lender on each date on which interest is payable for such Loan.

### ARTICLE IV GUARANTY

**4.01    The Guaranty.**

(a)    Each of the Parent Borrower and the Domestic Guarantors hereby jointly and severally guarantees to the Administrative Agent and each of the holders of the Obligations, as hereinafter provided, as primary obligor and not as surety, the prompt payment of the Borrower Obligations (the "Domestic Guaranteed Obligations") in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof. The Domestic Guarantors hereby further agree that if any of the Domestic Guaranteed Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Domestic Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Domestic Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

(b)    Notwithstanding any provision to the contrary contained herein, in any other of the Credit Documents, Swap Contracts or other documents relating to the Domestic Guaranteed Obligations, the obligations of each Domestic Guarantor under this Credit Agreement and the other Credit Documents shall be limited to an aggregate amount equal to the largest amount that would not

-99-

render such obligations subject to avoidance under the Debtor Relief Laws or any comparable provisions of any applicable state law.

**4.02    Obligations Unconditional.**

The obligations of the Domestic Guarantors under Section 4.01 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Credit Documents or other documents relating to the Obligations, or any substitution, compromise, release, impairment or exchange of any other guarantee of or security for any of the Domestic Guaranteed Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 4.02 that the obligations of the Domestic Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Each Domestic Guarantor agrees that such Domestic Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrowers or any other Domestic Guarantor for amounts paid under this Article IV until such time as the Obligations have been irrevocably paid in full and the commitments relating thereto have expired or been terminated. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by law, the occurrence of any one or more of the following shall not alter or impair the liability of any Domestic Guarantor hereunder, which shall remain absolute and unconditional as described above:

    (a)    at any time or from time to time, without notice to any Domestic Guarantor, the time for any performance of or compliance with any of the Domestic Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

    (b)    any of the acts mentioned in any of the provisions of any of the Credit Documents, or other documents relating to the Domestic Guaranteed Obligations or any other agreement or instrument referred to therein shall be done or omitted;

    (c)    the maturity of any of the Domestic Guaranteed Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Credit Documents or other documents relating to the Domestic Guaranteed Obligations, or any other agreement or instrument referred to therein shall be waived or any other guarantee of any of the Domestic Guaranteed Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

    (d)    any Lien granted to, or in favor of, the Administrative Agent or any of the holders of the Domestic Guaranteed Obligations as security for any of the Domestic Guaranteed Obligations shall fail to attach or be perfected; or

    (e)    any of the Domestic Guaranteed Obligations shall be determined to be void or voidable (including, without limitation, for the benefit of any creditor of any Domestic Guarantor) or shall be subordinated to the claims of any Person (including, without limitation, any creditor of any Domestic Guarantor).

With respect to its obligations hereunder, each Domestic Guarantor hereby expressly waives diligence, presentment, demand of payment, protest, notice of acceptance of the guaranty given hereby and of extensions of credit that may constitute obligations guaranteed hereby, notices of amendments, waivers and supplements to the Credit Documents and other documents relating to the Domestic Guaranteed Obligations, or the compromise, release or exchange of collateral or security, and all notices whatsoever, and any requirement that the Administrative Agent or any holder of the Domestic Guaranteed Obligations exhaust any right, power or remedy or proceed against any Person under any of the Credit Documents or any other documents relating to the Domestic Guaranteed Obligations or any other agreement or instrument referred to therein, or against any other Person under any other guarantee of, or security for, any of the Obligations.

-100-

**4.03        Reinstatement.**

Neither the Domestic Guarantors' obligations hereunder nor any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by an impairment, modification, change, release or limitation of the liability of any Borrower, by reason of such Borrower's bankruptcy or insolvency or by reason of the invalidity or unenforceability of all or any portion of the Domestic Guaranteed Obligations. The obligations of the Domestic Guarantors under this Article IV shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Domestic Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings pursuant to any Debtor Relief Law or otherwise, and each Domestic Guarantor agrees that it will indemnify the Administrative Agent and each holder of Domestic Guaranteed Obligations on demand for all reasonable costs and expenses (including all reasonable fees, expenses and disbursements of any law firm or other counsel) incurred by the Administrative Agent or such holder of Domestic Guaranteed Obligations in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

**4.04        Certain Waivers.**

Each Domestic Guarantor acknowledges and agrees that (a) the guaranty given hereby may be enforced without the necessity of resorting to or otherwise exhausting remedies in respect of any other security or collateral interests, and without the necessity at any time of having to take recourse against any Borrower hereunder or against any collateral securing the Domestic Guaranteed Obligations or otherwise, (b) it will not assert any right to require the action first be taken against any Borrower or any other Person (including any co-guarantor) or pursuit of any other remedy or enforcement of any other right and (c) nothing contained herein shall prevent or limit action being taken against the Borrowers hereunder, under the other Credit Documents or the other documents and agreements relating to the Domestic Guaranteed Obligations or from foreclosing on any security or collateral interests relating hereto or thereto, or from exercising any other rights or remedies available in respect thereof, if neither the applicable Borrower nor the Domestic Guarantors shall timely perform their obligations, and the exercise of any such rights and completion of any such foreclosure proceedings shall not constitute a discharge of the Domestic Guarantors' obligations hereunder unless as a result thereof, the Domestic Guaranteed Obligations shall have been indefeasibly paid in full and the commitments relating thereto shall have expired or been terminated, it being the purpose and intent that the Domestic Guarantors' obligations hereunder be absolute, irrevocable, independent and unconditional under all circumstances.

**4.05        Remedies.**

The Domestic Guarantors agree that, to the fullest extent permitted by law, as between the Domestic Guarantors, on the one hand, and the Administrative Agent and the holders of the Domestic Guaranteed Obligations, on the other hand, the Domestic Guaranteed Obligations may be declared to be forthwith due and payable as provided in Section 9.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 9.02) for purposes of Section 4.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Domestic Guaranteed Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Domestic Guaranteed Obligations being deemed to have become automatically due and payable), the Domestic Guaranteed Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Domestic Guarantors for purposes of Section 4.01. The Domestic Guarantors acknowledge and agree that the Domestic Guaranteed Obligations are secured in accordance with the terms of the Collateral Documents and that the holders of the Domestic Guaranteed Obligations may exercise their remedies thereunder in accordance with the terms thereof.

**4.06        Rights of Contribution.**

The Domestic Guarantors hereby agree as among themselves that, in connection with payments made hereunder, each Domestic Guarantor shall have a right of contribution from each other Domestic Guarantor in accordance with applicable Law. Such contribution rights shall be subordinate and subject in right of payment to the

-101-

Domestic Guaranteed Obligations until such time as the Domestic Guaranteed Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated, and none of the Guarantors shall exercise any such contribution rights until the Domestic Guaranteed Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated.

**4.07    Guaranty of Payment; Continuing Guaranty.**

The guarantee in this Article IV is a guaranty of payment and not of collection, and is a continuing guarantee, and shall apply to all Domestic Guaranteed Obligations whenever arising.

**4.08    Keepwell.**

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its obligations under this guarantee and any security interest granted under the U.S. Security Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 4.08 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 4.08, or otherwise under this guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 4.08 shall remain in full force and effect until the Obligations have been paid and performed in full. Each Qualified ECP Guarantor intends that this Section 4.08 constitute, and this Section 4.08 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

## ARTICLE V

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**5.01    Conditions to Amendment No. 8 Effective Date.**

The effectiveness of Amendment No. 8 is subject to the satisfaction of the following conditions precedent:

(a)    Executed Amendment Agreement. The Administrative Agent shall have received (i) executed signature pages to (or consents authorizing the relevant party's consent to) Amendment No. 8 from (A) Lenders constituting the Required Lenders under the Credit Agreement (prior to giving effect to Amendment No. 8) and (B) each of the Credit Parties.

(b)    Opinions of Counsel. The Administrative Agent's receipt of a customary duly executed opinion of Latham & Watkins LLP, counsel to the Credit Parties dated as of the Amendment No. 8 Effective Date and reasonably satisfactory to the Administrative Agent.

(c)    Organization Documents, Etc. The Administrative Agent's receipt of a duly executed certificate of a Responsible Officer of each Credit Party, attaching each of the following documents (or in the case of clauses (i), (ii) and (iii) below, certifying that no changes have been made to such documents since the Amendment No. 7 Effective Date or the date such Credit Party became a Guarantor) and certifying that each is true, correct and complete and in full force and effect as of the Amendment No. 8 Effective Date:

   (i)    Charter Documents. Copies of its articles or certificate of organization or formation, certified by the appropriate Governmental Authority of the jurisdiction of its organization or formation;

   (ii)    Bylaws. Copies of its bylaws, operating agreement or partnership agreement;

-102-

Exhibit 2, page 249

(iii)    <u>Resolutions</u>. Copies of its resolutions approving and adopting the Credit Documents to which it is a party, the transactions contemplated therein, and authorizing the execution and delivery thereof;

(iv)    <u>Incumbency</u>. Incumbency certificates identifying the Responsible Officers of such Credit Party that are authorized to execute Amendment No. 8 and to act on such Credit Party's behalf in connection with Amendment No. 8; and

(v)    <u>Good Standing Certificates</u>. Certificates of good standing or the equivalent (if any) from its jurisdiction of organization or formation, in each case certified as of a recent date by the appropriate Governmental Authority.

(d)    <u>Officer Certificates</u>. The following shall be true as of the Amendment No. 8 Effective Date, and the Administrative Agent shall have received a certificate or certificates of a Responsible Officer of the Parent Borrower, dated as of the Amendment No. 8 Effective Date, certifying each of the following:

(i)    <u>Consents</u>. No consents, licenses or approvals are required in connection with the execution, delivery and performance by any Credit Party of Amendment No. 8, other than as are in full force and effect and, to the extent requested by the Administrative Agent, are attached thereto;

(ii)    <u>Material Adverse Effect</u>. There shall have been no event or circumstance since December 31, 2019 that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(iii)    <u>Material Litigation</u>. There shall be no action, suit, investigation or proceeding pending in any court or before any arbitrator or Governmental Authority that would reasonably be expected to have a Material Adverse Effect; and

(iv)    <u>Representations and Warranties; No Default</u>. The conditions to the honoring of a Credit Extension set forth in <u>Section 5.02(a)</u> have been satisfied as of the Amendment No. 8 Effective Date. As of the Amendment No. 8 Effective Date and after giving effect thereto, no Default or Event of Default has occurred and is continuing.

(e)    <u>Solvency</u>. The Administrative Agent shall have received a customary certificate, dated as of the Amendment No. 8 Effective Date, certified by the chief financial officer of the Parent Borrower, stating that the Parent Borrower and its Subsidiaries, on a consolidated basis after giving effect to the Transactions occurring on the Amendment No. 8 Effective Date, are Solvent.

(f)    <u>Fees and Expenses</u>. (A) To the extent required by Amendment No. 8, all accrued reasonable and documented out-of-pocket fees and expenses of the Lead Arrangers and the Agents (including the reasonable fees and expenses of counsel (limited to a single counsel plus one local counsel in any reasonably necessary jurisdiction for the Agents)) shall have been paid; <u>provided</u> that the Parent Borrower shall have received a reasonably detailed invoice therefor at least two (2) Business Days prior to the Amendment No. 8 Effective Date, (B) each Lender that is party to Amendment No. 8 shall have received such fees based on the percentage of Delayed Draw Term Loan A Commitments and Revolving Commitments as of the Amendment No. 8 Effective Date communicated to such Lenders by the Administrative Agent and as agreed by the Parent Borrower and (C) all fees separately agreed to by the Parent Borrower and any Lead Arranger to be payable on the Amendment No. 8 Effective Date shall have been paid.

(g)    <u>KYC Information and Beneficial Ownership Certificate</u>. The Credit Parties shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act. Further, to the extent the Parent Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Parent Borrower shall have provided, at least

-103-

five days prior to the Amendment No. 8 Effective Date, to any Lender that has requested, in a written notice to the Parent Borrower at least 10 days prior to the Amendment No. 8 Effective Date, a Beneficial Ownership Certification (provided that, upon the execution and delivery by such Lender of its signature page to this Credit Agreement, the condition to deliver such Beneficial Ownership Certification shall be deemed to be satisfied).

Without limiting the generality of the provisions of Section 10.04, for purposes of determining compliance with the conditions specified in this Section 5.01, each Lender that has signed Amendment No. 7 shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Amendment No. 7 Effective Date specifying its objection thereto.

**5.02    Conditions to All Credit Extensions.**

The obligation of each Lender and L/C Issuer to honor any Request for Credit Extension is subject to the satisfaction of the following conditions precedent:

(a)    The representations and warranties of the Parent Borrower and each other Credit Party contained in Article VI shall be true and correct in all material respects on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (provided that representations and warranties that are qualified by materiality shall be true and correct in all respects).

(b)    No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)    The Administrative Agent and, if applicable, the applicable L/C Issuer or the Swingline Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

Each Request for Credit Extension submitted by any Borrower shall be deemed to be a representation and warranty by such Borrower that the conditions specified in Sections 5.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.

**5.03    First Credit Extension to each Foreign Borrower.**

The obligation of each Lender to honor any initial request for a Loan or B/A by each Foreign Borrower or of any L/C Issuer to honor any initial request for a Letter of Credit by each Foreign Borrower is subject to the satisfaction of the following further conditions precedent:

(a)    The Administrative Agent shall have received an opinion of counsel for such Foreign Borrower and each Foreign Subsidiary provided for in clause (c) below reasonably acceptable to the Administrative Agent and covering such matters relating to the transactions contemplated hereby as the Administrative Agent may reasonably request;

(b)    The Administrative Agent shall have received all documents which it may reasonably request relating to the existence of such Foreign Borrower and such Foreign Subsidiary, its corporate authority for and the validity of its entry into its Foreign Borrower Agreement, this Credit Agreement, any other Credit Document and any amendments to the Credit Documents contemplated by Section 1.08 to which it a party, and any other matters relevant thereto, all in form and substance reasonably satisfactory to the Administrative Agent;

(c)    (i) Each of the Foreign Subsidiaries (other than an Excluded Subsidiary) shall have jointly and severally guaranteed to the Administrative Agent and each of the holders of the Foreign Obligations the prompt payment of the Foreign Obligations in full when due (whether at stated maturity, as a mandatory pre-payment, by acceleration, as a mandatory cash collateralization or otherwise) (the "Foreign Guaranteed Obligations") pursuant to one or more guarantees in form in substance reasonably satisfactory to the Administrative Agent and (ii) each of such Foreign Borrower and each such Foreign Subsidiary shall have executed and delivered to the Administrative Agent a Perfection Certificate in form and substance substantially consistent with that delivered on the Amendment No. 6 Effective Date with respect to the Domestic Credit Parties and taken all actions necessary to create and

-104-

perfect in favor of the Collateral Agent for the benefit of the applicable Secured Parties in accordance with applicable law a security interest in its assets other than any Excluded Property pursuant to Foreign Collateral Documents in form and substance reasonably satisfactory to the Collateral Agent, including the delivery to the Collateral Agent of all certificates, if any, representing all of the Capital Stock of such Foreign Borrower or such Foreign Subsidiary (to the extent required by the applicable Collateral Document), together with undated stock transfer powers executed in blank, and all unsecured intercompany notes owing to such Foreign Borrower or Foreign Subsidiary (to the extent required by the applicable Collateral Documents), together with undated alloges executed in blank; provided that this clause (c) shall not require the creation or perfection of pledges of or security interests in particular assets of the Foreign Subsidiaries or guarantees from particular Foreign Subsidiaries if, to the extent and for so long as, the Administrative Agent, in consultation with the Parent Borrower, reasonably determines, in writing, that the cost to the Borrowers of creating or perfecting such pledges or security interests in such assets or obtaining such guarantees from Foreign Subsidiaries (in each case, taking into account, among other things (i) any material adverse Tax or other consequences to the Borrowers and the other Subsidiaries (including the imposition of withholding or other material Taxes or costs on Lenders) and (ii) with respect to security interests in Capital Stock in Persons that are not, directly or indirectly, wholly owned by the Parent Borrower, any restrictions on the creation or perfection of such security interests (including the costs of obtaining necessary consents and approvals from other holders (other than the Parent Borrower and its Affiliates) of Capital Stock in such Persons)) shall be commercially unreasonable in view of the benefits to be obtained by the Lenders therefrom (as reasonably determined, in writing, by the Parent Borrower and the Administrative Agent); provided further that until such time as the Outstanding Amount of the Foreign Borrowers exceeds $250.0 million, only those Foreign Subsidiaries that are organized in a jurisdiction in which a Foreign Borrower is located shall be required to comply with this clause (c).

5.04    **Additional Conditions to Delayed Draw Term A Loans.**

In addition to the conditions precedent set forth in Sections 5.1 and 5.2, the obligation of each Delayed Draw Term A Lender to fund its portion of any Delayed Draw Term A Loan shall be subject to the satisfaction of, each of the additional conditions precedent below:

(a)    no more than ten (10) separate fundings of Delayed Draw Term A Loans shall have occurred after giving effect to the funding of Delayed Draw Term A Loans requested by the applicable Request for Credit Extension; and

(b)    in the case of a single Borrowing of Delayed Draw Term A Loans in an aggregate principal amount greater than $100.0 million, the Administrative Agent shall have received a certificate setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the financial covenant(s) contained in Section 8.10 (and if applicable, subject to the Limited Condition Acquisition provisions in Section 1.11) after giving Pro Forma Effect to such Borrowing and other events financed thereby as are appropriate and consistent with the definition of "Pro Forma Basis".

Each delivery of a Request for Credit Extension with respect to the funding of Delayed Draw Term A Loans and the acceptance by the Parent Borrower of the proceeds of such Delayed Draw Term A Loans shall constitute a representation and warranty by the Parent Borrower and each other Credit Party that on the date of the funding of such Delayed Draw Term A Loans (both immediately before and after giving effect thereto and the application of the proceeds thereof) the conditions contained in this Section 5.04 have been satisfied.

-105-

**ARTICLE VI REPRESENTATIONS AND WARRANTIES**

The Credit Parties represent and warrant to the Administrative Agent, the Lenders and the L/C Issuers that:

**6.01    Existence, Qualification and Power.**

Each Credit Party (a) is duly organized or formed, validly existing and (to the extent the concept is applicable in such jurisdiction) in good standing under the Laws of the jurisdiction of its incorporation or formation,
(b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) execute, deliver and perform its obligations under the Credit Documents to which it is a party and (ii) except to the extent it would not reasonably be expected to have a Material Adverse Effect, own its assets and carry on its business, and (c) except to the extent it would not reasonably be expected to have a Material Adverse Effect, is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license.

**6.02    Authorization; No Contravention.**

The execution, delivery and performance by each Credit Party of each Credit Document to which it is party have been duly authorized by all necessary corporate or other organizational action and do not (a) contravene the terms of such Credit Party's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien (other than Permitted Liens) under, (i) any Contractual Obligation to which such Credit Party is party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Credit Party or its Property is subject; or (c) violate any Law applicable to such Credit Party and the relevant Credit Documents, except, in the case of clause (b) or (c) of this Section 6.02 only, as would not reasonably be expected to have a Material Adverse Effect.

**6.03    Governmental Authorization; Other Consents.**

No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party of this Credit Agreement or any other Credit Document (other than (a) as have already been obtained and are in full force and effect, (b) filings to perfect security interests granted pursuant to the Credit Documents and (c) approvals, consents, exemptions, authorizations, or other actions, notices or filings the failure to procure which would not reasonably be expected to have a Material Adverse Effect).

**6.04    Binding Effect.**

Each Credit Document has been duly executed and delivered by each Credit Party that is party hereto or thereto. Each Credit Document constitutes legal, valid and binding obligations of such Credit Party, enforceable against such Credit Party in accordance with its terms, except to the extent the enforceability thereof may be limited by applicable Debtor Relief Laws affecting creditors' rights generally and by equitable principles of law (regardless of whether enforcement is sought in equity or at law) and implied covenants of good faith and fair dealing.

**6.05    Financial Statements.**

The audited combined balance sheets of the Parent Borrower and its Subsidiaries as of December 31, 2018 and the related combined statements of income or operations, shareholders' equity (or invested equity) and cash flows for the years ending December 31, 2016, December 31, 2017 and December 31, 2018, including the notes thereto, (i) were prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein and (ii) fairly present the financial condition of the Parent Borrower and its Subsidiaries as of the date thereof and its results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

The unaudited combined balance sheets of the Parent Borrower and its Subsidiaries dated June 30, 2019, and the related combined statements of income or operations, shareholders' equity (or invested equity) and cash flows for the six months ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Parent Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

**6.06    No Material Adverse Effect.**

Since December 31, 2018, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

**6.07    Litigation.**

There are no actions, suits or proceedings pending or, to the knowledge of the Parent Borrower, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any member of the Consolidated Group or against any of their properties or revenues that either individually or in the aggregate would reasonably be expected to have a Material Adverse Effect.

**6.08    No Default.**

No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Credit Agreement or any other Credit Document.

**6.09    Ownership of Property; Liens.**

Each of the Parent Borrower and its Subsidiaries has good and valid title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in or right to use, all its other material property, except as would not reasonably be expected to have a Material Adverse Effect, and the property of the Consolidated Group is subject to no Liens, other than Permitted Liens.

**6.10    Environmental Matters.**

Except with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Parent Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

**6.11    Taxes.**

Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (a) the Parent Borrower and each of its Subsidiaries (i) has timely filed (or has had filed on its behalf) all Tax returns required to be filed and (ii) has paid prior to delinquency all Taxes, whether or not shown on a Tax Return, levied or imposed upon it or its properties, income or assets otherwise due and payable (including in its capacity as a withholding agent), except for Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided, in accordance with GAAP, if such contest suspends enforcement or collection of the claim in question; and (b) there are no current, pending or, to the knowledge of the Parent Borrower or any of its Subsidiaries, proposed Tax assessments, deficiencies, audits or other claims against or with respect to the Parent Borrower or any of its Subsidiaries.

**6.12  ERISA Compliance.**

(a)  Each Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the IRS or an application for such a letter is currently pending before the IRS with respect thereto and, to the knowledge of the Parent Borrower, nothing has occurred that would prevent, or cause the loss of, such qualification except in such instances in which the failure to comply therewith either individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (i) the Parent Borrower and each ERISA Affiliate have made all required contributions to each Pension Plan subject to Section 412 of the Internal Revenue Code and (ii) no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Internal Revenue Code has been made with respect to any Pension Plan.

(b)  There are no pending or, to the knowledge of the Parent Borrower, threatened, claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect.

(c)  Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) neither the Parent Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred that, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (iii) there has been no "prohibited transaction" (within the meaning of Section 4975 of the Internal Revenue Code) with respect to any Plan; and (iv) neither the Parent Borrower nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA.

**6.13  Labor Matters.**

Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (a) as of the Amendment No. 6 Effective Date, there are no strikes, lockouts or slowdowns against the Parent Borrower or any of its Subsidiaries pending or, to the knowledge of Parent Borrower, overtly threatened to Parent Borrower or any of its Subsidiaries and (b) the hours worked by and payments made to employees of the Parent Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.

**6.14  Subsidiaries.**

Set forth on Schedule 6.14 is a list of all Subsidiaries of the Parent Borrower immediately after giving effect to the Amendment No. 6 Effective Date, together with the jurisdiction of organization, and ownership and ownership percentages of Capital Stock of each such Subsidiary as of such date. Schedule 6.14 identifies whether such Subsidiary shall be party to a Collateral Document or is an Excluded Subsidiary. The outstanding Capital Stock has been validly issued, is owned free of Liens (other than Permitted Liens) and, with respect to any outstanding shares of Capital Stock of a corporation, such shares have been validly issued and are fully paid and non-assessable. The outstanding shares of Capital Stock of each Loan Party and each direct Subsidiary of any Loan Party are not subject to any buy-sell, voting trust or other shareholder agreement except as identified on Schedule 6.14.

**6.15  Margin Regulations; Investment Company Act.**

(a)  The Credit Parties are not engaged and will not engage, principally or as one of their important activities, in the business of purchasing or carrying "margin stock" (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)  None of the Credit Parties or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

-108-

**6.16    Disclosure.**

(a)    No written report, financial statement, certificate or other information (taken as a whole) furnished by or on behalf of any Credit Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Credit Agreement or delivered hereunder or under any other Credit Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading, in each case as of the date such information is provided and as of the Amendment No. 6 Effective Date; provided that, with respect to projected financial information and estimates, the Parent Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time they were made.

(b)    As of the Amendment No. 7 Effective Date, the information included in the Beneficial Ownership Certification provided on or prior to the Amendment No. 7 Effective Date to any Lender (if any) in connection with this Credit Agreement is true and correct in all material respects.

**6.17    Compliance with Laws.**

Each member of the Consolidated Group is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions, settlements or other material agreements with any Governmental Authority and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

**6.18    Insurance.**

The Parent Borrower and each of its Subsidiaries maintain, in force, with financially sound and reputable insurance companies, and have paid all premiums and costs that are due and payable and are related to, insurance coverages in such amounts (with no materially greater risk retention) and against such risks under similar circumstances as are reasonably determined by the management of the Parent Borrower and its Subsidiaries to be sufficient in accordance with the usual and customary practices of companies of established repute engaged in the same or similar lines of business as the Parent Borrower and its Subsidiaries and operating in the same or similar locations, except to the extent reasonable self-insurance meeting the same standards is maintained with respect to such risks.

**6.19    Solvency.**

As of the Amendment No. 7 Effective Date, the Parent Borrower and its Subsidiaries, on a consolidated basis, are, and after giving effect to the transactions occurring on the Amendment No. 7 Effective Date will be, Solvent.

**6.20    Intellectual Property; Licenses, Etc.**

Except as would not reasonably be expected to have a Material Adverse Effect, as of the Amendment No.6 Effective Date, each Credit Party owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person. As of the Amendment No. 6 Effective Date, no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Credit Parties, threatened, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. None of the IP Rights listed on Section 2 of Schedule 8.01 is material to the operation of the business of Parent Borrower and its Subsidiaries. No material IP Rights have been acquired or otherwise come into the possession of any Credit Party at any time following the Amendment No. 6 Effective Date through and including the Amendment No. 7 Effective Date.

-109-

**6.21** **Collateral Matters.**

(a)  Each of the Collateral Documents creates (or will create, as the case may be), as security for the Obligations purported to be secured thereby, subject to the provisions hereof and thereof, a legal, valid and enforceable security interest in favor of the Collateral Agent for the benefit of the applicable Secured Parties in all the Collateral subject to such Collateral Document (or comparable interest under foreign law in the case of foreign Collateral) and each such Collateral Document constitutes either (x) a fully perfected Lien on, and security interest in, all of the Collateral subject to such Collateral Document (except for Collateral for which the absence or failure of the Lien on such Collateral to be perfected would not constitute an Event of Default under Section 9.01(l)) or (y) a floating charge, fixed charge or security interest, as specified in the applicable Collateral Document, with respect to all of the Collateral subject to such Collateral Document, in each case in favor of the Collateral Agent and subject to no other Liens except Permitted Liens. The pledgor or assignor, as the case may be, under each Collateral Document has good title to all Collateral subject thereto free and clear of all Liens other than Permitted Liens. No filings or recordings are required in order to perfect the security interests created under the Collateral Documents except, (i) with respect to the Domestic Credit Parties, for filings or recordings listed on Schedule 6.21 (as amended by each Perfection Certificate delivered to the Administrative Agent after the Amendment No. 6 Effective Date), all of which shall have been made on or prior to the Amendment No. 6 Effective Date except as otherwise expressly provided in Schedule 6.21 (or such Perfection Certificates, as applicable) and (ii) with respect to the Foreign Credit Parties, the filings or recordings listed in a schedule to the applicable Collateral Documents similar in purpose to the schedule described in the foregoing clause (i).

(b)  When the U.S. Security Agreement (or a short-form version thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office, the security interest created thereunder shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Domestic Credit Parties in the Intellectual Property (as such term is defined in the U.S. Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks, trademark applications and copyrights acquired by the Domestic Credit Parties after the Amendment No. 6 Effective Date).

(c)  The requirements set forth in Sections 7.12, 7.13 and 7.14 are satisfied.

(d)  Notwithstanding the foregoing, it is agreed that the Credit Parties shall not be required to enter into control agreements with respect to their deposit accounts and securities accounts in order to perfect the Collateral Agent's Lien on the Collateral.

**6.22** **Status of Obligations.**

The Obligations constitute Senior Indebtedness (and any other similar term defining Senior Indebtedness) under each indenture or other agreement governing any Subordinated Debt, if any, of the Parent Borrower or any other Credit Party.

**6.23** **Immunities, Etc.**

Each Credit Party is subject to civil and commercial law with respect to its obligations under this Credit Agreement, and the execution, delivery and performance by it of this Credit Agreement and each other Credit Document to which it is a party constitutes and will constitute private and commercial acts rather than public or governmental acts. Each Credit Party has validly given its consent to be sued in respect of its obligations under this Credit Agreement and the other Credit Documents to which it is a party. Each Credit Party has waived every immunity (sovereign or otherwise) to which it or any of its properties would otherwise be entitled from any legal action, suit or proceeding, from jurisdiction of any court or from setoff or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) under the laws of the jurisdiction of its incorporation in respect of its obligations under this Credit

-110-

Agreement and the other Credit Documents to which it is a party. The waiver by each Credit Party described in the immediately preceding sentence is legal, valid and binding on such Credit Party.

**6.24    Anti-Money Laundering, Economic Sanctions Laws and Anti-Corruption Laws.**

(a)    To the extent applicable, each of Parent Borrower and its Subsidiaries, and to the knowledge of Parent Borrower and any other Credit Party, any director, officer, employee, agent or Affiliate of Parent Borrower or any Subsidiary, is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and other economic or financial sanctions imposed by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"), and economic sanctions administered by the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom ("Sanctions"), (ii) the Patriot Act and (iii) laws, rules and regulations of any jurisdiction applicable to Borrower and its Subsidiaries relating to bribery, corruption or money laundering ("Anti-Corruption Laws").

(b)    No part of the proceeds of the Loans will be used, directly or indirectly, in violation of any Anti-Corruption Laws or applicable Sanctions.

(c)    No Credit Party, any Subsidiary of Parent Borrower, nor to the knowledge of any Credit Party, any director, officer, employee, agent or Affiliate of a Credit Party or any Subsidiary of Parent Borrower, is the subject of any Sanctions. The proceeds of the Loans will not be used for the purpose of financing the activities of any Person, or in any country, region or territory, that, at the time of such financing, is the target of Sanctions, or in any manner that would result in the violation of Sanctions applicable to any party hereto.

**6.25    EEA Financial Institution.**

No Credit Party is an EEA Financial Institution.

## ARTICLE VII

## AFFIRMATIVE COVENANTS

Until the Loan Obligations shall have been paid in full or otherwise satisfied, and the Commitments hereunder shall have expired or been terminated, the Parent Borrower will, and will cause each of its Subsidiaries to:

**7.01    Financial Statements.**

Deliver to the Administrative Agent, each Lender and each L/C Issuer:

(a)    not later than ninety (90) days after the end of each fiscal year of the Parent Borrower (provided that, solely with respect to the fiscal year ending December 31, 2020, not later than the earlier of (x) the date allowed by the Securities and Exchange Commission for the filing of Form 10-K for such fiscal year for the Parent Borrower and (y) one hundred five (105) days after the end of such fiscal year), a consolidated balance sheet of the Parent Borrower as at the end of such fiscal year, and the related consolidated statements of income or operations, invested equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by (1) a report and opinion of a Registered Public Accounting Firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and applicable Securities Laws and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit or other material qualification or exception and (2) if required by Section 404 of Sarbanes-Oxley, an attestation report of such Registered Public Accounting Firm as to the Parent Borrower's internal controls pursuant to Section 404 of Sarbanes-Oxley;

(b)    not later than forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Parent Borrower (provided that, solely with respect to the fiscal quarters ending March 31, 2020, June 30, 2020 and September 30, 2020, not later than the earlier of (x) the date allowed by the Securities and Exchange Commission for the filing of Form 10-Q for such fiscal quarter for the Parent Borrower and (y) eighty-five (85) days after the end of such fiscal quarter), a consolidated balance sheet of the Parent Borrower and the

-111-

Consolidated Group as at the end of such fiscal quarter, and the related consolidated statements of income or operations, invested equity and cash flows for such fiscal quarter and for the portion of the Parent Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Parent Borrower as fairly presenting the financial condition, results of operations, invested equity and cash flows of the Consolidated Group in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(c)     simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 7.01(a) and (b) above, if during any of the periods for which financial statements are required to be delivered hereunder the Parent Borrower shall have one or more material Unrestricted Subsidiaries, then such financial statements shall be accompanied by information in reasonable detail summarizing the material differences between the financial statements delivered hereunder and the results of operations and financial condition of the Parent Borrower and its Subsidiaries without giving effect to the results or condition of any such Unrestricted Subsidiaries.

As to any information contained in materials furnished pursuant to Section 7.02, the Parent Borrower shall not be separately required to furnish such information under subsection (a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Parent Borrower to furnish the information and materials described in subsections (a) and (b) above at the times specified therein.

**7.02     Certificates; Other Information.**

Deliver to the Administrative Agent, each Lender and each L/C Issuer:

(a)     within five (5) Business Days following the delivery of the financial statements referred to in Section 7.01(a), a certificate of its independent certified public accountants certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default with respect to the financial covenant or, if any such Default or Event of Default shall exist, stating the nature and status of such event (which may be limited to the extent consistent with industry practice or the policy of the accounting firm);

(b)     within five (5) Business Days following each delivery of the financial statements referred to in Sections 7.01(a) and (b) (except as set forth in clause (i) below), a duly completed Compliance Certificate signed by a Responsible Officer of the Parent Borrower (i) setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the applicable financial covenant contained herein (provided that, with respect to the fiscal quarters ending June 30, 2020 and September 30, 2020, if, in compliance with Section 7.01(b), the Borrower delivers financial statements later than the date that is 45 days following such quarters, the portion of the Compliance Certificate referred to in this clause (i) shall nevertheless be duly executed and delivered within 5 Business Days following the date that is 45 days after such quarter), (ii) certifying that no Default or Event of Default exists as of the date thereof (or the nature and extent thereof and proposed actions with respect thereto), (iii) setting forth a list of each Subject Disposition and Involuntary Disposition effected during the fiscal quarter or fiscal year, as the case may be, covered by such financial statements, to the extent the Net Cash Proceeds received in such Subject Disposition (or series of related Subject Dispositions) or Involuntary Disposition (or series of related Involuntary Dispositions) exceed $35.0 million or the Net Cash Proceeds received in all Subject Dispositions or Involuntary Dispositions effected during such fiscal year exceeds $75.0 million (or the elapsed portion of such fiscal year in the case of a Compliance Certificate relating to a fiscal quarter), and whether the Parent Borrower and its Subsidiaries intend to reinvest the Net Cash Proceeds thereof or to use such Net Cash Proceeds to prepay the Loans, (iv) a calculation of the Cumulative Credit (in reasonable detail) as of the last day of the period covered by such financial statements and (v) setting forth a list of (A)

-112-

the Unrestricted Subsidiaries ~~and the Subsidiaries (other than Immaterial Subsidiaries) (A) formed or~~formed, acquired, ~~(B)~~ divested, liquidated, merged or otherwise disposed of, and (~~C) that ceased to meet~~ the ~~definition of "Immaterial~~B) the Subsidiaries~~" or (D)~~ of the Parent Borrower designated as Unrestricted Subsidiaries or ~~Material Subsidiaries, or~~ redesignated as ~~Subsidiaries~~a Restricted Subsidiary pursuant to a Subsidiary Redesignation, in each case during the period covered by such financial statements; provided that no such Compliance Certificate shall be required to be delivered in connection with the delivery of financial statements for the fiscal quarter ended September 30, 2019;

(c)    promptly upon receipt thereof, all notices of default under any Indebtedness having an aggregate principal amount of at least $75.0 million;

(d)    promptly, such additional information regarding the business, financial or corporate affairs of any Credit Party or any Subsidiary of a Credit Party, or compliance with the terms of the Credit Documents, as the Administrative Agent or any Lender (acting through the Administrative Agent) may from time to time reasonably request;

(e)    promptly after the furnishing thereof, copies of any material financial statement or report furnished to any holder of material Indebtedness of any Credit Party or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 7.01 or any other clause of this Section 7.02;

(f)    as soon as available, but in any event no more than ninety (90) days following the beginning of each fiscal year of the Parent Borrower, a detailed consolidated budget for the subsequent fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of and for each fiscal quarter of such fiscal year and setting forth the assumptions used for purposes of preparing such budget) and, promptly when available, any significant revisions of such budget;

(g)    within 15 Business Days after the date of any Major Disposition, the Parent Borrower shall notify the Administrative Agent thereof and whether and to what extent the Net Cash Proceeds received therefrom is intended to be used to reinvest or make prepayments pursuant to Section 2.06(b)(ii);

(h)    commencing with the calendar month ending on January 31, 2021 and for each subsequent calendar month ended while the financial covenant in Section 8.10(b) is in effect, not later than thirty (30) days after the end of each calendar month other than the months ending on a fiscal quarter, a Compliance Certificate setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with Section 8.10(b) as of the last day of such month; and

(i)    promptly following any request therefor, the Parent Borrower will provide documentation reasonably request by any Lender for purposes of compliance with the Beneficial Ownership Certification.

Documents required to be delivered pursuant to Section 7.01 or 7.02 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Parent Borrower posts such documents, or provides a link thereto on the Parent Borrower's website on the internet at the website address listed on Schedule 11.02; or (ii) on which such documents are posted on the Parent Borrower's behalf on an internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) including, to the extent the Lenders and the Administrative Agent have access thereto and such documents are available thereon, the EDGAR database and sec.gov; provided that the Parent Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents. Except for Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Parent Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

-113-

The Credit Parties hereby acknowledge that the Administrative Agent and/or the Lead Arrangers will make available to the Lenders and the L/C Issuers materials and/or information provided by or on behalf of the Credit Parties hereunder (collectively, the "Credit Party Materials") by posting the Credit Party Materials on IntraLinks or another similar electronic system (the "Platform") and that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Credit Parties or their securities) (each, a "Public Lender"). The Credit Parties hereby agree that so long as any Credit Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities (1) all Credit Party Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" (which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof), or otherwise indicated to the Administrative Agent as being "PUBLIC"; (2) by marking or otherwise indicating the Credit Party Materials "PUBLIC," the Credit Parties shall be deemed to have authorized the Agents, the Lead Arrangers, the L/C Issuers and the Lenders to treat such Credit Party Materials as not containing any material non-public information with respect to the Credit Parties or their securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Credit Party Materials constitute Information, they shall be treated as set forth in Section 11.07); (3) all Credit Party Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (4) the Administrative Agent and the Lead Arrangers shall be entitled to treat any Credit Party Materials that are not marked or otherwise indicated "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor."

### 7.03    Notification.

Promptly, and in any event within two Business Days after any Responsible Officer of the Parent Borrower or any of its material Subsidiaries obtains knowledge thereof, notify the Administrative Agent, each Lender and each L/C Issuer of:

      (a)    the occurrence of any Default or Event of Default;

      (b)    the filing or commencement of any litigation, investigation or proceeding affecting any Credit Party which would reasonably be expected to have a Material Adverse Effect;

      (c)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in liability of the Parent Borrower and its Subsidiaries in an aggregate amount exceeding $75.0 million; and

      (d)    any other occurrences or events that result in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 7.03 shall be accompanied by a statement of a Responsible Officer of the Parent Borrower setting forth the details of the occurrence or event requiring such notice and any action taken or proposed to be taken with respect thereto.

### 7.04    Preservation of Existence.

Except as otherwise permitted hereunder, do all things necessary to preserve and keep in full force and effect (x) its existence and (y) its rights, franchises and authority, except (i) to the extent, in the case of clauses (x) (with respect to any Subsidiary only and not the Parent Borrower) and (y), that the failure to do so would not have a Material Adverse Effect, (ii) with respect to any Subsidiary or the Parent Borrower, to the extent otherwise permitted by Section 8.04 hereof, and (iii) for the liquidation or dissolution of Subsidiaries if the assets of such Subsidiaries, to the extent such assets exceed estimated liabilities, are acquired by the Parent Borrower or a Wholly Owned Subsidiary of the Parent Borrower in such liquidation or dissolution (and, in the case of assets of a non-Wholly Owned Subsidiary, such assets are acquired by the Parent Borrower or a Wholly Owned Subsidiary of the Parent Borrower on a pro rata basis according to the Parent Borrower or such Wholly Owned Subsidiary's ownership in such Subsidiary); provided that Subsidiaries that are Guarantors may not be liquidated into Subsidiaries that are not Guarantors.

-114-

**7.05** **Payment of Taxes and Other Obligations.**

(a)    Except in each case to the extent that the failure to do so would not, individually or in the aggregate, have a Material Adverse Effect, pay and discharge (i) all Taxes imposed upon it, or upon its income or profits, or upon any of its properties, before they become delinquent (it being understood that, with respect to any Unrestricted Subsidiary, such Subsidiary shall comply with this clause (i) to the extent that any such obligation to pay and discharge such Taxes may become an obligation of the Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary)), (ii) all lawful claims (including claims for labor, material and supplies) that, if unpaid, might give rise to a Lien upon any of its properties, and (iii) except as prohibited hereunder, all of its other Indebtedness as it becomes due; provided that no such Person shall be required to pay any amount that is being contested in good faith by appropriate proceedings and for which adequate reserves, determined in accordance with GAAP, have been established, if such contest suspends enforcement or collection of the claim in question.

(b)    Timely and correctly file all Tax Returns required to be filed by it, except for failures to file that would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

**7.06** **Compliance with Law.**

Comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, a breach of which would result in a Material Adverse Effect, except where contested in good faith by appropriate proceedings diligently pursued. The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

**7.07** **Maintenance of Property.**

Maintain and preserve its material properties and equipment in good repair, working order and condition, normal wear and tear and casualty and condemnation excepted, and make all repairs, renewals, replacements, extensions, additions, betterments and improvements thereto as may be necessary or proper, to the extent and in the manner customary for similar businesses, except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

**7.08** **Insurance.**

Maintain at all times in force and effect insurance in such amounts, covering such risks and liabilities and with such deductibles or self-insurance retentions as determined by the Parent Borrower in its reasonable business judgment. The Collateral Agent shall be named as loss payee and/or additional insured, as its interests may appear, with respect to any such insurance providing coverage in respect of any Collateral under the Collateral Documents, and the Parent Borrower shall request that each provider of any such insurance to agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the Collateral Agent, that it will give the Collateral Agent thirty (30) days' prior written notice (except for nonpayment, which shall be 10 days' prior written notice) before any such policy or policies shall be altered in any material respect or canceled, and that no act or default of any member of the Consolidated Group or any other Person shall affect the rights of the Collateral Agent or the Lenders under such policy or policies. The insurance coverage for the Consolidated Group as of September 1, 2019 is described as to type and amount on Schedule 7.08.

**7.09** **Books and Records.**

Maintain (a) proper books of record and account, in which true and correct entries in conformity with GAAP shall be made of all financial transactions and matters involving the assets and business of the Parent Borrower or such Subsidiary, as the case may be, and (b) such books of record and account are in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Parent Borrower or such Subsidiary.

**7.10    Inspection Rights.**

Permit representatives and independent contractors of the Administrative Agent or any Lender (in the case of such Lender, coordinated through the Administrative Agent) to (i) to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Parent Borrower and (ii) visit and inspect any of its properties and examine its corporate, financial and operating records, once per fiscal year of the Parent Borrower at such reasonable times during normal business hours, upon reasonable advance notice to the Parent Borrower; provided, however, that when an Event of Default exists the Administrative Agent or any of its representatives or independent contractors or any Lender (in the case of such Lender, coordinated through the Administrative Agent) may do any of the foregoing at the expense of the Parent Borrower at any time during normal business hours. Notwithstanding any provision to the contrary, all meetings and inspections requested and held pursuant to this Section 7.10 are subject to applicable attorney-client privilege exceptions and compliance with

non-disclosure and confidentiality agreements between the Parent Borrower, any of its Subsidiaries and third parties. The Administrative Agent and the Lenders shall give the Parent Borrower the opportunity to participate in any discussions with the Borrowers' accountants.

**7.11    Use of Proceeds.**

Use the proceeds of (a) the Term B-4 Loans to repay in full and terminate the Term B-3 Loans that are not Converted Term B-3 Loans, (b) the Delayed Draw Term A Loans for general corporate purposes (including to finance Permitted Acquisitions and fees and expenses associated therewith), (c) the Dollar Revolving Loans, the Limited Currency Revolving Loans and the Multicurrency Revolving Loans, from time to time following the Amendment No. 6 Effective Date and (d) the 2020-1 Incremental Revolving Loans, from time to time following the Amendment No. 7 Effective Date, for general corporate purposes and, in each case of clause (a), (b), (c) and (d), not in contravention of any Law or of any Credit Document. No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Federal Reserve Board, including Regulation U.

**7.12    Joinder of Subsidiaries as Guarantors.**

(a)    ~~With respect to the formation, acquisition (or other receipt of interests) or existence of any Subsidiary that is not required to become a Guarantor, notify~~the ~~Administrative Agent of such formation, acquisition (or other receipt of interests) or existence of any such Subsidiary, together~~Together and simultaneously with its delivery of a Compliance Certificate pursuant to Section 7.02(b), deliver a written notice setting forth a list (the "New Guarantor List") of all Subsidiaries that would be required to become Guarantors pursuant to Section 7.12(b)(I) or 7.12(b)(II) below which were formed, acquired (or other interests received), brought into existence (including, without limitation, upon the formation of any such Subsidiary resulting from a division of a limited liability company) or that ceased to constitute Excluded Subsidiaries, in each case during the period covered by the financial statements attached to such Compliance Certificate (it being understood that with respect to the annual financial statements, the fourth quarter of such year is the period referenced in this clause (a)), which notice shall include information as to the jurisdiction of organization, the number and class of Capital Stock outstanding and ownership thereof (including options, warrants, rights of conversion or purchase relating thereto). Together with each delivery of the Compliance Certificate required to be delivered within five (5) Business Days of the delivery of financial statements pursuant to Section 7.01(a), (i) in the case of the Compliance Certificate being delivered in connection with such financial statements covering the period ending December 31, 2021, deliver a list of all Subsidiaries that constituted Excluded Subsidiaries as of the last day of the period covered by such financial statements and (ii) in the case of each other Compliance Certificate, deliver a list of all Subsidiaries that became Excluded Subsidiaries during the period covered by such financial statements.

(b)    With respect to the formation, acquisition (or other receipt of interests) or existence (including, without limitation, upon the formation of any Subsidiary resulting from a division of a limited liability company) of any Subsidiary that is not an Excluded Subsidiary (and with respect to any Subsidiary that ceases to be an Excluded Subsidiary), (I) in the case of any such Subsidiary that would constitute a Material Subsidiary (solely for the purposes of this clause (I), without giving effect to the proviso in the definition of Immaterial Subsidiary when

-116-

determining whether such Subsidiary constitutes a Material Subsidiary), within forty-five (45) days (or such longer period as the Administrative Agent may agree in its sole discretion) of the formation, acquisition, cessation, division or other receipt of interests of any such Subsidiary, cause and (II) in the case of any other Subsidiary that is not an Excluded Subsidiary (other than by reason of clause (a) of the definition of Excluded Subsidiary), no later than theearlier of (X) thirty (30) days from the date the New Guarantor List containing such Subsidiary was required to have been prepared and delivered pursuant to Section 7.12(a) and (Y) the date such Subsidiary incurs or guarantees Indebtedness for borrowed money with a principal amount of $100.0 million or greater (or such longer period asthe Administrative Agent may agree in its sole discretion), cause, in the case of each of clauses (I) and (II), the joinder of such Subsidiary as (x) in the case of a Domestic Subsidiary, as a Guarantor of the Domestic Obligations (provided that a CFC Holdco shall not be a Guarantor of the Domestic Obligations) and any Foreign Obligations or (y) in the case of a Foreign Subsidiary, as a Guarantor of the Foreign Obligations, in each case pursuant to Joinder Agreements (or such other documentation in form and substance reasonably acceptable to the Administrative Agent) accompanied by Organization Documents, take all actions necessary to create and perfect a security interest in favor of the Collateral Agent for the benefit of the applicable Secured Parties in its assets to the extent required by the applicable Collateral Documents (including the delivery to the Collateral Agent of all intercompany notes owing to such Subsidiary), together with undated alonges executed in blank, and all filings required under applicable law (including filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent) and, if reasonably requested by the Administrative Agent, deliver favorable opinions of counsel to such Subsidiary, in form and substance reasonably satisfactory to the Administrative Agent; provided that (A) no Foreign Subsidiary shall be required to comply with any of the foregoing unless a Foreign Borrower has then been added and not terminated and (B) no Foreign Subsidiary located in a jurisdiction other than the jurisdiction of a Foreign Borrower shall be required to comply with any of the foregoing until such time as the Outstanding Amount of the Foreign Borrowers exceeds $250.0 million.

(a)     For the avoidance of doubt, if (i) an Excluded Subsidiary shall cease to be an Excluded Subsidiary, (ii) an Unrestricted Subsidiary shall be redesignated as a Subsidiary pursuant to a Subsidiary Redesignation or (iii) a Foreign Borrower shall have been added and a Foreign Subsidiary required to become a Guarantor pursuant to clause (b) above, such Subsidiary shall thereupon comply with the foregoing; provided that this Section 7.12 shall not require the creation or perfection of pledges of or security interests in particular assets of the Foreign Subsidiaries or guarantees from particular Foreign Subsidiaries if, to the extent and for so long as, the Administrative Agent and the Parent Borrower jointly determine, in writing, that the cost to the Borrowers of creating or perfecting such pledges or security interests in such assets or obtaining such guarantees from Foreign Subsidiaries (in each case, taking into account, among other things, (i) any material adverse Tax or other consequences to the Borrowers and the other Subsidiaries (including the imposition of withholding or other material Taxes or costs on Lenders) and (ii) with respect to security interests in Equity Interests in Persons that are not, directly or indirectly, wholly owned by the Parent Borrower, any restrictions on the creation or perfection of such security interests (including the costs of obtaining necessary consents and approvals from other holders (other than the Parent Borrower and its Affiliates) of Equity Interests in such Persons)) shall be commercially unreasonable in view of the benefits to be obtained by the Lenders therefrom.

**7.13     Pledge of Capital Stock.**

Pledge or cause to be pledged to the Collateral Agent for the benefit of the applicable Secured Parties to secure the Obligations, other than in the case of Excluded Property, one hundred percent (100%) of the issued and outstanding Capital Stock of each Subsidiary to the extent owned by a Credit Party within forty-five (45) days (or such longer period as the Administrative Agent may agree in its sole discretion) of its formation, acquisition or other receipt of such interests; provided that, solely with respect to the Domestic Obligations, the pledge of the Capital Stock of any CFC or any CFC Holdco shall be limited to Capital Stock representing sixty-five percent (65%) of the voting and 100% of non-voting issued Capital Stock of each such CFC and CFC Holdco to the extent directly owned by a Credit Party, in each case pursuant to the applicable Collateral Documents or pledge joinder agreements, together with, if reasonably requested by the Administrative Agent, opinions of counsel and any filings and deliveries reasonably requested by the Collateral Agent in connection therewith to perfect (but with respect to perfection under foreign laws, only to the extent required under Section 5.03 or Section 7.12) the security interests therein, all in form and substance reasonably satisfactory to the Administrative Agent.

-117-

**7.14    Pledge of Other Property.**

With respect to each Credit Party, pledge and grant a security interest in all of its personal property, tangible and intangible, owned and leased (except (a) Excluded Property, (b) as otherwise set forth in Section 7.13 with respect to Capital Stock and (c) as otherwise set forth in the Collateral Documents) to secure (x) in the case of a Domestic Credit Party, the Obligations, and (y) in the case of a Foreign Credit Party, the Foreign Obligations, in each case within forty-five (45) days (or such longer period as the Administrative Agent may agree in its sole discretion) of the acquisition or creation thereof pursuant to such pledge and security agreements, joinder agreements or other documents as may be required, together with opinions of counsel and any filings and deliveries reasonably requested by the Collateral Agent in connection therewith to perfect (or the equivalent under applicable foreign laws) the security interests therein, all in form and substance reasonably satisfactory to the Administrative Agent.

**7.15    Further Assurances Regarding Collateral.**

(a)    Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error relating to the granting or perfection of security interests that may be discovered in any Credit Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or the Required Lenders through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Credit Documents, (ii) to the fullest extent permitted by applicable law, subject any Credit Party's or any Credit Party's Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the holders of the Obligations the rights granted to the holders of the Obligations under any Credit Document or under any other instrument executed in connection with any Credit Document to which any Credit Party or any Credit Party's Subsidiaries is or is to be a party, and cause each of the Parent Borrower's Subsidiaries to do so.

(b)    Notwithstanding anything to the contrary provided herein or in any Credit Document, the Parent Borrower and the Subsidiaries shall not be required to deliver control agreements with respect to deposit accounts or securities accounts.

**7.16    Rating.**

The Parent Borrower shall use its commercially reasonable efforts to obtain and maintain a corporate family and/or corporate credit rating, as applicable, and ratings in respect of this Credit Agreement, in each case, from each of Moody's and S&P.

**7.17    Ownership of Foreign Borrowers.**

Each of the Foreign Borrowers will, at all times, be a direct or indirect wholly owned subsidiary of the Parent Borrower.

**7.18    Redemption of 2022 Senior Notes.**

The Parent Borrower shall redeem all of the 2022 Senior Notes on or before December 31, 2019 in accordance with the redemption provisions of the indenture governing the 2022 Senior Notes.

**7.19    Post-Closing Matters.**

The Parent Borrower shall complete the tasks set forth on Schedule 7.19, in each case within the time limits specified on such schedule.

-118-

Exhibit 2, page 265

**ARTICLE VIII**

**NEGATIVE COVENANTS**

Until the Loan Obligations shall have been paid in full or otherwise satisfied, and the Commitments hereunder shall have expired or been terminated, the Parent Borrower will not, and will not permit any of its Subsidiaries to:

      **8.01**    **Liens.**

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

      (a)    Liens created pursuant to the Credit Documents;

      (b)    Liens under the Collateral Documents given to secure obligations under Swap Contracts between any Credit Party and the Administrative Agent, any Lead Arranger, any Lender or Affiliate of a Lender or any Person that was the Administrative Agent, a Lead Arranger, a Lender or Affiliate of a Lender at the time it entered into such Swap Contract; provided that such Swap Contracts are otherwise permitted under Section 8.03;

      (c)    Liens existing on the Amendment No. 6 Effective Date and listed on Schedule 8.01, together with any extensions, replacements, modifications or renewals of the foregoing; provided that the collateral interests are not broadened or increased or secure any Property not secured by such Liens on the Amendment No. 6 Effective Date (but shall be permitted to apply to after-acquired property affixed or incorporated into the property covered by such Lien and the proceeds and products of the foregoing);

      (d)    Liens for Taxes, assessments or governmental charges or levies not yet due or to the extent non-payment thereof is permitted under Section 7.05;

      (e)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business; provided that such Liens secure only amounts not yet due and payable or, if due and payable, are unfiled and no other action has been taken to enforce the same, are not overdue by more than 30 days, or are being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established (and as to which the property subject to any such Lien is not yet subject to a foreclosure, sale or loss proceeding on account thereof (other than a proceeding where foreclosure, sale or loss has been stayed));

      (f)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations (other than obligations under ERISA), bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

      (g)    Liens in connection with attachments or judgments (including judgment or appeal bonds) that do not result in an Event of Default under Section 9.01(i);

      (h)    easements, rights-of-way, covenants, conditions, restrictions (including zoning restrictions), declarations, rights of reverter, minor defects or irregularities in title and other similar charges or encumbrances, whether or not of record, that do not, in the aggregate, interfere in any material respect with the ordinary course of business of the Parent Borrower or its Subsidiaries;

      (i)    Liens on property of any Person securing purchase money Indebtedness or Indebtedness in respect of Sale and Leaseback Transactions permitted under Section 8.14 (including capital leases and

-119-

Synthetic Leases) of such Person, in each case to the extent incurred under Section 8.03(c) (or any refinancing of such Indebtedness incurred under Section 8.03(l)); provided that any such Lien attaches only to the Property financed or leased and such Lien attaches prior to, at the time of or within one hundred eighty (180) days after the later of the date of acquisition of such property or the date such Property is placed in service (or, in the case of Liens securing a refinancing of such Indebtedness pursuant to Section 8.03(l), any such Lien attaches only to the Property that was so financed with the proceeds of the Indebtedness so refinanced);

(j)   licenses, sublicenses, leases or subleases granted to others not interfering in any material respect with the business of any member of the Consolidated Group;

(k)   any interest or title of a lessor or sublessor under, and Liens arising from UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases and subleases permitted by this Credit Agreement;

(l)   Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods and Liens deemed to exist in connection with Investments in repurchase agreements that constitute Investments permitted by Section 8.02 hereof;

(m)   normal and customary contractual rights of setoff upon deposits of cash or other Liens relating to bankers liens, rights of setoff or similar rights in favor of banks or other depository institutions not securing Indebtedness;

(n)   Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection;

(o)   Liens on Property securing obligations incurred under Section 8.03(h) (or any refinancing of such Indebtedness incurred under Section 8.03(l)); provided that the Liens are not incurred in connection with, or in contemplation or anticipation of, the acquisition and do not attach or extend to any Property other than the Property so acquired (or, in the case of Liens securing a refinancing of such Indebtedness pursuant to Section 8.03(l), the Property acquired with the proceeds of the Indebtedness so refinanced);

(p)   other Liens; provided that during the Restricted Period such Liens do not secure principal obligations exceeding $150.0 million in an aggregate amount at any time outstanding; provided further that, following the end of the Restricted Period such Liens do not secure principal obligations exceeding $300.0 million in an aggregate amount at any time outstanding; provided further that, following the end of the Restricted Period, such amount shall be increased to $375.0 million if, after giving pro forma effect to the incurrence of such obligations, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Consolidated Total Leverage Ratio would not be in excess of 4.25 to 1.00;

(q)   Liens in respect of any Indebtedness permitted under Section 8.03(g) to the extent such Liens extend only to Property of the Foreign Subsidiary or Foreign Subsidiaries incurring such Indebtedness (other than a Foreign Credit Party);

(r)   pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Parent Borrower or any Subsidiary;

(s)   Liens solely on any cash earnest money deposits made by the Parent Borrower or any of the Subsidiaries in connection with any letter of intent or purchase agreement in respect of any Investment permitted hereunder;

(t)   Liens securing obligations incurred pursuant to Section 8.03(n);

-120-

(u)    Liens on Capital Stock in joint ventures securing obligations of such joint venture, to the extent required by the terms of the organizational documents or material contracts of such joint venture;

(v)    Liens on goods or inventory the purchase, shipment or storage price of which is financed by a bank guarantee or bankers' acceptance issued or created for the account of the Parent Borrower or any Subsidiary in the ordinary course of business so long as such Liens are extinguished when such goods or inventory are delivered to the Parent Borrower or a Subsidiary; provided that such Lien secures only the obligations of the Parent Borrower or such Subsidiaries in respect of such bankers' acceptance or bank guarantee to the extent permitted under Section 8.03;

(w)    Liens securing insurance premiums financing arrangements; provided that such Liens are limited to the applicable unearned insurance premiums;

(x)    Liens in favor of any Credit Party; provided that if any such Lien shall cover any Collateral, the holder of such Lien shall execute and deliver to the Administrative Agent a subordination agreement in form and substance reasonably satisfactory to the Administrative Agent;

(y)    Liens on the Capital Stock of Unrestricted Subsidiaries;

(z)    Liens on deposits and accounts of Foreign Subsidiaries to secure Indebtedness incurred pursuant to Section 8.03(v);

(aa)   Liens on (i) assets of any member of the Academy Music Group securing AMG Indebtedness or (ii) on assets of any member of the AIL Group securing AIL Indebtedness;

(bb)   Liens on Permitted Deposits securing customary obligations that are incurred in the ordinary course of business;

(cc)   Liens on Collateral securing Obligations in respect of Refinancing Notes/Loans; provided that the holders of such Refinancing Notes/Loans or their representative is or becomes party to a customary intercreditor agreement and all such Liens are subject to such intercreditor agreement;

(dd)   Liens on the Collateral securing Incremental Equivalent Debt so long as such Liens are, to the extent secured on a *pari passu* basis with the Obligations, shall be subject to a customary *pari passu* intercreditor agreement or, to the extent secured on a junior lien basis with the Obligations, shall be subject to a customary junior priority intercreditor agreement, in each case, on terms that are reasonably satisfactory to the Administrative Agent; and

(ee)   Liens on ticket inventory and Proceeds thereof (including on deposits accounts holding such Proceeds) securing Indebtedness not exceeding $150.0 million in an aggregate principal amount at any time outstanding; provided that such Indebtedness shall only be used to finance advances to artists and performers and similar expenses.

**8.02    Investments.**

Make or permit to exist any Investments, except:

(a)    cash and Cash Equivalents of or to be owned by the Parent Borrower or a Subsidiary;

(b)    Investments existing on, contractually committed or announced but unconsummated as of, the Amendment No. 6 Effective Date and set forth on Schedule 8.02(b) and any extensions, renewals or reinvestments thereof, so long as the aggregate amount of any Investment pursuant to this clause (b) is not increased at any time above the amount of such Investment existing on the Amendment No. 6 Effective

-121-

Date, unless such increase is permitted by any clause of this Section 8.02 (other than by this clause (b)), in which case the capacity of such other clause shall be reduced by such increase;

(c)     loans or advances to officers, directors and employees and consultants of the Parent Borrower and Subsidiaries made for travel, entertainment, compensation, relocation and other ordinary business purposes in an aggregate amount not to exceed $40.0 million at any time outstanding or, to the extent not used as part of or to increase the Cumulative Credit, in connection with such person's purchase of equity of the Parent Borrower;

(d)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers, clients, developers or purchasers or sellers of goods or services made in the ordinary course of business;

(e)     except to the extent constituting an Acquisition, Investments by the Parent Borrower and its Subsidiaries in Domestic Credit Parties;

(f)     Investments by the Parent Borrower and Domestic Subsidiaries in Restricted Subsidiaries that are not Domestic Credit Parties (and, in the case of a Permitted Acquisition, in Persons that become Subsidiaries that are not Domestic Credit Parties upon consummation of such Permitted Acquisition) in an aggregate amount at any time not to exceed (A) during the Restricted Period, $300.0 million and (B) following the end of the Restricted Period ,the greater of $500.0 million and 7.5% of Consolidated Tangible Assets at such time;

(g)     Investments by Foreign Subsidiaries in any member of the Consolidated Group (including other Foreign Subsidiaries) and, in the case of a Permitted Acquisition, in Persons that become a members of the Consolidated Group (including Foreign Subsidiaries) upon consummation of such Permitted Acquisition;

(h)     Support Obligations incurred pursuant to Section 8.03;

(i)     Investments comprised of Permitted Acquisitions;

(j)     advances in the ordinary course of business to secure developer, promoter, manager and artist contracts of the Parent Borrower and its Subsidiaries;

(k)     Investments at any time outstanding in an aggregate amount not to exceed (A) during the Restricted Period, $300.0 million and (B) following the end of the Restricted Period, the greater of $500.0 million and 7.5% of Consolidated Tangible Assets at such time plus, following the Specified Restrictions Termination Date, so long as (x) no Default shall have occurred and be continuing or exist after giving effect thereto and (y) after giving effect on a Pro Forma Basis to the Investment to be made, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and if the Investment is greater than $100.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (y)), the amount of the Cumulative Credit at such time; provided that if any Investment is made pursuant to this Section 8.02(k) in any Person that is not a Domestic Credit Party and such Person thereafter becomes a Domestic Credit Party, such Investment shall thereafter be deemed to have been made pursuant to Section 8.02(e);

(l)     Investments representing non-cash consideration received in connection with any Subject Disposition permitted pursuant to Section 8.05;

-122-

(m)    Investments in joint ventures in an aggregate amount not to exceed $300.0 million at any time outstanding;

(n)    Swap Contracts allowed by Section 8.03(d);

(o)    Investments resulting from pledges and deposits under Section 8.01(f), (l), (r), (s) or (bb);

(p)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by the Parent Borrower as a result of a foreclosure by the Parent Borrower or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(q)    loans or advances or other similar transactions with customers, distributors, clients, developers, promoters, managers, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business, regardless of frequency;

(r)    to the extent not used as part of or increasing the Cumulative Credit, any Investment to the extent procured in exchange for the issuance of Qualified Capital Stock;

(s)    Investments to the extent consisting of the redemption, purchase, repurchase or retirement of any common Capital Stock permitted under Section 8.06;

(t)    advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Parent Borrower or such Subsidiary;

(u)    (A) guarantees by the Parent Borrower or any Subsidiary of operating leases or of other obligations that do not constitute Indebtedness, in each case entered into by the Parent Borrower or any Subsidiary in the ordinary course of business and (B) Investments consisting of guarantees permitted by Section 8.03;

(v)    Investments consisting of the non-exclusive licensing of intellectual property pursuant to joint marketing arrangements with other Persons otherwise permitted hereunder;

(w)    Investments consisting of Permitted Deposits;

(x)    Designated Investments set forth on Schedule 8.02(x);

(y)    Investments received in exchange for the making of Restricted Payments under Section 8.06(b);

(z)    Investments in Subsidiaries (other than Unrestricted Subsidiaries) organized under the laws of a jurisdiction in Mexico, Central America or South America in an aggregate principal amount at any time outstanding not to exceed $500.0 million;

(aa) other Investments provided that, at the time of making such Investments, (x) no Event of Default shall have occurred and be continuing or would result therefrom and (y) on a pro forma basis, the Consolidated Total Leverage Ratio is equal to or less than 4.00 to 1.00;

(bb) any payments in connection with a Permitted Bond Hedge Transaction; and

(cc) Investments in Subsidiaries (other than Unrestricted Subsidiaries) organized under the laws of a jurisdiction in Canada in an aggregate principal amount at any time outstanding not to exceed $150.0 million;

-123-

Exhibit 2, page 270

(dd)    any Investment in one or more Restricted Subsidiaries or Unrestricted Subsidiaries in the form of cash, Cash Equivalents and/or real property in an aggregate amount (with the amount of any Investment consisting of real property being valued at the fair market value thereof at the time such Investment is made) for all such Investments made pursuant to this Section 8.02(dd) not to exceed (A) in the 2022 calendar year, $500.0 million and (B) in each calendar year following the calendar year 2022, the greater of (I) $500.0 million and (II) 7.5% of Consolidated Tangible Assets at the time such Investment is made, so long as, if any such Investment is made in reliance of clause (B)(II) of this Section 8.02(dd), (x) no Default shall have occurred and be continuing or exist after giving effect thereto and (y) after giving effect on a Pro Forma Basis to the Investment to be made, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b), the Parent Borrower would be in compliance with Section 8.10 (and if the Investment is greater than $100.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (y)); provided that if any Investment is made pursuant to this Section 8.02(dd) in any Person that is not a Domestic Credit Party and such Person thereafter becomes a Domestic Credit Party, such Investment shall thereafter be deemed to have been made pursuant to Section 8.02(e); and

(ee)    any Investment in one or more Unrestricted Subsidiaries in the form of real property in an aggregate amount (with the amount of real property being valued at the fair market value thereof at the time such Investment is made) for all such Investments made pursuant to this Section 8.02(ee) not to exceed (A) in the 2022 calendar year, $250.0 million and (B) in each calendar year following the calendar year 2022, the greater of (I) $250 million and (II) 5.0% of Consolidated Tangible Assets at the time such Investment is made, so long as, if any such Investment is made in reliance of clause (B)(II) of this Section 8.02(ee), (x) no Default shall have occurred and be continuing or exist after giving effect thereto and (y) after giving effect on a Pro Forma Basis to the Investment to be made, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b), the Parent Borrower would be in compliance with Section 8.10 (and if the Investment is greater than $100.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (y)); provided that if any Investment is made pursuant to this Section 8.02(ee) in any Person that is not a Domestic Credit Party and such Person thereafter becomes a Domestic Credit Party, such Investment shall thereafter be deemed to have been made pursuant to Section 8.02(e).

**8.03    Indebtedness.**

Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness existing or arising under this Credit Agreement and the other Credit Documents;

(b)    Indebtedness existing on the Amendment No. 6 Effective Date set forth on Schedule 8.03;

(c)    capital lease obligations and purchase money Indebtedness (including obligations in respect of capital leases) to finance the purchase, acquisition, construction, development, enlargement, repair or improvement of fixed or capital assets, at any time outstanding (when aggregated with the aggregate amount of refinancing Indebtedness outstanding at such time pursuant to Section 8.03(l) in respect of Indebtedness incurred pursuant to this Section 8.03(c)) not to exceed (A) during the Restricted Period, $150.0 million and (B) following the end of the Restricted Period, $300.0 million; provided that such Indebtedness when incurred shall not exceed the purchase price of the asset(s) financed;

(d)    obligations under Swap Contracts permitted by Section 8.15;

(e)    unsecured intercompany Indebtedness among members of the Consolidated Group to the extent permitted by Section 8.02(e), (f), (g) or (k);

-124-

(f)    unsecured Indebtedness of the Parent Borrower to the extent (i) no Default or Event of Default has occurred and is continuing or would result from the incurrence thereof at such time; (ii) after giving pro forma effect to the incurrence of such Indebtedness (including application of the proceeds thereof), as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and if the Indebtedness incurred is greater than $150.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (ii)); (iii) such Indebtedness has a stated maturity no earlier than the Term B-4 Loans and has a Weighted Average Life to Maturity that is no shorter than the Term B-4 Loans (other than, with respect to maturity, customary extension rollover provisions (including by conversion or exchange) for bridge facilities, in which case, such maturity may be earlier than that of the Term B-4 Loans if such maturity is automatically extended upon the initial maturity date to a date not earlier than the maturity date of the Term B-4 Loans); (iv) such Indebtedness does not have prepayment or redemption events that are less favorable to the Parent Borrower and its Subsidiaries than those relating to the Term B-4 Loans, except, to the extent such Indebtedness consists of Convertible Indebtedness, for change of control and other events that are typical for that type of Indebtedness (other than a scheduled "put" date prior to the maturity of the Term B-4 Loans); and (v) such Indebtedness has other terms that are, in the case of this clause (v), taken as a whole, not materially less favorable to the Parent Borrower and its Subsidiaries than the terms of the Credit Agreement, as determined in good faith by the Parent Borrower (other than pricing, rate floors, discounts, fees, premiums and optional prepayment or redemption provisions and any provisions customary for convertible bonds); provided that such Indebtedness may benefit from unsecured guarantees from the Domestic Guarantors on the same basis as the Parent Borrower has issued such Indebtedness;

(g)    Indebtedness of Foreign Subsidiaries and guarantees thereof by other Foreign Subsidiaries, without duplication, in an aggregate principal amount at any time outstanding not to exceed (A) during the Restricted Period, $300.0 million and (B) following the end of the Restricted Period, the greater of (i) $500.0 million and (ii) 7.5% of Consolidated Tangible Assets at such time;

(h)    Indebtedness acquired or assumed pursuant to a Permitted Acquisition; provided that (a) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition and (b) after giving pro forma effect to the incurrence of such Indebtedness, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10; provided further that during the Restricted Period, the aggregate principal amount of Indebtedness at any time acquired or assumed pursuant to this Section 8.03(h) shall not exceed $200.0 million; provided further that, during the Restricted Period, to the extent any Indebtedness acquired or assumed pursuant to this Section 8.03(h) is secured by the Collateral on a pari passu basis with the Obligations hereunder, then the Incremental Base Amount shall be reduced by the principal amount of Indebtedness then acquired or assumed;

(i)    Indebtedness arising under any performance or surety bond, completion bond or similar obligation entered into in the ordinary course of business consistent with past practice;

(j)    other Indebtedness of the Parent Borrower and its Subsidiaries (and guarantees thereof, without duplication) in an aggregate principal amount at any time outstanding not to exceed (A) during the Restricted Period, $250.0 million and (B) following the end of the Restricted Period, the greater of (i) $500.0 million and (ii) 7.5% of Consolidated Tangible Assets at such time;

(k)    Indebtedness incurred by the Parent Borrower under (i) the Existing Senior Unsecured Debt (and guarantees by the Domestic Guarantors thereof), and (ii) the 2023 Convertible Notes;

-125-

(l)  any refinancing of Indebtedness incurred or outstanding pursuant to Section 8.03(b), (c), (f), (h) or (k) so long as (i) if the Indebtedness being refinanced is Subordinated Debt, then such refinancing Indebtedness shall be at least as subordinated in right of payment and otherwise to the Obligations as the Indebtedness being refinanced, (ii) unless permitted pursuant to another clause of this Section 8.03 (and reducing availability under such other clause), the principal amount of the refinancing Indebtedness is not greater than the principal amount of the Indebtedness being refinanced, together with any premium paid, and accrued interest thereon and reasonable fees in connection therewith and reasonable costs and expenses incurred in connection therewith, (iii) the final maturity and Weighted Average Life to Maturity of the refinancing Indebtedness is not earlier or shorter, as the case may be, than the Indebtedness being refinanced; provided that in the case of a refinancing of Indebtedness incurred or outstanding pursuant to Section 8.03(k)(i) the final maturity and Weighted Average Life to Maturity of the refinancing Indebtedness is not earlier or shorter, as the case may be, than that of the Term B-4 Loans, (iv) no Subsidiary (other than a Domestic Credit Party) that is not an obligor with respect the Indebtedness to be refinanced shall be an obligor with respect to the refinancing Indebtedness and (v) other than with respect to a refinancing of Convertible Indebtedness, in the case of this clause (v), the material terms (other than as to interest rate, which shall be on then market terms, or as otherwise specified in any of clauses (i) through (iv) of this clause (l)) of the refinancing Indebtedness taken as a whole are at least as favorable to the Consolidated Group and the Lenders as under the Indebtedness being refinanced;

(m)  overdrafts paid within 10 Business Days;

(n)  Indebtedness in respect of trade letters of credit, warehouse receipts or similar instruments issued to support performance obligations (other than obligations in respect of Indebtedness) in the ordinary course of business;

(o)  Indebtedness supported by a Letter of Credit, in a principal amount not in excess of the stated amount of such Letter of Credit;

(p)  Indebtedness consisting of (i) the financing of insurance premiums or (ii) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(q)  Indebtedness representing deferred compensation to employees of the Parent Borrower or any Subsidiary incurred in the ordinary course of business;

(r)  Indebtedness consisting of promissory notes issued by the Parent Borrower to current or former officers, directors and employees, their respective estates, spouses or former spouses issued in exchange for the purchase or redemption by the Parent Borrower of Qualified Capital Stock permitted by Section 8.06(f); provided that (a) the Parent Borrower shall be able to make a Restricted Payment pursuant to Section 8.06(f) in an amount equal to the principal amount of each such note at the time such note is issued, and an amount equal to the principal amount of each such note shall reduce the amount of Restricted Payments able to be made under Section 8.06(f) and (b) the Parent Borrower shall be able to make a Restricted Payment pursuant to Section 8.06(f) in the amount of any other payment on each such note at the time such payment is made, and each such payment shall reduce the Restricted Payments available to be able to be made under Section 8.06(f);

(s)  Indebtedness consisting of obligations of the Parent Borrower or any Subsidiary under deferred compensation, indemnification, adjustment of purchase or acquisition price or other similar arrangements incurred by such Person in connection with the Transactions and Permitted Acquisitions or any other Investment expressly permitted hereunder;

(t)  all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (s) above and clauses (w) through (aa) below;

-126-

(u)    Support Obligations by any member of the Consolidated Group in respect of Indebtedness incurred under clauses (a) through (t) of this Section 8.03, solely to the extent such member of the Consolidated Group would have itself been able to originally incur such Indebtedness;

(v)    Indebtedness of Foreign Subsidiaries arising under Euro-denominated and Sterling-denominated cash pooling arrangements; provided that the net obligations (after notional offsets for pooling participants, cash and Cash Equivalents) for such shall not exceed €10,000,000 for Euro-denominated arrangements and £10,000,000 for Sterling-denominated, and such Indebtedness may benefit from cross-guarantees from pooling participants and a guarantee from the Parent Borrower;

(w)    AMG Indebtedness;

(x)    AIL Indebtedness and any Support Obligations by the Parent Borrower in respect of such AIL Indebtedness;

(y)    Indebtedness under Refinancing Notes/Loans;

(z)    Incremental Equivalent Debt in an aggregate principal amount not to exceed, for all the Incremental Equivalent Debt incurred after the Amendment No. 8 Effective Date, the sum of (i) the Incremental Base Amount, plus amounts referred to in Section 2.01(f)(i)(y) minus the aggregate principal amount of Incremental Loan Facilities incurred pursuant to Section 2.01(f)(i)(x) or (y) plus (ii) except during the Restricted Period, an additional amount of secured Incremental Equivalent Debt if, after giving Pro Forma Effect to the incurrence of such additional amount as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05) as if any Indebtedness had been outstanding on the date of such incurrence on the last day of such period, the Senior Secured Leverage Ratio is equal to or less than 3.75:1.00; provided that, in each case, the maximum amount of Incremental Equivalent Debt available to be incurred is determined without giving effect to any incurrence under the Incremental Base Amount that is incurred substantially simultaneously with amounts under this clause (ii); provided further that the Borrowers shall be deemed to have utilized the amounts under clause (ii) prior to utilization of the amounts under clause (i);

(aa)    Indebtedness incurred by any Subsidiary of Parent Borrower organized under the laws of a jurisdiction of Australia (which is not guaranteed by any Subsidiary that is not organized under the laws of a jurisdiction of Australia) in an aggregate principal amount at any time outstanding not to exceed the Dollar Equivalent of AUS$75.0 million;

(bb)    other unsecured Indebtedness of the Parent Borrower (but which shall not be guaranteed by, or otherwise be an obligation of, any Subsidiary of Borrower) in an aggregate principal amount at any time outstanding not to exceed $460.0 million; provided such Indebtedness has a stated maturity no earlier than that of the Revolving Facility as of the Amendment No. 6 Effective Date and has a Weighted Average Life to Maturity that is no shorter than that of the Revolving Facility as of the Amendment No. 6 Effective Date; provided further that after giving pro forma effect to the incurrence of such Indebtedness (including application of the proceeds thereof), as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (bb)); and

(cc)    Subject to Section 7.18, the 2022 Senior Notes.

-127-

For purposes of determining compliance with this Section 8.03, (A) Indebtedness need not be permitted solely by reference to one category of permitted Indebtedness (or any portion thereof) described in Sections 8.03(a) through (bb) but may be permitted in part under any relevant combination thereof, (B) in the event that an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Indebtedness (or any portion thereof) described in this Section 8.03(a) through (bb), the Parent Borrower may, in its sole discretion, classify, reclassify or divide such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 8.03 and will be entitled to only include the amount and type of such item of Indebtedness (or any portion thereof) in one of the above clauses (or any portion thereof) and such item of Indebtedness (or any portion thereof) shall be treated as having been incurred or existing pursuant to only such clause or clauses (or any portion thereof); provided that (i) all Indebtedness outstanding under the Credit Documents will be deemed to have been incurred in reliance only on the exception in clause (a) of this Section 8.03, (ii) the Existing Senior Unsecured Debt will be deemed to have been incurred in reliance only on the exception in clause (k)(i) of this Section 8.03 (and any refinancing thereof pursuant to Section 8.03(l) shall only be incurred pursuant to such Section 8.03(l)), (iii) the 2023 Convertible Notes will be deemed to have been incurred in reliance only on the relevant exceptions in clauses (k)(ii) of this Section 8.03 (and any refinancing thereof pursuant to Section 8.03(l) shall only be incurred pursuant to such Section 8.03(l)) and (iv) Indebtedness incurred pursuant to Section 8.03(z) shall only be deemed to have been incurred under Section 8.03(z) and may not be reclassified between clauses (i) and (ii) of such Section 8.03(z); provided, further, that any Indebtedness incurred pursuant to Section 2.01(f)(i)(x) or (y) may not be reclassified to be incurred under any other provision (including, for the avoidance of doubt, any other clause in Section 2.01(f)).

8.04   **Mergers and Dissolutions.**

(a)     Enter into a transaction of merger or consolidation, except that:

(i)     a Domestic Subsidiary of the Parent Borrower may be a party to a transaction of merger or consolidation with the Parent Borrower or another Domestic Subsidiary of the Parent Borrower; provided that if the Parent Borrower is a party to such transaction, the Parent Borrower shall be the surviving Person; provided, further that if the Parent Borrower is not a party to such transaction but a Domestic Guarantor is, such Domestic Guarantor shall be the surviving Person or the surviving Person shall become a Domestic Guarantor immediately upon the consummation of such transaction;

(ii)    a Foreign Subsidiary may be party to a transaction of merger or consolidation with the Parent Borrower or a Subsidiary of the Parent Borrower other than a Domestic Guarantor (unless such Domestic Guarantor is the surviving party); provided that (A) if the Parent Borrower is a party thereto, it shall be the surviving entity, (B) if preceding clause (A) does not apply and if a Foreign Borrower is a party thereto, it shall be the surviving entity, (C) if neither preceding clause (A) nor preceding clause (B) applies and if a Foreign Guarantor is a party thereto, it shall be the surviving Person or the surviving Person shall become a Foreign Guarantor immediately following the consummation of such transaction, and (D) if a Domestic Subsidiary is not a party thereto, the surviving entity shall be a Foreign Subsidiary and the Parent Borrower and its Subsidiaries shall be in compliance with the requirements of Section 7.13;

(iii)   a Subsidiary may enter into a transaction of merger or consolidation in connection with a Subject Disposition effected pursuant to Section 8.05, so long as no more assets are Disposed of as a result of or in connection with any transaction undertaken pursuant to this clause (iii) than would otherwise have been allowed pursuant to Section 8.05; and

(iv)    the Parent Borrower or any Subsidiary may merge with any other Person in connection with an Investment permitted pursuant to Section 8.02 so long as the continuing or surviving Person shall be a Subsidiary, which shall be (x) a Domestic Guarantor if the merging Subsidiary was a Domestic Guarantor and (y) a Foreign Guarantor if the merging Subsidiary was a Foreign Guarantor and, in each case, which together with each of its Subsidiaries shall have complied with the requirements of Section 7.12; provided that following any such merger or consolidation involving the Parent Borrower, the Parent Borrower is the surviving Person.

-128-

(b)    Except pursuant to a transaction permitted by Section 8.04(a)(i), the Parent Borrower will not dissolve, liquidate or wind up its affairs.

Notwithstanding the foregoing and for the avoidance of doubt, in no event shall Parent Borrower reorganize, redomesticate or reincorporate in any jurisdiction other than a state of the United States of America or the District of Columbia.

**8.05    Dispositions.**

Make any Subject Disposition or Specified Intercompany Transfer, unless (i) in the case of a Subject Disposition only, at least seventy-five percent (75%) of the consideration received from each such Subject Disposition is cash or Cash Equivalents; provided, that for the purposes of this clause (i), the following shall be deemed to be cash: (A) any liabilities (as shown on the Parent Borrower or such Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Parent Borrower or such Subsidiary (other than liabilities that are by their terms subordinated to the Obligations) that are assumed by the transferee with respect to the applicable Disposition, (B) any securities received by the Parent Borrower or such Subsidiary from such transferee that are converted by the Parent Borrower or such Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received in the conversion) within 180 days following the closing of the applicable Subject Disposition and (C) any Designated Non-Cash Consideration in respect of such Subject Disposition having an aggregate fair market value, taken together with the Designated Non-Cash Consideration in respect of all other Subject Dispositions, not in excess of $150.0 million (with the fair market value of each item of Designated Non-Cash Consideration being measured as of the time received), (ii) such Subject Disposition or Specified Intercompany Transfer is made at fair market value and (iii) the aggregate amount of Property so Disposed (valued at fair market value thereof) in all Subject Dispositions and Specified Intercompany Transfers does not exceed the Applicable Disposition Amount.

**8.06    Restricted Payments.**

Declare or make, directly or indirectly, any Restricted Payment, except that:

(a)    each Subsidiary may make Restricted Payments to the Parent Borrower or any Wholly Owned Subsidiary, or in the case of a Subsidiary that is not a Wholly Owned Subsidiary, to each equity holder of such Subsidiary on a pro rata basis (or on more favorable terms from the perspective of the Parent Borrower and its Wholly Owned Subsidiaries) based on their relative ownership interests, as required by such non-Wholly Owned Subsidiary's organizational agreements or stockholders' agreements, or, solely to the extent required by law and involving de minimis amounts, on a non-pro rata basis to such equity holders;

(b)    Restricted Payments to purchase Capital Stock of (A) any Person listed on Schedule 8.06(b) or (B) any other Person that becomes a Domestic Guarantor upon such purchase, that in each case is not held by (i) Parent Borrower, (ii) any Subsidiary or (iii) an Affiliate of Parent Borrower or any of its Subsidiaries; provided that after giving effect thereto (x) as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 and (y) such Person becomes or continues to be a Subsidiary of the Parent Borrower;

(c)    any refinancing permitted pursuant to Section 8.03(l) shall be permitted;

(d)    any Investment permitted or not prohibited by Section 8.02 shall be permitted;

(e)    following the Specified Restrictions Termination Date, other Restricted Payments; provided that, at the time of making such Restricted Payments, (x) no Event of Default shall have occurred and be continuing or would result therefrom and (y) on a Pro Forma Basis, the Consolidated Total Leverage Ratio is equal to or less than 3.75 to 1.00;

(f)    following the Specified Restrictions Termination Date, the Parent Borrower may make Restricted Payments at any time in an aggregate amount not to exceed the greater of (i) $500.0 million and (ii) 7.5% Consolidated Tangible Assets at such time plus if after giving effect to such Restricted Payments as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial

-129-

statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), (x) the Parent Borrower would be in compliance with Section 8.10 and (y) the Consolidated Net Leverage Ratio would not be in excess of 5.00:1.00 (and if the Restricted Payment is greater than $100.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (i)) and no Default shall have occurred and be continuing or exist after giving effect thereto, the amount of the Cumulative Credit at such time;

(g)     following the Specified Restrictions Termination Date, the Parent Borrower may make Restricted Payments consisting of payments or prepayments of principal on, or redemptions, repurchases or acquisitions for value of, its Indebtedness (i) in an aggregate amount for all such payments, prepayments, redemptions, repurchases and acquisitions not to exceed $300.0 million (measured in each case by the fair market value of the consideration given by the Parent Borrower in connection with such prepayments, redemptions, repurchases or acquisitions) and (ii) in the case of any payment, prepayment, redemption, repurchase and acquisition of the 2024 Senior Notes, 2026 Senior Notes, 2027 Senior Notes, 2023 Convertible Notes (and in each case of the foregoing, any permitted refinancing thereof pursuant to Section 8.03(l)), or additional amounts with respect to Indebtedness incurred pursuant to Section 8.03(bb), additional amounts so long as, immediately after giving effect to such payment, prepayment, redemption, repurchase or acquisition, (x) as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 and (y) the aggregate Dollar Equivalent amount available to be drawn under the Revolving Facilities after giving effect to such Restricted Payments would exceed $100.0 million (and the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (ii));

(h)     to the extent not used as part of or increasing the Cumulative Credit, the Parent Borrower may purchase, redeem or otherwise acquire shares of its common Capital Stock with the proceeds received from the substantially concurrent issue of new shares of its common Capital Stock;

(i)     the members of the Consolidated Group may prepay or repay intercompany Indebtedness otherwise permitted hereunder owed to other members of the Consolidated Group;

(j)     repurchases of Capital Stock deemed to occur upon the "cashless exercise" of stock options or warrants, cashless tax withholding, stock appreciation rights or upon the vesting of restricted stock or restricted stock units if such Capital Stock represents the exercise price of such options or warrants or represents withholding taxes due upon such exercise or vesting shall be permitted;

(k)     to the extent constituting Restricted Payments, the delivery of common stock of Parent Borrower (together with cash in lieu of any fractional share) and, to the extent that, after giving pro forma effect to such Restricted Payment, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b), the Parent Borrower would be in compliance with Section 8.10, the making of cash payments in connection with any conversion of Convertible Indebtedness issued as of or following the Amendment No. 6 Effective Date in an aggregate amount since the Amendment No. 6 Effective Date not to exceed the sum of (i) the principal amount of such Convertible Indebtedness *plus* (ii) any payments received by the Parent Borrower or any of its Restricted Subsidiaries pursuant to the exercise, settlement or termination of any related Permitted Bond Hedge Transaction;

(l)     any required payment with respect to, or required early unwind or settlement of, any Permitted Bond Hedge Transaction or Permitted Warrant Transaction, in each case, in accordance with the terms of the agreement governing such Permitted Bond Hedge Transaction or Permitted Warrant Transaction shall not constitute a Restricted Payment; provided that, in the case of this Section 8.06(l), to the extent any consideration other than the Parent Borrower's common stock is required to be paid under a Permitted Bond Hedge Transaction (other than, for the avoidance of doubt, the required payment of premium thereunder) or a Permitted Warrant Transaction as a result of the election of "cash settlement" (or substantially equivalent term) as the "settlement method" (or substantially

-130-

Exhibit 2, page 277

equivalent term) thereunder by the Parent Borrower (or its Affiliates) (including in connection with the exercise and/or early unwind or settlement thereof), the payment of such cash shall constitute a Restricted Payment notwithstanding this clause (l) (and such Restricted Payment must be permitted pursuant to a clause of this Section 8.06 other than Section 8.06(l)); and prior to the Specified Restrictions Termination Date, Restricted Payments (other than Restricted Payments within the meaning of clause (i) or (ii) of the definition of Restricted Payments with respect to the Capital Stock of the Parent Borrower) in an aggregate amount not to exceed $50.0 million.

**8.07    Change in Nature of Business.**

Engage in any material line of business other than a Permitted Business.

**8.08    Change in Accounting Practices or Fiscal Year.**

Change its (a) accounting policies or reporting practices, except as required by GAAP, or (b) fiscal year of the Parent Borrower or any Subsidiary.

**8.09    Transactions with Affiliates.**

Enter into any transaction of any kind with any Affiliate (including, for purposes of clarity, any Unrestricted Subsidiary) of the Parent Borrower (other than between or among (x) Domestic Credit Parties, (y) Foreign Credit Parties or (z) one or more Subsidiaries of the Parent Borrower that are not Credit Parties), whether or not in the ordinary course of business, other than (i) on fair and reasonable terms substantially as favorable in all material respects to the Parent Borrower or the applicable Subsidiary as would be obtainable by the Parent Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate, (ii) Restricted Payments permitted by Section 8.06 (other than Section 8.06(c)) and (iii) Investments permitted by Section 8.02(c), (f), (g), (s), (w) or, to the extent that such transaction is with a Person that becomes an Affiliate of the Parent Borrower or a Subsidiary solely as a result of such transaction, any transaction pursuant to Section 8.02(i), (k), (m) or (x).

**8.10    Financial Covenant.**

(a)    Beginning on the Financial Covenant Start Date, permit the Consolidated Net Leverage Ratio to exceed (A) as of the Financial Covenant Start Date and the last day of each of first, second and third fiscal quarters of the Parent Borrower ending following the Financial Covenant Start Date, 6.75:1.00, (B) as of the last day of each of the fourth, fifth, sixth and seventh fiscal quarters of the Parent Borrower ending following the Financial Covenant Start Date, 6.25:1.00, (C) as of the last day of each of the eighth, ninth, tenth and eleventh fiscal quarters of the Parent Borrower ending following the Financial Covenant Start Date, 5.75:1.00, (D) as of the last day of each of the twelfth and thirteenth fiscal quarters of the Parent Borrower ending following the Financial Covenant Start Date, 5.50:1.00 and (E) as of the last day of the fourteenth fiscal quarter of the Parent Borrower ending following the Financial Covenant Start Date and as of the last day of each fiscal quarter of the Parent Borrower thereafter, 5.25:1.00. Notwithstanding the foregoing, upon the consummation of a Material Permitted Acquisition and until the completion of four fiscal quarters following such Material Permitted Acquisition (the "Increase Period"), if elected by the Parent Borrower by written notice to the Administrative Agent given on or prior to the date of consummation of such Material Permitted Acquisition, the maximum permitted Consolidated Net Leverage Ratio level for purposes of this covenant shall be increased by 0.50x for the relevant period (the "Step-Up") during such Increase Period; provided (i) that Increase Periods may not be successive unless the Consolidated Net Leverage Ratio would have been complied with for at least two fiscal quarters without giving effect to the Step-Up, (ii) there shall be a maximum of two Increase Periods in the aggregate under this Credit Agreement and (iii) no Increase Period shall begin prior to the third full quarter following the Financial Covenant Start Date (other than an Increase Period in connection with the acquisition of an aggregate of 51% of the Capital Stock of OCESA Entretenimiento S.A. de C.V.).

(b)    Prior to the Financial Covenant Start Date, permit Liquidity to be less than $500.0 million as of the last day of (x) each fiscal quarter of the Parent Borrower ending on or prior to December 31, 2020 and (y) each calendar month following December 31, 2020.

**8.11    [Reserved].**

**8.12    Limitation on Subsidiary Distributions.**

-131-

Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Parent Borrower or any Restricted Subsidiary, or pay any Indebtedness owed to the Parent Borrower or a Restricted Subsidiary, (b) make loans or advances to the Parent Borrower or any Restricted Subsidiary or (c) transfer any of its properties to the Parent Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Law; (ii) this Credit Agreement and the other Credit Documents; (iii) the Existing Senior Unsecured Debt; (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (v) customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business; (vi) any Lien permitted by Section 8.01 restricting the transfer of the property subject thereto; (vii) any agreement relating to the sale of any property permitted under Section 8.05 pending the consummation of such sale (provided that such encumbrances or restrictions are customary for such agreements); (viii) without affecting the Credit Parties' obligations under Sections 7.12, 7.13 or 7.14, customary provisions in partnership agreements, limited liability company organizational governance documents, stockholders agreements, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person; (ix) restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the ordinary course of business; (x) any instrument evidencing or governing Indebtedness assumed in connection with any Permitted Acquisition pursuant to Section 8.03(h), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired; (xi) in the case of any Subsidiary that is not a Wholly Owned Subsidiary in respect of any matters referred to in clauses (b) and (c) above, such Person's Organization Documents or pursuant to any joint venture agreement or stockholders agreements solely to the extent of the Capital Stock of or property held in the subject joint venture or other entity; (xii) contracts or agreements in effect on the Amendment No. 6 Effective Date relating to Indebtedness existing on the Amendment No. 6 Effective Date and set forth on Schedule 8.03 or relating to AMG Indebtedness or AIL Indebtedness; (xiii) any restrictions imposed by any agreement incurred pursuant to Section 8.03(f) or pursuant to a refinancing of the 2023 Convertible Notes, in each case to the extent such restrictions are not more restrictive, taken as a whole, than the restrictions contained in the Existing Senior Unsecured Debt as in effect on the Amendment No. 6 Effective Date, as determined in good faith by the Parent Borrower; (xiv) customary net worth provisions contained in real property leases entered into by the Parent Borrower or any Subsidiary, so long as the Parent Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Parent Borrower and its Subsidiaries to meet their ongoing obligations; (xv) any agreement in effect at the time any Person becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary; (xvi) any agreement representing Indebtedness permitted under Section 8.03 of a Subsidiary of the Parent Borrower that is not a Credit Party; (xvii) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business; (xviii) the buy-sell, voting trust and other shareholder arrangements set forth in Schedule 6.14; (xix) any instrument evidencing or governing Indebtedness permitted pursuant to Section 8.03(z) or Section 8.03(aa), so long as such encumbrances and restrictions do not, when taken as a whole, materially and adversely affect ability of any Borrower to make interest, principal and fee payments to the Lenders hereunder (as determined in good faith by the Parent Borrower) and (xx) any refinancings that are otherwise permitted by the Credit Documents of the contracts, instruments or obligations referred to above; provided that such refinancings are no more materially restrictive, as determined in good faith by the Parent Borrower, with respect to such encumbrances and restrictions than those prior to such amendment or refinancing.

**8.13    Amendment of Material Documents.**

Amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in each case to the extent that such amendment, modification or waiver could reasonably be expected to be material and adverse to the Lenders.

**8.14    Sale and Leaseback Transactions.**

Enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for any such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 180 days after the Parent Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset. Notwithstanding the foregoing, each of the Parent Borrower and its Subsidiaries may sell or transfer any Designated Sale and Leaseback Asset, and rent or lease it back (or rent or lease other property that it intends to use for substantially the same purpose or purposes as the property so sold or transferred), if (a) the Parent Borrower promptly gives notice of such sale to the Administrative Agent; (b) the Net Cash Proceeds of such sale or transfer are at least equal to fair market value (provided that in the event such sale or transfer (or series of related sales or transfers) involves an aggregate consideration of more than the Dollar Equivalent of $150.0 million, the Parent Borrower will obtain a written opinion from an independent accounting or appraisal firm of nationally recognized standing confirming that the

-132-

consideration for such sale or transfer (or series of related sales or transfers) is fair, from a financial standpoint, to the Parent Borrower and its Subsidiaries or is not less favorable than those that might reasonably have been obtained in a comparable sale or transfer of such property, real or personal, at such time on an arm's-length basis from a Person that is not an Affiliate of the Parent Borrower); (c) at least 75% of the consideration received with respect to each such sale or transfer shall consist of cash, Cash Equivalents, Investments permitted by Section 8.02, liabilities assumed by the transferee, accounts receivable retained by the transferor or any combination of the foregoing; (d) in the event that such sale and leaseback results in a capital lease obligation or Synthetic Lease, such Indebtedness is permitted by Section 8.03(c); (e) no Default shall have occurred and be continuing or exist after giving effect thereto; and (f) after giving effect on a Pro Forma Basis to such Sale and Leaseback Transaction and any Indebtedness incurred in respect therewith, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and in the event such sale or transfer (or series of related sales or transfers) involves an aggregate consideration of more than the Dollar Equivalent of $150.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (f)).

8.15    **Swap Contracts.**

Enter into any Swap Contract, except (a) Swap Contracts entered into to hedge or mitigate risks to which the Parent Borrower or any Subsidiary has actual exposure, (b) Swap Contracts entered into in order to effectively cap, collar or exchange (i) interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest bearing liability or investment of any Borrower or any Subsidiary and (ii) currency exchange rates, in each case in connection with the conduct of its business not for speculative purposes, and (c)    any Permitted Bond Hedge Transaction or any Permitted Warrant Transaction.

-133-

## ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES

**9.01    Events of Default.**

Any of the following shall constitute an Event of Default:

(a)    Non-Payment. The Parent Borrower or any other Credit Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or any B/A or any amount of principal of any L/C Obligation, or (ii) within three (3) Business Days after the same becomes due or required to be paid herein, any interest on any Loan or any B/A or any regularly accruing fee due hereunder or any other amount payable hereunder or under any other Credit Document; or

(b)    Specific Covenants. The Parent Borrower or any other Credit Party fails to perform or observe any term, covenant or agreement contained in any of Section 7.03(a), 7.11, 7.18 or Article VIII or, with respect to the existence of any Borrower only, Section 7.04; or

(c)    Other Defaults. The Parent Borrower or any other Credit Party fails to perform or observe any other covenant or agreement (not specified in subsections (a) or (b) above) contained in any Credit Document on its part to be performed or observed and such failure continues for thirty (30) calendar days after written notice to the defaulting party or the Parent Borrower by the Administrative Agent or the Required Lenders; or

(d)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Parent Borrower or any other Credit Party herein, in any other Credit Document, or in any document delivered in connection herewith or therewith shall be false in any material respect when made or deemed made; or

(e)    Cross-Default. (i) Any member of the Consolidated Group (A) fails (beyond the period of grace (if any) provided in the instrument or agreement pursuant to which such Indebtedness was created) to make any payment when due (whether by scheduled maturity, interest, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Support Obligations (other than Indebtedness hereunder or Indebtedness under Swap Contracts) having a principal amount (with principal amount for the purposes of this clause (e) including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), when taken together with the principal amount of all other Indebtedness and Support Obligations as to which any such failure has occurred, exceeding $150.0 million or (B) fails to observe or perform any other agreement or condition relating to any Indebtedness or Support Obligations or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which failure or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Support Obligations (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Support Obligations to become payable or cash collateral in respect thereof to be demanded, which has an unpaid principal amount, when taken together with the unpaid principal amounts of all other Indebtedness and Support Obligations as to which any such failure or event has occurred, exceeding $150.0 million (it being understood, for the avoidance of doubt, that the satisfaction of any customary "conversion conditions" set forth in the instruments governing any Convertible Indebtedness will not be deemed to constitute a Default under this clause (B) on account of such satisfaction giving any holder of such Convertible Indebtedness the right to convert the same); or (ii) there occurs under any Swap Contract an "early termination date" (or term of similar import) resulting from (A) any event of default under such Swap Contract as to which the Parent Borrower or any Subsidiary is the "defaulting party" (or term of similar import) or (B) any "termination event" (or term of similar import) under such Swap Contract as to which the

-134-

Parent Borrower or any Subsidiary is an "affected party" (or term of similar import) and, when taken together with all other Swap Contracts as to which events of default or events referred to in the immediately preceding clauses (A) or (B) are applicable, the Swap Termination Value owed by the Parent Borrower and its Subsidiaries exceeds $150.0 million; provided that this clause (e)(ii) shall not apply to any early payment requirement or unwinding or termination with respect to any Permitted Bond Hedge Transaction or Permitted Warrant Transaction, or satisfaction of any condition giving rise to or permitting the foregoing, in accordance with the terms thereof, so long as, in any such case, neither Parent Borrower nor any of its Affiliates is the "defaulting party" (or substantially equivalent term) under the terms of such Permitted Bond Hedge Transaction or Permitted Warrant Transaction, as applicable; or Insolvency Proceedings, Etc. Any Credit Party or any Significant Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty

(60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(f)     Change of Control. There shall have occurred a Change of Control of the Parent Borrower; or

(g)     Inability to Pay Debts; Attachment. Any Credit Party or any Significant Subsidiary becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or any writ or warrant of attachment or execution or similar process issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issue or levy; or

(h)     Judgments. There is entered against any member of the Consolidated Group one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $150.0 million (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage or otherwise discharged), and there is a period of 30 consecutive days during which a stay of enforcement of such judgments, by reason of a pending appeal or otherwise, is not in effect; or

(i)     ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or would reasonably be expected to result in liability of a Credit Party in an aggregate amount in excess of $150.0 million, or (ii) a Credit Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan that has resulted or would reasonably be expected to result in liability of a Credit Party in an aggregate amount in excess of $150.0 million; or

(j)     Invalidity of Credit Documents. Any Credit Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Credit Party contests in any manner the validity or enforceability of any Credit Document; or any Credit Party denies that it has any or further liability or obligation under any Credit Document, or purports to revoke, terminate or rescind any Credit Document; or

(k)     Collateral Documents. Any Collateral Document after delivery thereof shall for any reason cease (or shall be asserted in writing by any Credit Party to cease) to create a valid and perfected first priority Lien to the extent required by the Collateral Documents (subject to no other Liens other than Liens permitted by Section 8.01) on Collateral that is (i) purported to be covered thereby and (ii) comprises Property which, when taken together with all Property as to which such a Lien has so ceased to be effective, has a fair market value in excess of $50.0 million (other than by reason of (x) the express release thereof

-135-

pursuant to Section 10.10, (y) the failure of the Collateral Agent to retain possession of Collateral physically delivered to it or (z) the failure of the Collateral Agent to timely file UCC continuation statements); or

(m)     Subordinated Debt. Any Subordinated Debt of the Parent Borrower or any Credit Party or any guarantee of the Parent Borrower or any Credit Party in respect thereof shall cease, for any reason, to be validly subordinated to the Obligations, as provided in such Subordinated Debt or such guarantee, or the Parent Borrower, any Subsidiary, any Affiliate of the Parent Borrower or any Subsidiary, the trustee in respect of such Subordinated Debt (or any refinancing thereof pursuant to Section 8.03(l)) shall so assert in writing.

**9.02     Remedies upon Event of Default.**

If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)     declare the Commitments of the Lenders and the obligation of the L/C Issuers to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans and B/As, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Credit Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers;

(c)     require that the Parent Borrower Cash Collateralize the L/C Obligations (in an amount equal to the then Outstanding Amount thereof);

(d)     require that the Canadian Borrowers cash collateralize amounts to become due with respect to outstanding B/As in accordance with Section 2.06(c)(iii); and

(e)     exercise on behalf of itself and the Lenders all rights and remedies available to it or to the Lenders under the Credit Documents or applicable Law;

provided, however, that upon the occurrence of an Event of Default under Section 9.01(f) or (h), the obligation of each Lender to make Loans and accept and purchase B/As and any obligation of the L/C Issuers to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Parent Borrower to Cash Collateralize the L/C Obligations and the Canadian Borrowers to cash collateralize amounts to become due with respect to outstanding B/As as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

**9.03     Application of Funds.**

After the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable, the outstanding B/As have automatically been required to be cash collateralized and the L/C Obligations have automatically been required to be Cash Collateralized, in each case as set forth in the proviso to Section 9.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including all reasonable fees, expenses and disbursements of any law firm or other counsel and amounts payable under Article III) payable to the Administrative Agent and the Collateral Agent, in each case in its capacity as such;

-136-

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest, Commitment Fees, Letter of Credit Fees and B/A Fees) payable to the Lenders (including all reasonable fees, expenses and disbursements of any law firm or other counsel and amounts payable under Article III), ratably among the Lenders in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid Commitment Fees, Letter of Credit Fees, B/A Fees and interest on the Loans, B/A Drawings, L/C Borrowings and other Obligations, ratably among the Lenders, the Swingline Lender and the L/C Issuers in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to (a) payment of that portion of the Obligations constituting unpaid principal of the Loans, the aggregate face amount of any outstanding B/As and L/C Borrowings, (b) payment of breakage, termination or other amounts owing in respect of any Swap Contract between Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary) and the Administrative Agent, any Lender or Affiliate of the Administrative Agent or a Lender or any Person that was the Administrative Agent, a Lead Arranger, a Lender or Affiliate of the Administrative Agent, a Lead Arranger or a Lender at the time it entered into such Swap Contract, (c) payments of amounts due under any Treasury Management Agreement between Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary) and the Administrative Agent, any Lender or Affiliate of the Administrative Agent or a Lender or any Person that was the Administrative Agent, a Lender or Affiliate of the Administrative Agent or a Lender at the time it entered into such Treasury Management Agreement, to the extent such Treasury Management Agreement is permitted hereunder and (d) the Administrative Agent for the account of the L/C Issuers, to Cash Collateralize that portion of the L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit, ratably among such parties in proportion to the respective amounts described in this clause Fourth payable to them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Parent Borrower or as otherwise required by Law.

provided that no amount received from any Foreign Credit Party or on account of any Collateral that is solely Collateral for the Foreign Obligations shall be applied pursuant to second, third or fourth clause of this paragraph to the extent such amounts do not constitute Foreign Obligations. Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fourth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Notwithstanding the foregoing, amounts received from the Borrowers or any Guarantor that is not a Qualified ECP Guarantor shall not be applied to the Obligations that are Excluded Swap Obligations.

## ARTICLE X AGENTS

**10.01    Appointment and Authorization of the Agents.**

(a)    Each of the Lenders and the L/C Issuers hereby irrevocably appoints (i) JPMCB to act on its behalf as the Administrative Agent and Collateral Agent, (ii) JPMorgan Chase Bank, N.A., Toronto Branch, to act on its behalf as the Canadian Agent and (iii) JPME to act on its behalf as the London Agent, in each case hereunder and under the other Credit Documents and authorizes each Agent to take such actions on its behalf and to exercise such powers as are delegated to the such Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agents, the Lenders and the L/C Issuers, and neither the Parent Borrower nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions.

-137-

Exhibit 2, page 284

(b)    Each Lender hereby irrevocably appoints, designates and authorizes the Collateral Agent to take such action on its behalf under the provisions of this Credit Agreement and each Collateral Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Credit Agreement or any Collateral Document, together with such powers as are reasonably incidental thereto. In this connection, the Collateral Agent, and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 10.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent, shall be entitled to the benefits of all provisions of this Article X and Article XI (including Section 11.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Credit Documents) as if set forth in full herein with respect thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any Collateral Document, no Agent shall have any duties or responsibilities, except those expressly set forth herein or therein, nor shall any Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Credit Agreement or any Collateral Document or otherwise exist against any Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the Collateral Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. The Collateral Agent shall act on behalf of the Lenders with respect to any Collateral and the Collateral Documents, and the Collateral Agent shall have all of the benefits and immunities (i) provided to the Administrative Agent under the Credit Documents with respect to any acts taken or omissions suffered by the Collateral Agent in connection with any Collateral or the Collateral Documents as fully as if the term "Administrative Agent" as used in such Credit Documents included the Collateral Agent with respect to such acts or omissions, and (ii) as additionally provided herein or in the Collateral Documents with respect to the Collateral Agent.

(c)    Each L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each L/C Issuer shall have all of the benefits and immunities (i) provided to the Agents in this Article X with respect to any acts taken or omissions suffered by any L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Agent" as used in this Article X included such L/C Issuer with respect to such acts or omissions, and (ii) as additionally provided herein with respect to such L/C Issuer.

(d)    In addition to any other rights and remedies granted to the Administrative Agent and the Lenders in the Credit Documents, the Administrative Agent on behalf of the Lenders may exercise all rights and remedies of a secured party under the New York UCC or any other applicable law. Without limiting the generality of the foregoing, the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Credit Party or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, or consent to the use by a Credit Party of any cash collateral arising in respect of the Collateral on such terms as the Administrative Agent deems reasonable, and/or may forthwith sell, lease, assign give an option or options to purchase or otherwise dispose of and deliver, or acquire by credit bid on behalf of the Lenders, the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or any Lender or elsewhere, upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery, all without assumption of any credit risk.

**10.02    Rights as a Lender.**

Each Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as such Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

-138-

**10.01    Exculpatory Provisions.**

The Agents and Lead Arrangers shall not have any duties or obligations except those expressly set forth herein and in the other Credit Documents. Without limiting the generality of the foregoing, the Agents and Lead Arrangers:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Agents are required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Credit Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its or their Affiliates in any capacity.

No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 9.02) or (ii) in the absence of its own gross negligence or willful misconduct. The Agents shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to such Agent by the Parent Borrower, a Lender or an L/C Issuer.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Credit Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Credit Agreement, any other Credit Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents or to assure that the Liens granted to the Collateral Agent pursuant to any Collateral Document have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article V or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

**10.04    Reliance by Agents.**

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, the acceptance and purchase of any B/A or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or an L/C Issuer, each Agent may presume that such condition is satisfactory to such Lender or such L/C Issuer unless such Agent shall have received notice to the contrary from such Lender or such L/C Issuer prior to the making of such Loan, the acceptance and purchase of such B/A or the issuance of such Letter of Credit. Each Agent may consult with legal counsel (who may be counsel for the Parent Borrower), independent accountants and other

-139-

Exhibit 2, page 286

experts selected by it, and shall not be liable for any action taken or not taken by them in accordance with the advice of any such counsel, accountants or experts.

### 10.05    Delegation of Duties.

Each Agent may perform any and all of their duties and exercise their rights and powers hereunder or under any other Credit Document by or through any one or more sub-agents appointed by such Agent. Any Agent and any such sub-agent may perform any and all of their duties and exercise their rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agents, and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent.

### 10.06    Resignation of an Agent.

\Each of the Agents may at any time give notice of its resignation to the Lenders, the L/C Issuers and the Parent Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Parent Borrower (provided that no consent shall be required if an Event of Default has occurred and is continuing), to appoint a successor, which (i) in the case of a resignation by the Administrative Agent or the Collateral Agent, shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States, (ii) in the case of a resignation by the Canadian Agent, shall be a bank with an office in Canada, or an Affiliate of any such bank with an office in Canada or (iii) in the case of a resignation by the London Agent, shall be a bank with an office in London, or an Affiliate of any such bank with an office in London. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the L/C Issuers, with the consent of the Parent Borrower (provided that no consent shall be required if an Event of Default has occurred and is continuing), appoint a successor Agent meeting the qualifications set forth above; provided that if such Agent shall notify the Parent Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by such Agent on behalf of the Lenders or the L/C Issuers under any of the Credit Documents, such retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender and each L/C Issuer directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as an Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Parent Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Parent Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as such Agent.

Any resignation by JPMCB as Administrative Agent or Collateral Agent, as the case may be, pursuant to this Section shall also constitute its resignation as Dollar L/C Issuer, Multicurrency L/C Issuer and Swingline Lender. Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent, as the case may be, hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuers and Swingline Lender, (b) the retiring L/C Issuers and Swingline Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Credit Documents, and (c) the successor L/C Issuers shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuers to effectively assume the obligations of the retiring L/C Issuers with respect to such Letters of Credit.

-140-

**10.07    Non-Reliance on Agents and Other Lenders.**

Each Lender and L/C Issuer acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Credit Agreement. Each Lender and L/C Issuer also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Credit Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

**10.08    No Other Duties.**

Anything herein to the contrary notwithstanding, none of the "Syndication Agent," "Joint Lead Arrangers" and "Joint Bookrunners" listed on the cover page hereof shall have any powers, duties or responsibilities under this Credit Agreement or any of the other Credit Documents, except in its capacity, as applicable, as an Agent, a Lender or an L/C Issuer hereunder.

**10.09    Agents May File Proofs of Claim.**

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Credit Party, any Agent (irrespective of whether the principal of any Loan, B/A Drawing or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Applicable Agent shall have made any demand on the Parent Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations (other than obligations under Swap Contracts or Treasury Management Agreements to which such Agent is not a party) that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuers and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuers and the Agents and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuers and the Agents under Sections 2.09 and 11.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and L/C Issuer to make such payments to such Agent and, in the event that such Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuers, to pay to such Agent any amount due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due to such Agent under Sections 2.09 and 11.04.

Nothing contained herein shall be deemed to authorize the Applicable Agent to authorize or consent to or accept or adopt on behalf of any Lender or L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize any Agent to vote in respect of the claim of any Lender in any such proceeding.

-141-

Exhibit 2, page 288

**10.10    Collateral and Guaranty Matters.**

The Lenders and the L/C Issuers irrevocably authorize the Administrative Agent and the Collateral Agent, at its option and in its discretion:

(a)    to release any Guarantor from its obligations under the Collateral Documents if such Person ceases to be a Subsidiary as a result of a transaction not prohibited hereunder, is designated as an Immaterial Subsidiary or is designated as an Excluded Subsidiary pursuant to clause (e) of the definition thereof, or if the conditions set forth in clause (b)(i) below are satisfied;

(b)    to release any Lien on any property granted to or held by the Collateral Agent under any Credit Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (A) contingent indemnification obligations not then due and payable and (B) obligations and liabilities under Swap Contracts and Treasury Management Agreements not then due and payable) and the expiration or termination of all Letters of Credit (or if any Letters of Credit shall remain outstanding, upon (x) the cash collateralization of the Outstanding Amount of Letters of Credit on terms satisfactory to the Administrative Agent and L/C Issuer or (y) the receipt by any applicable L/C Issuer of a backstop letter of credit on terms satisfactory to the Administrative Agent and such L/C Issuer), (ii) that is Disposed of as part of or in connection with any sale or other Disposition not prohibited hereunder or under any other Credit Document (other than any such sale or other Disposition to another Credit Party), or (iii) subject to Section 11.01, if approved, authorized or ratified in writing by the Required Lenders; and

(c)    to subordinate any Lien on any property granted to or held by the Collateral Agent under any Credit Document to the holder of any Lien on such property that is granted pursuant to Section 8.01(i) or (z).

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the authority of the Collateral Agent to release or subordinate its interest in particular property and of the Administrative Agent to release any Guarantor from its obligations hereunder pursuant to this Section 10.10 in connection with a transaction permitted hereunder.

**10.11    Withholding Tax.**

To the extent required by any applicable Law, the Applicable Agent may deduct or withhold from any payment to any Lender under any Credit Document an amount equivalent to any applicable withholding Tax. If the IRS or any other authority of the United States or other jurisdiction asserts a claim that the Applicable Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Applicable Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall indemnify and hold harmless the Agents (to the extent that the Applicable Agent has not already been reimbursed by the Borrowers pursuant to Sections 3.01 and 3.04 and without limiting or expanding the obligation of the Borrowers to do so) fully for all amounts paid, directly or indirectly, by the Applicable Agent as Tax or otherwise, together with all expenses incurred, including legal expenses and any out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Applicable Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Applicable Agent to set off and apply any and all amounts at any time owing to such Lender under this Credit Agreement or any other Credit Document against any amount due to the Applicable Agent under this Section 10.11. The agreements in this Section 10.11 shall survive the resignation and/or replacement of the Applicable Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Credit Agreement and the repayment, satisfaction or discharge of all other Obligations. For the avoidance of doubt, for purposes of this Section 10.11, the term "Lender" shall include any L/C Issuer and the Swingline Lender.

-142-

**10.12    Treasury Management Agreements and Swap Contracts.**

Except as otherwise expressly set forth herein or in any Collateral Document, no Treasury Management Bank or Hedge Bank that obtains the guarantees hereunder or any Collateral by virtue of the provisions hereof or of any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Credit Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Credit Documents. Notwithstanding any other provision of this Article X to the contrary, no Agent shall be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Treasury Management Agreements and Swap Contracts unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Treasury Management Bank or Hedge Bank, as the case may be.

**10.13    Credit Bidding.**

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Credit Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles

(ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.01 of this Agreement),

(iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

-143-

## ARTICLE XI

## MISCELLANEOUS

**11.01   Amendments, Etc.**

No amendment or waiver of, or any consent to deviation from, any provision of this Credit Agreement or any other Credit Document shall be effective unless in writing and signed by the Parent Borrower or the applicable Credit Party, as the case may be, and the Required Lenders and the Administrative Agent (at the direction of the Required Lenders), and each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given; provided, however, that:

(a)   without the consent of each Lender, no such amendment, waiver or consent shall:

(i)   amend or waive any condition precedent to the initial Credit Extension set forth in Section 5.01 or (solely with respect to the initial Credit Extension) any condition precedent set forth in Section 5.02,

(ii)   except to the extent permitted by Section 2.17, 2.18 or 2.19 to effectuate a transaction pursuant to Section 2.17, 2.18 or 2.19, as the case may be, change any provision of this Credit Agreement regarding pro rata sharing or pro rata funding with respect to (A) the making of advances (including participations), (B) the manner of application of payments or prepayments of principal, interest, or fees, (C) the manner of application of reimbursement obligations from drawings under Letters of Credit, or (D) the manner of reduction of commitments and committed amounts,

(iii)   change any provision of this Section 11.01(a) (other than any such changes made pursuant to Amendment No. 6) or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder,

(iv)   release all or substantially all of the Collateral (other than as provided herein as of the Amendment No. 6 Effective Date), or

(v)   release all or substantially all of the value of the guarantees provided by the Domestic Guarantors or the Foreign Guarantors (other than as provided herein as of the Amendment No. 6 Effective Date) or, if any Foreign Subsidiary shall have been added as an additional Foreign Borrower pursuant to Section 1.08, release the Parent Borrower from its guarantee of the obligations in respect of any borrowings by such Foreign Borrower;

(b)   without the consent of each Lender adversely affected thereby, no such amendment, waiver or consent shall:

(i)   except to the extent permitted by Section 2.17, 2.18 or 2.19 to effectuate a transaction pursuant to Section 2.17, 2.18 or 2.19, as the case may be, extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 9.02), it being understood that the amendment or waiver of an Event of Default or a mandatory reduction or a mandatory prepayment in Commitments shall not be considered an increase in Commitments,

(ii)   waive non-payment or postpone any date fixed by this Credit Agreement or any other Credit Document for any payment of principal, interest, fees or other amounts due to any Lender hereunder or under any other Credit Document or change the scheduled final maturity of any Loan or any B/A,

-144-

(iii)    reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or any amount payable in respect of B/As or any fees or other amounts payable hereunder or under any other Credit Document; provided, however, that only the consent of the Required Lenders shall be necessary (A) to amend the definition of "Default Rate" or to waive any obligation of the applicable Borrower to pay interest or Letter of Credit Fees at the Default Rate or (B) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or L/C Borrowing, or any amount payable in respect of B/As or to reduce any fee payable hereunder, or

(iv) except as otherwise expressly permitted in the Credit Documents as in effect on the Amendment No. 6 Effective Date, expressly subordinate any of the Obligations in right of payment to any other obligations or subordinate all or substantially all of the Liens securing the Obligations to Liens securing any other Indebtedness;

(c)    unless signed by the Required Delayed Draw Term A Lenders, no such amendment, waiver or consent shall:

(i)    amend or waive or modify any provision of Section 5.04;

(ii)    amend or waive the manner of application of any mandatory prepayment to the Delayed Draw Term A Loans under Section 2.06(c), or

(iii)    amend or waive the provisions of this Section 11.01(c) or the definition of "Required Delayed Draw Term A Lenders";

(d) unless signed by the Required Term B-4 Lenders, no such amendment, waiver or consent shall:

(i)    amend or waive the manner of application of any mandatory prepayment to the Term B-4 Loans under Section 2.06(c), or

(ii)    amend or waive the provisions of this Section 11.01(c) or the definition of "Required Term B-4 Lenders";

(e)    any such amendment, waiver or consent to any provision that relates to the Delayed Draw Term A Commitments and/or Delayed Draw Term A Loans, the Term B-4 Loan Commitments and/or Term B-4 Loans or the Revolving Commitments and/or Revolving Loans but does not apply (or applies differently) to the other Commitments and/or Loans, shall also require the consent of the Required Delayed Draw Term A Lenders, Required Term B-4 Lenders or Required Revolving Lenders, respectively;

(f)    any such amendment, waiver or consent to any provision that relates to (i) the Dollar Revolving Commitments or Dollar Revolving Loans, on the one hand, but not the Limited Currency Revolving Commitments, Multicurrency Revolving Commitments, the 2020-1 Incremental Revolving Commitments, Limited Currency Revolving Loans, Multicurrency Revolving Loans or 2020-1 Incremental Revolving Loans, on the other hand, (ii) the Limited Currency Revolving Commitments or Limited Currency Revolving Loans, on the one hand, but not the Dollar Revolving Commitments, Multicurrency Revolving Commitments, 2020-1 Incremental Revolving Commitments, Dollar Revolving Loans, Multicurrency Revolving Loans or 2020-1 Incremental Revolving Loans, on the other hand, (iii) the Multicurrency Revolving Commitments or Multicurrency Revolving Loans, on the one hand, but not the Dollar Revolving Commitments, Limited Currency Revolving Commitments, 2020-1 Incremental Revolving Commitments, Dollar Revolving Loans, Limited Currency Revolving Loans or 2020-1 Incremental Revolving Loans, on the other hand, or (iv) the 2020-1 Incremental Revolving Commitments or 2020-1 Incremental Revolving Loans, on the one hand, but not the Limited Currency Revolving Commitments, Multicurrency Revolving Commitments, the Dollar Revolving Commitments, Limited Currency Revolving Loans, Multicurrency Revolving Loans or Dollar Revolving Loans, on the other hand,

-145-

or applies differently to (w) the Dollar Revolving Commitments or Dollar Revolving Loans, on the one hand, and to the Limited Currency Revolving Commitments, Multicurrency Revolving Commitments, 2020-1 Incremental Revolving Commitments, Limited Currency Revolving Loans, Multicurrency Revolving Loans or 2020-1 Incremental Revolving Loans, on the other hand, (x) the Limited Currency Revolving Commitments or Limited Currency Revolving Loans, on the one hand, and the Dollar Revolving Commitments, Multicurrency Revolving Commitments, 2020-1 Incremental Revolving Commitments, Dollar Revolving Loans, Multicurrency Revolving Loans or 2020-1 Incremental Revolving Loans, on the other hand, (y) the Multicurrency Revolving Commitments or Multicurrency Revolving Loans, on the one hand, and the Dollar Revolving Commitments, Limited Currency Revolving Commitments, 2020-1 Incremental Revolving Commitments, Dollar Revolving Loans, Limited Currency Revolving Loans or 2020-1 Incremental Revolving Loans, on the other hand, or (z) the 2020-1 Incremental Revolving Commitments or 2020-1 Incremental Revolving Loans, on the one hand, and to the Limited Currency Revolving Commitments, Multicurrency Revolving Commitments, Dollar Revolving Commitments, Limited Currency Revolving Loans, Multicurrency Revolving Loans or Dollar Revolving Loans, on the other hand, shall only require the consent of the Required Dollar Revolving Lenders, the Required Limited Currency Revolving Lenders, the Required Multicurrency Revolving Lenders or the 2020-1 Incremental Revolving Lenders, respectively;

(g)    unless also signed by the Required Revolving Lenders, no such amendment, waiver or consent shall amend or waive (i) the provisions of this Section 11.01(g), (ii) the definition of "Required Revolving Lenders" or (iii) any condition precedent to any Credit Extension (other than the initial Credit Extension) set forth in Section 5.02 or Section 5.03;

(h)    unless also signed by the Required Dollar Revolving Lenders, no such amendment, waiver or consent shall amend or waive the provisions of this Section 11.01(h) or the definition of "Required Dollar Revolving Lenders";

(i)    unless also signed by the Required Limited Currency Revolving Lenders, no such amendment, waiver or consent shall amend or waive the provisions of this Section 11.01(i) or the definition of "Required Limited Currency Revolving Lenders";

(j)    unless also signed by the Required Multicurrency Revolving Lenders, no such amendment, waiver or consent shall amend or waive the provisions of this Section 11.01(j) or the definition of "Required Multicurrency Revolving Lenders";

(k)    unless also consented to in writing by an L/C Issuer, no such amendment, waiver or consent shall affect the rights or duties of such L/C Issuer under this Credit Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it;

(l)    unless also consented to in writing by the Swingline Lender, no such amendment, waiver or consent shall affect the rights or duties of the Swingline Lender under this Credit Agreement;

(m)    unless also consented to in writing by the Administrative Agent, no such amendment, waiver or consent shall affect the rights or duties of the Administrative Agent under this Credit Agreement or any other Credit Document;

(n)    unless also consented to in writing by the Collateral Agent, no such amendment, waiver or consent shall affect the rights or duties of the Collateral Agent under this Credit Agreement or any other Credit Document;

(o)    unless also consented to in writing by each Lead Arranger, no such amendment, waiver or consent shall affect the rights or duties of such Lead Arranger this Credit Agreement or any other Credit Document; and

-146-

(p)    unless also signed by the Required 2020-1 Incremental Revolving Lenders, no such amendment, waiver or consent shall amend or waive the provisions of this Section 11.01(p) or the definition of "Required 2020-1 Incremental Revolving Lenders";

provided, however, that notwithstanding anything to the contrary contained herein, (i) each Lender is entitled to vote as such Lender sees fit on any bankruptcy or insolvency reorganization plan that affects the Loans, (ii) each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code of the United States supersedes the unanimous consent provisions set forth herein, (iii) the Required Lenders may consent to allow a Credit Party to use cash collateral in the context of a bankruptcy or insolvency proceeding, (iv) Section 11.06(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by a SPC at the time of such amendment, waiver or other modification, (v) the Engagement Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto and (vi) the Administrative Agent Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

Notwithstanding anything herein to the contrary, the Borrowers and the Administrative Agent may, without the input or consent of any other Lender, effect such amendments to this Credit Agreement and the other Credit Documents as may be necessary or appropriate to effect the provisions of Section 2.01(f), 2.17, 2.18 or 2.19 (including to provide that additional Classes of Loans or Commitments shall (i) share ratably in the benefits of this Credit Agreement and the other Credit Documents with the Loan Obligations, (ii) to include appropriately the Lenders holding such Classes in any determination of the Required Lenders, Required Revolving Lenders, Required Delayed Draw Term A Lenders and Required Term B-4 Lenders, (iii) to permit any such additional credit facilities which are term facilities to share ratably with the Term Loans in the application of prepayments and to permit any such credit facilities which are revolving credit facilities to share ratably with the Revolving Facility in the application of prepayments and (iv) to amend the Exhibits hereto to reflect the 2020-1 Incremental Revolving Facility).

Notwithstanding anything to the contrary contained in this Section 11.01, (a) if the Administrative Agent and the Parent Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical nature, in each case, in any provision of any Credit Document, then the Administrative Agent and/or the Collateral Agent (acting in their sole discretion) and the Parent Borrower or any other relevant Credit Party shall be permitted to amend such provision or cure any ambiguity, defect or inconsistency and such amendment shall become effective without any further action or consent of any other party to any Credit Document, and (b) the Parent Borrower and the Administrative Agent and/or the Collateral Agent shall have the right to amend any Credit Document without notice to or consent of any other person to the extent described in the last paragraph of each of Sections 2.01(g) and (h) and in Section 1.08 or for the purpose of ensuring the enforceability of any local law pledge agreement entered into with respect to the Capital Stock of any Foreign Subsidiary.

Without the consent of any other person, the applicable Credit Party or Parties and the Administrative Agent and/or Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Credit Document) enter into any amendment or waiver of any Credit Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the holders of the Obligations, or as required by local law to give effect to, or protect any security interest for the benefit of the holders of the Obligations, in any property or so that the security interests therein comply with applicable requirements of Law.

No provision of any Credit Document relating to the Fronted Currency provisions shall be amended without the consent of the Alternative Currency Fronting Lender(s). At the request of the Administrative Agent or any Participating Fronted Currency Lender, the Parent Borrower and the Administrative Agent shall make such amendments to the provisions regarding Fronted Currency Loans as are reasonably requested by the Administrative Agent and such Participating Fronted Currency Lender in order to better effectuate the intent of such provisions, and such amendments shall not require the consent of any Lender or any other party hereto or to any Credit Document.

The Parent Borrower and the Administrative Agent shall enter into such amendments to the Credit Documents (without the consent of any other party) relating to the mechanics (in terms of determining index rates, borrowing times and notice periods, statutory reserves or otherwise) of Borrowings in any Alternative Currency as may be reasonably requested by the Administrative Agent to conform to the requirements of loans made in such Alternative Currency (as reasonably determined by the Administrative Agent), and the Administrative Agent shall notify the Limited Currency Revolving Lenders and the Multicurrency Revolving Lenders following the execution of any such amendments and such amendment shall become effective within five Business Days unless a Limited Currency Revolving Lenders or a Multicurrency Revolving Lenders shall have notified the Administrative Agent in writing of its objection thereto and the reason for any such objection prior to the end of such five Business Day period.

This Section 11.01 shall be subject to the provisions of the last sentence of Section 11.23.

**11.02    Notices; Effectiveness; Electronic Communication.**

(a)    Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or, with confirmation of receipt, electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Parent Borrower, an Agent, an L/C Issuer or the Swingline Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02;

(ii)    if to any Credit Party other than the Parent Borrower, in care of the Parent Borrower at the address, telecopier number, electronic mail address or telephone number specified for such Parent Borrower on Schedule 11.02; and

(iii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications. Notices and other communications to the Lenders and the L/C Issuers hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender or L/C Issuer pursuant to Article II if such Lender or L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Parent Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent (a) to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, if available, return e-mail or other written acknowledgement) and (b) by facsimile shall be deemed received upon the sender's receipt of a notice of the successful transmission of such facsimile or upon the recipient's written acknowledgement of receipt of such facsimile; provided, in each case, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE CREDIT PARTY MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND

-148-

Exhibit 2, page 295

EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE CREDIT PARTY MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE CREDIT PARTY MATERIALS OR THE PLATFORM. In no event shall any Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Credit Party, Lender, L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Credit Party's or any Agent's transmission of Credit Party Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Credit Party, Lender, L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc. Each of the Parent Borrower, each Agent, each L/C Issuer and the Swingline Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Parent Borrower, each Agent, each L/C Issuer and the Swingline Lender. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by each Agent, L/C Issuer and Lender. Each Agent, L/C Issuer and Lender shall be entitled to rely and act upon any notices (including telephonic Loan Notices and Loan Notices for Swingline Loans) purportedly given by or on behalf of any Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify each Agent, L/C Issuer, Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of any Borrower. All telephonic notices to and other telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.

**11.03    No Waiver; Cumulative Remedies; Enforcement.**

No failure by any Lender, L/C Issuer, Swingline Lender or Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Credit Document, the authority to enforce rights and remedies hereunder and under the other Credit Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 9.02 for the benefit of all the Lenders and the L/C Issuers; provided, however, that the foregoing shall not prohibit (a) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as such Agent)

-149-

hereunder and under the other Credit Documents, (b) any L/C Issuer or the Swingline Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer or Swingline Lender, as the case may be) hereunder and under the other Credit Documents, (c) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.12), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Credit Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 9.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.12, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**11.04    Expenses; Indemnity; Damage Waiver.**

(a)    Costs and Expenses. The Borrowers shall pay (i) all reasonable documented out-of-pocket expenses incurred by each Agent and its Affiliates and each Lead Arranger (including the reasonable and invoiced fees, charges and disbursements of any one counsel for any Agent, plus one local counsel in any jurisdiction reasonably necessary), in connection with the administration, syndication and closing of the credit facilities provided for herein, the preparation, due diligence, negotiation, execution, delivery and administration of this Credit Agreement and the other Credit Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated and whether or not such amendment or waiver becomes effective), (ii) all reasonable documented out-of-pocket expenses incurred by any L/C Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all reasonable documented out-of-pocket expenses incurred by any Agent, Lender, L/C Issuer or Lead Arranger (including the reasonable documented fees, charges and disbursements of one counsel to the Agents, Lenders and L/C Issuers taken as a whole, plus one local counsel to the Agents, Lenders, L/C Issuers and Lead Arrangers taken as a whole in each relevant jurisdiction and, in the event of any actual or potential conflict of interest, one additional counsel to each affected Agent, Lender, L/C Issuer and Lead Arranger plus one local counsel in each relevant jurisdiction for each affected Lender, Agent, L/C Issuer and Lead Arranger) in connection with the enforcement or protection of its rights (A) in connection with this Credit Agreement and the other Credit Documents, including its rights under this Section, or (B) in connection with the Loans made, B/As accepted or purchased or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, B/As or Letters of Credit.

(b)    Indemnification by the Borrowers. The Borrowers shall indemnify each Agent (and any sub-agents thereof), Lender, L/C Issuer and Lead Arranger, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including any settlement costs and reasonable fees, charges and disbursements of one counsel for any Indemnitee plus one local counsel in each reasonably necessary jurisdiction and in the event of any actual or perceived conflict of interest, one additional counsel for each affected party plus one additional local counsel in each reasonably necessary jurisdiction), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrowers or any other Credit Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Credit Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agents (and any sub-agents thereof) and their Related Parties only, the administration of this Credit Agreement and the other Credit Documents, (ii) any Loan, B/A or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by an L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any Environmental Liability related to the Parent Borrower or any of its Subsidiaries, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Parent Borrower or any other Credit Party, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from any settlement entered into by any Indemnitee without the Parent Borrower's written consent, which shall not be unreasonably withheld or delayed, (y) result

-150-

from disputes between and among Persons otherwise entitled to indemnification and to which Parent Borrower or any of its Subsidiaries is not a party (provided that this clause (y) shall not apply to disputes involving the Administrative Agent or any other agent or arranger in its capacity as such) or (z) result from a claim brought by the Parent Borrower or any other Credit Party against an Indemnitee for a breach in bad faith of such Indemnitee's obligations hereunder or under any other Credit Document, if the Parent Borrower or such Credit Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. This Section 11.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)   Reimbursement by Lenders. To the extent that the Borrowers for any reason fails to indefeasibly pay any amount required under subsections (a) or (b) of this Section to be paid by them to any Agent (or any sub-agent thereof), L/C Issuer or Related Party of any of the foregoing, each Lender severally agrees to pay to such Agent (or any such sub-agent), L/C Issuer or Related Party, as the case may be (but, in each case, without affecting the Borrowers' obligations with respect thereto), such Lender's Aggregate Revolving Commitment Percentage or, in the case of L/C Obligations, L/C Commitment Percentage (as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or any such sub-agent), L/C Issuer in its capacity as such, or Related Party of any of the foregoing acting for such Agent (or any such sub-agent) or L/C Issuer in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.11(d).

(d)   Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, the Borrowers shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Credit Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, B/A or Letter of Credit or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Credit Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

(e)   Payments. All amounts due under this Section shall be payable not later than ten (10) Business Days after demand therefor.

(f)   Survival. The agreements in this Section shall survive the resignation of any Agent and L/C Issuer, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**11.05   Payments Set Aside.**

To the extent that any payment by or on behalf of the Borrowers is made to any Agent, L/C Issuer or Lender, or any Agent, L/C Issuer or Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any Agent, L/C Issuer or Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and L/C Issuer severally agrees to pay to such Agent on demand its applicable share (without duplication) of any amount so recovered from or repaid by such Agent plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect. The obligations of the Lenders and the L/C Issuers under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

-151-

11.06    **Successors and Assigns.**

(a)    <u>Successors and Assigns Generally</u>. The provisions of this Credit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Parent Borrower nor any other Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (other than in connection with a transaction permitted by <u>Section 8.04</u>) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of <u>subsection (b)</u> of this <u>Section 11.06</u>, (ii) by way of participation in accordance with the provisions of<u>subsection (d)</u> of this <u>Section 11.06</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of<u>subsection (f)</u> of this <u>Section 11.06</u> (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Credit Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>subsection (d)</u> of this <u>Section 11.06</u> and, to the extent expressly contemplated hereby, the Related Parties of each of each Agent, L/C Issuer and Lender) any legal or equitable right, remedy or claim under or by reason of this Credit Agreement.

(b)    <u>Assignments by Lenders</u>. Any Lender may at any time assign to one (1) or more Eligible Assignees all or a portion of its rights and obligations under this Credit Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this <u>subsection (b)</u>, participations in L/C Obligations and in Swingline Loans) at the time owing to it); <u>provided</u> that

(i)    except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than (A) in the case of Revolving Commitments, Delayed Draw Term A Commitments, and Revolving Loans, $5.0 million, and (B) in the case each of the Term Loans, $500,000, unless, in each case, each of the Administrative Agent and, so long as no Event of Default pursuant to <u>Section 9.01(a)</u> or <u>(f)</u> has occurred and is continuing, the Parent Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed and <u>provided</u> that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof), it being understood that assignments to a Lender or an Affiliate of a Lender or an Approved Fund shall not be subject to such minimum amounts;

(ii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Dollar Revolving Lender's rights and obligations under this Credit Agreement with respect to the Dollar Revolving Loans and the Dollar Revolving Commitment assigned, except that this <u>clause (ii)</u> shall not apply to rights in respect of Swingline Loans;

(iii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Limited Currency Revolving Lender's rights and obligations under this Credit Agreement with respect to the Limited Currency Revolving Loans and the Limited Currency Revolving Commitment assigned;

(iv)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Multicurrency Revolving Lender's rights and obligations under this Credit Agreement with respect to the Multicurrency Revolving Loans and the Multicurrency Revolving Commitment assigned;

(v)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Term Loan Lender's rights and obligations under this Credit Agreement with respect to the Term Loans or Term Loan Commitment assigned;

-152-

(vi)     any assignment of (A) a Dollar Revolving Commitment and Dollar Revolving Loans must be approved by the Administrative Agent, each Dollar L/C Issuer and the Swingline Lender and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that the Parent Borrower's approval shall not be required if the proposed assignee is a Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund; (B) a Limited Currency Revolving Commitment and Limited Currency Revolving Loans must be approved by the Administrative Agent and each Multicurrency L/C Issuer and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that the Parent Borrower's approval shall not be required if the proposed assignee is a Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund; (C) a Multicurrency Revolving Commitment and Multicurrency Revolving Loans must be approved by the Administrative Agent and the Alternative Currency Fronting Lender(s) and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that the Parent Borrower's approval shall not be required if the proposed assignee is a Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund; (D) the Term Loans other than Delayed Draw Term A Loans must be approved by the Administrative Agent and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that no approval shall be required if the proposed assignee is a Lender, an Affiliate of a Lender or an Approved Fund; (E) the Delayed Draw Term A Loans and Delayed Draw Term A Commitments must be approved by the Administrative Agent and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that no approval shall be required if the proposed assignee is a Delayed Draw Term A Lender, Revolving Lender, an Affiliate of a Delayed Draw Term A Lender or Revolving Lender or an Approved Fund; and (F) a 2020-1 Incremental Revolving Commitment and 2020-1 Incremental Revolving Loans must be approved by the Administrative Agent and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that the Parent Borrower's approval shall not be required if the proposed assignee is a Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund;

(vii)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500, and the Eligible Assignee, if it shall not be a Lender, shall (A) deliver to the Administrative Agent an Administrative Questionnaire and (B) deliver to the applicable Borrower and the Applicable Agent the forms required to be delivered pursuant to Section 3.01(e); and

(viii)   each partial assignment shall be made as an assignment of a proportionate part of all the assigning 2020-1 Incremental Revolving Lender's rights and obligations under this Credit Agreement with respect to the 2020-1 Incremental Revolving Loans and the 2020-1 Incremental Revolving Commitments assigned.

-153-

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section 11.06, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Credit Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Credit Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Credit Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Credit Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, and 11.04 (subject to the requirements and limitations of such Sections) with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the applicable Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Credit Agreement that does not comply with this subsection shall be treated for purposes of this Credit Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section 11.06.

(c)  Register. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, acceptance and purchase of any B/As and L/C Obligations and the interest thereon owing and paid to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Credit Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by each of the Parent Borrower, the Agents, the Lenders (solely with respect to each Lender's own Loans and Commitments) and the L/C Issuers at any reasonable time and from time to time upon reasonable prior notice.

Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Eligible Assignee, the Eligible Assignee's completed Administrative Questionnaire (unless the Eligible Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 11.06 and any written consent to such assignment required by paragraph (b) of this Section 11.06, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the Eligible Assignee shall have failed to make any payment required to be made by it pursuant to Section 2.02(b), 2.03(c), 2.04(b), 2.11(b) or 11.04(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Credit Agreement unless it has been recorded in the Register as provided in this paragraph.

(d)  Participations. Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural person or the Parent Borrower or any of the Parent Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Credit Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations and/or Swingline Loans) owing to it); provided that (i) such Lender's obligations under this Credit Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Agents, the Lenders and the L/C Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Credit Agreement. Each Lender, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain a register for the recordation of the names and addresses of such Participants and the rights, interests or obligations of such Participants in any Obligation, in any Commitment and in any right to receive any principal, interest and other payments thereunder (the "Participant Register"). The entries in the Participant Register shall be conclusive absent manifest error and the Borrowers and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Credit Agreement notwithstanding any notice to the contrary; provided that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of the Participant or any information relating to a Participant's interest in any Loans or other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any loans are in registered form for U.S. federal income Tax purposes under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the proposed United States Treasury Regulations.

-154-

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Credit Agreement and to approve any amendment, modification or waiver of any provision of this Credit Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 11.01(a)(iv) or (v) or, to the extent the Participant is affected thereby, Section 11.01(b)(i), (ii) or (iii). Subject to subsection (e) of this Section 11.06, each Participant (i) shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 11.06 and (ii) shall be subject to Sections 3.06 and 11.13(a) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 11.06. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; provided such Participant agrees to be subject to Section 2.12 as though it were a Lender.

(e)    Limitation upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Parent Borrower's prior written consent to such sale, not to be unreasonably withheld or delayed (it being agreed, without limitation, that it will be reasonable for the Parent Borrower to withhold consent if giving consent would result in increased indemnification obligations at the time the participation takes effect or would be reasonably certain to result in increased indemnification obligations thereafter as a result of a Change in Law announced prior to the time the participation takes effect). For the avoidance of doubt, a Participant entitled to benefits under Section 3.01, 3.04 or 3.05 shall be subject to all of the limitations and requirements of such Sections as if it were a Lender (including, in the case of Section 3.01, all of the limitations in the definition of Excluded Taxes).

(f)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Credit Agreement (including under its Note(s), if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other governmental authority; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    Special Purpose Funding Vehicles. Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Parent Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Credit Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if a SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Applicable Agent as is required under Section 2.11(b)(i). Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Credit Agreement for which a Lender would be liable, and the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Credit Document, remain the lender of record hereunder. The making of a Loan by a SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Credit Agreement) that, prior to the date that is one (1) year and one (1) day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Parent Borrower and the Administrative Agent and with the payment of a processing fee in the amount of $2,500, assign all or any portion of its right to receive payment with respect to any

-155-

Exhibit 2, page 302

Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC. Each SPC (i) shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections) to the same extent as if it were a Granting Lender and had acquired its interest by assignment pursuant to Section 11.06(b) (it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the Granting Lender) and (ii) shall be subject to Sections 3.06 and 11.13(a) to the same extent as if it were a Granting Lender and had acquired its interest by assignment pursuant to Section 11.06(b). A SPC shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Granting Lender would have been entitled to receive with respect to the interest granted to such SPC unless the grant of the interest is made with the Parent Borrower's prior written consent to such grant, not to be unreasonably withheld or delayed (it being agreed, without limitation, that it will be reasonable for the Parent Borrower to withhold consent if giving consent would result in increased indemnification obligations at the time the grant to the SPC takes effect or would be reasonably certain to result in increased indemnification obligations thereafter as a result of a Change in Law announced prior to the time the grant to the SPC takes effect). For the avoidance of doubt, an SPC entitled to benefits under Section 3.01, 3.04 or 3.05 shall be subject to all of the limitations and requirements of such Sections as if it were a Granting Lender (including, in the case of Section 3.01, all of the limitations in the definition of Excluded Taxes).

(i)     Resignation as L/C Issuer or Swingline Lender After Assignment. Notwithstanding anything to the contrary contained herein, if at any time any L/C Issuer or Swingline Lender assigns all of its Commitment and Loans pursuant to subsection (b) above, such L/C Issuer or Swingline Lender may, (i) upon thirty (30) days' notice to the Parent Borrower and the Lenders, resign as L/C Issuer and/or (ii) upon thirty (30) days' notice to the Parent Borrower, resign as Swingline Lender. In the event of any such resignation as L/C Issuer or Swingline Lender, the Parent Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer or Swingline Lender hereunder; provided, however, that no failure by the Parent Borrower to appoint any such successor shall affect the resignation of such L/C Issuer or Swingline Lender as L/C Issuer or Swingline Lender, as the case may be. If any L/C Issuer resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of an L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)). If any Swingline Lender resigns as Swingline Lender, it shall retain all the rights of the Swingline Lender provided for hereunder with respect to Swingline Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swingline Loans pursuant to Section 2.04(b). Upon the appointment of a successor L/C Issuer and/or Swingline Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swingline Lender, as the case may be, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

(j)     Notwithstanding anything to the contrary contained herein, any Lender may assign all or any portion of its Term B-4 Loans to Parent Borrower or any of its Subsidiaries through (x) Dutch auctions open to all Lenders on a pro rata basis in accordance with procedures set forth in Exhibit 11.06(j) or (y) notwithstanding Sections 2.11 and 2.12 or any other provision in this Credit Agreement, open market purchases on a non-pro rata basis; provided that:

(i)     in connection with assignments pursuant to clause (x) above, Parent Borrower or such Subsidiary shall make an offer to all Lenders to take Term B-4 Loans by assignment pursuant to procedures set forth in Exhibit 11.06(j);

-156-

(ii)     upon the effectiveness of any such assignment, such Term B-4 Loans shall be retired, and shall be deemed cancelled and not outstanding for all purposes under this Credit Agreement;

(iii)     no Default or Event of Default shall exist or be continuing or would result therefrom;

(iv)     the Parent Borrower must represent and warrant, at the time of the offer and at the time of the assignment, either (x) it does not possess material non-public information with respect to Parent Borrower and its Subsidiaries or the securities of any of them that has not been disclosed to the Term B-4 Lenders generally (other than Term B-4 Lenders who elect not to receive such information) or (y) make a statement that such representation cannot be made; and

(v)   such purchases shall not be financed with the proceeds of a Revolving Loan or Swingline Loan.

**11.07.    Treatment of Certain Information; Confidentiality.**

Each of the Agents, Lenders and L/C Issuers agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Credit Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Credit Agreement, (ii) any actual or prospective counterparty (or advisors) to any swap, derivative transaction relating to the Borrowers and their obligations, (g) subject to each such Person being informed of the confidential nature of the Information and to their agreement to keep such Information confidential, to (i) an investor or prospective investor in securities issued by an Approved Fund that also agrees that Information shall be used solely for the purpose of evaluating an investment in such securities issued by the Approved Fund, (ii) a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in securities issued by an Approved Fund in connection with the administration, servicing and reporting on the assets serving as collateral for securities issued by an Approved Fund, or (iii) a nationally recognized rating agency that requires access to information regarding the Credit Parties, the Loans and Credit Documents in connection with ratings issued in respect of securities issued by an Approved Fund, (h) with the consent of the Parent Borrower or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Agent, Lender, L/C Issuer or any of their respective Affiliates on a nonconfidential basis from a source other than the Parent Borrower. In addition, the Administrative Agent and the Lenders may disclose the existence of this Credit Agreement and information about this Credit Agreement to market data collectors, similar service providers to the lending industry and service providers to the Lead Arrangers, Agents and the Lenders in connection with the administration of this Credit Agreement, the other Credit Documents, the Loans and the Commitments.

For purposes of this Section, "Information" means all information received from the Parent Borrower or any Subsidiary relating to the Parent Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to the any Agent, Lender or L/C Issuer on a nonconfidential basis prior to disclosure by the Parent Borrower or any Subsidiary. In the case of Information received from the Parent Borrower or any Subsidiary after the Amendment No. 6 Effective Date, such Information is clearly identified at the time of delivery. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Exhibit 2, page 304

Each of the Agents, Lenders and L/C Issuers acknowledges that (a) the Information may include material non-public information concerning the Parent Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including federal and state securities Laws.

**11.01    Right of Setoff.**

If an Event of Default shall have occurred and be continuing, each Lender, L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, L/C Issuer or any such Affiliate to or for the credit or the account of the Parent Borrower or any other Credit Party against any and all of the obligations of such Parent Borrower or such Credit Party now or hereafter existing under this Credit Agreement or any other Credit Document to such Lender or L/C Issuer, irrespective of whether or not such Lender or L/C Issuer shall have made any demand under this Credit Agreement or any other Credit Document and although such obligations of such Parent Borrower or such Credit Party may be contingent or unmatured or are owed to a branch or office of such Lender or L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender, L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, L/C Issuer or their respective Affiliates may have. Each Lender and L/C Issuer agrees to notify the Parent Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

**11.02    Interest Rate Limitation.**

Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the applicable Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest,
(b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**11.10    Counterparts; Integration; Effectiveness.**

This Credit Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Credit Agreement and the other Credit Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 5.01, this Credit Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Credit Agreement by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Credit Agreement.

Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be,

-158-

to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent. Without limiting the generality of the foregoing, each party hereto hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and the Credit Parties, electronic images of this Agreement or any other Credit Documents (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (ii) waives any argument, defense or right to contest the validity or enforceability of the Credit Documents based solely on the lack of paper original copies of any Credit Documents, including with respect to any signature pages thereto.

**11.11    Survival of Representations and Warranties.**

All representations and warranties made hereunder and in any other Credit Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and Lender, regardless of any investigation made by any Agent or Lender or on their behalf and notwithstanding that any Agent or Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

**11.12    Severability.**

If any provision of this Credit Agreement or the other Credit Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Credit Agreement and the other Credit Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**11.13    Replacement of Lenders.**

(a)    If any Lender requests compensation under Section 3.04, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any other circumstance exists hereunder that gives the Parent Borrower the right to replace a Lender as a party hereto, then the Parent Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interests, rights and obligations under this Credit Agreement and the related Credit Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)    the Parent Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 11.06(b);

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, amounts owing to it in respect of B/As, accrued fees and all other amounts payable to it hereunder and under the other Credit Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Parent Borrower (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

-159-

(iv)      such assignment does not conflict with applicable Laws; and

(v)       such assignment is recorded in the Register.

(b)      If, in connection with any proposed amendment, change, waiver, discharge or termination of any of the provisions of this Credit Agreement or any other Credit Document as contemplated by Section 11.01, the consent of the Required Lenders (or Required Limited Currency Revolving Lenders, Required Dollar Revolving Lenders, Required Delayed Draw Term A Lenders, Required Term B-4 Lenders or Required 2020-1 Incremental Revolving Lenders, as the case may be) is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in this clause (b) being referred to as a "Non-Consenting Lender"), then, at the Borrower's request, any Eligible Assignee reasonably acceptable to the Administrative Agent that consents to such amendment, change, waiver, discharge or termination shall have the right to purchase from such Non-Consenting Lender, and such Non-Consenting Lender agrees that it shall, upon the Administrative Agent's request, sell and assign to such Eligible Assignee, all of the Commitments and Loans of such Non-Consenting Lender for an amount equal to the principal balance of all Loans and L/C Advances held by such Non-Consenting Lender and all accrued and unpaid interest and fees with respect thereto through the date of sale and payment to the Administrative Agent of the assignment fee under Section 11.06(b); provided, however, that such purchase and sale shall not be effective until (x) in the case of this clause (x), to the extent requested by the Administrative Agent, the Administrative Agent shall have received from such Eligible Assignee an agreement in form and substance satisfactory to the Administrative Agent and the Parent Borrower whereby such Eligible Assignee shall agree to be bound by the terms hereof and (y) such Non-Consenting Lender shall have received payments of all Loans and L/C Advances held by it and all accrued and unpaid interest and fees with respect thereto and all other amounts payable to it hereunder through the date of the sale, but upon the satisfaction of the requirements set forth in clause (x) (in the case of clause (x), if so requested by the Administrative Agent) and (y) of this proviso, such purchase and sale shall be deemed effective and such Eligible Assignee shall be deemed the holder of such Loans, Commitments and L/C Advances of such Non-Consenting Lender. Each Lender agrees that, if it becomes a Non-Consenting Lender, to the extent requested by the Administrative Agent, it shall execute and deliver to the Administrative Agent an Assignment and Assumption to evidence such sale and purchase and shall deliver to the Administrative Agent any Note (if the assigning Lender's Loans are evidenced by a Note) subject to such Assignment and Assumption.

A Lender that has assigned its interests, rights and obligations under this Credit Agreement and the related Credit Documents pursuant to this Section 11.13 shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 11.04 (subject to the requirements and limitations of such Sections) with respect to facts and circumstances occurring prior to the effective date of such assignment.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Parent Borrower to require such assignment and delegation cease to apply.

**11.14    Governing Law; Jurisdiction; Etc.**

(a)      GOVERNING LAW. THIS CREDIT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)      SUBMISSION TO JURISDICTION. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF SUCH STATE AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS

Exhibit 2, page 307

CREDIT AGREEMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY HERETO MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST ANY OTHER PARTY HERETO OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02. NOTHING IN THIS CREDIT AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**11.15    Waiver of Jury Trial.**

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS CREDIT AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**11.16    USA PATRIOT Act Notice.**

Each Lender that is subject to the Act (as hereinafter defined) and the Agents (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender or Agent, as applicable, to identify such Borrower in accordance with the Patriot Act.

**11.17    Designation as Senior Debt.**

All Obligations shall be "Designated Senior Indebtedness" (or such similar defined term) for purposes of all documentation governing Subordinated Debt, to the extent such concept exists in the documentation governing such Subordinated Debt.

**11.18    Limitation on Foreign Credit Party Obligations.**

Notwithstanding anything to the contrary herein, no provision of this Credit Agreement shall render any Foreign Credit Party liable for the Obligations of any Domestic Credit Party.

-161-

**11.19    No Advisory or Fiduciary Responsibility.**

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), the Parent Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Credit Agreement provided by the Agents and the Lead Arrangers are arm's-length commercial transactions between the Parent Borrower and its Affiliates, on the one hand, and the Agents and the other Lead Arrangers, on the other hand, (B) the Parent Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Parent Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (ii) (A) each Agent, Lender and Lead Arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Parent Borrower or any of its Affiliates, or any other Person and (B) no Agent, Lender or Lead Arranger has any obligation to the Parent Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; and (iii) the Agents, Lenders and the Lead Arrangers and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Parent Borrower and its Affiliates, and no Agent or any Lead Arranger has any obligation to disclose any of such interests to the Parent Borrower or its Affiliates. To the fullest extent permitted by law, the Borrowers hereby waive and release any claims that it may have against any Agent, Lender or Lead Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**11.20    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.**

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Credit Document may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

**11.21    Judgment Currency; Submission to Jurisdiction.**

If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Credit Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of a Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Credit Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement

-162-

Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from a Borrower in the Agreement Currency, such Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to such Borrower (or to any other person who may be entitled thereto under applicable law).

By the execution and delivery of this Credit Agreement, each Credit Party (i) hereby designates and appoints Parent Borrower as its authorized agent upon which process may be served in any suit or proceeding arising out of or relating to this Agreement that may be instituted in New York Courts, (ii) submits to the jurisdiction of any such court in any such suit or proceeding and (iii) agrees that service of process upon Parent Borrower and written notice of said service to Parent Borrower in accordance with the manner provided for notices in Section 11.02 shall be deemed in every respect effective service of process upon such Credit Party, in any such suit or proceeding. Each Credit Party further agrees to take any and all action, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of Parent Borrower in full force and effect so long as this Credit Agreement is in effect. To the extent that any Credit Party has or hereafter may acquire any immunity from jurisdiction of any court of (i) any jurisdiction in which it owns or leases property or assets or (ii) the United States or the State of New York or any political subdivision of either or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property and assets or this Agreement or any of the other Credit Documents or actions to enforce judgments in respect of any thereof, such Credit Party hereby irrevocably waives such immunity in respect of its obligations under the above-referenced documents, to the extent permitted by law.
Nothing in this Credit Agreement, any other Credit Document will affect the right of any party to this Credit Agreement to serve process in any other manner permitted by law.

### 11.22    Acknowledgement Regarding Any Supported QFCs

To the extent that the Credit Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

-163-

**11.23**    **Restricted Lenders**.

In relation to each Lender that notifies the Administrative Agent and the Parent Borrower to such effect in writing (each, a "Restricted Lender"), Section 6.24, Section 7.06 and, solely as it relates to compliance with Section 6.24, Article V, shall only apply to such Restricted Lender to the extent that such provision would not result in (a) any violation of, conflict with or liability under EU Regulation (EC) 2271/96 or (b) a violation or conflict with section 7 of the German Foreign Trade and Payments Ordinance (*Außenwirtschaftsverordnung*) or a similar anti-boycott statute. The election of any Lender who elects to be a Restricted Lender shall remain in effect until such time as such Restricted Lender advises the Administrative Agent and the Parent Borrower in writing that it is no longer a Restricted Lender. In connection with any amendment, waiver, determination or direction relating to any part of Section 6.24, Section 7.06 and, solely as it relates to compliance with Section 6.24, Article V, of which such Restricted Lender does not have the benefit, the Commitments, Loans and Obligations of that Restricted Lender will be excluded for the purpose of determining whether the consent of the Required Lenders, Required Delayed Draw Term A Lenders, Required Dollar Revolving Lenders, Required L/C Lenders, Required Limited Currency Revolving Lenders, Required Multicurrency Revolving Lenders, Required Revolving Lenders, Required Specified Currency Limited Currency/Multicurrency Revolving Lenders, Required Term B-4 Lenders or Required 2020-1 Incremental Revolving Lenders, as applicable, has been obtained or whether the determination or direction by such Lenders has been made.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Exhibit 21.1**

**Subsidiaries of Live Nation Entertainment, Inc.**

| Domestic | State or Jurisdiction of Incorporation or Organization |
| --- | --- |
| #JUSTAREGULARNATION, LLC | Delaware |
| 3P Festival LLC | Delaware |
| 6 Washington Pool LLC | Delaware |
| 6021 Hollywood Operating Company, LLC | Delaware |
| 801 Brickell LLC | Delaware |
| Academy LA, LLC | Delaware |
| ACMF, LLC | Texas |
| Arrive I LLC | Delaware |
| Arrive I Management, LLC | Delaware |
| Arrive II GP LLC | Delaware |
| Arrive II LP | Delaware |
| Arrive Opportunities Fund 1 GP, LLC | Delaware |
| Arrive Opportunities Management, LLC | Delaware |
| Artist Nation Management Group, LLC | Delaware |
| Assembly Room Studios, LLC | Delaware |
| Austin Arena Holdings, LLC | Delaware |
| Axis Nation, LLC | Virginia |
| Bamboozle Festival, LLC | Delaware |
| Baron Global, Inc. | Delaware |
| Beyond Fabrication, LLC | Delaware |
| Big Loud Mountain Management, LLC | Tennessee |
| BigChampagne, LLC | Delaware |
| Birmingham Festival 2015, LLC | Delaware |
| Birmingham Festival 2016, LLC | Delaware |
| Birmingham Festival 2017, LLC | Delaware |
| Birmingham Festival 2018, LLC | Delaware |
| Birmingham Festival Ventures, LLC | Delaware |
| Black Swan Hospitality LLC | Delaware |
| Blackout Merch LLC | Delaware |
| Blueprint Artist Management, LLC | Delaware |
| Blues at the Depot, LLC | Utah |
| Bottlerock Presents LLC | Delaware |
| Boundless Systems, LLC | Delaware |
| Bowls Holdings Nashville, LLC | Delaware |
| Bowls Holdings Philadelphia, LLC | Delaware |
| Bowls Holdings, LLC | Delaware |
| Bowls Las Vegas, LLC | Delaware |
| Broccoli City Festival, LLC | Delaware |
| Brooklyn Bowl Las Vegas, LLC | Delaware |
| Brooklyn Bowls Present, LLC | Delaware |
| By Any Means Management, LLC | Delaware |
| C2 Acquisitions, LLC | Delaware |
| C3 Booking, LLC | Texas |

- 1 -

| Domestic | State or Jurisdiction of Incorporation or Organization |
|---|---|
| C3 Presents, L.L.C. | Texas |
| C3P Emo's, LLC | Texas |
| C3P Scoot Inn, LLC | Texas |
| Career Acquisitions, LLC | Delaware |
| Career Artist Management LLC | Delaware |
| Caring & Daring, LLC | Delaware |
| Cellar Door Venues, Inc. | Florida |
| CG Brickell IP LLC | Delaware |
| Clear Entertainment Corp. | Florida |
| Club Space Management, LLC | Florida |
| CN Holdco, LLC | Delaware |
| Connecticut Amphitheater Development Corporation | Connecticut |
| Connecticut Performing Arts Partners | Connecticut |
| Counterpointfest, LLC | Texas |
| Country Music Holding Company, LLC | Delaware |
| Country Nation - Chicago, LLC | Delaware |
| Country Nation - DE, LLC | Delaware |
| Country Nation, LLC | Delaware |
| Crossroads Presents, LLC | Delaware |
| Crown Merchandise LLC | Delaware |
| Crush Next, LLC | Delaware |
| Crush Next Sports, LLC | Delaware |
| Cultivate Management, LLC | Delaware |
| Cumberland Amphitheatre Partners, LLC | Delaware |
| Dalton Entertainment, LLC | Delaware |
| Delmar Hall, LLC | Missouri |
| DG Medios US, LLC | New York |
| DGXP Resorts LLC | Delaware |
| Diversified Production Services, LLC | Delaware |
| Do617 LLC | Delaware |
| EDC The Movie, LLC | Delaware |
| Eight Ball Pricing Solutions, LLC | Delaware |
| Ekho Events, LLC | Delaware |
| Electric Forest, LLC | Delaware |
| Element1 Management, LLC | California |
| Emagen WITH Music, LLC | Delaware |
| Emagen WITH, LLC | Delaware |
| Emporium Presents, LLC | Nevada |
| Equity Distribution LLC | Delaware |
| Equity Publishing LLC | Delaware |
| ESM Productions, LLC | Delaware |
| Event Merchandising, Inc. | California |
| Event Support Group, LLC | Delaware |
| F and F Concessions, Inc. | Illinois |

- 2 -

| Domestic | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Faculty Management, LLC | Delaware |
| Faculty Productions, LLC | Delaware |
| Femme it Forward, LLC | Delaware |
| Fenway Music Company, LLC | Delaware |
| Festival Holdings, L.L.C. | Virginia |
| Fillmore Minneapolis Corp. | Delaware |
| Fillmore New Orleans Corp. | Delaware |
| FKMF, LLC | Delaware |
| Forecastle Ventures, LLC | Tennessee |
| Founders Entertainment, LLC | New York |
| FPC Live LLC | Wisconsin |
| FPSF Holding, LLC | Delaware |
| Frank Productions Concerts, LLC | Wisconsin |
| Frank Productions, LLC | Delaware |
| Front Gate Ticketing Solutions, LLC | Delaware |
| Gellman Management LLC | Delaware |
| Glow DC, LLC | Delaware |
| Glow Events, LLC | Delaware |
| Gov Ball 2016, LLC | New York |
| Greenlight Media & Marketing, LLC | Delaware |
| Greenlight Studios, LLC | Virginia |
| Groot 1575 Alton LLC | Delaware |
| Groot 41st Street | Delaware |
| Groot 8th Street LLC | Delaware |
| Groot 8th Street Management LLC | Delaware |
| Groot Alton IP LLC | Delaware |
| Groot Alton Management LLC | Delaware |
| Groot Cocowalk LLC | Delaware |
| Groot Cocowalk Management LLC | Delaware |
| Groot Design District Hospitality, LLC | Florida |
| Groot Entertainment LLC | Delaware |
| Groot Forge, LLC | Delaware |
| Groot Hospitality Holdings, LLC | Delaware |
| Groot Hospitality LLC | Delaware |
| Groot Investments, LLC | Delaware |
| Groot Music Design District LLC | Delaware |
| Groot Papi Steak Restaurant LLC | Delaware |
| Groot PS Management LLC | Delaware |
| Groot Reign Makers Hotel Brand LLC | Delaware |
| Groot Stadium LLC | Delaware |
| Groot Steak LLC | Delaware |
| Groot WMP Hospitality LLC | Delaware |
| Groot Womens Club LLC | Delaware |
| GrouponLive, LLC | Delaware |
| GrouponLive, LLC | Delaware |
| Hard Events LLC | California |

- 3 -

Exhibit 2, page 314

| *Domestic* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| High Noon Saloon LLC | Wisconsin |
| HOB Ace of Spades Corp. | Delaware |
| HOB Boardwalk, Inc. | Delaware |
| HOB Café Corp. | Delaware |
| HOB Chicago, Inc. | Delaware |
| HOB Depot Corp. | Delaware |
| HOB Entertainment, LLC | Virginia |
| HOB Grand Rapids, LLC | Delaware |
| HOB HiFi Dallas Corp. | Delaware |
| HOB Marina City Partners, L.P. | Delaware |
| HOB Marina City, Inc. | Delaware |
| HOB Marquis Corp. | Delaware |
| HOB Punch Line Penn Corp. | Delaware |
| HOB Punch Line S.F. Corp. | Delaware |
| HOB Queen Theater Corp. | Delaware |
| HOB Rose City MH Corp. | Delaware |
| HOB Roxian Corp. | Delaware |
| HOB Seattle Corp. | Delaware |
| HOB Summit MH Corp. | Delaware |
| HOB Varsity Corp. | Delaware |
| Hofesh, LLC | Delaware |
| Host VIP, LLC | Delaware |
| Hot Fire, LLC | Texas |
| House of Blues Anaheim Restaurant Corp. | Delaware |
| House of Blues Cleveland, LLC | Delaware |
| House of Blues Concerts, Inc. | California |
| House of Blues Dallas Restaurant Corp. | Delaware |
| House of Blues Houston Restaurant Corp. | Delaware |
| House of Blues Las Vegas Restaurant Corp. | Delaware |
| House of Blues Myrtle Beach Restaurant Corp. | Delaware |
| House of Blues New Orleans Restaurant Corp. | Delaware |
| House of Blues Orlando Restaurant Corp. | Delaware |
| House of Blues Restaurant Holding Corp. | Delaware |
| House of Blues San Diego Restaurant Corp. | Delaware |
| House of Blues San Diego, LLC | Delaware |
| Hungry, Thirsty, Crazy, and Lucky, LLC | Texas |
| I am OTHER Ventures, LLC | Delaware |
| Innings East, LLC | Delaware |
| Innings, LLC | Delaware |
| Insomniac Holdings, LLC | Delaware |
| Insomniac Records, LLC | Delaware |
| IO Media, Inc. | New York |
| IOMedia Technologies, LLC | New York |
| ISBE Brand Owner, LLC | Delaware |
| JMBLYA, LLC | Texas |
| Key Club Miami LLC | Delaware |

- 4 -

| *Domestic* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| Kingdom of Mind, LLC | Delaware |
| Komodo Dallas Holdings, LLC | Texas |
| Komodo Dallas, LLC | Texas |
| LaneOne Management, LLC | Delaware |
| LaneOne, LLC | Delaware |
| Lansdowne Boston Restaurant, LLC | Delaware |
| Levitate Music Festival, LLC | Delaware |
| Lionfish Management, LLC | Delaware |
| Live Nation Bogart, LLC | Delaware |
| Live Nation Chicago, Inc. | Delaware |
| Live Nation LGTours (USA), LLC | Delaware |
| Live Nation Marketing, Inc. | Delaware |
| Live Nation Merchandise, LLC | Delaware |
| Live Nation MTours (USA), Inc. | Delaware |
| Live Nation Paradise, LLC | Delaware |
| Live Nation Productions, LLC | Delaware |
| Live Nation Studios Holdings, LLC | Delaware |
| Live Nation Studios Productions, LLC | Delaware |
| Live Nation Ticketing, LLC | Delaware |
| Live Nation Touring (USA), Inc. | Delaware |
| Live Nation Urban, LLC | Delaware |
| Live Nation UshTours (USA), Inc. | Delaware |
| Live Nation UTours (USA), Inc. | Delaware |
| Live Nation Worldwide, Inc. | Delaware |
| LMG Management LLC | Delaware |
| LMG Management Ventures, LLC | Delaware |
| LN-HS Concerts, LLC | Delaware |
| Lollapalooza, LLC | Delaware |
| Marcy Musik LLC | New York |
| MBA Artist Management Company, LLC | Delaware |
| Meadowbrook Amphitheatre Holdings, LLC | Delaware |
| Merch Nation Holdings, LLC | Delaware |
| Merch Traffic, LLC | Delaware |
| MIA Festival Holdings, LLC | Delaware |
| Michigan Licenses, LLC | Delaware |
| Microflex 2001 LLC | Delaware |
| Mountain Jam Productions, LLC | Delaware |
| Music City Eats, LLC | Texas |
| National Shows 2, LLC | Wisconsin |
| NDMF, LLC | Texas |
| Neste Event Marketing, LLC | Delaware |
| New Community Management, LLC | Delaware |
| New Era Farms, LLC | Virginia |
| New IAMSPORTS, LLC | California |
| New York Theater, LLC | Delaware |
| No Limit Entertainment LLC | Delaware |

- 5 -

Exhibit 2, page 316

| Domestic | State or Jurisdiction of Incorporation or Organization |
|---|---|
| NOC, Inc. | Connecticut |
| Ohana Music Festival Holdings, LLC | Delaware |
| Okeechobee Experience, LLC | Delaware |
| Patriot Nation II, LLC | Delaware |
| Philly Artist Management, LLC | Delaware |
| Philymack Management, LLC | Delaware |
| Philymack Productions, LLC | Delaware |
| Philymack Wellness, LLC | Delaware |
| Production Staffing Group, LLC | Delaware |
| PromoHouse, LLC | Delaware |
| Rebel Artist Management, LLC | Delaware |
| Red Ginger SB, LLC | Florida |
| Red Mountain Entertainment, LLC | Delaware |
| Redrock Entertainment Services LLC | Delaware |
| ReignDeer Entertainment Corp. | California |
| ReignDeer Entertainment, LLC | Delaware |
| ReignDeer Investments, LLC | Delaware |
| Rival Labs, Inc. | Delaware |
| Roc Nation Advertising LLC | Delaware |
| Roc Nation Latin Publishing LLC | Delaware |
| Roc Nation LLC | Delaware |
| Roc Nation Management, LLC | Delaware |
| Roc Nation Publishing, LLC | Delaware |
| Roc Nation Records, LLC | Delaware |
| Roc Nation Sports - Roc Nation Boxing, LLC | Delaware |
| Roc Nation Sports, LLC | Delaware |
| Roc Nation Ventures, LLC | Delaware |
| Rock in Rio USA, Inc. | Delaware |
| Rock World USA, LLC | Delaware |
| Rolling Loud, LLC | Delaware |
| RonRuss Red Ginger, LLC | Florida |
| S10 Entertainment & Media, LLC | Delaware |
| S2 Songs, LLC | Delaware |
| SAL & Co Management LP | Delaware |
| SC Management GP, Inc. | Delaware |
| Scheme Engine, LLC | Delaware |
| Scoremore Dreamville, LLC | Texas |
| ScoreMore Holdings, LLC | Delaware |
| Seitrack International Inc. | Delaware |
| Seitrack USA, LLC | Delaware |
| SFX Financial Advisory Management Enterprises, Inc. | Delaware |
| Shaky Boots Fest, LLC | Georgia |
| Shaky Festivals Holdings, LLC | Delaware |
| Shaky Knees Fest, LLC | Georgia |
| SHN Festivals, LLC | Texas |
| Silk City Printing, LLC | Delaware |

- 6 -

Exhibit 2, page 317

| _Domestic_ | _State or Jurisdiction of Incorporation or Organization_ |
|---|---|
| SME Entertainment Group LLC | Delaware |
| Soundcheck LLC | District of Colombia |
| Space Invaders, LLC | Florida |
| Space IP Licensing, LLC | Florida |
| Spaceland Productions, LLC | California |
| Space Park, LLC | Delaware |
| Spalding Entertainment Acquisitions, LLC | Delaware |
| Spalding Entertainment, LLC | Tennessee |
| Starr Hill Presents Kansas, LLC | Virginia |
| Stateside Group, LLC | Delaware |
| Stubb's Austin Restaurant Company, LC | Texas |
| Swan Hospitality LLC | Florida |
| The Core Entertainment, LLC | Delaware |
| The Echo, LLC | California |
| Ticketmaster L.L.C. | Virginia |
| Ticketmaster New Ventures Holdings, Inc. | Delaware |
| Ticketmaster Pacific Acquisitions, Inc. | Delaware |
| Ticketstoday, LLC | Virginia |
| Ticketweb, LLC | Delaware |
| TM Vista Inc. | Virginia |
| TMF Holdco, LLC | Delaware |
| TNA Tour II (USA) Inc. | Delaware |
| TX Music Club Adventures, LLC | Texas |
| Universe Inc. | Delaware |
| Upgraded, Inc. | Delaware |
| V Major, LLC | Delaware |
| Van Buren Group Holdings, LLC | Delaware |
| Vector Management LLC | Delaware |
| Veeps Inc. | Delaware |
| Voodoo Music Experience, LLC | Louisiana |
| We Are Voices Entertainment, Inc. | Delaware |
| WE Fest Holdings, LLC | Delaware |
| Why Not OC LLC | California |
| Why Not San Diego, LLC | Delaware |
| Wiltern Renaissance LLC | Delaware |
| Wolfson Entertainment, Inc. | California |
| Women Nation, LLC | Delaware |
| Womens Club Holdings, LLC | Delaware |
| Womens Club IP, LLC | Delaware |
| YCFUNCO, LLC | Delaware |
| ZeroSix, LLC | Delaware |

- 7 -

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| DF Entertainment, S.A. | Argentina |
| Live Nation Argentina S.A. | Argentina |
| Ash Assets Pty Ltd | Australia |
| Ash Sounds Pty Ltd | Australia |
| Brunswick Street Venue Pty Ltd | Australia |
| DNA Experiences Live Pty Ltd | Australia |
| Four Fish Swimming Pty Ltd | Australia |
| Hindley Street Music Hall Pty Ltd | Australia |
| Live Nation Australasia Pty Ltd | Australia |
| Live Nation Australia Festivals Pty Ltd | Australia |
| Live Nation Australia Venues Pty Ltd | Australia |
| Live Nation Holdings Australasia Pty Ltd | Australia |
| Live Nation Holdings Australasia 2 Pty Ltd | Australia |
| LN Oldco Pty Ltd | Australia |
| Look up and Live Pty Ltd | Australia |
| Mellen Touring Pty Ltd | Australia |
| Moshtix Pty Ltd | Australia |
| Secret Sounds Artist Management Pty Ltd | Australia |
| Secret Sounds Group Pty Ltd | Australia |
| Secret Sounds Group Services Pty Ltd | Australia |
| Secret Sounds Pty Ltd | Australia |
| Secret Sounds Sponsorship Pty Ltd | Australia |
| Southern Ocean Venues Pty Ltd | Australia |
| Splendour in the Grass Pty Ltd | Australia |
| SSG-LN Festivals Pty Ltd | Australia |
| T Shirt Printers Pty Limited | Australia |
| Ticketmaster Australasia Pty Ltd | Australia |
| TSP Merchandising Pty Ltd | Australia |
| Village Sounds Agency Pty Ltd | Australia |
| Live Nation Austria GmbH | Austria |
| ASB N.V | Belgium |
| Antwerps Sportpaleis N.V. | Belgium |
| Biebob B.V. | Belgium |
| GMM Festival B.V. | Belgium |
| Live Nation Belgium Holdings B.V. | Belgium |
| Live Nation B.V. | Belgium |
| Live Nation Festivals N.V. | Belgium |
| Ticketmaster Belgium N.V. | Belgium |
| We Love Entertainment B.V. | Belgium |
| Show Tickets Australia Pty Ltd | Australia |
| Ticketmaster Australasia Pty Ltd | Australia |

- 8 -

Exhibit 2, page 319

| International | State or Jurisdiction of Incorporation or Organization |
|---|---|
| SE – Engenharia Consultiva Ltda | Brazil |
| Live Nation Brasil Entretenimento Ltda. | Brazil |
| Live Nation Brasil Marketing LTDA. | Brazil |
| Rock City S.A. | Brazil |
| Rock World S.A. | Brazil |
| Ticketmaster Brasil LTDA | Brazil |
| Gestion Evenko Festival, Inc. | Canada |
| 4327144 Nova Scotia Company | Canada |
| Agence Evenko, Inc. | Canada |
| Center of Gravity Sports and Music Festival Inc. | Canada |
| Embrace Entertainment, Inc | Canada |
| Embrace Presents, Ltd. | Canada |
| Evenko, G.P. | Canada |
| Front Gate Ticketing Solutions Canada, Ltd. | Canada |
| Impressario, Inc. | Canada |
| Live Nation Canada, Inc. | Canada |
| Live Nation Ontario Concerts GP, Inc. | Canada |
| Live Nation Ontario Concerts, L.P. | Canada |
| Live Nation Touring (Canada), Inc. | Canada |
| Manett Holdings (Canada) Limited | Canada |
| Midway Music Arcade Kitchen Ltd. | Canada |
| Sal & Co LP | Canada |
| SC GP, Inc. | Canada |
| Spectra International Distribution, Inc. | Canada |
| Ticketmaster Canada LP | Canada |
| Ticketmaster Canada ULC | Canada |
| Ticketmaster Canada Holdings ULC | Canada |
| Universe Experiences Inc, | Canada |
| Ticketmaster Cayman Finance Company Ltd. | Cayman Islands |
| Ticketmaster Middle East Limited | Cayman Islands |
| DG Medios SpA | Chile |
| Live Nation Chile SpA | Chile |
| SACA Producciones SpA | Chile |
| Ticketmaster Chile SpA | Chile |
| Compañía de Entretenimiento Colombia, S.A.S. | Colombia |
| OCESA Colombia, S.A.S. | Colombia |
| Promotora Colombia, S.A.S. | Colombia |
| Ticket Colombia, S.A.S. | Colombia |
| Aquapath Limited | Cyprus |
| Live Nation Czech Republic Sro | Czech Republic |
| Ticketmaster Ceska republika, a.s | Czech Republic |

- 9 -

Exhibit 2, page 320

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| Ticketpro Software s.r.o. | Czech Republic |
| Danish Venue Enterprise A/S | Denmark |
| I/S Heartland Festival | Denmark |
| Live Nation Denmark Aps | Denmark |
| Live Nation Denmark Management Holding Aps | Denmark |
| PDH Music A/S | Denmark |
| PDH Tour Accounts ApS | Denmark |
| Ticketmaster Danmark A/S | Denmark |
| Academy Music Group Limited | England & Wales |
| Academy Music Holdings Ltd | England & Wales |
| Angel Venues Limited | England & Wales |
| ANM2 Limited | England & Wales |
| Apollo Leisure Group Limited | England & Wales |
| Arena Island Limited | England & Wales |
| Artist Nation Management Limited | England & Wales |
| C I (Events) Limited | England & Wales |
| Cardiff Arena Operations Limited | England & Wales |
| Cardiff Arena Ventures Limited | England & Wales |
| Cream Events Limited | England & Wales |
| Cream Global Limited | England & Wales |
| Cream Liverpool Limited | England & Wales |
| Cuffe and Taylor Limited | England & Wales |
| De-lux Merchandise Company Limited | England & Wales |
| Electricland Limited | England & Wales |
| FC 1031 Limited | England & Wales |
| Festival Republic Limited | England & Wales |
| Finlaw 279 Limited | England & Wales |
| FREH Limited | England & Wales |
| Gafrus Limited | England & Wales |
| Globalgathering Group Limited | England & Wales |
| HNOE Limited | England & Wales |
| Hot Festivals Limited | England & Wales |
| Isle of Wight Festival Limited | England & Wales |
| Live Nation (Music) UK Limited | England & Wales |
| Live Nation Limited | England & Wales |
| Live Nation Merchandise Limited | England & Wales |
| LN-Gaiety Holdings (Cardiff) Limited | England & Wales |
| LN-Gaiety Holdings Limited | England & Wales |
| Lollibop Festival Limited | England & Wales |
| MAMA & Company Limited | England & Wales |
| MAMA Festivals Limited | England & Wales |

- 10 -

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| MAMA New Music Limited | England & Wales |
| Maztec Limited | England & Wales |
| Maztecrose Holdings Limited | England & Wales |
| Merch Traffic Limited | England & Wales |
| Metropolis Music Limited | England & Wales |
| Midland Concert Promotions Group Limited | England & Wales |
| Nova Batida Festivals Limited | England & Wales |
| OnBlackheath Limited | England & Wales |
| Parklife Manchester Limited | England & Wales |
| Parallel Lines Promotions Limited | England & Wales |
| Plan B Management Limited | England & Wales |
| Quest Management (UK) Limited | England & Wales |
| Reading Festival Limited | England & Wales |
| Rewind Festival Limited | England & Wales |
| Roc Nation Sports Limited | England & Wales |
| Roc Nation UK limited | England & Wales |
| Roseclaim Limited | England & Wales |
| Safe Festivals Group Limited | England & Wales |
| Showsec International Limited | England & Wales |
| The Warehouse Project (Manchester) Limited | England & Wales |
| the17 Limited | England & Wales |
| Ticketmaster Europe Holdco Limited | England & Wales |
| Ticketmaster Sport Limited | England & Wales |
| Ticketmaster UK Limited | England & Wales |
| TM Number One Limited | England & Wales |
| Ugly Duckling Limited | England & Wales |
| Live Nation Baltics OU | Estonia |
| Live Nation Estonia OU | Estonia |
| Events Club Oy | Finland |
| Full Production Oy | Finland |
| K2 Entertainment Oy | Finland |
| Live Nation Finland Oy | Finland |
| Ticketmaster Suomi Oy | Finland |
| Entre Deux | France |
| Live Lab | France |
| Live Nation France 2006 | France |
| Live Nation France Festivals | France |
| Live Nation SAS | France |
| LNE France Holdings SAS | France |
| Ticketnet | France |
| Berlin Festival Gmbh & Co. KG | Germany |

- 11 -

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| BF Berlin Festival Verwaltungs-GmbH | Germany |
| FRHUG Festival GmbH & Co. KG | Germany |
| FRHUG Verwaltungs-GmbH | Germany |
| Live Nation Brand Partnership & Media GmbH | Germany |
| Live Nation Germany Oldco GmbH | Germany |
| Live Nation GmbH | Germany |
| Live Nation Holdings GmbH | Germany |
| Live Nation Theater GmbH | Germany |
| Lollapalooza GmbH | Germany |
| Seatwave Deutschland GmbH | Germany |
| Ticketmaster Deutschland Holding GmbH | Germany |
| Ticketmaster GmbH | Germany |
| Ticketmaster Hellas S.A. | Greece |
| Dancing Dragon Management Limited | Hong Kong |
| Fabled Records Limited | Hong Kong |
| Live Nation (HK) Limited | Hong Kong |
| Live Nation Electronic (Asia) Limited | Hong Kong |
| Live Nation Connects Hong Kong Limited | Hong Kong |
| Live Nation Venues (HK) Company Limited | Hong Kong |
| Media Nation Limited | Hong Kong |
| Twenty Eight Group Holding Limited | Hong Kong |
| Live Nation Central & Eastern Europe Kft | Hungary |
| IOMEDIA India Private Limited | India |
| PT Live Nation Indonesia | Indonesia |
| Amphitheatre Ireland Limited | Ireland |
| Cork Venue Enterprise Limited | Ireland |
| EP Republic Limited | Ireland |
| Live Nation Gaiety Ireland Holding Limited | Ireland |
| Live Nation Ireland Holdings Limited | Ireland |
| MCD Productions Limited | Ireland |
| Principle Management Limited | Ireland |
| The Ticket Shop Unlimited Company | Ireland |
| Ticketline Unlimited Company | Ireland |
| Ticket Shop Holdings (IOM) | Isle of Man |
| Ticket Shop One (IOM) Limited | Isle of Man |
| Ticket Shop Two (IOM) Limited | Isle of Man |
| Live Nation Israel Ltd. | Israel |
| Ticketmaster Israel Ltd | Israel |
| Comcerto Srl | Italy |
| Get Live 2 Srl | Italy |
| Live Nation 2 Srl | Italy |

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| Live Nation 3 Srl | Italy |
| Live Nation Italia Srl | Italy |
| Parcolimpico Srl | Italy |
| Ticketmaster Italia Srl | Italy |
| Live Nation Holding Japan GK | Japan |
| Live Nation Japan GK | Japan |
| UAB Live Nation Lietuva | Lithuania |
| Live Nation Luxembourg Holdco 1 S.à.r.l. | Luxembourg |
| Live Nation Luxembourg Holdco 2 S.à.r.l. | Luxembourg |
| Banquetes a la Carta, S.A. de C.V. | Mexico |
| Car Sport Racing, S.A. de C.V. | Mexico |
| Corporativo Integral SECOMAD II, S.A. de C.V. | Mexico |
| Enterteinvestments, S.A. de C.V. | Mexico |
| ETK Boletos, S.A. de C.V. | Mexico |
| HNMPL México, S. de R.L. de C.V. | Mexico |
| Inmobiliaria de Centros de Espectáculos, S.A. de C.V. | Mexico |
| Logística Organizacional para la Integración de Eventos, S.A. de C.V. | Mexico |
| Monitoreo y Planeación CREA, S.A. de C.V. | Mexico |
| Monitoreo y Planeación Remex, S.A. de C.V. | Mexico |
| OCESA Entretenimiento, S.A. de C.V. | Mexico |
| OCESA Presenta, S.A. DE C.V. | Mexico |
| OCESA Promotora de Eventos, S. de R.L. de C.V. | Mexico |
| OCESA Promotora, S.A. de C.V. | Mexico |
| OISE Entretenimiento, SA de CV | Mexico |
| Operación y Comercialización Ideas Creativas, S.A. de C.V. | Mexico |
| Operadora de Centros de Espectáculos, S.A. de C.V. | Mexico |
| Promotodo Mexico, S.A. de C.V. | Mexico |
| Representaciones de Exposiciones Mexico, S.A. de C.V. | Mexico |
| Sae Logística En Entretenimiento, S.A. de C.V. | Mexico |
| Sae Operación En Eventos, S.A. de C.V. | Mexico |
| Secocie II, S.A. de C.V. | Mexico |
| Secomad II, S.A. de C.V. | Mexico |
| Servicios Administrativos Del Entretenimiento, S.A. de C.V. | Mexico |
| Servicios de Protección Privada Lobo, S.A. de C.V. | Mexico |
| Servicios Especializados para pa Venta Automatizada de Boletos, S.A. de C.V. | Mexico |
| Sistema Central Inteligente CREA, S.A. de C.V. | Mexico |
| Sistema Central Inteligente REMEX, S.A. de C.V. | Mexico |
| Sputnik Digital, S.A.P.I. de C.V. | Mexico |
| Ticketmaster New Ventures S. de R.L. de C.V. | Mexico |
| Venta de Boletos Por Computadora, S.A. de C.V. | Mexico |
| Live Nation Malaysia Sdn Bhd | Malaysia |

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| Amsterdam Music Dome Exploitatie BV | Netherlands |
| Art of Bookings B.V. | Netherlands |
| Artist and Business Transport Group B.V. | Netherlands |
| Crowdcare B.V. | Netherlands |
| Event Design Holland B.V. | Netherlands |
| Festivals Limburg B.V. | Netherlands |
| Holland Event Marketing B.V. | Netherlands |
| Insomniac Europe B.V. | Netherlands |
| Live Nation International Holdings B.V. | Netherlands |
| Live Nation Venues (Netherlands) B.V. | Netherlands |
| LYV B.V. | Netherlands |
| Mojo Concerts B.V. | Netherlands |
| Mojo Works B.V. | Netherlands |
| Noctua B.V. | Netherlands |
| Security Company Security B.V. | Netherlands |
| Straight International Security B.V. | Netherlands |
| The Event Support Company B.V. | Netherlands |
| The Security Company Utrecht Holland Holding B.V. | Netherlands |
| Tickethour Nederland B.V. | Netherlands |
| Ticketmaster B.V. | Netherlands |
| Woo Hah! Partner B.V. | Netherlands |
| Endeavour Live Limited | New Zealand |
| Evenz Limited | New Zealand |
| Greenstone Entertainment Limited Partnership | New Zealand |
| Greenstone Entertainment GP Limited | New Zealand |
| Live Nation GE Holdings Limited | New Zealand |
| Live Nation NZ Festivals Limited | New Zealand |
| Live Nation NZ Limited | New Zealand |
| NZ Venue and Event Management Limited | New Zealand |
| QPAM Limited | New Zealand |
| R&V Live Nation Limited | New Zealand |
| Ticketmaster NZ Limited | New Zealand |
| Village Sounds Agency NZ Limited | New Zealand |
| Ticket Shop (NI) Limited | Northern Ireland |
| ACT Agency AS | Norway |
| Bergen Live AS | Norway |
| Billettservice AS | Norway |
| Event og Media AS | Norway |
| Kadetten Festival AS | Norway |
| Live Nation Norway AS | Norway |
| Luger Norway AS | Norway |

- 14 -

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| TimeOut Agency & Concerts AS | Norway |
| Tons of Rock Festival AS | Norway |
| DF Entertainment Paraguay SRL | Paraguay |
| Live Nation Peru S.A.C. | Peru |
| Ticketmaster Peru S.A. | Peru |
| Concert Supplies Sp. z o.o. | Poland |
| Live Nation Sp. z.o.o. | Poland |
| Music Marketing Sp. z.o.o. | Poland |
| Ticketmaster Poland Sp. z.o.o. | Poland |
| Better World Comunicação, Publicidade e Entretenimento S.A. | Portugal |
| Live Nation Arabia Company LLC | Saudi Arabia |
| Ticketmaster Arabia Company LLC | Saudi Arabia |
| ABC3 Limited | Scotland |
| D.F. Concerts Limited | Scotland |
| King Tut's Recordings Limited | Scotland |
| Tecjet Limited | Scotland |
| Live Nation Business Consulting (Shanghai) Company Limited | Shanghai, China |
| Live Nation Electronic (Shanghai) Company Limited | Shanghai, China |
| KFK Shanghai Company Limited | Shanghai, China |
| Imagine Media Agency Pte. Ltd. | Singapore |
| Live Nation (Singapore) Holdings Pte Ltd | Singapore |
| Live Nation Singapore Concerts Pte. Ltd. | Singapore |
| Live Nation Singapore Venues Pte Ltd | Singapore |
| Ticketmaster SG Pte Ltd | Singapore |
| Ticketmaster-Singapore Pte. Ltd. | Singapore |
| Big Concerts International Pty Ltd | South Africa |
| Big Concession Management Proprietary Limited | South Africa |
| Big Merchandise Proprietary Limited | South Africa |
| Live Nation Media and Sponsorship (Pty) Ltd | South Africa |
| Ticketmaster South Africa (Pty) Ltd | South Africa |
| Live Nation Korea Corporation | South Korea |
| Better World Sociedade Unipessoal S.L. | Spain |
| Compania Editora de Talentos Internacionales S.A. | Spain |
| Live Nation Espana S.A.U. | Spain |
| Mean Fiddler Spain S.L. | Spain |
| Mediterranea Concerts SL | Spain |
| Planet Events S.A. | Spain |
| Rock in Rio Madrid S.A. | Spain |
| Ticketmaster Iberica SLU | Spain |
| Ticketmaster Spain SAU | Spain |
| Artist och underhallningsservice i Sverige AB | Sweden |

Exhibit 2, page 326

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| Live Nation Holding Nordic AB | Sweden |
| Live Nation Nordic AB | Sweden |
| Live Nation Sweden AB | Sweden |
| Lugerinc AB | Sweden |
| Neu Festival Live AB | Sweden |
| Sweden Rock Festival AB | Sweden |
| Ticketmaster New Ventures Holdings II AB | Sweden |
| Ticketmaster Sverige AB | Sweden |
| First Event AG | Switzerland |
| Live Nation Switzerland GmbH | Switzerland |
| Mainland Music AG | Switzerland |
| Ticketmaster Schweiz AG | Switzerland |
| Indievox Inc | Taiwan |
| Live Nation Taiwan Co., Ltd | Taiwan |
| Tixcraft Inc | Taiwan |
| Live Nation Tero Entertainment Co., Ltd | Thailand |
| Biletix Bilet Dagitim Basim ve Ticaret AS | Turkey |
| Live Nation Middle East FZ-LLC | United Arab Emirates |
| Ticketmaster Middle East Events LLC | United Arab Emirates |
| Ticketmaster Middle East FZ-LLC | United Arab Emirates |
| Ticketmaster Middle East North LLC | United Arab Emirates |

- 16 -

EXHIBIT 23.1

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)    Registration Statement (Form S-8 No. 333-175139) pertaining to the 2005 Stock Incentive Plan, as amended and restated as of April 15, 2011 of Live Nation Entertainment, Inc.,

(2)    Registration Statement (Form S-8 No. 333-164507) pertaining to the Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan of Live Nation Entertainment, Inc.,

(3)    Registration Statement (Form S-8 No. 333-164494) pertaining to the Amended and Restated Stock Bonus Plan of Live Nation, Inc.,

(4)    Registration Statement (Form S-8 No. 333-164302) pertaining to the 2005 Stock Incentive Plan, as Amended and Restated of Live Nation, Inc.,

(5)    Registration Statement (Form S-8 No. 333-157664) pertaining to the Employee Stock Bonus Plan of Live Nation, Inc.,

(6)    Registration Statement (Form S-8 No. 333-149901) pertaining to the Employee Stock Bonus Plan of Live Nation, Inc.,

(7)    Registration Statement (Form S-8 No. 333-132949) pertaining to the 2005 Stock Incentive Plan of Live Nation, Inc.,

(8)    Registration Statement (Form S-8 No. 333-206294) pertaining to the 2005 Stock Incentive Plan, as amended and restated as of March 19, 2015, of Live Nation Entertainment, Inc.,

(9)    Registration Statement (Form S-3ASR No. 333-233823) of Live Nation Entertainment, Inc., and

(10)    Registration Statement (Form S-3ASR No. 333-259515) of Live Nation Entertainment, Inc.;

of our reports dated February 23, 2022, with respect to the consolidated financial statements of Live Nation Entertainment, Inc., and the effectiveness of internal control over financial reporting of Live Nation Entertainment, Inc., included in this Annual Report (Form 10-K) of Live Nation Entertainment, Inc. for the year ended December 31, 2021.

/s/ Ernst & Young LLP

Los Angeles, California
February 23, 2022

**Exhibit 31.1**

CERTIFICATION OF CHIEF EXECUTIVE OFFICER

**CERTIFICATION**

I, Michael Rapino, certify that:

1. I have reviewed this Annual Report on Form 10-K of Live Nation Entertainment, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 23, 2022

By:     /s/ Michael Rapino
        Michael Rapino
        President and Chief Executive Officer

**Exhibit 31.2**

CERTIFICATION OF CHIEF FINANCIAL OFFICER

**CERTIFICATION**

I, Joe Berchtold, certify that:

1. I have reviewed this Annual Report on Form 10-K of Live Nation Entertainment, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 23, 2022

By:        /s/ Joe Berchtold
           Joe Berchtold
           President and Chief Financial Officer

**Exhibit 32.1**

SECTION 1350 CERTIFICATION OF CHIEF EXECUTIVE OFFICER

In connection with this Annual Report of Live Nation Entertainment, Inc. (the "Company") on Form 10-K for the year ended December 31, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael Rapino, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date: February 23, 2022

By:      /s/ Michael Rapino
         Michael Rapino
         President and Chief Executive Officer


A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 2, page 331

**Exhibit 32.2**

SECTION 1350 CERTIFICATION OF CHIEF FINANCIAL OFFICER

In connection with this Annual Report of Live Nation Entertainment, Inc. (the "Company") on Form 10-K for the year ended December 31, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Joe Berchtold, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date: February 23, 2022


By:       /s/ Joe Berchtold
          Joe Berchtold
          President and Chief Financial Officer


A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 2, page 332