Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Ex Kano S. Sams II (SBN 192936)
  *esams@glancylaw.com*
Charles Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
  *prajesh@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Co-Lead Counsel for Plaintiffs and the Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN DONLEY, Individually and on behalf of all others similarly situated, | Case No. 2:23-cv-06343-KK-AS |
| Plaintiff, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| LIVE NATION ENTERTAINMENT, INC., MICHAEL RAPINO, and JOE BERCHTOLD, | Judge:   Hon. Kenly Kiya Kato |
| | Date:    Not Set Per Dkt. 43 |
| Defendants. | Time:    None |
| | Place:   Courtroom 3 |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................. 3

   A.   Company Background ................................................................................ 3

   B.   General Background on the Live Music Industry .................................. 4

   C.   Live Nation's Merger with Ticketmaster Faced Intense Regulatory
       Scrutiny ...................................................................................................... 5

   D.   Live Nation's Dominance in Multiple Related Markets ....................... 6

   E.   Live Nation Engages in Anticompetitive Practices .............................. 7

III. STANDARD OF REVIEW ................................................................................ 8

IV.  PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE EXCHANGE
    ACT .................................................................................................................... 9

   A.   Plaintiffs Adequately Allege that Defendants Made Materially False and
       Misleading Statements ............................................................................. 9

      1.   Defendants Made False and Misleading Statements Regarding
           Live Nation's Anticompetitive Behavior ..................................... 9

      2.   Defendants Made False and Misleading Statements Regarding
           Live Nation's Cooperation with Regulators .............................. 11

      3.   Defendants Misrepresented the Company's Financial Results .. 11

      4.   Defendants' Falsity Arguments Fail ........................................... 12

   B.   Plaintiffs Adequately Allege that Defendants Acted With
       Scienter .................................................................................................... 16

   C.   Plaintiffs Adequately Allege Loss Causation ..................................... 21

   D.   Plaintiffs Adequately Allege Control Person Liability ....................... 24

V.   CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 13

*Baker v. Twitter, Inc.*,
    2023 WL 6932568 (C.D. Cal. Aug. 25, 2023) ..................................................... 18

*Batwin v. Occam Networks, Inc.*,
    2008 WL 2676364 (C.D. Cal. July 1, 2008) ........................................................ 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 13

*Bielousov v. GoPro, Inc.*,
    2017 WL 3168522 (N.D. Cal. July 26, 2017) ..................................................... 18

*Brown v. Ambow Educ. Holding Ltd.*,
    2014 WL 523166 (C.D. Cal. Feb. 6, 2014) .......................................................... 29

*Chamberlain v. Reddy Ice Holdings, Inc.*,
    757 F. Supp. 2d 683 (E.D. Mich. 2010) ............................................................... 26

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,
    2018 WL 1046892 (N.D. Cal. Feb. 26, 2018) ..................................................... 22

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) ................................................................................ 29

*Cutler v. Kirchner*,
    2017 WL 3530893 (9th Cir. Aug. 17, 2017) .................................................. 20, 24

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................................... 26, 28

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) .............................................................................. 21, 23

*Eastwood Enterprises, LLC v. Farha*,
  2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) .......................................26

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014)...............................................................22

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003)..............................................................30

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011)...............................................................25

*Henning v. Orient Paper, Inc.*,
  2011 WL 2909322 (C.D. Cal. July 20, 2011) ......................................19

*Hodges v. Akeena Solar, Inc.*,
  2010 WL 3705345 (N.D. Cal. May 20, 2010) ......................................25

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021).................................................................16

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)...............................................................29

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F.Supp.2d 148 (S.D.N.Y. 2008) ...................................................26

*In re Diamond Foods, Inc., Sec. Litig.*,
  2012 WL 6000923 (N.D. Cal. Nov. 30, 2012)......................................25

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023)..............................................16, 17, 26

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) .................................................18

*In re Herbalife, Ltd. Sec. Litig.*,
  2015 WL 1245191 (C.D. Cal. Mar. 16, 2015)......................................29

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .................................19, 20

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FAC

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)...........................................................14, 17, 18, 24

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...................................................................................19

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003)...............................................................25

*In re STEC Inc. Sec. Litig.*,
    2011 WL 2669217 (C.D. Cal. June 17, 2011) .....................................................17

*In re Tesla, Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020) .................................................................29

*In re VEON Ltd. Sec. Litig.*,
    2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)....................................................20

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012)................................................................................21

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)...................................................................................20

*Joyce v. Amazon.com, Inc., et. al.*,
    2023 WL 8370101 (W.D. Wash. Dec. 4, 2023)...................................................28

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016)..............................................................................28

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014)................................................................................28

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008)..............................................................................26

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008)..........................................................................19, 20

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003)..........................................................................24, 25

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ........................................................................ 18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ............................................................................... 17, 18

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015) .................................................................. 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) .......................................................................... 24

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ........................................................................... 28

*Robb v. Fitbit Inc.*,
    2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ..................................................... 24

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ................................................... 23

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................................... 25

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
    2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ................................................... 25

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ....................................................................... 21, 22

*Scheller v. Nutanix, Inc.*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) ............................................................ 24

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) .............................................................. 20

*Tarapara v. K12 Inc.*,
    2017 WL 3727112 (N.D. Cal. Aug. 30, 2017) ................................................... 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................ *passim*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FAC

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...................................................25

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2017 WL 3328543 (C.D. Cal. Aug. 4, 2017).........................................25

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) ......................................20

STATUTES

15 U.S.C. §78t(a) ....................................................................................30
15 U.S.C. §78u-4(b)(2)...........................................................................21
15 U.S.C. §78u-4(b)(4)...........................................................................26
15 U.S.C. §78u–5(c)(1)(B)(i) ................................................................17

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FAC

## I.    INTRODUCTION

Live Nation Entertainment ("Live Nation" or the "Company") is a live entertainment company and concert and ticketing platform.  Live Nations owns, operates, and has exclusive booking rights for several global venues and claims to be one of the world's leading artist management companies. Through Ticketmaster Entertainment LLC ("Ticketmaster"), Live Nation provides ticket sales and resale services for concerts, sporting events, and other events.

Live Nation and Ticketmaster merged in January 2010 but were under a consent decree with the U.S. Department of Justice ("DOJ") to preserve competition in the live events market.  In 2019, Live Nation faced federal scrutiny for pressuring concert venues to use Ticketmaster over other systems by threatening to withhold Live Nation concerts, which would have violated the consent decree.  To resolve these claims, the Company extended the consent decree through December 2025 and added new provisions.  Pursuant to the amended consent decree, Live Nation agreed to abide by a stricter set of rules, including not threatening to condition the provision of Live Nation concerts on a venue choosing Ticketmaster, or retaliating in response to a venue choosing a ticketing service provider other than Ticketmaster.  The Company is subject to an automatic penalty of $1 million for each violation.

On November 18, 2022, *The New York Times* reported that the DOJ had opened an antitrust investigation into Ticketmaster and Live Nation months earlier. On this news, Live Nation's stock price fell nearly 8%.  On February 23, 2023, *NPR* reported that following Congressional hearings, the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights wrote to the DOJ presenting evidence that "Live Nation is harming America's music industry." The letter cited issues with Live Nation's pricing models and fees, increasingly long contracts with competitors, and retaliatory behavior against artists and venues that did not want to work with the Company.  On this news, Live Nation's stock price fell more than 10%.

Then, on July 28, 2023, *Politico* reported that the DOJ "could file an antitrust lawsuit against [Live Nation and Ticketmaster]," that "[t]he DOJ is moving quickly, … and its litigation team is involved," and that the DOJ complaint is expected to allege that "the entertainment giant is abusing its power over the live music industry." On this news, Live Nation's stock price fell nearly 8%.

Finally, on November 20, 2023, *CNBC* reported that a Senate investigative subcommittee had issued a subpoena to Live Nation and Ticketmaster "for information regarding ticket pricing and fees after a months-long probe that had not been previously announced." In a letter accompanying the subpoena, Senator Richard Blumenthal wrote that "[d]espite nearly eight months and extensive efforts to obtain voluntary compliance, Live Nation/Ticketmaster has failed to fully comply with [the subcommittee's] requests, including refusing to produce certain documents critical to the Subcommittee's inquiry." In a statement on the same day, Senator Blumenthal said that "Live Nation has egregiously stonewalled my Subcommittee's inquiry into its abusive consumer practices — making the subpoena necessary." On this news, Live Nation's stock price fell nearly 3%.

Between February 23, 2022, and November 20, 2023, inclusive ("Class Period"), Defendants made materially false and misleading statements and omissions of material fact about the Company's compliance with antitrust laws, its cooperation with governmental investigations, and the regulatory risks it faced. Specifically, Defendants failed to disclose that: (1) Live Nation engaged in anticompetitive conduct, including improperly tying its underpriced Live Nation concert promotion services to its Ticketmaster services and retaliating against venues that spurned Ticketmaster secondary ticketing services; (2) Live Nation was not, in fact, cooperating with the ongoing DOJ and Senate subcommittee investigations; and (3) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. Plaintiffs subsequently brought this class action suit pursuant to the Securities Exchange Act of 1934 ("Exchange Act").

1     The Court should deny Defendants' Motion to Dismiss Amended Class Action

2   Complaint ("Motion").  First, contrary to Defendants' assertion, Plaintiffs adequately

3   allege that Defendants made false and misleading statements throughout the Class

4   Period.  These misrepresentations concerned the Company's anticompetitive conduct,

5   cooperation with regulators, and financial results.  Second, Plaintiffs sufficiently

6   allege that Defendants made these representations with scienter.  Finally, Plaintiffs

7   adequately allege loss causation.  Because Plaintiffs have sufficiently stated their

8   claims under the Exchange Act, the Court should deny Defendants' Motion.

9   **II.    STATEMENT OF FACTS**

10      **A.   Company Background**

11     Live Nation is a global live entertainment company.  ¶27.[1]  Live Nation owns,

12   operates, has exclusive booking rights, and/or an equity interest with significant

13   influence for approximately 338 venues in 44 countries.  *Id*. Live Nation also claims

14   to be one of the world's leading artist management companies.  *Id*.  Live Nation is the

15   largest live entertainment company in the world, claiming to have hosted "44,000

16   events across 45 countries, drawing in over 121 million attendees" in 2022.  *Id*.

17     Ticketmaster is a wholly owned subsidiary of Live Nation and is the largest

18   ticketing company in the United States, with 2022 revenues of approximately $2.2

19   billion.  ¶28.  Ticketmaster's business includes two main arms: its legacy primary

20   ticketing services and its newer secondary ticketing services.  *Id*.  Upon information

21   and belief, Ticketmaster's share of secondary ticketing services for major concert

22   venues in the U.S. already exceeds 60%.  *Id*.  Live Nation's 2022 total revenues were

23   approximately $16.7 billion, but roughly 60% of its adjusted operating income was

24   attributable to its Ticketing division (*i.e.*, Ticketmaster), even though Ticketmaster

25   represented only about 13% of Live Nation's revenues.  ¶29.

---

[1] Unless otherwise indicated, all paragraph ("¶") references are to the Amended Class
Action Complaint for Violations of the Federal Securities Laws ("Complaint").

Live Nation and Ticketmaster merged in 2010, with the post-merger conglomerate reorganized into the following three segments: (1) Concerts, whereby Live Nation serves primarily as a concert promoter and venue operator, controls over 60% of the U.S. market for concert promotion, and revenue streams from this segment are numerous and significant, but margins are below cost or very thin; (2) Ticketing, whereby Live Nation's Ticketing segment (*i.e.*, Ticketmaster) is highly profitable, with an adjusted operating margin in 2022 of 37.6%; and (3) Sponsorship & Advertising, which generated adjusted operating income of $592 million on revenue of $968 million in 2022—a 61.2% margin. ¶30.  In 2022, the Company's Ticketing and Sponsorship & Advertising segments generated only 19.0% of Live Nation's revenues but accounted for ***over 100%*** of its adjusted operating income. ¶31.

**B.    General Background on the Live Music Industry**

The major players of the live music industry include artists and their managers, promoters, venues, ticketing, and consumers. ¶¶32-35.  Live Nation claims to be the largest manager of artists in the music industry. ¶33.  Today, artists planning a tour at major concert venues often use a single company to provide and coordinate promotions for the entire tour. ¶36.  Offering these unique, nation-spanning services for artists led SFX Entertainment (Live Nation's predecessor) and now Live Nation to become many artists' promoter of choice for national concert tours. *Id*.  Live Nation is the largest promoter in the United States, promoting over 60% of the shows at major U.S. concert venues. *Id*.  Venue operators provide access to and maintain the facilities where concerts are held and oversee the venue's associated services. ¶¶37-38.  Upon information and belief, Live Nation Worldwide, along with other members of the Live Nation conglomerate, is the second-largest concert venue operator/owner in the United States and exclusively utilizes Ticketmaster. *Id*.

Additionally, primary ticketing service providers contract with venues to manage, sell, and distribute tickets to consumers for events. ¶¶39-41.  Ticketmaster

provides primary ticketing services to over 12,000 venues and has a renewal rate
"exceeding 100%," because there are no effective competitors.  *Id.*

According to Ticketmaster, its agreements with venues have terms that may
exceed 10 or more years in length and are typically in the five- to seven-year range.
¶42.  To induce venues to enter into these long-term exclusive dealing agreements,
Ticketmaster offers up-front payments and other subsidies that can run into the
millions of dollars, and which are conditioned on exclusivity.  *Id.*  Those up-front
payments act as a barrier to entry for smaller competitors and an additional
mechanism to maintain Ticketmaster's dominance.  *Id.*

Once there is a primary ticket sale, the purchaser may choose to resell their
ticket.  ¶¶42-46.  Recent years have seen a burgeoning market for secondary ticketing
service providers.  ¶44.  Ticketmaster's branded platform, as well as its secondary
platforms, have, upon information and belief, obtained a market share exceeding 60%
of secondary ticketing services for major concert venues and are threatening to obtain
(or have obtained) monopoly power in that market.  ¶46.

## C.    Live Nation's Merger with Ticketmaster Faced Intense Regulatory Scrutiny

Live Nation has long been the world's largest promoter of live concerts.  ¶47.
Live Nation Worldwide, combined with other members of the Live Nation
conglomerate, is also the second-largest owner or manager of concert venues and
owns, leases, operates, has booking rights for, or has equity interests in over 200 live
entertainment venues of various sizes in the United States.  *Id.*

Before their merger, Live Nation had been using Ticketmaster as its primary
ticketing service provider and was one of Ticketmaster's largest customers.  ¶48.  In
late 2006, Live Nation and its CEO, Rapino, concluded that the Company would be
better served by entering the ticketing service business itself.  *Id.*  Shortly after rolling
out its primary ticketing service strategy in 2008—which involved: (a) licensing
ticketing software from CTS Eventim, the leading German primary ticketing service

provider, for both Live Nation and third party venues to use within the United States; and (b) engaging in price competition with Ticketmaster on ticket service fees—Live Nation became the second-largest provider of primary ticketing services in the United States almost instantly. ¶49.

In lieu of competing with Ticketmaster as the two predominant primary ticketing services, each with complementary vertically integrated operations, Live Nation and Ticketmaster decided to merge. ¶50. The DOJ and several states opposed the merger, concerned that the merger would eliminate competition and innovation in the market for primary ticketing services and that the merger would make Ticketmaster dominant in the secondary ticketing service market. *Id*. To allay these concerns, Live Nation entered into a consent decree that allowed the merger with conditions. ¶¶51-52. Although the 10-year consent decree was set to expire in 2020, the DOJ in 2019 moved, and the Company agreed, to extend and modify the decree through 2025, because the DOJ alleged that the Company had committed multiple violations of the consent decree. ¶53. The DOJ asserted that the extension and modifications were necessary because the Company's acts had led to further domination by Ticketmaster in primary ticketing services and harmed consumers. *Id*.

### D.    Live Nation's Dominance in Multiple Related Markets

Live Nation has dominant market power in three key markets for major concert venue services: (1) primary ticketing; (2) secondary ticketing; and (3) concert promotion. ¶54. First, Live Nation, through Ticketmaster, dominates the market for primary ticketing services. ¶¶56-70. Indeed, Ticketmaster has dominated primary ticketing for decades, increasingly so over the past several years in part because of the merger with Live Nation. ¶59. Other companies have sought to compete against Ticketmaster for primary ticketing to concert venues over the years, but none have been successful because Ticketmaster acquired them, drove them out of business, or minimized their market share. *Id*. As the DOJ recently noted in moving to modify the Live Nation-Ticketmaster consent decree, "Ticketmaster has been the largest

primary ticketing service provider for major concert venues in the United States for at least three decades." *Id*.  In 2017, Ticketmaster's share of primary ticketing services in the country exceeded 70% among major concert venues and its market power is growing because of renewals and extensions of existing agreements.  ¶60.

Second, Live Nation, through Ticketmaster, also dominates the market for secondary ticketing services.  ¶¶71-77.  Ticketmaster currently controls over 70% of the primary ticketing services for major concert venues market, and, upon information and belief, over 60% of the secondary ticketing services for major concert venues market.  ¶76.  No other companies even remotely approach Ticketmaster's share of either market.  *Id*.  Even if the primary and secondary ticketing services for major concert venues were deemed one single ticketing services market, Ticketmaster would still have monopoly power.  ¶77.

Third, Live Nation dominates the market for concert promotion services.  ¶¶78-88.  Upon information and belief, Live Nation controls at least 60% of concert promotion services for major concert venues, promotes the vast majority of the top grossing touring acts, and it is the only promoter that has a direct relationship with the nation's most dominant ticketing service provider, Ticketmaster.  ¶78.

**E.    Live Nation Engages in Anticompetitive Practices**

In addition to barriers to entry based on the Company's vertically integrated structure, Live Nation's anticompetitive practices, including tying agreements, long-term exclusive dealing contracts, "conditioning," and retaliation, also act as a barrier to entry and dissuade competition in the chief markets in which Live Nation operates.  ¶¶89-99.  The evidence of these efforts to intimidate and coerce venues into using Ticketmaster first came to light in 2019, when Senators Richard Blumenthal and Amy Klobuchar sent an open letter to the head of the DOJ's Antitrust Division regarding their significant concerns about Live Nation and Ticketmaster's anticompetitive conduct.  ¶91.  This letter echoed an April 2018 investigative piece from *The New York Times* that the DOJ had begun investigating numerous complaints from

7

Ticketmaster's competitors that Live Nation "used its control over concert tours to pressure venues into contracting with its subsidiary, Ticketmaster." ¶92.

On December 19, 2019, the DOJ issued a press release stating that "[d]espite the prohibitions in the Final Judgment [consent decree], Live Nation repeatedly and over the course of several years engaged in conduct that, in the Department's view, violated the Final Judgment." ¶93. Accordingly, the DOJ moved for an amendment to the consent decree that extended the decree for five and a half years and alleged several specific acts that directly violated its terms. ¶¶93-95. Reports from former Live Nation employees corroborate this anticompetitive conduct, including kickbacks that determined the choice of venues for concerts and the use of anticompetitive tying practices to freeze out competitors. ¶¶96-99.

Live Nation also engaged in anticompetitive practices in the secondary ticketing market. ¶¶100-113. For example, Live Nation's use of a "conditional license" is tool employed by the Company to stifle competition. ¶¶104-105. Another tactic Ticketmaster employs to dominate secondary ticketing services for major concert venues is to limit primary purchasers' ability to transfer their tickets through any means other than Ticketmaster's secondary ticketing platform. ¶¶106-113. The result of the Company's efforts is the substantial decrease in competition in the relevant markets for primary and secondary ticketing services. ¶¶114-124.

## III.   STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety . . . ." *Tellabs, Inc. v. Makor Issues & Rights*,

---

[2] Unless otherwise indicated, all emphasis is added and all internal quotations and citations are omitted.

*Ltd*., 551 U.S. 308, 322 (2007).  Courts must also construe facts "in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).

## IV.    PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE EXCHANGE ACT

### A.    Plaintiffs Adequately Allege that Defendants Made Materially False and Misleading Statements

#### 1.    Defendants Made False and Misleading Statements Regarding Live Nation's Anticompetitive Behavior

Throughout the Class Period, Defendants made false and misleading statements regarding the Company's anticompetitive behavior.  For instance, Defendants stated that "[i]n the case of antitrust (and similar or related) matters, any adverse outcome could limit or prevent us from engaging in the ticketing business generally (or in a particular segment thereof) or subject us to potential damage assessments, all of which could have a material adverse effect on our business, financial condition and results of operations."  ¶¶127, 145.   Defendants also claimed, among other things, that "[c]ompetition in the live entertainment industry is intense" (¶¶131, 140), that Live Nation "does not engage in behaviors that could justify antitrust litigation" (¶134), and that "U.S. ticketing markets have never been more competitive. . . ." ¶136.

These statements were false and misleading because: (1) Live Nation engaged in anticompetitive conduct and was not cooperating fully with the ongoing DOJ and Senate Subcommittee investigations; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. ¶¶128, 132-133, 142, 146.  For example, Live Nation improperly tied its underpriced Live Nation promotion services to its Ticketmaster services, retaliated against venues that spurned Ticketmaster, and improperly restricted consumers' ability to resell tickets using competing secondary ticketing services.  ¶¶132, 135, 137, 141.

Additionally, the accounts of confidential witnesses further demonstrate falsity. ¶¶81, 84, 97-99.  For instance, FE1 stated that when choosing which venue Live

9

Nation would use for a concert, "a lot of times it just comes down to where does Live Nation have the better kickback deal, so if it comes down to two venues and all things are equal but one venue is using Ticketmaster and the other isn't it'll go to the Ticketmaster venue ten times out of ten."  ¶97.  As FE1 described, "it wasn't ever really much of a secret," and that "I would say you'd be hard pressed to find anyone above Director or above a Manager level … who would say otherwise. … It was just part of the business plan."  *Id*.  FE1 also explained that it was "common knowledge" that Live Nation used anticompetitive tying practices to freeze out competitors.  ¶98. FE1 noted that "obviously since the [Senate] hearings started it sheds a different light on what was happening."  *Id*.  FE2 added that smaller promoters and venues just could not compete with Live Nation, stating that "[i]f you're a small promoter who's fighting the [] gorilla who has all the content and has unlimited pockets tell me what you would do. At a certain point you'd turn around and sell because you just can't fight the behemoth for long. If they offered a band $20, I'd offer $30. If they offered $40, I'd offer $60 and I'd run the price up and then walk out at the end. Our buyers would do that routinely."  ¶81.

Additionally, FE3 stated that Ticketmaster's ability to "spread their losses across all of the other clients that are profitable" makes it extremely difficult for other firms to compete. ¶84.  According to FE3, Ticketmaster's primary competitors, including SeatGeek, AXS, or Tickets.com "just don't have the financial ability to do those deals and still be a profitable company."  *Id*.  FE3 has personally experienced losing a deal to Ticketmaster where the venue freely admitted that the ticketing software offered by FE3's company (a primary competitor of Ticketmaster) was superior to Ticketmaster's, "but there's a fear of losing [Live Nation] shows . . . . Wherever there is a building that does a lot of concerts on top of sports – like NBA and NHL games – they might have 45, 50 NBA games but they also put on 100 to 150 shows throughout the year with a lot of those shows being booked by Live Nation so there's a fear of losing that content. That's how we lose a lot of those deals."  ¶99.

Thus, Plaintiffs have adequately alleged falsity because "[i]n the securities fraud context, statements and omissions are actionably false or misleading if they directly contradict what the defendant knew at that time," or "create an impression of a state of affairs that differs in a material way from the one that actually exists[.]" *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023).

### 2. Defendants Made False and Misleading Statements Regarding Live Nation's Cooperation with Regulators

Defendants also made false and misleading statements regarding the Company's cooperation with regulators. For example, Defendants claimed that "[o]ur businesses have historically cooperated with authorities in connection with these investigations and have satisfactorily resolved each such material investigation, inquiry or litigation." ¶¶125, 143. Defendants also claimed that "[i]n the last few weeks alone, we've submitted more than 35 pages of information to provide greater context and transparency to policymakers on the realities of the industry" and that "[w]e remain committed to working with lawmakers on developing reforms that will benefit fans and artists including those outlined in a FAIR Ticketing Act." ¶138. These statements were false and misleading because: (1) Live Nation engaged in anticompetitive conduct and was not cooperating fully with the ongoing DOJ and Senate Subcommittee investigations; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. ¶¶126, 139, 144. These representations also created "a plausibly misleading impression of a state of affairs that differed in a material way from the one that actually existed." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021).

### 3. Defendants Misrepresented the Company's Financial Results

Defendants also misrepresented the Company's financial results, including the Company's revenue growth, segment revenue, and demand for live events. ¶¶129, 147. Defendants claimed that these results were a "reflection of the quality of the Ticketmaster platform and its continued popularity with clients across the globe,

giving us confidence that the Ticketmaster features and functionality will continue to fuel growth going forward." ¶147. These statements, however, were misleading because Defendants failed to disclose that a material factor driving the Company's strong performance in the Concerts and Ticketing segments was the Company's anticompetitive conduct, which was unsustainable due to regulatory scrutiny and investigations of the Company's violations of antitrust laws. ¶¶130, 148. Thus, Plaintiffs have adequately alleged falsity.

### 4.    Defendants' Falsity Arguments Fail

Defendants' falsity arguments are without merit. First, Defendants claim that several of their statements are not actionable because they are purportedly forward-looking statements. Motion at 8. Defendants are incorrect. "Defendants bear the burden of demonstrating that their statements are protected by the safe harbor." *In re STEC Inc. Sec. Litig.*, No. CV09-08536-JVS MLGX, 2011 WL 2669217, at *9 (C.D. Cal. June 17, 2011). Stating that "[o]ur businesses have historically cooperated with authorities in connection with these investigations and have satisfactorily resolved each such material investigation, inquiry or litigation" (Statement 1) is not a forward-looking statement. "[T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts." *Quality Sys.*, 865 F.3d at 1142. Also, Statement 2 is not protected because "broad pronouncements without meaningful acknowledgement of the known risks" do "not suffice to invoke the safe harbor provision." *Facebook*, 87 F.4th at 951. And, as demonstrated below, the safe harbor provision does not protect Defendants' statements because they had actual knowledge that the statements were false or misleading. 15 U.S.C. §78u–5(c)(1)(B)(i).

Second, Statements 1, 3, 5, and 7 do not constitute puffery. Contrary to Defendants' suggestion (Motion at 9), in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), the Supreme Court affirmed that statements of opinion are actionable if ***either*** "the speaker did not hold the belief she

professed" or if "the supporting fact she supplied were untrue."  *Id*. at 185-86. Defendants attempt to create ambiguity by plucking the statements out of context. *See, e.g*., Statement 5 ("Live Nation takes its responsibilities under the antitrust laws seriously ***and does not engage in behaviors that could justify antitrust litigation*** . . . ").  Defendants ignore the latter portion of this statement.  Moreover, "even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."  *Quality Sys.*, 865 F.3d at 1143; *see also Bielousov v. GoPro, Inc*., No. 16-cv-06654-CW, 2017 WL 3168522, at *4 (N.D. Cal. July 26, 2017) (statement that "[w]e believe we're still on track" was actionable).

Third, Defendants claim they had no duty to disclose the alleged information (Motion at 9-12) while disregarding the principle that "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc*., 780 F. App'x 480, 483 (9th Cir. 2019).  As Plaintiffs allege, Defendants failed to do so here. Although Defendants claim that "it was no secret that Live Nation was a 'perennial target' of antitrust regulators" and that the Company had no obligation to profess its guilt (Motion at 10, 11),[3] Defendants miss the point.  It was Live Nation's anticompetitive conduct and failure to cooperate with government inquiries – the Company's own past conduct – that it failed to disclose that rendered Defendants' statements false and misleading.

Fourth, Defendants' contention that Plaintiffs do not adequately allege particularized facts showing that Live Nation was engaged in anticompetitive conduct

---

[3]    Citing *Baker v. Twitter, Inc.*, No. 2:22-CV-06525-MCS-E, 2023 WL 6932568 (C.D. Cal. Aug. 25, 2023) and *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980 (N.D. Cal. 2020), *aff'd in part, rev'd in part and remanded,* 84 F.4th 844 (9th Cir. 2023), *opinion amended and superseded on denial of reh'g,* 87 F.4th 934 (9th Cir. 2023), and *aff'd in part, rev'd in part and remanded,* 87 F.4th 934 (9th Cir. 2023).

and not cooperating fully with government inquiries fails.  ¶¶128, 132-133, 142, 146.
Defendants' attempt to confine Plaintiffs' allegations to certain time frames also fails
because "[a]ny information that sheds light on whether class period statements were
false or materially misleading is relevant." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d
63, 72 (2d Cir. 2001).  Defendants, moreover, suggest that Plaintiffs have not alleged
any facts contradicting the challenged statements (Motion at 13-14) by improperly
engaging in factual disputes regarding aspects of their purported cooperation with
regulators, including references to the Company's self-serving explanation. *Id*.  Such
factual disputes are inappropriate at this stage. *Henning v. Orient Paper, Inc*., No.
CV 10-5887-VBF (AJWx), 2011 WL 2909322, at *4 (C.D. Cal. July 20, 2011).

Fifth, Defendants contend that Plaintiffs' allegations regarding Live Nation's
competitive environment are inactionable because "Plaintiffs have failed to allege any
facts establishing that Live Nation was actually violating any laws or obligations" and
"Plaintiffs cannot show that these statements were untrue."  Motion at 14.  This
assertion does not reflect the applicable standard.  "[T]he disclosure required by the
securities laws is measured not by literal truth, but by the ability of the material to
accurately inform rather than mislead prospective buyers." *Miller v. Thane Int'l, Inc.*,
519 F.3d 879, 886 (9th Cir. 2008).  Moreover, courts have held that allegations of
facts underlying an antitrust violation are sufficient to state a claim under the
Exchange Act even where the complaint does not plead the ultimate legal violation.
In *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *17
(S.D.N.Y. Mar. 28, 2018), the court held that plaintiffs had adequately alleged an
Exchange Act violation with respect to allegations of anticompetitive behavior.
While the complaint did not contain direct evidence of a collusive agreement, the
court found that the existence of facts tending to show collusive behavior, together
with evidence that top executives controlled pricing decisions, was sufficient to allege
that the defendants knew, or were reckless in not knowing, that their actions

constituted illegal price fixing. *Id.* Plaintiffs adequately allege that Defendants' representations were false and misleading.

Finally, Defendants suggest that Plaintiffs' allegations regarding drivers of segment revenue are purportedly insufficient because "these challenged statements do not speak to sustainability of revenues." Motion at 15. Once again, however, Defendants' assertion that the "statements were factually accurate" ignores the applicable standard (*Miller*, 519 F.3d at 886) and the misleading impression created by claiming that Ticketmaster's features and functionality will drive growth going forward. Additionally, the statement – which does not constitute puffery given its context – is not protected by the safe harbor provision. Because the mixed statement contained present representations about Ticketmaster's features and functionality, "the non-forward-looking statements are not protected by the safe harbor." *Cutler v. Kirchner*, No. 15-56897, 2017 WL 3530893, at *4 (9th Cir. Aug. 17, 2017); *see also In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) ("A company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading," but falsity may nonetheless be found based on the "misleading statements themselves.").[4] Thus, Plaintiffs have adequately alleged falsity.

---

[4] Even if the anticompetitive behavior contributed only a small portion of the Company's revenues, failing to disclose that conduct is still a material omission. *See, e.g., Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (undisclosed kickback scheme that "was worth a fraction of SAIC's yearly revenues" was material given company's "possible exposure to significant civil and even criminal liability"); *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2017 WL 1169629, at *12 (S.D.N.Y. Mar. 28, 2017) (failure to account for bribery payments representing 0.5% of income, but which caused a decrease in stock price, affected the company's reputation, and subjected the company to regulatory penalties, was material to investors); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 & n.119 (S.D.N.Y. 2015) (statements regarding trading platform that accounted for 0.1% of total revenue, but which "call into question the integrity of the company as a whole" were material to investors).

### B.    Plaintiffs Adequately Allege that Defendants Acted With Scienter

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023). Importantly, "courts must consider the complaint in its entirety . . . . The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (italics in original). "Thus, Tellabs counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Moreover, "[t]he Supreme Court's reasoning in Tellabs permits a series of less precise allegations to be read together to meet the PSLRA requirement . . . ." *Id*. "Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *Id*. Accordingly, in assessing scienter allegations, often "the sum is greater than the parts." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 698 (9th Cir. 2012).

A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. "In assessing the allegations holistically as required by Tellabs, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry*, 542 F.3d at 784. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre,

or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference. *Tellabs*, 551 U.S. at 324. Moreover, "a tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

### 1. The Core Operations Inference Supports a Strong Inference of Scienter

The facts alleged support a strong inference of scienter because they relate to the Company's core operations. In the Ninth Circuit, there are three ways in which such allegations can support a strong inference of scienter. "First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations." *S. Ferry*, 542 F.3d at 785. "Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . ." *Id.* at 786. "Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.*

The first two standards apply here. Live Nation's 2022 total revenues were approximately $16.7 billion, with roughly 60% of its adjusted operating income attributable to its Ticketing division (*i.e.*, Ticketmaster), even though Ticketmaster represented only about 13% of Live Nation's revenues. ¶29. Additionally, Live Nation's Ticketing segment (*i.e.*, Ticketmaster) is highly profitable, with an adjusted operating margin in 2022 of 37.6%. ¶30. In 2019, moreover, Live Nation reported that Ticketmaster generated nearly $232 million in operating income. ¶82. Because these allegations involve a "critical" aspect of the company's success, the core business doctrine supports a strong inference of scienter. *City of Miami Gen.*

17

*Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 1046892, at *11 (N.D. Cal. Feb. 26, 2018); *see also Tarapara v. K12 Inc.*, No. 16-CV-4069-PJH, 2017 WL 3727112, at *23 (N.D. Cal. Aug. 30, 2017) ("Courts in the Ninth Circuit have imputed scienter where the matters at issue relate to the core operations of the company.").

### 2. The Confidential Witnesses Support a Strong Inference of Scienter

Plaintiffs can also establish a strong inference of scienter through confidential witness accounts by satisfying two pleading requirements. "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *NVIDIA*, 81 F.4th at 937. "Second, those statements which are reported by confidential witnesses . . . must themselves be indicative of scienter." *Id.* Such is the case here. First, the confidential witnesses here are described with sufficient particularity to establish their reliability and personal knowledge. ¶¶24-26. Second, as described more fully above, the confidential witness statements (which are relevant for falsity) are also indicative of scienter. ¶¶81, 84, 97-99.

Defendants claim that the confidential witness statements do not support scienter because "[o]f the three FEs, only one (FE2) is alleged to have been in the same reporting structure as Rapino or Berchtold, but FE2 was only employed at Live Nation until April 2021, *prior to any challenged statement*, and the Complaint merely cites one lone anecdote from FE2 that does not mention either of them." Motion at 19 (italics in original). But "there is no baseline requirement of [contact with defendants] in order to allege sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615–16 (S.D.N.Y. 2015); *see also Roberts v. Zuora, Inc.*, No. 19-CV-03422-SI, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) ("That none of the CWs was employed

at [the company] during the *entire* Class Period does not in itself render their statements unreliable as a matter of law") (italics in original); *Robb v. Fitbit Inc.*, No. 16-CV-00151-SI, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017) (where "plaintiffs' allegations do not directly connect the dots between a CW's knowledge and the individual defendants," this circumstance is not "fatal" and "will not be grounds for dismissing the complaint" if a strong inference of scienter is alleged based upon "a holistic evaluation of the allegations"). Thus, these accounts support a strong inference of scienter. *Cutler*, 696 F. App'x at 815.[5]

### 3. CEO Rapino's Stock Sales Bolster the Strong Inference of Scienter Alleged

Although "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period," (*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003)), CEO Rapino's stock sales add to the strong inference of scienter alleged. "Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter" considering: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Quality Sys.*, 865 F.3d at 1146. Here, during a roughly six-month stretch of the Class Period, CEO Rapino sold 2,467,343 shares of stock for gross proceeds of ***over $250 million***. ¶167; *see Am. W.*, 320 F.3d at 939 (holding that the collective proceeds from defendants' sales of over $12 million was "troubling"). Thus, the "massive volume" of the trades is a factor that indicates "suspicious and unusual trading." *Id.* at 940.

Additionally, these sales equate to roughly 83% of CEO Rapino's holdings as of March 16, 2022. ¶167. Sales of much lesser percentages support a strong inference

---

[5] Defendants' reliance upon *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020) is misplaced. Motion at 19. *Scheller* did not impose a "direct contact" standard as Defendants suggest, but rather held that the witnesses lacked "personal knowledge with respect to falsity of the specific statements at issue." *Id.* The same is true for *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014). As described herein, such is not the case here.

of scienter.  *See, e.g.*, *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx),
2008 WL 2676364, at *14-15 (C.D. Cal. July 1, 2008) (sales of 7% of holdings were
suspicious); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69
(C.D. Cal. 2003) (sales of 7.6% of holdings supported scienter).  Moreover, the timing
of the sales was suspicious because they coincided with the onset of the DOJ's then-
undisclosed investigation in the summer of 2022.  ¶168; *see also Turocy v. El Pollo
Loco Holdings, Inc.*, No. SACV151343DOCKESX, 2017 WL 3328543, at *18 (C.D.
Cal. Aug. 4, 2017) (holding that stock sales occurred after learning adverse
information supported a strong inference of scienter).  These allegations, therefore,
bolster the strong inference of scienter alleged.[6]

### 4. The DOJ Investigation Adds to the Strong Inference of Scienter Alleged

Courts have repeatedly held that the existence of governmental investigation
adds to a strong inference of scienter.  *See, e.g.*, *Frank v. Dana Corp.*, 646 F.3d 954,
961-62 (6th Cir. 2011) (holding that "the investigation into [the company's]
accounting practices by the Securities and Exchange Commission" added to the strong
inference of scienter alleged); *Thomas v. Magnachip Semiconductor Corp.*, 167 F.
Supp. 3d 1029, 1043 (N.D. Cal. 2016) (holding that an ongoing investigation adds
"one more piece of the scienter puzzle").  Here, the existence of the DOJ investigation
is a relevant factor in the scienter calculus.  ¶¶4, 149; *see, e.g.*, *Rosky ex rel. Wellcare*

---

[6] Defendants claim that CEO Rapino's stock sales do not support an inference of
scienter because they purportedly: (1) were made pursuant to a trading plan or for tax
purposes; (2) were done in the course of exercising soon-to-expire stock options; and
(3) increased his holdings during the Class Period.  Motion at 16-18.  These arguments
fail.  *See, e.g.*, *Hodges v. Akeena Solar, Inc.*, No. C 09-02147 JW, 2010 WL 3705345,
at *6 (N.D. Cal. May 20, 2010) ("the factual question of whether Defendant . . . sold
his stock pursuant to [a Rule 10b5-1 trading plan] is an issue appropriately resolved
on summary judgment"); *Ronconi v. Larkin*, 253 F.3d 423, 435 n.25 (9th Cir. 2001)
("Stock options should be considered in calculating the percentage of shares sold
unless the insider could not have exercised them."); *In re Diamond Foods, Inc., Sec.
Litig.*, No. C 11-05386 WHA, 2012 WL 6000923, at *7 (N.D. Cal. Nov. 30, 2012)
(rejecting defendants' argument that the fact that defendants "did not sell stock during
the class period, and in fact increased their holdings, negates a finding that they were
involved in fraud").  And the fact Berchtold did not sell is "not fatal."  *Tellabs*, 551
U.S. at 325; *Am. W.*, 320 F.3d at 944.

*Health Plans, Inc. v. Farha*, No. 8:07-cv-1952-T-26MAP, 2009 WL 3853592, at *7 (M.D. Fla. Mar. 30, 2009) ("Courts commonly hold that pending government investigations are relevant and provide notice of a possible fraud, *i.e.*, that the pendency of an investigation serves to suggest that a fraud may have occurred and may not be ignored."); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 713 n.8 (E.D. Mich. 2010) ("The existence of such investigations is not sufficient, standing alone, to support a strong inference of scienter, but is not irrelevant to the analysis"); *Eastwood Enterprises, LLC v. Farha*, No. 8:07-cv-1940-T-33EAJ, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) ("the investigations into [the company] by various government agencies only serve to bolster the inference of scienter at this stage of this action"); *In re Bristol Myers Squibb Co. Sec. Litig.,* 586 F.Supp.2d 148, 168 (S.D.N.Y. 2008) (holding that a DOJ investigation supported a strong inference of scienter). When considering all of these facts collectively as required under *Tellabs* (551 U.S. at 323), Plaintiffs have adequately alleged scienter.

### C.    Plaintiffs Adequately Allege Loss Causation

The PSLRA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §78u-4(b)(4). To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Additionally, "there is no prohibition against [a party] alleging loss causation through a series of disclosures by the Defendants." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 n.6 (9th Cir. 2008). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *Facebook*, 87 F.4th at 954. Thus, loss causation pleading requirements "are not meant to impose a great burden upon a plaintiff." *Dura*, 544 U.S. at 347.

Under these standards, Plaintiffs have adequately alleged loss causation.  On November 18, 2022, after the ticketing platform's systems crashed during a highly anticipated presale for Taylor Swift tickets, *The New York Times* reported that the DOJ had opened an antitrust investigation into Ticketmaster and Live Nation, "focused on whether Live Nation Entertainment has abused its power over the multibillion-dollar live music industry."  ¶149.  On this news, Live Nation's stock price fell nearly 8%. ¶150.  The truth continued to emerge on February 23, 2023, when *NPR* reported that the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights called on the DOJ to continue examining the "anticompetitive conduct" of Live Nation and Ticketmaster.  ¶151.  In a letter to the Assistant Attorney General for Antitrust, Senators Amy Klobuchar and Mike Lee wrote that "Live Nation and Ticketmaster have wielded monopoly power anticompetitively, harming fans and artists alike."  *Id*.  The *NPR* report revealed for the first time that the Company was facing increased exposure to regulatory scrutiny and the risk of regulatory action, not merely a fact-finding investigation.  ¶153.  On this news, Live Nation's stock price fell more than 10%.  ¶154.

On July 28, 2023, *Politico* reported that the DOJ "could file an antitrust lawsuit against concert promoter Live Nation Entertainment and its subsidiary Ticketmaster by the end of the year," citing three knowledgeable sources.  ¶¶155-157.  The *Politico* report revealed to the market for the first time the likelihood that the DOJ would actually file an antitrust lawsuit against the Company.  *Id*.  On this news, Live Nation's stock price fell nearly 8%.  ¶158.

On November 20, 2023, *CNBC* reported that a Senate investigative subcommittee had issued a subpoena to Live Nation and Ticketmaster "for information regarding ticket pricing and fees after a months-long probe that had not been previously announced."  ¶¶159-163.  In a statement on the same day, Senator Blumenthal said that "Live Nation has egregiously stonewalled my Subcommittee's inquiry into its abusive consumer practices — making the subpoena necessary."  ¶161.

22

On this news, Live Nation's stock price fell nearly 3%.  ¶164.  These allegations are sufficient because they provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 347.

Defendants' assertions to the contrary fail.  First, Defendants suggest that the *New York Times* article cannot constitute a partial corrective disclosure.  Motion at 20-21.  Although Defendants are correct that the announcement of a government investigation, without more, does not demonstrate loss causation (*Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014)), "much more is alleged here."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  Plaintiffs' allegations also include the information disclosed within the *NPR* report (¶151), letters and statements written by Senate committee members (¶¶151, 161), the *Politico* report (¶¶155-157), and the *CNBC* report (¶¶159-163).  Collectively, these allegations adequately allege loss causation.  *Lloyd*, 811 F.3d at 1210.  Indeed, Defendants' assertion would allow wrongdoers "to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false."  *Id.*; *see also Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323–26 (5th Cir. 2014) (holding that a "district court erred in imposing an overly rigid rule that government investigations can never constitute a corrective disclosure in the absence of a discovery of actual fraud").

Second, Defendants' contention that the *NPR* report cannot constitute a corrective disclosure (Motion at 21) also fails.  Defendants assert that different ideas among lawmakers and the lack of a DOJ conclusion does not give rise to loss causation.  *Id*.  Yet, they ignore that the *NPR* report revealed for the first time that the Company was facing increased exposure to regulatory scrutiny and the risk of regulatory action – not merely a fact-finding investigation – which caused a 10% stock price decline.  ¶¶153-54; *see also Joyce v. Amazon.com, Inc., et. al.*, No. 2:22-CV-00617, 2023 WL 8370101, at *16 (W.D. Wash. Dec. 4, 2023) ("Defendants' argument

1  that the Subcommittee reports are not corrective disclosures because the reports did

2  not determine that [the company] engaged in wrongdoing is not convincing.").

3      Third, Defendants claim that the *Politico* article does not constitute a corrective

4  disclosure because it purportedly did not reveal new information to the market.

5  Motion at 21.  The *Politico* report, however, revealed to the market for the first time

6  the likelihood that the DOJ would actually file an antitrust lawsuit against the

7  Company, which caused a stock price decline of nearly 8%.  ¶¶155-158.  The market's

8  reaction to the news demonstrates that the Company revealed new information.

9      Finally, Defendants claim that *CNBC* report does not correct Defendants'

10  representations because the report purportedly pre-dates the PSI's document requests.

11  Motion at 22.  But Defendants' argument would lead to the perverse result of creating

12  the impression that the Company was complying at one point in time while it was

13  failing to do so later.  Thus, Plaintiffs have "sufficiently pled a series of disclosing

14  events—each one having a causal relationship with the decline of stock price that ties

15  back to the [misrepresentations]—that permits a reasonable inference sufficient to

16  survive a motion to dismiss." *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 934

17  (N.D. Cal. 2020).[7]

18    **D.    Plaintiffs Adequately Allege Control Person Liability**

19      Contrary to Defendants' assertion (Motion at 22), Plaintiffs have adequately

20  pled a primary violation and have also sufficiently alleged the Individual Defendants'

21

22

---

23  [7] Defendants' cases do not help them.  In *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d

24  781 (9th Cir. 2020), the court held that, like here, "some information, although nominally available to the public, can still be new if the market has not previously understood its significance." *Id.* at 794.  And unlike the case in *Brown v. Ambow*

25  *Educ. Holding Ltd.*, No. CV 12-5062 PSG AJWX, 2014 WL 523166 (C.D. Cal. Feb. 6, 2014), Plaintiffs here adequately allege a causal nexus between the

26  misrepresentations and their losses.  Similarly, *In re Herbalife, Ltd. Sec. Litig.*, No. CV 14-2850 DSF JCGX, 2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) is

27  distinguishable because the court found no other facts supported the loss causation allegations.  *Id.* at *3.  And *Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017) is

28  unavailing because plaintiff cited "customer complaints . . . without a subsequent investigation." *Id.* at 1225.

24

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FAC

control over the Company.  ¶¶18-22; 191-95.  Thus, Plaintiffs have adequately alleged a control person claim under Section 20(a) of the Exchange Act.  15 U.S.C. §78t(a).

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, Plaintiffs respectfully request leave to amend.  *See Eminence Capital, L.L.C. v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").

Dated:  January 11, 2024                 Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  clinehan@glancylaw.com

*Counsel for Co-Lead Plaintiff Brian Donley and Co-Lead Counsel for the Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Brian Donley*

Dated:  January 11, 2024                 **THE ROSEN LAW FIRM, P.A.**

By:  */s/ Laurence M. Rosen*

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim (*pro hac vice* forthcoming)
Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

*Counsel for Co-Lead Plaintiff Gene Gress and Co-Lead Counsel for the Class*

## SIGNATURE ATTESTATION

All other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated:  January 11, 2024                          */s/ Ex Kano S. Sams II*
                                                    Ex Kano S. Samsa II

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On January 11, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 11, 2024.


*/s/ Ex Kano S. Sams II*
Ex Kano S. Sams II