1
2
3
4
5
6

LATHAM & WATKINS LLP
Melanie M. Blunschi (CA Bar No. 234264)
 *melanie.blunschi@lw.com*
Nicholas R. Rosellini (CA Bar. No. 316080)
 *nick.rosellini@lw.com*
Elizabeth J. Cheng (CA Bar No. 342131)
 *liz.cheng@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.45.395.8095

7
8
9

Gregory Mortenson (*pro hac vice* forthcoming)
 *gregory.mortenson@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200
Facsimile: +1.212.751.4864

10
11
12

*Attorneys for Defendants Live Nation
Entertainment, Inc., Michael Rapino,
and Joe Berchtold*

13

## UNITED STATES DISTRICT COURT

14

## CENTRAL DISTRICT OF CALIFORNIA

15

## EASTERN DIVISION

16

| | |
|---|---|
| 17  BRIAN DONLEY, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:23-cv-06343-KK (ASx) |
| 18 | **DEFENDANTS' REPLY IN SUPPORT** |
| 19          Plaintiffs, | **OF MOTION TO DISMISS** **AMENDED CLASS ACTION** |
| 20     v. | **COMPLAINT** |
| 21  LIVE NATION ENTERTAINMENT, INC., MICHAEL RAPINO, and JOE | Judge: Hon. Kenly Kiya Kato Date:  Not Set Per Dkt. 43 |
| 22  BERCHTOLD, | Time:  None Place:  Courtroom 3 |
| 23          Defendants. | |

24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................. 1

II.  LEGAL STANDARD ......................................................... 3

III.  ARGUMENT .................................................................... 4

    A.  Plaintiffs Fail To Plead Any Actionable Misstatement Or Omission ................................................................. 5

        1.  Plaintiffs' Falsity Theory Relies Entirely On Unproven And Conclusory Accusations ..................... 5

        2.  Plaintiffs' Challenges Also Fail For Additional Reasons ................................................................. 8

    B.  There Is No Strong Inference Of Scienter ......................... 14

        1.  The Innocent Explanation Is Compelling .............. 14

        2.  Plaintiffs' Contrary Theory Is Inadequately Pled ... 15

    C.  At Most, Plaintiffs Allege A Loss, Not Loss *Causation* ... 18

IV.  CONCLUSION ................................................................ 21

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

### CASES

4

*Baker v. Twitter, Inc.*,
5
   2023 WL 6932568 (C.D. Cal. Aug. 25, 2023) ...................................................5

6

*Bell Atl. Corp. v. Twombly*,
7
   550 U.S. 544 (2007) .........................................................................................3

8

*Brody v. Transitional Hosps. Corp.*,
9
   280 F.3d 997 (9th Cir. 2002) ..........................................................................8

10

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ....................................................................6, 14

11

*Chamberlain v. Reddy Ice Hldgs., Inc.*,
12
   757 F. Supp. 2d 683 (E.D. Mich. 2010) .......................................................17

13

*City of Philadelphia v. Fleming Cos.*,
14
   264 F.3d 1245 (10th Cir. 2001) .....................................................................18

15

*Davoli v. Costco Wholesale Corp.*,
16
   854 F. App'x 116 (9th Cir. 2021 ) .................................................................17

17

*Dura Pharms., Inc. v. Broudo*,
18
   544 U.S. 336 (2005) .........................................................................................3

19

*Eastwood Enters., LLC v. Farha*,
   2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ............................................17

20

*Elam v. Neidorff*,
21
   544 F.3d 921 (8th Cir. 2008) .........................................................................15

22

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
23
   100 F. Supp. 2d 1086 (C.D. Cal. 1999) ........................................................11

24

*Greenberg v. Sunrun Inc.*,
25
   233 F. Supp. 3d 764 (N.D. Cal. 2017) ...........................................................7

26

*Grigsby v. BofI Hldg., Inc.*,
27
   979 F.3d 1198 (9th Cir. 2020) ......................................................................20

28

*Hoang v. ContextLogic, Inc.*,
   2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ................................................. 13

*In re AT&T/DirecTV Now Sec. Litig.*,
   480 F. Supp. 3d 507 (S.D.N.Y. 2020) .......................................................... 11

*In re BofI Hldgs., Sec. Inc.*,
   977 F.3d 781 (9th Cir. 2020) ............................................................... 18, 20

*In re Facebook, Inc. Sec. Litig.*,
   477 F. Supp. 3d 980 (N.D. Cal. 2020) ........................................................... 5

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023) ................................................................... 9

*In re German Auto. Mfrs. Antitrust Litig.*,
   392 F. Supp. 3d 1059 (N.D. Cal. 2019) .......................................................... 6

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ................................................................ 15

*In re Paypal Hldgs., Inc. S'holder Deriv., Litig.*,
   2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ..................................................... 5

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) ................................................................... 10

*In re Progenity, Inc. Sec. Litig.*,
   2023 WL 4498502 (S.D. Cal. July 12, 2023) ..................................................... 5

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ................................................................... 3

*In re Solarcity Corp. Sec. Litig.*,
   274 F. Supp. 3d 972 (N.D. Cal. 2017) ......................................................... 15

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ................................................................ 18

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
   2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ..................................................... 5

*Lloyd v. CVB Financial Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ............................................................... 19, 20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ................................................................. 3, 18, 21

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
   876 F.3d 541 (4th Cir. 2017) ........................................................................ 16

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .............................................................. 3, 15, 18

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) .................................................................. passim

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) .................................................................................... 10

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ..................................................................... 4, 11

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ...................................................................... passim

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ...................................................................... 17

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund. v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ...................................................................... 11

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...................................................................... 8, 21

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
   2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ................................................ 17

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ....................................................................... 16

*Stickrath v. Globalstar, Inc.*,
   527 F. Supp. 2d 992 (N.D. Cal. 2007) ........................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................. 2, 4

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ......................................................... 17

*Van Noppen v. InnerWorkings, Inc.*,
 136 F. Supp. 3d 922 (N.D. Ill. 2015)..................................................................11

*Veal v. LendingClub Corp.*,
 423 F. Supp. 3d 785 (N.D. Cal. 2019).................................................................5

*Weston Family P'ship LLLP v. Twitter, Inc.*,
 29 F.4th 611 (9th Cir. 2022)...............................................................................4

*Wochos v. Tesla, Inc.*,
 985 F.3d 1180 (9th Cir. 2021 )...........................................................................16

*Yates v. Mun. Mortg. & Equity, LLC*,
 744 F.3d 874 (4th Cir. 2014)..............................................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009)........................................................................16, 17

## STATUTES

15 U.S.C. § 78u-4(b).....................................................................................................2

15 U.S.C. § 78u-4(b)(1)(B) ....................................................................................4, 5

15 U.S.C. § 78u-4(b)(2)(A) ..................................................................................4, 14

15 U.S.C. § 78u-4(b)(4)................................................................................................4

## RULES

Fed. R. Civ. P. 9(b)......................................................................................................4

## I.      INTRODUCTION

Plaintiffs' opposition ("Opp.") confirms that their lawsuit hinges on a theory that is foreclosed by black-letter securities law:  All of their attacks boil down to the assertion that Defendants "failed to disclose" allegedly "anticompetitive conduct" or a supposed "failure to cooperate with government inquiries."  Opp. at 13.  But as Defendants explained in their Motion to Dismiss ("Mot."), and as Plaintiffs offer no authority to dispute, the securities laws do *not* require companies to confess to unproven accusations, particularly those that are hotly disputed.  *See, e.g.*, *Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98 (2d Cir. 2021).  That alone requires dismissal, though the Complaint additionally fails because Plaintiffs fall short of the PSLRA's exacting standards for pleading false or misleading statements, scienter, and loss causation.

According to Plaintiffs' own sources, Live Nation is "a perennial target" for antitrust scrutiny, Ex. 11 at 2, and this latest round involves regulators bent on "trying to push the boundaries of antitrust law," Ex. 4 at 1.  Throughout the putative class period (and ever since), Defendants disputed allegations that they have engaged in anticompetitive conduct or have failed to cooperate with investigations.  *See, e.g.*, Ex. 5 at 2.  But Defendants explicitly warned investors that "there can be no assurance" regulators would agree with those assessments.  *See, e.g.*, Ex. 2 at 23.  To date, *no* enforcement action has even been brought, let alone adjudicated against Live Nation, based on the accusations Plaintiffs cite.  Plaintiffs nevertheless cry securities fraud because Defendants did not preemptively admit antitrust violations they believe they did not commit.  The securities laws do not countenance heads-I-win-tails-you-lose lawsuits of this sort.

Plaintiffs have no good answer for the myriad other independently dispositive flaws in their Complaint, either.  Their top-line response to the Motion is to brazenly misstate the pleading standard, falsely claiming that their "allegations need only be 'plausible'" to survive dismissal.  Opp. at 8.  In reality, Plaintiffs' Complaint is

1   "subject to heightened pleading requirements" under the PSLRA that Congress
2   specifically designed to weed out opportunistic securities-fraud lawsuits like this
3   one—*before* permitting any discovery. *Nguyen v. Endologix, Inc.*, 962 F.3d 405,
4   414 (9th Cir. 2020). A complaint that fails to plead the elements of securities fraud
5   with particularity "shall" be terminated at the pleading stage, 15 U.S.C. § 78u-4(b),
6   and here, Plaintiffs fail to adequately plead multiple required elements:

7        On falsity, Plaintiffs scarcely contest that most of the challenged statements
8   are inactionable as a matter of law, either because they are puffery, subjective
9   opinions, statutorily protected forward-looking statements, or some combination of
10  the three. And they have not pled particularized facts showing that any challenged
11  statement was false or misleading when made. To the contrary, Plaintiffs make a
12  cursory attempt to plead "predicate violations" of the antitrust laws, offering only
13  conclusory, generalized assertions that something happened, which could ultimately
14  result in liability under the Sherman Act. Courts routinely dismiss these kinds of
15  bald assertions as amounting to nothing "more than a generality with surface
16  appeal," which is insufficient to render any of the challenged statements false or
17  misleading, even at the pleading stage. *Danske Bank*, 11 F.4th at 99-100.

18       On scienter, Plaintiffs have to satisfy an even more "exacting pleading
19  requirement[]": The Complaint must be dismissed unless "the inference of scienter"
20  is "cogent and at least as compelling as any opposing inference one could draw from
21  the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324
22  (2007). Plaintiffs try to concoct an inference of scienter based on demonstrably
23  innocuous stock sales, Defendants Rapino and Berchtold's management positions at
24  Live Nation, confidential witnesses with no firsthand knowledge, and the mere fact
25  of a government investigation. Whether considered individually or together, these
26  allegations fall far short of the required "strong inference," and in any event outright
27  ignore the obvious innocent explanation for Defendants' conduct—that they
28  believed what they said.

1    Finally, on loss causation, Plaintiffs' position would require the Court to infer
2    fraud based on the mere fact of a stock drop following articles about investigations.
3    But the securities laws are not meant "to provide investors with broad insurance
4    against market losses," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).
5    While a stock drop might show loss, it cannot alone demonstrate loss *causation*,
6    since not every stock drop can be treated "as a coded message revealing [a] fraud."
7    *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008).
8    None of Plaintiffs' purported corrective disclosures revealed anything false or
9    misleading about the challenged statements, as the disclosure of an *investigation* into
10   whether anticompetitive conduct occurred is *not* a disclosure that anticompetitive
11   conduct actually occurred.  *See Loos v. Immersion Corp.*, 762 F.3d 880, 883
12   (9th Cir. 2014). This fundamental mismatch between the challenged statements and
13   the alleged "corrective disclosures" defeats loss causation.

14   For all these reasons—or any one of them—the Complaint should be
15   dismissed in its entirety.

16   **II.    LEGAL STANDARD**

17   Plaintiffs insist that their "allegations need only be 'plausible'" to survive
18   dismissal.  Opp. at 8.  That is wrong.  Securities-fraud plaintiffs must carry a far
19   heavier burden than the average civil plaintiff, given the "demanding pleading
20   requirements" imposed by Federal Rule of Civil Procedure 9(b) and the Private
21   Securities Litigation Reform Act ("PSLRA") in securities cases like this one.  *In re
22   Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *see* Mot. at 5-7.
23   Congress established these stringent pleading standards "to halt early on securities
24   litigation that lacks merit," given "the substantial costs that securities fraud litigation
25   can impose." *Nguyen*, 962 F.3d at 414.

26   Plaintiffs must therefore do *more* than merely allege sufficient facts to
27   "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp.
28   v. Twombly*, 550 U.S. 544, 570 (2007).  Under Rule 9(b), Plaintiffs must "state with

1    particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). That

2    requires precise, detailed allegations about "the who, what, when, where, and how"

3    of the alleged fraud, *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619

4    (9th Cir. 2022), as "to all elements" of their claims—including falsity, scienter, and

5    loss causation. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605

6    (9th Cir. 2014).

7         The PSLRA raises the bar even further. To allege a material misstatement,

8    Plaintiffs must "specify each statement alleged to have been misleading" and the

9    "reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs

10   must also "state with particularity facts giving rise to a *strong inference* that the

11   defendant acted with [scienter]," *id.* § 78u-4(b)(2)(A) (emphasis added)—that is, "a

12   mental state embracing intent to deceive, manipulate, or defraud," *Nguyen*, 962 F.3d

13   at 414. And they must demonstrate that the defendants' fraudulent conduct "caused

14   the loss for which the[y] seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

15        The PSLRA's standard for pleading scienter is particularly demanding: The

16   Supreme Court has made clear that the inference of scienter from the facts alleged

17   "must be more than merely plausible or reasonable—it must be cogent and at least

18   as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551

19   U.S.at 314. So unlike everyday civil pleading requirements—indeed, beyond even

20   Rule 9(b)'s heightened pleading requirements for most fraud cases—the PSLRA

21   establishes a "comparative inquiry" at the pleading stage that requires weighing the

22   strength of Plaintiffs' scienter theory against innocent explanations for the conduct

23   alleged. *Id.* at 323-24. If the innocent explanation is "more plausible" than the

24   culpable one, the complaint must be dismissed. *Nguyen*, 962 F.3d at 408.

25   **III.   ARGUMENT**

26        Plaintiffs come nowhere close to satisfying the stringent pleading standards

27   applicable here as to three elements of their claims: falsity, scienter, and loss

28   causation. Each of those deficiencies independently requires dismissal.

### A.   Plaintiffs Fail To Plead Any Actionable Misstatement Or Omission

To plead falsity, Plaintiffs had to "specify each statement alleged to have been misleading" and the "reasons why."  15 U.S.C. § 78u-4(b)(1)(B).  They have not done so.  Their opposition confirms that *all* of their challenges fail for one overarching reason:  Their falsity theory rests on the mistaken premise that Defendants had "a duty to disclose uncharged, unadjudicated wrongdoing." *Danske Bank*, 11 F.4th at 98.  That alone is dispositive, but Plaintiffs' efforts to dispel the other fatal flaws with their falsity allegations fall equally flat.

### 1.   Plaintiffs' Falsity Theory Relies Entirely On Unproven And Conclusory Accusations

The securities laws do not require Defendants to admit accusations of antitrust violations that they dispute—and that *to this day* have not even resulted in a lawsuit brought by regulators, much less one adjudicated against Live Nation.  *See* Mot. at 1, 10-11.  Nor do the securities laws command that Defendants must accede to inaccurate aspersions regarding Live Nation's compliance with government inquiries.  *See id.*  That simple legal reality eviscerates Plaintiffs' falsity theory as to all of the challenged statements.  *See id.*

A company has "no obligation to declare itself liable for unproven allegations" on pain of potentially ruinous liability for securities fraud.  *Baker v. Twitter, Inc.*, 2023 WL 6932568, at *8 (C.D. Cal. Aug. 25, 2023); *accord Danske Bank*, 11 F.4th at 98.  Numerous courts within the Ninth Circuit have endorsed this established principle.  *See, e.g.*, *In re Progenity, Inc. Sec. Litig.*, 2023 WL 4498502, at *13 (S.D. Cal. July 12, 2023); *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1023-24 (N.D. Cal. 2020), *rev'd in part on other grounds*, 87 F.4th 934 (9th Cir. 2023); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019); *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *8 (N.D. Cal. Aug. 31, 2018); *In re Paypal Hldgs., Inc. S'holder Deriv., Litig.*, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018).  And it applies with special force here.

Plaintiffs' own sources note that Defendants have been "a perennial target" for antitrust scrutiny for over a decade, Ex. 11 at 2, and that regulators have recently been "trying to push the boundaries of antitrust law," Ex. 4 at 1, but "could ultimately decide not to bring a case," Ex. 11 at 2.  Moreover, "interpreting and enforcing" the antitrust laws is rarely a clear-cut exercise, given "the amorphous prohibitions of §§ 1 and 2 of the Sherman Act" and the need to avoid "punish[ing] economic behavior that benefits consumers and will not cause long-run injury to the competitive process." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 902-03 (9th Cir. 2008).  What qualifies as "anticompetitive" is thus "often in the eye of the beholder." *Burden Shifting and Presumptions Under Section One of the Sherman Act After California Dental Ass'n v. FTC*, 53 Rutgers L. Rev. 247, 269 (2000).  And the mere fact of a "government antitrust investigation[]"carries "no weight in pleading an antitrust conspiracy."  *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1071 (N.D. Cal. 2019) (collecting cases).

Throughout the putative class period—and ever since—Defendants steadfastly disputed accusations of antitrust violations, asserting that Live Nation "takes its responsibilities under the antitrust laws seriously and does not engage in behaviors that could justify antitrust litigation."  Ex. 5 at 1-2.  Defendants consistently maintained that they have complied with authorities to the fullest extent possible, while protecting "highly sensitive client information about artists, venues and other[]" partners. Ex. 13 at 4.  And Defendants explicitly warned investors that, "[w]hile we attempt to conduct our business and operations in a manner that we believe to be in compliance with [applicable] laws and regulations, there can be no assurance that a law or regulation will not be interpreted or enforced in a manner contrary to our current understanding[.]"  Ex. 2 at 23; *see* Ex. 8 at 22 (same). In short, Defendants stated their belief that they had complied with the antitrust laws and regulatory inquiries, while emphasizing "that regulatory [action]" on well-known accusations against Live Nation "was a threat to [its] business" and

1    letting investors "assess that risk" for themselves.  *Greenberg v. Sunrun Inc.*, 233

2    F. Supp. 3d 764, 772 (N.D. Cal. 2017) (dismissing securities-fraud complaint).

3    "That is precisely how securities markets are supposed to work."  *Id.*  So as in

4    *Greenberg*, "[t]here was no untruth or misleading omission here"—and no fraud.  *Id.*

5           Plaintiffs respond that their Complaint alleges Live Nation "failed to disclose"

6    its "own past conduct"—*i.e.*, allegedly "anticompetitive conduct" and a supposed

7    "failure to cooperate with government inquiries."  Opp. at 13.  That contention gives

8    the game away:  It concedes that Plaintiffs' entire case relies on unproven

9    accusations about Live Nation's conduct, which Live Nation vehemently disputes,

10   which have never been adjudicated, and which—as explained—Live Nation had no

11   duty to preemptively admit.

12          Specifically, Plaintiffs' challenges to Statements 1, 2, 5, and 7 explicitly rest

13   on the notion that Live Nation "failed to disclose" that it supposedly "engaged in

14   anticompetitive conduct" and/or "was not cooperating fully with the ongoing DOJ

15   and Senate Subcommittee investigations."  ¶¶ 125-26; *see* ¶¶ 127-28, 134-35,

16   138-39, 143-46.  Plaintiffs' challenges to Statements 3 and 6 likewise presuppose

17   "that Live Nation engaged in anticompetitive conduct."  ¶¶ 131-32; *see* ¶¶ 136-37,

18   140-41.  And Plaintiffs' challenges to Statements 4a and 4b assume "anticompetitive

19   conduct" was "a material factor driving [Live Nation's] strong performance."

20   ¶¶ 129-30; *see* ¶¶ 147-48.  All of Plaintiffs' arguments, then, assume the conclusion

21   of government inquiries that are still underway and try to fast-forward to the end of

22   an enforcement action that does not even exist.  That cart-before-the-horse theory of

23   fraud cannot support a claim and demands dismissal across the board.  *See supra*

24   at 5; Mot. at 9.

25          Contrary to Plaintiffs' suggestion, Defendants are not asking the Court to

26   resolve "factual disputes" at the pleading stage.  Opp. at 14.  Whether Defendants

27   actually engaged in anticompetitive conduct is not a question for this Court.  Rather,

28   Defendants are asking the Court to follow black-letter law making clear that the type

of information that Plaintiffs claim Defendants should have disclosed—preemptive admissions of guilt to disputed accusations—was not required to be disclosed. "[D]isclosure is not a rite of confession" demanding preemptive penance for any and all "suspected misconduct" suggested by regulators or reported in the popular press. *Danske Bank*, 11 F.4th at 98-99. Therefore, the failure to make such disclosures is insufficient to plead an actionable misstatement or omission. For that reason alone, this action must be dismissed in its entirety.

### 2.   Plaintiffs' Challenges Also Fail For Additional Reasons

On top of that fundamental problem, Plaintiffs plead no facts suggesting that any of the challenged statements were demonstrably "false at the time" they were made, *Ronconi v. Larkin*, 253 F.3d 423, 431 (9th Cir. 2001), or otherwise "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]," *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Plaintiffs' scattershot attempts to address these fatal defects miss the mark.

### a.   Statements About Antitrust Compliance

That Live Nation is constantly the target of antitrust accusations and inquiries was no secret. Plaintiffs' Complaint and the sources on which it relies repeatedly acknowledge that Live Nation has "faced federal scrutiny" under the antitrust laws for over a decade. ¶ 3; *see, e.g.*, ¶¶ 53, 92; Ex. 11 at 2, 4. Yet Plaintiffs paradoxically challenge disclosures reminding investors of this longstanding and well-known risk. Plaintiffs' arguments are meritless.

On Statement 1, Plaintiffs do not dispute that warning that regulators may "commence investigations, inquiries or litigation with respect to [Live Nation's] compliance with" the "antitrust" laws is a forward-looking statement protected by the PSLRA—and otherwise beyond reproach. ¶¶ 125, 143. Rather, Plaintiffs emphasize that the *second* sentence of Statement 1—which states that Live Nation has "historically cooperated with authorities" and "satisfactorily resolved each such

material investigation," ¶¶ 125, 143—is "not a forward-looking statement." Opp. at 12. True, but Plaintiffs' position destroys the Complaint's theory of falsity—that this retrospective statement somehow asserted "that the Company was likely to 'satisfactorily resolve[]'" investigations *in the future*. ¶¶ 126, 144. Plaintiffs also plead no facts suggesting that Defendants failed to satisfactorily resolve prior investigations. In fact, their allegations admit that Live Nation "resolve[d]" a 2019 dispute by "agree[ing]" to a revised consent decree, ¶ 3—and their only allegation of supposed non-cooperation with investigating authorities concerns events that occurred *after* the challenged statements were made, *see infra* at 21. Plaintiffs also nowhere dispute that the adverb "satisfactorily" is inactionable puffery. *See* Mot. at 8.

Statement 2 was not false or misleading, either. It is plainly true that "any adverse outcome" in an antitrust investigation or enforcement action "could limit or prevent [Live Nation] from engaging in the ticketing business" or "subject [it] to potential damage[s] assessments." ¶¶ 127, 145. Plaintiffs nonetheless invoke *In re Facebook, Inc. Securities Litigation*, 87 F.4th 934 (9th Cir. 2023), to assert that Statement 2 misleadingly treated a "known risk[]" as hypothetical. Opp. at 12. But in *In re Facebook*, the defendant stated that "users' data *may be* improperly accessed, used, or disclosed," despite having allegedly "known" about then-existing misuse of users' data. 87 F.4th at 948, 951. Here, by contrast, the risk discussed was "an adverse *outcome*" of an antitrust investigation, ¶ 128 (emphasis added), which had not yet happened and still has not come to pass—and thus could not have been "known" when Statement 2 was made. No such outcome can be presumed, either, particularly given the complexity and uncertainty involved in applying the antitrust laws. *See supra* at 6.

As for Statement 5, Plaintiffs concede that saying "Live Nation takes its responsibilities under the antitrust laws seriously" is aspirational and thus inactionable. Opp. at 13; *see* Mot. at 8. Plaintiffs take issue only with "the latter

portion of this statement," which remarked that Live Nation "does not engage in behaviors that could justify antitrust litigation." Opp. at 13. But that assessment on the complicated and indeterminate question of antitrust compliance is the kind of "inherently subjective" assessment that constitutes an inactionable statement "of pure opinion"—despite not being prefaced, in this instance, "with words such as 'we think' or 'we believe.'" *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183, 186 (2015)).[1]

At any rate, Plaintiffs come nowhere close to pleading "predicate violations" of the antitrust laws with the requisite "particularity," which is a necessary prerequisite to sustaining a securities-fraud claim on the back of a purported antitrust violation. *Danske Bank*, 11 F.4th at 99. Plaintiffs' perfunctory attempt to allege antitrust violations—which merely incant Live Nation's alleged market share, while relying on stale data from 2011 through 2016 and anecdotal remarks from a smattering of mid-level employees (most of whom were not even employed by Live Nation during the class period)—offer nothing "more than a generality with surface appeal." *Id.* at 99-100. That is insufficient. *Id.* And it is even more so here, since regulators did *not* "actually file an antitrust lawsuit," and the revised consent decree's "automatic penalty" provision has never been triggered. ¶¶ 3, 157.

Finally, Plaintiffs do not meaningfully defend their challenge to Statement 7, which observed that Defendants had "submitted more than 35 pages of information to provide greater context and transparency to policymakers on the realities of the industry" and that Defendants "remain committed to working with lawmakers." ¶ 138. Plaintiffs do not dispute that Defendants in fact submitted 35 pages of information. And while Plaintiffs appear to assert in passing that saying you "remain

---

[1] Plaintiffs point out that, in some cases, liability may attach if a "supporting fact [the speaker] supplied" in conjunction with an opinion statement "were untrue." Opp. at 12-13. But because the opinion statement here was *not* accompanied by assertions about supporting facts, that principle is irrelevant.

committed" to a goal "do[es] not constitute puffery," they do not even try to explain themselves. Opp. at 12. Nor could they, since their position flouts binding precedent. *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund. v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (statements expressing "commitment" are aspirational); Mot. at 8.

### b.    Statements About Competition

Plaintiffs scarcely engage with the numerous reasons why Defendants' statements about competition in the industry—*i.e.*, Statements 3 and 6—cannot support a claim for securities fraud. Both are inactionable as a matter of law and, in any event, were not false or misleading when made.

As Defendants explained, characterizing competition as "intense," "significant," and "increasing" are textbook examples of inactionable puffery. Mot. at 8-9; *see Apollo Grp.*, 774 F.3d at 606 ("significant events" is too "vague" to support a claim); *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 941 (N.D. Ill. 2015) (same for "intense focus"); *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1096 (C.D. Cal. 1999) (same for "increasing corporate resources"). Plaintiffs' opposition contains a single sentence on puffery, but that sentence merely claims that Statement 3 is actionable without explanation or citation—and does not even try to defend their challenge to Statement 6. Opp. at 12. Nor do Plaintiffs explain how the obvious opinion statements in Statement 3—*e.g.*, "*We believe* that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences"—are even potentially actionable under *Omnicare*. ¶¶ 131, 140 (emphasis added). They are not. *See supra* at 10 & n.1. And touting "quality" products and services that provide an "enhanced" experience are paradigmatic puffery to boot. *See Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 998 (N.D. Cal. 2007) ("high quality"); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 523 (S.D.N.Y. 2020) ("enhanced capabilities").

More fundamentally, Plaintiffs do not adequately allege that ticketing markets are *not* competitive.  As noted, Plaintiffs' perfunctory allegations of anticompetitive conduct fall far short of well-pled antitrust violations, particularly under the heightened pleading standards applicable here.  *See supra* at 10.  Plaintiffs also do not dispute Defendants' assertion that Live Nation faces competition from numerous "primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite," and others, as well as "secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek." ¶¶ 131, 140 (Statement 3); *see* ¶ 136 (Statement 6).  Nor do Plaintiffs dispute that "Ticketmaster has lost, not gained, market share" since merging with Live Nation in 2010.  ¶ 136.  In fact, the Complaint admits—as it must—that Live Nation has competition in these areas.  *See, e.g.*, ¶ 78.  So even assuming Statements 3 and 6 are potentially actionable (which they aren't), Plaintiffs *still* have not pled that either was false or misleading.[2]

### c.    Statements About Revenue Drivers

On Statements 4a and 4b, Plaintiffs offer just one paragraph parroting their Complaint.  Opp.  at 11-12.  That paragraph is tellingly non-responsive to the multiple flaws with Plaintiffs' allegations that Defendants laid out.  *See* Mot. at 15.

Statements 4a and 4b informed investors about year-over-year changes in Live Nation's revenue at the end of fiscal year 2021 and 2022, respectively.  *See* ¶ 129 (Statement 4a); ¶ 147 (Statement 4b).  Plaintiffs do not assert that any financial figures were misstated or misleading.   And they do not dispute that the "improvement" Live Nation saw "was primarily due to more shows [each] year, an increase in net ancillary spend per fan at our amphitheater and festival events, and growth in pricing across all venue types." ¶ 129; *see* ¶ 147.  Nor could they:  Live Nation was "emerging from the pandemic" during this period, with "reopening well

---

[2]   For all these reasons, the portions of Statement 5 referring to "increasingly competitive" ticket markets and a "large gap that exists between the quality of the Ticketmaster system" and its competitors likewise cannot support a claim.  ¶ 134.

underway in the United States and United Kingdom" by the end of 2021, Ex. 2 at 31—and most markets "fully open by the fourth quarter" of 2022, Ex. 8 at 30. The abatement of the COVID-19 pandemic and related restrictions on mass gatherings *obviously* fueled revenue growth for Live Nation, whose business depends on mass gatherings like concerts and sporting events.

Plaintiffs nevertheless claim that these transparently true statements were misleading because "Defendants failed to disclose that *a* material factor driving the Company's strong performance" was allegedly "anticompetitive conduct." Opp. at 12 (emphasis added.) Not so. As Defendants explained, "'Plaintiffs have alleged no facts that show that the increases were not 'primarily' caused by'" increased demand and pricing increases, particularly as the world returned to normalcy after the COVID-19 pandemic. Mot. at 15 (quoting *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *12 (N.D. Cal. Mar. 10, 2023)). Defendants also had no duty to disclose unproven accusations, while Plaintiffs' perfunctory antitrust allegations are insufficiently pled in their own right. *See supra* at 5, 10. On top of all that, Plaintiffs allege that "Live Nation has dominated the [ticketing] market" for "nearly two decades," not just in 2021 and 2022. ¶ 80. How allegedly longstanding anticompetitive practices could possibly have caused a sudden revenue spike during those two years is unclear—and the Complaint does not suggest an answer.

Plaintiffs also seize on the portion of Statement 4b stating the Live Nation's recent success was "a reflection of the quality of the Ticketmaster platform and its continued popularity with clients across the globe, giving us confidence that the Ticketmaster features and functionality will continue to fuel growth going forward." Opp. at 11-12. Plaintiffs baldly assert that revenue growth was in fact "unsustainable due to regulatory scrutiny." *Id.* at 12. But Plaintiffs offer *zero* response to the fact that this boast about Live Nation's services and optimistic projection about the Complaint's future is inactionable as a matter of law three times over: It is puffery, an opinion, and a forward-looking statement protected by the PSLRA's safe harbor.

1   Mot. at 15.  Plaintiffs also do not allege that revenue growth turned out to be
2   unsustainable; on the contrary, Live Nation's revenues *increased* by 36% during "the
3   first nine months of 2023."[3]

4   ### B.    There Is No Strong Inference Of Scienter

5   Plaintiffs' claims also fail for the independent reason that their allegations do
6   not raise the requisite "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).
7   That stringent pleading requirement—which is unique to securities law—"has
8   teeth." *Nguyen*, 962 F.3d at 414.  Under the comparative inquiry it demands, this
9   case "cannot go forward" because the innocent explanation for Defendants' conduct
10  is far "more plausible" than Plaintiffs' unsupported scienter theory. *Id.* at 419.

11  ### 1.    The Innocent Explanation Is Compelling

12  The innocent explanation here jumps off the page:  A "perennial target" for
13  antitrust scrutiny, Ex. 11 at 2, confronting regulators who have recently been "trying
14  to push the boundaries of antitrust law," Ex. 4 at 1, Defendants believed that
15  Live Nation has complied with the antitrust laws' "amorphous prohibitions,"
16  *Cascade Health*, 515 F.3d at 902, and regulatory authorities' requests.  That is why
17  Defendants consistently maintained that Live Nation "takes its responsibilities under
18  the antitrust laws seriously and does not engage in behaviors that could justify
19  antitrust litigation." Ex. 5 at 1-2.  It is why Defendants denied accusations that they
20  were not cooperating with government inquiries, while promptly explaining their
21  efforts to protect "highly sensitive client information."  Ex. 13 at 5.  And it is why
22  Defendants nevertheless warned investors that "there can be no assurance that a law
23  or regulation will not be interpreted or enforced in a manner contrary to our current
24  understanding[.]"  Ex. 2 at 23; *see* Ex. 8 at 22 (same).  Defendants' consistent

25

26

27  [3] *See* Live Nation, SEC Form 10-Q (November 2, 2023), at 22, *available at* <https://www.sec.gov/ix?doc=/Archives/edgar/data/1335258/00013352582300010 2/lyv-20230930.htm>.  This Court may take judicial notice of this publicly filed
28  document, just like Live Nation's other SEC filings. *See* Dkt. 45 at 7-8 (Defendants' unopposed request for judicial notice).

position, coupled with their candid warnings about the inherently indeterminate nature of antitrust liability, demonstrate that Defendants were "endeavoring in good faith to inform" investors, not deceive them. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 888 (4th Cir. 2014).

### 2.    Plaintiffs' Contrary Theory Is Inadequately Pled

To adequately allege scienter in spite of the foregoing, Plaintiffs had to plead particularized facts raising an equally compelling, contrary inference. *See supra* at 4, 14. Specifically, they had to show that Defendants "intentionally misled investors, or acted with deliberate recklessness, by not" confessing to alleged antitrust violations that, to date, not even the Department of Justice ("DOJ") has deemed worthy of an enforcement action. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056-57 (9th Cir. 2014). Plaintiffs' attempt to cobble together a countervailing narrative along those lines flunks the PSLRA's "exacting" pleading standard. *Nguyen*, 962 F.3d at 414. All they have are demonstrably innocuous stock sales, a make-weight core operations theory, patently inadequate confidential witnesses, and the mere fact of an investigation. Taken together, these allegations are nowhere near as compelling as the obvious innocent explanation for Defendants' statements—that they believed what they said.

Start with the stock sales. Again, Plaintiffs do not allege *any* class period stock sales by Berchtold, which cuts sharply against scienter. Mot. at 17; *see In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1011 (N.D. Cal. 2017). Plaintiffs also do not dispute that *all* of Rapino's stock sales was made pursuant to a 10b5-1 trading plan, to satisfy tax withholding requirements, or for charitable purposes, which likewise cuts against scienter. Mot. at 17 & n.4. Instead, Plaintiffs claim in a footnote that these innocuous reasons for Rapino's sales somehow don't matter or can't be considered on a motion to dismiss. *See* Opp. at 20 n.6. That is wrong. *See, e.g., Metzler*, 540 F.3d at 1067 n.11; *Yates*, 744 F.3d at 891; *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008). And it is especially wrong here, given Plaintiffs'

failure to "provide a 'meaningful trading history' for purposes of comparison to [Rapino's] stock sales within the class period," as required to infer scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009).  That Rapino sold shares as stock options were expiring and came away with *more* shares at the end of the class period (thus suffering losses himself) confirms that these routine sales were not suspicious.  Mot. at 17.

Plaintiffs also argue that, because Live Nation's "Ticketing division (*i.e.*, Ticketmaster)" is "a 'critical' aspect of the company's success," and because their allegations center on allegedly anticompetitive conduct involving Ticketmaster, they have shown a "core operations" theory of scienter.  Opp. at 17.  Plaintiffs' own lead case refutes that argument, reasoning that "management's general awareness of the day-to-day workings of the company's business does *not* establish scienter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784-85 (9th Cir. 2008) (emphasis added).  Rather, a core operations theory demands "allegation[s] of specific information conveyed to management and related to the fraud." *Id.* at 785. Plaintiffs' conclusory core operations argument points to nothing of the sort. *See* Opp. at 17-18.

Plaintiffs' confidential witness allegations do not cure that fundamental problem.  *See* Mot. at 19.  "Even if someone at [Live Nation] believed that [the company was violating the antitrust laws]"—something the confidential witnesses do not actually assert—"no fact alleged suggests that [Berchtold or Rapino] was this person."  *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 550 (4th Cir. 2017).  Even assuming the FEs believed that Live Nation was engaging in anticompetitive conduct, Plaintiffs simply plead no facts showing that Berchtold or Rapino "ever accepted those employees' views[.]" *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021).  FE1 and FE3 are not alleged to have even been in the same reporting line as Berchtold or Rapino, much less to have had any personal contact with them.  ¶¶ 24, 26.  Their "roles did not give them personal knowledge

regarding what information was provided to" Berchtold or Rapino.  *Davoli v. Costco Wholesale Corp.*, 854 F. App'x 116, 117 (9th Cir. 2021).  Both FE1 and FE3 "provide[d] only snippets of information" based on anecdotal experience and—as Plaintiffs concede (*see* Opp. at 18)—"lack[ed] first-hand knowledge regarding what the individual defendants" believed regarding Live Nation's compliance with antitrust laws and cooperation with regulators.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014); *see* ¶¶ 97-98.  Indeed, FE3's only substantive allegation concerned experience while working at a "*competitor* of Ticketmaster," as FE3 was not employed by Live Nation during *any* portion of the putative class period.  ¶ 99 (emphasis added); *see Zucco*, 552 F.3d at 996.  Neither was FE2.  ¶ 25.  And while the Complaint alleges that FE2's *boss* reported to Rapino, no allegation suggests that FE2 had any insight whatsoever into Rapino's mental state.  ¶ 25.  Worse still, FE2 merely described efforts "to buy out competing venues," the kind of acquisition efforts that are a standard feature of a market economy, not proof of antitrust violations.  ¶ 81.

That leaves Plaintiffs' reliance on the mere "existence of [a] governmental investigation"—which changes nothing.  Opp. at 20-21.  The innocent account is fully consistent with the existence of an investigation:  Defendants firmly believed Live Nation was in compliance with the antitrust laws, notwithstanding yet another round of antitrust scrutiny by an increasingly aggressive regulator.  Plaintiffs' own cases recognize that an "investigation[] is not sufficient, standing alone, to support a strong inference of scienter."  *Chamberlain v. Reddy Ice Hldgs., Inc.*, 757 F. Supp. 2d 683, 713 n.8 (E.D. Mich. 2010); *accord Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016).  And those decisions hold merely that an investigation can "provide notice" to management of previously unknown misconduct that "may not be ignored" once the investigation is under way.  *Eastwood Enters., LLC v. Farha*, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009); *accord Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, 2009 WL

3853592, at *7 (M.D. Fla. Mar. 30, 2009). Here, however, no one disputes that Defendants were aware of ongoing antitrust scrutiny. What matters is that all facts alleged indicate they believed the accusations were unfounded. There is no strong inference of scienter.

## C. At Most, Plaintiffs Allege A Loss, Not Loss *Causation*

Plaintiffs also fail to plead loss causation—yet another independent ground for dismissal. Mot. at 19-22. None of Plaintiffs' purported corrective disclosures demonstrates that an alleged "fraud was 'revealed to the market,'" as they must to plead loss causation. *Loos*, 762 F.3d at 887. The four news articles Plaintiffs cite did not disclose any "actual wrongdoing"—and thus did "not reveal to the market the pertinent truth of anything." *Id.* at 890 n.3. Those articles largely did not even "reveal new information," as required for a viable corrective disclosure. *In re BofI Hldgs., Sec. Inc.*, 977 F.3d 781, 794 (9th Cir. 2020). Plaintiffs' attempts to deny this reality are unpersuasive.

Plaintiffs' loss causation argument is that the "market's reaction" when these four articles were published "demonstrates that [the articles] revealed new information," and then they make the logical leap that the articles corrected prior statements. Opp. at 24. That is wrong. "So long as there is a drop in a stock's price, a plaintiff will *always* be able to contend that the market 'understood'" this "as a coded message revealing the [alleged] fraud." *Metzler*, 540 F.3d at 1064. Congress determined that such allegations were an "abuse[]" and specifically enacted the PSLRA to "eliminate" the "routine filing of lawsuits . . . whenever there is a significant change in an issuer's stock price." *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258-59 (10th Cir. 2001). "Loss causation requires more" than a stock drop. *Metzler*, 540 F.3d at 1064. Plaintiffs do not have it, so the PSLRA bars them from going on a "fishing expedition[]" in discovery. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 (9th Cir. 2002).

To begin, Plaintiffs acknowledge that the only new information revealed in

1  the November 18, 2022 article from the *New York Times* was "the announcement of
2  a government investigation" into Live Nation's business practices.  Opp. at 23.  And
3  they further concede that, "without more," this fact "does not demonstrate loss
4  causation."  *Id.*  Plaintiffs nevertheless invoke *Lloyd v. CVB Financial Corp.*, 811
5  F.3d 1200 (9th Cir. 2016), to claim that "much more is alleged here." *Id.*  But they
6  do not come close to the showing *Lloyd* requires—public confirmation that the
7  alleged wrongdoing being investigated actually occurred.

8       The *Lloyd* complaint "adequately ple[d] loss causation" not just because the
9  announcement of an investigation into a lending institution's cash reserves "caused
10 [the defendant's] stock price to drop precipitously" by 22%, but *also* because
11 (i) investor "fears about" the investigation "were confirmed" by the defendant's
12 subsequent "disclosure that it was writing off $34 million" in outstanding loans, and
13 (ii) "the market reacted hardly at all to [the defendant's] bombshell disclosure about
14 its largest borrower['s]" inability to repay its debts.  811 F.3d at 1210-11.  In other
15 words, the investigation announcement in *Lloyd* could serve as a "partial" corrective
16 disclosure only because the defendant later acknowledged publicly that its prior
17 statements about the borrower's creditworthiness were false, and the behavior of the
18 "stock price indicate[d] that the earlier 22% drop reflected" harm stemming from the
19 defendants' failed cover-up.  *Id.*

20      This case is completely different.  Again, Defendants have not admitted to
21 anticompetitive conduct and instead have steadfastly disputed the accusations.  *See*
22 *supra* at 6.  Despite commencing its investigation more than a year ago, the DOJ has
23 not filed an enforcement action against Live Nation, much less proved its case.  *Id.*
24 And the automatic penalty provision of the revised consent decree has *never* been
25 triggered.  *Id.*  So unlike in *Lloyd*, the alleged wrongdoing has not been confirmed—
26 just the opposite.  Indeed, Plaintiffs' sole argument for having shown "something
27 more" is that their allegations "also include the information disclosed within the *NPR*
28 report (¶151), letters and statements written by Senate committee members (¶¶151,

161), the *Politico* report (¶¶155-157), and the *CNBC* report (¶¶159-163)."  Opp. at 23.  None of that saves them.

No antitrust violations "were confirmed by" the February 23, 2023 *NPR* report.  *Lloyd*, 811 F.3d at 1211.  Plaintiffs do not assert otherwise, insisting instead that the report "revealed for the first time that [Live Nation] was facing increased *exposure* to regulatory scrutiny and the risk of regulatory action."  Opp. at 23 (emphasis added).  Nonsense.  The *NPR* report and the Senate committee letter it reported on were published "one month *after* senators held a hearing on issues in the ticketing industry" that publicly scrutinized Live Nation's business practices.  Ex. 9 at 1 (emphasis added).  The letter's summary of witness testimony (which Plaintiffs quote at length, ¶ 151) was old news, not "new information."  *In re BofI*, 977 F.3d at 794.  And the letter acknowledged "different ideas" held by lawmakers, who merely "encourag[ed] the [DOJ] to take action *if* it finds that Ticketmaster has walled itself off from competitive pressure at the expense of the industry and fans."  ¶ 152 (emphasis added).  The *NPR* report did not announce findings of wrongdoing by the Senate, the DOJ, or any other regulatory authority.  Nor did it otherwise confirm that actual wrongdoing had taken place.  The *NPR* report's renewed discussion about the longstanding specter of regulatory action was mere "confirmatory information." *Grigsby v. BofI Hldg., Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020).

So too of *Politico*'s July 28, 2023 report that the DOJ "*could* file an antitrust lawsuit against concert promoter Live Nation Entertainment and its subsidiary Ticketmaster by the end of the year."  ¶ 155 (emphasis added); *see* Ex. 11 at 1.  That same article cautioned that the DOJ "could ultimately decide not to bring a case." Ex. 11 at 2.  And—to repeat—no lawsuit has been filed, let alone adjudicated. *Politico*'s additional speculation about the possibility that the DOJ could decide to sue (or not) does not reveal the "truth [purportedly] concealed by the [alleged] misstatements" at issue—that Defendants *in fact* violated the antitrust laws.  *In re BofI*, 977 F.3d at 790.  At worst, it suggests "a mere 'risk' or 'potential' for fraud."

1    *Loos*, 762 F.3d at 889.   That is not enough.   *Id.*; *see* Mot. at 21.

2    Plaintiffs' reliance on *CNBC*'s November 20, 2023 report that a single senator

3    believed Live Nation had "failed to fully comply with [a senate committee's]

4    requests" fares even worse.   ¶ 160.   The Complaint asserts that this article proved

5    false the assertion in Statements 1 and 7 that Defendants had "fully cooperated" with

6    government investigations.   ¶ 163.   That is impossible.   *See* Mot. at 21.   The

7    challenged statements were made in Live Nation's 2021 Form 10-K (issued on

8    February 23, 2022) and its 2022 Form 10-K and related press release (both issued

9    on February 23, 2023).   *See* Ex. 1 at 1, 3.   But the Complaint acknowledges that the

10   Senate committee "first wrote to Live Nation/Ticketmaster on March 24, 2023"—

11   *after* the challenged statements.   ¶ 160.   Even assuming Live Nation had not

12   cooperated with the committee's inquiries, that later-in-time conduct could not

13   possibly demonstrate that an earlier "statement was false *at the time it was made*."

14   *Ronconi*, 253 F.3d at 431 (emphasis added).[4]   And as explained, the personal views

15   of one senator do not establish non-cooperation anyway.   Mot. at 14.   The *CNBC*

16   report does not support loss causation either.

17   None of Plaintiffs' "corrective disclosures" actually corrects any of the

18   challenged statements.   This mismatch confirms that Plaintiffs have not adequately

19   pled loss causation.   *Metzler*, 540 F.3d at 1064.

20   **IV.   CONCLUSION**

21   For the foregoing reasons, the Complaint should be dismissed.

---

[4]  Plaintiffs claim it would be "perverse" for a company to say it "was complying at one point in time while it was failing to do so later."  Opp. at 24-25.  Not so. Someone who says on Monday that he's never missed work is not a liar just because he calls in sick for the first time the following Friday.  Plaintiffs' contrary assertion defies common sense and hornbook securities law.

1   Dated:  January 25, 2024                    Respectfully submitted,

2                                               LATHAM & WATKINS LLP

3                                               By /s/ *Melanie M. Blunschi*
                                                    Melanie M. Blunschi
4

5                                               *Attorneys for Defendants Live Nation*
                                                *Entertainment, Inc., Michael Rapino, and*
6                                               *Joe Berchtold*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>**CERTIFICATE OF COMPLIANCE**</u>

The undersigned, counsel of record for Defendants Live Nation Entertainment, Inc., Michael Rapino and Joe Berchtold, certify that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

Dated:  January 25, 2024          <u>/s/ *Melanie M. Blunschi*</u>
                                                  Melanie M. Blunschi