UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 23-6343-KK-ASx** | Date: | February 23, 2024 |
|---|---|---|---|
| Title: | *Brian Donley v. Live Nation Entertainment, Inc., et al.* | | |

Present: The Honorable KENLY KIYA KATO, UNITED STATES DISTRICT JUDGE

| Noe Ponce | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** (In Chambers) Order DENYING Defendants' Motion to Dismiss [Dkts. 44, 45]

## I.
## INTRODUCTION

On November 30, 2023, plaintiffs Brian Donley and Gene Gress ("Plaintiffs") filed a First Amended Class Action Complaint ("FAC") against defendants Live Nation Entertainment, Inc. ("Live Nation"), Michael Rapino, and Joe Berchtold ("Defendants") alleging violations of the Exchange Act and SEC Rule 10b-5 based on Defendants' allegedly false statements and omissions of material fact about Live Nation's compliance with antitrust laws.  ECF Docket No. ("Dkt.") 40. On December 22, 2023, Defendants filed a Motion to Dismiss the FAC and a Request for Judicial Notice[1] of documents incorporated by reference into the FAC.  Dkts. 44, 45.

The Court finds this matter appropriate for resolution without oral argument.  See FED. R. CIV. P. 78(b); L.R. 7-15.  For the reasons stated below, the Court **DENIES** Defendants' Motion to Dismiss.

## II.
## ALLEGATIONS IN THE FAC

Plaintiffs are common stockholders of Live Nation who suffered losses based on the decline in stock prices between February 23, 2022 and November 20, 2023.  FAC ¶¶ 15, 16.  Defendant

---

[1] In light of the Court's Order denying the Motion to Dismiss, the Request for Judicial Notice, dkt. 45, is **DENIED as MOOT**.

Live Nation "is a live entertainment company and concert and ticketing platform" that "provides ticket sales and resale services for concerts, sporting events, performing arts experiences, festivals, museums, and theaters" through Ticketmaster Entertainment LLC ("Ticketmaster"). Id. ¶ 2. Live Nation "owns, operates, has exclusive booking rights, and/or an equity interest with significant influence for approximately 338 global venues, with operations in 44 countries." Id. ¶ 27. Ticketmaster is "the largest ticketing company in the United States" and is "a wholly owned subsidiary of Live Nation" since its merger with Live Nation in 2010. Id. ¶¶ 28, 30. Defendant Michael Rapino ("defendant Rapino") is Live Nation's Chief Executive Officer and defendant Joe Berchtold ("defendant Berchtold") is Live Nation's Chief Financial Officer. Id. ¶¶ 18, 19.

### A.      CONCERNS OVER ANTICOMPETITIVE BEHAVIOR

Before the 2010 merger, Live Nation used "Ticketmaster as its primary ticketing service provider and was one of Ticketmaster's largest customers." Id. ¶ 48. The Department of Justice ("DOJ") "opposed the merger," concerned "that the merger would eliminate competition and innovation in the market for primary ticketing services." Id. ¶ 50. In response to these concerns, Live Nation entered into a consent decree ("Consent Decree") in 2010 that "allowed the merger along with numerous conditions and restrictions" designed "to prevent certain anticompetitive behaviors." Id. ¶ 51.

The Consent Decree was originally set to expire in 2020, but was extended through 2025 and modified by the DOJ because of allegations Live Nation "had committed multiple violations of the [C]onsent [D]ecree," which "led to further domination by Ticketmaster in primary ticketing services and, therefore, harmed consumers." Id. ¶ 53. As part of the amendment to the Consent Decree, Live Nation "agreed to oversight from an independent monitor and that any violation of the consent decree would incur an automatic $1,000,000 fine." Id. ¶ 93.

### B.      NEWS ARTICLES REVEALING INFORMATION ABOUT INVESTIGATIONS INTO ANTICOMPETITIVE PRACTICES AND ALLEGED FALSE AND MISLEADING STATEMENTS

From February 2022 to February 2023, Plaintiffs allege Defendants made seven false and misleading statements and omissions[2] about Live Nation's anticompetitive behavior and cooperation with regulators. FAC ¶¶ 125, 127, 129, 134, 136, 138, 140, 143, 145, 147; dkt. 44-1, Declaration of Melanie Blunschi ("Blunschi Decl.") ¶ 5, Ex. 1.[3]

#### 1.      Defendants' 2021 Form 10-K

On February 23, 2022, Live Nation filed its 2021 Form 10-K annual report with the SEC ("2021 10-K"), signed by both defendants Rapino and Berchtold. FAC ¶ 125. Plaintiffs allege the 2021 10-K includes four specific false and/or misleading statements that give rise to liability under Section 10(b). Id. ¶¶ 125-129. The first statement discusses Live Nation's historical cooperation with authorities in connection with any federal, state, and local authorities' investigation, inquiry, or

---

[2] The seven statements and omissions are further detailed below.

[3] The Court uses the same naming convention for the statements at issue as applied by the parties and defined in Exhibit 1. See dkt. 44-2, Ex. 1.

litigation ("Statement 1"). Id. ¶ 125.  In the second allegedly misleading statement, Defendants address antitrust matters, warning that any adverse outcome could have an adverse effect on business ("Statement 2"). Id. ¶ 127.  In the third allegedly misleading statement, Defendants describe the intense competition in the live entertainment industry ("Statement 3"). Id. ¶ 127.  The fourth allegedly false statement discusses revenue growth for the year, attributing Defendants' success largely to more events and higher ticket sales ("Statement 4(a)"). Id. ¶ 129.

### 2. November 2022 New York Times Article and Defendants' Response

On November 18, 2022, The New York Times "reported that the DOJ had opened an antitrust investigation into Ticketmaster and Live Nation, 'focused on whether Live Nation Entertainment has abused its power over the multibillion-dollar live music industry.'" Id. ¶ 149.  Following this article, "Live Nation's stock price fell $5.64, or 7.8%[.]" Id. ¶ 150.

On November 19, 2022, in response to reports about the DOJ investigation, Live Nation issued a statement explaining Live Nation "takes its responsibilities under the antitrust laws seriously and does not engage in behaviors that could justify antitrust litigation" ("Statement 5"). Id. ¶ 134.

### 3. Defendant Berchtold's January 2023 Testimony Before the United States Judiciary Committee

On January 24, 2023, defendant Berchtold testified before the United States Senate Judiciary Committee and described the competitive nature of the market with statements such as: "Ticketmaster has a modest market share and many strong competitors"; "there is intense competition for every ticketing contract that goes out to bid"; and "U.S. ticketing markets have never been more competitive than they are today, and we read about new potential entrants all the time" ("Statement 6"). Id. ¶ 136.

### 4. February 2023 NPR Report and Defendants' Response

On February 23, 2023, NPR "reported that the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights called on the DOJ to continue examining the 'anticompetitive conduct' of Live Nation and Ticketmaster." Id. ¶ 151.  The article references a letter sent by Senators Amy Klobuchar and Mike Lee to Assistant Attorney General for Antitrust, Jonathan Kanter, which describes concerns over Live Nation's anticompetitive conduct and testimony from the January 24, 2023 Senate Judiciary Committee hearing. Id.  The letter references testimony from the Founder and CEO of Seat Geek, who testified that "Ticketmaster now uses even longer exclusive agreements with venues, in some instances as long as ten years." Id.  A concert promoter, Jam Productions, testified that "Live Nation attempts to lock up talent so competitors cannot produce concert tours" and that Ticketmaster "has exclusive ticketing contracts for more than 85% of the nation's NFL, NHL, and NBA teams." Id.  A public policy expert testified that "Ticketmaster's market dominance allows it to harm consumers through charging service fees and demanding exclusivities." Id.

Plaintiffs allege "[t]he NPR news report revealed for the first time that [Live Nation] was facing increased exposure to regulatory scrutiny and the risk of regulatory action, and not merely a fact-finding investigation." Id. ¶ 153.  Following the NPR report, Live Nation's "stock price fell $7.71, or 10.1%[.]" Id. ¶ 154.

That same day, Live Nation issued a statement stating it had "submitted more than 35 pages of information to provide greater context and transparency to policymakers on the realities of the industry" ("Statement 7"). Id. ¶ 138.

### 5. Defendants' 2022 Form 10-K

On February 23, 2023, Live Nation filed its 2022 Form 10-K report with the SEC ("2022 10-K"), signed by both defendants Rapino and Berchtold. Id. ¶ 140. The 2022 10-K contained many of the same statements as the 2021 10-K, including Statement 1, addressing historical investigation cooperation; Statement 2, addressing antitrust matters; and Statement 3, addressing competition in the live entertainment industry. Id. ¶¶ 143, 145, 147. The 2022 10-K also discussed revenue growth ("Statement 4(b)") – crediting the "[e]xceptionally strong demand for live events" and "the quality of the Ticketmaster platform and its continued popularity with clients across the globe[.]" Id. ¶ 147.

### 6. July 2023 Politico Report and November 2023 CNBC Report

On July 28, 2023, Politico "reported that the DOJ 'could file an antitrust lawsuit against [Live Nation and Ticketmaster] by the end of the year[.]'" Id. ¶ 155. Plaintiffs allege "[t]he Politico report revealed to the market for the first time the likelihood that the DOJ would not just investigate but actually file an antitrust lawsuit against the Company based on its abuse of its monopoly power in the live music industry." Id. ¶ 157. Following this report, "Live Nation's stock price fell $7.60, or 7.8%[.]" Id. ¶ 158.

On November 20, 2023, CNBC "reported that a Senate investigative subcommittee had issued a subpoena to Live Nation and its Ticketmaster subsidiary 'for information regarding ticket pricing and fees after a months-long probe that had not been previously announced.'" Id. ¶ 159. Plaintiffs allege CNBC's report "about the Senate subpoena revealed for the first time that Live Nation had 'stonewalled,' not fully cooperated with, the Senate Subcommittee's investigation into the Company's unfair practices and misuse of monopoly power." Id. ¶ 163. Following this news, "Live Nation's stock price fell $2.78, or roughly 3%[.]" Id. ¶ 164.

## C. ALLEGATIONS OF MISCONDUCT

Plaintiffs allege Statements 1-7 issued by Defendants from February 2022 to February 2023 were false and misleading because Defendants failed to disclose (1) that "Live Nation engaged in anticompetitive conduct and was not cooperating fully with the ongoing DOJ and Senate Subcommittee investigations," and (2) thus, "Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm." FAC ¶¶ 126, 128, 132, 135, 137, 139, 141, 144, 146, 148. Plaintiffs additionally allege it was false and misleading for Defendants to describe industry competition as "intense[,]" id. ¶¶ 133, 142, or to attribute strong performance in concerts and ticketing segments to "the inherent superiority" of Live Nation's services, id. ¶ 135, when Live Nation "enjoyed monopolistic market power and abused that power to stifle competition[,]" id. ¶¶ 133, 142. Lastly, Plaintiffs allege statements suggesting cooperation with ongoing investigations was false and misleading because Live Nation was "not cooperating fully with the Senate investigation but was actually stonewalling the Subcommittee's efforts, in an attempt to hide the undisclosed anticompetitive conduct[.]" Id. ¶ 139.

Plaintiffs further allege three former employees of Defendants described anticompetitive conduct whereby Defendants allegedly "used anticompetitive tying practices to freeze out competitors," id. ¶ 98, including a "persistent practice of trying to buy out competing venues," id. ¶ 81, and prioritizing venues that use Ticketmaster's services, id. ¶ 97, all of which resulted in a fear amongst venues of choosing other ticketing software companies over Ticketmaster, out of concern of losing Live Nation's business, id. ¶ 99.

Finally, Plaintiffs allege that, from March 16, 2022, to September 23, 2022, defendant Rapino "sold 2,467,343 shares of Live Nation common stock, for gross proceeds of over $250 million," which equated to "roughly 83% of [defendant Rapino's] holdings as of March 16, 2022." Id. ¶ 167.

### III.
### PROCEDURAL HISTORY

On August 4, 2023, plaintiff Donley filed a putative class action complaint ("Complaint") pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") against Defendants, alleging violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  Dkt. 1.  On October 12, 2023, plaintiff Donley and plaintiff Gress stipulated to serve as co-lead plaintiffs in this matter, which the Court granted on October 18, 2023.  Dkts. 26, 27.  Plaintiffs allege they purchased Live Nation common stock at artificially inflated prices between February 23, 2022 and November 20, 2023 (the "Class Period"). FAC ¶¶ 1, 15, 16.

On November 30, 2023, Plaintiffs filed the operative FAC as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of themselves and the putative Class. The FAC raises two causes of action:

1. **Cause of Action One:**  Violations of Section 10(b) of the Exchange Act ("Section 10(b)") and SEC Rule 10b-5 ("Rule 10b-5") against Defendants; and

2. **Cause of Action Two:**  Violations of Section 20(a) of the Exchange Act ("Section 20(a)") against defendants Rapino and Berchtold.

Id. at 64-67.

In Cause of Action One, Plaintiffs allege Defendants violated Section 10(b) and Rule 10b-5 when they disseminated or approved false and/or misleading statements, which they knew, or disregarded with severe recklessness, were false and/or misleading.  Id. ¶¶ 183-84.  Plaintiffs allege defendants Rapino and Berchtold "had actual knowledge of the material omissions and/or the falsity or misleading nature of the statements," and "intended to deceive Plaintiffs," or, "in the alternative, acted with severely reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public[.]"  Id. ¶ 186.  As a result, Plaintiffs allege the market price of Live Nation's stock was "artificially inflated during the Class Period."  Id.  Plaintiffs relied on Defendants' false statements in purchasing Live Nation's "common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements and omissions."  Id.  Plaintiffs allege that had they been aware the price of Live Nation's stock had been artificially inflated, they would not

have purchased the stock.  Id. ¶ 187.  As a result of Defendants' wrongful conduct, Plaintiffs have suffered damages.  Id. ¶ 188.

In Cause of Action Two, Plaintiffs allege that during the Class Period, defendants Rapino and Berchtold "participated in the operation and management of the Company"; "conducted and participated, directly and indirectly, in the conduct of the Company's business affairs"; "had direct and supervisory involvement in the day-to-day operations of the Company"; and "had the power to control or influence the particular transactions giving rise to the securities violations."  Id. ¶ 191.  Defendants Rapino and Berchtold "had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading."  Id. ¶ 192.  Defendants Rapino and Berchtold "exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein," and therefore, were "controlling persons" within the meaning of Section 20(a).  Id. ¶ 193.

On December 22, 2023, Defendants filed the instant Motion to Dismiss and a Request for Judicial Notice of various documents incorporated by reference into the FAC.  Dkts. 44, 45.  Defendants argue the FAC fails to state a claim under the PSLRA because Plaintiffs fail to plead "(1) any material misstatement or omission (2) made with an intent to defraud investors, or (3) losses caused by a corrective disclosure that reveals some fraudulently withheld 'truth.'"  Dkt. 44 at 8, 14-29.

On January 11, 2024, Plaintiffs filed an Opposition.  Dkt. 47.  On January 25, 2024, Defendants filed a Reply.  Dkt. 50.  This matter, thus, stands submitted.

**IV.**
**DISCUSSION**

**A.   LEGAL STANDARD**

A complaint may be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") "only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).  In considering whether a complaint states a claim, a court must "construe the pleadings in the light most favorable to the nonmoving party," Capp v. Cnty. of San Diego, 940 F.3d 1046, 1052 (9th Cir. 2019) (quoting Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005)), accepting as true all factual allegations in the complaint and drawing all reasonable inferences in the nonmoving party's favor, Moreno v. UtiliQuest, LLC, 29 F.4th 567, 573 (9th Cir. 2022).  The court, however, need not accept as true "a legal conclusion couched as a factual allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

Although a complaint need not include detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011) (quoting Iqbal, 556 U.S. at 678).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  The complaint "must contain sufficient allegations of

underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

"Complaints alleging securities fraud are also subject to heightened pleading requirements under the [PSLRA] and Rule 9(b)." In re Facebook, Inc. Sec. Litig., 87 F.4th 934, 947 (9th Cir. 2023) (citing Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc. (Glazer II), 63 F.4th 747, 765 (9th Cir. 2023)). The PSLRA requires that complaints alleging falsity "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Glazer II, 63 F.4th at 765 (quoting 15 U.S.C. § 78u-4(b)(1)).

Allegations of fraud are similarly subject to the heightened pleading standard under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1107 (9th Cir. 2003). Rule 9(b) requires the party to "state with particularity the circumstances constituting fraud[.]" FED. R. CIV. P. 9(b). Specifically, the pleading should "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 964 (9th Cir. 2018).

**B.    CAUSE OF ACTION ONE**

   **1.    Applicable Law**

Section 10(b) of the Exchange Act "prohibits 'manipulative or deceptive' practices in connection with the purchase or sale of a security." In re Facebook, 87 F.4th at 947 (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 of the Exchange Act's implementing regulations prohibits making "any untrue statement of a material fact" or omitting material facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Glazer II, 63 F.4th at 764 (quoting 17 C.F.R. § 240.10b-5(b)). "The scope of Rule 10b-5 is coextensive with the coverage of [Section 10(b)]." S.E.C. v. Zandford, 535 U.S. 813, 816 n.1 (2002) (internal citations omitted).

To state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must allege: (1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Glazer II, 63 F.4th at 764 (internal quotation marks omitted) (quoting In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1052 (9th Cir. 2014)).

"A materially false or misleading statement violates Section 10(b) and Rule 10b-5." E. Ohman J:or Fonder AB v. NVIDIA Corp., 81 F.4th 918, 928 (9th Cir. 2023). A materially false statement is alleged where a defendant's statement "directly contradict[s] what the defendant knew at the time." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1008 (9th Cir. 2018). A statement is misleading if it omits material information, "giv[ing] a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation marks and citation omitted). However, Section 10(b) does not "create an

affirmative duty to disclose any and all material information." Glazer II, 63 F.4th at 764 (internal quotation marks omitted) (citing Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)). "Disclosure is mandatory only when necessary to ensure that a statement made is not misleading." In re Facebook, Inc., 87 F.4th at 948 (internal quotation marks and citation omitted).

Under the heightened pleading requirements, to sufficiently plead scienter, "the complaint must 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" Glazer II, 63 F.4th at 766 (quoting 15 U.S.C. § 78u-4(b)(2)(A)) (emphasis in original). "[T]he required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." E. Ohman J:or Fonder AB, 81 F.4th at 937. "When evaluating 'whether the strong inference standard is met,' the court first 'determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter.'" In re Facebook, Inc., 87 F.4th at 947 (quoting Glazer II, 63 F.4th at 766). "If no individual allegation is sufficient, the court 'conducts a holistic review to determine whether the allegations combine to give rise to a strong inference of scienter.'" Id. (quoting Glazer II, 63 F.4th at 766).

To plead loss causation, a plaintiff must allege facts showing that the "share price fell significantly after the truth became known." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 392 (9th Cir. 2010) (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005)). Plaintiff must show that the "misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1210 (9th Cir. 2016).

**2. Analysis**

Here, Plaintiffs have stated a claim under Section 10(b) and Rule 10b-5 of the Exchange Act with respect to Statements 3, 4, and 5.[4]

**a. Material Misrepresentations**

**i. Statement 3**

In Statement 3, which was contained in both the 2021 and 2022 10-Ks signed by defendants Rapino and Berchtold, Defendants state:

> Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences . . . .
>
> . . . . We believe that barriers to entry into the promotion services business are low and that certain local promoters are increasingly expanding the geographic scope of their operations.
>
> \* \* \*

---

[4] Because Plaintiffs have stated a claim based on Statements 3, 4, and 5, the Court declines to address the remaining statements.

> We experience competition from other national, regional and local primary ticketing service providers to secure new venues and to reach fans for events . . . .
>
> We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that we understand have recently entered or could enter these markets.

FAC ¶¶ 131, 140.

In Statement 3, Defendants assert they "believe that [Live Nation] compete[s] primarily on the basis of [its] ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences" and that "barriers to entry into the promotion services business are low," id., however, Plaintiffs have raised multiple allegations that undermine Defendants' statements and describes a materially different state of affairs than what Defendants describe. For example, Plaintiffs allege that "Live Nation controls at least 60% of concert promotion services for major concert venues"; that "[p]romoters for major concert venues must have the ability to provide substantial up-front payments to artists"; and as testified to at the Senate Judiciary Committee hearing in January 2023 by a competing promoter, Jam Productions, "Live Nation attempts to lock up talent so competitors cannot produce concert tours." Id. ¶¶ 78, 79, 85, 151.

Plaintiffs' allegations reveal "a state of affairs that differs in a material way" from the "intense[ly]" competitive market with "low" barriers to entry that Defendants describe in Statement 3. Id. ¶¶ 131, 140; Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002). While Defendants couch their claims about the competition in the live entertainment industry as opinions and beliefs, see, e.g., FAC ¶¶ 131, 140 ("We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences . . . . We believe that barriers to entry into the promotion services business are low . . . ."), an opinion statement can be found materially misleading when allegations show "there is no reasonable basis for the belief." City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 616 (9th Cir. 2017) (holding an opinion statement can be actionable as a false or misleading statement: "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy").

Defendants' failure to include specific facts and details about their presence and control of the live entertainment industry – for example, that they control 60% of concert promotion services and that competitors must have the ability to pay substantial up-front costs to actually compete in the market – makes their claims about an "intense[ly]" competitive market and success based predominantly "on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences" materially misleading because it strongly suggest there is "no reasonable basis for" Defendants' claimed beliefs. City of Dearborn Heights Act 345 Police & Fire Ret. Sys, 856 F.3d at 616; FAC ¶¶ 78, 79, 85, 151.

Thus, Plaintiffs have sufficiently alleged Statement 3, describing the competition in the live entertainment industry, is materially misleading because, under an omissions theory of liability, Statement 3 "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." Brody, 280 F.3d at 1006.

### ii.     Statement 4

In Statement 4(b)[5], which was contained in the 2022 10-K signed by defendants Rapino and Berchtold respectively, Defendants state:

> All three of our segments had revenue growth in the year, with the largest increase coming from our Concerts segment as discussed below. Exceptionally strong demand for live events in the year led to record fan count and ticket sales, powering the concerts center of our business flywheel.
>
> * * *
>
> Our Concerts segment revenue grew by $8.8 billion, from $4.7 billion in 2021 to $13.5 billion in 2022. The revenue growth was a result of more shows and fans coming back to venues to enjoy their favorite artists . . . .
>
> Our Ticketing segment revenue grew by $1.1 billion, from $1.1 billion in 2021 to $2.2 billion in 2022. Ticketing AOI for the year increased by $407 million, from $421 million in 2021 to $828 million in 2022. Along with an increase in ticket sales, upward pricing momentum and revenue generated from non-service fee sources, while direct costs rose to support higher operations and enterprise growth. Our fee-bearing ticket sales for the year were a record breaking 281 million, over 50 million higher than our previous best year. Our resale business continued to grow, with nearly $4.5 billion dollars in gross transaction value for 2022, more than doubling resale gross transaction value in 2019. It was our highest resale year ever, powered by both Concerts and all the major sports leagues. . . . *This is a reflection of the quality of the Ticketmaster platform and its continued popularity with clients across the globe, giving us confidence that the Ticketmaster features and functionality will continue to fuel growth going forward.*

FAC ¶ 147 (emphasis in original).

In Statement 4(b), Defendants assert that 2022 revenue growth "is a reflection of the quality of the Ticketmaster platform and its continued popularity with clients across the globe[.]" Id. However, Statement 4(b) is misleading because it failed to include material information relevant to Defendants' revenue success – including that Ticketmaster controls ticket distribution for over 70% of major concert venues, is the "sole ticketing provider for 82% of the top amphitheaters in the U.S., as well as 77% of the top 100 amphitheaters worldwide," and enters into "long-term exclusive dealing contracts" with venues that may range to 10 or more years in length. Id. ¶¶ 65, 66. In light of these allegations, Defendants' statement that revenue growth was a reflection of the quality of the Ticketmaster platform and its popularity, without additional explanation or context about their control in the market, "give[s] a reasonable investor the impression of a state of affairs that differs in

---

[5] Section 4(a) addresses revenue growth in the 2021 10-K. FAC ¶ 131.

a material way from the one that actually exists." Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund, 845 F.3d at 1275.

Thus, Plaintiffs have sufficiently alleged Statement 4 contains a material misrepresentation.

### iii.    Statement 5

In Statement 5, defendant Berchtold testified before the United States Senate Judiciary Committee and stated the following:

> *As we have stated many times in the past, Live Nation takes its responsibilities under the antitrust laws seriously and does not engage in behaviors that could justify antitrust litigation, let alone orders that would require it to alter fundamental business practices . . . .*
>
> Ticketmaster has a significant share of the primary ticketing services market because of the large gap that exists between the quality of the Ticketmaster system and the next best primary ticketing system.  The market is increasingly competitive nonetheless, with rivals making aggressive offers to venues.  That Ticketmaster continues to be the leader in such an environment is a testament to the platform and those who operate it, not to any anticompetitive business practices . . . .
>
> Secondary ticketing is extremely competitive, with Ticketmaster competing with StubHub, SeatGeek, Vivid and many others. No serious argument can be made that Ticketmaster has the kind of market position in secondary ticketing that supports antitrust claims.  For the past 12 years Live Nation has operated under a Consent Decree that among other things seeks to prevent anticompetitive leveraging of Live Nation promoted content to advantage Ticketmaster. Pursuant to the Amended Decree voluntarily entered in 2020, Live Nation's compliance is monitored by a former federal judge.  There never has been and is not now any evidence of systemic violations of the Consent Decree.  *It remains against Live Nation policy to threaten venues that they won't get Live Nation shows if they do not use Ticketmaster, and Live Nation does not re-route content as retaliation for a lost ticketing deal.*

FAC ¶ 134 (emphasis in original).

In Statement 5, Defendants' claim that "Ticketmaster has a significant share of the primary ticketing services market because of the large gap that exists between the quality of the Ticketmaster system and the next best primary ticketing system," id., is materially misleading because it omits material information, "giv[ing] a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund, 845 F.3d at 1275.  Plaintiffs have raised multiple allegations that undermine Defendants' claim that Ticketmaster's success is primarily due to their quality ticketing system and services.  For example, Plaintiffs cite to testimony provided by the founder and CEO of Seat Geek at the January 2023 Senate Judiciary Committee hearing who testified that "Ticketmaster now uses even longer exclusive agreements with venues, in some instances as long as ten years."  FAC ¶ 151.  Plaintiffs also cited to testimony from a public policy expert who opined that "Ticketmaster's market dominance allows it to harm consumers through charging service fees and demanding exclusives."

Id. These allegations demonstrate that, without further context and details, Statement 5 describing Ticketmaster's success in the market due simply to its superiority in services is materially misleading.

Hence, Plaintiffs sufficiently allege Defendants' claim that "Ticketmaster has a significant share of the primary ticketing services market because of the large gap that exists between the quality of the Ticketmaster system and the next best primary ticketing system," id., is materially misleading because it omits material information, "giv[ing] a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund, 845 F.3d at 1275. Thus, for the same reasons identified with respect to Statement 4, Defendants' claim without additional explanation or context contains a material misrepresentation.

        b.    **Scienter**

With respect to Statements 3, 4, and 5, Plaintiffs also sufficiently allege, taking the FAC as a whole, a strong inference that defendants Rapino and Berchtold signed the 2021 and 2022 10-Ks with the required state of mind to plead scienter. Plaintiffs allege defendants Rapino and Berchtold were aware of investigations into Live Nation's anticompetitive behavior from as early as 2010. See FAC ¶ 57. Taking the allegations collectively, the FAC gives rise to a "cogent and compelling" inference that defendants Rapino and Berchtold elected not to disclose the full picture regarding Live Nation's 2022 revenue success or the difficulties for competitors to enter the market "not because [they] believed [the contextual statements] were meaningless but because [they] understood their likely effect on" the investigations into alleged anticompetitive conduct. Matrixx Initiatives, Inc., 563 U.S. at 49. "[A] reasonable person" would deem the inference that defendants Rapino and Berchtold acted with deliberate recklessness or even intent "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 324 (2007) ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

        c.    **Loss Causation and Damages**

Additionally, Plaintiffs sufficiently allege loss causation, reliance, and harm. As alleged in the FAC, Defendants' materially misleading statements artificially inflated the stock price. FAC ¶ 186. Plaintiffs "relied on the statements . . . and/or integrity of the market price of [Live Nation's] common stock" in purchasing the stock at prices that were artificially inflated due to Defendants' misleading statements. Id. Plaintiffs allege had they known about the material information Defendants failed to disclose in Statements 3, 4, and 5, they would not have purchased Live Nation's stock at the artificially inflated price. Id. ¶ 187. As a result of Defendants' misleading statements, Plaintiffs allege they have suffered damages. Id. ¶ 188.

Based on these allegations, Plaintiffs have stated a claim under Section 10(b) and Rule 10b-5 of the Exchange Act with respect to Statements 3, 4, and 5. Accordingly, Defendants' Motion to Dismiss with respect to Cause of Action One is **DENIED**.

///

### C. CAUSE OF ACTION TWO

Section 20(a) requires a plaintiff to allege (1) a primary violation of federal securities law; and (2) that defendant exercised actual power or control over the primary violator. E. Ohman J:or Fonder AB, 81 F.4th at 946 (citing Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000)). Here, as discussed above, Plaintiffs have sufficiently alleged a federal securities violation – specifically, violations of Section 10(b). Additionally, because Plaintiffs allege defendants Rapino and Berchtold were responsible for signing or providing Statements 1-7, they are, in fact, the controlling persons and primary violators of the alleged securities violation. Arthur Children's Trust v. Keim, 994 F.2d 1390, 1398 (9th Cir. 1993) ("To establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter."). Thus, Plaintiffs have sufficiently alleged a violation of Section 20(a). Accordingly, Defendants' Motion to Dismiss with respect to Cause of Action Two is **DENIED**.

## V.
## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED.**