Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the Class*

[*additional counsel on signature page*]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN DONLEY, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC., MICHAEL RAPINO, and JOE BERCHTOLD,<br><br>Defendants. | Case No. 2:23-cv-06343-KK-AS<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Brian Donley and Gene Gress ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege in this amended complaint the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (1) review and analysis of Defendants' public statements, public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, and wire and press releases published by and regarding Live Nation Entertainment, Inc. ("Live Nation" or the "Company"); (2) media and analyst reports and advisories about Live Nation; (3) interviews with confidential witnesses; (4) information from related court filings; and (5) publicly available information. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION AND OVERVIEW

1. Plaintiffs bring this action as a federal securities class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class defined as all persons and entities that purchased the publicly traded common stock of Live Nation between February 23, 2022 and May 22, 2024, both dates inclusive ("Class Period").[1] Plaintiffs bring claims individually and on behalf of the Class pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2. Live Nation is a live entertainment company and concert and ticketing platform operating in 48 countries. Live Nations owns, operates, and has exclusive

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity affiliated with any excluded person or entity or in which any excluded person or entity has or had a majority ownership interest at any time.

booking rights for a number of global venues and claims to be one of the world's leading artist managements companies. Through Ticketmaster Entertainment LLC ("Ticketmaster"), Live Nation provides ticket sales and resale services for concerts, sporting events, performing arts experiences, festivals, museums, and theaters.

3. Live Nation and Ticketmaster merged in January 2010 but were under a consent decree with the U.S. Department of Justice ("DOJ") to preserve competition in the live events market. In 2019, Live Nation faced federal scrutiny for pressuring concert venues to use Ticketmaster over other systems in five incidents, which would have violated the consent decree. To resolve these claims, the Company extended the consent decree through December 2025 and added new provisions. Pursuant to the amended consent decree, Live Nation agreed to abide by a stricter set of rules, including not threatening to condition the provision of Live Nation concerts on a venue choosing Ticketmaster or retaliate in response to a venue choosing a ticketing service provider other than Ticketmaster. The Company is subject to an automatic penalty of $1 million for each violation.

4. On November 18, 2022, *The New York Times* reported that the U.S. Department of Justice ("DOJ") had opened an antitrust investigation into Ticketmaster and Live Nation months earlier. On this news, Live Nation's stock price fell $5.64, or 7.8%.

5. Then, on February 23, 2023, *NPR* reported that, following Congressional hearings, the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights wrote to the DOJ presenting evidence that "Live Nation is harming America's music industry." The letter cited issues with Live Nation's pricing models and fees, increasingly long contracts with competitors, and retaliatory behavior against artists and venues that do not want to work with the Company. The senators "encourage[d]" the DOJ to take action if it found Live Nation had "walled itself off

from competitive pressure at the expense of the industry and fans." On this news, Live Nation's stock price fell $7.71, or 10.1%.

6. Then, on July 28, 2023, *Politico* reported that the DOJ "could file an antitrust lawsuit against [Live Nation and Ticketmaster] by the end of the year, according to three people with knowledge of the matter." *Politico* reported that "[t]he DOJ is moving quickly, … and its litigation team is involved." *Politico* further reported that the DOJ complaint is expected to allege that "the entertainment giant is abusing its power over the live music industry." On this news, Live Nation's stock price fell $7.60, or 7.8%.

7. On November 20, 2023, *CNBC* reported that a Senate investigative subcommittee had issued a subpoena to Live Nation and its Ticketmaster subsidiary "for information regarding ticket pricing and fees after a months-long probe that had not been previously announced." In a letter accompanying the subpoena, Senator Richard Blumenthal, Chairman of the Senate subcommittee, wrote that "[d]espite nearly eight months and extensive efforts to obtain voluntary compliance, Live Nation/Ticketmaster has failed to fully comply with [the subcommittee's] requests, including refusing to produce certain documents critical to the Subcommittee's inquiry." In a statement on the same day, Senator Blumenthal said that "Live Nation has egregiously stonewalled my Subcommittee's inquiry into its abusive consumer practices — making the subpoena necessary." On this news, Live Nation's stock price fell $2.78, or roughly 3%.

8. Finally, on May 23, 2024, the DOJ filed a 128-page complaint against Live Nation. The DOJ's complaint alleged violations of the Sherman Act and various state competition and consumer protection laws. Specifically, the DOJ alleged that Live Nation: (1) monopolized the markets for primary ticketing services, concert promotion services, and the use of large amphitheater venues; (2) engaged in unlawful exclusive dealing; and (3) engaged in unlawful tying arrangements concerning the use

of large amphitheater venues and artist promotions markets. The DOJ's complaint included substantial factual allegations based on its multi-year investigation of Live Nation and its competitors in the relevant markets for major concert venues. On this news, Live Nation's stock price fell $7.92, or roughly 7.8%.

9. Throughout the Class Period, Defendants made materially false and/or misleading statements and omissions of material fact about the Company's compliance with antitrust laws, its cooperation with governmental investigations, and the regulatory risks it was currently facing. Specifically, Defendants failed to disclose to investors: (1) that Live Nation engaged in anticompetitive conduct, including improperly tying its underpriced Live Nation concert promotion services to its Ticketmaster services and retaliating against venues that spurned Ticketmaster and improperly restricting consumers' ability to resell tickets using competing secondary ticketing services; (2) that Live Nation was not, in fact, cooperating with the ongoing DOJ and Senate subcommittee investigations; and (3) that, as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm.

10. The gradual revelation of the truth about the Company's anticompetitive conduct in violation of antitrust laws, refusal to fully cooperate with investigators, and undisclosed risks of regulatory action caused precipitous declines in the market value of the Company's stock. As a result, Plaintiffs and the Class lost a significant amount of value in their investments and were damaged thereby.

## **<u>JURISDICTION AND VENUE</u>**

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the alleged false and misleading public filings and statements were made in or issued from this District and the Company's principal executive offices are located in this District. Substantial acts in furtherance of the alleged fraud or the effects of the fraud, including the dissemination of materially false and/or misleading information, have also occurred in substantial part in this district.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, the Internet, and the facilities of a national securities exchange.

## PARTIES

16. Lead Plaintiff Brian Donley, as set forth in his certification on file with the Court (Dkt. No. 1 at 30-31), and incorporated by reference herein, purchased Live Nation common stock at artificially inflated prices during the Class Period and was damaged thereby.

17. Lead Plaintiff Gene Gress, as set forth in his certification on file with the Court (Dkt. No. 20-2), and incorporated by reference herein, purchased Live Nation common stock at artificially inflated prices during the Class Period and was damaged thereby.

18. Defendant Live Nation is incorporated under the laws of Delaware with its principal executive offices located in Beverly Hills, California. Live Nation's common stock trades on the New York Stock Exchange under the symbol "LYV."

Live Nation is the largest live entertainment company in the world. Live Nation claims on its website that it "annually issues over 500 million tickets, promotes more than 35,000 events, partners with over 1,000 sponsors and manages the careers of 500+ artists."

19. Defendant Michael Rapino ("Rapino") was the Company's Chief Executive Officer ("CEO") at all relevant times.

20. Defendant Joe Berchtold ("Berchtold") was the Company's Chief Financial Officer ("CFO") at all relevant times.

21. Rapino and Berchtold are collectively referred to herein as the "Individual Defendants."

22. Live Nation is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

23. As senior executives of Live Nation, the Individual Defendants possessed the power and authority to control the contents of Live Nation's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors. The Individual Defendants received copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## **CONFIDENTIAL WITNESSES**

24. Plaintiffs' investigators spoke with former employees of the Company who have personal knowledge of the facts alleged and attributed to them in this Complaint.

25. Former Employee 1 ("FE1") worked as Vice President of Premium Seating for Live Nation from January 2019 to November 2022. In that role, FE1

oversaw all of the Company's salespeople in roughly 50 of their club and theater venues across the country, including leading the sales team and managing revenue and budgets.

26. Former Employee 2 ("FE2") worked as an Executive Vice President in Live Nation's Clubs, Theaters and Ballrooms segment from 2010 to April 2021. FE2 reported to former Live Nation President of Venues Ron Bension, who reported to Defendant Rapino. FE2's division promoted and operated venues, including ticketing services.

27. Former Employee 3 ("FE3") worked as a Director of Client Development for Ticketmaster from 2010 to 2021, and now works at one of Ticketmaster's top competitors. FE3's responsibilities included overseeing the overall relationship between the Company and a group of clients.

## **COMPANY BACKGROUND**

28. Live Nation is a global live entertainment company. Live Nation owns, operates, has exclusive booking rights, and/or an equity interest with significant influence for approximately 338 global venues, with operations in 44 countries. Live Nation also claims to be one of the world's leading artist managements companies. Live Nation is the largest live entertainment company in the world, claiming to have hosted "44,000 events across 45 countries, drawing in over 121 million attendees," in 2022.

29. Ticketmaster is a wholly owned subsidiary of Live Nation. Ticketmaster is the largest ticketing company in the United States, with 2022 revenues of approximately $2.2 billion. Ticketmaster's business includes two main arms: its legacy primary ticketing services and its newer secondary ticketing services. Upon information and belief, Ticketmaster's share of secondary ticketing services for major concert venues in the U.S. already exceeds 60%.

30. Live Nation's 2022 total revenues were approximately $16.7 billion, but roughly 60% of its adjusted operating income was attributable to its Ticketing division (*i.e.*, Ticketmaster), even though Ticketmaster represented only about 13% of Live Nation's revenues.

31. Live Nation and Ticketmaster merged in 2010, with the post-merger conglomerate reorganized into the following three segments:

(a) ***Concerts*** - Live Nation serves primarily as a concert promoter and venue operator. Live Nation and AEG Live are the only promoters that can operate on a national (in the U.S.) and global scale; the rest of their competitors are regional or local.[2] Live Nation often serves as the exclusive promoter for artists on national tours, and uses its deep pockets, including cross-collateralization across concerts and operating profits from its Ticketmaster and sponsorship divisions, to routinely offer artists higher guaranteed compensation than its only other national competitor, AEG Live. Live Nation controls over 60% of the U.S. market for concert promotion. Revenue streams from this segment are numerous and significant, but margins are below cost or very thin. The adjusted operating margin for the Concerts segment in 2022 was 1.3%. Live Nation's promoted artists receive the vast majority of the Concerts segment's revenue.

(b) ***Ticketing*** – Live Nation's Ticketing segment (*i.e.*, Ticketmaster) is highly profitable, with an adjusted operating margin in 2022 of 37.6%. This division primarily consists of the legacy Ticketmaster business, which focuses on primary ticket sales, as well as a newer business focused on secondary ticket sales (*i.e.*, resales). Ticketmaster sells tickets to the public under contract with

---

[2] The Anschutz Entertainment Group ("AEG") is a global live entertainment company and a subsidiary of The Anschutz Corporation. AEG owns a variety of major concert venues throughout the U.S. that compete with venues owned by Live Nation and others for major concerts. AEG Live is AEG's concert promotion arm.

the venues and earns service and other ancillary fees on the sale of each ticket. Ticketmaster also has a growing secondary ticketing marketplace, with over $4.5 billion of gross transaction value in 2022, more than doubling since 2019. This high-margin secondary ticketing business provides an additional income stream for Ticketmaster on the same shows for which it sells primary tickets. This secondary ticketing business allows Ticketmaster to generate revenues two or more times on the same exact tickets. Ticketmaster also maintains a database containing the contact information of over 130 million customers, a valuable resource that it has generally refused to provide to the very artists who create the demand that drives ticket sales.

(c) ***Sponsorship & Advertising*** – This segment leverages the 121 million fans Live Nation draws to its shows, the over 130 million names in the Ticketmaster database, their stable of managed and promoted artists, and the venues they control to sell targeted advertising to major companies. In 2022, this segment generated adjusted operating income of $592 million on revenue of $968 million—a 61.2% margin.

32. In 2022, the Ticketing and Sponsorship & Advertising segments generated only 19.0% of Live Nation's revenues but accounted for ***over 100%*** of its adjusted operating income. This tracks with the Company's results from 2019 (the most recent previous full year without significant adverse impact from COVID-19 restrictions on live events), when the Ticketing and Sponsorship & Advertising segments generated 18.4% of Live Nation's revenues, but ***over 100%*** of its adjusted operating income (reduced by, among other things, losses in the Company's Concerts business segment).

**General Background on the Live Music Industry**

33. At a high level, the major players and components of the live music industry include the following: artists and their managers, promoters, venues, ticketing, and consumers.

34. Artists are the draw for a live music event and drive the demand for the services of the other participants in the industry. An artist manager serves as the “CEO” of an artist’s business activities, advising in some or all phases of the artist’s professional life, including tours, appearances, recording deals, publicity, and endorsements. Managers are typically compensated based on a percentage of all of the artist’s revenues or profit streams. Live Nation claims to be the largest manager of artists in the music industry.

35. The artist manager often hires booking agents to assist in arranging a concert or tour. The manager or booking agent contracts with promoters to secure payments for artists as compensation for their live performances. Booking agents typically receive a percentage of an artist’s receipts from live performances.

36. The promoter is responsible for promoting the concert to consumers. For example, the promoter hires the artist for the performance or national tour (often guaranteeing more popular artists millions of dollars for their performance(s)), contracts with the venue (or uses its own), pays the venue operator a fixed fee (rental payment) to host the concert, arranges for local production services, and advertises and markets the concert. The promoter typically receives the proceeds from gross ticket receipts for each concert it promotes. The promoter bears the downside risk if tickets sell poorly and reaps the upside benefit, along with the artists, if tickets sell well.

37. Today, artists planning a tour at major concert venues often use a single company to provide and/or coordinate promotions for the entire tour. SFX Entertainment, Live Nation’s predecessor company, was the first to achieve this feat on a large scale by acquiring multiple regional promoters and integrating them into

one national organization. Offering these unique, nation-spanning services for artists led SFX (and now Live Nation) to become many artists' promoter of choice for national concert tours, particularly at major concert venues. Although some artists still use multiple regional concert promoters for a single national tour this practice is now the exception, not the rule, for tours that include shows at major concert venues. Live Nation is the largest promoter in the United States, promoting over 60% of the shows at major U.S. concert venues.

38. Venue operators provide access to and maintain the facilities where concerts are held and oversee the venue's associated services, such as concessions, parking, and security. Along with a rental fee received from the promoter, venues generally take a share of the proceeds from concessions, parking, and artist merchandise sales. Concert venues that contract with Ticketmaster have also, in recent years, begun to take a portion of the fees added to the face value of tickets for events at the venue.

39. In terms of ticket sales, venue operators have two options: either manage the sale of primary ticket inventory themselves or contract with a third party to handle the sale process for them. Managing and selling concert venue tickets is technologically and operationally complex, particularly for large venues, so most venue operators use primary ticketing service providers (predominantly Ticketmaster for major venues) for comprehensive ticketing solutions. Upon information and belief, Live Nation Worldwide, along with other members of the Live Nation conglomerate, is the second-largest concert venue operator/owner in the United States and exclusively utilizes Ticketmaster for these services.[3]

[3] Live Nation Worldwide, Inc. is a wholly owned subsidiary of Live Nation. In addition to the venues it owns and/or operates, Live Nation Worldwide also runs the website "livenation.com." That website is separate from Live Nation's website, "livenationentertainment.com" and has a different purpose. On livenation.com, Live Nation Worldwide sells tickets to events at venues it owns or operates, as well as for other shows promoted by Live Nation.

40. Primary ticketing service providers contract with venues to manage, sell, and distribute tickets to consumers for events at that venue. Primary ticketing service providers create "back-end" inventory management systems and provide "front-end" support, including customer service, shipping, and fulfillment services, as well as the technology and staff to allow concert venue operators to sell tickets through their box offices. They sell tickets through the Internet, call centers, retail outlets, and/or help the venue sell tickets at its box office.

41. Primary ticketing service providers generate revenues by applying surcharges to the base ticket price. The overall price a consumer pays generally includes the "face value" of the ticket (typically set by the artist and promoter) plus a variety of additional fees.[4] These fees are generally charged and retained by the primary ticketing service provider, although they may be split with other parties, including the venue. Typically described as "convenience," "processing," "service," "facility," and/or "delivery" fees, they can constitute a substantial portion of the total ticket price.

42. Substantially all of the nation's major concert venues have entered into long-term exclusive agreements with primary ticketing service providers—over 70% of them (and growing) with Ticketmaster. Under these agreements, the ticketing service provider obtains the exclusive rights to most or all ticket sales for events held at the venue. Ticketmaster provides primary ticketing services to over 12,000 venues and has a renewal rate "exceeding 100%," because there are no effective competitors when these long-term exclusive dealing contracts expire.

43. According to Ticketmaster, its agreements with venues have terms that may exceed 10 or more years in length and are typically in the five- to seven-year

[4] In recent years, Ticketmaster has rolled out "dynamic pricing" services, which help artists and promoters dynamically adjust ticket face values based on market demand. Thus, consumers attending the same show with similar seats may pay different face values for tickets based on when they purchased the tickets.

range. In order to induce venues to enter into these long-term exclusive dealing agreements, Ticketmaster offers up-front payments and other subsidies that can run into the millions of dollars, and which are conditioned on exclusivity. Those up-front payments act as a barrier to entry for smaller competitors and act as an additional mechanism to maintain Ticketmaster's dominance.

44. Once there is a primary ticket sale, the purchaser may choose to resell their ticket. Historically, such "secondary" ticket sales were challenging because it was logistically difficult to find a purchaser. Ticket holders wanting to resell their tickets had to personally find a purchaser for the tickets, sell to local ticket brokers or put tickets on commission with a broker, or simply go to the event site and sell to a scalper, who would then try to resell the ticket to passersby.

45. Recent years have seen a burgeoning market for secondary ticketing service providers. These providers typically offer online platforms connecting resellers to secondary purchasers and distributing tickets from the reseller to the purchaser. This substantially reduces the logistical difficulties of reselling tickets. Today, reselling a ticket is often as easy as posting the ticket on a secondary ticketing platform and waiting for a purchaser to buy the ticket.

46. Like primary ticketing service providers, secondary ticketing service providers do not set the price of the ticket; the seller does. Secondary ticketing service providers generate revenues by levying fees on the transaction. However, unlike primary ticketing service providers, secondary ticketing service providers typically charge fees on both sides of the transactions, as opposed to just on the purchaser. A ticket reseller therefore must pay a set fee (often a percentage of the "face value" they set for the ticket), and the purchaser must also pay fees (often a percentage of the sale price in addition to other assorted "service" fees).

47. Ticketmaster's branded platform, as well as its TicketExchange, TicketsNow, TM+, and Verified Tickets secondary platforms, have, upon information

and belief, obtained a market share exceeding 60% of secondary ticketing services for major concert venues and are threatening to obtain (or have obtained) monopoly power in that market.

**Live Nation Merged with Ticketmaster and Faced Intense Regulatory Scrutiny**

48. Live Nation has long been the world's largest promoter of live concerts. The Company's Concerts business segment principally involves the promotion of live music events at concert venues throughout the world, although its largest footprint is in the United States. Live Nation Worldwide, combined with other members of the Live Nation conglomerate, is also the second-largest owner or manager of concert venues and owns, leases, operates, has booking rights for, or has equity interests in over 200 live entertainment venues of various sizes in the United States.

49. Before their merger, Live Nation had been using Ticketmaster as its primary ticketing service provider and was one of Ticketmaster's largest customers. In late 2006, Live Nation and its CEO, Rapino, concluded that the Company would be better served by entering the ticketing service business itself. They believed that Live Nation's prominence as the nation's foremost concert promoter would give it immediate access to the primary ticketing services market.

50. Shortly after rolling out its primary ticketing service strategy in 2008—which involved: (a) licensing ticketing software from CTS Eventim, the leading German primary ticketing service provider, for both Live Nation and third party venues to use within the United States; and (b) engaging in price competition with Ticketmaster on ticket service fees—Live Nation became the second-largest provider of primary ticketing services in the United States almost overnight (by signing up both itself *and* the largest venue operator at the time, SMG).

51. In lieu of competing with Ticketmaster as the two predominant primary ticketing services, each with complementary vertically integrated operations to boot, Live Nation and Ticketmaster decided to merge. The DOJ opposed the merger, joined

by regulators from California and 16 other states. The regulators' primary concern was that the merger would eliminate competition and innovation in the market for primary ticketing services. Regulators also expressed concerns that the merger would make Ticketmaster dominant in the secondary ticketing service market.

52. To allay these concerns, and resolve the legal challenges to the merger, Live Nation entered into a consent decree that allowed the merger along with numerous conditions and restrictions. The consent decree included several behavioral remedies (*i.e.*, remedies meant to prevent certain anticompetitive behaviors), as well as structural remedies (*i.e.*, divesting parts of the business or licensing key technology to competitors).

53. One of the behavioral remedies was that the merged entity was prohibited from "conditioning," or threatening to withhold artists' performances tour stops (which Live Nation arranges as the artists' concert promoter) based on whether a venue selects Ticketmaster as its primary ticketing service provider. In other words, Live Nation cannot punish or threaten to punish venues by sending (or threatening to send) fewer concerts to a venue if the venue decided not to use Ticketmaster as its ticketing service provider.

54. The ten-year consent decree was set to expire in 2020. However, in 2019 the DOJ moved to extend and modify the consent decree through 2025, because it alleged that the Company had committed multiple violations of the consent decree, specifically its behavioral remedies. The DOJ asserted that the extension and modifications were necessary because the Company's acts had led to further domination by Ticketmaster in primary ticketing services and, therefore, harmed consumers.

**Live Nation's Dominance in Multiple Related Markets**

55. Live Nation has dominant market power in three key markets for major concert venue services: (1) primary ticketing; (2) secondary ticketing; and (3) concert promotion.

56. A major concert venue is a facility suitable for hosting events of the most successful artists and the largest concert tours. Due to the large demand for events featuring popular artists, major concert venues are likely to generate more revenue from various streams (*e.g.*, ticket sales, merchandise sales, concessions) than smaller venues. Relative to other concert venues, major concert venues are also likely to have greater seating capacity and to be located closer to major metropolitan areas. Major concert venues must be suitable for hosting live music concerts, but they may also be used for other events requiring large seating capacity such as sports, festivals, or other live entertainment events.

***Live Nation (via Ticketmaster) Dominates the Market for Primary Ticketing Services***

57. Concerts require specialized ticketing services, and major concert venues in particular require even more specialized services. Ticketmaster internally categorizes concerts as a specific type of ticketing within Ticketmaster's broader ticketing services business including professional sports, college sports, arts, and family events.

58. Within the concert ticketing services category, major concert venues constitute a distinct segment. Major concert venues host the industry's biggest acts. Shows for superstar artists sell out in minutes, bombarded by thousands of fans and ticket brokers struggling to scoop up seats for top-tier performances. As the DOJ explained in its January 25, 2010 Competitive Impact Statement on the Ticketmaster-Live Nation merger, "major concert venues require more sophisticated primary ticketing services than other venues." The websites of ticketing service providers that service these venues need to be equipped to handle massive online traffic. Such "high-

demand events" have much higher requirements than other types of events and have been likened to a "denial of service attack" by industry insiders, meaning they receive heavy online traffic during initial ticket sales.

59. This view is echoed by industry publications, such as Pollstar, that distinguish "major" concert venues from other venues (*e.g.*, awarding a "Best Major Outdoor Concert Venue").

60. Ticketmaster has dominated primary ticketing for decades, increasingly so over the past several years in part because of the merger with Live Nation. Other companies have sought to compete against Ticketmaster for primary ticketing to concert venues over the years, but none have been successful because Ticketmaster acquired them, drove them out of business, or minimized their market share through a variety of tactics. Indeed, as the DOJ recently noted in moving to modify the Live Nation-Ticketmaster consent decree, "Ticketmaster has been the largest primary ticketing service provider for major concert venues in the United States for at least three decades."

61. In 2017, Ticketmaster's share of primary ticketing services in the United States exceeded 70% among major concert venues and its market power is growing as a result of renewals and extensions of existing agreements. Furthermore, Ticketmaster sells the vast bulk of tickets for major concerts in the U.S. on an annual basis because Live Nation promotes the great majority of major concert tours each year and routes those tours through major concert venues for which Ticketmaster is the primary ticketing service provider.

62. In addition to its strikingly high market share, Ticketmaster's revenues are also much greater than those of the next several largest primary ticketing service competitors combined, as are, upon information and belief, its gross profit margins. Moreover, although a small number of other primary ticketing competitors attempt to compete against Ticketmaster for primary ticketing rights at venues not controlled by

Live Nation, Ticketmaster's net renewal rate with venues on an annual basis has been "over 100%."

63. Using a widely-recognized measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), the post-merger HHI for primary ticketing services for major concert venues increased by over 2,190 points, resulting in a post-merger HHI of over 6,900. The DOJ considers any market with an HHI of more than 2,500 to be highly concentrated.

64. Ticketmaster is the largest primary ticketing services provider in the nation. Ticketmaster has historically maintained multiple competitive advantages. As a result, smaller primary ticketing service providers have been limited in their ability to compete with Ticketmaster.

65. The primary source of, and barrier surrounding, Ticketmaster's market dominance is a nationwide web of long-term, exclusive dealing contracts with the vast majority of major concert venues throughout the United States. Under these contracts, Ticketmaster sells tickets to the venue's shows and pays the venue a high fixed fee (often including undisclosed rebates and other subsidies). Depending on the venue and the term of the contract, these fees can reach many millions of dollars. Potential competitors or market entrants would need significant sums of money to effectively compete with Ticketmaster for the business of these major concert venues. Accordingly, Ticketmaster's practices create a substantial barrier to entry and have allowed Ticketmaster to steadily grow its dominant share of exclusive venue contracts since its merger with Live Nation.

66. The long-term exclusive dealing contracts Ticketmaster enters with venues also create market power and barriers to entry because of their length and ubiquity. Ticketmaster's exclusive dealing arrangements with venues have terms that may range to 10 or more years in length. According to public industry data, Ticketmaster controls the ticket distribution for over 70% of major concert venues

and works with over 12,000 venues total. Public industry data also indicates that approximately 70% of all online concert ticket sales are completed through ticketmaster.com or Ticketmaster-operated websites (*i.e.*, "white-label" sites).

67. According to a report by the American Economic Liberties Project, the top 100 concert amphitheaters and arenas worldwide generated nearly 50 percent of concert sales in 2022. According to PollStar's 2022 venue data, 88 of the top 100 amphitheaters are located in the United States. Live Nation controls most of the top grossing amphitheaters in the United States, operating 56 or 64% of them. Ticketmaster also operates as the sole ticketing provider for 82% of the top amphitheaters in the U.S., as well as 77% of the top 100 amphitheaters worldwide. Among the top 100 arenas worldwide, 68 are based in the U.S. and 53 of those, or 78%, are serviced by Ticketmaster. Ticketmaster-serviced arenas contributed an overwhelming 83% of the gross revenue generated by these top U.S. arenas, whereas venues served by the next closest competitor (AXS) accounted for only 9.3%. The Company's dominance in these markets is striking:


TOP US-BASED AMPHITHEATERS BY VENUE OPERATOR
VENUE OPERATOR
313 Operator 1
AEG Presents and MOA 1
Another Planet Entertainment 3
ASM Global 4
Bold Events, LLC 1
City and County of Denver 1
City of Kettering 1
City of Mesa Parks, Recreation and Community Facilities Dept. 1
Cobb County 1
I.M.P. LLC 1
Kesey Enterprises 1
Live Nation 56
Los Angeles Philharmonic 1
Mary Kay von Brendel 1
Monqui Presents 1
NA 4
Nederlander Concerts 2
New West Presentations 1
Non-profit Wolf Trap Foundation 1
Oak View Group (OVG360) 1
Santa Barbara Bowl Foundation 1
St. Johns County Cultural Events 1
tvg Hospitality 1
Walton Arts Center 1
0
20
40
60
AMPHITHEATER COUNT


ANNUAL GROSS REVENUE FROM TOP 100 AMPHITHEATERS
BROKEN DOWN BY VENUE TICKETING PROVIDER
2022 GROSS REVENUE (TOP 100 AMPHITHEATERS)
$800,000,000
$600,000,000
$400,000,000
$200,000,000
$0
AXS
AXS & Ticketmaster
eTix
eTix (Cascade Tickets)
Eventim
In-House
NA
Paciolan
Starlight Ticket
Ticketek
Ticketmaster
TicketOne.it
Tickets.com
Ticketswest
Walton Arts Center
TICKETING PROVIDER







68. Live Nation uses Ticketmaster almost exclusively for ticketing services and actively seeks to dissuade artists under its management from using any other ticketing platform for the artists' presales.

69. A potential competitor seeking to enter the primary ticketing services market also faces high upfront costs of capital and time, constituting an additional substantial barrier to entry. A ticketing service provider seeking to compete for the business of major concert venues must develop, maintain, and efficiently operate the required ticketing software and hardware computer systems, and possess the ability and track record to demonstrate the reliability of its computer systems. Moreover, competitors must be able to compete with Ticketmaster's substantial up-front payments offered to customers. Given these baseline requirements, no new entrant has developed or can develop the combination of comparable business characteristics and abilities in order to compete effectively in primary ticketing services with the combination of Ticketmaster and Live Nation.

70. Ticketmaster's market power in primary ticketing services is evidenced by the high and supracompetitive fees that it charges for such services, and the restricted output that those fees cause. Ticketmaster's fees can collectively increase the price of a ticket to the consumer by 20-80% over the ticket's face value.

71. There are no effective constraints on Ticketmaster's ability to charge these supracompetitive fees because physical box office sales for most concerts and other events, which might bypass some of those fees, are minimal and decreasing. This is because: (a) Ticketmaster sometimes dictates that box office sales cannot begin until a specified time period after the online general sale opens (*e.g.*, for Madison Square Garden, box office sales are prohibited until one day after the general sale commences on ticketmaster.com); (b) consumers understand they have a better chance of obtaining a better seat online; and (c) consumers increasingly prefer online purchases through mobile- or web-based applications.

***Live Nation (via Ticketmaster) Dominates the Market for Secondary Ticketing Services***

72. Secondary ticketing services facilitate the resale of tickets, and they provide a distinct role in the live music industry. Similar to online auction websites

like eBay, a secondary ticketing service provider offers an online platform that allows ticket holders to post their tickets for sale. The ticket holder/seller determines the sale price for the ticket. The secondary ticketing platform then provides potential purchasers with search capabilities to locate tickets. If a purchaser wants to buy tickets for sale on the platform, they fill in their purchase information and the platform completes the sale. Typically, the secondary ticketing service provider charges fees to both the seller and purchaser, usually a percentage of the sale price of the tickets.

73. Primary and secondary ticketing services are broadly recognized as distinct markets. The Company's CEO, Rapino, for example, has been repeatedly quoted discussing the difference between the two types of service, specifically commenting that Ticketmaster has grown its secondary ticketing services substantially over the past several years. Industry sources also regularly recognize the difference between the services, and secondary ticketing service providers are often listed and grouped as a distinct category of provider, although there is some overlap between the companies that provide such services.

74. Several other factors also demonstrate the unique and separate nature of the market for secondary ticketing services for major concert venues:

(a) Secondary ticket sellers and purchasers recognize the distinction between primary and secondary ticketing service providers. In fact, in Live Nation's 2022 annual report filed with the SEC on Form 10-K ("2022 10-K"), Live Nation repeatedly distinguishes between "ticketing services" and "ticketing resale services," noting that the former serves venues and the latter serves resellers, and that the services they each provide are different. The 2022 10-K also distinguishes between "primary ticketing companies" and "secondary ticketing companies," and between primary ticket sales and the "secondary ticket sales market." Public analyses of the ticketing industry also regularly sort primary and secondary ticketing service providers into different categories.

(b) Secondary ticketing services have a purpose distinct from primary ticketing services: the latter are meant to facilitate the original sale of tickets on a venue's behalf, and the former are meant to facilitate ticket purchasers' resale of their tickets to other consumers at a later date.

(c) The customers for secondary ticketing services are distinct from the customers for primary ticketing services for events at major concert venues. For primary ticketing services, major concert venue operators retain primary ticketing service providers to sell tickets to consumers. For secondary ticketing services, the ticket sellers are consumers who bought a ticket and now wish to resell that ticket. The ticket buyers who utilize the two types of ticketing services are also distinct, in that the secondary ticket buyers are purchasers who were unable to obtain the ticket they wanted from the primary ticketing service provider, and therefore needed to look for resale options instead.

(d) There are distinct pricing models between the two ticketing service markets. Primary ticketing service providers generate profits by levying fees on top of a ticket's face value, paid by the ticket purchaser. The venue does not pay these fees and often shares in a portion of the fees, sometimes even setting the fee levels. Unlike in the primary market, a secondary ticketing service provider typically charges the ticket seller a fee, often a percentage of the sale price of the ticket. Secondary ticketing service providers also charge the purchaser one or more fees on the sale, thus obtaining profits from both sides of the transaction.

(e) Demand for secondary ticketing services is not sensitive to changes in prices for primary ticketing services, because such changes do not cause secondary purchasers to choose a different set of services. It is irrelevant to secondary ticket sellers and purchasers whether the prices primary purchasers pay for a venue's primary ticketing service provider (*i.e.*, the fees those primary ticket purchasers pay) change in any real way. What matters for the secondary market customers is that they have a service available to resell tickets or purchase resold tickets.

(f) There are specialized vendors that are largely distinct between the primary and secondary ticketing service markets, and the platforms they provide are substantially different, depending on the ticketing service involved. For primary ticketing service providers, the platform is venue-specific, and the services provided are aimed at facilitating a sale of primary tickets—which often includes the high-volume rush once tickets go on sale—as well as providing on-the-ground ticketing services at the actual event (*e.g.*, employees scanning tickets at the door). Secondary ticketing service providers must instead provide a platform that focuses on connecting resellers and purchasers.

75. In the secondary ticketing services market, Ticketmaster has a very small number of substantial competitors. Upon information and belief, along with Ticketmaster, those few secondary ticketing service providers control the vast bulk of the market for secondary ticketing services for major concert venues, such that Ticketmaster would stand to control roughly 70-80% of the market by eliminating those few competitors via the anticompetitive acts alleged herein.

76. Ticketmaster provides both primary and secondary ticketing services for major concert venues. Ticketmaster is unique in that it is the only ticketing services provider in the nation to have substantial shares of both markets. Most of Ticketmaster's competitors for major concert venue ticketing services operate in only one market or the other, and the very small handful who operate in both focus primarily on one of the two markets with only a small presence in the other.

77. Ticketmaster currently controls over 70% of the primary ticketing services for major concert venues market, and, upon information and belief, over 60% of the secondary ticketing services for major concert venues market. No other companies even remotely approach Ticketmaster's share of either market.

78. Even if the primary and secondary ticketing services for major concert venues were deemed one single ticketing services market, Ticketmaster would still have monopoly power. The U.S. Government Accountability Office ("GAO") recently noted that the primary ticketing services market in the United States is larger than the secondary ticketing services market. Upon information and belief, Ticketmaster's dominance in primary ticketing services and its growing share of secondary ticketing services therefore means that it would still have well over 60% of a hypothetical combined ticketing service market for major concert venues.

***Live Nation Dominates the Market for Concert Promotion Services***

79. Upon information and belief, Live Nation controls at least 60% of concert promotion services for major concert venues. AEG Live is Live Nation's

closest competitor, with roughly 20% of the market. Live Nation, however, promotes the vast majority of the top grossing touring acts in the world (who tour almost exclusively at major concert venues), and it is the only promoter that has a direct corporate relationship with the nation's most dominant ticketing service provider, Ticketmaster.

80. Live Nation has distinct advantages over competitors like AEG Live. Neither AEG Live nor any likely entrant to the concert promotion services market possesses the combination of attributes to threaten Live Nation's dominant market power over artists and major concert venues. A potential competitor seeking to enter the concert promotion market at a comparable scale to that of Live Nation would encounter sky-high costs and a long ramp-up timeline. Promoters for major concert venues must have the ability to provide substantial up-front payments to artists. Artists seeking to promote a national tour that includes major concert venues require employees with the expertise, contacts, and business acumen to organize and promote such a tour (and with particularized knowledge of how to promote shows at such venues), who must necessarily be located throughout the country in the various regions the tour will visit. A prospective new entrant would need a substantial investment of capital and time to develop the combination of attributes necessary to begin to compete with Live Nation in the market for concert promotion services.

81. For nearly two decades, Live Nation has dominated the market for concert promotion services. It has maintained its dominance by virtue of its size and scope, as well as anticompetitive and unfair business tactics, including acquisitions of competing promoters, and incurring losses via significant overpayment to artists (*i.e.*, predatory bidding) with the aim of reducing or eliminating rival promoters' access to clients.

82. For example, FE2 described the Company's persistent practice of trying to buy out competing venues. According to FE2, smaller promoters and venues just

couldn't compete with Live Nation. "If you're a small promoter who's fighting the [] gorilla who has all the content and has unlimited pockets tell me what you would do. At a certain point you'd turn around and sell because you just can't fight the behemoth for long. If they offered a band $20, I'd offer $30. If they offered $40, I'd offer $60 and I'd run the price up and then walk out at the end. Our buyers would do that routinely."

83. Additional entry barriers to Live Nation's concert promotion dominance have also emerged since it merged with Ticketmaster, because Ticketmaster provides the bulk of the merged firm's annual operating income. Buoyed by that income stream from Ticketmaster, Live Nation is able to offer higher payments to artists than other concert promoters, and to use its promotion business as a loss leader to generate outsized profits for its ticketing and sponsorship businesses which it ties to the promotion business. In 2019, for example, Live Nation reported in SEC filings that its promotion business operated at a $53 million dollar loss. In the same period, Ticketmaster generated nearly $232 million in operating income. In 2022, Live Nation's adjusted operating margins for its Concerts segment were a paltry 1.3%, while its Ticketing segment pulled in margins of 37.6%.

84. Live Nation's ability to price concert promotion services in this way—losing money or surviving with razor-thin margins year after year—is one of the reasons why Live Nation has durable market power over its smaller competitors. Armed with that unique pricing ability, Live Nation has only grown its market share and power without fear of serious competition.

85. As FE3 described, Ticketmaster's ability to "spread their losses across all of the other clients that are profitable" makes it extremely difficult for other firms to compete. Per FE3, Ticketmaster's primary competitors, including SeatGeek, AXS, or Tickets.com "just don't have the financial ability to do those deals and still be a profitable company."

86. Live Nation's market power is also supported by current trends in the music industry. Whereas, in previous decades, revenues from recorded music were musicians' main source of income, with touring revenues providing a smaller income stream, that dynamic has thoroughly reversed itself. This shift places much more economic importance on the touring portion of artists' careers, making them more reluctant to defy Live Nation by selecting a different promoter and/or planning tours that avoid Ticketmaster-controlled major concert venues (which is largely impracticable for tours in the United States).[5] Indeed, Defendant Rapino has admitted that artists today make substantially all of their income from live music events and that Live Nation is the largest single financer of artists worldwide, having firmly supplanted record companies in that role.[6]

87. Since its merger with Ticketmaster in 2010, Live Nation has acquired unparalleled dominance within the live music industry. Whereas, pre-merger, Ticketmaster needed to be cognizant of promoters and artists taking business away from Ticketmaster's contracted venues, that concern has now disappeared because the post-merger Company promotes, manages, and/or hosts concerts for most of the biggest acts that tour in the United States—*i.e.*, the artists that Ticketmaster and its venue clients most care about.

88. Live Nation's unique position in the live music industry also creates numerous entry barriers that protect and extend Ticketmaster's dominance. Live Nation's promotion and artist management businesses, for example, provide a steady stream of business to Ticketmaster and its venue clients that smaller competitors cannot replicate. Prior to its merger with Ticketmaster, Live Nation had begun to

---

[5] *See* Josh Baker, "The Merger and the Damage Done: How the DOJ Enabled an Empire in the Live Music Industry," *Journal of Intellectual Property and Entertainment Law* 3, no. 1, Dec. 2, 2013, *available at* https://jipel.law.nyu.edu/vol-3-no-1-3-baker/

[6] *See also id.*

challenge Ticketmaster's dominance by using its stable of artists as an inducement to venue operators to select its own primary ticketing services over Ticketmaster's. Without that competition, Ticketmaster has grown its market share and can set prices without fear of serious competition from any new entrant.

89. In addition to barriers to entry based on the Company's vertically integrated structure, Live Nation's anticompetitive practices, including tying agreements, long-term exclusive dealing contracts, "conditioning," and retaliation, also act as a barrier to entry and dissuade competition in the chief markets in which Live Nation operates.

**Live Nation Engaged in Anticompetitive Practices By "Conditioning" and "Retaliating" in Violation of the DOJ Consent Decree**

90. When Ticketmaster first came to prominence in the 1980s after it helped introduce electronic ticketing, it was able to quickly snap up a web of long-term exclusive dealing contracts with venues throughout the country. Ticketmaster's share of primary ticketing services for major concert venues continued to grow, and it soon became dominant in that market. It has held that position of dominance ever since, despite multiple attempts by other primary ticketing services to wrest away market share and power.

91. Any venue contemplating a contract with Ticketmaster must also keep in mind that Ticketmaster is part of the broader Live Nation empire. As the DOJ described it: "venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all. Given the paramount importance of live event revenues to a venue's bottom line, this is a loss most venues can ill-afford to risk." Thus, for those venues that step out of line, Defendants have the ability to threaten and punish—and have actually punished—venues with a loss of future revenues via denying access to Live Nation concerts.

92. The evidence of these efforts to intimidate and coerce venues into using Ticketmaster first came to light in 2019. On August 27, 2019, Senators Richard Blumenthal and Amy Klobuchar sent an open letter to the head of the DOJ's Antitrust Division regarding their significant concerns about Live Nation and Ticketmaster's anticompetitive conduct. Among other things, Senators Blumenthal and Klobuchar noted that the DOJ's 2010 consent decree "imposed behavioral conditions to prevent Ticketmaster from using its dominance to stifle new competitors," including "prohibit[ing the Company] from withholding concerts that Live Nation promotes or concerts by artists that Live Nation manages from venues that use a competitor's ticket platform." The Senators observed that, at the time of the merger, "many experts were skeptical that the merger conditions were sufficient to create a competitive market," and that more recent evidence indicated that "the skeptics' fears have proven correct." The Senators wrote that they were "deeply disturbed by reports that Ticketmaster has violated the behavioral conditions by retaliating against venues that use a competing ticket platform."

93. Senators Blumenthal's and Klobuchar's letter echoed an April 2018 investigative piece from *The New York Times* that the DOJ had begun investigating numerous complaints from Ticketmaster's competitors that Live Nation "used its control over concert tours to pressure venues into contracting with its subsidiary, Ticketmaster." AEG, the second-largest primary ticketing services provider in the United States, "told [DOJ] officials that venues it manages that serve Atlanta; Las Vegas; Minneapolis; Salt Lake City; Louisville, Ky.; and Oakland, Calif., were told they would lose valuable shows if Ticketmaster was not used as a vendor." AEG backed up these complaints with emails from the venues, including one in which a venue booking director asked Live Nation to address any issues regarding booking, to which the Live Nation representative replied, "Issue? … Three letters. Can you guess what they are?" The following year, Live Nation then halved the number of

Live Nation-promoted tours that stopped at that venue. AEG reportedly provided the DOJ with numerous other examples.

94. On December 19, 2019, the DOJ issued a press release stating that "[d]espite the prohibitions in the Final Judgment [consent decree], Live Nation repeatedly and over the course of several years engaged in conduct that, in the Department's view, violated the Final Judgment." The DOJ accordingly moved for an amendment to the consent decree that extended the decree for five and a half years and alleged several specific acts that directly violated its terms. As part of the agreement resolving this enforcement action, Live Nation agreed to oversight from an independent monitor and that any violation of the consent decree would incur an automatic $1,000,000 fine.

95. In the DOJ's motion to amend the 2010 consent decree, it included several instances of the Company's wrongful, anticompetitive conduct. These examples include:

> (a) In early 2012, the President of Live Nation Arenas threatened on multiple occasions to divert Live Nation concerts away from a venue if it did not select Ticketmaster as its primary ticketer. After that venue did not select Ticketmaster, two Live Nation executives—the President of Live Nation Arenas and the local Live Nation President in charge of placing concerts in the region—repeatedly threatened that the venue would not get Live Nation shows unless it switched to Ticketmaster. When the venue refused to switch to Ticketmaster despite these threats, Live Nation indeed retaliated against the venue by reducing the number of concerts played there. Between 2011 and 2015, Live Nation shows playing at the venue dropped by an average of almost 50%.
>
> (b) In another instance, an arena venue switched from Ticketmaster to a competitor. Immediately after learning that the venue had switched providers, Ticketmaster's President contacted the local Live Nation President responsible for placing concerts in the region to suggest that Live Nation book more shows at the venue's nearby rival venue. In the two years following the venue's move to a Ticketmaster competitor, Live Nation significantly reduced the number of shows promoted at the venue.

(c) In 2017, Live Nation threatened to withhold concerts from a venue if that venue did not contract with Ticketmaster, and then refused to book concerts at the venue for a year in retaliation for its selection of a competing ticketing service provider. In that instance, the venue had issued a request for proposal only for ticketing services and not for live content. Nevertheless, when Ticketmaster met with the venue's ticketing committee, a Live Nation promoter responsible for deciding where in the region to place Live Nation concerts also attended the meeting. At the meeting, the Live Nation promoter explicitly threatened to withhold concerts from the venue if it did not select Ticketmaster. A few weeks later, when the venue informed the Live Nation promoter that it planned to select a competing ticketer that had offered better financial terms, the promoter responded that the competitor's offer would not be better than Ticketmaster's if the venue did not receive as many Live Nation shows. The Live Nation promoter went on to specify that Live Nation would not book shows at the venue unless it had no other options in the market. Before the venue's decision not to contract with Ticketmaster, Live Nation estimated that for the next several years it would book three to four shows per year at the venue. But in the year following the venue's switch to Ticketmaster's competitor, Live Nation promoted zero shows at the venue.

(d) Also in 2017, another venue evaluated offers for primary ticketing services from Ticketmaster and several competitors. When the venue informed Live Nation that it was planning to choose Ticketmaster's competitor, Ticketmaster's Vice President for Client Development threatened to withhold all Live Nation concerts from the venue if it did not renew its contract with Ticketmaster. The Ticketmaster VP told the venue that "if you move in that direction, you won't see any Live Nation shows." Ticketmaster's Executive Vice President and Co-Head of Sports for NBA and NHL Arenas made a similar threat to the venue, telling it that Live Nation's CEO, Rapino, would never put one of his shows on sale through that particular Ticketmaster competitor. Despite Defendants' threats, the venue initially selected a Ticketmaster competitor as its primary ticketing provider. Before that ticketing decision, Live Nation and the venue discussed potential bookings approximately once per week. But when the venue opted to go with Ticketmaster's competitor, Live Nation stopped contacting the arena about any possible concerts or booking shows at the venue. For unrelated reasons, one month later, the venue agreed to contract with Ticketmaster. Immediately thereafter, Live Nation began to get "geared back up" to bring concerts to the venue, because the venue was "back in the family."

(e) In September 2018, a different venue began evaluating primary ticketing providers in advance of the expiration of its Ticketmaster contract. When the venue told Ticketmaster that it was considering other primary ticketers, Ticketmaster's executive in charge of Sports for NBA and NHL Arenas told the venue that if it chose another primary ticketer, its Live Nation concert volume would be put at risk because Live Nation concerts would either skip the market altogether or play at another venue. Later, that senior executive reiterated his threat that if the venue went with another primary ticketing provider, Live Nation would pull concerts from the venue and reduce the volume of shows held there. Despite receiving a competitive bid from a Ticketmaster competitor, the venue determined that the risk of contracting with a ticketing service provider other than Ticketmaster was too great and it renewed its contract with Ticketmaster.

(f) In yet another instance, the Company threatened to blacklist a certain venue from all future Live Nation shows after the venue decided to contract with Ticketmaster's competitor for primary ticketing services. According to the venue's executive, Ticketmaster's President warned the executive that if the venue went with a competing ticketing service provider, Ticketmaster's response "would be 'nuclear'" and "Live Nation would never do a show in our building, that they would find other places for their content…." Following a conversation with Ticketmaster's President, a second executive from the venue reported that Ticketmaster and Live Nation "will not do any business whatsoever with our stadium" and that Ticketmaster was "drawing a line in the sand and picking this as their 'hill to die on.'" The venue executive went on to state his understanding that the venue was "now on 'the black list.'"

96. On information and belief, the above examples are not isolated instances but instead reflect a widespread and continuing practice directed, encouraged, and mandated from and also actively participated in and conducted by Live Nation's highest executives on down. Rapino publicly stated in September 2019 that Live Nation's concert promotion segment considers whether a venue selected Ticketmaster as its primary ticketing service provider. If the venue did not, Rapino stated that it "won't be the best economic place anymore" for Live Nation-promoted tours "because we don't hold the revenue." Live Nation thus made explicit threats and, as

the DOJ reported, backed up those threats with actual retaliation by withholding Live Nation shows from venues that sought to work with a Ticketmaster competitor.

97. Reports from former Live Nation employees corroborate that this anticompetitive conduct was continuing during the Class Period.

98. FE1 reported that when choosing which venue Live Nation would use for a concert, "a lot of times it just comes down to where does Live Nation have the better kickback deal, so if it comes down to two venues and all things are equal but one venue is using Ticketmaster and the other isn't it'll go to the Ticketmaster venue ten times out of ten." As FE1 described, "it wasn't ever really much of a secret," and that "I would say you'd be hard pressed to find anyone above Director or above a Manager level … who would say otherwise. … It was just part of the business plan."

99. FE1 also explained that it was "common knowledge" that Live Nation used anticompetitive tying practices to freeze out competitors. FE1 noted that "obviously since the [Senate] hearings started it sheds a different light on what was happening."

100. FE3 has personally experienced losing a deal to Ticketmaster where the venue freely admitted that the ticketing software offered by FE3's company (a primary competitor of Ticketmaster) was superior to Ticketmaster's, "but there's a fear of losing [Live Nation] shows. … Wherever there is a building that does a lot of concerts on top of sports – like NBA and NHL games – they might have 45, 50 NBA games but they also put on 100 to 150 shows throughout the year with a lot of those shows being booked by Live Nation so there's a fear of losing that content. That's how we lose a lot of those deals."

**Live Nation Engaged in Anticompetitive Practices in the Secondary Ticketing Market**

101. The rise of the internet helped create a viable and robust secondary market for concert tickets in the U.S. The internet allowed secondary ticketing service providers to create platforms where secondary ticket sellers and purchasers could

easily arrange and transact ticket resales. Ticket resellers suddenly had a far broader reach to potential customers via online platforms that dramatically lowered the transaction costs for ticket resales. These conveniences allowed the market to flourish, which created substantial benefits for ticket resellers and purchasers.

102. Many states have enacted laws ensuring that ticket purchasers may resell their tickets, and secondary ticket sale platforms exist today because there is substantial demand for secondary ticketing services. Until Live Nation's actions there was robust competition between secondary ticketing services providers, which benefited consumers who wanted to purchase secondary tickets.

103. Over the years, the Company made a concerted effort to grow its secondary ticketing services in addition to its dominant primary ticketing service, so that it could make money off the initial purchase and resales of the very same concert tickets. This was a mandate from Rapino on down.

104. Ticketmaster first entered the secondary ticketing services market by acquiring preexisting secondary ticketing service providers. It kept the platforms separate from its primary ticketing website for several years. Recently, however, the Company integrated those secondary ticketing service providers into Ticketmaster's online platform, such that consumers can now purchase primary *or* secondary tickets off of Ticketmaster.com or the Ticketmaster mobile app, and may not even know if they are purchasing a primary or secondary ticket at the time of the purchase.

105. Given the optics problems from publicly embracing ticket brokers and other entities whose business is purchasing and reselling tickets at a markup, Live Nation has claimed to be taking efforts to stifle broker behavior. One of the primary ways Live Nation does so is through the "conditional license" Ticketmaster grants to users of its website and/or mobile app. The conditional license allows users to use Ticketmaster's site only if they agree to a bevy of restrictions that prevent brokers from purchasing tickets from Ticketmaster and then reselling them on rival secondary

ticketing platforms. As one example, the conditional license prevents users from refreshing Ticketmaster's ticketing pages "more than once during any three second interval." The conditional license also restricts the use of "ticket bot technology," which makes it more difficult for brokers to engage in bulk purchases of tickets. Ticketmaster claims elsewhere that it will put brokers to the back of the electronic line if it spots them in the digital queue.

106. This tactic is simply one more tool the Company uses to stifle competition. Ticketmaster's conditional license plays into this scheme by acting as the proverbial stick Ticketmaster wields against ticket brokers. Ticketmaster allocates primary tickets for a ticket broker only if that broker agrees it will resell its tickets through Ticketmaster's secondary ticket platform. If the broker does not agree, then Ticketmaster will use the conditional license to try to keep the broker off its platform. It is able to do so with impunity because of the power Ticketmaster holds over the supply of primary tickets at major concert venues, and because Live Nation, as the dominant concert promoter in the nation, controls the vast bulk of major concert tours. Faced with this potent combination, ticket brokers seeking to resell major concert venue seats have no other choice but to use Ticketmaster's secondary ticketing services, even though Ticketmaster is not as attractive a platform for secondary sellers as some of its competitors. Upon information and belief, brokers that have agreed to this setup include DTI, Dynasty, and Eventellect.

107. Another tactic Ticketmaster employs to dominate secondary ticketing services for major concert venues is to limit primary purchasers' ability to transfer their tickets through any means other than Ticketmaster's secondary ticketing platform. The Company does so most prominently through a combination of mobile ticket and Ticketmaster's branded "SafeTix" technology. The goal of these efforts is to prevent primary ticket purchasers from using competing secondary ticketing service platforms.

108. Due to the rise of smartphone usage, many primary ticketing service providers have developed electronic ticket technology. Primary purchasers receive an email with a link to their mobile ticket or receive the ticket directly on a smartphone application that the primary ticketing service provider creates and provides. That mobile ticket usually includes a QR or other type of electronic code that attendants at an event scan to permit the purchaser to enter.

109. Historically, primary ticket purchasers have been able to transfer electronic tickets easily. Either as the result of a resale or simply in order to send the ticket to a friend or family member, primary purchasers could send their ticket electronically and without cost. A ticket reseller could upload their electronic ticket to the secondary ticketing platform or send it directly to a secondary purchaser after the completion of the resale transaction.

110. Recently, however, Live Nation has taken steps to prevent primary ticket purchasers for events at major concert venues ticketed by Ticketmaster from transferring their tickets, except through Ticketmaster's secondary ticketing platform. The Company accomplishes this by utilizing technological limits built into their primary ticketing platform, which they and artists using their services can place on primary tickets sold at major concert venues. Ticketmaster has applied various names to these technological limits over the years, including mobile tickets, Verified Fan tickets, and, more recently, SafeTix. SafeTix, in particular, demonstrates the insidious competition problems these transfer restrictions create.

111. The Company advertises SafeTix as "encrypted mobile tickets built with leading-edge technology" that "come standard with powerful fraud and counterfeit protection." They "are powered by a new and unique barcode that automatically refreshes every few seconds so it cannot be stolen or copied, keeping your tickets safe and secure." The tickets are only available on Ticketmaster's smartphone application. A SafeTix ticket holder supposedly can transfer some or all of their tickets to someone

else "[i]n just a few taps" of their smartphone. The technology also "ma[kes] it a snap to sell your tickets on the world's largest marketplace [*i.e.*, Ticketmaster's secondary ticketing platform] in a few taps."

112. Similar to the conditional license, however, the Company uses SafeTix (and its functional predecessors) for anticompetitive purposes. Primary ticket purchasers typically expect that they can resell their tickets wherever and however they want. SafeTix purchasers are often restricted from transferring their tickets through (competing) external platforms. In fact, the only way to know if a purchaser can transfer their tickets is if they "look for the 'Transfer Tickets' button on your order [*i.e.*, after the purchase]. If transfer is not available, the button will not be there." In some instances, primary purchasers have no advance notice of this limitation on their transferability,[7] or were allowed to resell their tickets only through Ticketmaster's secondary ticketing platform.[8]

113. Competing secondary ticketing service providers require a free-flowing supply of tickets. Without a supply of primary tickets to list on their platforms, secondary ticketing service providers simply cannot compete. Furthermore, competing secondary ticketing service providers have no ability to circumvent the technological limits the Company has increasingly placed on ticket transferability.

114. The Company's use of the conditional license to force secondary resellers to use Ticketmaster's platform, as well as their limitations on ticket transferability, have had anticompetitive effects for both primary and secondary ticketing services. These actions also harm consumers because, despite the fact that

---

[7] *See, e.g.*, Sarah Pittman, *The Black Keys' Wiltern Snafu Thrusts SafeTix Into Spotlight*, Pollstar (Sept. 26, 2019), https://www.pollstar.com/News/the-black-keys-wiltern-snafu-thrusts-safetix-into-spotlight-141163.

[8] *See, e.g., Pearl Jam Deploys TicketMaster's SafeTix Tech*, Ticketing Business News (Jan. 17, 2020), https://community.pearljam.com/discussion/283246/pearl-jam-deploys-ticketmaster-s-safetix-tech.

Ticketmaster's secondary ticketing services competitors charge lower fees, Ticketmaster has increased its secondary ticketing market share, leading to the Company generating supracompetitive fees.

**Live Nation's Conduct Has Had Anticompetitive Effects**

115. As a result of the Company's anticompetitive conduct, consumers have paid supracompetitive fees on primary ticket purchases for years. Ticketmaster has reduced competition for such services through the anticompetitive conduct described above and therefore largely immunized itself from price competition on its ticketing fees. Thus, consumers who would otherwise be able to obtain primary tickets at lower overall cost must pay supracompetitive prices to obtain tickets from Ticketmaster, or else not be able to obtain tickets at all in the primary market.

116. For example, some major concert venues are also sport venues. There are instances where Ticketmaster is the exclusive primary ticketing service provider for the live music events at a major concert venue, but is not the exclusive primary ticketing service provider for the sports events at the venue. As of late 2017, one such venue was the American Airlines Arena, in Miami. The following chart compares the ticketing fees for the live music events, for which Ticketmaster was the exclusive primary ticketing service provider, against the NBA's Miami Heat games, for which it was not. The fees on live music events were markedly higher:




Source: Ticketmaster, "Licensed User Agreement," Oct. 28, 2014, 8–10 (TM00000362 at -369–371, -373).

117. A similar pattern emerges at Philips Arena, Atlanta, which has a similar separation between Ticketmaster's exclusivity over primary ticketing for live music events, and its lack of exclusivity over sporting events:




Source: Ticketmaster, "Licensed User Agreement," Jul. 11, 2011, 50 (TM00000243 at -289–291).

118. The United Kingdom is a geographic market in which no one provider has extensive exclusive deals for primary ticketing services. In the U.K. market it is very rare for a single provider to conduct all primary ticketing services at a venue. Instead, the venue typically selects a provider for a portion of primary ticketing sales, and then others involved with the show (*e.g.*, the promoter, artist, etc.) each may select their own primary ticketing service provider(s) for a portion of the tickets. Ticketing service providers therefore compete with each other, including by offering lower fees for fans. As the data show, ticketing fees in the U.S. (where Ticketmaster exerts its market dominance) are consistently higher than the fees for tickets with the same face value in the U.K.:




Note: Fees calculated on the basis of a purchase of two tickets at the given face value. Y-axis represents (total fees) / (total combined face value). Ticket face value is given in USD. UK ticket prices converted to USD at the exchange rate available at the time of data collection.

119. Live Nation's anticompetitive conduct has also harmed competition in the secondary ticketing services market. Consumers of secondary tickets are harmed by having to pay inflated fees when purchasing from Ticketmaster rather than competitors. The fees that Ticketmaster charges secondary ticket purchasers are, on average, significantly higher than those charged by its competitors. Secondary ticket resellers are normally incentivized to resell tickets wherever they and potential purchasers would incur the lowest fees.

120. Ticketmaster's secondary ticket reseller fees are either the same or higher than its competitors' fees, making the secondary ticket transaction either neutral or worse for resellers if they use Ticketmaster's platforms (*e.g.*, TicketsNow and TicketExchange) as opposed to its competitors' platforms.[9] Ticketmaster's competitors also charge lower fees to secondary ticket purchasers than Ticketmaster charges.

121. Accordingly, a rational ticket reseller would normally choose Ticketmaster's competitors if they want to maximize their profits. Thus, in a competitive market, one would expect Ticketmaster to have no (or very little) secondary ticketing service growth, or that it would lower its fees in order to compete with lower-priced competitors.

122. Instead, Ticketmaster's secondary ticketing services have enjoyed explosive growth since the Company prioritized that business over the past few years, without competing on fees. Ticketmaster grew its market share in secondary ticketing services for major concert venues via anticompetitive conduct while maintaining supracompetitive prices.

123. Defendants' efforts to restrict the ability of ticket brokers and consumers to use other platforms have also had the effect of anticompetitively raising prices for its primary ticketing service fees. This is because, *inter alia*, fees levied on primary ticket sales are typically set as a percentage of, or set fee based on, the face value of the primary ticket. By artificially inflating the demand for primary ticket sales, the Company drives up the face values of tickets overall, which leads to higher ticketing fees.

124. In addition to the empirical evidence discussed above with respect to lower primary ticketing services fees in the United Kingdom, similar evidence from

---

[9] Ticketmaster acquired TicketsNow in February 2008 for $265 million. TicketsNow operates as a wholly owned subsidiary of Ticketmaster.

the same market shows that greater competition in secondary ticketing services has a similar downward effect on price. In an analysis of secondary ticketing fees in the United States, the GAO noted that while service fees for U.S. venues that the GAO reviewed averaged 22% of a ticket's face value and could reach as high as 38%, "[i]n the United Kingdom, where the venue and promoter typically contract with multiple ticket sellers, ticket fees are lower than in the United States—around 10 percent to 15 percent of the ticket's face value, according to a recent study."[10]

125. The result of the Company's efforts is the substantial decrease in competition in the relevant markets for primary and secondary ticketing services for major concert venues, injuring both competitors and consumers alike.

## DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS ABOUT LIVE NATION'S ANTICOMPETITIVE BEHAVIOR AND COOPERATION WITH REGULATORS

126. On February 23, 2022, Live Nation filed its annual report with the SEC on Form 10-K for the period ended December 31, 2021 ("2021 10-K").[11] Rapino and Berchtold signed the 2021 10-K, which stated:

> From time to time, federal, state and local authorities and/or consumers commence investigations, inquiries or litigation with respect to our compliance with applicable consumer protection, advertising, unfair business practice, antitrust (and similar or related laws) and other laws. ***Our businesses have historically cooperated with authorities in connection with these investigations and have satisfactorily resolved each such material investigation, inquiry or litigation.***

[10] Citing Michael Waterson, *Independent Review of Consumer Protection Measures Concerning Online Secondary Ticketing Facilities*, a report prepared at the request of the United Kingdom Department for Business, Innovation and Skills and Department for Culture, Media and Sport (London: May 2016), 30-31.

[11] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

127. This statement was false and misleading because Defendants failed to disclose that: (1) Live Nation engaged in anticompetitive conduct and was not cooperating fully with the ongoing DOJ and Senate Subcommittee investigations; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. Thus, it was false and misleading to suggest to investors that Live Nation had a practice of full cooperation with investigations, or that the Company was likely to "satisfactorily resolve[]" the DOJ and Senate investigations and potential litigation.

128. The 2021 10-K also stated:

> In the case of antitrust (and similar or related) matters, any adverse outcome could limit or prevent us from engaging in the ticketing business generally (or in a particular segment thereof) or subject us to potential damage assessments, all of which could have a material adverse effect on our business, financial condition and results of operations.

129. This statement was misleading because Defendants failed to disclose that: (1) Live Nation engaged in anticompetitive conduct and was not cooperating fully with the ongoing DOJ and Senate Subcommittee investigations; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. Thus, it was misleading to present as purely hypothetical the risk of an adverse outcome in antitrust matters because Live Nation's anticompetitive actions already created and heightened this existing risk.

130. The 2021 10-K also stated:

> All three of our segments reported revenue growth due to more events, higher ticket sales and increased sponsor fulfillment over the past twelve months. … The improvement resulted from increased events, ticket sales and sponsor client activation partially offset by higher selling, general and administrative expenses as we brought employees back from furlough and began hiring new roles to execute 2021 events and prepare for 2022. …

> Our Concerts segment revenue for the full year increased by $3.3 billion, from $1.5 billion in 2020 to $4.7 billion in 2021. The revenue growth was a result of increased shows and fans during the year as well as higher ancillary spend per fan and pricing at our events. … The improvement was primarily due to more shows this year, an increase in net ancillary spend per fan at our amphitheater and festival events, and growth in pricing across all venue types. …
>
> Our Ticketing segment revenue for the full year increased by $946 million, from $188 million in 2020 to $1.1 billion in 2021. The improvement resulted from an increase in ticket sales, stronger pricing, and a reduction in ticket refunds this year. … The improvement was almost entirely driven by sales in the United States and the United Kingdom, largely for concert and sporting events. Pricing on our fee-bearing tickets increased by double-digits, reflecting strong consumer demand, particularly for premium seats and VIP experiences. Our resale business bounced back dramatically in the second half of the year and Q4 was our highest resale gross transaction value quarter ever, at over $1 billion. … The improvement in operating results was largely driven by increased ticket sales, strong ticket pricing and higher ancillary revenue streams.

131. Each of these statements were misleading because Defendants failed to disclose that a material factor driving the Company's strong performance in the Concerts and Ticketing segments was the Company's anticompetitive conduct, which was unsustainable due to regulatory scrutiny and investigations of the Company's violations of antitrust laws.

132. The 2021 10-K also stated:

> Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences. …
>
> … We believe that barriers to entry into the promotion services business are low and that certain local promoters

> are increasingly expanding the geographic scope of their operations.
>
> * * *
>
> We experience competition from other national, regional and local primary ticketing service providers to secure new venues and to reach fans for events. …
>
> We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that we understand have recently entered or could enter these markets.

133. The above statements were false and misleading because Defendants failed to disclose to investors: (1) that Live Nation engaged in anticompetitive conduct, including improperly tying its underpriced Live Nation concert promotion services to its Ticketmaster services and retaliating against venues that spurned Ticketmaster and improperly restricting consumers' ability to resell tickets using competing secondary ticketing services; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm.

134. It was false and misleading to call competition in the live music industry intense when the Company enjoyed monopolistic market power and abused that power to stifle competition. It was misleading to say that the Company competes "primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences" because Defendants omitted that a

material factor in how the Company "competes" in the live music industry is through anticompetitive behavior in violation of antitrust laws. It was false and misleading to say that barriers to entry in the promotion services business are low because Defendants failed to disclose that the Company took efforts to raise those barriers to dissuade potential market entrants by, among other things, using predatory bidding practices subsidized by the Company's much more profitable Ticketing and Sponsorship operations. Similarly, it was misleading to say the Company experiences competition from primary and secondary ticketing service providers when in truth the Company was engaged in anticompetitive conduct aimed squarely at reducing or eliminating competition in those spaces and maintaining the Company's monopolistic position.

135. On November 19, 2022, Live Nation issued a statement in response to the reports about the DOJ investigation, stating as follows:

> ***As we have stated many times in the past, Live Nation takes its responsibilities under the antitrust laws seriously and does not engage in behaviors that could justify antitrust litigation, let alone orders that would require it to alter fundamental business practices.***
>
> …
>
> Ticketmaster has a significant share of the primary ticketing services market because of the large gap that exists between the quality of the Ticketmaster system and the next best primary ticketing system. The market is increasingly competitive nonetheless, with rivals making aggressive offers to venues. That Ticketmaster continues to be the leader in such an environment is a testament to the platform and those who operate it, not to any anticompetitive business practices. …
>
> Secondary ticketing is extremely competitive, with Ticketmaster competing with StubHub, SeatGeek, Vivid and many others. No serious argument can be made that

> Ticketmaster has the kind of market position in secondary ticketing that supports antitrust claims.
>
> For the past 12 years Live Nation has operated under a Consent Decree that among other things seeks to prevent anticompetitive leveraging of Live Nation promoted content to advantage Ticketmaster. Pursuant to the Amended Decree voluntarily entered in 2020, Live Nation's compliance is monitored by a former federal judge. There never has been and is not now any evidence of systemic violations of the Consent Decree. ***It remains against Live Nation policy to threaten venues that they won't get Live Nation shows if they do not use Ticketmaster, and Live Nation does not re-route content as retaliation for a lost ticketing deal.***

136. These statements were false and misleading because Defendants failed to disclose that: (1) Live Nation engaged in anticompetitive conduct, including improperly tying its underpriced Live Nation concert promotion services to its Ticketmaster services and retaliating against venues that spurned Ticketmaster and improperly restricting consumers' ability to resell tickets using competing secondary ticketing services; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. It was false and misleading to say that Ticketmaster's "significant" share of the primary ticketing services market was due to the inherent superiority of Ticketmaster's services, when it was actually due in material part to anticompetitive practices the Company was engaged in. It was also false and misleading to say that Ticketmaster lacks the market position in the secondary ticketing market that can support antitrust claims, when in truth the Company did hold such a position and did abuse its monopoly power to stymie competition in violation of antitrust laws. Finally, it was false and misleading to say that conditioning or retaliating against venues was against Live Nation's policy when it, in fact, had engaged and continued to engage in that very same conduct.

137. On January 24, 2023, Defendant Berchtold testified before the U.S. Senate Judiciary Committee and made the following statements:

> We hear people say that ticketing markets are less competitive today than they were at the time of the Live Nation-Ticketmaster merger. That is simply not true. In 2009 the Department of Justice alleged that Ticketmaster's market share was over 80%. It is a different story today. The most obvious change is the emergence of the enormous secondary ticketing market, in which Ticketmaster has a modest market share and many strong competitors. But also in primary ticketing, the Ticketmaster of 2010 did not face the level of competition we face today from new competitors including SeatGeek, AEG's AXS, and Eventbrite, along with established competitors including Tickets.com and Paciolan. Today, there is intense competition for every ticketing contract that goes out to bid—far more than there was in 2010. Ticketmaster has lost, not gained, market share, and every year competitive bidding results in ticketing companies getting less of the economic value in a ticketing contract while venues and teams get more. The bottom line is that U.S. ticketing markets have never been more competitive than they are today, and we read about new potential entrants all the time.

138. These statements were false and misleading because Berchtold failed to disclose that: (1) Live Nation engaged in anticompetitive conduct, including improperly tying its underpriced Live Nation concert promotion services to its Ticketmaster services and retaliating against venues that spurned Ticketmaster and improperly restricting consumers' ability to resell tickets using competing secondary ticketing services; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. Thus, it was false and misleading to say that "Ticketmaster has a modest market share and many strong competitors" in the secondary ticketing market because Ticketmaster has a large and growing share and actively engages in anticompetitive conduct aimed at thwarting its

competitors in that market. It was likewise false and misleading to say that "there is intense competition for every ticketing contract that goes out to bid" because Ticketmaster's use of long-term exclusive contracts prevents many contracts from going out to competitive bidders, and the Company uses anticompetitive conduct like conditioning and retaliation to stymie competition in the primary ticketing services market. Similarly, it was false and misleading to say that "U.S. ticketing markets have never been more competitive than they are today, and we read about new potential entrants all the time," because the Company was actively engaged in anticompetitive conduct in the ticketing markets and purposefully imposing significant barriers to entry to dissuade new entrants that could compete with Live Nation in those markets.

139. Live Nation issued a statement on February 23, 2023, stating:

> In the last few weeks alone, we've submitted more than 35 pages of information to provide greater context and transparency to policymakers on the realities of the industry. … We remain committed to working with lawmakers on developing reforms that will benefit fans and artists including those outlined in a FAIR Ticketing Act.

140. These statements were misleading because Defendants failed to disclose that, despite purportedly providing a whopping "more than 35 pages of information" to policymakers, the Company was not cooperating fully with the Senate investigation but was actually stonewalling the Subcommittee's efforts, in an attempt to hide the undisclosed anticompetitive conduct that the Company was engaged in.

141. On February 23, 2023, Live Nation filed its 2022 10-K. Rapino and Berchtold signed the 2022 10-K, which stated:

> Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences. …
>
> … We believe that barriers to entry into the promotion services business are low and that certain local promoters

> are increasingly expanding the geographic scope of their operations.
>
> * * *
>
> We experience competition from other national, regional and local primary ticketing service providers to secure new venues and to reach fans for events. …
>
> We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that we understand have recently entered or could enter these markets.

142. The above statements were false and misleading because Defendants failed to disclose to investors: (1) that Live Nation engaged in anticompetitive conduct, including improperly tying its underpriced Live Nation concert promotion services to its Ticketmaster services and retaliating against venues that spurned Ticketmaster and improperly restricting consumers' ability to resell tickets using competing secondary ticketing services; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm.

143. It was false and misleading to call competition in the live music industry intense when the Company enjoyed monopolistic market power and abused that power to stifle competition. It was misleading to say that the Company competes "primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences" because Defendants omitted that a

material factor in how the Company "competes" in the live music industry is through anticompetitive behavior in violation of antitrust laws. It was false and misleading to say that barriers to entry in the promotion services business are low because Defendants failed to disclose that the Company took efforts to raise those barriers to dissuade potential market entrants by, among other things, using predatory bidding practices subsidized by the Company's much more profitable Ticketing and Sponsorship operations. Similarly, it was misleading to say the Company experiences competition from primary and secondary ticketing service providers when in truth the Company was engaged in anticompetitive conduct aimed squarely at reducing or eliminating competition in those spaces and maintaining the Company's monopolistic position.

144. The 2022 10-K also stated:

> From time to time, federal, state and local authorities and/or consumers commence investigations, inquiries or litigation with respect to our compliance with applicable consumer protection, advertising, unfair business practice, antitrust (and similar or related laws) and other laws. ***Our businesses have historically cooperated with authorities in connection with these investigations and have satisfactorily resolved each such material investigation, inquiry or litigation.***

145. This statement was false and misleading because Defendants failed to disclose that: (1) Live Nation engaged in anticompetitive conduct and was not cooperating fully with the ongoing DOJ and Senate Subcommittee investigations; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. Thus, it was false and misleading to suggest to investors that Live Nation had a practice of full cooperation with investigations, or that the Company was likely to "satisfactorily resolve[]" the DOJ and Senate investigations and potential litigation.

146. The 2022 10-K also stated:

> In the case of antitrust (and similar or related) matters, any adverse outcome could limit or prevent us from engaging in the ticketing business generally (or in a particular segment thereof) or subject us to potential damage assessments, all of which could have a material adverse effect on our business, financial condition and results of operations.

147. This statement was misleading because Defendants failed to disclose that: (1) Live Nation engaged in anticompetitive conduct and was not cooperating fully with the ongoing DOJ and Senate Subcommittee investigations; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. Thus, it was misleading to present as purely hypothetical the risk of an adverse outcome in antitrust matters because Live Nation's anticompetitive actions already created and heightened this existing risk.

148. The 2022 10-K also stated:

> … All three of our segments had revenue growth in the year, with the largest increase coming from our Concerts segment as discussed below. Exceptionally strong demand for live events in the year led to record fan count and ticket sales, powering the concerts center of our business flywheel.
>
> * * *
>
> Our Concerts segment revenue grew by $8.8 billion, from $4.7 billion in 2021 to $13.5 billion in 2022. The revenue growth was a result of more shows and fans coming back to venues to enjoy their favorite artists. …
>
> Our Ticketing segment revenue grew by $1.1 billion, from $1.1 billion in 2021 to $2.2 billion in 2022. Ticketing AOI for the year increased by $407 million, from $421 million in 2021 to $828 million in 2022. Along with an increase in ticket sales, upward pricing momentum and revenue generated from non-service fee sources, while direct costs rose to support higher operations and enterprise growth. Our fee-bearing ticket sales for the year were a record breaking 281 million, over 50 million higher than our previous best year. Our resale business continued to grow, with nearly $4.5

> billion dollars in gross transaction value for 2022, more than doubling resale gross transaction value in 2019. It was our highest resale year ever, powered by both Concerts and all the major sports leagues. …***This is a reflection of the quality of the Ticketmaster platform and its continued popularity with clients across the globe, giving us confidence that the Ticketmaster features and functionality will continue to fuel growth going forward.***

149. Each of these statements were misleading because Defendants failed to disclose that a material factor driving the Company's strong performance in the Concerts and Ticketing segments was the Company's anticompetitive conduct, which was unsustainable due to regulatory scrutiny and investigations of the Company's violations of antitrust laws.

## THE COMPANY'S STOCK PRICE DROPPED UPON REVELATIONS OF REGULATORS' INVESTIGATIONS AND IMMINENT CHARGES

150. On November 18, 2022, after the ticketing platform's systems crashed during a highly-anticipated presale for Taylor Swift tickets, *The New York Times* reported that the DOJ had opened an antitrust investigation into Ticketmaster and Live Nation, "focused on whether Live Nation Entertainment has abused its power over the multibillion-dollar live music industry." The article reported that the DOJ has "in recent months [long-predating the Swift fiasco] contacted music venues and players in the ticket market, asking about Live Nation's practices and the wider dynamics of the industry," and that the "inquiry appears to be broad, looking at whether the company maintains a monopoly over the industry."

151. On this news, Live Nation's stock price fell $5.64, or 7.8%, to close at $66.21 per share on November 18, 2022, on unusually heavy trading volume.

152. The truth continued to emerge on February 23, 2023, when *NPR* reported that the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights called on the DOJ to continue examining the "anticompetitive conduct" of Live Nation and Ticketmaster, citing issues with Live Nation's pricing

models and fees, increasingly long contracts with competitors, and alleged retaliatory behavior against artists and venues that do not want to work with it. In a letter to the Assistant Attorney General for Antitrust, Jonathan Kanter, Senators Amy Klobuchar and Mike Lee wrote:

> As you know, we have long been concerned about the state of competition in America's ticketing industry, especially with the power and reach of Live Nation and its wholly-owned subsidiary, Ticketmaster. We strongly believe that music and live events connect communities and bring people together. For too long, Live Nation and Ticketmaster have wielded monopoly power anticompetitively, harming fans and artists alike.
>
> We recently held a bipartisan hearing in the Senate Judiciary Committee at which the President of Live Nation testified under oath, as did other industry participants, including an artist, a secondary market ticketing company, a promoter, and industry experts. We write to share some of the evidence developed at that hearing and to encourage the Division to follow up on some remaining questions in this industry.
>
> ***As an initial matter, other than Live Nation's executive, every witness at our hearing testified that Live Nation is harming America's music industry.*** For example:
>
> - The Founder and CEO of Seat Geek testified that Ticketmaster now uses even longer exclusive agreements with venues, in some instances as long as ten years.
>
> - Clyde Lawrence, lead singer in the band Lawrence, testified that on a $30 ticket, Live Nation adds $12 in fees, and of that $42 price the customer pays, only $12 goes to the band before accounting for its cost of the tour.
>
> - A competing promoter, Jam Productions, testified that Live Nation attempts to lock up talent so competitors cannot produce concert tours. He also noted that 87

percent of Billboard's Top 40 Tours in 2022 were ticketed by Ticketmaster in the U.S. and that Ticketmaster has exclusive ticketing contracts for more than 85 percent of the nation's NFL, NHL, and NBA teams. (While Live Nation contested the accuracy of this data, it failed to provide any alternative data.)

- A public policy expert at the James Madison Institute testified that Ticketmaster's market dominance allows it to harm consumers through charging service fees and demanding exclusivities. In particular, he noted that the service fees can be greater than 30 percent and "are tacked on at the very end of the process, on the very last screen before purchasing," raising questions about deceptive pricing strategies.

- A former DOJ lawyer testified that the conduct remedies in the 2010 consent decree from the Live Nation-Ticketmaster merger investigation have failed and that such failures constitute hard evidence of the firm's monopoly power. She also testified that "the company still has the power to silence market participants who fear its retaliation."

153. The Senators' letter also stated that "Live Nation's responses amount to 'trust us.' We believe that is wholly insufficient." The Senators also "encourage[d] the Antitrust Division to take action if it finds that Ticketmaster has walled itself off from competitive pressure at the expense of the industry and fans."

154. The *NPR* report revealed for the first time that the Company was facing increased exposure to regulatory scrutiny and the risk of regulatory action, and not merely a fact-finding investigation.

155. On this news, Live Nation's stock price fell $7.71, or 10.1%, to close at $68.78 per share on February 24, 2023, on unusually heavy trading volume. As observed by an article by *Barron's* published on February 24, 2023 entitled "Live Nation's Stock Is Paying for the Taylor Swift Ticket Mess":

> Live Nation Entertainment gave investors an upbeat earnings report and outlook but the stock on Friday was on track for its worst day in nearly a year. ***Worries about regulatory scrutiny and margins may be weighing on shares of the Ticketmaster parent.***

156. On July 28, 2023, at 3:13 p.m. EDT, *Politico* reported that the DOJ "could file an antitrust lawsuit against concert promoter Live Nation Entertainment and its subsidiary Ticketmaster by the end of the year," citing three knowledgeable sources. *Politico* noted that the DOJ complaint is expected to allege that "the entertainment giant is abusing its power over the live music industry." Indeed, *Politico* reported that "a potential case against Ticketmaster has been part of recent discussions about upcoming litigation plans in the department's antitrust division." According to *Politico*, "Live Nation executives were told early on that the investigation is largely focused on the Ticketmaster side of the business, and the DOJ has asked questions on topics including prohibitions on reselling tickets and exclusive deals with venues to only use Ticketmaster."

157. With respect to the investigation, *Politico* reported that "[t]he DOJ is moving quickly, … and its litigation team is involved." As *Politico* explained, "[b]ecause of the federal scrutiny dating back more than a decade and the voluminous information the government is getting from third parties, it might not be necessary to have all of the information that the DOJ is seeking from the company in advance of filing a lawsuit." *Politico* also noted that the head of the DOJ's antitrust division, "[Jonathan] Kanter has said repeatedly that he prefers to litigate rather than settle enforcement actions and has indicated a preference for so-called structural remedies, such as separating lines of business, rather than behavioral fixes, which include promises not to engage in certain types of conduct."

158. The *Politico* report revealed to the market for the first time the likelihood that the DOJ would not just investigate but actually file an antitrust lawsuit against the Company based on its abuse of its monopoly power in the live music industry.

This report revealed a substantial increased risk of regulatory enforcement action against the Company, including the potential divestment of Ticketmaster as a structural remedy.

159. On this news, Live Nation's stock price fell $7.60, or 7.8%, to close at $89.33 per share on July 28, 2023, on unusually heavy trading volume.

160. On November 20, 2023, after the close of markets, *CNBC* reported that a Senate investigative subcommittee had issued a subpoena to Live Nation and its Ticketmaster subsidiary "for information regarding ticket pricing and fees after a months-long probe that had not been previously announced."

161. In a letter accompanying the subpoena, Senator Richard Blumenthal, Chairman of the Senate Permanent Subcommittee on Investigations ("PSI"), wrote:

> PSI first wrote to Live Nation/Ticketmaster on March 24, 2023, seeking documents and information in connection with this inquiry. Despite nearly eight months and extensive efforts to obtain voluntary compliance, Live Nation/Ticketmaster has failed to fully comply with PSI's requests, including refusing to produce certain documents critical to the Subcommittee's inquiry.

162. In a statement on the same day, Senator Blumenthal said that "Live Nation has egregiously stonewalled my Subcommittee's inquiry into its abusive consumer practices — making the subpoena necessary," and that "This subpoena demands that the company promptly comply with our request for documents essential to understand its business practices. American consumers deserve fair ticket prices, without hidden fees or predatory charges. And the American public deserves to know how Ticketmaster's unfair practices may be enabled by its misuse of monopoly power."

163. According to the *CNBC* report, the Senate subpoena seeks documents and internal communications about "ticket pricing, fees, and resale practices as well as the company's relationship with artists and venues."

164. The news about the Senate subpoena revealed for the first time that Live Nation had "stonewalled," not fully cooperated with, the Senate Subcommittee's investigation into the Company's unfair practices and misuse of monopoly power. This demonstrated to the market that the Senate Subcommittee was still vigorously scrutinizing the Company's anticompetitive business practices and that the Company was exposed to significant regulatory risk on top of the DOJ's investigation.

165. On this news, Live Nation's stock price fell $2.78, or roughly 3%, to close at $87.04 per share on November 21, 2023, on unusually heavy trading volume.

166. On May 23, 2024, the DOJ filed a 128-page complaint against Live Nation. The DOJ's complaint alleged violations of the Sherman Act and various state competition and consumer protection laws. Specifically, the DOJ alleged that Live Nation: (1) monopolized the markets for primary ticketing services, concert promotion services, and the use of large amphitheater venues; (2) engaged in unlawful exclusive dealing; and (3) engaged in unlawful tying arrangements concerning the use of large amphitheater venues and artist promotions markets. The DOJ's complaint included substantial factual allegations based on its multi-year investigation of Live Nation and its competitors in the relevant markets for major concert venues.

167. The DOJ complaint echoed Plaintiffs' allegations of a lack of competition and Live Nation's ongoing use of anticompetitive conduct to further entrench its monopolistic positions, including conditioning, retaliation, long-term exclusive contracts, acquiring competitors and competitive threats, and restricting access to artists and venues. For example, the DOJ alleged that Rapino publicly threatened that Live Nation would steer concerts away from venues that do not use Ticketmaster:

> We can't say to a Ticketmaster venue that says they want to use a different ticketing platform, "If you do that, we won't put shows in your building." … [But] we have to put the show where we make the most economics, and maybe that venue … won't be the best economic place anymore.…

168. The DOJ complaint also alleged that Live Nation had a collusive agreement with Oak View Group ("OVG"), a leading U.S. venue development and management company formed by the former CEOs of AEG and Ticketmaster and former chairman of Live Nation. OVG's CEO told Rapino "we 100% always protect you and LN on your lanes." Despite OVG's positioning to potentially challenge Live Nation as a serious competitor, the two companies allegedly agreed not to compete directly with each other so as not to let artists and venues "start playing us off [each other]," in Rapino's own words. After Live Nation and OVG entered into a long-term agreement in 2022, OVG has allegedly pushed venues to renew or sign contracts with Ticketmaster, subverting the venues' ticketer selection process.

169. The DOJ also alleged how Live Nation uses "carrots" and "sticks" to lock venues into long-term exclusive deals with Ticketmaster, noting that even Live Nation's biggest competitor, AEG, had to maintain its subsidiaries' contracts with Ticketmaster out of fear that Live Nation would retaliate by withholding Live Nation shows from AEG venues, even though AEG has its own in-house competing ticketing services provider, AXS.

170. The DOJ also alleged how Ticketmaster's long-term exclusive contracts "[h]edge against significant improvements by the competition or even a new competitor" because the "client is under contract for longer and not able to leave [Ticketmaster] or price the competition's offer into our new deal for an extended time." Ticketmaster consistently renews these deals before they expire and allegedly even used the COVID-19 pandemic to extend its agreements further, preventing rivals from even having the opportunity to bid on ticketing contracts. According to the DOJ, Ticketmaster has also refused to allow venues to pursue non-exclusive ("open") ticketing contracts which would also expand competition and benefit venues and consumers.

171. The DOJ also reiterated Plaintiffs' allegations about Live Nation's use of SafeTix technology to reduce competition for secondary ticketing services. The DOJ also alleged that "Live Nation senior executives know the company has restricted the use of its amphitheaters and other venues for years," to prevent competing promoters from using its venues and forcing artists to use Live Nation. The DOJ also contends Live Nation has strategically acquired competitors to eliminate potential rivals, recognizing that one of its "Biggest Competitor Threats" is smaller and regional independent promoters that have the ability to "com[e] in from the edges creating events, opening venues, and purchasing artist inventory."

172. On this news, Live Nation's stock price fell $7.92, or roughly 7.8%, to close at $93.48 per share on May 23, 2024, on unusually heavy trading volume.

## ADDITIONAL SCIENTER ALLEGATIONS

173. Plaintiffs allege that each of the false and misleading statements and omissions identified above was made with Defendants' knowledge or severely reckless disregard of the falsity of those statements.

174. The scienter of the Individual Defendants and other employees and agents of the Company is imputed to the Company under *respondeat superior* and agency principles. This is particularly true with respect to Defendants Rapino and Berchtold, executive officers of the Company who were sufficiently senior in the organization that it is proper to impute their scienter to Live Nation.

175. Rapino had a significant personal financial incentive to commit securities fraud. During a roughly six-month stretch of the Class Period, from March 16, 2022 through September 23, 2022, Rapino sold 2,467,343 shares of Live Nation common stock, for gross proceeds of over $250 million. Those sales equate to roughly 83% of Rapino's holdings as of March 16, 2022.

176. To the extent Rapino's stock sales were made pursuant to a 10b5-1 trading plan, it is unclear when the plan was entered into and whether at that time

Rapino was in possession of non-public material facts pertinent to Plaintiffs' allegations of false, thus the mere existence of a 10b5-1 trading plan does not negate the strong inference of scienter created by Rapino's substantial Class Period stock sales. Moreover, the timing of the sales was suspicious because they coincided with the onset of the DOJ's then-undisclosed investigation in the summer of 2022.

## CLASS ACTION ALLEGATIONS

177. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and the Class.

178. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Live Nation's common stock actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of shares of Live Nation common stock were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Live Nation or its transfer agent and may be notified of the pendency of this action by mail or email, using the form of notice similar to that customarily used in securities class actions.

179. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

180. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

181. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether, during the Class Period, Defendants made false or misleading statements of material fact to the investing public, or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) whether the Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(d) whether Defendants acted negligently, knowingly, or recklessly in issuing, or causing the Company to issue, false and misleading SEC filings and public statements during the Class Period;

(e) whether the price of the Company's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

182. Plaintiffs will rely in part upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) during the Class Period, Defendants made public statements of material fact that were false, misleading, or were rendered misleading because of Defendants' failure to disclose material facts necessary to prevent such statement from being misleading; (b) as a result of the false and misleading statements and omissions of material fact, the Company's common stock traded at artificially inflated prices during the Class

Period; (c) Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock relying on the integrity of the market price of the Company's common stock and market information relating to the Company, and have been damaged thereby.

183. During the Class Period, the artificial inflation of the Company's common stock was caused by Defendants' material misrepresentations and omissions as described above, causing the damages sustained by Plaintiffs and the other members of the Class. Defendants' material misrepresentations and omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, causing the price of the Company's common stock to be artificially inflated at all relevant times, including when Plaintiffs and other members of the Class purchased the stock. When the truth hidden by these misrepresentations and omissions was disclosed, those disclosures negatively affected the value of the Company's common stock, dissipating the artificial inflation and damaging Plaintiffs and other members of the Class.

184. The market for the Company's common stock was an efficient market at all times during the Class Period for the following reasons, among others:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

(d) The Company's shares were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 10.2 million shares of the Company's common stock, or roughly 4.4% of

Live Nation's total shares outstanding, were traded weekly during the Class Period, permitting a very strong presumption that its shares traded on an efficient market;

(e) During the Class Period, the Company's common stock met the requirements for listing, and were listed and traded on the NYSE, a highly efficient and automated market;

(f) The Company was covered by several securities analysts employed by brokerage firms who wrote reports about the Company, which were distributed to customers, made publicly available, and entered the public marketplace;

(g) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(h) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's securities prices during the Class Period.

185. Based on the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the Company's common stock shares. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and thus are entitled to a presumption of reliance.

186. Alternatively, Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are in large part grounded on Defendants' omissions of material facts in their Class Period

statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

187. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

188. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

## COUNT I

## Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants)

189. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

190. This Count is asserted against Defendants Live Nation, Rapino, and Berchtold and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

191. During the Class Period, Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew, or disregarded with severe recklessness, were false and/or misleading in that they contained misrepresentations and/or failed to disclose material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

192. Defendants acted with scienter in that they knew, or disregarded with severe recklessness, that the public statements they made were materially false and misleading; knew, or disregarded with severe recklessness, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents.

193. Rapino and Berchtold, senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity or misleading nature of the statements set forth above, and intended to deceive Plaintiffs and other members of the Class, or, in the alternative, acted with severely reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and Class.

194. As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and members of the Class relied on the statements described above and/or the integrity of the market price of the Company's common stock during the Class Period in purchasing the Company's common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements and omissions.

195. Had Plaintiffs and members of the Class been aware that the market price of the Company's common stock had been artificially inflated by Defendants' false and misleading statements and by the material adverse information which they did not disclose, they would not have purchased the Company's common stock at the artificially inflated prices that they did, or at all.

196. As a result of the wrongful conduct alleged herein, Plaintiffs and members of the Class have suffered damages in an amount to be established at trial.

197. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

198. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

199. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations. In performing their responsibilities in their senior positions, they knew the adverse non-public information regarding the Company's business practices.

200. As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

201. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the public filings which the Company disseminated in the marketplace during the Class Period.

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

202. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain. The Individual Defendants also had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

203. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment, as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiffs as class representatives and Plaintiffs' counsel and class counsel;

B. Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class prejudgment and post-judgment interest and their reasonable costs and expenses incurred in prosecuting this action, including reasonable attorneys' fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: March 14, 2025

**THE ROSEN LAW FIRM, P.A.**

By: */s/Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim (*pro hac vice* forthcoming)
Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Email: clinehan@glancylaw.com
Email: esams@glancylaw.com

*Co-Lead Counsel for Plaintiffs and the Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Brian Donley*