Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs*
*and the Settlement Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN DONLEY, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>LIVE NATION ENTERTAINMENT, INC., MICHAEL RAPINO, and JOE BERCHTOLD,<br><br>        Defendants. | Case No. 2:23-cv-06343-KK-AS<br><br><u>CLASS ACTION</u><br><br>**JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II IN SUPPORT OF: (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES** |

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................... 1

II.     PROSECUTION OF THE ACTION.................................................................... 4

        A.      Background .................................................................................................. 4

        B.      Commencement of the Instant Action ...................................................... 4

        C.      Lead Counsel's Investigation, the First Amended Complaint, And
                Defendants' Motion To Dismiss ............................................................... 4

        D.      Discovery Efforts ........................................................................................ 6

        E.      The Mediation Process Results in a Settlement ...................................... 7

        F.      Preliminary Approval of the Settlement .................................................. 8

III.    THE RISKS OF CONTINUED LITIGATION ................................................. 9

        A.      Risks to Proving Liability .......................................................................... 9

        B.      Risk of Proving Loss Causation and Damages ...................................... 11

        C.      Other Risks, Including Class Certification, Trial And Appeals ........... 14

        D.      The DOJ's Investigation and Action Do Not Weigh Against Approval
                ..................................................................................................................... 16

        E.      The Settlement is Reasonable in Light of Potential Recovery in the
                Action ........................................................................................................ 17

IV.     LEAD PLAINTIFFS DULY EXECUTED THE COURT-APPROVED
        NOTICE PROGRAM ........................................................................................ 19

V.      OBJECTIONS AND EXCLUSIONS ............................................................... 22

VI.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT.......... 23

VII.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND
        REIMBURSEMENT OF LITIGATION EXPENSES........................................ 26

        A.      The Fee Application..................................................................................26

1. The Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action ............................ 26

2. Standing and Caliber of Opposing Counsel ..................................... 29

3. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases ............................................................................................................ 30

4. The Reaction of the Settlement Class to the Fee Application ..... 31

5. Lead Plaintiffs Support the Fee Application .................................. 32

B. Reimbursement of the Requested Litigation Expenses Is Fair and Reasonable ...................................................................................................... 32

VIII. CONCLUSION ........................................................................................................ 34

**TABLE OF EXHIBITS TO DECLARATION**

| EXHIBIT | TITLE |
|---|---|
| 1 | Declaration of Brian Donley in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 2 | Declaration of Gene Gress in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 3 | Declaration of Adam D. Walter Concerning: (A) Mailing and Emailing of Notice; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date |
| 4 | Declaration of Joshua Baker in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of The Rosen Law Firm, P.A. |
| 5 | Declaration of Ex Kano S. Sams II in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Glancy Prongay & Murray LLP |
| 6 | Excerpts from Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2025) |
| 7 | Table of Select Ninth Circuit Cases with 30% or Above Fee Awards |
| 8 | Survey of Law Firm Billing Rates – Plaintiffs' and Defense Firms |
| 9 | Biography of Mediator Hon. Layn R. Phillips |

We, Joshua Baker and Ex Kano S. Sams II, jointly declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

I.      INTRODUCTION

1.      Court-appointed lead counsel The Rosen Law Firm, P.A. ("Rosen Law") and Glancy Prongay & Murray LLP ("GPM" and, together with Rosen Law, "Lead Counsel"), are counsel for lead plaintiffs Brian Donley and Gene Gress ("Lead Plaintiffs") in the above-captioned action (the "Action").[1] We oversaw or conducted the day-to-day activities in the Action on behalf of our respective firms. We are familiar with the proceedings in this litigation, and we have personal knowledge of the matters set forth herein based upon supervising and participating in all aspects of the Action.

2.      We submit this declaration, together with the attached exhibits, in support of Lead Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $20,000,000 settlement ("Settlement") that the Court preliminarily approved by Order dated April 25, 2025 ("Preliminary Approval Order") (ECF No. 92), as well as of the proposed plan ("Plan of Allocation") for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members ("Final Approval Motion").

3.      We also submit this declaration in support of Lead Counsel's motion for: (a) an award of attorneys' fees in the amount of 30% of the Settlement Fund (*i.e.*, $6,000,000, plus interest earned at the same rate as the Settlement Fund); and (b) reimbursement of Litigation Expenses in the total amount of $142,613.30, including awards of $12,500 total to Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs, including for time spent, incurred in connection with their representation of the Settlement Class ("Fee Application").

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation and Agreement of Settlement dated March 21, 2025 ("Stipulation") (ECF No. 89-1).

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

4. This is a securities class action brought pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Lead Plaintiffs assert claims against Defendants Live Nation Entertainment, Inc. ("Live Nation" or the "Company"), Michael Rapino, and Joe Berchtold (collectively, "Defendants") for alleged false and misleading statements and omissions of material fact regarding Live Nation's alleged anticompetitive conduct, level of competition in key markets, cooperation with regulatory and Congressional investigations, and the risk of incurring regulatory scrutiny and severe penalties. Lead Plaintiffs alleged that the price of Live Nation's publicly traded common stock was artificially inflated as a result of Defendants' alleged false and misleading statements, and Live Nation's stock price declined when the truth was revealed through a series of partial disclosures principally concerning the investigation and civil complaint by the U.S. Department of Justice ("DOJ") into alleged anticompetitive conduct by Live Nation.

5. The proposed Settlement provides for the resolution of all claims in the Action in exchange for a non-reversionary, all cash payment of $20,000,000. As detailed below, Lead Counsel believes that the Settlement represents a favorable result for the Settlement Class, especially when juxtaposed against the significant risks of continued litigation. Indeed, Defendants had advanced, and would continue to advance, serious arguments with respect to liability, loss causation, and damages. If any of these arguments were accepted, Lead Plaintiffs' potential recovery would have been substantially reduced, if not completely eliminated.

6. Moreover, the Settlement is the product of a mediator's proposal, by a well-respected mediator of securities class actions, following, *inter alia*: (a) a comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class; (b) briefing Defendants' motion to dismiss; (c) substantial document discovery from Defendants and third parties; and (d) a full-day mediation session during which experienced counsel forcefully

advocated on behalf of their respective clients.  The Settlement is substantively fair, and was achieved through a fair process, and thus Lead Counsel believes that it is in the best interest of the Settlement Class and should be approved.

7.    In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed plan of allocation ("Plan of Allocation" or "Plan") as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiffs' consulting damages expert.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  Courts routinely approved similar allocation plans, and Lead Counsel believes that the proposed Plan of Allocation here should likewise be approved.

8.    Lead Counsel also seek approval of the requests in the Fee Application. As detailed in the concurrently filed memorandum of law in support thereof, as well as Exhibits 4-5 hereto, the requested 30% fee is well within the range of percentage awards granted by courts in this Circuit in comparable complex litigation, and is a fair and reasonable amount in light of the work performed and the result obtained. Moreover, the out-of-pocket expenses incurred were all reasonable and necessary for the prosecution of the Action.  The amounts of fees and expenses requested both fall comfortably within the maximum figures proposed in the Postcard Notice sent to the Settlement Class, and to date no Settlement Class Member has objected to either request.

9.    For these reasons and those discussed below, Lead Counsel respectfully submit that the $20 million Settlement should be approved as fair, reasonable, adequate, that the proposed Plan of Allocation is equitable and just, and that the

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

requested attorneys' fees of 30% of the $20 million Settlement Fund and reimbursement of Litigation Expenses should be awarded in full.

## II.     PROSECUTION OF THE ACTION

### A.     Background

10.     Live Nation is the largest live entertainment company in the world.  Lead Plaintiffs allege that Defendants made several false and misleading statements during the Settlement Class Period concerning Live Nation's anticompetitive practices and the level of competition (or lack thereof) that Live Nation faced in its key markets. Lead Plaintiffs alleged they and the other Settlement Class Members were misled by these statements during the Settlement Class Period, and were damaged as a result thereof when the truth was slowly revealed through a series of partial disclosures culminating with the filing of the DOJ's complaint against Live Nation alleging violations of antitrust laws closely tracking Plaintiffs' allegations.

### B.     Commencement of the Instant Action

11.     On August 4, 2023, Donley filed the initial class action complaint in this Action.  ECF No. 1.  The complaint alleged violations of the Exchange Act against defendants Live Nation, Rapino, and Berchtold.

12.     On October 18, 2023, the Court appointed Donley and Gress to serve as Lead Plaintiffs and approved their selection of GPM and Rosen Law to serve as Lead Counsel.  ECF No. 27.

### C.     Lead Counsel's Investigation, the First Amended Complaint, And Defendants' Motion To Dismiss

13.     Following the appointment of Lead Plaintiffs and Lead Counsel, Lead Counsel conducted a thorough investigation into Defendants' allegedly wrongful acts, which included, among other things: (a) reviewing and analyzing (i) Live Nation's filings with the SEC, (ii) public reports, research reports prepared by securities and financial analysts, and news articles concerning Live Nation, (iii) Live Nation's investor call transcripts, press releases, and other public statements made by

Defendants prior to, during, and after the Settlement Class Period, and (iv) other publicly available material related to Live Nation, including current and prior complaints alleging anticompetitive conduct by Live Nation; and (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information. Lead Counsel also consulted with a damages and loss causation expert.

14. On November 30, 2023, Lead Plaintiffs filed their Amended Class Action Complaint for Violations of the Federal Securities Laws ("First Amended Complaint"), against the same Defendants. ECF No. 40. Among other things, the First Amended Complaint alleged that Defendants made materially false and misleading statements and omissions, in violation of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, including by misleadingly failing to disclose that: (a) Live Nation engaged in anticompetitive conduct, which was the true source of its business growth, including improperly tying its underpriced concert promotion services to its Ticketmaster services, retaliating against venues that spurned Ticketmaster, and restricting consumers' ability to resell tickets using competing secondary ticketing services; (b) Live Nation did not face significant competition; (c) Live Nation was not cooperating with investigations by the DOJ and a Senate subcommittee; and (d) as a result, Live Nation was likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. Lead Plaintiffs further alleged that the prices of Live Nation's publicly traded common stock were artificially inflated as a result of Defendants' allegedly false and misleading statements and that the price of Live Nation's common stock declined when the truth was gradually revealed through a series of partial disclosures. Lead Plaintiffs asserted these allegations on behalf of themselves and a putative class of Live Nation shareholders who, between February 23, 2022 and November 20, 2023, both dates inclusive, purchased the publicly traded common stock of Live Nation. *Id.*

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

15.    On December 22, 2023, Defendants moved to dismiss the First Amended Complaint.  ECF No. 44.  Lead Plaintiffs filed their opposition to the motion to dismiss on January 11, 2024.  ECF No. 47.  On January 25, 2024, Defendants filed a reply in support of their motion to dismiss.  ECF No. 50.

16.    The Court denied Defendants' motion to dismiss in its entirety on February 23, 2024.  ECF No. 52.

17.    On March 27, 2024, Defendants filed their answer to the First Amended Complaint.  ECF No. 59.  In addition to denying the allegations in the First Amended Complaint, the Defendants asserted seventeen affirmative defenses.

18.    On March 13, 2025, the Parties filed a Joint Stipulation for Leave to File Second Amended Complaint, which was approved by the Court on March 14, 2025.  ECF Nos. 84-85.  On March 14, 2025, Lead Plaintiffs filed the Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC").  ECF No. 86.  The SAC includes the allegations from the First Amended Complaint, as well as additional allegations relating to the DOJ's May 23, 2024 complaint, which postdated the First Amended Complaint and the Court's order denying Defendants' motion to dismiss and predated the Parties' settlement discussions and mediation (discussed below).

**D.    Discovery Efforts**

19.    Discovery began only after the Court denied Defendants' motion to dismiss, lifting the PSLRA's automatic discovery stay.  Lead Counsel and Defendants' Counsel met and conferred pursuant to Rule 26(f), pursuant to which the Parties thereafter filed a joint case management statement on March 7, 2024.  ECF No. 57.

20.    The Parties served and responded to interrogatories and requests for production of documents, and Lead Plaintiffs served 12 subpoenas *duces tecum* on third parties.  Defendants produced approximately 55,209 documents, consisting of 140,352 pages (including certain of Defendants' emails and business records), and

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

certain non-parties produced approximately 11,766 documents, consisting of 52,125 pages, pursuant to the subpoenas issued by Lead Plaintiffs. These documents were reviewed, analyzed, and distilled into a workable set of "hot" documents. Lead Counsel analyzed documents and noted related issues, including, but not limited to, evidence of each Individual Defendant's scienter, evidence demonstrating the materiality of the statements at issue in the case, discussions of agreements with potential competitors, and discussions of competition levels and Live Nation's influence in various markets. Reviewing attorneys were tasked with making several analytical determinations as to evidentiary importance and relevance. They also drafted memoranda summarizing their analysis of all evidence of escalated relevance. Regular team meetings were held to discuss, *inter alia*, the status of the document review, the evidence uncovered to date, and the adequacy and scope of the production.

21. The Parties also engaged in substantial negotiations related to, among other things, the scope of discovery, scheduling, a protective order that was entered by the Court, and an Electronic Discovery Protocol that was entered by the Court. ECF Nos. 64 and 70.

### E.    The Mediation Process Results in a Settlement

22. While the Parties were actively engaging in fact discovery, they agreed to participate in a private mediation. The Parties selected former United States District Court Judge Layn R. Phillips to serve as mediator. Judge Phillips has successfully mediated numerous complex commercial cases, including many securities class action cases. A copy of Judge Phillips's biography is attached hereto as Exhibit 9.

23. Prior to the mediation, Lead Plaintiffs and Defendants exchanged extensive mediation statements and exhibits that addressed, among other things, issues related to liability and damages. On November 13, 2024, the Parties participated in a full-day mediation session with Judge Phillips. The session ended without an agreement being reached, however, Judge Phillips continued to work with

7

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

the Parties.  Following subsequent negotiations, Judge Phillips made a double-blind mediator's proposal to resolve the Action for $20,000,000 in cash for the benefit of the Settlement Class.  The Parties each accepted the mediator's proposal.

24.    The agreement in principle to settle the Action was memorialized in a term sheet dated November 27, 2024.  The term sheet set forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a cash payment by or on behalf of Defendants of $20,000,000 for the benefit of the Settlement Class, subject to certain terms and conditions, including the execution of a customary "long form" stipulation and agreement of settlement and related papers.

**F.    Preliminary Approval of the Settlement**

25.    The Parties thereafter worked diligently to finalize the Settlement, which involved numerous complex terms and other issues that required substantial negotiation among the Parties.  The terms of the Settlement are memorialized in the Stipulation dated March 21, 2025.  ECF No. 89-1.

26.    On March 21, 2025, Lead Plaintiffs moved for preliminary approval of the Settlement.  ECF Nos. 88-89.

27.    On April 25, 2025, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice.  ECF No. 92.  The order preliminarily approved the Settlement, conditionally certified the Settlement Class for settlement purposes only, appointed Lead Plaintiffs as Class Representatives, appointed Lead Counsel as Class Counsel, approved the proposed procedure to provide notice of the Settlement to potential Settlement Class Members, and set August 28, 2025, as the date for the final approval hearing.  *Id.*  The Settlement Class is defined as:

> all persons and entities that purchased the publicly traded common stock of Live Nation between February 23, 2022 and May 22, 2024, both dates inclusive ("Settlement Class Period"). Excluded from the Settlement Class are: (a) persons and entities that suffered no compensable losses; and (b)(i) Defendants; (ii) any person who served

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

as a partner, control person, officer and/or director of Live Nation during the Settlement Class Period, and members of their Immediate Families; (iii) present and former parents, subsidiaries, assigns, successors, affiliates, and predecessors of Live Nation; (iv) any entity in which any excluded person or entity has or had a controlling interest; (v) any trust of which an Individual Defendant is the settlor or which is for the benefit of an Individual Defendant and/or member(s) of their Immediate Families; and (vi) the legal representatives, heirs, successors, predecessors, and assigns of any person or entity excluded under provisions (i) through (v) hereof. Also excluded from the Settlement Class are any persons and entities who or which submit a request for exclusion from the Settlement Class that is accepted by the Court. For the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants.

## III.    THE RISKS OF CONTINUED LITIGATION

28.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary, all cash payment of $20,000,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case proceeded through additional years of litigation to a potential verdict, followed by the inevitable appeals. Defendants asserted, or could have asserted, many non-frivolous arguments with respect to liability, loss causation, and damages in this case. These arguments, among many risks, were carefully considered in evaluating whether the Settlement was in the Settlement Class's best interests. At bottom, there was simply no guarantee that Lead Plaintiffs and the Settlement Class would achieve any recovery, let alone one greater than $20 million.

### A.    Risks to Proving Liability

29.    Lead Plaintiffs and Lead Counsel recognized that this Action presented a number of substantial risks to establishing liability.

30.    Defendants forcefully argued in their motion to dismiss, and undoubtedly would continue to argue at summary judgment and trial, that Plaintiffs

must prove complex violations of antitrust law in order to prove the elements of falsity and scienter. Allegations of anticompetitive conduct, or lack of market competition, are tentpoles of antitrust litigation, which is itself notoriously complex. Proving those allegations would require extensive discovery (beyond what Plaintiffs had already undertaken at the time of settlement, including significant additional third-party discovery) and would entail an expensive and extensive "battle of the experts," where each side would propound expert economic analysis on several different issues, including purported "procompetitive" effects of Live Nation's conduct and market definition.

31. In their motion to dismiss, Defendants argued that Plaintiffs failed to allege the falsity of their challenged statements. ECF No. 44 at 7-15. Defendants argued that many of their statements were inactionable as forward-looking statements, puffery, or opinions. Defendants also argued that they had no duty to disclose uncharged, unadjudicated wrongdoing. And Defendants argued that Plaintiffs failed to plead facts showing the falsity of their statements concerning antitrust investigations and risks, competition in Live Nation's industry, and the drivers of Live Nation's performance.

32. Even if Lead Plaintiffs could demonstrate falsity, Defendants would have continued to contest scienter. Plaintiffs would need to prove that Defendants not only engaged in the alleged anticompetitive conduct, or that Live Nation lacked real competition in its primary markets, but also that they misled investors knowingly or with deliberate recklessness in their statements. Defendants argued in their motion to dismiss that they lacked scienter because "Defendants did not believe that the Company's actions violate the antitrust laws." *Id.* at 16. Defendants also argued that Rapino's increased ownership of Live Nation stock over the class period undercut any inference of scienter. *Id.* at 17. In addition, Defendants argued that no particularized facts were pled showing their knowledge of the alleged fraud. *Id.* at 19.

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

33.    There was also no assurance that Lead Plaintiffs would be able to ascertain evidence and testimony sufficient to prove their allegations, or that such evidence would be accepted by the Court at summary judgment or trial.  Some of the key events at issue took place several years ago.  Memories fade, documents are lost, and Lead Plaintiffs would have had to rely on testimony from people who may well have a personal or professional relationship with Defendants to prove their case.  Moreover, at the time the Parties reached the Settlement, the deadline for completion of document production was rapidly approaching.  ECF No. 77 at 2.  While Plaintiffs believe that many of the documents produced supported their claims, they had not found a "smoking gun"—such as an admission that Defendants were knowingly committing antitrust violations.  In fact, Defendants forcefully argued that many of the documents produced would defeat falsity, scienter, and Plaintiffs' claims as a whole.    These issues could have seriously affected Lead Plaintiffs' ability to successfully prosecute this Action.

34.    Despite believing this Action is meritorious, Lead Plaintiffs and Lead Counsel were well aware of the high hurdles they would have to surmount to successfully prove Defendants' liability under the federal securities laws.

**B.    Risk of Proving Loss Causation and Damages**

35.    Even assuming that Lead Plaintiffs overcame the risks to establishing Defendants' liability, Lead Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.

36.     In their motion to dismiss, Defendants argued that Plaintiffs could not show loss causation because the alleged corrective disclosures merely reflected speculation, not any concealed facts.  ECF No. 44 at 20.  Defendants argued that the February 2023 NPR article showed only disagreement among lawmakers and that the DOJ had not yet decided whether Live Nation had engaged in anticompetitive practices.  *Id.* at 21.  Defendants also argued that the July 2023 Politico article simply reported rumors from anonymous sources that the DOJ *might* bring a case against

Live Nation. *Id.* And Defendants argued that the November 2023 CNBC report could not be corrective because it related to a Senate subcommittee document request issued *after* Defendants' last alleged false statement. *Id.* at 22. If the Action were litigated to class certification and summary judgment, Lead Counsel expects that Defendants would have continued to make these arguments, with the added benefit of supporting information and expert testimony produced in discovery, and would have made additional arguments against loss causation.

37. Lead Counsel expects that Defendants would have argued that confounding information defeated the February 2023 corrective disclosure. The February 23, 2023, NPR article "Senators are calling on the Justice Department to look into Ticketmaster's practices" was published during regular stock market trading hours, and Live Nation's stock price ended the day modestly higher than its prior day closing price. After the close of trading on February 23, 2023, Live Nation introduced substantial new information into the market, publishing a press release reporting fourth quarter and full year 2022 results, and publicly filing its annual report on Form 10-K with the SEC, which Defendants would likely have argued revealed a wider than expected loss. As such, Lead Counsel expects that Defendants would have argued that there can be no loss causation attributed to the NPR article for the stock price decline alleged on the following day, February 24, 2023.

38. Lead Counsel also expects that Defendants would have argued that the July 28, 2023, Politico article—"Ticketmaster could face new legal threat this fall, sources say"—revealed no new information to the market, because it was already publicly known that the DOJ had opened an investigation into Live Nation that could result in an antitrust suit, and at that time the DOJ had not even decided whether to file a suit against Live Nation or reached a conclusion as to whether Live Nation committed any antitrust violations. As to the November 20, 2023. CNBC report— "Senate committee subpoenas Live Nation, Ticketmaster after months-long probe"— Lead Counsel expects that Defendants would challenge whether the movement in

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

Live Nation's stock price the following day was statistically significant in comparison to other companies in its peer industry. Thus, in addition to the risks to Plaintiffs' ability to establish loss causation in general, Lead Counsel believes there were particularly acute risks as to the February 2023, July 2023, and November 2023, alleged corrective disclosures.

39. Pursuant to *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), it is Lead Plaintiffs' burden to prove loss causation and damages. This would require Lead Plaintiffs to proffer expert testimony as to: (a) what the "true value" of Live Nation common stock would have been had there been no alleged material misstatements; (b) the amount by which Live Nation common stock was artificially inflated by the alleged material misstatements; and (c) the amount of artificial inflation removed by the purported corrective disclosures made in November 2022, February 2023, July 2023, November 2023, and May 2024. Defendants almost certainly would have retained their own damages expert(s) to present conflicting conclusions and theories as to the reasons for the declines in Live Nation common stock on the alleged disclosure dates. Were any of these arguments to succeed, damages would have been significantly reduced, if not eliminated. *See infra* ¶¶49-52 (discussing alternative damages estimates).

40. The burden of proving loss causation and damages would require a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process. Additionally, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury. As this Court is no doubt aware, a jury's reaction to complicated expert testimony is highly unpredictable, and there is always the possibility that a jury could be swayed by Defendants' expert(s) and award only a fraction of the damages that Lead Plaintiffs contend were suffered by the Settlement Class. Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

## C.    Other Risks, Including Class Certification, Trial And Appeals

41.    In addition, any future recovery would require Lead Plaintiffs to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this one.  For example, Lead Plaintiffs would have to move to certify the class, and while Lead Counsel is confident that all of the Rule 23 requirements are met, and that the Court would have certified the proposed class, Defendants would have almost certainly raised arguments challenging the propriety of class certification.  Even if Plaintiffs' class certification motion was granted, this would likely result in Defendants filing a Rule 23(f) petition for appellate review, and there would remain a risk that the class could be de-certified at a later stage in the case.  *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 81 (2d Cir. 2023) (de-certifying the class and effectively ending the case—after approximately 13 years of litigation—based on 2021 Supreme Court decision).

42.    The arguments raised with respect to loss causation and damages could have also posed a substantial risk to class certification as Defendants would argue a lack of price impact.  *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) (directing courts to consider "all evidence relevant to price impact" at the class certification stage).[2]  In particular, Lead Counsel expects Defendants would have argued that there was a "mismatch" between the generality of alleged misstatements concerning compliance and competition, as compared to the specific corrective disclosures.  *See id.*  And, as there were only two plaintiffs, if Defendants were able to demonstrate that the Plaintiffs were atypical in any way, it could put the entire case at risk.

43.    Lead Plaintiffs would also have to complete substantial additional fact and expert discovery, which would entail, among other things, negotiation of

---

[2] Arguments about price impact generally do not weigh against class certification for settlement purposes. *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 232 (2d Cir. 2012).

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

additional document production, review and analysis of additional documents produced by Defendants and third parties, taking and defending percipient and expert depositions, propounding and responding to interrogatories and requests for admission, and defending Lead Plaintiffs' depositions. The costs of each of these tasks would assuredly be high, and the fruits of each endeavor would be highly uncertain. Furthermore, Lead Plaintiffs would have to successfully navigate and prevail against Defendants' anticipated motion for summary judgment, as well as at trial. And finally, even if Lead Plaintiffs prevailed on all of those stages, they would have to succeed on the appeals that would surely follow. This process could extend for years and might ultimately lead to a smaller recovery, or no recovery at all. Indeed, even prevailing at trial would not guarantee a recovery larger than the $20,000,000 Settlement.[3]

44.     Lead Counsel know from painful experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this case is never assured. For instance, Lead Counsel GPM lost a six-week antitrust jury trial in this Circuit after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.); *see also Gross v. GFI Group, Inc.*, 310 F. Supp. 3d 384, 399 (S.D.N.Y. 2018) (GPM served as Co-Lead Counsel in case where the Court granted summary judgment for defendants following four years of litigation, discovery in the U.S. and U.K., and the expenditure of millions

---

[3] *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (overturning jury verdict for plaintiffs after extended trial).

15
JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

of dollars of attorney time and hard costs), *aff'd on other grounds* 784 F. App'x 27 (2d Cir. Sept. 13, 2019).

45.     Similarly, in *In re ChinaCast Education Corporation Sec. Litig.*, No. 2:12cv-04621-JFW-PLA (C.D. Cal.), as Co-Lead Counsel, Rosen Law diligently pursued a securities class action for about six years against ChinaCast Education Corporation, a Delaware company operating in China. The effort included a successful appeal at the Ninth Circuit, which reversed the district court's dismissal decision. ChinaCast's insurers refused to cover litigation costs, however, and the company's counsel withdrew from the action leaving ChinaCast unrepresented.  The plaintiffs later secured a default judgment of $65.8 million for the class, but the very next day, ChinaCast filed for bankruptcy.  In an attempt to recover the default judgment, plaintiffs spent an additional two years pursuing a lawsuit against ChinaCast's multiple insurers.  *See Jayhawk Private Equity Fund II LP v. Liberty Insurance Underwriters*, 2:17-cv-05523-GW-RAO (C.D. Cal.).   Unfortunately, plaintiffs' claims were dismissed due to the expansive exclusion provisions in the insurance policies.  Therefore, despite approximately eight years of dedicated efforts by the plaintiffs' counsel, there was no financial recovery for the investors.  Similarly, in *Sawant v. Ramsey*, 2012 WL 3265020 (D. Conn. Aug. 9, 2012), Rosen Law spent thousands of hours securing a trial verdict only to find it impossible to collect on the judgment.  As these examples make clear, complex litigation is uncertain, and success in cases like this one is never guaranteed.

46.     Given these significant litigation risks, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

**D.     The DOJ's Investigation and Action Do Not Weigh Against Approval**

47.      Although there was an ongoing investigation and action by the DOJ, at the time the Settlement was reached in November 2024, the DOJ's complaint had not

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

yet survived Live Nation's motion to dismiss (which eventually transpired in March 2025). In fact, when the Settlement was reached there was substantial doubt as to whether the DOJ's case would even continue under the then-incoming administration. For example, during Live Nation's third quarter 2024 earnings call on November 11, 2024, an analyst asked "a lot of investors think that Trump is going to be a very good thing for you. I'm sure you've studied it a very closely. Just wanted to hear what your thoughts are on how he's going to approach antitrust." Defendant Berchtold replied in part "absolutely we are hopeful that we'll see a return to the more traditional antitrust approach, where the agencies have generally tried to find ways to solve problems that they see with targeted remedies that minimize government intervention in the marketplace." More directly to the point, industry publication Digital Music News published an article on November 14, 2024, titled "US Government's Lawsuit Against Live Nation and Ticketmaster May Go Kaput Under Trump."

48. Furthermore, unlike this Action, the DOJ's still-pending antitrust case does not stand to provide a direct financial benefit to investors in Live Nation stock. Nor did the DOJ case materially decrease the risks of Plaintiffs prevailing here, as this case was procedurally ahead of the DOJ case and likely would have reached summary judgment stage well before any resolution or findings of fact were made in the DOJ case. Indeed, if the DOJ case were dismissed or withdrawn, or if exculpatory evidence came to light in that case, Plaintiffs' case here would have been substantially weakened. Notably, Plaintiffs did not have access to the fruits of the years-long DOJ investigation, other than what the DOJ later chose to reveal in its publicly filed complaint, and had to build their case independently, from scratch.

E. **The Settlement is Reasonable in Light of Potential Recovery in the Action**

49. In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable considering the potential recovery of available damages. *If* Lead Plaintiffs had fully prevailed in their claims at both summary

judgment and after a jury trial, *if* the Court certified the same class period as the Settlement Class Period, and *if* the Court and jury accepted Lead Plaintiffs' damages theory, including proof of loss causation as to each of the five stock price drop dates alleged in this case—*i.e., Lead Plaintiffs' best-case scenario*—estimated total *maximum* damages are approximately $743 million.    Thus, the $20 million Settlement Amount represents approximately 2.7% of the total *maximum* damages potentially available in this Action.

50.    A recovery of 2.7% of estimated damages is *59% higher* than the median recovery for cases of a similar magnitude.  *See* Ex. 6 (excerpt from Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2025) ("NERA Report"), at p. 26 (Fig. 23) (median recovery for securities class actions that settled between 2015 and 2024 was 1.7% for cases with estimated damages between $600-$999 million).

51.    Moreover, the estimated damages assume that Lead Plaintiffs are given full credit for each of the respective drops and does not consider any disaggregation arguments that Defendants may have raised.  *See Destefano v. Zynga, Inc.*, 2016 WL 537946, at *10 (N.D. Cal. Feb. 11, 2016) ("[L]oss causation might have been particularly difficult for Lead Plaintiff to prove, as Defendants would have argued that Lead Plaintiff's expert could not apportion losses to Defendants' misstatements as opposed to other events and information available on the market …."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("to establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by changed economic circumstances, 'changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements.") (quoting *Dura*, 544 U.S. at 343).  Even if Lead Plaintiffs were able to establish that at least some portion of the stock price drop on each of the alleged corrective disclosure dates was attributable to the fraud, Defendants likely would have raised arguments concerning the release of other, non-fraud related

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

information on those dates, which could have decreased the amount of recoverable damages even further.

52.    Furthermore, if the Court or the jury did not find loss causation as to the alleged stock price declines on February 24, 2023, July 28, 2023, and November 21, 2023 (as discussed *supra*, Defendants were likely to raise substantial arguments as to loss causation for each of these dates), then Lead Counsel estimate that recoverable damages for the two remaining corrective disclosures (November 18, 2022 and May 23, 2024) would be approximately $320 million.  In this scenario, the $20 million Settlement Amount would represent approximately 6.2% of recoverable damages, which is more than double the median recovery in securities cases with similar damages.  Ex. 6 (NERA Report), at p.26 (Fig. 23) (between 2015 and 2024, the median recovery for settlements of securities class actions with estimated damages between $200-$399 million was 2.9% of investor losses).  When viewed in that context, the Settlement amount is even more reasonable.

53.    In sum, having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and having considered the very real risks presented by the significant hurdles of class certification, summary judgment, trial and any eventual appeals that lie ahead, it is the informed judgment of Lead Counsel, based upon all of the proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

54.    Lead Counsel's conclusion that the Settlement is fair, reasonable, and adequate is also supported by Lead Plaintiffs.  *See* Exs. 1-2, ¶8.

## IV.    LEAD PLAINTIFFS DULY EXECUTED THE COURT-APPROVED NOTICE PROGRAM

55.    The Court's Preliminary Approval Order directed that the Postcard Notice be disseminated to the Settlement Class.  ECF No. 92.  The Preliminary Approval Order also set deadlines for the receipt of objections to the Settlement, Plan

of Allocation and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final fairness hearing date ("Settlement Hearing"). *Id*. These dates were posted to the case specific settlement website (www.LiveNationSecuritiesSettlement.com ("Settlement Website")). *See* Declaration of Adam D. Walter Regarding: (A) Mailing and Emailing of Notice; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date (Ex. 3, "Walter Decl.") ¶13.

56.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data, the Court-approved Claims Administrator, to begin mailing and emailing notice of the Settlement and to publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice and emailing of the Notice and Claim Form, Lead Counsel instructed A.B. Data to post downloadable copies of the Notice and Claim Form on the Settlement Website. Upon request, A.B. Data mailed and/or emailed copies of the Notice and/or Claim Form to Settlement Class Members and their nominees and will continue to do so until the deadline to submit a Claim Form has passed. *Id*., ¶6.

57.    The Postcard Notice provides a limited description of the Settlement and directs potential Settlement Class Members to downloadable versions of the Notice and Claim Form posted online on the Settlement Website. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed one third of the Settlement Fund, reimbursement of Litigation Expenses in an amount not to exceed $185,000, including the reasonable

costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class. *See* Walter Decl., Ex. B (Notice) at ¶¶5, 75.

58.    On May 1, 2025, A.B. Data received from Defendants' Counsel a list containing the names and addresses of record holders ("Record Holder List") for the purchasers of Live Nation Entertainment, Inc. Securities during the Settlement Class Period. *Id.*, ¶3. However, as in most class actions of this nature, the vast majority of potential Settlement Class Members are expected to be beneficial purchasers whose securities are held in "street name"—*i.e.*, the securities are purchased by brokerage firms, banks, institutions, and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers. The names and addresses of these beneficial purchasers are known only to the nominees. Thus, A.B. Data maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees (the "Broker Mailing Database"). *Id.*, ¶4. At the time of the initial mailing, the Broker Mailing Database consisted of 4,899 mailing records. *Id.*

59.    On May 23, 2025, A.B. Data caused the Postcard Notice to be sent by First-Class Mail to the combined 7,899 mailing records contained in the Record Holder List and the Broker Mailing Database. *Id.*, ¶5. A.B. Data also sent an email to each of the nominees on the Broker Mailing Database, which included a copy of the Notice, eFiling Guidelines, and an eFiling Template. *Id.*, ¶7. The Notice requested that nominees who purchased Live Nation stock during the Settlement Class Period for the beneficial interest of other persons, within seven days from the date of the letter, either: (a) request from A.B. Data sufficient copies of the Postcard Notice to forward to all such beneficial purchasers/owners and within seven days of receipt of those Postcard Notices forward them to all such beneficial purchasers/owners; (b) request from A.B. Data a link to the Notice and Claim Form and, within seven days of receipt of the link from A.B. Data, email the link to all such beneficial owners for whom valid email addresses are available; or (c) send a list of

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

the names, mailing addresses and email addresses (to the extent available) of all such beneficial owners to A.B. Data at *Live Nation Securities Litigation*, c/o A.B. Data, P.O. Box 173080, Milwaukee, WI 53217, in which event A.B. Data would promptly mail the Postcard Notice, or email a link to the Notice and Claim Form, to such beneficial owners. *Id.*, ¶8.

60.     As of July 22, 2025, a total of 207,096 potential Settlement Class Members were notified either by mailed Postcard Notice or emailed the link to the Notice and Claim Form. *Id.*, ¶10.

61.     On June 6, 2025, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the *PR Newswire*. *See id.*, ¶11 & Exs. E-F.

62.     On May 23, 2025, the Settlement Website became operational.  On the Settlement Website, Settlement Class Members can submit a claim online, and download copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and SAC. *Id.*, ¶¶13-14.

63.     The deadline to submit a valid Claim Form with all required information is September 20, 2025.  *See* ECF No. 92; Walter Decl., Ex. B (Notice) at pp. 2, 5, 7; Stipulation ¶24.  In our experience, as well as A.B. Data's, the vast majority of claimants—including institutional investors—submit their claims on or shortly before the deadline.  Walter Decl., ¶19.

64.     Once A.B. Data has processed all of the claims it receives, Lead Counsel will move the Court to enter a Class Distribution Order.  In conjunction with that motion, Lead Counsel will provide the Court with information concerning all of the claims received by A.B. Data, and A.B. Data's recommendations regarding the acceptance and rejection of claims.  *See* Stipulation ¶26.

## V.     OBJECTIONS AND EXCLUSIONS

65.     The deadline for Settlement Class Members to exclude themselves from the Settlement or object to the Settlement, Plan of Allocation, and/or to the Fee and

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

Expense Application is August 7, 2025. To date, only one (1) request for exclusion has been received. Walter Decl. ¶17. That request simply states "I hereby opt out of the settlement." *Id.*, Ex. G. No other information, such as the date(s) and number of shares of Live Nation common stock purchased or sold was provided. A.B. Data contacted the individual and explained that, to be excluded from the Settlement Class, they were required to provide all of the information outlined in the Notice. A copy of the Notice was included in our response. To date, A.B. Data has not received a response. *Id.*, ¶17.

66. A.B. Data will file a supplemental affidavit after the August 7, 2025, deadline updating the Court with respect to requests for exclusion. To date, no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application have been entered on this Court's docket or have otherwise been received by Lead Counsel or A.B. Data. *See id.*, ¶18. Lead Counsel will file reply papers by August 21, 2025, which will address any objections that may be received.

## VI.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

67. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $20 million Settlement Amount, plus interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Lead Plaintiffs for their costs and expenses incurred in representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information online or postmarked no later than September 20, 2025. *See* Walter Decl., Ex. B (Notice) at pp. 2, 5, 7; Stipulation at ¶24. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

68. The Plan of Allocation is detailed in the long-form Notice. *See* Walter Decl., Ex. B (Notice, pp. 8-11). The full Notice is posted online at the Settlement

Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member.  The objective of the Plan is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violation of the Exchange Act, as opposed to losses caused by market, industry, Company-specific factors or factors unrelated to the alleged violation of law.  Under the Plan, each Authorized Claimant will receive their *pro rata* share of the Net Settlement Fund based on their total Recognized Loss Amount as compared to the total Recognized Loss Amounts of all Authorized Claimants.  *See id.*, ¶64.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *Id.*, ¶54.

69.    The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Lead Plaintiffs contend could have been recovered under the theories of liability asserted in the Action.  More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiffs' allegation that the price of Live Nation common stock was artificially inflated during the period between February 23, 2022 and May 22, 2024, due to Defendants' alleged materially false and misleading statements.  The Plan is based on the premise that the decreases in the price of Live Nation common stock following the alleged partial disclosures that occurred on November 18, 2022, February 23, 2023, July 28, 2023, November 20, 2023, and May 23, 2024, may be used to measure the alleged artificial inflation in the price of Live Nation common stock prior to these disclosures.

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

70.    Under the proposed Plan of Allocation, each Authorized Claimant will receive their *pro rata* share of the Net Settlement Fund.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  *Id.*, ¶64.

71.    An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and how many shares of Live Nation common stock the Claimant purchased, acquired, or sold during the Settlement Class Period, and when that Claimant bought, acquired, or sold the shares.  If a Claimant has an overall market gain with respect to their overall transactions in Live Nation common stock during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but did not hold any of those shares through at least one of the alleged partial disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

72.    If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant.  *Id.*, ¶64. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.

73.    The Net Settlement Fund in its entirety will be distributed to Authorized Claimants and if any funds remain after the initial distribution (for example, due to uncashed or returned checks), further distributions to Authorized Claimants who would receive at least $10.00 from such a re-distribution will be conducted as long as they are cost effective.  *Id.*, ¶72.  If Lead Counsel, in consultation with the Claims Administrator, deems a further distribution not cost effective, Lead Counsel will

propose a non-sectarian, not-for-profit organization as the *cy pres* recipient of any residual funds that may remain, subject to approval by the Court.

74. In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Live Nation common stock that were attributable to the conduct alleged in the SAC. It does not favor Lead Plaintiffs over any other Settlement Class Member. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

75. To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VII. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

76. In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of 30% of the Settlement Fund (*i.e.*, $6,000,000 plus interest accrued thereon). Lead Counsel also request reimbursement in the amount of $130,113.30 for out-of-pocket expenses incurred by Lead Counsel in connection with the prosecution and resolution of the Action, and reimbursement to Lead Plaintiffs in the amount of $12,500 in total, for costs, including lost wages, incurred directly related to their representation of the Settlement Class pursuant to as authorized by the PSLRA (15 U.S.C. § 78u-4(a)(4)).

77. The legal authorities supporting the requested fees and expenses are set forth in the concurrently filed Fee Application. The primary factual bases for the requested fees and expenses are set forth below.

### A. The Fee Application

#### 1. The Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action

78. Attached hereto as Exhibits 4-5 are declarations from Rosen Law and GPM in support of an award of attorneys' fees and reimbursement of litigation

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

expenses.  Each declaration sets forth a table reflecting the position, hours, rate, and total lodestar of each individual who worked on this case, a summary of expenses by category, and attaches a firm résumé.  In accordance with this Court's Civil Standing Order §VII(9), included with each firm's declaration is a table summarizing the hours worked by, and billing rate of, each attorney who worked on this case, organized by each task performed.

79.     The following is a summary chart of the hours expended and lodestar amounts using current rates for the two firms:

| LAW FIRM | HOURS | LODESTAR |
|---|---|---|
| GLANCY PRONGAY & MURRAY LLP | 2,005.95 | $1,528,065.00 |
| THE ROSEN LAW FIRM, P.A. | 1,312.61 | $952,051.15 |
| **TOTAL** | **3,318.56** | **$2,480,116.15** |

80.     The lodestar charts presented in Lead Counsel's declarations were prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel.  Time expended on the Fee Application has not been included in these calculations.  Lead Counsel will not request or receive any additional compensation for the time they will spend preparing their reply papers, preparing for and attending the final approval hearing, overseeing the claims administration process, responding to Settlement Class Members' inquiries regarding the Settlement, and preparing the Motion for Class Distribution Order.

81.     As set forth in detail in Exhibits 4-5, Lead Counsel have collectively expended a total of 3,318.56 hours in the investigation and prosecution of the Action. The resulting total lodestar is $2,480,116.15.  The requested fee of 30% of the Settlement Fund equals $6,000,000 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a multiplier of 2.42 to Lead Counsel's lodestar.  Such a multiplier is reasonable and well within the range of fee multipliers

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

82.    Lead Counsel's attorneys' and professional support staff's rates have recently been accepted as reasonable by other courts when performing a lodestar cross-check, including Courts in the Ninth Circuit. *See In re Mullen Auto., Inc. Sec. Litig.*, No. 2:22-cv-03026, ECF No. 130 (C.D. Cal. June 20, 2025) (GPM rates); *Lea v. Tal Education Group*, 2021 WL 5578665, at *12 (S.D.N.Y. Nov. 30, 2021) (finding GPM's rates "comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude." (citation omitted)); *In re FAT Brands, Inc. Sec. Litig.,* Case No. 2:22-cv-1820-MCS-RAO (C.D. Cal.), ECF Nos. 67-2 (declaration setting forth 2023 hourly rates for Rosen Law attorneys) and 71 (order awarding attorneys' fees); *Oh v. Hanmi Fin. Corp.*, Case No. 2:20-cv-2844-FLA-JCx (C.D. Cal.), ECF Nos. 94-4 (declaration setting forth 2024 hourly rates for Rosen Law attorneys) and 98 (order awarding attorneys' fees)..  Additionally, the rates billed by Lead Counsel (ranging from $550-$950 per hour for non-partner attorneys and $1,000-$1,400 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude.  *See* Ex. 8 (table of peer plaintiff and defense law firm billing rates).  In fact, Lead Counsel's rates are substantially less than rates charged by the firm representing Defendants in this Action, Latham & Watkins LLP, in two recent bankruptcy cases where partners billed at rates as high as $2,650 per hour, associates at rates as high as $1,635 per hour, and support staff at rates as high as $980 per hour. *See id.* at pp. 10-11.

83.    Throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action, as detailed above.  We maintained control of, and monitored the work performed by, lawyers and other personnel on this case.  We personally devoted substantial time to this case and were personally involved in drafting or reviewing and editing all pleadings, court filings, and other correspondence prepared on behalf of Lead Plaintiffs, communicating with Lead

Plaintiffs on a regular basis, engaging with counsel for Defendants on a variety of matters, and were intimately involved in Settlement negotiations. Other experienced attorneys at our firms also drafted, reviewed and/or edited pleadings, court filings, and other correspondence prepared on behalf of Lead Plaintiffs and were involved in Settlement negotiations and other matters. Other attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

84. As demonstrated by the firms' respective résumés, attached to Exhibits 4-5, Lead Counsel are highly experienced and skilled law firms that focus their practices on securities class action litigation. Indeed, Rosen Law and GPM have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved in courts throughout the country. *See Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 346 (D.N.J. 2018) (finding, with respect to Rosen Law and GPM, that the firms "have extensive experience in securities litigation and have demonstrated competency in litigating the present matter."). We believe Lead Counsel's experience added valuable leverage in the settlement negotiations.

### 2. Standing and Caliber of Opposing Counsel

85. The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated considering the quality of the opposition. Here, Defendants were represented by Latham & Watkins LLP, a firm with a national reputation for the tenacious defense of class actions and other complex civil matters. In the face of this experienced and formidable opposition, Lead Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the Settlement Class.

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

### 3. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

86.    This prosecution was undertaken by Lead Counsel on a fully contingent basis.  From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this one.

87.    With an average lag time of many years for complex cases like this one to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation during more than two years of litigation and incurred $130,113.30 in out-of-pocket litigation-related expenses in prosecuting the Action.

88.    Lead Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured.  Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement.  *See*, *supra*, ¶¶44-45.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.  And, even when that effort is put forth, sometimes you still lose.  *Id*.

89.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  *See*

30

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("private securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets.") (internal quotation marks omitted).  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

### 4.    The Reaction of the Settlement Class to the Fee Application

90.    As noted above, as of July 22, 2025, direct notice has been provided to 207,586 potential Settlement Class Members or their nominees informing them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed one third of the Settlement Fund.  Walter Decl., ¶10; Exs. A (Postcard Notice) and B (Notice).  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  *Id.* ¶11; Exs. E-F (confirmations of Summary Notice publication).  To date, no objections to the maximum potential attorneys' fees request have been received or entered on this Court's docket.  Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers.

91.    In sum, Lead Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success.  Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 30%, which equates to a multiplier of 2.42, is fair and reasonable, and is supported by the fee awards courts in this Circuit and others have granted in other comparable cases.

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

### 5.    Lead Plaintiffs Support the Fee Application

92.    As set forth in the declarations submitted by Lead Plaintiffs, Mr. Donley and Mr. Gress each concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Exs. 1-2, ¶¶9-10. Mr. Donley and Mr. Gress have each been intimately involved in this case since their appointment as Lead Plaintiffs, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

### B.    Reimbursement of the Requested Litigation Expenses Is Fair and Reasonable

93.    Lead Counsel seek a total of $142,613.30 in Litigation Expenses to be paid from the Settlement Fund. We submit that the request for reimbursement of Litigation Expenses is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

94.    Exhibits 4-B and 5-B break down by category all expenses incurred by Rosen Law (Ex. 4-B) and GPM (Ex. 5-B), respectively.

95.    The Postcard Notice and long-form Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $185,000. The total amount requested by Lead Counsel, $142,613.30, including $12,500 in proposed PSLRA awards to Lead Plaintiffs, falls well below the $185,000 maximum amount that Settlement Class Members were advised could be sought. To date, no objections have been raised as to the maximum amount of expenses set forth in the Postcard Notice and long-form Notice. If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

96.    From the beginning of the case, Lead Counsel were aware that they might never recover any of their expenses. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

compensate them for the lost use of funds advanced to prosecute this Action. Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

97.     The largest component of expenses, $52,889.64, or approximately 40.6% of Lead Counsel's total expenses, was expended on Lead Counsel's share of mediation fees paid for the services of Judge Phillips.

98.     Another large component of expenses, $13,208, or approximately 10.2% of Lead Counsel's total expenses, was expended on the retention of a private investigation firm to assist Lead Counsel in their factual investigation into Lead Plaintiffs' claims.

99.     Another large component of expenses, $25,131.00, or approximately 19.3% of Lead Counsel's total expenses, was expended on the retention of two experts in the field of financial analysis, loss causation and damages.  The experts were consulted at different points throughout the litigation, including on matters related to the preparation of the amended complaints, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

100.    The other Litigation Expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These Litigation Expenses include, among others, costs of on-line legal and factual research, copying costs, and postage and delivery expenses.

101.    The $130,113.30 in total Litigation Expenses for which Lead Counsel seeks reimbursement represents approximately 0.7% of the $20 million Settlement Amount.

102.    Finally, Mr. Donley and Mr. Gress worked closely with Lead Counsel throughout the pendency of this Action in connection with their service as Lead Plaintiffs.  For example, they each: (a) collected and produced documents related to

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

their transactions in Live Nation common stock to Lead Counsel; (b) moved to be appointed as lead plaintiff in the Action; (c) reviewed all significant pleadings and briefs filed in the Action; (d) regularly communicated with their attorneys via email and telephone about case developments and litigation strategy; (e) reviewed Court orders and discussed them with their attorneys; (f) communicated with Lead Counsel regarding mediation related topics and made themselves available during the mediation and settlement negotiations; (g) evaluated and approved the Settlement Amount; and (h) communicated with counsel regarding the process for finalizing the Settlement. *See* Exs. 1-2, ¶5. Accordingly, they seek aggregate awards of $12,500 ($7,500 for Donley and $5,000 for Gress) as reimbursement for their time spent on this action that they otherwise would have spent on their job, investing, or other activities. *Id.* ¶¶12-13.

103. The $12,500 in total requested awards to Lead Plaintiffs represents approximately 0.06% of the $20 million Settlement Amount.

104. In our opinion, the Litigation Expenses incurred by Lead Counsel and time spent by Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.

## VIII. CONCLUSION

105. For all the reasons set forth above, we submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate. We further submit that the requested attorneys' fee in the amount of 30% of the Settlement Amount should be approved as fair and reasonable, and the request for reimbursement of $142,613.30 in Litigation Expenses, including the requested awards of $12,500 total for Lead Plaintiffs' costs, should also be approved.

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this, the 24th day of July 2025, at Jenkintown, Pennsylvania.

*s/ Joshua Baker*
Joshua Baker

Executed on this, the 24th day of July 2025, at Los Angeles, California.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II

JOINT DECLARATION OF JOSHUA BAKER AND EX KANO S. SAMS II